## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
In re:                                      :   Chapter 11
                                            :
CORINTHIAN COLLEGES, INC., et al.,          :   Case No. 15-_____ (_____)
                                            :
                Debtors.¹                    :   Joint Administration Requested
                                            :
-------------------------------------------------------- x
```

## DECLARATION OF WILLIAM J. NOLAN IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Under 28 U.S.C. § 1764, William J. Nolan declares as follows under the penalty of

perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of Corinthian Colleges, Inc., a

Delaware corporation ("**Corinthian**") and its debtor-subsidiaries (together with Corinthian, as

debtors and debtors-in-possession, the "**Debtors**" or the "**Company**").  I submit this declaration

(the "**First Day Declaration**") in support of the chapter 11 petitions of the Debtors and requests

for relief contained in certain "first day" applications and motions filed in the above-captioned

chapter 11 cases (the "**First Day Motions**").

2.      I am a Senior Managing Director in the Corporate Finance/Restructuring practice

of FTI Consulting, Inc. ("**FTI**").  I have over twenty years of diverse financial consulting and

---

¹       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Corinthian Colleges, Inc. (7312), Corinthian Schools, Inc. (0525), Rhodes Colleges, Inc. (7311), Florida Metropolitan University, Inc. (7605), Corinthian Property Group, Inc. (2106), Titan Schools, Inc. (3201). Career Choices, Inc. (1425), Sequoia Education, Inc. (5739), ETON Education, Inc. (3608), Ashmead Education, Inc. (9120), MJB Acquisition Corporation (1912), ECAT Acquisition, Inc. (7789), Pegasus Education, Inc. (2336), Grand Rapids Educational Center, Inc. (2031), Rhodes Business Group, Inc. (6709); Everest College Phoenix, Inc. (6173), CDI Education USA, Inc. (0505), SP PE VII-B Heald Holdings Corp. (0115), SD III-B Heald Holdings Corp. (9707), Heald Capital LLC (6164), Heald Real Estate, LLC (4281), Heald Education, LLC (1465), Heald College, LLC (9639), QuickStart Intelligence Corporation (5665) and Socle Education, Inc. (3477).  The Debtors' corporate headquarters is at 6 Hutton Centre Drive, Suite 400, Santa Ana, California 92707.

management experience.  The Company engaged FTI on May 30, 2014 and on July 1, 2014, I was appointed CRO by the Company's Board of Directors.

3.      I have considerable experience working with senior management teams in the areas of financial and operational restructuring, loan workouts and business planning in out-of-court restructurings and in formal bankruptcy proceedings, in a number of different industries. My experience includes, assisting management teams in developing business plans, devising financial management strategies and related projections, as well as implementing controls over cash expenditures, overhead and operating costs.  I have assisted numerous companies in preparing for and/or managing through the chapter 11 process including, but not limited to, Residential Capital, LLC; MF Global Holdings, Ltd.; Delta Mills, Inc.; Orleans Homebuilders, Inc.; Oakwood Home Corporation; and Toshoku America, Inc.  In these capacities, I have negotiated cash collateral agreements and debtor in possession financing agreements and overseen the preparation of 13-week cash flow budgets, the preparation of statements of financial affairs, statements of assets and liabilities and monthly operating reports, as well as the claims reconciliation process.  I have also participated in developing plans of reorganization and plans of liquidation and in preparing the related disclosure statements.

4.      Prior to its acquisition by FTI, I was a partner in the U.S. division of PricewaterhouseCoopers' Business Recovery Services group.  I hold an M.B.A. in finance from the Wharton School of Business at the University of Pennsylvania and a Bachelor of Science in economics from the University of Delaware.  I am a Certified Insolvency and Restructuring Advisor.

5.      As part of my duties as the CRO of Corinthian, my review of public and non-public documents, and my discussions with other representatives of the Debtors, I am generally

familiar with the Debtors' financial condition, financial and cash management policies and procedures, day-to-day activities, and books and records.

6.       As CRO of Corinthian, I am authorized to submit this First Day Declaration on behalf of the Debtors.  Except as otherwise noted, as to the matters set forth herein, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' representatives or retained advisers that report to me in the ordinary course of my responsibilities.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

7.       Part I of this First Day Declaration provides an overview of the Debtors' business and capital structure.  Part II of this First Day Declaration provides a summary of the developments that led to the commencement of the Chapter 11 Cases (as defined below).  Part III sets forth the relevant details of the various First Day Motions.

## PART I

### I.      The Debtors' Business and Capital Structure

#### A.      Overview of the Corinthian Business

8.       The Company was founded in February 1995, and through acquisitions became one of the largest for-profit post-secondary education companies in the United States and Canada.  The Company offered career-oriented diploma and degree programs in diverse fields such as health care, business, criminal justice, transportation technology and maintenance, construction trades, and information technology.  As of March 31, 2014, the Company operated over 100 campuses and provided educational opportunities to more than 74,000 students and had more than 10,000 employees.  It also offered degrees online.

3

9.     Among its acquisitions, in January 2010, the Company purchased Heald Capital, LLC, a Delaware limited liability company ("**Heald**").  Heald, through its subsidiaries, operated Heald College, a 150 year old regionally accredited institution with 12 campuses offering associate degree curricula in, among other fields, healthcare, business, legal, and information technology.

**B.      Debt Structure**

10.     In May 2012, Corinthian and Everest Colleges Canada, Inc. (the "**Canadian Borrower**," and together with Corinthian, the "**Borrowers**") entered into that certain fourth amended and restated credit agreement dated as of May 17, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**," and together with the other Loan Documents as defined therein, the "**Pre-Petition Loan Documents**"), with certain lenders party thereto (the "**Lenders**") and Bank of America, N.A., as Domestic Administrative Agent (the "**Administrative Agent**," and together with the Administrative Agent, the "**Prepetition Secured Parties**").  Pursuant to that certain Third Amended and Restated Guaranty (Domestic Borrower Obligations), dated May 17, 2012 (as the same has been amended, restated, supplemented or otherwise modified from time to time, the "**Domestic Guaranty**"), all of the Debtors other than Corinthian (collectively, the "**Guarantors**") guaranteed Corinthian's obligations under the Credit Agreement.  Additionally, pursuant to that certain Third Amended and Restated Guaranty (Canadian Borrower Obligations), dated May 17, 2012 as the same has been amended, restated, supplemented or otherwise modified from time to time, the "**Canadian Guaranty**," and together with the Domestic Guaranty, the "**Guaranties**"), Corinthian and the Guarantors guaranteed the Canadian Borrower's obligations under the Credit Agreement.

4

11.     The Credit Agreement provides an aggregate credit facility of up to $145 million, of which $135 million was a domestic facility and $10 million was a Canadian facility.  In the period leading up to the Petition Date, the Credit Agreement was amended on numerous occasions, and the Lenders agreed to certain forbearances, including:

- On May 12, 2014, the Borrowers, the Guarantors, the Lenders, and the Administrative Agent entered into Amendment No. 1 to Credit Agreement, pursuant to which the Lenders waived the event of default caused by the Borrowers' failure to meet the fixed charge coverage ratio and the Borrowers agreed to, among other things, certain adjustments in interest rates, reduce the maximum Credit Extensions (as defined therein), an amendment fee equal to 1.50% of each Prepetition Lender's Commitment (as defined in the Credit Agreement) as of the effective date thereof, and certain repayment obligations.

