IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CORINTHIAN COLLEGES, | ) Case No. 15-10952 (KJC) |
| INC., *et al.* | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Re:  Docket Nos. 6, 22 |
| | ) Obj. Deadline: 5/20/15, 4:00 p.m. |
| | ) Hearing Date: 5/27/15, 2:00 p.m. |
| | ) |

OBJECTION OF SALT RIVER PROJECT AND
SOUTHERN CALIFORNIA EDISON COMPANY TO THE DEBTORS' MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS (I) PROHIBITING UTILITIES
FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE; (II) APPROVING
THE DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT FOR
UTILITIES; AND (III) ESTABLISHING PROCEDURES FOR RESOLVING
OBJECTIONS TO THE DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE

Salt River Project ("SRP") and Southern California Edison Company ("SCE") (collectively, the "Utilities"), by counsel, hereby object to the *Debtors' Motion For Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment For Utilities; and (III) Establishing Procedures For Resolving Objections To the Debtors' Proposed Form of Adequate Assurance* (the "Utility Motion"), and set forth the following:

## Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the

amount of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to shift their statutory burden.

With respect to Section 366(c) of the Bankruptcy Code, it specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account. Despite the foregoing, the Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing $47,069.64 that purportedly represents two weeks of the Debtors' estimated utility charges (the "Bank Account"). Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment, the Court should reject it as an insufficient form of adequate assurance of payment for the following reasons:

(i) Unlike all of the identified and permissible forms of adequate assurance of payment listed in Section 366(c)(1)(A), the Bank Account is not something held by the Utilities, so the Utilities have no control over: (A) when the Bank Account will be terminated; or (B) If the Bank Account will remain in place if there is an event of a default by the Debtors on their use of cash collateral (this is in complete contrast to the $75,000 carve-out for the

2

payment of fees and expenses of the Debtors' professionals, in addition to the line-item amounts for Debtors' counsel set forth in the Budget that total $852,000, which remains in place even if there is an event of default);

(ii) In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a disbursement request;

(iii) It is underfunded from the outset because the Utilities issue monthly bills; and

(iv) The Debtors are not required to replenish the Bank Account following pay-outs.

The post-petition deposits sought by the Utilities in these jointly-administered cases are the following two-month deposits that the Utilities are authorized to obtain from all of the customers in their service territories pursuant to applicable state law:  (A) SCE - $219,330; and (B) SRP - $36,855.  Based on all the foregoing, this Court should deny the Utility Motion because the amounts of the post-petition deposit requests of the Utilities are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.   On May 4, 2015 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United

SL1 1367945v1 000000.00000

States Code (the "Bankruptcy Code") that are now pending with
this Court.  The Debtors continue to operate their businesses and
manage their properties as debtors in possession pursuant to
Bankruptcy Code sections 1107(a) and 1108.

2.    The Debtors' chapter 11 bankruptcy cases are being
jointly administered.

### The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility
Motion.

4.    Proper notice of the Utility Motion was not provided to
the Utilities prior to the Court entering the *Interim Order (I)
Prohibiting Utilities From Altering, Refusing, or Discontinuing
Service; (II) Approving Debtors' Proposed Form of Adequate
Assurance of Payment For Utilities; and (III) Establishing
Procedures For Resolving Objections To Debtors' Proposed Form of
Adequate Assurance* (the "Interim Utility Order") on May 5, 2015.

5.    Because the Utilities were not properly or timely
served with the Utility Motion and the Debtors never attempted to
contact the Utilities regarding their adequate assurance requests
prior to the filing of the Utility Motion, the Utilities had no
opportunity to respond to the Utility Motion or otherwise be
heard at the *ex parte* hearing on the Utility Motion that took
place on May 5, 2015, despite the fact that Section 366(c)(3)
(presuming this was the statutory basis for the relief sought by

4

the Debtors) requires that there be "notice and a hearing" to the Utilities.

6.   Although the Debtors have prepetition and post-petition accounts with SRP, SRP is not listed on the Utility Services List attached to the Utility Motion.

