**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------x
In re:                                      : Chapter 11
                                            :
CORINTHIAN COLLEGES, INC., *et al.*[1],     : Case No. 15-10952 (KJC)
                                            :
        Debtors.                            : (Jointly Administered)
                                            :
                                            : **Objection Deadline: June 23, 2015 at 4:00 p.m.**
                                            : **Hearing Date: June 30, 2015 at 2:00 p.m.**
----------------------------------x

**MOTION OF THE COMMITTEE OF STUDENT CREDITORS FOR AN ORDER APPLYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 362(A) AND 105(A) AND GRANTING RELATED RELIEF**

1. The Committee of Student Creditors (the "Student Committee") appointed in these jointly administered chapter 11 cases of Corinthian Colleges, Inc. and twenty-three debtor affiliates (the "Debtors") respectfully requests entry of an order pursuant to sections 362(a) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and rules 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1 of the Local Rules For The United States Bankruptcy Court District of Delaware (the "Local Rules"), applying the "automatic stay" set forth in Bankruptcy Code section 362 to stay all entities from any act to collect, assess or recover Corinthian Student Loan Debt (as defined, below).

2. The Student Committee seeks relief that will (i) maintain the *status quo*—the relative debtor/creditor positions of the debtors, the government, the students and other creditors; (ii)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Corinthian Colleges, Inc. (7312), Corinthian Schools, Inc. (0525), Rhodes Colleges, Inc. (7311), Florida Metropolitan University, Inc. (7605), Corinthian Property Group, Inc. (2106), Titan Schools, Inc. (3201), Career Choices, Inc. (1425, Sequoia Education, Inc. (5739), ETON Education, Inc. (3608), Ashmead Education, Inc. (9120), MJB Acquisition Corporation (1912), ECAT Acquisition, Inc. (7789), Pegasus Education, Inc. (2336), Grand Rapids Educational Center, Inc. (2031), Rhodes Business Group, Inc. (6709), Everest College Phoenix, Inc. (6173), CDI Education USA, Inc. (0505), SP PE VII-B Heald Holdings Corp. (0115), SD III-B Heald Holdings Corp. (9707), Heald Capital LLC (6164), Heald Real Estate, LLC (4281), Heald Educations, LLC (1465), Heald College, LLC (9639), QuickStart Intelligence Corporation (5665) and Socle Education, Inc. (3477). The Debtors' corporate headquarters is at 6 Hutton Centre Drive, Suite 400, Santa Ana, California 92707.

preserve the integrity of the chapter 11 process; and (iii) avoid a multiplicity of litigation in various forums that will waste resources that would be better utilized in addressing creditor needs and claims.[2] The Debtors received billions of dollars from government and private "student loan" programs for educational programs, the efficacy and value of which were significantly misrepresented to the students, the government and accreditation agencies. Undeniably, in these chapter 11 cases, the Debtors' estates will be subject to claims to return any funds that were wrongfully received and the students will seek, among other things, the cancellation of alleged "student loan" obligations—obligations that rightfully should be charged to the Debtors' estates. The Debtors' estates cannot be efficiently administered until the breadth of the Debtors' misconduct and the nature and amount of the claims against the Debtors' estates are determined. Concentrating and resolving these issues through the bankruptcy process is the most efficient path, in the best interest of the parties and is the central purpose of the Motion.

3. In support of this Motion, the Student Committee relies upon and incorporates by reference the Declaration of Cynthia C. Hernandez ("Hernandez Declaration"); the Declarations of Tasha Courtright, Amber Thompson, Brittany Ann Smith Jackl, Jessica King, Crystal Loeser and Michael Adorno-Miranda (the "Student Declarations"); and the Request for Judicial Notice ("RJN"), filed concurrently with this Motion. In further support of the Motion, the Student Committee, by and through its undersigned counsel, respectfully represents as follows:

## JURISDICTION & VENUE

4. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2). The statutory bases for the relief requested herein are Bankruptcy Code sections 105 and 362.

