# **EXHIBIT B**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | Case No. 14-7194 |
| CORINTHIAN COLLEGES, INC. d/b/a Everest College, Everest Institute, Everest University, Everest University Online, Everest College Phoenix, Everest College Online, WyoTech, and Heald College, | ) ) ) ) ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), brings this

action against Defendant Corinthian Colleges, Inc. referred to herein as "Corinthian"

and alleges the following:

### INTRODUCTION

1.     Corinthian is a publicly-traded, for-profit school that marketed itself as a

provider of career training. Corinthian's business model is predicated on convincing

consumers to obtain student financial aid to pay the high cost of tuition to enroll in its

programs. Because most of its prospective students could not afford to pay tuition out-

of-pocket, from July 2011 through March 2014, students took out nearly 130,000

private student loans to pay Corinthian's tuition and fees. The total outstanding balance

of these loans is in excess of $568.7 million.

2.      Since at least July 2011, it has been Corinthian's practice to induce prospective students to incur the loan obligations necessary to enroll by promising career training and graduate employment opportunities of the type that would enable a consumer to repay his or her debt upon completing Corinthian's program. As detailed below, Corinthian induced students to enroll in its programs through false and misleading representations about its graduates' career opportunities, including representations suggesting Corinthian would provide assistance in helping students find a job, and that students were likely to obtain a permanent job upon graduation.

3.      Corinthian falsely inflated its job placement statistics to induce students to enroll and to maintain its accreditation. Among other deceptive tactics, Corinthian defined a "placement" as any job that lasted one day, with the promise of a second day; paid employers to temporarily hire graduates from Corinthian schools; falsified placement information; and provided meager career services, and virtually no career services to graduates that Corinthian could already record as being placed.

4.      Prospective students received counseling from Corinthian admissions and financial aid staff concerning the value of a Corinthian education and the options available to them to pay the cost of tuition. Corinthian's staff was instructed to, and did, seek to cultivate relationships of trust with these prospective students, and assuage any concerns they may have had about the affordability of a Corinthian education and their ability to repay the student loans needed to finance it.

5.      In internal communications, Corinthian described its prospective student population as individuals who have "low self-esteem" and "[f]ew people in their lives who care about them"; who are "isolated," "stuck, unable to see and plan well for

future"; and "impatient, [and] want quick solutions." Corinthian aggressively recruited these consumers, including through persistent telemarketing and subjecting consumers who visited its campuses to high-pressure sales efforts.

6.    Corinthian referred internally to its students as having "[m]inimal to non-existent understanding of basic financial concepts," as well as poor or no credit history. Corinthian assisted these students in applying for federal financial aid, but even with the maximum amount of available federal aid, many prospective Corinthian students were not able to afford Corinthian's tuition. Corinthian referred to this shortfall as a "funding gap."

7.    Rather than reduce tuition to eliminate this gap, Corinthian marketed and promoted private student loans, known as Genesis loans, to its students. During the time period material to this complaint, Corinthian represented to its students that the Genesis loans were made by an independent third-party entity and that Corinthian did not have a financial interest in the loans.

8.    Contrary to Corinthian's representations, Corinthian did have an interest in the Genesis loans. At different times during the period July 21, 2011 to the present, Corinthian has been obligated to purchase all such loans immediately after origination, or all such loans on which a payment is more than 90 days past due.

9.    Corinthian took aggressive action to collect in-school payments on the Genesis loans as soon as they become past due, and Corinthian's campus staff members received bonuses based in part on their success in collecting such past-due payments from students. Corinthian's efforts to collect such payments included pulling students

out of class, preventing students from attending and registering for class, and terminating students' computer access.

10.     Despite its aggressive collection efforts, to date, more than 60% of students with a Genesis loan have defaulted on that loan within three years.

11.     When Corinthian marketed, promoted, and facilitated these student loans, Corinthian expected that most student-borrowers would default.

12.     Despite the high default rate, Corinthian marketed, promoted, and facilitated the Genesis loan program because it could not rely solely on federal funding for 100% of its revenue. Federal law requires that no more than 90% of its revenue may come from federal financial aid provided under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.* (Title IV aid). Every Genesis loan dollar that Corinthian induced its students to borrow, in effect, allowed Corinthian to receive up to an additional nine dollars in Title IV aid. As a result, Corinthian had strong financial incentives to induce its students into taking out Genesis loans, even given students borrowers' high default rates.

13.     Because Corinthian deceptively and unfairly induced students to incur significant debt, and because Corinthian took illegal aggressive action to collect on that debt, the Bureau brings this action to stop these practices and make Corinthian's consumers whole.

14.     On July 3, 2014, Corinthian and its wholly- and partially-owned subsidiaries entered into an Operating Agreement with the U.S. Department of Education ("Department").

15.     Corinthian entered into the Operating Agreement after the Department's Federal Student Aid office placed Corinthian on Heightened Cash Monitoring on June 12, 2014. This required Corinthian to wait 21 days after submitting student enrollment data to receive Title IV funds. The Department placed Corinthian on heightened oversight after Corinthian failed to provide the Department with satisfactory information regarding Corinthian's job placement data.

16.     Per the terms of the Operating Agreement, Corinthian has put a majority of its campuses up for sale and will close the remaining campuses. Corinthian further disclosed that for any school designated for sale, Corinthian "will seek to reach definitive sale agreements ... within six months."

17.     The Operating Agreement requires Corinthian to enter into an agreement with an independent monitor who will report to the Department and have full access to Corinthian's personnel, financial forecasts, and cash receipts.

18.     On or about July 18, 2014, the independent monitor was appointed.

19.     The Operating Agreement also states that Corinthian and the Department "will work together to establish a reserve fund" of not less than $30 million to be used exclusively for student refunds. To date, no reserve fund has been established.

20.     On August 20, 2014, Corinthian sold virtually all of the Genesis loan notes that it owned, totaling approximately 170,000 loans with a face value of $505 million, to a third-party company for $19 million.

