# EXHIBIT I

# CRS Report for Congress

## Institutional Eligibility for Participation in Title IV Student Aid Programs Under the Higher Education Act:  Background and Reauthorization Issues

**March 9, 2007**

Rebecca R. Skinner
Specialist in Social Legislation
Domestic Social Policy Division



**Congressional
Research
Service**

**Prepared for Members and
Committees of Congress**

# Institutional Eligibility for Participation in Title IV Student Aid Programs Under the Higher Education Act: Background and Reauthorization Issues

## Summary

Title IV of the Higher Education Act (HEA) authorizes programs that provide student financial aid to support attendance at a variety of institutions of higher education (IHEs).  These institutions include public institutions, private non-profit institutions, and private for-profit (proprietary) institutions.  In order for students attending a school to receive federal Title IV assistance, the school must:

- Be licensed or otherwise legally authorized to provide postsecondary education in the state in which it is located,
- Be accredited by an agency recognized for that purpose by the Secretary of the U.S. Department of Education (ED), and
- Be deemed eligible and certified to participate in federal student aid programs by ED.

The most recent reauthorization of the Higher Education Act in 1998 resulted in several key changes to provisions affecting institutional eligibility, including:

- The requirement that proprietary institutions derive at least 10% of their revenues from non-Title IV sources (also known as the 90/10 rule),
- Modification of refund policy requirements to apply only to Title IV funds and to require pro-rata refunds for all Title IV recipients who withdraw before the completion of 60% of the payment period or period of enrollment, and
- Establishment of a distance learning demonstration program.

Since the 1998 reauthorization, Congress has acted through the Higher Education Reconciliation Act (P.L. 109-171) to make additional changes to HEA institutional eligibility requirements, particularly as they relate to program eligibility, distance education, and the return of Title IV funds.  ED has also made regulatory changes affecting institutional eligibility — most notably the elimination of the 12-hour rule and clarification of incentive compensation regulations.

As the 110th Congress considers HEA reauthorization, several issues may become a focus of debate.  These issues may include, for example, the 90/10 rule, accreditation, institutional outcomes, transfer of credit, and distance education.

This report will be updated as warranted by major legislative action.

# Contents

Overview ........................................................... 1

Eligibility Criteria ................................................. 3
   Eligible Institutions ............................................. 4
      Section 101 ............................................... 4
      Section 102 ............................................... 4
      Foreign Institutions ....................................... 5
      Additional Requirements ................................... 6
   Academic Year .................................................. 7
      12-Hour and One-Day Rules ................................ 7
   Eligible Programs ............................................... 9
   Reauthorization Issues ......................................... 10

Program Integrity Triad .......................................... 11
   State Authorization ............................................ 11
   Accreditation .................................................. 12
      Background Information on the Accreditation Process ........... 12
      Federal Requirements ..................................... 14
      Other Institutional Accreditation Provisions ................... 16
   Eligibility and Certification by ED ............................. 17
      Financial Responsibility ................................... 17
      Administrative Capacity ................................... 17
      Provisional Certification .................................. 19
      Program Review .......................................... 20
      Corrective Actions and Sanctions ........................... 20
   Loss of Title IV Eligibility ..................................... 21
   Reauthorization Issues ......................................... 22

Other Related Issues .............................................. 23
   Program Participation Agreements ............................... 24
      Incentive Compensation ................................... 24
   Return of Title IV Funds ....................................... 25
      Percentage of Title IV Aid Earned .......................... 26
      Amount of Title IV Aid Earned by the Student ................. 27
      Funds to Be Returned by the Institution ...................... 27
      Funds to Be Returned by the Student ......................... 28
      Post-Withdrawal Disbursement Counseling .................... 28
      Issues for Reauthorization ................................. 29
   Distance Education ............................................. 29
      Definitions of Correspondence and Telecommunications Courses ... 30
      50% Rules ................................................ 30
      Student Eligibility for Federal Student Aid .................... 31
      Distance Education Eligible Program ......................... 32
      Distance Education Demonstration Program .................... 32
      Issues for Reauthorization ................................. 34

## List of Tables

Table 1.  Loss of Institutional Eligibility, by Reason:  2000-2005  . . . . . . . . . . . 22

# Institutional Eligibility for Participation in Title IV Student Aid Programs under the Higher Education Act: Background and Reauthorization Issues

## Overview

Title IV of the Higher Education Act (HEA) authorizes programs that provide student financial aid to support attendance at a variety of institutions of higher education (IHEs).[1] These institutions include public institutions, private non-profit institutions, and private for-profit (proprietary) institutions. During the 2005-2006 academic year, a total of 6,441 institutions were classified as Title IV IHEs.[2] Of these, 39.9% were proprietary (for-profit) institutions, with the rest almost equally divided between public and private non-profit institutions. It is estimated that Title IV federal student aid programs made over $80 billion available to students attending IHEs during the 2005-2006 academic year.[3]

In order for students attending a school to receive federal Title IV assistance, the school must:

- Be licensed or otherwise legally authorized to provide postsecondary education in the state in which it is located,
- Be accredited by an agency recognized for that purpose by the Secretary of the U.S. Department of Education (ED), and

---

[1] This report only considers institutional eligibility with respect to Title IV programs. For more information about institutional eligibility for other HEA programs, see CRS Report RL30834, *K-12 Teacher Quality: Issues and Legislative Action*, by Jeffrey J. Kuenzi; CRS Report RL31647, *Title III and Title V of the Higher Education Act: Background and Reauthorization Issues*, by Charmaine Mercer; and CRS Report RL31625, *Foreign Language and International Studies: Federal Aid Under Title VI of the Higher Education Act*, by Jeffrey J. Kuenzi.

[2] This includes institutions in the United States and outlying areas. Due to natural disaster, 22 Title IV-eligible IHEs did not respond to the data collection. These institutions are not included in the total number of institutions. (U.S. Department of Education, National Center for Education Statistics, 2006, *Postsecondary Institutions in the United States: Fall 2005 and Degrees and Other Awards Conferred: 2004-05*, NCES 2007-167, Table 1. Available online at [http://nces.ed.gov/pubs2007/2007167.pdf].)

[3] This includes federal loans, work-study, and grants. College Board, October 2006, *Trends in Student Aid: 2006*, Table 1. Available online at [http://www.collegeboard.com/prod_downloads/press/cost06/trends_aid_06.pdf].

- Be deemed eligible and certified to participate in federal student aid programs by ED.[4]

Of the three components of this triad — state licensing, accreditation, and eligibility and certification — the first two were developed independently to serve purposes related to quality assurance and consumer protection, but not necessarily from a federal perspective. To avoid generating concerns about federal interference in educational decision-making, the federal government (ED specifically) relies on accrediting agencies and state licensing to determine standards of program quality. The federal government's only direct involvement in determining institutional eligibility for Title IV programs is through the third arm of the triad, which focuses on protecting the administrative capacity and fiscal integrity of its funding programs through certification by ED.[5]

In the 1992 reauthorization of the HEA, a central goal of the Congress was to reform the triad structure to address reported problems of fraud and abuse.[6] Growing default costs in the guaranteed student loan program, as well as media and other reports of exploitation of the student aid programs, especially by proprietary institutions, focused attention on the need to improve the triad structure used to approve institutions for program participation. The Higher Education Amendments of 1992 (P.L. 102-325) made numerous changes to the HEA intended to strengthen program integrity, including revision of the definitions of eligible institutions and inclusion of provisions to reform the process by which institutions become eligible to participate in Title IV student aid programs. Instead of singling out the proprietary school sector for special screening and oversight, the 1992 amendments reformed the institutional eligibility rules for all postsecondary institutions. The amendments, however, have had the greatest impact on proprietary schools.

The Higher Education Act Amendments of 1998 (P.L. 105-244) were signed into law by President Clinton on October 7, 1998. Among the key provisions affecting institutional eligibility were:

- Modification of the requirement that proprietary institutions of higher education derive at least 15% of their revenues from non-Title IV sources to require proprietary institutions to derive at least 10% of their revenues from non-Title IV sources,
- Elimination of the requirement for accrediting agencies to conduct unannounced site visits at institutions,
- Modification of refund policy requirements to apply only to Title IV funds and to require pro-rata refunds for all Title IV recipients who

---

[4] An IHE must also sign a Program Participation Agreement (PPA) to participate in most Title IV programs. The PPA is discussed in a subsequent section.

[5] While ED does not play a direct role in accrediting institutions, institutions seeking Title IV eligibility must be accredited by an accrediting organizations recognized by ED. ED has also established criteria that accrediting organizations must meet to be recognized for Title IV purposes. These criteria are discussed in a subsequent section of this report.

[6] A series of hearings on abuses in federal student aid programs were held by the Senate from February 1990 through October 1990.

withdraw before the completion of 60% of the payment period or period of enrollment,

- Establishment of a distance learning demonstration program, and
- Addition of the requirement that any IHE with a teacher preparation program that has lost state approval or financial support because it has been designated as low-performing by the state is no longer eligible to accept or enroll any students in its teacher preparation program who are receiving Title IV aid.[7]

On February 8, 2006, President George W. Bush signed the Higher Education Reconciliation Act of 2006 (HERA), Title VIII of the Deficit Reduction Act of 2005, into law (P.L. 109-171). The HERA made several changes to the HEA related to institutional eligibility. These changes affected program eligibility for participation in Title IV programs, rules governing the percentage of courses offered through telecommunications and the percentage of students participating in courses offered through telecommunications, and requirements for the return of Title IV funds by IHEs and students. Each of these changes is discussed in detail in this report.

This report provides a general overview of HEA provisions that affect institutional eligibility for participation in Title IV student aid programs and, in some instances, discusses specific issues that may arise during the HEA reauthorization process.[8] It begins with a general discussion of eligibility, both at the institutional level and program level. The discussion of institutional eligibility provides a brief summary of several key rules that affect eligibility. The second part of the report focuses on the program integrity triad: state authorization, accreditation, and eligibility and certification. This is followed by an overview of three additional issues that are closely associated with institutional eligibility: Program Participation Agreements, return of Title IV funds policy, and distance education.

# Eligibility Criteria

To participate in the federal student aid programs, institutions must meet specific criteria, including requirements related to program offerings, student enrollment, operations, and the length of academic programs. This section discusses the definition of an eligible IHE for Title IV purposes, academic year requirements, eligible program requirements, and reauthorization issues.

---

[7] This provision is part of Title II; however, it essentially established a new "program eligibility" requirement under Title IV. For more information, see CRS Report RL31254, *Pass Rates as an Accountability Measure for Teacher Education Programs*, by James B. Stedman and Bonnie F. Mangan.