- On June 25, 2014, the Borrowers, the Guarantors, the Lenders, and the Administrative Agent entered into Waiver and Amendment No. 2 to Credit Agreement, pursuant to which the Lenders agreed to permit the Borrowers to draw down the remaining $9 million of availability under the Credit Agreement, in exchange for, among other things, various amendments and modifications to interest and applicable rates, modification of the maturity date to December 31, 2014 and an amendment fee equal to 2.07% of each Prepetition Lender's Commitment (as defined in the Credit Agreement) as of the effective date thereof;

- On July 3, 2014, the Borrowers, the Guarantors, the Lenders, and the Administrative Agent entered into Consent and Amendment No. 3 to Credit Agreement, pursuant to which the Lenders consented to execution of that certain First Amendment to Memorandum of Understanding, dated as of July 3, 2014 (the "**Memorandum of Understanding**"), between Corinthian and the Department of Education (the "**DOE**"), which amended that certain Memorandum of Understanding, dated as of June 22, 2014, between Corinthian and the DOE;

- On August 19, 2014, the Borrowers, the Guarantors, the Lenders, and the Administrative Agent entered into that Consent and Amendment No. 4 to Credit Agreement, pursuant to which the Lenders permitted Corinthian to sell certain assets, including student loan notes, equipment and real property, subject to certain specified terms and conditions, in exchange for, among other things, increased reporting requirements and limitations on capital expenditures and an amendment fee equal to 2.5% of each Prepetition Lender's Commitment (as defined in the Credit Agreement) as of the effective date thereof;

- On September 18, 2014, the Lenders and the Administrative Agent under the Credit Agreement agreed to forbear from exercising any rights or remedies that might be available as a result of the Borrower's execution and delivery of a second amendment to that certain Operating Agreement, effective as of July 8, 2014, entered into

between the Debtors and the DOE (the "**Operating Agreement**"), until the earlier of (i) the occurrence of any event of default under the Credit Agreement and (ii) September 25, 2015;

- On September 25, 2014, the Borrowers, the Guarantors, the Lenders and the Administrative Agent entered into the Consent Agreement, wherein the Administrative Agent and the Lenders consented to Corinthian's entry into that certain Second Amendment to Operating Agreement, dated as of September 12, 2014;

- On October 10, 2014, the Borrowers, the Guarantors, the Lenders and the Administrative Agent entered into the Forbearance and Consent Agreement, wherein the Lenders and the Administrative Agent agreed to consent to the sale of certain real property and to temporarily forbear from the exercise of certain remedies available to them under the Credit Agreement with respect to certain defaults for a period ending the earlier of (i) December 31, 2014, (ii) the commencement of or consent to an insolvency proceeding by Corinthian, the Canadian Borrower or any Guarantor or the inability of Corinthian, the Canadian Borrower or any Guarantor to generally pay its debts as they come due, or (iii) the termination of the Forbearance Period (as defined in the forbearance agreement) due to (x) the occurrence of an event of default under the Credit Agreement other than a Specified Default (as defined in the forbearance agreement) or (y) the failure of any Loan Party (as defined in the Credit Agreement) to comply with any undertaking under the forbearance agreement or the breach by any Loan Party in any material respect of any representation or warranty set forth therein, in exchange for (a) the termination of the Lenders' Aggregate Canadian Commitments and Aggregate Domestic Commitments (as defined in the Credit Agreement) as of the effective date of the forbearance agreement, (b) repayment of Total Outstandings under the Credit Agreement (as defined therein) in the amount equal to proceeds received by the Borrower in connection with the sale of its QuickStart business, (c) repayment of the Total Outstandings under the Credit Agreement (as defined therein) in the amounts of $5.0 million on October 23, 2014 and $2.0 million on November 21, 2014, (d) application of any excess funds distributed from the reserve account established pursuant to the Operating Agreement, to repay the Total Outstandings under the Credit Agreement (as defined therein), (e) having any letter of credit liability related to assets sold assumed by the purchaser and submission to the Lenders of a plan to reduce the remaining letter of credit liability by October 31, 2014, and (f) the deposit of all proceeds under certain real property sales into a separate bank account that would be subject to a control agreement in favor of the Administrative Agent; and

- On December 9, 2014, the Borrowers, the Guarantors, the Lenders, and the Administrative Agent entered into Consent and Amendment No. 5 to Credit Agreement, pursuant to which the Lenders and the Administrative Agent consented to Corinthian's entry into a further amendment to the Operating Agreement, and further consented to the Everest Plus Sale (as defined herein), provided that, among other things, (i) all letters of credit in association with the Everest Plus Business (as defined therein) be terminated, replaced, or cash collateralized, (ii) all net cash proceeds from the Everest Plus Sale shall be applied as follows: (a) 35% distributed to an escrow

6

reserve account established by the Operating Agreement, and (b) all remaining amounts will be applied as repayment of the Total Outstandings under the Credit Agreement (as defined therein), (iii) the entry by the Loan Parties (as defined in the Credit Agreement) into binding agreements for the sale of certain real property providing for the direct payment of all net proceeds from such sale to be paid to the Administrative Agent for the benefit of the Lenders, and (iv) the Everest Plus Sale being consummated on or prior to January 31, 2015;

- On March 31, 2015, the Borrowers, the Guarantors, the Lenders and the Administrative Agented entered into the Forbearance Agreement, wherein the Lenders and the Administrative Agent agreed to temporarily forbear from exercising certain remedies available to them under the Credit Agreement with respect to certain defaults for a period ending the earlier of (i) April 30, 2015, (ii) the commencement of or consent to an insolvency proceeding by Corinthian or any Guarantor or the inability of Corinthian or any Guarantor to generally pay its debts as they come due, or (iii) the termination by the Administrative Agent due to (x) occurrence of an event of default under the Credit Agreement other than a Specified Default (as defined in the forbearance agreement) or (y) the failure of Corinthian or any Guarantor to timely comply with the terms of the forbearance agreement or the breach by Corinthian or any Guarantor in any material respect of any representation or warranty set forth therein, in exchange for (a) a forbearance fee of $10,000 on April 10, 2015 and a forbearance fee of $250,000 on April 24, 2015 and (b) Corinthian's agreement to repay all outstanding L/C Borrowings (as defined in the Credit Agreement) of the Canadian Borrower, together with all accrued and unpaid interest thereon, in full in cash (i) on April 17, 2015, from the Specified Account to the extent of funds available that account on such date, or (ii), if such amounts were not repaid in full by April 17, 2015, no later than April 24, 2015.

12.    As of the Petition Date, the outstanding obligations of Corinthian, as borrower and as guarantor for the obligations of the Canadian Borrower, and each of the other Debtors, as guarantors for the obligations of Corinthian and the Canadian Borrower under the Credit Agreement, were approximately $94.4 million in aggregate principal amount, in respect of prepetition domestic loans, approximately $8.9 million in aggregate principal amount, in respect of domestic letters of credit issued, and approximately CAD $2.3 million in aggregate principal amount, in respect of Canadian letters of credit issued.  Further, the foregoing amounts were in addition to unpaid interest with respect thereto and any additional fees, costs, expenses, and other obligations incurred in connection therewith (including any payment-in-kind obligations and any attorneys', financial advisors' and other professionals' fees and expenses chargeable or

reimbursable under the Prepetition Loan Documents.   Pursuant to the Prepetition Loan Documents, and as security for the payment and performance of the Debtors' obligations thereunder, the Debtors granted the Administrative Agent, for the benefit of itself and the other Prepetition Secured Parties, a first priority security interest (the "**Prepetition Liens**") in substantially all of the Debtors' assets and proceeds thereof.