7.   On May 6, 2015, counsel for the Utilities sent an email to Debtors' counsel which set forth three prepetition accounts that the Debtors had with SRP and requested confirmation as to whether or not those three accounts are post-petition Debtor accounts.  Debtors' counsel never responded to that email.

8.   In the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is a bank account containing $47,069.64 that purportedly represents two weeks of the Debtors' estimated utility charges (the "Bank Account").   Utility Motion at ¶ 9. The foregoing proposal is unacceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

9.    The Debtors propose that the monies contained in the Bank Account attributable to each utility shall be returned to the Debtors on the earlier of (i) the Debtors' termination of services from such utility, (ii) entry of an order of the Court authorizing the return of such monies to the Debtors, or (iii) the effective date of a Chapter 11 Plan.  Utility Motion at ¶ 10. As the Utilities bill the Debtors in arrears and the proposed two-week Bank Account is insufficient to cover their monthly billing charges, the Bank Account, if approved, should not be released until the Debtors confirm payment in full of their post-petition utility expenses.

10.    The Utility Motion does not address why the Bank Account would be undercapitalized at only a supposed two-week deposit amount when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contract to bill the Debtors monthly.

11.    Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account "together with the Debtors' ability to pay for postpetition Utility Services in the ordinary course of business . . . constitutes "adequate assurance of payment to Utility Companies . . . " Utility Motion at ¶ 11.

6

### Facts Regarding the Debtors

12.   The Debtors were founded in February 1995 and through acquisitions became of the largest for-profit post-secondary educations companies in the United States and Canada.  As of March 2014, the Debtors operated over 100 campuses.  *Declaration of William J. Nolan In Support of Chapter 11 Petitions and First Day Motions* ("First Day Declaration") at ¶ 8.

### The Debtors' Debt Structure

13.   In May 2012, Debtor Corinthian Colleges, Inc. ("Corinthian") and Everest Colleges Canada, Inc. (the "Canadian Borrower," and together with Corinthian, the "Borrowers") entered into the fourth amended and restated credit agreement dated as of May 17, 2012 (as amended, restated, supplemented or otherwise modified, the "Credit Agreement," and together with other Loan Documents, the "Pre-Petition Loan Documents").  First Day Declaration at ¶ 10.

14.   The Credit Agreement provides an aggregate credit facility of up to $145 million of which $135 million was a domestic facility and $10 million was a Canadian facility.  First Day Declaration at ¶ 11.

15.   As of the Petition Date, the outstanding obligations of Corinthian, as borrower and guarantor for the obligations of the Canadian Borrower, and each of the other Debtors, as guarantors for the obligations of Corinthian and the Canadian Borrower under

7

the Credit Agreement, were approximately $94.4 million in aggregate principal amount with respect to prepetition domestic loans, approximately $8.9 million in aggregate principal amount with respect to domestic letters of credit issued, and approximately CAD $2.3 million in aggregate principal amounts with respect to Canadian letters of credit issued.  First Day Declaration at ¶ 12.

16.   The Debtors have unsecured debt in the approximate aggregate amount of $100 million, including claims of trade creditors, landlords and lessors, employees and students, and regulatory refunds, fines and penalties.  A significant portion of those claims remain disputed, contingent and unliquidated.  First Day Declaration at ¶ 13.

### Events Leading To the Debtors' Chapter 11 Cases

17.   Effective April 27, 2015, the Debtors discontinued instruction at all of their schools and began the process of winding down their operations.  First Day Declaration at ¶ 18.

18.   On November 19, 2014, the Debtors entered into an asset purchase agreement with Zenith Education Group, Inc. ("Zenith") for the sale of 56 Everest and WyoTech schools (the "Asset Purchase Agreement").  Zenith also agreed to complete the teach-out process at 12 additional schools and entered into subleases with the Debtors for those locations.  The subleases expire upon the completion of Zenith's teach-out obligations with respect to

8

such locations.  First Day Declaration at ¶ 25.