---

[2] While the United States Department of Education ("DOE") has recently announced a partial voluntary forbearance, such action does not obviate the need for the relief sought in the Motion for numerous reasons: first, the forbearance is not on a class-wide basis, and will require individual students to seek such relief; second, the relief will only be effective for twelve months; third, interest will continue to accrue during the period of forbearance; fourth, it affects only federal loans; and, finally, the voluntary nature of this relief means that the DOE can revise the forbearance at any time.

**PROCEDURAL BACKGROUND**

5. On May 4, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6. On May 15, 2015, the United States Trustee appointed the Student Committee[3] to represent the interests, and act on behalf, of all student creditors of the Debtors.

**RELIEF REQUESTED**

7. By this Motion, the Student Committee requests entry of an Order, substantially in the form attached hereto as Exhibit A, applying the "automatic stay" afforded under Bankruptcy Code section 362(a) to operate as a stay, applicable to all entities, of any act to collect, assess or recover a claim or debt which relates to funds provided pursuant to (i) Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq. (a "Federal Student Loan");[4] or (ii) the Genesis, EducationPlus or other private student loan programs (a "Private Student Loan")[5] for the purpose of paying the expenses necessary for students to attend the Debtors' colleges; expenses may include students' tuition, fees, room and board, books, supplies, equipment, dependent child care expenses, transportation, commuting expenses, personal computer, and loan fees (the aggregate of the obligations outstanding as of the date hereof is hereinafter referred to as the "Corinthian Student Loan Debt").

---

[3] The members of the Student Committee are: Tasha Courtright, Jessica King, Amber Thompson, Crystal Loeser, Michael Adorno-Miranda, Krystle Powell and Brittany Ann Smith Jackl.
[4] *See infra* ¶¶ 23-30.
[5] *See infra* ¶¶ 31-36.

## BASIS FOR REQUESTED RELIEF

I. **FACTS SPECIFIC TO THE REQUESTED RELIEF**

    A. **The Debtors' Operations**

8. The Debtors were founded in February 1995 and became one of the largest for-profit post-secondary education companies in the United States and Canada. [Debtors' First Day Decl., ¶ 8, Dkt. No. 10].

9. As of March 31, 2014, the Debtors operated over 100 campuses and had current enrollment in excess of 74,000 students with more than 10,000 employees. [*Id*.]

10. At its many campuses, the Debtors' colleges - Heald, Everest and Wyotech—offered programs in many fields, including health care, business, criminal justice, transportation technology and maintenance, construction trades and information technology. [*Id*.]

11. The Debtors' nationwide enrollment grew from 28,372 students in 2001 to a peak of 113,818 students in 2010. In 2011, enrollment declined to approximately 94,000 and, thereafter, continued to experience moderate decline through the closure of its remaining schools in April, 2015. [RJN Exh. A, p. 409.]

12. The cost of education at the Debtors' schools was much higher than similar not-for-profit schools and the Debtors "lack[ed] transparency regarding these costs." [*Id.* at p. 415-16.] For example, a Medical Assistant Diploma Program at the Debtor's Heald College in Fresno, California was $22,275.15, compared to $1,650 at a local community college (Fresno City College). [*Id.*] An associate degree in paralegal studies at Debtors' Everest College in Ontario, California, was $41,149, compared to $2,392 for the same degree at a local community college (Santa Ana College). The Debtors charged $82,280 for a Bachelor's Degree in Business, compared to $55,880 at the University of California – Irvine. [*Id.* at 415.]

13. In general, the cost of education for an 8-12 month diploma program ranged from $13,100-$21,338; associate's degree (24 months) ranged from $33,120-$42,820; and a bachelor's degree ranged from $60,096-$75,384. [RJN Exh. B at ¶ 32.]

**B.    The Debtors' Continued Misconduct**

14. The Debtors consistently misled prospective and current students, the government and accreditation agencies about the value and successes of the Debtors' programs. Based on the Debtors' misrepresentations, students enrolled in Debtors' educational programs at inflated rates that allowed Debtors to take billions of taxpayers' dollars from federally-funded student loan programs, the repayment of which is currently being sought from students. *See generally,* the Student Declarations.

15. In 2007, the Debtors were fined and thereafter permanently enjoined from, among other things, engaging in misleading practices related to the recruitment of students and pressuring prospective students to sign documents before reasonable review. [*See* RJN Exh. G at p. 14.]