## NATURE OF ACTION

21.     The Bureau brings this action under sections 1031(a), 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564, and 5565, for Corinthian's violations, from July 21, 2011 through the present, of sections 1031(a) and 1036(a)(1) of the CFPA, which prohibit unfair, deceptive, and abusive acts and practices, as well as for Corinthian's violations of the Fair Debt Collection Practices Act ("FDCPA"),  15 U.S.C. § 1692d.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

23.     Venue is proper in this district because Corinthian maintains campuses and does business in the Northern District of Illinois. 28 U.S.C. § 1391(b); 12 U.S.C. § 5564(f).

## PLAINTIFF

24.     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to commence civil actions to enforce federal consumer financial laws, including the CFPA and the FDCPA.  12 U.S.C. §§ 5564(a)-(b); 5481(12), (14).

## DEFENDANT

25.     Corinthian is one of the largest for-profit, post-secondary education companies in the United States. With more than 100 school campuses, Corinthian operates schools under the following names:  Everest College, Everest Institute, Everest University Online, Everest University, Everest College Phoenix, Heald College, and WyoTech.

26.     Corinthian Colleges, Inc. is headquartered in Santa Ana, California and, during times material to this complaint, has transacted and continues to transact business in the Northern District of Illinois. Corinthian operates five Everest College campuses in this district: Bedford Park, Burr Ridge, Melrose Park, Merrionette Park, and Skokie.

27.     Corinthian engaged in promoting, marketing, offering, and providing "consumer financial products or services," within the meaning of the CFPA, 12 U.S.C. § 5481(5). Specifically, Corinthian participated in designing, funding, promoting, and marketing the Genesis private loan program and facilitating students' application for Genesis loans that were made available to its prospective and current students to pay a portion of the tuition and fees that Corinthian charged students to enroll.

28.     Corinthian brokered loans to its students by, among other things, serving as the single point of contact that introduced the students to the Genesis loan program, assisted them in completing the application for a Genesis loan, and submitted the application to the loan originator. Corinthian received a benefit in arranging such loans, which were exclusively provided to Corinthian students.

29.     Corinthian provided financial advisory services to students and
prospective students regarding the payment of tuition and fees required to enroll in and
attend Corinthian's schools. Corinthian, through its financial aid staff, provided
substantial advice and assistance regarding private student loans and federal financial
aid to students enrolling in its schools. This included advising students on what
financial aid and loan programs were available to them to pay for school, assisting
students in completing the necessary applications and paperwork, and ensuring that
such applications and paperwork were completed to ensure receipt of funds.

30.     Because Corinthian engages in offering or providing consumer financial
products and services as described above, Corinthian is a "covered person" under the
CFPA, 12 U.S.C. § 5481(6).

## FACTUAL BACKGROUND

31.     Corinthian depends upon tuition and fees to generate revenue.

32.     The amount of tuition and fees Corinthian charged varied among
Corinthian's schools and educational programs. In 2013, tuition and fees to earn a
diploma from a Corinthian school, typically an 8 to 12 month program, were between
$13,100 and $21,338. In the same year, the tuition and fees for an associate's degree,
which is a 24 month program, were between $33,120 and $42,820. The tuition and fees
for a bachelor's degree for the same time period were between $60,096 and $75,384.

33.     Most students attending Corinthian's schools are low-income, or the first
in their families to seek an education beyond a high school diploma. Many Corinthian
students struggle economically. In 2012, Corinthian reported that approximately 85%
percent of its students had family incomes of less than $45,000 a year. A 2011 survey of

8

its campus operations indicated that over 57% of Corinthian's student population had a household income of $19,000 or less, and 35% of Corinthian's student population had a household income of less than $10,000.

34.     Students attending Corinthian's schools could very rarely pay for the school's tuition out-of-pocket. Students relied on private loans and aid provided by the federal government under Title IV to pay Corinthian's tuition and fees.

35.     In its Annual Report Form 10-K for fiscal year 2013, filed with the United States Securities and Exchange Commission, Corinthian reported that its operations in the United States derived 84.8% of net revenue from Title IV aid programs.

36.     Under Title IV, a for-profit company that owns a school receiving federal student aid funds is subject to the "90/10 rule," 34 C.F.R. § 668.14(b)(16). Under this rule, a for-profit college must not receive more than 90% of its net revenue from Title IV aid. A minimum of 10% of such an entity's revenue must come from non-Title IV aid, such non-Title IV federal aid, state aid, ordinary tuition payments from students, or as private student loans. Non-Title IV federal aid, which is not counted toward the 90% limit, includes educational benefits available to service members and veterans from the U.S. Department of Defense or the U.S. Department of Veterans Affairs. Schools that do not comply with the "90/10" rule risk losing their eligibility to participate in federal student aid programs.

37.     To be eligible for Title IV aid, a for-profit company that owns a school must be accredited by an accrediting agency recognized by the U.S. Department of Education. 34 C.F.R. § 600.5.

38.     In order to maintain its accreditation, Corinthian must meet any accrediting agency's minimum standards in several areas including job placement and graduation rates. Corinthian must report these rates to both its accreditors and its prospective students.

### Corinthian Created an Artificial "Funding Gap" to Increase Students' Need for Private Student Loans.

39.     In order to comply with the 90/10 rule, Corinthian made sure that the cost of attending its schools was high enough that students would not be able to pay solely through using Title IV aid.

40.     In September 2011, Corinthian's CEO distributed a presentation to his executive team, describing efforts by Corinthian to meet the requirements of the 90/10 rule by instituting "above market price increases to create 'funding gaps.'" By increasing tuition, Corinthian caused students, who otherwise would have been able to pay for the entire cost of tuition through Title IV aid, to take out private student loans in order to maintain 90/10 compliance. Regardless of whether students were able to repay the private student loans, Corinthian would profit from the increased availability of Title IV monies.