[8] This report draws, in part, on information contained in archived CRS Report 97-671, *Institutional Eligibility For Student Aid Under the Higher Education Act: Background and Issues*, by Margot A. Schenet.

## Eligible Institutions

The HEA includes two definitions of IHEs.  The first definition, contained in Section 101, applies to institutional participation in non-Title IV programs.  The second definition, contained in Section 102, applies only to institutions participating in Title IV programs.  The use of these definitions is one legislative technique used to screen out institutions with certain characteristics associated with fraud and abuse, without denying eligibility to other institutions.  All 6,441 institutions that were identified as Title IV postsecondary institutions during the 2005-2006 academic year met the Section 102 definition of an IHE.

**Section 101.**  Section 101 recognizes IHEs as those that are legally authorized by the state, are accredited or preaccredited by an agency or association recognized by ED, are nonprofit institutions, award a bachelor's degree or provide at least a two-year program that is accepted as credit toward the completion of a bachelor's degree, and enroll as regular students only individuals who have graduated from a secondary institution or hold the equivalent of a high school diploma.  The statute also recognizes institutions offering not less than a one-year program of training in preparation for employment and institutions admitting students beyond the age of compulsory secondary school attendance.

**Section 102.**  Section 102 includes all institutions recognized as IHEs under Section 101 and expands the definition of IHEs for Title IV purposes to include proprietary institutions, postsecondary vocational institutions, and institutions outside of the United States (i.e., foreign institutions).  Proprietary institutions are defined as those institutions that provide training in preparation for gainful employment in a recognized occupation, are legally authorized by the state, are accredited by an agency or association recognized by ED, and admit as regular students only individuals who have graduated from a secondary institution or hold the equivalent of a high school diploma, or who are past the age of compulsory attendance in the state in which the institution is located.[9]  In addition, proprietary institutions must have been in existence for at least two years and derive at least 10% of school revenue from non-Title IV funds.  The latter requirement is commonly referred to as the 90/10 rule.[10]

Postsecondary vocational institutions must meet criteria similar to those applicable to proprietary institutions with two exceptions.  First, these institutions must be nonprofit institutions.  Second, they do not have to derive at least 10% of their revenue from non-Title IV funds.

---

[9] To be eligible to receive federal student aid, students who are beyond the age of compulsory attendance but do not have a high school diploma must meet ability-to-benefit requirements or meet the student eligibility criteria for home schooled students (Section 484(d)).

[10] A detailed discussion of the 90/10 rule, its legislative history, and reauthorization issues is available in  CRS Report RL32182, *Institutional Eligibility and the Higher Education Act: Legislative History of the 90/10 Rule and Its Current Status*, by Rebecca R. Skinner. (Hereafter referred to as CRS Report RL32182, *90/10 Rule*.)

All Title IV eligible institutions must also meet requirements with respect to the course of study offered and student enrollment.[11] The first set of requirements focus on courses offered by correspondence or telecommunications. Federal regulations define a correspondence course as a home study course offered by an IHE in which the IHE provides the student with instructional materials.[12] Upon completing a section of the instructional materials, the student takes a correspondent examination provided by the IHE and returns it to the IHE for grading. In contrast, a telecommunications course is defined as a course that is offered via the application of technology, including via the Internet.[13] In general, institutions offering over 50% of their *courses* by correspondence, excluding courses offered by telecommunications, are not Title IV eligible (Section 102(a)(3)(A)). An institution is also not considered eligible for the purposes of Title IV if 50% or more of its *students* are enrolled in correspondence courses, excluding courses offered by telecommunications (Section 102(a)(3)(B)).[14] A more detailed discussion about the 50% rules and recent changes to these rules appears in the section on distance education.

Two other requirements regarding enrollment also apply to all eligible institutions. The institution must not have a student enrollment in which more than 25% of its students are incarcerated (Section 102(a)(3)(C)).[15] Second, an institution will not be granted eligibility for Title IV programs if more than 50% of its students do not possess a high school diploma or its equivalent *and* the institution does not provide a two-year or four-year course of study (or both) leading to an associate's or bachelor's degree, respectively (Section 102(a)(3)(D)).[16]

**Foreign Institutions.** Generally, foreign institutions are eligible to participate in the Federal Family Education Loan (FFEL) program if they meet the same requirements as an IHE under Section 101 and have been approved by ED to

---

[11] There are exceptions to these rules, including participation in the Distance Education Demonstration Program, discussed later in this report.

[12] 34 CFR 600.2.

[13] If a correspondence courses also include some form of telecommunications technology, the course is classified as correspondence or telecommunications based on the predominant mode of instruction. For more information, see see U.S. Department of Education, Office of Federal Student Aid, *Volume 2—FSA Handbook: School Eligibility and Operations, 2006-2007*, p. 2-134, available online at [http://ifap.ed.gov/sfahandbooks/attachments/0607FSAHBkVol2Master.pdf]. (Hereafter referred to as ED, *Volume 2—FSA Handbook*.)

[14] The Secretary may waive this requirement for "good cause" for an IHE providing a two-year and/or four-year course of study leading to an associate's or bachelor's degree, respectively.

[15] The Secretary may waive this requirement for a nonprofit institution providing a two-year and/or four-year course of study leading to an associate's degree, bachelor's degree, or postsecondary diploma.

[16] The Secretary may waive this requirement if the institution has federal, state, or local government agency contracts that result in the institution serving significant numbers of students lacking a secondary school credential.

participate in FFEL.[17]  Foreign medical and veterinary institutions, however, must meet additional requirements to participate in FFEL.  Foreign medical institutions must meet one of two sets of additional criteria (Section 102(a)(2)(A)).  The first set of criteria require that at least 60% of the students and at least 60% of the graduates of a graduate medical school located outside of the United States must not be U.S. citizens or permanent residents, and at least 60% of the students or graduates of a graduate medical school located outside of the United States or Canada taking examinations administered by the Educational Commission for Foreign Medical Graduates must receive a passing score.  Under the alternative second set of criteria, a foreign medical school can be eligible to participate in FFEL if the institution has a clinical training program that was approved by a state as of January 1, 1991.[18]  To participate in FFEL, foreign for-profit veterinary institutions must have their students complete their clinical training at an approved veterinary school located in the United States.

**Additional Requirements.**  In addition to meeting the definitions discussed in Sections 101 and 102, institutions must comply with several additional requirements to be eligible for Title IV programs.  For example, an institution must certify to ED that it has adopted and implemented a program to prevent the use of illicit drugs and alcohol abuse by students.  An institution failing to provide this certification is not eligible to receive funds or any other form of financial assistance under any federal program (Section 120).  An institution must meet specific management requirements, shall not be considered an IHE for Title IV purposes if the institution, the institution's owner, or the institutions's chief executive office has been convicted of, or pled nolo contendere or guilty to, a crime involving Title IV funds (Section 102).[19]  An institution must also certify that is has established a campus security policy and has complied with requirements for the disclosure of this policy and campus crime statistics (Section 485(f)).  There are also reporting and dissemination requirements that institutions must meet with respect to general institutional information (e.g., costs of attendance, available financial assistance, description of the institution's academic programs), athletically related student aid, intercollegiate athletic programs,[20] and students' right to be informed about the availability of this information (Section 485).  These compliance requirements are reiterated in the Program Participation Agreement (PPA) discussed later in this report.

---

[17] FFEL is the only Title IV program in which foreign institutions may participate.

[18] Foreign medical institutions meeting the clinical training requirement do not have to meet the enrollment or examination passing rate requirements.

[19] The Program Participation Agreement, discussed in a subsequent section, also prohibits IHEs from hiring an individual to work with Title IV funds that has been convicted of, or had pled nolo contendere to, a crime involving the acquisition, use, or expenditure of Title IV funds (Section 484(a)(16)).

[20] Only a coeducational institution participating in Title IV programs must report on its intercollegiate athletic program, if one exists.

## Academic Year

Prior to the HERA, an academic year was required to include a minimum of 30 weeks of instructional time for undergraduate study during which a full-time student was expected to complete at least 24 semester or trimester hours or 36 quarter hours at an IHE measuring program length in credit hours, or at least 900 clock hours at an IHE measuring program length in clock hours. The Secretary was permitted to reduce the requirement of a minimum of 30 weeks of instructional time to 26 weeks of instructional time on a case-by-case basis for IHEs providing a 2-year or 4-year program of instruction for which it awards associate's or bachelor's degrees.

The HERA modified the minimum weeks of instructional time for programs measuring program length in clock hours. While programs measuring instructional time in credit hours must continue to provide a minimum of 30 weeks of instructional time, programs measuring instructional time in clock hours are required to provide a minimum of 26 weeks of instructional time. It should be noted that the provision allowing the Secretary to waive the requirement of a minimum of 30 weeks of instructional time at IHEs providing a 2-year or 4-year program of instruction leading to an associate's or bachelor's degree was retained.

**12-Hour and One-Day Rules.** The Higher Education Amendments of 1992 defined the academic year that an eligible institution must provide as including both a minimum number of credit hours for undergraduate students and a minimum length of instructional time for all students (Section 481 (d)). According to the statute, an academic year must contain at least 30 weeks of instructional time. This 30-week requirement may be met through standard terms (i.e., quarters, semesters, and trimesters), non-standard terms (i.e., the term has a beginning and end date but does not meet the definition of a standard term), or a non-term program (i.e., the program is not organized in terms and may or may not have preestablished beginning and end dates).

ED addressed the implementation of the statutory requirement that the academic year contain at least 30 weeks of instruction through regulatory action. Initially, this involved defining what constituted a "week of instructional time." In the April 1994 interim final regulations,[21] for programs using standard terms or clock hours, a week of instructional time was defined as any week that included at least one day of "regularly scheduled instruction, examination, or preparation for examination ..."[22] For programs measured in credit hours without standard terms,[23] a week of instructional time was defined "as any week in which at least five days of regularly

---

[21] U.S. Department of Education, Office of Postsecondary Education, *Student Financial Assistance and Nontraditional Educational Programs (Including the "12-Hour Rule"): A Report to Congress*, July 2001, p. 8. Available online at [http://www.ed.gov/policy/highered/guid/12hourrulereport.html]. (Hereafter cited as ED, *12-Hour Rule*.)

[22] ED, *12-Hour Rule*, p. 8.

[23] The phrase "without standard terms" includes non-term and nonstandard term-based programs.

scheduled instruction, examination, or preparation for examination occurs."[24]  The former was known as the "one day rule."