13.    Additionally, the Debtors have unsecured debt in the approximate aggregate amount of $100 million, including claims of trade creditors, landlords and lessors, employees and students, and regulatory refunds, fines, and penalties.   A significant portion of these claims remain disputed, contingent, and unliquidated.

### C.    The Regulatory Environment

14.    The DOE and various state regulatory agencies and national accrediting bodies regulate for-profit educators.   As proprietary post-secondary institutions, the Debtors rely on funding from the DOE, pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* ("**Title IV**").   Title IV funds accounted for nearly 90% of the Debtors' revenue prior to the Petition Date.

15.    The federal government provides financial support for students attending post-secondary educational institutions in the United States through the federal student aid programs administered by the DOE under the Higher Education Act ("**HEA**"), 20 U.S.C. §§ 1001 *et seq.* ("**FSA Programs**").   The DOE promulgates regulations under the HEA and enforces the regulatory and statutory provisions governing the administration of FSA funds to students through post-secondary institutions.   Post-secondary institutions must apply for and receive approval from the DOE in order to be eligible to participate in the FSA Programs.   Once an institution has been certified by the DOE to participate in the FSA Programs, it is assigned an

OPEID number and may disburse FSA funds to eligible students attending an approved program. Many students rely principally on these FSA funds to finance their education.

16.    It is my understanding that, in the event of a bankruptcy filing, eligibility to participate in FSA Programs is immediately and irrevocably terminated by operation of law, notwithstanding the automatic stay pursuant to section 362 of the Bankruptcy Code.  It is also my understanding that an institution that becomes ineligible on account of a bankruptcy filing must immediately stop awarding FSA Programs funds to students and eligibility cannot be reinstated.

17.    The DOE conducts periodic reviews—generally, every six years—to determine whether to renew the eligibility and certification of every institution participating in the FSA Programs.  Post-secondary schools are also subject to audits and program compliance reviews by various external agencies, including the DOE, its Office of Inspector General and state licensing and accrediting agencies.   The HEA and its implementing regulations also require that the administration of FSA Program funds be audited annually by an independent accounting firm. Additionally, to participate in the FSA Programs, an institution must be (a) legally authorized by a state to provide post-secondary education programs in that state and (b) accredited by an agency recognized by the DOE as a reliable authority on institutional quality and integrity. Accordingly, institutions participating in FSA Programs, such as the Debtors, are subject to extensive regulation and review by various agencies, which can vary extensively from state to state.

9

## II.    The Chapter 11 Cases

### A.    Commencement of the Chapter 11 Cases

18.    Effective Monday, April 27, 2015, the Company discontinued instruction at all of its schools and began the process of winding down its operations.  To complete the orderly wind down of its operations, on May 4, 2015 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), thus commencing these chapter 11 cases (the "**Chapter 11 Cases**").

### B.    Events Leading to the Chapter 11 Cases

19.    As mentioned above, the Debtors operated in a highly-regulated industry, subject to DOE and other regulatory and accreditation oversight.  In the past several years, the Debtors, as well as the entire for-profit education sector, have faced increased scrutiny and review by various regulatory bodies including the DOE.

20.    In January 2014, the Debtors received a letter from the DOE (the "**January 2014 Letter**") that requested extensive information from the Debtors regarding various educational statistics reported by the Debtors.  The Debtors devoted significant resources to responding to such requests and ultimately delivered to the DOE, in electronic or paper format, the equivalent of more than 1.2 million pages of responsive data from January to August 2014.

21.    On June 12, 2014, the Debtors received a letter from the DOE (the "**June 12 Letter**"), in which the DOE made additional information requests, asked questions about the documents and data that the Debtors had provided to that date, and stated that certain information requested in the January 2014 Letter remained outstanding.  In addition, and without notice, by the June 12 Letter, the DOE imposed the following: (a) a 21-day delay in the ability to draw down further Title IV funds, (b) monthly updates on student information and disclosures, (c)

10

disclosures relating to adverse regulatory, accreditor or business actions, and (d) immediate notice of the Debtors' intent to sell or close any location.

22.     The imposition of a 21-day delay in access to Title IV funds by the DOE created a significant liquidity crisis for the Debtors.  As noted, nearly 90% of revenues came from Title IV funds and the three-week delay in revenue created an immediate and significant reduction in projected cash receipts.  This impact was exacerbated by this event occurring in the last month of the fiscal year—historically a low point for Corinthian liquidity.  The Debtors immediately began discussions with the DOE to regain access to Title IV funds to avoid an immediate closure of more than 100 schools.  After ten days of negotiations, on June 22, 2014, Corinthian and the DOE entered into a memorandum of understanding ("**MOU**") that provided for the immediate release of certain Title IV funds and established the framework for a transition plan to be memorialized in an operating agreement.

23.     On July 8, 2014, the Debtors and the DOE entered into the Operating Agreement. Under the Operating Agreement, the Debtors agreed to "teach-out" 12 schools (meaning that the schools continued to teach existing students to allow them to complete their education before the school closes, but no new students were admitted), and to pursue the sale of its remaining schools.  Under the Operating Agreement, among other things, the DOE permitted the Debtors to continue drawing Title IV funds (subject to weekly audit verification by an agreed upon third party FSA audit firm) to operate the schools, and the Debtors agreed to produce certain additional documents within an agreed upon schedule, restrict Title IV funds from being used for certain prohibited expenditures, make refunds available to students in certain circumstances, and work with the DOE to establish a reserve for student refunds.  The Operating Agreement also provided for oversight of the Debtors' compliance with the Operating Agreement and Title IV

11

funding requirements by a monitor selected by the DOE.  On July 18, 2014, the DOE selected

Patrick Fitzgerald of Skadden, Arps, Slate, Meagher & Flom LLP as the monitor under the

Operating Agreement.   On September 12, 2014, pursuant to the Operating Agreement, the

Debtors established a separate, segregated escrow account with Citibank NA to create a reserve

that would be available for student refunds, which had a balance of approximately $4.3 million

as of the Petition Date.   This student refund reserve escrow account is not subject to the

Administrative Agent's security interest under the Prepetition Loan Documents.

24.     The Debtors conducted an extensive marketing and sales process for all of its

schools.   In May 2014, the Debtors engaged Barclays PLC ("**Barclays**") to explore strategic

options for the Debtors, including a potential sale of some or all of its schools and operations.

Following entry into the Operating Agreement, the Debtors directed Barclays to conduct a sale

process, during which a substantial number of financial and strategic potential buyers were

contacted, and various interested parties conducted extensive diligence.  The Debtors negotiated

with a number of parties concerning the purchase of all of the schools or certain groups of

schools operated by the Debtors.

25.     On November 19, 2014, the Debtors entered into an asset purchase agreement

with Zenith Education Group, Inc. ("**Zenith**"), a subsidiary of Education Credit Management

Corp. Group, for the sale of 56 Everest and WyoTech schools (the "**Asset Purchase**

**Agreement**").  Zenith also agreed to complete the teach-out process at 12 additional schools and

entered into subleases with the Debtors for those locations.   The subleases expire upon the

completion of Zenith's teach-out obligations with respect to such locations.   Just before signing

the definitive agreement, the Everest and WyoTech schools in California were excluded from the

sale because the California Attorney General sought to impose significant economic and

12

operational demands on Zenith as a buyer.  Zenith found those demand unacceptable and decided to exclude all of those California schools from the Asset Purchase Agreement.