19.  The sale to Zenith closed in February 2015.  Pursuant to the Asset Purchase Agreement, the parties established an escrow account with Citibank NA that was funded with $8.5 million, consisting of an escrow of $500,000 for certain working capital and deferred tuition revenue adjustments and an escrow of $8 million for certain indemnification obligations of the Debtors.  On April 16, 2015, the parties instructed Citibank NA to distribute $988,521 from the escrow account to Zenith in connection with the satisfaction of certain obligations under the Asset Purchase Agreement.  As of the Petition Date, the aggregate balance in both escrow accounts total approximately $7.5 million. First Day Declaration at ¶ 26.

## The Debtors' Use of Cash Collateral

20.  On the Petition Date, the Debtors filed the *Debtors' Motion For Entry of Interim and Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 and 507 (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection To Prepetition Secured Parties; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* (the "Cash Collateral Motion").

21.  Through the Cash Collateral Motion, the Debtors seek authority to use cash collateral pursuant to a 13-week cash flow budget attached as Exhibit "B" thereto (the "Budget"). It is unclear from the Budget whether the Debtors have budgeted

SL1 1367945v1 000000.00000

sufficient sums for the payment of their post-petition utility expenses.

22.   The Debtors also seek a $75,000 carve-out for the payment of fees and expenses of the Debtors' professionals, in addition to the line-item amounts for Debtors' counsel set forth in the Budget that total $852,000 (the "Carve-Out").  Financing Motion at pp. 12-13.

23.   On May 5, 2015, the Court entered the *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 and 507 (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "Interim Cash Collateral Order"). The Interim Cash Collateral Order approved the Carve-Out.  Interim Cash Collateral Order at pp. 19-21.

## The Debtors' Lease Rejection Motion

24.   On May 6, 2015, the Debtors filed the *Debtors' Motion For Entry Of An Order (I) Authorizing the Debtors To Reject Certain Unexpired Leases Of Nonresidential Real Property Effective Nunc Pro Tunc To the Date That the Debtors Surrendered Possession; (II) Approving the Nunc Pro Tunc Lease Locations; and (III) Granting Certain Related Relief* (the "Lease Rejection

10

Motion").[1]  Through the Lease Rejection Motion, the Debtors seek
the entry of an order rejecting certain leases set forth in
Exhibit "1" to the proposed Order (Docket No. 46-2), effective
*nunc pro tunc* to an applicable notice date supposedly identified
in Exhibit "1."  However, Exhibit "1" only sets forth a proposed
lease rejection date for one lease and does not set forth lease
rejection effective dates for the other 33 leases listed in
Exhibit "1."

    25.  The Debtors have not provided the Utilities with notice
as to when the Debtors propose to reject certain leases for
locations that the Utilities currently provide post-petition
utility goods/services to the Debtors.

    26.  Neither the Lease Rejection Motion nor the proposed
Order set forth any requirements for the Debtors to provide
notice to the Utilities as to when the Debtors will no longer
require utility service at a rejected lease location.  The
Debtors, however, should be required to provide the Utilities
with advance notice of when they will no longer require service
at a rejected lease location.  Furthermore, the Debtors should be
required to pay the Utilities in full for all post-petition
utility goods/services provided by the Utilities to the Debtors
through the date when the Debtors provide notice to the

---

[1] The Debtors filed a Motion (Docket No. 16) prior to filing the Lease Rejection
Motion to reject five leases at locations that do not receive utility
goods/services from the Utilities.

SL1 1367945v1 000000.00000

applicable Utility that the Debtors no longer require utility
service at a location.

## Facts Concerning the Utilities

27.   The Utilities provided the Debtors with prepetition
utility goods and/or services and have continued to provide the
Debtors with utility goods and/or services since the Petition
Date.

28.   Under the Utilities' billing cycles, the Debtors
receive approximately one month of utility goods and/or services
before the Utility issues a bill for such charges.  Once a bill
is issued, the Debtors have approximately 20 to 30 days to pay
the applicable bill. If the Debtors fail to timely pay the bill,
a past due notice is issued and, in most instances, a late fee
may be subsequently imposed on the account. If the Debtors fail
to pay the bill after the issuance of the past due notice, the
Utilities issue a notice that informs the Debtors that they must
cure the arrearage within a certain period of time or its service
will be disconnected.  Accordingly, under the Utilities' billing
cycles, the Debtors could receive at least two months of unpaid
charges before the utility could cease the supply of goods and/or
services for a post-petition payment default.