16. However, even after 2007, the Debtors consistently misrepresented job placement rates and starting salaries for graduates of their educational programs. Prior to the Petition Date, litigation related to the Debtors' deception and misrepresentations was expanding rapidly. Attached to the concurrently filed Hernandez Declaration as Exhibit A is a chart detailing some of the myriad of lawsuits now pending against the Debtors stemming from allegations of their misconduct. [*See generally*, RJN Exh. B through F.]

17. In April, 2015, the DOE levied a $30 million fine against the Debtors after a comprehensive investigation which found that the Debtors "failed to meet the fiduciary standard of conduct by misrepresenting its [job] placement rates to current and prospective students and to its accreditors, and by failing to comply with federal regulations requiring the complete and accurate disclosure of its placement rates." [RJN Exh. H at 1.]

18. The DOE found that the Debtors intentionally misled students and accreditation agencies. For example, the DOE's investigation found that in 2011 the Debtors reported that the campus job placement rate for students in its Medical Office Administration program (AA Degree) at Heald's Hayward and Modesto campuses was 100%; in reality, the placement rate was 38% according to the Debtors' own data. [*Id*. at Enclosure A.] In all, the DOE investigation

uncovered no less than 947 specific instances in which the Debtors had misstated job placement rates.

19. Immediately prior to the Petition Date, the DOE notified the Debtors that their pending applications to continue participating in programs under Title IV of the Higher Education Act, 20 U.S.C. §§ 1001 et seq. ("Title IV FSA Programs") at Heald's Salinas and Stockton colleges would be denied. [*Id.*]

### C. Student Claims For Relief For The Debtors' Misconduct

20. The Student Committee will, among other things, pursue relief in these cases for students that were misled regarding the value and nature of the Debtors' programs. For example, the Student Committee will seek a determination or an agreement among the Debtors and the government that students will not be held responsible for the funds advanced to the Debtors for program enrollments that were based on the Debtors' misrepresentations.

21. Through the collective proceeding and a consensual plan, the Student Committee will seek to relieve the Court, the government, the Debtors and students from individual proceedings by all former students that are aggrieved by the Debtors' misconduct.

### D. Student Loan Funding

22. "As proprietary post-secondary institutions, the Debtors rel[ied] on funding from the Department of Education, pursuant to [Title IV FSA Programs]. <u>Title IV funds accounted for nearly 90% of the Debtors' revenue prior to the Petition Date</u>." [Debtors' First Day Decl., ¶ 14, Dkt. No. 10 (emphasis added)]. Presumably, the remaining 10% of the Debtors' revenue came from students' funding, use of students' GI Bill benefits and from Corinthian Private Student Loan Programs (as defined below).

#### 1. Federal Student Loans

23. The United States was the primary funding source for the Debtors' operations through federal student aid programs administered by the DOE under Title IV FSA Programs.

24. To qualify for participation in Title IV FSA Programs, for-profit and postsecondary vocational institutions, like the Debtors, must, among other requirements: (1) be authorized by

the state in which the institution is operating, (2) be accredited by a federally recognized agency, (3) enroll only students who hold a high school diploma or recognized equivalent and are beyond the compulsory school age, (4) derive at least 10% of their school revenue from non-Title IV funds (the "90/10 Rule"), and (5) comply with certain refund policy requirements. [RJN Exh. I at 2.]

25. The DOE also sets additional requirements for postsecondary institutions by setting federal standards that accrediting agencies must meet to achieve federal recognition. 34 CFR §§602.16-602.21. These standards focus on ensuring that the institutions being accredited meet acceptable levels of educational quality. *See, e.g.*, 34 CFR § 602.16(a)(1) ("The agency's accreditation standards effectively address the quality of the institution or program in the following areas: (i) success with respect to student achievement in relation to the institution's mission…(ii) curricula, (iii) faculty . . . .").

26. Prior to July 2010, Title IV FSA Programs were administered through: (1) the William D. Ford Federal Direct Loan Program (20 U.S.C. §§ 1087a–1087j); (2) the Perkins Loan Program (20 U.S.C. §§ 1087aa–1087ii); or (3) the Federal Family Education Loan Program ("FFEL") (20 U.S.C. §§ 1071–1087-4).