41.     In or about Spring 2011, for example, Corinthian increased tuition at Heald College by 14% to ensure that the school received additional non-Title IV funds in order to meet 90/10 requirements.

### *Corinthian Used Misrepresentations About Likely Student Outcomes to Induce Students to Incur Debt and Enroll.*

42.     Corinthian induced students to take out private student loans to enable them  to enroll at its schools through a series of misrepresentations about the likely employment outcomes for Corinthian students.

43.     Internally, Corinthian emphasized that its admissions representatives were salespeople. A training manual for Corinthian's Directors of Admissions instructed them to look for "sales" experience when hiring admissions representatives. A March 2012 training for admissions representatives trained them on "closing the sale" and instructed them that "all interactions with a customer are sales interactions."

44.     Rather than instructing Corinthian's admissions representatives to help prospective students find appropriate educational options, this training advised admissions representatives: "As our customer seeks to learn more about our college, your role will be more to bring about agreement that Everest is the right choice for him or her."

45.     Corinthian trained its admissions representatives to pressure prospective students who were parents by telling them that enrolling in a program was their best or only chance to help their children.

46.     Corinthian also recruited students by falsely implying urgency in the enrollment process by, for example, training admissions representatives to falsely tell prospective students that seats might not be available in the future.

47.     Corinthian admissions representatives put prospective students under constant pressure. At the Everest College in Melrose Park, Illinois, Corinthian trained

admissions representatives not to let prospective students leave their offices until they had enrolled in a Corinthian program.

48.     At the Everest College Burr Ridge, Illinois campus, managers instructed admissions representatives to keep calling the same prospective student until that prospective student explicitly told them not to call back again.

### Corinthian Promised a Career, But at Best, Only Helped Graduates Find Temporary Employment.

49.     While Corinthian promoted its schools to consumers as providing a "career-focused" education, Corinthian and its schools deliberately overstated the likelihood that students would be able to find a job that would enable them to pay off their loans. Corinthian and its schools promised "career training" and promoted Corinthian's "lifetime career services" and successful "career placement" rate.

50.     For example, in promoting Heald College, Corinthian advertised, "[y]our education might mean the difference between a rewarding career or just another job." Similarly, Everest Colleges, Universities, and Institutes advertised on its websites that it provided students "[a] better career, a better life, a better way to get there."

51.     But while Corinthian promoted "career" opportunities, its placement policies reflected a definition of "career" that does not correspond with that of a reasonable consumer. The "career" Corinthian schools promised is in fact just any job that a Corinthian graduate worked at for at least one day.

52.     Corinthian's Policy on Graduate Employment, effective since at least January 2010, states, "a graduate shall be counted as employed only if... The employment is for a reasonable period of time, is based on program objectives, and can be considered sustainable (e.g., not a single day of employment)."

53.     Corinthian maintained a distinct policy for graduates who became employed by an "employment agency that finds employees to fill short-term temporary jobs." As Corinthian's policy explained, these agencies may offer "positions where the position starts out as a temporary job, but, could become permanent if the employer decides to hire the candidate." For an agency employment to be counted for reporting purposes, Corinthian required that "a graduate must have actually worked on an assignment (e.g., a paid orientation does not count as an employment unless the graduate works for an additional day in an actual assignment)."

54.     Corinthian's written policy contained a broad exception to the two-day employment requirement. In bold-faced type, Corinthian's employment policy states, "In the event a graduate is hired for an ongoing (sustainable) position and does not return after one (1) day, this employment can remain in the system."

55.     So when Corinthian advertises on its website, www.mycareercounts.org/outcomes, "In 2012, over 69 percent of our 38,721 graduates found careers in their field of study," this really meant that 69 percent of Corinthian graduates found a job that lasted as little as one day.

56.     In contrast to Corinthian's definition, a reasonable consumer would understand the promise of a career—consistent with its dictionary definition—to mean "a job or profession that someone does for a long time."

57.     Corinthian's promise of a "career" was material to consumers' decision to enroll in Corinthian and to take out a private student loan.

### *Corinthian Falsified its Job Placement Rate.*

58.     In order to maintain accreditation and eligibility for Title IV aid, Corinthian must meet any accrediting agency's job placement minimum standards and report these rates to its accreditors and to prospective students.

59.     In addition to its misleading promotion of career opportunity, Corinthian has a history of falsely representing its job placement rate in its marketing materials and disclosures provided to consumers, and in documents submitted to accreditors.

60.     Corinthian promoted its career-focused education and job placement rate to induce students to enroll at its schools and take out Genesis loans. Corinthian attempted to bolster the credibility of its job placement claims by trumpeting, "In 2006, we formed a corporate verification team that confirms the accuracy of our job placement statistics ..." Yet Corinthian continued to misrepresent its job placement rates.

61.     At Everest College's Decatur, Georgia campus, school employees created fictitious employers and reported students as having been placed with those fake employers. The school employees then had friends falsely verify the employment. This resulted in increasing placement rates by as much as 37% per program on reports that Corinthian gave to accreditors in 2009 and 2010.

62.     In another example, at Everest Institute's Mid-Cities, Texas campus in 2010, two career services employees coordinated with employers to improperly verify 251 placements, only 7 of which were confirmed upon later review.

63.     At the Everest Institute's Hialeah, Florida campus in 2010, Corinthian had to lower the campus-wide placement rate that it had reported to its accreditor by 6.6

percentage points because it had falsely reported that graduates had been placed when, in fact, they remained unemployed.

64.     In April 2011, Corinthian management instructed an employee at the Everest Institute's Jonesboro, Georgia campus to list 70 unemployed graduates as employed for a report that Corinthian sent to its accreditor. Days later, after the report was sent, that employee was directed to change those 70 graduates' status back to unemployed.