The November 1994 final regulations retained the one day rule, but modified the requirement for programs measured in credit hours without standard terms to provide greater flexibility to these institutions.  There were concerns, however, that programs without standard terms may alter their program structures to meet the 30-week requirement without providing an adequate level of instruction to a full-time student. Under these circumstances, a student could be receiving more financial aid than was merited (e.g., receiving full-time student aid when part-time student aid was appropriate).  ED was also concerned that the workload in these programs "was not properly distributed through the period."[25]  Thus programs without standard terms were required to provide 12 hours, instead of five days, of regularly scheduled instruction, examination, or preparation for examination in order for it to be considered a week of instructional time.[26]  This became known as the "12-hour rule."

Implementation of the 12-hour rule, however, resulted in several unintended consequences.[27]  For example, many programs offer rolling starting times and overlapping terms, which provide students with increased flexibility and access to higher education.  These non-standard or non-term educational programs were experiencing difficulty complying with the 12-hour rule.  The 12-hour rule was also difficult for distance education programs to implement for several reasons, including the difficulty in determining the number of hours of instruction in which students were participating weekly.  In addition, the 12-hour rule resulted in inequities in Title IV funding received by students completing the same amount of academic credit, based on whether an individual student was enrolled in an institution using standard or non-standard academic terms.  In recognition of the difficulties created by the 12-hour rule, ED revised its regulatory guidance and stated that all Title IV program eligibility will be determined using the one-day rule regardless of whether standard terms are used or not.[28]  This new regulation went into effect on July 1, 2003.

---

[24] ED, *12-Hour Rule*, p. 8.

[25] Ibid., p. 9.

[26] Instructional time was defined to include internships, cooperative education programs, independent study, and other forms of regularly scheduled instruction.  Previous regulations had already clarified that homework could not be counted toward the instructional time requirement.  In addition, in order for preparation for examination to be counted as instructional time, the preparation had to occur after the last day of scheduled classes for a given payment period.

[27] *Federal Register*, Nov. 1, 2002, vol. 67, no. 212.  Available online at [http://www.ed.gov/legislation/FedRegister/finrule/2002-4/110102a.html].  (Hereafter cited as *Federal Register*, Nov. 2002.)  See also *Federal Register*, Aug. 8, 2002, vol. 67, no. 153.  Available online at [http://www.ed.gov/legislation/FedRegister/proprule/2002-3/080802a.html].

[28] *Federal Register*, Nov. 2002.

## Eligible Programs

In order to qualify as an eligible institution for the purpose of Title IV, a school must offer at least one eligible program.[29]  The IHE must ensure that a program qualifies as a Title IV eligible program prior to awarding Title IV funds to students in that program.  IHEs are also responsible for ensuring that individual Title IV eligible programs are included on the institution's accreditation notice, and that the institution is authorized by the state to provide the programs.

There are several provisions that specify the criteria for program eligibility. These program definitions classify a school as an IHE, proprietary institution of higher education, or postsecondary vocational institution.

A school is considered an IHE if it:

- offers a program leading to an associate's, bachelor's, professional, or graduate degree, or
- offers a program of two or more academic years that is acceptable for full credit toward a bachelor's degree, or
- offers a training program of at least one academic year leading to a certificate, degree, or other recognized credential and prepares students for gainful employment in a recognized occupation.

There are three types of programs that classify a school as a proprietary institution or postsecondary vocational education institution.[30]  Each program type requires a specific number of weeks of instruction and must prepare students for gainful employment in a recognized occupation.

- The first type of eligible program must provide undergraduate instruction for at least 600 clock hours, 16 semester or trimester hours, or 24 quarter hours offered during a minimum of 15 weeks of instruction.  The program may admit students who have not completed the equivalent of an associate's degree as students.
- The second type of eligible program must be a graduate or professional program or must admit only students who have completed the equivalent of an associate's degree as students.  It must provide at least 300 clock hours, 8 semester hours, or 12 quarter hours of instruction offered during a minimum of 10 weeks of instruction.

---

[29] Not all programs at an institution must meet the eligible program requirements, but at least one program must meet these requirements.  Students in non-eligible programs may not receive Title IV funds.

[30] While a distinction between institutions of higher education, proprietary institutions of higher education, and postsecondary vocational education institutions can be made based on program type, all three types of institutions are considered institutions of higher education for the purpose of Title IV eligibility.

- The third type of eligible program, known as a short-term program,[31] must provide at least 300 but less than 600 hours of undergraduate instruction during a minimum of 10 weeks of instruction.[32] The program must admit at least some students who have not completed an associate's degree or its equivalent as students.

Short-term programs must also meet several additional criteria in order to be considered eligible. First, the program must have verified student completion and job placement rates of at least 70%. Second, the program may not be more than 50% longer than the minimum training period required by the state or federal agency, if any, for the occupation for which the program prepares students. Last, the program must have been in existence for at least one year.

The HERA expanded the definition of an eligible program to include instructional programs that use the direct assessment of student learning or recognize the direct assessment of student learning by others rather than measuring student learning in credit hours or clock hours.[33] The assessment used to determine student learning must be consistent with the institution's or program's accreditation. The Secretary of Education (Secretary) is required to determine whether a program that proposes to use direct assessment rather than credit hours or clock hours to measure student learning qualifies as an eligible program.

Finally, the HERA added a definition of an eligible program offered through distance education. This new definition is discussed in the distance education section of this report.

## Reauthorization Issues

There are several issues related to institutional eligibility that may be considered by Congress. Examples of these issues are summarized below:

- Definition of an institution of higher education: Congress may consider whether it is necessary to have separate definitions of an IHE for Title IV and non-Title IV purposes. One issue that may be focused on in this debate is whether Congress wants to allow proprietary institutions to participate in other titles of the HEA. Under current law, their participation in limited to Title IV.

---

[31] Short-term programs are only eligible for the Federal Family Education Loans (FFEL) Direct Loans (DL) programs. For more information, see ED, *Volume 2—FSA Handbook*, p2-2.

[32] These programs are eligible only to participate in FFEL and DL. P.2-2

[33] ED has stated that direct assessment programs are not programs that grant students credit for "life experience." For more information, see U.S. Department of Education, Office of Federal Student Aid (April 2006), *Dear Partner Letter: Changes Made by the Higher Education Reconciliation Act of 2005 (HERA) to Student and Institutional Eligibility, and the Student Assistance General Provisions, under the Federal Student Aid Programs* (GEN-06-05), available online at [http://ifap.ed.gov/dpcletters/GEN0605.html]. (Hereafter referred to as ED, Changes Made by HERA.)

- Regular students: Under the Section 101 definition of an IHE, IHEs may only admit students who have a high school diploma or its equivalent or are beyond the age of compulsory attendance as regular students. Congress may consider extending the definition of a regular student to include students who are dually enrolled in high school and college courses and students who were home schooled.

- 90/10 rule: As previously discussed, the 90/10 currently applies only to proprietary institutions. Congress may consider eliminating the 90/10 requirement or applying the 90/10 requirement to all IHEs. Congress may also consider continuing to apply the 90/10 rule only to proprietary institutions but eliminating the 90/10 rule as a requirement for institutional eligibility, so that proprietary institutions that violate the rule do not necessarily lose their Title IV eligibility.[34]

- College costs and prices: Congress may require IHEs to provide additional information about their costs and prices to aid consumers in selecting an IHE to attend. Congress may also consider offering incentives to IHEs that are able to reduce their costs and pass these savings on to students, or may consider penalizing or publicly identifying IHEs whose prices are rising faster than a particular benchmark (e.g., the Consumer Price Index-All Urban Consumers).

# Program Integrity Triad

Part H of Title IV specifies the roles and responsibilities for the three aspects of the program integrity triad: state authorization, accreditation by an accrediting organization recognized by the Secretary of Education, and eligibility and certification by ED. The triad is intended to provide balance in assuring the eligibility of institutions for Title IV. The state role is primarily one of consumer protection, while the accrediting agencies are intended to function as a quality assurance mechanism. These two legs of the triad were developed independently of the federal government. The federal government has historically relied on them to avoid generating concerns about federal interference in educational decision-making. ED is responsible for oversight of compliance, the third leg of the triad; that is, protecting the administrative and fiscal integrity of the federal student aid programs.

## State Authorization

The state role in the triad is to provide legal authority for postsecondary institutions to operate in the state in which they are located. The state provides legal authorization to an institution through a charter, license, or other written document issued by the appropriate state agency or state official. For example, the document may be provided by a licensing board or a state educational agency. An institution is required to provide ED with evidence that it has received the authority to operate in a particular state when it applies to participate in the federal student aid programs.

---

[34] For more information, see CRS Report RL32182, *90/10 Rule*.

The state agencies responsible for providing legal authorizations for institutions to operate in the state are also required to carry out three additional functions:

- Upon request, the agencies must provide the Secretary with information about the licensing and authorization process used by the state,
- Notify the Secretary when the state revokes the authority of an institution of higher education to operate, and
- Notify the Secretary if the agency has credible evidence that an institution has committed fraud in administering its Title IV programs or has substantially violated a Title IV provision (Section 495).

## Accreditation[35]

Accreditation by an agency or association recognized by ED is the second component of the triad for institutional eligibility.  Accrediting agencies are private organizations set up to review the qualifications of member institutions based on self-initiated quality guidelines and self-improvement efforts.  Institutional and program accreditation was included in the triad as a quality control mechanism.

**Background Information on the Accreditation Process.**  Accreditation has always been and continues to be a voluntary process.  It started in the late 1800s with the formation of associations to distinguish institutions of higher education that merited the designation of college or university from those that did not but called themselves colleges.  Beginning in 1952 the federal government began to formally recognize accrediting agencies.[36]   Accreditation was subsequently linked to institutional eligibility for Title IV aid as an indicator of the institution's educational quality.

---

[35] For more information about key reauthorization issues and relevant legislative activity regarding accreditation, see CRS Report RL32989, *Accreditation and the Reauthorization of the Higher Education Act*, by Rebecca R. Skinner and Jody Feder.  (Hereafter referred to as CRS Report RL32989, *Accreditation*.)   Additional information about potential reauthorization issues can also be found in  House Hearing, Subcommittee on 21st Century Competitiveness, *Assuring Quality and Accountability in Postsecondary Education: Assessing the Role of Accreditation*, Oct. 1, 2002.  (Hereafter cited as House, *Accreditation Hearing*.)