26.    The sale to Zenith closed in early February of 2015.  As part of the sale, approximately 40,000 students were able to continue their studies and thousands of employees retained their jobs through Zenith.  In addition, Zenith acquired the right to related Title IV funding and other school-related and accounting-related back office operations and information of the Debtors.  To retain access to the back office services for the Debtors' continued operations following the transaction, the Debtors and Zenith entered into a transition services agreement (the "**Transition Services Agreement**") for the remaining schools owned by the Debtors. Additionally, as part of the sale, pursuant to the Asset Purchase Agreement, the parties established an escrow account with Citibank NA, which was funded with $8.5 million, consisting of an escrow of $500,000 for certain working capital and deferred tuition revenue adjustments and an escrow of $8 million for certain indemnification obligations of the Debtors.  On April 16, 2015, the parties jointly instructed Citibank NA to distribute $988,521 from the escrow account to Zenith in connection with satisfaction of certain obligations under the Asset Purchase Agreement and the Transition Services Agreement.  As of the Petition Date, the aggregate balance in both escrow accounts totaled approximately $7.5 million.

### C.    <u>Inability to Sell or Teach-Out Remaining Schools</u>

27.    Following the sale of non-California Everest and WyoTech campuses to Zenith, the Debtors continued to operate the Heald schools, all Everest and WyoTech schools in California, and 14 schools in Canada (through a non-Debtor Canadian subsidiary).  In February 2015, the Debtors' 14 career schools in Canada were shut down by the Province of Ontario as a result of the worsening financial condition of the Canadian subsidiaries and the Company, and

the Canadian subsidiaries commenced insolvency proceedings in Canada shortly thereafter, which proceedings remain pending.

28.    The Debtors pursued sale options and teach-out options for the remaining schools through Barclays and through another consultant who specializes in educational institution advice and transactions, Eduvize LLC.  Several parties engaged in diligence, and the Debtors entered into negotiations with at least three potential buyers for the Heald schools, and held discussions with several other parties regarding the teach-out of the remaining thirteen Everest and WyoTech schools in California.

29.    Ultimately, however, no agreement was reached for the sale or teach-out of any of the remaining schools.  On April 14, 2015, the DOE imposed a $30 million fine against the Heald schools and prohibited Heald from enrolling new students.  Despite multiple efforts by the Debtors and their advisors, as well as potential purchasers of Heald, to negotiate terms with the DOE for the sale of Heald, the DOE sought to impose significant financial and operational conditions on both Corinthian and the potential buyers that were not acceptable to the buyers or capable of performance.  These included, among other things, that Heald reduce future tuition by 20 percent, and that Corinthian or a buyer pay to the DOE $30 million (and apart from the payment of the purchase price to the selling entities), $10 to $12 million of which would be paid at closing, and the remaining $18 million to $20 million of which would be paid over time.  The California Attorney General also held negotiations with potential buyers over the terms under which it would agree not to continue pursuing the claims it had asserted in a lawsuit against Corinthian against the potential buyer.  These negotiations, while protracted, were not successful.  As a result of the DOE requirements and conditions and the unsuccessful negotiations with the California Attorney General's office, on April 22, 2014, the last potential

14

buyer withdrew from the Heald sale process.  When sale efforts for the remaining schools ceased to be viable, both for the Heald schools and remaining Everest and WyoTech schools in California, the Debtors pursued teach-out arrangements with third parties in an effort to permit students to complete their education with minimal disruption.  Ultimately, however, the DOE continued to insist that unaffiliated teach-out partners assume undefined liabilities of the Debtors in order to conduct teach-outs at the affected campuses on economically viable terms.  Without the DOE's cooperation, no teach-out partners were willing to proceed.

30.     In the absence of a sale or teach-out options, the Debtors had no ability to continue operating in light of their cash position and cash forecast.  Moreover, the DOE mandated that the Debtors post a significant letter of credit by May 17, 2015 to maintain eligibility for Title IV funds.

31.     After thoroughly considering their alternatives, the Debtors commenced the wind-down of operations on April 23, 2015.  On Sunday, April 26, 2015, the Debtors announced the closure of their remaining 29 schools effective Monday, April 27, 2015 and provided notice to the relevant regulatory bodies. This resulted in ceasing instruction for approximately 16,000 students, and the termination of approximately 2,700 employees.  Terminated employees participated in a final informational meeting on Monday, April 27, 2015, collected their belongings, and received their final paychecks.  Student meetings, which included the Company, the DOE and state regulators, occurred on April 28, 29, and 30, 2015 to provide students with their transcripts and information on educational options at other institutions.  The Debtors also facilitated and provided information to students for transfer to other schools and to otherwise complete their educational programs.

15

32.     Limited staff was retained at the campuses, divisional headquarters, call centers and the corporate office to coordinate the meetings with employees and students, and to complete the closing of campuses and the exit from facilities.  The Corinthian wind down plan includes, among other things: (i) the consolidation of student academic and financial aid files required to be preserved or made available to state educational regulatory bodies, (ii) consolidation of valuable assets from all of the schools at two campuses for the purpose of facilitating a sale of assets during the Chapter 11 Cases, (iii) preservation of other hard copy and electronic business information, (iv) completion of the closeout audit for the FSA Programs to establish student financial aid balances, and (v) the return of leased premises and equipment as soon as possible after commencing the Chapter 11 Cases to minimize administrative rent.  The wind down also contemplates the prompt sale of the Debtors' remaining assets, including real property located in Laramie, Wyoming, assets used for instruction, such as machinery and other equipment, and miscellaneous furniture and other assets located in certain schools.  The Debtors will also seek recovery or collection for stakeholders of certain cash subject to writs of attachment or garnishment, certain assets held in trust in connection with deferred compensation programs, and certain state and federal tax refunds and adjustments.

33.     The Chapter 11 Cases have been commenced, with the support of the Lenders, to achieve an orderly wind-down of operations in a manner that minimizes administrative expenses of the Chapter 11 Cases.   The filing  permits those with knowledge of the Debtors' business, operations and regulatory requirements to conduct a prompt and responsible closure of the campuses in the interest of the Debtors stakeholders, including creditors, employees, and students.

III.    <u>**First Day Motions**</u>

34.    As part of these cases, the Debtors are seeking approval of the First Day Motions and related orders (the "**Proposed Orders**").

35.    I have reviewed each of the First Day Motions, Proposed Orders and exhibits thereto, and the facts set forth therein are true and correct to the best of my knowledge, information and belief.   Moreover, I believe that the relief sought in each of the First Day Motions (i) is vital to enabling the Debtors to wind down with minimal disruption and (ii) constitutes a critical element to successfully maximizing value for the benefit of the estates.

A.    **Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases**

36.    Pursuant to this motion (the "**Joint Administration Motion**"), the Debtors request the joint administration of their chapter 11 cases, twenty five (25) in total, for procedural purposes only.   Many of the motions, hearings, and other matters involved in the chapter 11 cases will affect all of the Debtors.   Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

37.    Because the Debtors seek only administrative, not substantive, consolidation of the estates, I do not believe joint administration would adversely affect the Debtors' respective constituencies.   The relief requested will not only preserve individual creditors' rights, but also provide those creditors the benefit of cost reductions associated with joint administration.