29.   In order to avoid the need to bring witnesses and have
lengthy testimony regarding the Utilities regulated billing
cycles, the Utilities request that this Court, pursuant to Rule

12

201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles. Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web site links to the tariffs and/or state laws, regulations and/or ordinances are as follows:

SRP:
    Rules and Regulations:
    http://www.srpnet.com/about/rulesregs.aspx

    Price Plans:
    http://www.srpnet.com/prices/pdfx/Standard_Electric_Price_Plans_Nov2012.pdf

SCE: http://www.sce.com/AboutSCE/Regulatory/tariffbooks/rules.htm

30. Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---------|---------------|-------------------|--------------|
| SCE | 20 | $48,300 | $219,330 (2-month) |
| SRP | 3 | $20,574.27 | $36,855 (2-month) |

31. SCE held a $160,000 prepetition deposit that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. The deposit credit after recoupment can be applied to SCE's post-petition deposit request.

SL1 1367945v1 000000.00000

**Discussion**

**A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;
>
> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. If a debtor believes the **amount** of

14

the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

1. **The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

15

(i)  Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

(ii)  In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a Disbursement Request.

(iii) It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is issued the Debtors will have used at least 45 to 60 days of commodity or service. In addition, there are no sums in the Bank Account for SRP.

(iv)  The Debtors are not required to replenish the Bank Account following pay-outs.

Accordingly, the Court should not approve the Bank Account as adequate assurance to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

> **2.    The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amount of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.,* 1 B.R.

16

732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not provide the Court with any evidence or factually supported documentation to explain why the amount of the Utilities' adequate assurance requests should be modified.  Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

    **B.**    **THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure

17

for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

Although the billing cycles for each of the Utilities are slightly different, they all bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month. Each Utility then provides the Debtors with a certain period of time to pay the bill, the timing of which is set forth in applicable state laws, tariffs, and/or regulations. Based on the foregoing state-mandated billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months. Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of 45 to 60 days based on their billing cycles. Furthermore, the amounts of the Utilities' deposit requests are the amounts that the applicable public

18

service commission, which is a neutral third-party entity, or applicable contract, permits the Utilities to request from their customers. The Utilities are not taking the position that the deposits that they are entitled to obtain under applicable state law are binding on this Court, but, instead are introducing those amounts as evidence of amounts that their regulatory entities permit them to request from their customers.

Finally, in contrast to the improper treatment proposed to the Debtors' Utilities, the Debtors have made certain that their post-petition professionals are favored creditors over the Utilities by ensuring that the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition default in the use of cash collateral, by seeking a $75,000 carve-out for the payment of fees and expenses of the Debtors' professionals, in addition to the line-item amounts for Debtors' counsel set forth in the Budget that total $852,000. Despite the fact that the Utilities continue to provide the Debtors with crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of adequate security for which they are entitled to for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security they are

seeking.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities;

2.    Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities, which are the form and amounts requested herein;

3.    Requiring the Debtors to pay the Utilities in full for all post-petition utility goods/services provided by the Utilities to the Debtors though the date when the Debtors provide notice to the applicable Utility that the Debtors no longer require utility service at a location; and

4.    Providing such other and further relief as the Court deems just and appropriate.

Dated:    May 18, 2015              STEVENS & LEE, P.C.

                                    /s/ John D. Demmy_____
                                    John D. Demmy (Bar No. 2802)
                                    1105 North Market Street, 7th Floor
                                    Wilmington, Delaware 19801
                                    Telephone:  (302) 425-3308
                                    E-mail:    jdd@stevenslee.com

                                    and

                                    Russell R. Johnson III
                                    John M. Craig
                                    Law Firm of Russell R. Johnson III, PLC
                                    2258 Wheatlands Drive
                                    Manakin-Sabot, Virginia  23103
                                    Telephone: (804) 749-8861
                                    Facsimile: (804) 749-8862
                                    E-mail:    russj4478@aol.com

                                    *Counsel for Salt River Project and
                                    Southern California Edison Company*

SL1 1367945v1 000000.00000