27. Funds provided under the William D. Ford Federal Direct Loan Program ("Direct Loans") were "made by participating institutions [i.e. schools], or consortia thereof, that have agreements with the Secretary [of Education] to originate loans, or by alternative originators designated by the Secretary [of Education] to make loans . . . ." 20 U.S.C. § 1087a.

28. The FFEL Program allowed private entities to make loans to students which are insured or guaranteed by the federal government. *See* 20 U.S.C. § 1071(b). If students default on these loans, the private lender is repaid by the guaranty agency. *See* 20 U.S.C. § 1085(a) & (d); 34 C.F.R. § 682.411, 682.507.

29. As of July 2010, the FFEL and Federal Loan Insurance[6] programs were terminated and, thereafter, federal student aid funding has been made exclusively through the William D. Ford Federal Direct Loan Program. *See* 20 U.S.C. §§ 1087a et seq. Funding under these programs is made directly by the DOE. *Id*. at § 1087b(a).

30. Based on the Debtors' reported tuition and enrollment statistics, as well as the Debtors' reported percentage of revenues derived from Title IV FSA Programs, in recent years, the Debtors may have received in excess of $1 billion of revenue each year through funds supplied by Title IV FSA Programs.

### 2.     Private Student Loans

31. To insure compliance with the 90/10 Rule, the Debtors intentionally set tuition rates at an amount that was 10% higher than the amounts available under Title IV FSA Programs and provided students with options for obtaining privately-funded loans ("Corinthian Private Loan Programs") (the aggregate of all of the Debtors' students' outstanding obligations related to the Corinthian Private Loan Programs is hereinafter referred to as the "Corinthian Private Student Loan Debt"). [RJN Exh. A, p. 431.]

32. The two loan programs instituted by the Debtors are known as the Genesis Program and the EducationPlus Loan Program.

33. The Consumer Finance Protection Bureau determined that the Genesis program was a thinly-veiled form of "institutional lending" program, meaning that the Debtors were, in essence, lending funds directly to the students. Because direct institutional lending does not fully count toward the 10% requirement for non-federal funds that a for-profit school must take in to remain eligible for Title IV FSA Programs, the Debtors devised a complex arrangement with a third-party where the school would guarantee or promise to buy back non-performing loans made by the third party. [*See* RJN, Ex. B at ¶ 89-93.] In essence, the third-party lender was little more than the Debtors' conduit or agent to make these loans to students.

---

[6] 20 U.S.C. § 1074 (Scope and duration of Federal loan insurance program defining the limitations on the amounts of loans covered by federal insurance and apportionment of amounts.)

34. Similarly, under the EducationPlus Loan Program, in 2011, the Debtors entered into a new type of financial agreement with two separate financial entities to provide private loans to Corinthian students. Under this scheme, the first lender paid funds directly to the Debtors, which applied the funds toward students' tuition. Concurrently, a second institution purchased the alleged "student-loan" from the first lender and the Debtors paid the second institution a large upfront fee equal to 50% of the funds advanced. The second institution then had the right to force the Debtors to purchase the alleged loan at face value, less the fee already paid, if the loan became more than 90 days past due. [*See* RJN, Ex. F at ¶74.]

35. Between July 2011 and March 2014, the Debtor induced nearly 130,000 students to take Genesis Loans and EducationPlus Loans, with the aggregate amounts outstanding on these loans estimated to be in excess of $568.7 million. [*See* RJN, Ex. B at ¶ 103.] These loans were marketed, promoted, and offered to students by the Debtors and for the Debtors' benefit. [*Id*. at ¶ 107.]

36. The Debtors also engaged in improper debt collection practices on these loans, including pulling students out of class and barring students from attending classes and externships until payments were made. [*See* RJN, Ex. F at ¶ 77.]