65.     In the spring of 2012, a manager at WyoTech's Long Beach, California campus reported 366 self-employment placements after graduation, while most other WyoTech campuses had only three or four such placements during the same time period.

66.     Corinthian's employees reported inaccurate job placements so often that when, in May 2012, a senior employee told the West Division President that the Everest College's Renton, Washington campus would fail an audit for inaccurate placement records, the West Division President argued that the campus was being unfairly singled out. She wrote, "[I]f this is going to be how stringent we are, there's going to be a ton of failures. These people [Corinthian's employees responsible for verifying placements] don't know what they are doing."

67.     Corinthian's senior management knew that Corinthian's job placement representations were inaccurate.

68.     In September 2011, for example, Corinthian's chief executive officer acknowledged, "we have placement a compliance problem [sic] now and need to get back into compliance."

69.     Yet, despite the recognition of non-compliance, a March 2012 internal audit at Everest College's San Francisco, California campus found that Corinthian could not verify 53% of its reported placements.

70.     Also in March 2012, the former director of career services at Everest College's Milwaukee, Wisconsin campus, in an email titled "The Integrity of Career Services Management," informed Everest College's corporate office that the Milwaukee campus was "fudging the numbers, with the approval of [the] Director of Career Services." When the former employee raised questions after the placement rate increased from 6% to 33% in a short period of time, Corinthian terminated her employment.

71.     In August 2012, when an accreditor conducted a sample review of job placement rates for Everest College's Reseda, California campus, it found Corinthian was unable to verify 30% of its reported placements.

### To Inflate its Placement Statistics, Corinthian Falsely Classified Graduates as Unemployable.

72.     Not only did Corinthian falsely inflate the number of graduates it placed, it also deflated the number of graduates who were "available for employment."

73.     A graduate was considered unavailable for employment, and therefore removed from the employment rate calculation, for reason of death, incarceration, active military service deployment, the onset of a medical condition that prevents employment, continuing education, or because the student was an international student who returned to his or her country of origin.

74.     According to Corinthian's Policy on Graduate Employment, a graduate's incarceration could be documented with publicly-available documents such as "a copy of the arrest record, police report or booking/intake documentation… [or] a warrant that could lead to possible incarceration would be considered acceptable documentation."

75.     This verification policy enabled Corinthian employees to search the Internet for graduates' names for any purported evidence of incarceration. When Corinthian employees were able to match a graduate's name to some evidence of possible incarceration – irrespective of whether the name match was, in fact, an identity match – in some cases, Corinthian removed that graduate from the employment rate calculation.

### *Corinthian Inflated its Job Placement Statistics by Paying Employers to Temporarily Hire its Graduates.*

76.     Corinthian further inflated the job placement rate that it promoted to consumers and on which its accreditation was based by paying employers to temporarily hire its graduates.

77.     In 2011, at Everest Institute's Brighton, Massachusetts campus, the Campus President and Director of Career Services organized a scheme to pay a company to employ graduates for two days at a health fair. The school then counted those students as "placed," which inflated placement rates by 8 and 15 percentage points for the relevant programs.

78.     To further inflate the placement numbers it reported to consumers and accreditors, Corinthian engaged in a "pay to place" scheme exemplified by its "Calvary Initiative" ("Initiative"). In or about June 2011, Everest Institute's Decatur, Georgia campus, which risked losing its accreditation due to low placement rates, started the

Initiative to improve its placement rates. Under the Initiative, Corinthian paid employers $2,000 for each graduate that the employer hired if the employer promised to keep the graduate employed for 30 days.

79.    Corinthian did not inform graduates that their employment was subsidized or that it was temporary.

80.    According to the terms of the Initiative, and consistent with Corinthian's written policy, a graduate was counted as placed if the graduate worked one day and returned to work for a second day of work. Corinthian counted these jobs as placements, provided that information to accreditors, and included the placements in rates subsequently provided to prospective students.

81.    Corinthian management credited the Initiative and its implementers with placing 307 Decatur graduates, which raised the campus's placement rate sufficiently to allow it to meet accreditation standards.

82.    Due to the success of the Initiative in improving placement rates, Corinthian implemented similar programs at other campuses, including Everest Institute's Jonesboro, Georgia campus.

83.    Corinthian management also considered implementing this Initiative at schools in Florida, including its Jacksonville, Miami, Kendall, Hialeah, South Orlando, and North Orlando campuses. Corinthian's Executive Vice President opposed implementing the Initiative at these Florida campuses, stating that "the potential for negative press in Florida is much higher than it is in Atlanta and while [Corinthian has] put as much positive spin on the approach as we can the detractors will still use the program to detract."

### *Corinthian Deceptively Promoted the Utility of its Career Services.*

84.     While marketing and promoting its programs to prospective students, Corinthian falsely promised prospective students that they would receive career assistance while enrolled, and lifetime career assistance after graduation. Corinthian promoted "career-focused education" and career services that were available "whenever you need help finding a job, or want some advice on improving your resume or interviewing skills." Corinthian further promotes that it "not only help[s] you find a job after you graduate, we help you find a job any time you need one, throughout your career… From graduation to retirement, we'll help you advance your career whenever you need it."

85.     Contrary to Corinthian's representations that it would provide "career assistance for life," Corinthian schools did not provide meaningful career assistance while students were in school or after graduation.

86.     Corinthian's limited career services included distributing job postings from Craigslist. Students often had trouble contacting anyone in the career services office or getting any meaningful support.

87.     Once a student was initially placed, and Corinthian could report the placement to its accreditors, Corinthian refused to provide further career assistance to graduates. This was particularly problematic in light of Corinthian's policy of finding students temporary employment to pad its placement statistics.

88.     The career services Corinthian promised to provide were an important selling point for the school, which emphasized its nationwide network of employers and lifetime support for graduates. For prospective students incurring significant debt,

including Genesis loans, for the promise of a career, Corinthian's representations about its career services were material.