[36] Federal recognition of accrediting agencies was initiated in 1952, shortly after the passage of the GI Bill for Korean War veterans, to assess higher education quality and link it to the federal student financial assistance program.  Rather than creating its own system of quality assurance, the federal government opted to rely on existing accrediting agencies.  A recognition process was established in the Office of the U.S. Commissioner of Education to produce a list of federally recognized accrediting agencies and associations.  (Testimony provided by Dr. Judith Eaton, President, Council for Higher Education Accreditation, House *Accreditation Hearing*, p. 48.)

There are currently three types of accrediting organizations:

- **Regional accrediting organizations.** These eight commissions operate in six regions of the U.S.[37] They accredit 2,986 colleges and universities.[38] Accreditation status is granted to the whole institution. It does not guarantee the quality of individual programs or the students who graduate from those programs. At least 97% of the institutions accredited by regional accrediting organizations are degree-granting, nonprofit institutions.[39] Regional accrediting organizations may also accredit proprietary institutions regardless of whether they are degree-granting institutions.

- **National accrediting organizations.** These entities operate across the U.S., also accrediting whole institutions. According to information provided by the Council for Higher Education Accreditation (CHEA), there are two types of national accrediting organizations—faith-based and private career. The four faith-based accreditors review religiously-affiliated or doctrinally-based institutions.[40] There are 412 faith-based accredited institutions, all of which are degree-granting and non-profit. The seven private career accreditors accredit a substantially larger number of institutions.[41] Of the 3,416 institutions accredited by private career accreditors, about 75% are non-degree-granting and about 90% are proprietary institutions. Many are single-purpose institutions (e.g., focused on business and technology).

- **Specialized or programmatic accrediting organizations.** These entities also operate nationwide. They review programs and single-purpose institutions (e.g., engineering and technology). In many instances, particular programs (e.g., law) are accredited by a specialized accrediting organization, while the institution at which that program is offered is accredited by a regional or national

---

[37] There is no overlap among the regions accredited by these commissions. Two regions, New England and the West, each have two accrediting organizations. For New England, one accrediting agency organization accredits institutions of higher education, while the other accredits technical and career institutions. In the West, one accrediting agency accredits community and junior colleges, while the other accredits senior colleges and universities. For more information, see [http://www.chea.org/Directories/regional.asp].

[38] Council on Higher Education Accreditation (April 2006), *Fact Sheet #1: Profile of Accreditation*. Available at [http://www.chea.org/pdf/fact_sheet_1_profile.pdf]. (Hereafter cited as CHEA, *Fact Sheet #1*.)

[39] CHEA, *Fact Sheet #1*.

[40] For more information on the faith-based accreditors, see [http://www.chea.org/pdf/CHEA_USDE_AllAccred.pdf].

[41] For more information on the private career accreditors, see [http://www.chea.org/pdf/CHEA_USDE_AllAccred.pdf].

accrediting organization.  There are 18,152 programs that hold this type of accreditation.[42]

The accreditation process begins with institutional self-assessment.  The results of this analysis are reviewed by faculty and administrative peers.  Generally, an outside team composed of peers and members of the public conducts a site visit at the institution.  Based on the results of the self-assessment, peer review, and findings from the site visit, the accreditation commission determines whether accreditation should be awarded to a new institution, renewed for an existing institution, denied, or put on provisional or probational status.  Reevaluation occurs regularly, generally on a cycle ranging from every few years to every 10 years.[43]

**Federal Requirements.**  In order for a postsecondary institution to acquire institutional eligibility for the purposes of Title IV, it must be accredited[44] by an agency or association recognized by ED as a reliable authority for assessing the quality of education or training provided by that institution.  Accrediting organizations must meet a specific set of criteria prior to receiving recognition from ED.  Once granted, recognition is established for up to five years.  The accrediting organization must then be reapproved for inclusion on the list of recognized accrediting entities.

According to Section 496, the accrediting agency or association must be a state, regional, or national agency or association that demonstrates the ability and experience to serve as an accrediting agency or association.  These agencies or associations must then meet one of the following specific criteria:

- In order to participate in Title IV programs, the agency or association must have a voluntary membership of IHEs and have the accreditation of these institutions as one of its primary purposes or, for the purposes of participation in other ED or other federal programs, the agency must have a voluntary membership and have as its primary purpose accrediting IHEs or programs.
- It must be a state agency approved by the Secretary as an accrediting agency or association on or before October 1, 1991.
- For the purposes of determining eligibility for Title IV programs, the agency or association must either conduct accreditation through a voluntary membership organization of individuals participating in a profession, or the agency or association must have as its primary

---

[42] CHEA, *Fact Sheet #1.*

[43] For general information about accreditation, see materials available at [http://www.chea.org] and [http://www.ed.gov/admins/finaid/accred/index.html]. Information about federal recognition of accrediting agencies is available at [http://www.ed.gov/admins/finaid/accred/index.html].  Specific information about the activities of the National Advisory Committee on Institutional Quality and Integrity, established to advise ED on matters related to accreditation, can be found at [http://www.ed.gov/about/bdscomm/list/naciqi.html].

[44] Institutions meeting the definition of an IHE as discussed in Section 101 may be accredited or preaccredited.

purpose to accredit programs within institutions that have already been accredited by another agency or association recognized by the Secretary.

Accrediting agencies or associations meeting the first or third criterion must also be administratively and financially separate and independent[45] from any associated or affiliated trade organization or membership organization. For accrediting organizations meeting the third criterion, if the agency or association was recognized by the Secretary on or before October 1, 1991, the Secretary may waive the requirement that the agency or association be administratively and financially separate and independent if it can be shown that existing relationships with associated or affiliated trade organizations or membership organizations have not compromised the independence of the accreditation process.

Regardless of the type of accrediting association or agency, the organization must consistently apply and enforce standards that ensure that the education programs, training, or courses of study offered by an IHE are of sufficient quality to meet the stated objectives for which the programs, training, or courses are offered. The standards used by the accrediting agency or association must assess student achievement, in relation to the institution's mission, including, as applicable, course completion, passage of state licensing examinations, and job placement rates. The accrediting organization must also consider the institution's curricula, faculty, facilities, fiscal and administrative capacity, student support services, recruiting and admissions practices, measures of program length, objectives of the credentials offered, and student complaints received directly by the agency or association or those that are available to the agency or association. The institution's record of compliance with the institutional requirements of Title IV must also be examined with respect to the most recent student loan default rate data provided by ED, the results of financial or compliance audits, program reviews, and other information provided to the agency or association by ED.

There are additional requirements that accrediting agencies and associations must meet that focus on operating procedures, including reviewing newly established branch campuses at accredited institutions and publicly disclosing when an institution is considered for accreditation or reaccreditation. Accrediting agencies and associations must also perform regular on-site inspections that focus on educational quality and program effectiveness.[46]

---

[45] Section 496 (b) defines "separate and independent" to mean that (1) members of the postsecondary education governing body of the accrediting agency or association are not selected or elected by the board or chief executive officer of any related, associated, or affiliated trade associations or membership organizations; (2) the board must have at least one public member for every six board members; (3) dues paid to the accrediting agency or association must be separate payments from any dues paid to any related, associated, or affiliated trade associations or membership organizations; and (4) the accrediting agency or association develops and determines its own budget without consulting any other entity or organization.

[46] Prior to the 1998 HEA amendments, accrediting agencies were required to make
(continued...)

Section 496 also prescribes the procedures for ED's recognition of accrediting agencies, including requirements to conduct an independent evaluation, solicit third party information, make records of the decision process available, and publish reasons for denial of recognition. The Secretary is also specifically prohibited from basing recognition decisions on anything other than the statutory criteria, while accrediting agencies are expressly permitted to have criteria in addition to those needed for recognition.

The Secretary is advised on issues regarding accreditation by the National Advisory Committee on Institutional Quality and Integrity (NACIQI) authorized by Section 114 of the HEA. The 15 members of this advisory committee are appointed for 3 year terms by the Secretary. The Secretary is required to appoint individuals who are representatives of or knowledgeable about postsecondary education training, and the committee must include representatives from all sectors and types of IHEs. NACIQI is charged with assessing the process of eligibility and certification for Title IV purposes and providing recommendations for improving the process. The committee is also responsible for advising the Secretary with respect to the standards accrediting organizations must meet for Title IV purposes, the recognition of specific accrediting organizations, and the relationship between accreditation and the certification and eligibility of IHEs and state licensing responsibilities for Title IV purposes.

**Other Institutional Accreditation Provisions.** Generally institutions are accredited by only one accrediting agency or association. If an institution wants to change accrediting agencies, it must submit all documentation related to the prior accreditation to ED. These documents should demonstrate reasonable cause for making the change. Otherwise, ED will no longer consider the institution eligible for Title IV funds. Institutions seeking dual accreditation must also submit to each accrediting agency and ED the reasons for dual accreditation and demonstrate reasonable cause for holding dual accreditation. Dually accredited institutions must choose one accrediting agency for the purposes of Title IV eligibility. These rules were added to prevent abuses by institutions changing accrediting agencies or having dual accreditation as a means to avoid loss of eligibility for Title IV purposes.

Institutions that have had their accreditation withdrawn, revoked, or terminated for cause during the preceding 24 months are not eligible to be certified (or recertified) as an IHE or to participate in any programs authorized by the HEA, unless the accrediting agency rescinds the withdrawal, revocation, or termination. The same rules apply if an institution voluntarily withdraws from accreditation under a show cause or suspension order. However, a special rule (Section 496 (k)) allows the Secretary to continue the eligibility of a religious institution whose loss of accreditation (voluntary or otherwise) is related to its religious mission and not to the accreditation standards required by the HEA.

---

[46] (...continued)
unannounced visits to institutions. Unannounced visits are no longer required.

# Eligibility and Certification by ED

ED is responsible for the eligibility and certification portion of the triad. In this capacity, ED is responsible for verifying the institution's legal authority to operate in a state and its accreditation status, and evaluating its administrative capability and financial responsibility. ED has developed an *Application for Approval to Participate in Federal Student Financial Aid Programs* (E-App) that all institutions must complete in order to be eligible to participate in Title IV programs.[47] Through the application, ED requests information and documentation related to educational programs, telecommunications and correspondence courses, changes in ownership or structure, third-party servicers that perform functions related to the federal student aid programs, administrative capability, and financial responsibility. Eligibility to participate in Title IV programs is authorized for up to six years.[48]

**Financial Responsibility.** Regarding financial responsibility, ED determines whether the institution is able to provide the services described in its publications, has the administrative resources needed to comply with the Title IV requirements, and has the ability to meet all of its financial obligations. In addition, if an institution fails to meet specific financial ratios (e.g., equity ratio) established by ED regarding financial responsibility,[49] ED may use additional criteria to determine whether an institution is financially responsible, including third-party financial guarantees, evidence that the institution's liabilities are backed by the state or other government entity, or a financial statement audited by an independent certified public accountant indicating that the institution has sufficient resources to prevent its closure. The Secretary may waive the specific ratio requirements for two-year or four-year IHE's providing an associate's or bachelor's degree if there is no reasonable doubt about the institution's solvency and ability to provide high quality educational services, the institution is up-to-date on its current liability payments, and it has substantial equity in school-occupied facilities. Institutions must also maintain sufficient cash reserves to ensure repayment of any required Title IV funds. The level of required reserves is specified by ED. In addition, ED may require that financial guarantees be provided by the institution or the owners of the institution in order to protect the financial interests of the United States.