**B.     Debtors' Application for Entry of an Order Authorizing Employment and Retention of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent, *Nunc Pro Tunc*, to the Petition Date**

38.     Pursuant to this application (the "**Claims Agent Application**"), the Debtors request entry of an order authorizing the Debtors to retain Rust Consulting/Omni Bankruptcy ("**Rust/Omni**"), as claims and noticing agent pursuant to Sections 105(a), 156(c), and Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").   Rust/Omni is a leading chapter 11 administrator, with significant experience in noticing, claims administration, solicitation, balloting, and other administrative aspects of chapter 11 cases.   Appointing Rust/Omni as the claims and noticing agent in the Chapter 11 cases will relieve the administrative burden on the Clerk of the Bankruptcy Court for the District of Delaware (the "**Clerk**").

39.     I have also reviewed Rust/Omni's engagement letter and the description of the services that Rust/Omni has agreed to render and the compensation and other terms of the engagement as provided in the Claims Agent Application.   Based on that review, I believe that the Debtors' estates, creditors, parties in interest and this Court will benefit as a result of Rust/Omni's experience and cost-effective methods.   The Debtors' selection of Rust/Omni to act as the claims and noticing agent has complied with the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from three (3) other court-approved claims and noticing agents to ensure selection through a competitive process.   Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Rust/Omni's rates are competitive and reasonable given Rust/Omni's quality of services and expertise.   The Claims Agent Application pertains only to the work to be performed by Rust/Omni under the Clerk's delegation of duties

18

permitted by Judicial Code Section 156(c) and Local Rule 2002-1(f), and any work to be performed by Rust/Omni outside of this scope is not covered by the Claims Agent Application or by any order granting approval thereof. A separate retention application addressing Rust/Omni's services beyond Section 156(c) of the Bankruptcy Code will be filed by the Debtors in the near future. I believe that the services and expertise that Rust/Omni would provide would decrease costs for the estates and subsequently increase their value.

      **C.**    **Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment for Utilities; and (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance**

      40.    Pursuant to this motion (the "Utilities Motion"), the Debtors request entry of interim and final orders approving procedures that would provide adequate assurance of payment to their utility service providers (the "Utility Companies") under Bankruptcy Code section 366, while allowing the Debtors to avoid the threat of imminent termination of their utility services (collectively, the "Utility Services") from those Utility Companies. Specifically, the Debtors request entry of interim and final orders (i) approving the Debtors' deposit of $47,069.64 (which is approximately 50% of the estimated determined monthly cost of the Utility Services based on historical averages) into a newly created, segregated, account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Bankruptcy Code Section 366(b), (ii) approving the additional adequate assurance procedures described in the Utilities Motion as the method for resolving disputes regarding adequate assurance of payment to Utility Companies, and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing services to or discriminating against the Debtors except as may be permitted by the proposed procedures.

      41.    As of the Petition Date, eleven (11) Utility Companies provide Utility Services to the Debtors at their facilities. I have been informed that, on average, prior to the Petition Date,

the Debtors spent approximately $94,139.27 each month on the utility costs of these eleven providers.  The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors have proposed certain routine protections and procedures in the Utilities' Motion.

42.     I believe that the Utility Services are vital to ensuring that the Debtors' estates do not suffer immediate and irreparable harm.  I believe that prompt approval of the Utilities Motion will assist in maintaining the value of the Debtors' remaining assets which is the utmost significance and importance to the successful outcome of these chapter 11 cases.

**D.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Waiving Certain United State Trustee Requirements; (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief**

43.     Pursuant to this motion (the "**Cash Management Motion**"), the Debtors request entry of interim and final orders that, among other things, (i) authorize the Debtors to continue to use (a) their current centralized cash management system (the "**Cash Management System**"), and (b) their existing bank accounts, checks and business forms, including authorizing the Debtors to open and close bank accounts, as set forth below; (ii) waive certain bank account and related requirements of the Office of the United States Trustee (the "**U.S. Trustee**"); (iii) extend the time to comply with section 345(b) of title 11 of the United States Code (the "**Bankruptcy Code**"); (iv) authorize all banks participating in the cash management system to honor certain transfers and charge bank fees and certain other amounts; and (v) authorize Intercompany Transactions (as defined below) consistent with historical practice and grant administrative expense priority to Intercompany Transactions.

20

44.     The Cash Management System is an integrated network of bank accounts that is critical to the Debtors' operations during these cases and, in turn, maximizing the value of the Debtors' estates.  Like typical chapter 11 debtors, the Debtors use the Cash Management System to collect cash from operations and to make cash disbursements—primarily payroll and payments to vendors—to manage their businesses.  Recognizing the importance of the Cash Management System, the Debtors take care to record all collections, transfers, and disbursements made through the Cash Management System as and when made.

45.     *The Debtor Bank Accounts*.  There are eighty Debtor Bank Accounts: twenty-seven at Bank of America ("**BofA**"), thirty-five at Bank of the West ("**Bank of the West**"), two at First Hawaiian Bank ("**FHB**"), two at BMO Harris Bank, N.A. ("**BMO Harris**"), eleven at Union Bank ("**Union**"), one at U.S. Bank, N.A. ("**U.S. Bank**"), one at Capital West ("**Capital West**"), and one at California Bank and Trust ("**CA Bank**").[2]  Each Debtor Bank Account is insured by the Federal Deposit Insurance Corporation ("**FDIC**").

46.     Prior to the Petition Date, the Debtors received funds from a variety of sources, including Title IV funds from the federal government, other federal agency funds (such as funds received pursuant to the Workforce Investment Act, Native American funding, etc.), state grants, military-related sources of funding for tuition and related costs (such as the Post 9/11 GI Bill and Armed Forces Tuition Assistance Program), payments directly from students (including credit card and ACH receipts, cash and checks),  and proceeds from asset sales.  These amounts are initially deposited into various accounts and eventually funneled into one or more concentration

---

[2]     In addition to the Debtor Bank Accounts, pursuant to the Operating Agreement, Corinthian established a separate, segregated escrow account with Citibank NA (the "**Escrow Account**"). This fund was established to create a reserve that would be available for student refunds. While Corinthian is a party to the Escrow Account, the Escrow Account is not a Debtor Bank Account.

21

accounts before distribution to satisfy the Debtors' obligations, including payroll and debt service payments.

47.    *The Deposit Accounts*.  The majority of the Debtor Bank Accounts, approximately 50 of the 81 accounts, are deposit accounts.  The deposit accounts and the funding sources for each are discussed below:

- *The State Grant Accounts*: The Debtors maintain 13 accounts for receipt of state grant funds from California, Arizona and New York (the "**State Grant Accounts**").  Three of these accounts are held by Corinthian, and ten are held by Heald College, LLC ("**Heald**").  All State Grant Accounts are maintained at BofA.  These accounts are custodial, off balance sheet accounts where states deposited funds pending determination of student eligibility. Once students were eligible, the state gave the Debtors the authority to release funds from the account which then transferred into the Non-T4 Account (defined below). The Debtors need to maintain these accounts to complete the accounting of the existing balances in these accounts and distribute those funds as appropriate.  I anticipated that most, if not all, of the funds in these accounts will revert back to the states.

- *The T4 Accounts*: The Debtors maintain 34 accounts for receipt of Title IV funds from the federal government (the "**T4 Accounts**").  Three of these accounts are held by Sequoia Education, Inc., twenty-five are held by Corinthian Schools, Inc., two are held by Rhodes Business Group, Inc., two are held by Heald, and two are held by Everest College Phoenix, Inc.  All T4 Accounts are maintained by Bank of the West. Funds deposited into the T4 Accounts are subsequently transferred into the T4 Concentration Account (defined below).  The Debtors are no longer eligible to receive Title IV Funds.  Notwithstanding that the Debtors are no longer receiving Title IV Funds, I believe that the T4 Accounts need to be kept open in the short term to address potential refund issues (and may require the completion of a regulatory audit before they can be closed).