## II.   LEGAL BASIS FOR THE REQUESTED RELIEF

### A.   Introduction

37. The automatic stay must be applied or extended, as necessary, to maintain the *status quo* and promote an efficient resolution of issues related to the Debtors' obligations with respect to Corinthian Student Loan Debt. Among other claims, the Debtors are responsible for the repayment of billions of dollars, charged against students as alleged "student loan debt," that the Debtors have received through misrepresentations and deception. While a final accounting and resolution of such claims is sought in these cases, the students must be relieved of the harassment and undue hardships caused by the continuing collection proceedings related to these obligations.

38. As opposed to individual litigation with each student, negotiations by the class of aggrieved students to achieve a consensual plan among the Debtors, students, the government

61041020.4
50544980.1

and other creditors is the most efficient path to resolve the Debtors' and student creditors' relative liability for Corinthian Student Loan Debt. Bankruptcy courts have the power to extend or supplement the scope of the automatic stay to include actions against both debtors and non-debtors where there is just such an "identity of interest" between the debtors and the non-debtors and continued actions against the non-debtor would have an adverse impact on the ability to confirm a consensual plan. *See Midway Games, Inc. v. Anonuevo (In re Midway Games, Inc.)*, 428 B.R. 327, 333-34 (Bankr. D. Del. 2010); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 2008 Bankr. LEXIS 1048, at *36 (Bankr. D. Del. Apr. 11, 2008). Accordingly, it is appropriate for the Court to extend the automatic stay to maintain the *status quo* among the Debtors, the government, students and other creditors in a way that puts creditors on a level playing field and promotes resolution of issues pursuant to plan negotiations, in lieu of overwhelming individualized litigation or arbitration among the parties.

> B. **Application Or Extension of The Automatic Stay Will Promote An Efficient Resolution of The Debtors' Chapter 11 Cases**

39. The Bankruptcy Code provides a statutory framework that permits debtors, creditors and stakeholders to develop a consensual resolution of the issues facing an insolvent estate, including the recognition of relative claims, rights and obligations among the parties and the formulation of a plan that maximizes relief that may be afforded to creditors. *See In re ProtoStar Ltd.*, 2010 Bankr. LEXIS 5186, at *16 (Bankr. D. Del. Oct. 6, 2010) (finding that a "consensual resolution" is promoted by "the ultimate result — the Plan — [which] is a deal that maximizes value to all creditor constituencies, is fair and reasonable and in the best interests of [the] estates"); *see also, Glenstone Lodge v. Buckhead Am. Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 89 (D. Del. 1995) ("At its simplest, a plan is an offer of promises made by a debtor and accepted by the creditors following serious and frequently protracted negotiations.").

40. Collective bankruptcy proceedings, involving the Debtors and all creditor constituencies, are significantly more efficient than independent competing civil processes by each creditor that

could overwhelm courts, deplete the estates' resources that could be used to pay creditors, and lead to inconsistent relief for similarly situated creditors.

41. An extension of the automatic stay in these cases will permit the Debtors, students, the government, other creditors and parties in interest to focus on formulation of a consensual plan in these cases that addresses, among other things, the relative obligations of each constituency related to the billions of dollars of advances made to the Debtors pursuant to the Title IV FSA Programs and the Corinthian Private Loan Programs.

### 1. The Relative Rights And Obligations Of The Debtors, Students, Private Lenders And The Government Are "Core" Issues

42. The Student Committee estimates that, in recent years, the Debtors' received in excess of $1 billion per year in revenues funded by the Title IV FSA Programs and received as much as $200 million in revenues funded from other sources. Funds advanced to the Debtors, through the Title IV FSA Programs or otherwise, as a result of the Debtors' wrongful misrepresentations will give rise to claims against the Debtors' estates and the estimation and resolution of such claims are "core" proceedings. 28 U.S.C. § 157(b)(2)(B).

43. The nature of these claims, which may be held by the government, students or other lenders is dependent upon several factors and issues, including (i) the nature and extent of the Debtors' misconduct; (ii) the affiliation and relative culpability of the parties; (iii) contract language; and (iv) equitable remedies available under state and federal laws. 34 C.F.R. 685.206(c)(3) (providing that the Secretary of Education can initiate proceedings against institutions to recover student loan amounts discharged due to the institution's misconduct).