### *Corinthian Implemented the Genesis Loan Program to Fill the "Funding Gap" That Corinthian Created.*

89.    Before 2008, third-party providers of private education loans offered Corinthian students the opportunity to apply for loans to fund their educational expenses.

90.    In or about January 2008, these third-party lenders ceased making private student loans available to students who presented high credits risks (i.e. subprime borrowers), such as those enrolled at institutions owned by Corinthian.

91.    Rather than reduce tuition in response to the decision of these third-party lenders not to make funds available to subprime student borrowers, Corinthian launched its own institutional loan program – the Genesis Loan Program – which it developed together with a third-party entity ("Company A") already engaged in financing and servicing "funding gap" loans for other educational institutions.

92.    Under the Genesis loan program, pursuant to written agreements, Corinthian marketed the loan and a partner bank acted as the originator for each Genesis loan, disbursing the loan funds to Corinthian after each student's loan application was approved. Shortly after a student's loan funds were disbursed to Corinthian on the student's behalf, Company A purchased the loans from the bank. Corinthian then paid a "discount fee" to Company A equal to 50% of the face value of the loans that Company A purchased from the bank.

93.    Under the agreement with Company A, typically within two weeks after Company A purchased the loans from the bank, Corinthian purchased all of the loans

from Company A. Corinthian paid Company A the face value of the loans minus any discount fee that it had already paid and Company A operated as the servicer of the loans.

94.     Accordingly, from in or about 2008 through approximately July 2011, Corinthian knew that it would own all Genesis loans that its students took out within a period of approximately two weeks after the loan funds were disbursed.

95.     The lending criteria applicable to Corinthian students' applications for Genesis loans were developed jointly by Corinthian, Company A, and the originating bank.

96.     In 2011, the third-party lenders who had previously made loans to Corinthian's students that were considered prime borrowers ceased lending to Corinthian students altogether.

97.     In June 2011, Corinthian entered into an agreement with a private lending group (Company B) and changed the Genesis Loan program.  Corinthian launched this version of the loan program in or about August 2011. Company B assumed the role of intermediary between Corinthian and the bank.  As in the original version of the program, Corinthian marketed the loan and a partner bank originated loans to Corinthian students and disbursed the loan funds to Corinthian on behalf of the student borrower. Company B then purchased the loans from the bank, and Corinthian was then required to pay Company B a "discount fee" equal to 50% of the face value of each loan that Company B bought from the bank. Company A continued to service the loans.

98.     Unlike the prior version of the Genesis loan program, where Corinthian was then obligated to purchase all loans from Company A, the 2011 agreement required

Corinthian to purchase from Company B only the Genesis loans that were more than 90 days delinquent.

99.     From in or about 2011 through the present, Corinthian knew that it would own all Genesis loans that were more than 90 days delinquent in repayment, including those 90 days delinquent on required in-school payments.

100.    In or about 2013, Corinthian replaced the Genesis loan program with the EducationPlus loan program. The EducationPlus loan program is similar to the Genesis loan program in that, under the EducationPlus program, Corinthian markets the loan, a partner bank originates the loan, Company A services the loans, and Corinthian buys from Company B all of the loans that are more than 90 days delinquent. Corinthian management and staff often referred to the EducationPlus loan program as the Genesis loan program.

101.    In February 2014, after Company B withdrew from the program, Corinthian reinstated the first iteration of the Genesis loan program, under which Corinthian is obligated to purchase all loans originated.

102.    In or about July 2014, Corinthian ceased offering the Genesis loan program to it- students. In September 2014, Corinthian intends to resume offering Genesis loans to its students.

103.    From July 2011 through March 2014, Corinthian induced nearly 130,000 students to take private student loans through these programs, which are collectively referred to as "Genesis loans." The total outstanding balance of these loans is in excess of $568.7 million.

### *Corinthian's Financial Aid Staff Promoted Genesis Loans.*

104. During the times relevant to this complaint, Corinthian gave its financial aid planners a training instructing them to make "students believe you are operating with their best interest at heard [sic]." In truth, however, Corinthian's overriding goal was to enroll students. The same manual instructed staff to "build trust" with students so that they can "influence [students'] decisions and help them make the right choice for a better life by enrolling in our college."

105. At the Everest College's Burr Ridge, Illinois campus, through the spring of 2012, it was "all about numbers." Corinthian pressured staff to "close" the deal and enroll as many students as possible.

106. Corinthian's current and prospective students were encouraged to, and did, rely on Corinthian's financial aid staff to act in their interests in connection with the financial aid they applied for and received.

107. Beginning in approximately March 2008, Corinthian actively marketed, promoted, and offered Genesis loans to its prospective and current students to pay tuition and fees that were not covered by federal aid or other sources. Corinthian's financial aid staff promoted the loan by introducing the loan to prospective and current students, and by encouraging them to apply for the loan to pay for tuition and fees that were not covered by federal financial aid.

108. Corinthian staff was actively involved in the Genesis application process with its students. Once the student entered personal information in the electronic application, Corinthian's financial aid staff filled out the remaining information

including the requested loan amount, verified the information entered by the student, and submitted an application for a credit check on behalf of the borrower.

109.     During the time period material to this complaint, Corinthian also promoted the Genesis loan program through its "Preferred Lender List," which it published on each of its schools' websites. In the case of Heald College, for example, this "Preferred Lender List "advised Corinthian's prospective and current students that "[a]s a result of current conditions in the credit market, many lenders have ceased making private education loans, or have tightened their credit criteria such that fewer borrowers are qualifying for such loans. The lender listed below [Genesis loan program's originating bank] has expressed a willingness to make private education loans available to Heald students who meet its eligibility and credit criteria."

110.     The "Preferred Lender List" for each Corinthian school also stated that "[w]hile we do not promote or endorse this lender, we expect this lender to provide satisfactory customer service and representatives who can assist borrowers to make informed decisions. The lender listed below will work within our processing system and disburse funds to the student's account quickly using Electronic Funds Transfer."