**Administrative Capacity.** Section 498(d) specifies that ED is authorized to establish procedures and requirements with respect to the administrative capacity of IHEs. Administrative capability refers to the institution's ability to provide the education described in its public documents (e.g., marketing brochures) and to properly manage Title IV programs. More specifically, according to the regulations established by ED, administrative capability focuses on required electronic processes,

---

[47] For more information, see ED, *Volume 2—FSA Handbook*, p. 2-14.

[48] The Secretary must notify each IHE that its eligibility is expiring no later than six months prior to the expiration date.

[49] In evaluating the institution's financial responsibility, ED calculates a composite score based on the institution's Equity, Primary Reserve, and Net Income ratios. (34 CFR 668.172)

requirements for the financial aid office, student academic progress, student financial aid history, default rates, withdrawal rates, and debarment and suspension.[50]

There are several requirements institutions must meet in demonstrating administrative capability. For example, institutions must be able to use the federal student aid program electronic processes. The school financial aid office must have a staff member to administer the Title IV programs and coordinate Title IV aid with other aid received by students. This individual must have adequate staff support.[51] A system must be developed to identify and resolve discrepancies in Title IV information received by various school offices. In addition, the school must refer any cases of student fraud or criminal misconduct in applying for Title IV aid to the Office of Inspector General in ED. Financial aid counseling must be provided to all enrolled and prospective students and their families. Last, the administrative procedures for Title IV programs must include an adequate internal system of checks and balances.[52]

The institution must ensure that Title IV recipients are making satisfactory academic progress and establish a maximum timeframe in which a student must complete his/her educational program.[53] The institution must also consider a student's financial aid history when making award decisions. An institution seeking to participate in Title IV programs for the first time must have an undergraduate withdrawal rate for regular students of no more than 33% for the institution's latest completed award year.

ED requires that institutions certify that neither the institution nor its employees with management or supervisory responsibilities that involve federal funds has not been debarred or suspended by a federal agency. IHEs have a fiduciary responsibility

---

[50] 34 CFR 668.16

[51] The regulations do not specify a specific number of professional, paraprofessional, or clerical personnel. Rather, staffing decisions must be made based on a number of factors, such as the number of students aided, number of applicants evaluated and processed, and the amount of funds administered. ED retains the right to determine whether a school has an adequate number of staff members. For more information, see 34 CFR 668.16 or ED, *Volume 2—FSA Handbook*, p. 2-174.

[52] For example, the functions of authorizing payments and disbursing funds may not be handled by the same person.

[53] For undergraduate programs, the completion timeframe must be no longer than 150% of the published length of the program. The 150% restriction does not apply to graduate programs, but a maximum timeframe should be developed for these programs by the institution. The school must also include other elements in its standards of satisfactory academic progress including measurement in established increments, the minimum amount of work that must be completed at the end of each increment, and consistent application of the standards to all students. Students failing to meet satisfactory academic progress requirements are not eligible to receive Title IV student aid. For more information about student eligibility for aid, see U.S. Department of Education, Office of Federal Student Aid, *Volume 1—FSA Handbook: Student Eligibility 2006-2007*, available online at [http://ifap.ed.gov/sfahandbooks/attachments/0607FSAHBkVol1.pdf]. (Hereafter referred to as ED, *Volume 1—FSA Handbook*.)

to safeguard Title IV funds and ensure that they are used to benefit the intended students.[54]

***Cohort Default Rates.*** An institution may be deemed not administratively capable based on cohort default rates for specific Title IV programs, including FFEL, Direct Loans (DL), and Perkins loans.[55]    An institution's cohort default rate is calculated as the number of borrowers last attending that institution entering repayment in a given fiscal year who default by the end of the succeeding year *divided by* the total number of borrowers entering repayment in a given year.[56]  For institutions with fewer than 30 borrowers entering repayment, the default rate is aggregated over the most recent three-year period.

A school will be found not administratively capable if:

- The cohort default rates for FFEL or DL equal or exceed 25% for one or more of the three most recent fiscal years, or
- The most recent cohort default rate for FFEL or DL exceeds 40%, or
- The cohort default rate on Perkins loans made to students for attendance at the school exceeds 15%.[57]

ED may grant provisional certification to an institution that would be deemed administratively capable except for having high cohort default rates.  Provisional certification may be granted for up to three years.

**Provisional Certification.**  An institution may be awarded provisional certification of eligibility for up to one award year if the IHE is seeking initial certification.  It may also receive provisional certification for up to three years if ED is determining the institution's administrative capacity and financial responsibility for the first time, the institution has experienced a partial or total change in ownership, or ED has determined that the administrative or financial condition of the institution may hinder the institution's ability to meet its financial responsibilities. In addition, if ED withdraws the recognition of an accrediting agency, an institution which had been relying on that agency for its accreditation and otherwise meets all

---

[54] For more information, see ED, *Volume 1—FSA Handbook*, p. 2-185.

[55] The use of cohort default rates to assess administrative capability is separate from the use of cohort default rates to determine whether an institution is eligible to participate in a specific Title IV program.  For more information about cohort default rates and specific Title IV programs, see CRS Report RL33674, *The Administration of Federal Student Loan Programs:  Background and Provisions*, by Adam Stoll.

[56] The following FFELs are included in the cohort default rate calculation:  subsidized and unsubsidized Federal Stafford Loans and Federal Supplemental Loans for Students.  It should be noted that no Federal Supplemental Loans for Students have been awarded since July 1, 1994, but under certain circumstances they could still be included in a current cohort default rate calculation.  The following DLs are included in the cohort default rate calculation:    Federal Direct Subsidized Stafford/Ford Loans and Federal Direct Unsubsidized Stafford/Ford Loans.

[57] For more information about cohort default rates as they apply to administrative capability, see ED, *Volume 2—FSA Handbook*, p. 2-183; and 34 CFR 668.187.

requirements for Title IV eligibility may continue to participate in Title IV programs for up to 18 months from the date recognition was withdrawn.  The institution will lose its Title IV eligibility after 18 months if it has not been accredited (or preaccredited, if applicable) by another accrediting organization recognized by the Secretary.

**Program Review.**  Prior to granting Title IV eligibility to or recertifying an institution, ED staff may conduct a site visit at that institution.  ED also has the authority to conduct program reviews on a systematic basis at all IHEs participating in Title IV programs.  Priority for the reviews is given to institutions with a cohort default rate for the FFEL program that exceeds 25% or to institutions in the highest 25% of such institutions, followed by institutions with a default rate in dollar volume for the FFEL program which places the institutions in the highest 25% of such institutions.  Priority is also given to institutions with significant fluctuation in Federal Stafford Loan or Federal Direct Stafford/Ford loan volume or Federal Pell Grant award volume, institutions reported by the state or accrediting agency to have deficiencies or financial aid problems, and institutions with high annual dropout rates.  If through the program review process ED determines that an IHE is not financially responsible or lacks the administrative capacity to participate in the federal student aid programs, the IHE may be placed on provisional certification, take other corrective actions, or impose sanctions.

**Corrective Actions and Sanctions.**  Sanctions issued by ED may include emergency actions, fines, limitations, suspensions, and terminations.[58]  An IHE will be sanctioned if it violates statutory or regulatory requirements governing the federal student aid programs, its PPA, or any agreement the IHE has made under the law or regulations.  An IHE will also be sanctioned if it substantially misrepresents the nature of its programs, its financial charges, or the employability of its graduates.  ED may also sanction a third-party service provider that performs activities related to the federal student aid programs.

Once a violation has been identified, ED may take formal or informal actions.  If an IHE has violated the federal student aid program regulations, ED may allow the program to respond to the problem and provide information for how it will correct it.  If this informal approach does not work or if an IHE has repeatedly violated statutory or regulatory requirements, ED may take additional action.

ED may take emergency action to withhold federal student aid funds from an IHE or its students if ED receives reliable information that the IHE is violating statutory or regulatory provisions, special arrangements, agreements, or limitations.  An emergency action suspends an IHE's participation in all federal student aid programs, prohibits the IHE from disbursing federal student aid funds, and prohibits the IHE from certifying FFEL applications.  Emergency action may only be taken if ED determines that the IHE is misusing federal funds, immediate action is required to stop the misuse of funds, and the potential loss of funds outweighs the importance of using established procedures for limitation, suspension, or termination (discussed

---

[58] For additional information on corrective actions and sanctions, see ED, *Volume 2—FSA Handbook*, p. 2-222.

below).   Emergency actions are limited to 30 days in duration, unless ED initiates either limitation, suspension, or termination proceedings during those 30 days.  If ED initiates one of these additional proceedings, the emergency action is extended until the proceeding is complete.  An IHE is given an opportunity to show cause that an emergency action is unwarranted.

ED has established several formal procedures for addressing violations of statutory or regulatory requirements, including fines, limitations, and suspensions. ED may also fine an IHE up to $27,500 for each violation of statutory or regulatory provisions.  The size of the fine is determined by ED, taking into consideration the school's size and the seriousness of the violation.  ED may also place an IHE under a limitation, during which the IHE agrees to abide by certain conditions or restrictions as it administers the federal student aid programs.  A limitation lasts for at least 12 months, but while the limitation is in effect and upheld by an IHE, the IHE may continue to participate in the federal student aid programs.  If a program violation occurs and ED wants to suspend an IHEs participation in the federal student aid programs temporarily while the violation is corrected, ED may revoke an IHEs ability to participate in the federal student aid programs for up to 60 days.  Each of these actions may require an IHE to take corrective action, such as repaying illegally used funds to ED.

The last type of action ED may take is the termination of an IHE's participation in the federal student aid programs.  Generally, an IHE may not apply to be reinstated for 18 months.[59]   An IHE must apply to be reinstated and must show that it has corrected all the violations upon which its termination was based, including the repayment of any Title IV funds.  ED may approve the request, approve the request subject to limitations, or deny the request.