- *The FHB Accounts*: The two bank accounts maintained by FHB are each deposit accounts (the "**FHB Accounts**").  One of these accounts is the depository account for the Hawaiian location.  The other is the deposit account for federal funds that are available to Hawaiian students.  Such federal funds are not Title IV Funds, and are only available to students in the State of Hawaii.  Funds from the FHB Accounts are transferred into the Non-T4 Account.

- *The U.S. Bank Account*:  The account maintained by U.S. Bank (the "**U.S. Bank Account**") receives incoming credit card and ACH receipts from students for tuition and fees.  Amounts in the U.S. Bank Account are transferred into the Non-T4 Account.  I anticipate that the Debtors will be able to close this account by May 31, 2015.

- *The Non-T4 Account*:  Corinthian maintains an account with BofA (the "**Non-T4 Account**," and together with the State Grant Accounts, the T4 Accounts, the FHB Accounts and the U.S. Bank Account, each a "**Deposit Account**," and collectively, the "**Deposit Accounts**") that is a hybrid between a deposit account and a concentration account as it serves as a collection account for all of the funds received by the Debtors from non-Title IV sources while also directly receiving deposits.  The funds in the State Grant Accounts, the U.S. Bank Account and the FHB Accounts are all transferred into the Non-T4 Account.  In addition, moneys are deposited directly into the Non-T4 Account from sources other than Debtor Bank Accounts, including funds from Veterans Affairs, proceeds from asset sales, corporate deposits, and miscellaneous wire and ACH transfers.  Finally, Non-Title IV Funds deposited into the BofA Concentration Account (defined below) are manually transferred on a weekly basis to the Non-T4 Account, as set forth in further detail below.  The Debtors segregate the Title IV funds from non-Title IV funds pursuant to Amendment No. 4 to the Credit Agreement with BofA, which requires separate accounts for these two types of funding.  Amounts in the Non-T4 Account are used for non-Title IV purposes, including debt repayments and legal settlements.  In addition, funds in the Non-T4 Account are sometimes manually transferred into the BofA Concentration Account, the Union Concentration Account or the BMO Harris Concentration Account (as each term is defined below), when required.

48.    *The Concentration Accounts*.    In addition to the Non-T4 Account, the Debtors

have several additional concentration accounts:

- *The BofA Concentration Account*:    The Debtors' main concentration account (the "**BofA Concentration Account**"), held by Corinthian, is maintained at BofA. From time to time, available funds from the BMO Harris Concentration Account, the Union Concentration Account, the T4 Concentration Account and the Heald Concentration Account are consolidated into the BofA Concentration Account for cash management purposes.  The Debtors also periodically transfer funds from the Non-T4 Account into the BofA Concentration Account to support operating expenditures. In addition, non-Title IV funds are received directly into the BofA Concentration Account from the majority of campuses which deposit cash receipts into their local BofA bank branches.  This source of the funds deposited into the BofA Concentration Account is accounted for so that any non-Title IV funds can be manually transferred out of the BofA Concentration Account on a weekly basis into the Non-T4 Account.  The BofA Concentration Account directly funds the seven BofA Payroll Accounts (defined below) and the three Student Refund Accounts (defined below).  Funds from the BofA Concentration Account are also transferred to the Union Concentration Account, which, in turn, funds other accounts that pay obligations of the Debtors.    The Debtors also make their required US dollar-denominated debt service payments to BofA from the BofA Concentration Account.

- *The T4 Concentration Account*: Corinthian maintains an account at Bank of the West, into which all Title IV funds from the T4 Accounts are transferred (the "**T4**

**Concentration Account**").  Bank of the West transfers the funds received in the T4 Concentration Account to the BMO Harris Concentration Account and the BofA Concentration Account.

- *The BMO Harris Concentration Account*: Corinthian also maintains a concentration account at BMO Harris (the "**BMO Harris Concentration Account**").  Funds from the T4 Concentration Account and the BofA Concentration Account are transferred, as needed, to the BMO Harris Concentration Account.  These funds are then manually transferred to the BMO Harris Accounts Payable Account (defined below). Funds from the BMO Harris Concentration Account are also transferred to the BofA Concentration Account and the Union Concentration Account, as required.

- *The Union Concentration Account*:  Corinthian also maintains a concentration account at Union (the "**Union Concentration Account**").  Funds are manually transferred to the Union Concentration Account from the T4 Concentration Account, the BofA Concentration Account and the BMO Harris Concentration Account.  Funds in the Union Concentration Account are used to fund the seven Union Payroll Accounts (defined below).  They are also used to satisfy certain other obligations of the Debtors, including vendor payments, taxes and benefits.  All of the Debtors' wire payments are made from the Union Concentration Account.  As necessary, funds in Union Concentration Account are transferred to the BofA Concentration Account.

- *The Heald Concentration Account*: Heald maintains a concentration account with BofA (the "**Heald Concentration Account**," and together with the BofA Concentration Account, the T4 Concentration Account, the BMO Harris Concentration Account and the Union Concentration Account, each a "**Concentration Account**," and collectively, the "**Concentration Accounts**").  Non-Title IV funds related to Heald locations are received directly into the Heald Concentration Account from all Heald campuses, other than Hawaii (which deposit cash receipts into the FHB Accounts).  The balance in the Heald Concentration Account is periodically transferred into the Non-T4 Account.

49.    *The Payroll Accounts*. The Debtors maintain seven payroll accounts at BofA (the "**BofA Payroll Accounts**") and seven payroll accounts at Union (the "**Union Payroll Accounts**," and together with the BofA Payroll Accounts, the "**Payroll Accounts**").  Each of the fourteen Payroll Accounts relates to a separate legal entity and funds the payroll for the campuses that are part of that legal entity.  While the Debtors' campuses have been closed and ceased instruction at all locations, each location continues to employ a limited number of individuals who are working to wind down operations and preserve the Debtors' assets.

24

Accordingly, I believe that the Debtors must maintain the individual payroll accounts until this work is completed and the individual Debtors no longer have employees.

50.    _The Student Refund Accounts_.  The Debtors maintain three accounts with BofA that are used to pay refunds to their students (the "**Student Refund Accounts**").  Two of these accounts are in Corinthian's name and one is in Heald's name.  When an institution receives Title IV funds and/or non-Title IV funds associated with a student's financial aid package and the total amount of all Title IV funds and non-Title IV funds credited exceeds the amount of tuition and fees, books and supplies, room and board, and other authorized charges, the institution must pay the resulting credit balance directly to the student.    I believe that the Debtors need to maintain the Student Refund Accounts until they have finished the accounting of student credit balances and the reconciliation of amounts outstanding against these accounts.

51.    _The BMO Harris Accounts Payable Account_.  Corinthian maintains an accounts payable account with BMO Harris (the "**BMO Harris Accounts Payable Account**").  The BMO Harris Accounts Payable Account is manually funded from the BMO Harris Concentration Account.  All of the Debtors' accounts payable are paid through the BMO Harris Concentration Account.

52.    _The Investment Account_.  Corinthian maintains investment accounts with both BofA and Union, which were historically used to invest excess cash according to its investment policy which limits investments primarily to treasuries and government-backed securities.  The balance in both of these accounts is currently zero and the Debtors anticipate closing these accounts by May 18, 2015.