44. The Debtors, the government and the students' have a shared interest in the proper allocation of claims that arise from advances to the Debtors pursuant to the Title IV FSA Programs. For example, if the government has advanced funds to the Debtors for which it has not received repayment and any student obligation has been discharged because of the Debtors' misconduct, the government will have a claim against the Debtors and the estates. *Id.* By contrast, if a student has made payments to fund a "student-loan obligation" asserted by the

- 11 -

government for funds advanced to the Debtors (ostensibly on the student's behalf) for educational programs that were grossly misrepresented, the student will have a claim against the Debtors and the estates and possibly against the government as well. *See, e.g.*, *Beckett v. Computer Career Inst., Inc.,* 120 Or. App. 143, 147-49 (1993) (affirming a finding of an education institute's liability under consumer protection laws for misrepresenting job placement rates); *Guzman v. Bridgepoint Educ., Inc.,* 2012 U.S. Dist. LEXIS 74767, at *12-17 (S.D. Cal. May 30, 2012) (student plaintiffs' could bring claims against defendant school for tuition paid, education costs, future lost wages and other damages based on misleading recruitment tactics, misrepresentations of cost and fees, quality of instruction, accreditation status, and employability.).

45. Under a chapter 11 plan, claims of different classes of unsecured creditors may be, and often are, separately classified and afforded unique treatment. *See* 11 U.S.C. § 1122(a). The ability of debtors, creditors and stakeholders to consensually agree on alternative treatment for different classes of claims is critical to the ability of debtors to negotiate and propose a consensual plan, acceptable to various classes. *See e.g. Glenstone Lodge v. Buckhead Am. Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 89 (D. Del. 1995) ("At its simplest, a plan is an offer of promises made by a debtor and accepted by the creditors following serious and frequently protracted negotiations.

46. Hence, the resolution of the issues necessary to identify the holder, nature and amount of the related claims that arose from the Debtors' misconduct and the advance of billions of taxpayer dollars to the Debtors will be key to the ability of the Debtors and the parties in interest in these chapter 11 cases to reach consensus on the resolution of claims against the estates and the relative treatment of classes of creditors under a confirmable chapter 11 plan.

### 2. Litigation By Each Student Would Overwhelm The Court And Divert The Resources Of The Estates

47. Students have direct claims against the Debtors for the Debtors' deception and misconduct and also have the rights to cancellation of any alleged "student loan" obligation

arising from the Debtors' misconduct to the government or a private lender. *See, e.g.*, *Guzman v. Bridgepoint Educ., Inc.*, 2012 U.S. Dist. LEXIS 74767, at *12-17 (S.D. Cal. May 30, 2012) (student plaintiffs' could bring claims against defendant school for tuition paid, education costs, future lost wages and other damages based on misleading recruitment tactics, misrepresentations of cost and fees, quality of instruction, accreditation status, and employability.); *see also*, 34 C.F.R. § 685.206(c).

48. Absent stay relief and the ability to seek redress through a collective chapter 11 proceeding, thousands of students must immediately seek determinations of the Debtors' misconduct to avoid harsh collection practices, such as wage garnishment proceedings, on alleged student loans. *See generally*, the Student Declarations (detailing, among other things, current collection efforts on Corinthian Student Loan Debt). Moreover, each student might be compelled to proceed separately against the Debtors because students were made to sign class-action waivers and arbitration agreements upon enrollment in the Debtors' programs. [*See* Tasha Courtright Declaration ¶ 9, Exh. A.] Litigation or arbitration proceedings for tens or hundreds of thousands of former students would most assuredly overwhelm the resources of these estates and the Bankruptcy Court.

49. Such an imminent diversion of critical estate resources, including personnel, from the plan negotiation and confirmation efforts that would be occasioned by the breadth of such litigation constitutes the type of unusual circumstances that justifies extending the automatic stay. *See, e.g., Ionosphere Clubs*, 111 B.R. 423 at 435 (Bankr. SDNY 1990); *Johns-Manville Corp. v. Asbestos Lit. Group (In re Johns-Manville Corp.)*, 26 B.R. 420, 426 (Bankr. SDNY 1983) ("The massive drain on [key personnel's] time and energy at this crucial hour of plan formulation in either defending themselves or in responding to discovery requests could frustrate if not doom their vital efforts at formulating a fair and equitable plan . . ..").