111.     During the time period material to this complaint, Corinthian's "Preferred Lender List" did not inform consumers that Corinthian had an agreement to buy all of the Genesis loans and, consequently, that the student borrowers would shortly owe their debt to Corinthian.

112.     Moreover, Corinthian management misled even its own student finance planners to believe that Corinthian was not involved in funding the Genesis loan program. Management told planners that the Genesis loan was a private loan funded by

a third-party bank. Student finance planners in turn passed this information on to students.

113.     During the time material to this complaint, the Application/Enrollment Agreements provided to students at WyoTech, Heald College, Everest University Online, and Everest College Online did not include any mention of Corinthian's involvement in the Genesis loan.

114.     Students attending Everest University, Everest College Phoenix, and Everest Institute schools, however, typically received a six-page Application/Enrollment Agreement, which stated:

> Third parties who may make private loans to me to finance my education may subsequently sell such loans and related receivables to The School or to an affiliate of The School....[I]f I fail to comply with the terms of any financial assistance made available to me through The School or any other source or any cash payment plan offered to me, in addition to any other remedies available to The School by contract, or under law, the School may take action with respect to my continued enrollment, up to and including suspensions or termination of my enrollment.

115.     Corinthian staff did not review the terms of the Application/Enrollment Agreement with prospective students. Corinthian's practice of failing to review the terms with the prospective students left the students unaware that their relationship with Corinthian would be not just student-educator, but also borrower-debt collector.

116.     Under the Genesis loan program, nearly all student borrowers were required to make monthly loan payments while attending school. The most common payment plan was called "Plan A," which required a monthly loan payment while the student was attending school. The interest began accruing after the student left school.

A second plan, known as "Plan B," did not allow in-school payments, and interest began accruing while the student was enrolled in school. The school's campus president had to approve any Plan B payment plans.

117.    The interest rates for Genesis loans were typically substantially higher than the interest rate for federal loans. In or about July 2011, the Genesis loan interest rate was 14.9% with an origination fee of 6%. Meanwhile, the interest rate for federal student loans during this time period was 3.4% to 6.8% with an origination fee of 1%.

118.    When the Genesis loan program began using Company B in June 2011, Corinthian continued the practice of concealing from students and most of its financial aid planners that Corinthian had an obligation to buy Genesis loans, in this case, that were more than 90 days delinquent.

### Corinthian Used Unfair Harassing Tactics to Collect Past Due Loan Payments.

119.    Pursuant to the terms of the Genesis loans, a loan was delinquent immediately after a borrower was late on a payment for the first time.

120.    Because of its ownership interest in certain Genesis loans, and because of its obligation to purchase other Genesis loans in the event they became more than 90 days delinquent, Corinthian had a financial incentive to collect past-due Genesis loans. Corinthian harassed students to collect past-due loan payments.

121.    Corinthian made it a practice of identifying and tracking those students who were behind in their Genesis loan payments.

122.    At least since 2010 through part of 2013, Company A routinely provided Corinthian with monthly status reports concerning the status of the Genesis loan accounts, including the accounts that were past-due.

123. Corinthian's collection policy required school campuses to start the collection process as soon as a Genesis loan account became past-due.

124. It was Corinthian's practice to take action to collect loans that were less than 90 days delinquent. Corinthian took aggressive steps to collect these loans on Company B's behalf so that it would not be required to buy the loans from Company B.

125. Corinthian prevented student borrowers from attending classes they were currently enrolled in by informing instructors and other staff that these students were past-due on their Genesis loan accounts.

126. For example, in June 2013, a financial aid assistant instructed staff at Heald College's San Francisco campus not to allow a student who was over 38 days past-due on a Genesis loan to "sit in class until she provides a written authorization (Admission Slip) from the Business Office indicating that her [Genesis] account is up to date …"

127. Similarly, in June 2013, a Director of Student Accounts at Everest College's Ontario, California campus informed instructors that those students with past-due Genesis loan accounts were not allowed to attend class: "[B]elow are students with their Genesis accounts being in delinquent [sic]. Student in RED or 40+ days are BLOCKED from attending class until payment is made …"

128. This collection practice also was also carried out at WyoTech. In an email dated January 10, 2013, the Director of Student Accounts at WyoTech's Long Beach campus stated that the campus's Genesis collection practice included a "Director [meeting] with students who are not compliant and have not made their payments as

promised. Give them a deadline and do not allow them back to class until they get current and we have confirmation by Genesis."

129.    Corinthian also carried out its collection activities at inconvenient times or places for its students. Corinthian routinely pulled students out of class to address past-due Genesis loan payments.

130.    For example, in an email dated March 11, 2013, the President of Heald College's Stockton campus was informed of the number of students who were delinquent on their Genesis loan and notified that "All of the unpaid students will be pulled from class this week …"

131.    Similarly, in an email dated October 1, 2011, the President of Everest College's San Bernardino, California campus instructed the Director of Student Accounts to "ensure that EVERY time a student is pulled…add value as to why this is occurring during class time."

132.    Pulling students out of class for past-due Genesis loans was such a constant and routine practice at Everest College's Decatur, Georgia campus during the Spring of 2011 that students and employees referred to one financial aid staff member as the "Grim Reaper."

133.    Corinthian encouraged staff to continue these collection practices despite students' concerns. For example, in an email dated November 27, 2012, the President of Heald College's Modesto, California stated "I understand that instructors and other students do not like the interruptions. But until both departments come up with a better plan that works, we will support the plan we have known."

134.  A federal work-study student at the Everest College's City of Industry, California campus reported that she pulled one to five students per classroom per day out of class because they were behind on their Genesis loan payments.

135.  In January 2013, Corinthian employees at Everest College's Gardena and Alhambra campuses in California both noted in an e-mail that that their best practices for Genesis collections included "pulling student from class."