## Loss of Title IV Eligibility

Institutions lose their eligibility to participate in Title IV programs for one of four main reasons:

- School closure,
- Eligibility to participate expired and school did not renew eligibility,
- Voluntary withdrawal, or
- Failure to meet requirements (e.g., accreditation, financial responsibility, administrative capability).[60]

**Table 1** details the loss of Title IV institutional eligibility from January 1, 2000 through December 31, 2005.  During this time period, 530 institutions lost their

---

[59] An IHE that has substantially misrepresented the nature of its programs, its financial charges, or the employability of its graduates may not be reinstated in the federal student aid programs for at least three months.

[60] Following the establishment of the aforementioned cohort default rates by the 1992 HEA amendments, many IHEs lost their Title IV eligibility due to violations of the cohort default rate.  ED did not include violating cohort default rate requirements as a separate reason for loss of eligibility as discussed on **Table 1**.

eligibility to participate in Title IV programs.  The most common reason for loss of eligibility was closure (31% of institutions), followed by loss of accreditation (20% of institutions).

### Table 1.  Loss of Institutional Eligibility, by Reason:  2000-2005

| Reason for loss of eligibility | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| Closed | 42 | 43 | 28 | 22 | 22 | 6 | 163 |
| Voluntary withdrawal | 13 | 27 | 11 | 19 | 14 | 12 | 96 |
| Loss of accreditation | 20 | 18 | 19 | 21 | 12 | 15 | 105 |
| Expired eligibility | 0 | 2 | 2 | 14 | 0 | 6 | 24 |
| Does not meet financial responsibility | 4 | 5 | 3 | 2 | 2 | 2 | 18 |
| Does not meet administrative capability | 6 | 5 | 7 | 2 | 4 | 2 | 26 |
| Bankruptcy | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Failed 90/10 | 0 | 2 | 0 | 0 | 1 | 0 | 3 |
| Program Participation Agreement (PPA) revoked | 0 | 0 | 2 | 0 | 2 | 3 | 7 |
| No eligible program | 3 | 1 | 12 | 13 | 1 | 2 | 32 |
| Merged | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Fraud | – | – | – | 2 | 1 | 3 | 6 |
| Does not meet requirements | – | – | – | 1 | 1 | 5 | 7 |
| Past performance issues | – | – | – | 2 | 1 | 0 | 3 |
| Significant program review findings | – | – | – | 1 | 1 | 1 | 3 |
| State licensure | – | – | – | 0 | 0 | 1 | 1 |
| Ownership change in process | – | – | – | 6 | 8 | 14 | 28 |
| Other | – | – | – | 2 | 0 | 4 | 6 |
| Total | 89 | 103 | 85 | 107 | 70 | 76 | 530 |

**Source:**  U.S. Department of Education, unpublished data.

**Note:** The U.S. Department of Education provided data on additional reasons for the loss of eligibility beginning in 2003.  While IHEs may have lost their Title IV eligibility for these reasons prior to 2003, they were not reported in these specific categories.

–: Data were not reported for this reason for loss of eligibility.

## Reauthorization Issues

There are several issues related to institutional eligibility that may be considered by Congress.  Examples of these issues are summarized below:

- Transfer of credit: Many postsecondary education students attend more than one IHE in pursuit of a postsecondary education credential.  A recent GAO study found that institutions to which students try to transfer base their decisions on which credits to

accept on the type of accreditation held by the sending institution, whether academic transfer agreements have been established with the sending institution, and the comparability of coursework.[61]  The study also found that many institutions that are accredited by regional accrediting agencies would not accept credits earned at nationally accredited institutions.[62]    Congress may consider legislation related to the creation of articulation agreements.  It may also consider requiring IHEs to publicly release their transfer of credit policies and requiring that IHEs do not deny the transfer of credit solely on the accreditation held by the sending institution.  Congress may also require accrediting organizations to ensure that IHEs are in compliance with any transfer of credit policies included in statutory language.[63]

- Accountability: There is increased interest in knowing whether the federal investment in postsecondary education, primarily through the Title IV programs, and whether the investment made by students and their families in postsecondary education is a worthwhile investment.  That is, there is interest in knowing the outcomes of the educational process, such as student learning, job placement rates, graduation rates, and graduate school attendance.  As such, Congress may require accrediting organizations to focus more of their attention on the outcomes of the education process rather than focusing on the inputs (e.g., faculty, curricula) of the academic process.[64]

# Other Related Issues

There are several other issues that affect institutional eligibility for Title IV federal student aid programs.  This section focuses on three specific issues–Program Participation Agreements (PPA), the return of Title IV funds, and distance education.  Failure to meet the requirements associated with each of these areas may result in a loss of Title IV eligibility.

---

[61] Government Accountability Office, October 2005, *Transfer Students: Postsecondary Institutions Could Promote More Consistent Consideration of Coursework by Not Basing Determinations on Accreditation*, GAO-06-22.  Available online at [http://www.gao.gov/cgi-bin/getrpt?GAO-06-22].

[62] It should be noted that most proprietary (for-profit) institutions are nationally accredited institutions.  Examples of regionally accredited institutions include the University of Maryland, a four-year public institution; Williams College, a four-year private non-profit institution; and Montgomery College, a two-year public college.

[63] For more information, see CRS Report RL32989, *Accreditation*.

[64] For more information, see CRS Report RL32989, *Accreditation*.

## Program Participation Agreements

IHEs are required to enter into a Program Participation Agreement with ED in order to participate in most programs authorized under Title IV.[65]  By signing the PPA, the institution agrees to comply with the laws, regulations, and policies governing the Title IV programs.[66]  In order to aid the institution in administering federal student aid programs in the appropriate manner, the PPA provides critical information about the institution's participation in the programs.  It includes the effective date of the institution's approval for participation, the date by which the institution must reapply for participation, the expiration date of its current approval, and the Title IV programs in which the institution is eligible to participate.  The PPA also states the general terms and conditions for institutional participation in the FSA programs and contains information from the General Provisions Regulations (34 CFR Part 668) by which the institution is bound.

The PPA also reiterates provisions discussed earlier in this report as additional requirements for institutional eligibility, including certifying the institution has a drug and alcohol abuse program, certifying the institution has established a campus security program, reporting general institutional information, and providing data on student athletes.  By signing the PPA, the institution also agrees to make a good faith effort to register students to vote unless the institution is located in a state that has implemented the motor vehicle-voter registration provision of the National Voter Registration Act.[67]  Institutions are also required to provide a GED preparatory program to its students if it admits students without a high school diploma or its recognized equivalent.  The institution is also required to comply with the civil rights and privacy requirements contained in federal regulations that apply to all students.

**Incentive Compensation.**  One of the provisions of the PPA specifically prohibits the payment of commissions, bonuses, or other incentive payments to individuals based on their success in enrolling students or obtaining financial aid.[68]  The provision was added during the 1992 reauthorization to eliminate abuses at trade institutions that were enrolling unqualified applicants in order to receive Title IV funds.  Through the negotiated rulemaking process, however, ED developed new regulations for incentive compensation that took effect July 1, 2003.[69]

---

[65] Statutory provisions require an IHE to enter into a PPA to participate in any Title IV program with the exception of the Leveraging Educational Assistance Partnership (LEAP) program (Section 487(a)).

[66] Detailed information about the statutes and regulations contained in the PPA can be found in HEA Section 487 and 34 CFR 668.

[67] For more information on the National Voter Registration Act, see 42 U.S.C. 1973gg-5(a), (b).

[68] Section 487(a)(20).

[69] *Federal Register*, Nov. 1, 2002, available at [http://www.ed.gov/legislation/FedRegister/finrule/2002-4/110102a.pdf].

ED has created 12 "safe harbors" that IHEs can use to avoid statutory prohibitions against incentive compensation for recruiters and other individuals.[70] Without these safe harbors, ED determined that a strict interpretation of the statutory requirement would prohibit almost every compensation arrangement related to a student's admission to a postsecondary institution, including common business practices. ED has interpreted the requirement as functioning as a safeguard against institutions providing incentives to staff to enroll unqualified students.

Of the 12 safe harbors, one focuses on whether a particular compensation payment is considered an incentive payment. It describes the conditions under which compensation may be paid by an IHE without it being considered an incentive payment. The remaining 11 safe harbors address the conditions under which an incentive payment may be made based upon student enrollments. Examples of these safe harbors include allowing IHEs to provide incentive payments to recruiters who enroll students in non-Title IV eligible programs, providing compensation for Internet-based recruitment and admission activities, and providing compensation through a profit-sharing or bonus plan.

## Return of Title IV Funds

During the 1992 reauthorization, a new federal requirement for program participation was added with respect to the return of Title IV funds. The intent was to eliminate incentives for institutions to enroll students and receive Title IV funds without suffering any negative financial consequences if students dropped out. The initial legislation established a refund policy that affected all funding (e.g., federal funding, state funding, scholarships, grants, parental support) provided on behalf of first-time students who were receiving Title IV funds. According to the return of funds policy, funds were required to be returned to the federal government prior to returning funds to any other source.

This policy was substantially changed during the 1998 reauthorization. The return of Title IV funds policy currently applies to all students receiving Title IV funds who withdraw from school, but only applies to Title IV funding. The policy was further revised by the HERA.[71]

The return policy is a statutory schedule used to determine how much Title IV aid a student has earned at the time of his/her withdrawal from school. The schedule requires a pro-rata calculation of the amount of aid earned through the 60% point in

---

[70] For more information about ED, *Volume 2—FSA Handbook*, p. 2-33.

[71] Changes to the return of Title IV aid policy made by HERA apply to withdrawals made on or after July 1, 2006.

each payment period or period of enrollment.[72]  After the 60% point, a student has earned 100% of Title IV funds for that period.

ED has developed a specific process that institutions use to determine the amount of Title IV funds earned by a student and the amount of Title IV aid, if any, that needs to be returned to ED or disbursed to the student.  The process is briefly discussed in this section.[73]

**Percentage of Title IV Aid Earned.**  Institutions initially determine how much Title IV aid was received by the student.[74]  IHEs then calculate the percentage of Title IV aid earned by the student, by determining the date of the student's withdrawal.[75]  This is determined differently depending on whether the institution is required to take attendance.[76]  At institutions required to take attendance, the student's withdrawal date is determined based on attendance records.  At institutions not required to take attendance, different procedures exist to determine the student's date of withdrawal depending upon whether the student provided official notification of his/her withdrawal.  The withdrawal date is used to determine the point at which the student withdrew, so that the percentage of the period of enrollment or payment period completed can then be calculated.  The calculation of the percentage of the period of enrollment or payment period completed differs depending of whether the student withdrew from a program using credit-hours or clock-hours.