53.    _Miscellaneous Accounts_.  Finally, Corinthian maintains a few miscellaneous accounts for different purposes, including a Canadian account (for purposes of distributing

Canadian currency, when necessary) with Union Bank and a flexible spending account reimbursement account with CA Bank.  In addition, MJB Acquisition Corporation holds an account with Capital West that is an escrow account for medical benefits for students at one of the Debtors' campuses.  While these funds are Debtor assets, they are managed by Capital West.  Finally, there is one account, an obsolete transcript checking account, that is closed or intended to be closed shortly after the Petition Date.

54.      I believe that continuity of the Cash Management System is critical, but so is a measure of flexibility for the Debtors to implement reasonable changes to the Cash Management System that they deem necessary or appropriate, including closing any Debtor Bank Account.  I believe that this flexibility is particularly important as the Cash Management System was designed to facilitate the depository and payment needs of an operating company with campuses in multiple locations, receiving receipts/deposits from many and varied sources.  During the pendency of these Chapter 11 cases, these operations will be greatly simplified and receipts/deposits will be limited to very few sources.  Most specifically, the Debtors do not anticipate receiving any further Title IV funds and receipts/ deposits from states and other prior funding sources are likely to be limited.

55.      *Bank Fees*.  The Debtors pay, honor, or allow the deduction from the Debtor Bank Accounts service charges and other fees, costs, and expenses arising in the ordinary course (collectively, the "**Bank Fees**").  The Debtors estimate that they pay average monthly Bank Fees of approximately $85,000 and that they owe prepetition Bank Fees of approximately $80,000.  I believe that the Debtors' inability to pay prepetition or postpetition Bank Fees in the ordinary course could disrupt the Cash Management System and harm the Debtors' estates.

56.     _Intercompany Transactions_.    Historically, the Debtors have engaged in Intercompany Transactions largely to centralize cash management and maintain control over the funds moving within the Debtors' corporate group.    As described above, most of the Intercompany Transfers are from Concentration Accounts held by Corinthian to payroll accounts held by other Debtors or from the Deposit Accounts held by Debtors other than Corinthian to Concentration Accounts held by Corinthian.    Just as the Debtors can ascertain, trace, and account for all external fund transfers in their accounting system, they also carefully and accurately track Intercompany Transactions.    Indeed, during these cases, the Debtors intend to segregate and separately track postpetition Intercompany Transactions and include a detailed accounting of such Intercompany Transaction in the Debtors' monthly operating reports.

57.     I believe that if the Intercompany Transactions were discontinued, the Cash Management System and the operations of the Debtors alike would be harmed, all to the detriment of the Debtors and their estates.

**E.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Pay Certain Employee-Related Expenses and (b) Continue Their Workers' Compensation Policy and Pay All Obligations in Respect Thereof and (II) Granting Related Relief**

58.     Pursuant to this motion, the Debtors seek entry of interim and final orders, authorizing the Debtors to (a) pay certain reimbursable expenses, prepetition payroll obligations, payroll-related benefits, and healthcare premiums (all as described below and collectively, the "**Employee-Related Expenses**") and (b) continue their Workers' Compensation Policy (as described below) on an uninterrupted basis, and to pay, in their discretion, the Insurance Obligations (as described below).

59.     _The Reimbursable Expenses_.    Certain of the Debtors' former and current employees incurred expenses prior to the Petition Date in the course of performing their jobs,

including expenses for travel, mobile phones, meals, meetings, and related business items (the "**Reimbursable Expenses**").  The Debtors believe that they pre-funded a majority of the Reimbursable Expenses prior to the Petition Date; however, employees may continue to submit Reimbursable Expenses that were incurred prior to the Petition Date.

60.     The Debtors seek authorization to pay the Reimbursable Expenses.  The Debtors estimate that as of the Petition Date they owe approximately $40,000 in accrued but unpaid Reimbursable Expenses for approximately 25 employees.

61.     *The Prepetition Payroll*.  Prior to the Petition Date, the Debtors' issued checks totaling approximately $7.4 million to former and current employees for all prepetition payroll obligations (the "**Prepetition Payroll Checks**") and paid the related employer payroll taxes (the "**Prepetition Payroll Taxes**" and together with the Prepetition Payroll Checks, the "**Prepetition Payroll**").  The Debtors believe that they have pre-funded the majority of the Prepetition Payroll Checks; however, the Debtors are aware of certain instances in which they may need to reissue a number of the Prepetition Payroll Checks and pay the corresponding Prepetition Payroll Taxes due to checks issued for an incorrect amount, employees that were inadvertently excluded from the distribution of the Prepetition Payroll Checks, and other unintentional errors that prevented a limited number of the Prepetition Payroll Checks from being processed prior to the Petition Date.

62.     The Debtors seek authorization to reissue and pay any Prepetition Payroll obligations that were not processed, satisfied, or distributed prior to the Petition Date.  The Debtors believe that with respect to the Prepetition Payroll Checks no employee is owed more than $12,475.  The Debtors estimate that as of the Petition Date they owe approximately $800,000 on account of the Prepetition Payroll obligations.

63.    _The Payroll-Related Benefits_.  The Debtors provided certain of their former and current employees with prepetition payroll benefits pursuant to transportation, healthcare, and other related voluntary benefits programs (the "**Payroll-Related Benefits**").  With respect to the Payroll-Related Benefits, the Debtors withhold these amounts from the employees' paychecks for the benefit of the employees and seek authorization to pay these amounts to third parties.

64.    The Debtors estimate that as of the Petition Date they owe approximately $15,000 in accrued but unpaid Payroll-Related Benefits.

65.    _The Healthcare Premium_.  The Debtors maintain a health insurance policy for their employees with Kaiser Permanente.  Pursuant to the health insurance policy, the Debtors pay a monthly premium of approximately $490,000, which includes certain amounts withheld from employees' paychecks and certain amounts funded by the Debtor (together, the "**Healthcare Premium**" and, collectively with the Reimbursable Expenses, the Prepetition Payroll Obligations, and the Payroll-Related Benefits, the "**Employee-Related Expenses**").  Prior to the Petition Date, the Debtors attempted to prefund the Healthcare Premium for April, 2015; however, as of the Petition Date, the Debtors believe that the check for the Healthcare Premium for April, 2015 has not cleared the Debtors' bank account.  Accordingly, the Debtors seek authority to pay $488,417.30 for the Healthcare Premium for April 2015.

66.    I believe it is essential to the successful administration of these chapter 11 cases that the Debtors be permitted to continue reimbursing and paying their former and current employees for the Employee-Related Expenses.

67.    _The Debtors' Workers' Compensation Policy_.  The Debtors maintain a workers' compensation and employers' liability insurance policy (the "**Workers' Compensation Policy**") with Zurich.  Pursuant to the Workers' Compensation Policy, the Debtors are required to pay

29

fixed-cost premiums and monthly deductibles.  The Debtors have paid all of the premiums due

through July 1, 2015.  The monthly deductible under the Workers' Compensation Policy is

$350,000.  In addition to their premium obligations, each month the Debtors receive an invoice

on account of claims paid by Zurich during the previous month up to the monthly deductible

amount.  Accordingly, the Debtors' monthly obligations for claims paid under the Workers'

Compensation Policy range from $150,000 to $350,000.  Zurich fulfills claims over and above

the monthly deductibles up to an aggregate policy term cap.  Additionally, Zurich has the right to

review and adjust the premium and deductible rates annually.