### 3. Application Or Extension Of The Automatic Stay Will Promote Efficiency And A Consensual Plan

50. The automatic stay is "one of the fundamental protections supplied by the Bankruptcy Code." *In re Univ. Med. Ctr., 973 F.2d 1065, 1074* (3d Cir. 1992); *see also Midatlantic Nat'l Bank v. NJ. Dep't of Envtl. Prot.,* 474 U.S. 494, 503 (1986). It supports the effectiveness of the insolvency proceeding by giving "the debtor a breathing spell from his creditors. . . . It permits a debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." *In re Univ. Med. Ctr., 973 F.2d at 1074.* Moreover, it can facilitate negotiations, settlements and a plan by preserving the *status quo,* placing creditors on a level playing field and staving off a rush to the courthouse with the resultant competition for resources that necessarily flow from the separate adjudication of the disparate claims and issues of the separate creditors. *See, Krystal Cadillac Oldsmobile GMC Truck, Inc. v. GMC (In re Krystal Cadillac Oldsmobile GMC Truck, Inc.)*, 142 F.3d 631 (3d Cir. Pa. 1998) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 340 (1977)).

51. Stay relief will afford students, other creditors, the Debtors and the government with a breathing spell to collectively negotiate a consensual plan. Absent the stay, as further set forth above, the relative rights of the students, the Debtors, the government and lenders will continue to change with each new payment of a student creditor on disputed obligations. Chapter 11 plan negotiations will be hindered, if not rendered impossible, during such extensive litigation proceedings and with the rights of the constituent classes of creditors constantly in flux.

52. The opportunity for a collective plan will make individualized proceedings and the cancellation, transfer or re-characterization of alleged individual student obligations unnecessary; hence, it is the most efficient mechanism to afford maximum redress to student, government and other creditor classes.

### C. The Requested Relief Is Necessary And Appropriate

53. Courts that have extended the automatic stay to include acts against non-debtors have weighed factors traditionally applicable to a preliminary injunction: (1) a substantial likelihood

of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the extent to which the enjoined party would suffer irreparable injury if the injunction is issued, and (4) the public interest. *See, e.g.*, *In re W.R. Grace & Co.*, 2008 Bankr. LEXIS 1048, at *40 (Bankr. D. Del. 2008); *see also, In re Excel Innovations, Inc.*, 502 F.3d 1086, 1096 (9th Cir. 2007).

### 1. There Is A Likelihood Of A Consensual Plan In These Cases.

54. Weighing the "likelihood of success" prong in the context of an extension of the automatic stay, courts have considered the likelihood of a successful outcome in the chapter 11 case. *See, e.g.*, *In re W.R. Grace & Co.*, 2008 Bankr. LEXIS 1048, at *43.

55. In this context, "success on the merits" can mean "the probability of [confirming] a successful plan." *Otero Mills, Inc. v. Sec. Bank & Trust (In re Otero Mills),* 21 B.R. 777, 779 (Bankr. D.N.M.) (holding that injunctive relief was proper to allow the debtor an opportunity to present a plan and put it into operation), *aff'd*, 25 B.R. 1018 (D.N.M. 1982); s*ee also, Landmark Air Fund II v. BancOhio Nat'l Bank (In re Landmark Air Fund II),* 19 Bankr. 556, 560 (Bankr. N.D. Ohio 1982).

56. Thus, an injunction to preserve the *status quo* is appropriate if there is a likelihood of confirming a consensual plan. *See Baldwin-United Corp. v. Paine Webber*, 57 B.R. 759, 767 (S.D. Ohio 1985).

57. A consensual plan is likely in these cases because all constituencies will benefit from compromise in a collective proceeding. Litigating the respective rights and obligations of all parties with respect to the Debtors, the government, all of the Debtors' former students and other parties in interest, particularly if separate proceedings are required for each individual student, would be a daunting task that could conceivably take years, cost millions and lead to inconsistent, ineffective and scattered relief. By contrast, the very possibility of structured settlements in these cases related to the characterization of past conduct, relief from student debt obligations, availability of estate funds and third party relief, all of which can be embodied in a

consensual plan, can efficiently maximize relief for all classes of creditors, including students, trade creditors and government interests.