136.  Corinthian also prevented students who were past due on their Genesis loan payments from registering for any new classes at Corinthian. For example, Heald College's Best Practice Manual-Genesis Private Loans, attached to an email dated March 23, 2013 from Heald College's VP Controller, stated that, in the event of a past-due Genesis account, the staff must take the following action:

1.  31 Days Delinquent—Request to IT to turn off Student's Computer Access

2.  61 Days Delinquent—The student must meet with Campus President to discuss seriousness of past due status and next steps.

3.  91 Days Delinquent—A letter stating student will not be allowed to register for classes for the next quarter until the account is made current. The student must reaffirm their commitment to pay in writing with a letter to the President.

137.  In addition, Corinthian students who fell behind on their Genesis in-school loan payments often were locked out of the school's computer system and unable to log onto it.

138.  Corinthian also would prevent students who were overdue on their in-school payments for a certain period of time from receiving their books for the next class or module until they became current on their Genesis loans.

139.    Corinthian also informed students that they could not participate in the graduation ceremony or would have their certificate withheld if they were not current on their Genesis loan in-school payments.

140.    Corinthian pulled students out of class 20 days before graduation and financial aid staff threatened that if students did not become current on their Genesis loans, they could not graduate or start their externships. Some former students stated that Corinthian continues to withhold their certificates because they are unable to make payments on their Genesis loans.

141.    The collection of past-due Genesis in-school loan payments was so important to Corinthian management that Corinthian imposed Genesis collection goals for each school campus.

142.    In or about July 2010, Corinthian also launched an employee bonus plan tied to Genesis loan program collection efforts.

143.    Corinthian's Senior Director for Credit Risk Management, in an e-mail dated April 5, 2011 to a Student Accounts Collector, explained Corinthian's focus on collecting the in-school payments from students: "In FY11, the company has changed the focus of Genesis activities. In FY11, each campus is measured on Genesis Collection Metric of in-school activities. The collecting from the students should be a priority over offering forbearances."

144.    Corinthian management pressured campus level staff to meet the Genesis Collection Metric. For example, the president of Everest College's Reseda, California campus told the financial aid staff in an e-mail dated May 21, 2012,

> We all know that we are well off our normal Genesis
> cash collection for the month of May. This is the worst

month we have ever had. With that I need everyone to
pull out the stops. This means that if you do not have
a student in front of you I expect you to be getting
ahold of students who have not made their
payments... This will require you to use social media
efforts...; running to classrooms to see if the student is
in class; following up with the teacher directly; pulling
emergency numbers from the FA files.

145.    Corinthian caused substantial consumer injury with its aggressive
collection efforts, including disclosing students' debt to peers and persons of authority,
jeopardizing students' academic experience, and coercing students into making
payments they could not afford.

### *Corinthian Knew its Students Were Likely to Default on Genesis Loans.*

146.    Despite Corinthian's aggressive collection efforts, the default rate on
Genesis loans was consistently extremely high. Corinthian charged off a Genesis loan
when the student borrower was more than 270 days delinquent in making required loan
payments. Using the period in which Corinthian would charge off a Genesis loan and
calculating the default rate based upon the number of student loans, the default rate on
Genesis loans was typically greater than 50% for all loans more than two years old, and
above 60% for all loans more than three years old.

147.    Corinthian knew of the high default rates for its Genesis loans, and at all
times during operation of the Genesis loan program, Corinthian anticipated that the
default rates would remain at these high levels.

148.    Moreover, Corinthian knew the characteristics of students who were most
likely to default. Corinthian required that "Schools should gather information to discern
who is defaulting and why ... Internal data includes key information such as high school

attended, program of study, demographics, grades, etc." Corinthian used this information to identify its highest risk borrowers to target its debt collection efforts.

149.    Student borrowers who defaulted on Genesis loans suffered negative consequences including negative credit reporting, ineligibility for other forms of financing, or eligibility only on less favorable terms than would otherwise have been available.

## COUNT I

### CORINTHIAN'S REPRESENTATIONS AND OMISSIONS REGARDING PROSPECTIVE STUDENTS' CAREER OPPORTUNITIES VIOLATED THE CFPA'S PROHIBITION OF DECEPTIVE PRACTICES

150.    The allegations in paragraphs 1 through 149 are incorporated here by reference.

151.    Section 1036(a)(1)(B) of the CFPA, 12 U.S.C. § 5536(a)(1)(B), makes it unlawful for a covered person to engage "in any unfair deceptive, or abusive act or practice." An act or practice is deceptive under the CFPA if (1) there is a misrepresentation or omission of information that is likely to mislead consumers acting reasonably under the circumstances, and (2) that information is material to consumers.

152.    The Genesis loans issued to Corinthian students were consumer financial products.

153.    Corinthian is a "covered person" under the CFPA, 12 U.S.C. § 5481(6).

154.    From at least July 21, 2011 to the present, Corinthian made material misrepresentations or omissions to consumers directly or indirectly, expressly or by implication, regarding its graduates' career opportunities, including the assistance

Corinthian would provide students to help them find a job, the likelihood a student would receive a job, and the likelihood that job would last for more than one day.

155.    Corinthian made these misrepresentations to induce consumers to incur the private debt necessary to pay Corinthian's tuition and fees.

156.    Corinthian's misrepresentations or omissions misled, or were likely to mislead, consumers.

157.    Therefore, Corinthian violated the CFPA's prohibition on deceptive practices, 12 U.S.C. § 5536(a)(1)(B).

## COUNT II

### CORINTHIAN'S DEBT COLLECTION PRACTICES VIOLATED THE CFPA'S PROHIBITION OF UNFAIR PRACTICES

158.    The allegations set forth in paragraphs 1 through 149 are incorporated here by reference.

159.    An act or practice is unfair under the CFPA where "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).

160.    From at least July 21, 2011 through the present, Corinthian made misrepresentations or omissions to consumers, directly or indirectly, expressly or by implication, that the Genesis loan program was an independent third-party loan program in which Corinthian did not have a financial interest and upon which Corinthian could not collect.