---

[72] For programs that have terms and are measured in credit hours, the payment period is identical to the term.  For programs that measure progress in credit hours without terms or in clock hours, the payment period is defined by completed credit hours or clock hours.  A period of enrollment is defined as the academic period established by the school for which institutional charges are generally assessed.  If a student withdraws from a standard term-based educational program, a school must use the payment period for the return of Title IV funds calculation.  If a student withdraws from a nonstandard term-based or non-term-based educational program, the institution may use the payment period or period of enrollment for the return of Title IV funds calculation.  The same basis (e.g., payment period or enrollment period) must be used for all students within a program who have withdrawn.

[73] For detailed information about the return of Title IV funds policy, see U.S. Department of Education, Office of Federal Student Aid, *Volume 5 — FSA Handbook: Overawards, Overpayments, and Withdrawal Calculations, 2006-2007*, available online at [http://www.ifap.ed.gov/sfahandbooks/0405FSAHBVOL5Overawards.html].  (Hereafter cited as ED, *Volume 5 — FSA Handbook*).

[74] This calculation also includes a calculation of how much aid could have been disbursed if the student is eligible for a late disbursement.  For more information on late disbursements, see U.S. Department of Education, Office of Federal Student Aid, *Volume 4 — FSA Handbook: Processing Aid and Managing FSA Funds, 2006-2007*, available online at [http://ifap.ed.gov/sfahandbooks/attachments/0607FSAHBkVol4Master.pdf].

[75] It should be noted that prior to the HERA, students were permitted to take a leave of absence of up to 180 days in any 12-month period in accordance with the IHE's formal policy regarding leaves of absence.  The HERA modified the leave of absence provision to permit students to take one or more leaves of absence for not more than a total of 180 days within a 12-month period.

[76] Some institutions are required to take attendance by outside agencies, such as the school's accrediting or state licensing agency.

CRS-27

***Credit Hour Programs.*** If a student withdraws from a credit-hour program, the percentage of Title IV aid earned is equal to the percentage of the enrollment or payment period completed. The percentage of the period completed is determined by dividing the number of calendar days in the payment or enrollment period that the student completed by the total number of calendar days in the payment or enrollment period. If the student completed over 60% of the payment or enrollment period, he/she has earned 100% of his/her Title IV aid and no repayment of funds by the school or student is required. If the student withdrew at or prior to the 60% point in the payment or enrollment period, the percentage of Title IV aid earned is pro-rated. For example, if the student withdrew at the 50% point, he/she has earned 50% of his/her Title IV aid.

***Clock Hour Programs.*** The percentage of Title IV aid earned by a student who withdrew from a clock-hour program is based on the percentage of scheduled hours the student completed prior to withdrawing. A student who withdraws after the point at which he/she was scheduled to complete 60% of the scheduled hours in the payment period or period of enrollment has earned 100% of his/her aid. The percentage of payment period of period of enrollment completed is calculated by dividing the total number of clock hours scheduled to be completed as of the date the student withdrew by the total number of hours included in the payment period or period of enrollment.

**Amount of Title IV Aid Earned by the Student.** The percentage of Title IV aid earned is then multiplied by the sum of the Title IV aid disbursed plus the Title IV aid that could have been disbursed to the student or on the student's behalf to determine the amount of Title IV aid earned by the student. If the student received less Title IV aid than the amount earned, the institution may make a post-withdrawal disbursement. If the student received more Title IV aid than the amount earned, the school, the student, or both must return the unearned funds. The amount of aid that must be returned is based only on the amount of aid that was disbursed.

**Funds to Be Returned by the Institution.** If it is determined that funds must be returned, the institution first calculates how much it must return. The school must return the lesser of: (1) the amount of Title IV funds awarded to the student that the student did not earn, or (2) the amount of institutional charges incurred by the student for the payment or enrollment period multiplied by the percentage of unearned funds. Funds are then returned to the Title IV programs up to the net

amount distributed.[77]  The IHE has up to 45 days after the date it determines a student has withdrawn to return its portion of the unearned funds.[78]

**Funds to Be Returned by the Student.**  The student is responsible for all unearned Title IV funds that the school is not required to return.  The initial amount owed by the student is the balance of unearned funds after the school returns its portion of unearned funds.  This is referred to as the initial amount due because a student does not have to make grant repayments in full, so it is possible that the student may be responsible for returning a smaller amount of funds than initially calculated.  The initial Title IV grant overpayment is reduced by 50%.  The amount owed by the student is then recalculated, and the student repays the required funds.

This last provision in the calculation of Title IV funds to be returned regarding the reduction of the grant amount had been somewhat controversial.  The statute had been interpreted to mean that the 50% reduction in grant funds referred to 50% of the amount due for grant repayment rather than 50% of the total grant.  For example, assume a student had received only a $1,650 Pell Grant, but has $825 in unearned Title IV aid.  Also assume the institution had to return $250, leaving $575 as the initial amount to be repaid by the student.  The $575 would have been multiplied by 50%, reducing the amount owed to $287.50.

The HERA clarified the interpretation of this provision.  Section 484B(b)(2) was amended to limit the amount of a grant overpayment to be repaid by a student to the amount by which the original grant overpayment exceeds 50% of the total Title IV grant funds received by the student.  Thus, in the previous example, instead of multiplying $575 by 50%, the total grant amount of $1,650 would be multiplied by 50% to determine the amount of grant aid that would not have to be repaid.  The result of this calculation is $825.  Since the amount by which any grant repayment would be reduced ($825) is greater than the amount owed ($575), the student would not have to repay any of the Pell Grant.[79]  This statutory change provides a greater benefit to the student.

**Post-Withdrawal Disbursement Counseling.**  In some cases, students who have withdrawn from an IHE may have earned more Title IV aid than they actually received.  Prior to the HERA, if a student earned more grant or loan aid than he/she received, an IHE was required to make (or offer) a post-withdrawal

---

[77] Based on changes made by the HERA, only Pell Grant, Federal Supplemental Educational Opportunity Grant (FSEOG), FFEL, Direct Loan, Perkins Loan, Academic Competitiveness, and Science and Mathematics Access to Retain Talent (SMART) funds must be returned. The return of Title IV funds policy no longer applies to Leveraging Educational Assistance Partnership (LEAP), Special Leveraging Educational Assistance Partnership (SLEAP), Gaining Early Awareness and Readiness for Undergraduate Programs (GEAR UP), and Student Support Services (SSS) funds.  (For more information, see ED, *Changes Made by HERA*.)

[78] Prior to the HERA, IHEs had to return funds within 30 days after the date it was determined that a student had withdrawn.

[79] A student would also not have to repay a grant overpayment if the amount owed by the student was $50 or less.

disbursement to the student within 30 days of the date the IHE determined the student withdrew.[80]

The HERA added additional requirements that IHEs must follow in making this disbursement. Prior to making a post-withdrawal disbursement of loan funds to a student who had withdrawn, the IHE must contact the student, explain the repayment obligations associated with accepting the funds, and confirm that the loan funds are still needed by the student.[81] The result of this contact and the final determination regarding the post-withdrawal disbursement must be documented in the student's file.

**Issues for Reauthorization.** With the war in Iraq, the issue of how to handle federal aid provided to student reservists called to active duty has become a more prominent issue. Based on the return of Title IV funds policy, if these students officially withdraw from their IHE, the IHE must make a return of Title IV funds calculation. According to current ED guidance,[82] the IHE must return any funds that it owes to ED but students should not be notified if they owe funds.[83] If, on the other hand, the student reservist takes a leave of absence to serve, the total leave of absence is currently capped at 180 days in a 12-month period, raising questions about how to handle extended periods of absence. Based on ED regulations,[84] a student who takes a leave of absence for military duty must be able to resume his/her studies at the point at which those studies were interrupted. The student cannot be obligated to pay additional institutional charges to complete the coursework. Students who withdraw are not afforded the same protections by statutory language or regulations. ED, however, has encouraged institutions to provide students with a full refund of institutional charges or provide a credit for students to resume attendance at a later time.[85] ED has also encouraged institutions to develop flexible re-enrollment options for students affected by the military mobilization.

## Distance Education

Distance education refers to instructional modes where there is a separation in time and/or place between the instructor and the student. The term "distance education" refers to both correspondence courses and telecommunications courses

---

[80] For more information on post-withdrawal disbursements, see ED, *Volume 5 — FSA Handbook*.

[81] IHEs are also required to provide exit counseling to students receive Title IV student loans that are changing their attendance status to less than half time (34 CFR 685.304(b) and 34 CFR 682.604(g)).

[82] U.S. Department of Education, Office of Postsecondary Education, *Dear Colleague Letter: Administrative relief for students and borrowers affected by military mobilizations*, posted on Mar. 25, 2003. Available at [http://www.ifap.ed.gov/dpcletters/G03347.html]. (Hereafter cited as ED, *Dear Colleague Letter*.)

[83] Overpayments to students should, however, be referred to ED for tracking and verification purposes. (ED, *Dear Colleague Letter*.)

[84] ED, *Volume 5 — FSA Handbook*.

[85] ED, *Dear Colleague Letter*.

offered by television, audio or computer transmission, or over the Internet.[86] Historically, distance education courses have been used as a means to increase student access to postsecondary education by providing alternatives to the traditional mode of on-campus instruction. Recently, there has been substantial growth in the number and types of courses being offered by institutions due to the availability of new technology, such as the Internet.

Title IV program requirements, especially those related to the disbursement of funds, are based on student participation in term-based on-campus instruction. Existing requirements may restrict funding to students participating in distance education and may not be easily applied to distance education programs.[87] This issue was partially addressed by the Higher Education Amendments of 1998 with the creation of the Distance Education Demonstration Program discussed below.

### Definitions of Correspondence and Telecommunications Courses.

As previously discussed, the regulations governing the administration of Title IV programs provide specific definitions for correspondence and telecommunications courses.[88] A correspondence course is a home study course offered by an institution. The institution provides the student with instructional materials, including examinations. Upon the completion of a section of the instructional materials, the student takes the corresponding examinations and returns the examinations to the institution for grading. A telecommunications course is a course that is offered via the application of technology. This includes courses offered by television, audio or computer transmission, or over the Internet. If a correspondence course also includes telecommunications technology, the course is classified based on the predominant mode of instruction.