68.     Zurich provides the Debtors with an invoice detailing the Debtors' deductible

obligations with respect to all claims made in the prior month within the first few weeks of each

month.  The Debtors then have approximately 15 to 20 days from receipt of the invoice to pay

the deductible amount.

69.     Historically, the Debtors have provided Zurich with letters of credit in varying

amounts, which Zurich has the right to draw on in the event of a default by the Debtors.

Currently, Zurich has a $6.5 million letter of credit from Bank of America, N.A. securing the

Debtors' obligations under the Workers' Compensation Policy.  Zurich has the right to review

and adjust the required amount of the letter of credit annually.

70.     I believe it is essential that the Debtors' maintain the Workers' Compensation

Policy throughout these cases because any lapse in coverage would leave the Debtors exposed to

significant, potentially crippling liability.  Accordingly, the Debtors seek to pay up to $350,000

in Insurance Obligations, consisting of the monthly deductible payment for claims paid in April

2015.  In addition, I believe, to preserve and maximize the value of the Debtors' estates, it is

critical that the Court authorize the Debtors to continue, maintain, supplement, amend, extend,

30

renew, or replace their Workers' Compensation Policy during these chapter 11 cases and to pay all obligations thereunder in the ordinary course of business.

**F.      Debtors' Motion for an Order Authorizing the Debtors to Conduct *De Minimis* Asset Sales Without Further Order of the Court**

71.      Pursuant to this motion (the "**Miscellaneous Asset Sale Motion**"), the Debtors request entry of an order (i) authorizing the Debtors to consummate certain asset sales of limited size without the need for further Court approval; and (ii) granting certain related relief

72.      As further detailed herein, the Debtors closed each of their campus locations effective as of April 27, 2015 and are in the process of liquidating their assets and winding down their operations.  In connection with these efforts, the Debtors anticipate being in a position to reject many of the nonresidential real property leases relating to these campus locations within the first two weeks of the chapter 11 cases, thereby stemming the incurrence of additional administrative rent.  I believe that there are miscellaneous assets located at many of these locations, which, but for the relief requested in the Miscellaneous Asset Sale Motion, would need to be abandoned in order to effectuate an expedited rejection of the underlying nonresidential real property leases.

73.      Excluding the Debtors' headquarters, the Debtors currently own furniture or equipment at 31 locations (three locations also contain annexes).  Two of these locations, Fremont and Long Beach, CA (the "**Wyotech Locations**"), were campuses of the Debtors' Wyotech brand.  The Wyotech Locations are multi-building campuses which the Debtors believe may contain assets with significant value, including, but not limited to, auto repair and HVAC related equipment.  The Debtors intend to remain at the Wyotech Locations until they can perform and complete a fulsome sale process for the assets at these facilities (and are therefore not seeking to sell such assets pursuant to the Miscellaneous Asset Sale Motion).

31

74.     The Debtors' remaining locations consist of the former Everest and Heald campuses and certain other administrative offices. The Debtors believe that the remaining 29 locations contain furniture and equipment of considerably less value.  The Debtors have instructed the campus presidents at each of these remaining locations in California and Arizona to log and ship all equipment worth over $5,000 that is easily transportable to the nearer of the two Wyotech Locations to allow the Debtors additional time to properly market the assets.  The Debtors believe that the assets that will not be transferred to the Wyotech Locations consist mainly of office furniture and equipment, including, but not limited to, lab equipment (for example, dental chairs and x-ray machines), electronic blackboards or "smartboards", medical lab equipment and supplies and other items utilized in connection with the instruction provided at each respective campus location (the "**Miscellaneous Assets**").[3]  These are the assets that would be sold pursuant to the Miscellaneous Asset Sale Motion, which would allow for the transfer of $25,000 or less in total consideration to a single buyer or related group of buyers for assets per location, without the need for a further order of the Court.

75.     I believe requiring Court approval of every miscellaneous asset sale would be administratively burdensome to the Court and costly for the Debtors' estates, especially in light of the small size of many of the contemplated sales.   I believe that the procedures set forth in the Miscellaneous Asset Sale Motion will accommodate the smooth and timely consummation of such small asset sales.  I believe that under the circumstances, the usual process of obtaining Court approval of each Proposed Sale (i) would impose unnecessary administrative burdens on the Court and use valuable Court time at omnibus hearings, (ii) would create costs to the Debtors' estates that may undermine or eliminate the economic benefits of the underlying transactions and

---

[3]     Notably, the majority of the Debtors' computer equipment is leased, and therefore, is not property of the Debtors.

(iii) in some instances may hinder the Debtors' ability to take advantage of sale opportunities that are available only for a limited time.  More importantly, the Debtors are likely to forego certain sale opportunities and simply abandon the assets in question given the need to reject the underlying real property leases as quickly as possible.

76.    Therefore, I believe that (i) sufficient cause exists to implement the modified notice provisions proposed in the Miscellaneous Asset Sale Motion and (ii) these modified notice procedures will make the sale process as efficient as possible, while preserving fully the rights of the parties-in-interest.

G.    **Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief**

77.    Pursuant to this motion (the "**Cash Collateral Motion**"), the Debtors request entry of interim (the "**Interim Order**") and final orders that seek, among other things, ( i) authorization for the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"); (ii) authorization to provide adequate protection, including, inter alia, replacement liens and superpriority administrative claims, to the Prepetition Secured Parties (as defined in the Cash Collateral Motion) under the Credit Agreement; (iii) the scheduling of a hearing to consider the relief requested on a final basis, and (iv) related relief.

78.    The Debtors seek immediate interim approval of the motion.  As discussed in more detail in the Cash Collateral Motion, the Interim Order provides adequate protection in the form of, among other things, replacement liens, superpriority claims, and the payment of postpetition professional fees, costs and expenses of the Administrative Agent and the Lenders to protect against any diminution in value arising from the Debtors' use of Cash Collateral or the imposition of the automatic stay under Bankruptcy Code section 362.

33

79.     I believe the value of the Debtors' estates is dependent primarily on the Debtors' ability to efficiently and effectively wind down their estates.  To preserve the value of their estates, the Debtors have an immediate and critical need to use Cash Collateral.  Given the broad liens granted in connection with the Credit Agreement, I believe the Administrative Agent and the Prepetition Secured Parties have an interest in the Cash Collateral.

80.     The Debtors do not have sufficient available sources of working capital and financing to permit the Debtors to, among other things, effectuate an orderly sale of their assets, continue the wind down of their estates, and satisfy other short-term operational needs without the use of Cash Collateral.  I believe in the absence of the authority to use Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm, including, without limitation, the inability to close the schools and complete the related Title IV closeout audit in an orderly and efficient manner, wind down the Debtors' operations and sell the remaining assets, and resulting loss of value.  I believe the prompt approval of the Cash Collateral Motion will preserve, maintain and enhance the value of the Debtors' remaining assets which is the utmost significance and importance to the successful outcome of these chapter 11 cases.

81.     I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving  a successful, efficient and timely liquidation of the Debtors' assets for the benefit of all of the Debtors' creditors will be substantially enhanced.

## <u>CONCLUSION</u>

82.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

34

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May, 2015.

Corinthian Colleges, Inc., <u>et al.</u>
*Debtors and Debtors in Possession*


<u>/s/ William J. Nolan</u>
William J. Nolan
Chief Restructuring Officer