## 2. In the Absence Of Relief, There Will Be Irreparable Harm To Students

58. The second and third factors for injunctive relief suggest that the Court should weigh the relative benefits and hardships that could occur if the relief is granted. *See, In re W.R. Grace & Co.*, 2008 Bankr. LEXIS 1048, at *44. These factors weigh overwhelmingly in favor of extending the automatic stay.

59. The harm to students and the claims against the Debtors' estates increase every day that stay relief is not extended because the students remain subject to collection efforts for billions of dollars, which the Debtors received, in Corinthian Student Loan Debt. As well, although the alleged student debts likely will be rendered void or cancelled, it is unlikely that students will receive either (a) the return of funds that they have already paid or (b) relief for their damaged credit ratings related to unpaid obligations that are ultimately cancelled.

60. By controlling the expansion of students' claims, the Debtors and the estates will only benefit from application or extension of the automatic stay. Moreover, extension of the stay will promote an efficient chapter 11 process—a collective proceeding toward a consensual plan without the need for individual proceedings by each aggrieved former student that would drain the estates' resources.

61. The federal government will not be harmed by an extension of the automatic stay. Ultimately, it is likely that any student obligation for Corinthian Student Loan Debt related to the Debtors' misconduct will be void or cancelled. *See* 34 C.F.R. § 685.206(c). The continued ability of the government to attempt to force collection from student creditors, on obligations for which the students may not be liable, will only complicate the redress that might ultimately be available to students and the government in these cases.

### 3. The Public Interest Will Be Served Through An Extension of the Automatic Stay

62. The public interest weighs heavily in favor of the requested relief. The Debtors' misconduct drained billions of dollars of taxpayer money through the Title IV FSA Programs, which was used for educational programs that have been canceled, publicly derided and discredited. There is a heightened public awareness of the plight of the Debtors' students that are being subjected to constant harassment in the form of collection processes and wage garnishments for alleged "student loan" obligations arising from the Debtors' misconduct.

63. Accordingly, it is critical that the facts about the Debtors' programs be uncovered and the relative rights and obligations of the principal participants - the Debtors, the government and the students - be addressed publicly and efficiently in these chapter 11 proceedings.

64. By extending stay relief to all affected parties, the Bankruptcy Court can provide a fair and level playing field for the rights and obligations of the Debtors, the government and the students to be publicly addressed. Rather than private proceedings that may give rise to inconsistent outcomes for similarly situated constituents, the public interest is best served by collective relief that will be uniformly applied. The best method to afford fair and uniform relief to similarly situated parties is to maintain the *status quo* so that the parties can address the treatment of claims, rights and obligations through a negotiated settlement or a chapter 11 plan.

### III. CONCLUSION

65. For the reasons set forth herein, the application or extension of the automatic stay as necessary to stay enforcement and collection of Corinthian Student Loan Debt is essential to facilitating a meaningful chapter 11 process in these cases and the circumstances presented justify extension of the automatic stay.

66. Wherefore, the Student Committee respectfully requests that the Court enter an Order granting the requested relief and such other relief as the Court deems appropriate.

Dated: June 8, 2015
       Wilmington, Delaware

**POLSINELLI PC**

  */s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com

-and-

**ROBINS KAPLAN LLP**
Scott F. Gautier, Esq.
Lorie A. Ball, Esq.
Cynthia C. Hernandez, Esq.
2049 Century Park East, Suite 3400
Los Angeles, California 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5800
sgautier@robinskaplan.com
lball@robinskaplan.com
chernandez@robinskaplan.com

*Proposed Counsel for The Official Committee of Student Creditors*

-and-

**PUBLIC COUNSEL LLP**
Mark Rosenbaum, CA Bar No. 59940
Anne Richardson, CA Bar No. 151541
Alisa Hartz, CA Bar No. 285141
Dexter Rappleye, CA Bar No. 302182
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089
mrosenbaum@publiccounsel.org
arichardson@publichcounsel.org
ahartz@publiccounsel.org
drappleye@publiccounsel.com

*Proposed Special Counsel to the Official Committee of Student Creditors*