161.    From at least July 21, 2011 to the present, Corinthian prevented enrolled students from attending class, pulled students out of class, denied students access to computers, and otherwise prevented enrolled students from completing their course of study, in an effort to collect past-due in-school Genesis loan payments from students.

162.    These practices caused or were likely to cause substantial injury to students because, as a result of Corinthian's unfair practices, students were denied access to aspects of educational programs for which they already had paid, through loans and other aid, incurring substantial debt in the process.

163.    These practices caused, or were likely to cause, substantial injury to students because Corinthian's unfair practices, including publicly disclosing debts to fellow students and instructors, caused students to suffer reputational harm and emotional distress.

164.    Consumers could not reasonably avoid the injury caused by Corinthian's unfair practices.

165.    Consumers' injury was not outweighed by countervailing benefits to consumers or competition.

166.    Therefore, Corinthian violated the CFPA by engaging in unfair practices, 12 U.S.C. § 5536(a)(1)(B).

## COUNT III

### CORINTHIAN'S DEBT COLLECTION PRACTICES VIOLATED SECTION 806 OF THE FDCPA

167.    The allegations set forth in paragraphs 1 through 149 are incorporated here by reference.

34

168.     The Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692a *et seq.*, prohibits debt collectors from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d.

169.     The FDCPA's definition of "debt collector" includes any person "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a.

170.     Under the second iteration of the Genesis loan program, from in or about August 2011 through at least 2013, Company B purchased the loans from the originator and sold those loans that became more than 90 days past-due to Corinthian.

171.     Corinthian attempted to collect Company B's debts even before Corinthian was obligated to, or did, purchase those loans from Company B.

172.     Because it collected debt of another creditor, Company B, or debt that it purchased in default, Corinthian is a "debt collector" within the meaning of the FDCPA.

173.     Corinthian's collection practices included pulling students out of class, preventing students from attending class, preventing students from registering for class, blocking students' computer access through school computers, and preventing students from obtaining course materials.

174.     The natural and intended consequence of these practices was to harass, oppress, and abuse students in connection with the collection of debts owed to Company B or to Corinthian.

175.     Therefore, Corinthian's collection practices violated the FDCPA, 15 U.S.C. § 1692d.

## COUNT IV

### CORINTHIAN'S DEBT COLLECTION PRACTICES
### VIOLATED SECTION 805 OF THE FDCPA

176.    The allegations set forth in paragraphs 1 through 149 are incorporated here by reference.

177.    Section 805 of the FDCPA, 15 U.S.C. § 1692c, governs communications in connection with debt collection. Section 805(a) prohibits, without the prior consent of the consumer or the express permission of a court of competent jurisdiction, debt collectors from communicating with a consumer in connection with the collection of any debt at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. 15 U.S.C. § 1692c(a)(1).

178.    In connection with the collection of debts, Corinthian communicated with student consumers during class time. Corinthian knew interrupting class could jeopardize the student's academic performance and disrupt the learning environment, thus inconveniencing the student, and did so without the student consumer's prior consent, in violation of Section 805(a)(1) of the FDCPA, 15 U.S.C. § 1692c(a)(1).

## COUNT V

### CORINTHIAN'S DEBT COLLECTION PRACTICES
### VIOLATED SECTION 805 OF THE FDCPA

179.    The allegations set forth in paragraphs 1 through 149 are incorporated here by reference.

180.    Section 805(b) of the FDCPA prohibits, without the prior consent of the consumer or the express permission of a court of competent jurisdiction, debt collectors from communicating with a consumer in connection with the collection of any debt,

with any person other than a consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

181.   Students and employees observed Corinthian's aggressive collection efforts of preventing students from attending class, pulling students from class, and blocking their computer access, and were aware these efforts were used to collect other students' past-due loan payments. Corinthian's collections efforts disclosed the existence of debts to instructors, classmates and other third parties in violation of Section 805(b) of the FDCPA, 15 U.S.C. § 1692c(b).

182.   Therefore, Corinthian's collection practices violated section 805 of the FDCPA, 15 U.S.C. § 1692c.

## PRAYER FOR RELIEF

Wherefore, the Bureau, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's power to grant legal or equitable relief, requests that the Court:

a.   permanently enjoin Corinthian from committing future violations of the CFPA and the FDCPA;

b.   declare that Corinthian engaged in deceptive conduct that induced its students to take out private student loans;

c.   order Corinthian to pay restitution to consumers harmed by their unlawful conduct;

d.   order Corinthian to pay damages to consumers harmed by their unlawful conduct;

e.  order Corinthian to disgorge all ill-gotten profits;

f.  order the rescission of all Genesis and EducationPlus loans originated since July 21, 2011;

g.  impose civil money penalties against Corinthian;

h.  order Corinthian to pay the Bureau's costs incurred in connection with bringing this action; and

i.  award such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Dated:  September 16, 2014

Anthony Alexis (DC Bar #384545)
*Acting Enforcement Director*

Ori Lev (DC Bar #452565)
*Deputy Enforcement Director*

Laurel Loomis Rimon (CA Bar #166148)
*Assistant Deputy Enforcement Director*

 /s/ Rina Tucker Harris
Rina Tucker Harris (DC Bar #444550)
Jonathan B. Engel (MA Bar #664518)
Chandana Kolavala (CA Bar #268355)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9196
Facsimile: (202) 435-7329
E-mail: RinaTucker.harris@cfpb.gov

Thomas Ward (IL Bar # 6291011)
Consumer Financial Protection Bureau
230 South Dearborn Street
Chicago, IL 60604
Telephone: (312) 610-8966
Facsimile: (312) 610-8971

E-mail: Thomas.Ward@cfpb.gov

*Attorneys for the Consumer Financial Protection Bureau*