### 50% Rules.

During the 1992 reauthorization, to combat cases of fraud and abuse in institutions that primarily delivered instruction through print-based media, Congress established several requirements that are collectively known as the 50% rules. These requirements affected both institutional eligibility and student eligibility for Title IV aid, and were substantially revised by the HERA. The 1992 requirements are summarized below:

- If the sum of the telecommunications courses and correspondence courses equals or exceeds 50% of the total number of courses offered during that award year, telecommunications courses are considered correspondence courses.
- An institution loses its Title IV eligibility if more than 50% of its courses are offered by correspondence (Section 102 (a)(3)(A)).[89]

---

[86] It should be noted that under the HEA the term "distance education" is used only in conjunction with the Distance Education Demonstration Program. Title IV law and regulations use the terms "correspondence" and "telecommunications."

[87] ED, *Volume 2 — FSA Handbook*, p. 2-133.

[88] 34 CFR 600.2.

[89] This limitation does not apply to an institution that mainly provides vocational adult

(continued...)

- An institution loses its Title IV eligibility if 50% or more of its students are enrolled in correspondence courses (Section 102 (a)(3)(B)).[90]

The first 50% rule discussed above had implications for an institution's eligibility to participate in Title IV programs. If the sum of an institution's telecommunications courses and correspondence courses equaled or exceeded 50% of all courses offered by an institution, all telecommunications courses were considered correspondence courses. The HERA eliminated the requirement that courses offered by telecommunications be considered correspondence courses.

Based on the second 50% rule, if an institution offered more than 50% of its courses by correspondence then it would lose its eligibility to participate in Title IV programs. While this requirement continues to apply to institutions offering courses by correspondence, courses offered by telecommunications were specifically excluded from this requirement by the HERA.[91]

Under the third 50% rule, an institution would lose its Title IV eligibility if 50% or more of its students were enrolled in correspondence courses. As with the second 50% rule, this rule continues to apply to student enrollment in correspondence courses, but courses offered by telecommunications were specifically excluded from this requirement by the HERA.[92]

**Student Eligibility for Federal Student Aid.** The previous distinction between correspondence courses and telecommunications courses, and the 50% rule that resulted in telecommunications courses being considered correspondence courses, directly affected student eligibility for Title IV funds. For example, prior to the HERA, students enrolled in telecommunications courses were eligible to receive Title IV funds if they were enrolled in a degree program or a certificate program that was at least one year long. For certificate programs of less than one year, telecommunications students were considered correspondence students and, therefore, were not eligible to receive Title IV funds as correspondence students had to be enrolled in a degree-granting program to receive Title IV aid.

---

[89] (...continued)
education or job training.

[90] This limitation may be waived for a two-year or four-year institution offering associate's degrees or bachelor's degrees, respectively, if the students participating in the correspondence courses do not receive more than 5% of the Title IV funds received by all students in the school.

[91] This rule also does not apply to "a technical institute or vocational school used exclusively or principally for the provision of vocational education to individuals who have completed or left high school and who are available for study in preparation for entering the labor market" (P.L. 101-392, Section 521(4)(C)).

[92] It should also be noted that the third requirement regarding the percentage of students enrolled in correspondence courses may be waived for a school offering a two-year associate's degree or four-year bachelor's degree if the school demonstrates to ED that in that award year, the students enrolled in its correspondence courses received no more than 5% of the total Title IV funds received by students for that award year.

As previously discussed, the HERA eliminated the rule that required telecommunications courses to be considered correspondence courses and, as part of this change, eliminated the requirement that a telecommunications course had to be part of a program of study of one year or longer.[93] Thus, students enrolled in distance education courses, rather than correspondence courses, are eligible to receive Title IV aid if they are enrolled in degree-granting programs or certificate programs of any length, provided the program meets the program eligibility requirements for distance education programs. Students enrolled in correspondence courses, however, are only eligible for Title IV aid if they are enrolled in a degree-granting program.[94]

Another distinction between students enrolled in distance education courses and correspondence courses also remains. A student enrolled solely in correspondence courses cannot be considered more than a half-time student for the purposes of Title IV aid regardless of the number of credits the student is taking.[95] Students enrolled solely in telecommunications courses, however, can be considered full-time students for the purposes of Title IV aid.

**Distance Education Eligible Program.** As previously mentioned, the HERA added a definition of a distance education eligible program for Title IV purposes. An otherwise eligible program (see previous discussion of program eligibility) that is offered in whole or in part through telecommunications is eligible for the purposes of Title IV if the program is offered by an institution, other than a foreign institution, that has been determined to have the capability to effectively deliver distance education programs by an accrediting agency recognized by the Secretary.[96] The accrediting agency must have the evaluation of distance education programs within its scope of recognition. Currently, the Secretary recognizes 19 accrediting agencies as having the evaluation of distance education programs within their scope of recognition.[97]

**Distance Education Demonstration Program.** During the 1998 HEA reauthorization, Congress recognized that with changes in technology, IHEs are increasingly offering courses via distance education. A demonstration program was established to: (1) examine the quality and viability of expanding distance education programs, the support of which was limited under the HEA prior to HERA; (2) provide increased student access to postsecondary education through distance education; and (3) determine the most effective ways to deliver distance education, statutory and regulatory modifications needed to increase access to distance

---

[93] Section 484(l)

[94] Section 484(k)

[95] ED, *Volume 2—FSA Handbook*, p. 2-142.

[96] This provision only applies to programs for which over 50% of the program is offered via distance education. For more information, see U.S. Department of Education, Office of Federal Student Aid (September 2006), *Dear Partner Letter: Institutional Accreditation for Distance Education* (GEN-06-17), available online at [http://ifap.ed.gov/dpcletters/attachments/GEN0617Attach.pdf].

[97] For more information, see [http://www.ed.gov/admins/finaid/accred/accreditation_pg11.html#Distance].

education programs, and the appropriate level of Title IV aid that should be made available to distance education students.

Several program requirements for institutions participating in Title IV programs were waived for the demonstration program. For example, the 50% rules that applied to the percentage of correspondence courses offered by the institution and the percentage of students enrolled in correspondence courses were waived for many program participants. In addition, under certain circumstances, the provision that defines a telecommunications course as a correspondence course was also waived. Other institutions received waivers of the definition of a full-time student to allow correspondence students to be considered full-time students.

An initial group of 15 participants were selected to participate in the program beginning July 1, 1999.[98] Nine participants were invited to join the program at the beginning of its third year. Five additional participants joined the program in December 2003. There are currently 24 participants in the program–nine proprietary institutions, seven private non-profit institutions, four public universities, three consortia, and one public system.[99] Generally, institutions were considered eligible to apply for the program if they were located in the United States and participated in Title IV programs or provided a two-year or four-year program leading to an associate's degree or bachelor's degree, respectively, but were ineligible to participate in Title IV programs because of limitations on the number of correspondence courses or the number of students participating in correspondence courses.[100]

In April 2005, ED submitted a third report to Congress on the demonstration program.[101] Enrollment in distance education programs offered by the eight program participants that reported data for eight years indicated that enrollment had increased from 7,930 in 1998-1999 to 63,350 in 2003-2004–nearly a 700% increase in enrollment. Among the seven institutions in the second cohort of participants that provided data for all four years of their participation, enrollment grew by 400%. The greatest growth occurred at institutions primarily serving adult students. Students served by institutions participating in the DEDP tend to be female, enrolled part-time, and older than traditional college age.

ED concluded that granting waivers to program participants, including waivers of the 50% rules, had not led to increases in fraud and abuse. They determined that

---

[98] U.S. Department of Education, Office of Postsecondary Education, *Distance Education Demonstration Program: Background.* Available at [http://www.ed.gov/programs/disted/index.html].

[99] In addition, four participants have voluntarily left the program, and one participant was removed for improperly administering Title IV programs. (U.S. Department of Education. (2005). *Third Report to Congress on the Distance Education Demonstration Program.* Available online at [http://www.ed.gov/programs/disted]. Hereafter referred to as ED, *Third Report on the DEDP.*)

[100] Western Governors University was explicitly included in the legislation as being eligible to apply for participation.

[101] ED, *Third Report on the DEDP.*

the administrative capability and financial viability of an institution posed a greater risk to the integrity of federal student aid programs than the mode through which an institution provided instruction. ED also found that while distance education may enable institutions to be innovative with respect to student access and flexibility, this innovation may be hampered by the administrative requirements of Title IV student financial aid programs. For example, some DEDP participants have experienced difficulties administering federal student aid programs for non-traditional academic structures, as the federal student aid system was developed in an environment in which most institutions enrolled traditional students, offered programs on a semester or quarter basis, and students took summers off.

**Issues for Reauthorization.** While HERA made changes to the 50% rules and program eligibility requirements, additional issues related to distance education may be discussed during HEA reauthorization. Examples of these topics are outlined below.[102]

- Given the tremendous growth in distance education programs, Congress may consider whether accrediting agencies should be required to have specific standards for evaluating the quality and quantity of distance education programs in order to be recognized as an accrediting agency by ED, or whether accrediting organizations should review distance education similarly as they review traditional education programs. In addition, Congress may consider adding safeguards to ensure that a student who registers for a distance education course is the same student who completes the coursework and receives the credit.

- The Congress may consider adding a specific definition of a telecommunications course to replace the existing definition of telecommunications included in Section 484(l)(4). ED has suggested that the definition should "specify that there be regular and substantive interaction between students and the instructor."[103] The current definition does not address this interaction.

- An increasing number of institutions are offering multiple start dates for courses, shorter courses, and overlapping terms. This makes student aid calculation and disbursement complicated. The Congress may consider switching to an alternative model for aid calculation and disbursement based on an individual student's program of instruction, which could potentially alleviate some of this difficulty.[104]

---

[102] See for example H.R. 609 and S. 1614, the primary vehicles for HEA reauthorization in the 109th Congress. Both bills proposed several changes related to distance education. Also see the reports on the DEDP submitted to Congress by ED for additional proposed changes related to distance education.

[103] ED, *Third Report on the DEDP*, p. iii.

[104] This issue may already be addressed, in part with regard to FFEL and DL loans, by allowing IHEs to use either the Scheduled Academic Year (SAY), a traditional academic year, or the Borrower-Based Academic Year (BBAY), which can be adjusted to match a

(continued...)

---

[104] (...continued)
student's attendance and program progression, to monitor annual loan limits.  For more information, see U.S. Department of Education, Office of Federal Student Aid, *Volume 3—FSA Handbook: Calculating Awards and Packaging, 2006-2007*, p. 3-66, available online at [http://ifap.ed.gov/sfahandbooks/attachments/0607Vol3MasterNew.pdf].