Exhibit A
Government Lawsuits Against The Debtors

| Date | Action | Sample Allegations |
|---|---|---|
| 7/31/2007 | *The People of California v. Corinthian Schools, Inc.*, Los Angeles County Superior Court Case No. BC374999 | The Debtors' records (a) inflate employment statistics, (b) list non-existent businesses as the students' places of employment, (d) inflate salaries.  Debtors have placed intense pressure on their schools to meet a pre-set quota of starts.  Debtors use various untrue and misleading statements to induce students to enroll and not cancel programs and engage in unfair and unlawful business acts and practices.  See RJN Exh C, at ¶¶9, 14.<br><br>Debtors make untrue and misleading statements that they are authorized to offer the vocation programs it offers.  Id. at ¶11(c).<br><br>Debtors misrepresent that their schools or programs are approved by the California Department of Education.  Id. at ¶11(e).<br><br>Debtors provided inaccurate information regarding employment to the Bureau for Private Postsecondary and Vocational Education and the Attorney General.  Id. at ¶14(a).<br><br>Debtors fail to provide disclosure related to completion percentages, employment percentages, starting salaries, notices that students may cancel classes and obtain refunds under certain circumstances. Id. at ¶¶14 (c) and (d).<br><br>Debtors fail to provide students with enrollment agreements and other documents. Id. at ¶14(n).<br><br>Debtors do not provide important information about the costs of their programs and related charges, or about students' refund rights.  Id. at ¶14(s). |

| | | |
|---|---|---|
| | | Debtors required confidentiality clauses regarding settlements which bars students from discussing the bases for their disputes with a "any governmental agency." Id. at ¶14(t). |
| 2/19/2014 | *The People of California v. Corinthian Schools, Inc.*, San Francisco Superior Court Case No. CGC-13-534793 | Misrepresented job placement rates to students, misrepresenting job placement rates to investors, advertising for programs that aren't offered, unlawfully using military seals in advertising, inserting unlawful clauses into enrollment agreement that purport to bar any and all claims by students, subjecting students to unlawful debt collection practices on loans that Debtors do not own, and despite the fact that the proceeds of the loans have already been paid in full by the lender to the debtors, failing to disclose Debtors' role in the Genesis Private Student Loan Program, and misrepresenting the transferability of credits. RJN Exh. F, at ¶1.<br><br>Misrepresented job placement rates to students. Id. at ¶¶47-52.<br><br>Misrepresented Job Placement Rates To Investors. Id. at ¶¶53-59.<br><br>Advertising for programs that aren't offered. Id. at ¶¶60-64.<br><br>Unlawfully using military seals in advertising. Id. at ¶¶65-65-69.<br><br>Inserting unlawful clauses into enrollment agreements that release Debtors from all claims by students. Id. at ¶¶ 70-72.<br><br>Unlawful debt collection. Federal regulations limit the amount of federal financial aid that an institution can receive. In general, these rules require that for-profit colleges get no more than 90% of their revenue from federal student aid. The remaining 10 % must come from other sources, such as private loans. In order to meet |

|  |  | this requirement, Debtors entered into a complex financial arrangement wherein third parties would make loans to students in exchange for Debtors paying up-front discount fees to third parties and guaranteeing that it would buy back non-performing loans. Although Debtors did not make the loans, and had been paid in full by the lenders to fund the students' education, Debtors nonetheless had a strong incentive to engage in strong-arm debt-collection practices against students – it did not want to have to buy back non-performing loans. Id. at ¶¶73-76.<br><br>Debtors engaged in unfair debt collection practices such as: pulling students from class during instruction, barring students from attending class, barring students from attending externships, dropping students from program. Id. at ¶¶77-80.<br><br>Failure to disclose Debtors' role in Genesis loan program.  Debtors provided preferred lender lists to students and consumers in which Debtors failed to disclose information regarding Debtors role in the Genesis loan program, including the following (1) Debtors have a business and financial relationship with the entities involved in Genesis and Genesis loans are offered to students and included on lender lists as a result of that business and financial relationship, (2) Debtors fund and promote the Genesis loan programs by paying its business partners upfront discount fees to make Genesis loans, and (3) Debtors support and promote the Genesis program by obligating itself to purchase loans that are in default for more than 90 days. The preferred lender lists state that the Debtors "do not promote or endorse this lender." Debtors are required to disclose the basis for each lender's inclusion on the list.  Id. at ¶¶81-83. |

| | | |
|---|---|---|
| | | Misrepresenting transferability of credits.  Id. at ¶¶84-87. |
| 04/03/2014 | *Commonwealth of Massachusetts v. Corinthian Colleges, Inc.; Corinthian Schools, Inc.* Superior Court Case No. 14-1093 | Debtors deceived and misled public and prospective students in order to aggressively enroll students at is Massachusetts campuses with the goal of increasing tuition and fee revenues.  Debtors misrepresented:  (1) urgency of enrollment; (2) job placement, (3) employment opportunities, (4) salaries, (5) nature, character, and quality of programs, (6) transferability of credits, (7) nature and availability of financial aid.   RJN Exh. D at ¶¶2-3.<br><br>A portion of the private loans were guaranteed and ultimately funded by Debtors.  Debtors should have known, when it created the loan program that student borrowers were unable to repay the loans.  Id. at ¶7.<br><br>Unfair and deceptive acts or practices, including (1) unfair and harassing sales tactics and false and misleading representations to prospective students designed to induce enrollment, (2) recruitment and enrollment of students unable to benefit from the education, and (3) the creation, guarantee, and funding of private student loans Debtors knew or should have known were unable to be repaid.  Id. at ¶32.<br><br>Provided false and misleading statements and advertisements in written materials and/or on the website, including (1) urgency of admission, (2) success in finding in-field employment, (3) employment assistance, (4) earning, (5) nature, quality, and benefits of programs, (6) transferability of credits, (7) availability of externships, and (8) nature and availability of financial aid.  Id. at ¶38.<br><br>Debtors misrepresented and concealed information regarding financial aid and debt |

|  |  |  | collection practices. Debtors misrepresented the amount of loans sought, did not disclose costs, charged weekly and monthly fees for unknown reasons that were not credited to students' accounts. Id. at ¶¶92-94.<br><br>Debtors recruited Students unable to benefit from programs, including students with criminal backgrounds, who did not speak English, lacking a high school diploma. Id. at ¶¶95-107.<br><br>Debtors created, guaranteed, funded, and steered students to unfair private student loans. Debtors created a private student loan program in concert with Genesis Lending services, Inc. ("Genesis"), under which Debtors paid Genesis to market, manage, service and collect loans to students, made by a bank affiliated with and/or working together with Genesis. Debtors had an obligation to acquire the Genesis loans. Under the Genesis agreement, Debtors guaranteed, facilitated, and ultimately funded student loans. The Genesis program was created primarily to lend money to subprime borrowers with low credit scores. Debtors entered into similar agreements with other banks. The programs were created in order to aid Debtors in purporting to comply with the federal government's 90-10 rule, which prohibits schools from acquiring more than 90% of their funding from federal Title IV sources. Debtors steered students into these loans. In 2008, about half of the students starting in Everest MA programs obtained Genesis loans, in 2009, a third. The loans carried interest rates of 15 to 18% and origination fees of 3 to 6%. Federal loans had substantially lower rates. By January 2013, 70% of Everest MA students had defaulted on their Genesis loans. Debtors should have known students would be unable to repay. Id. at ¶¶108-118. |
|---|---|---|---|

| 9/16/2014 | *Consumer Financial Protection Bureau v. Corinthian College, Inc., et al.*, USDC Northern District of Illinois Case No. 14-7194 | Since at least July 2011, it has been the Debtors' practice to induce prospective students to incur loan obligations by promising career training and graduate employment opportunities through false and misleading representations about career opportunities.  RJN Exh. B at ¶2.<br><br>Debtors falsely inflated job placement statistics, paid employers to temporarily hire graduates, falsified placement information.  Id. at ¶3.<br><br>Corinthian referred internally to its students as having [m]inimal to non-existent understanding of basic financial concepts, as well as poor or not credit worthy.  Debtors assisted students in applying for federal financial aid.  Id. at ¶6.<br><br>Corinthian kept class costs high to create an artificial "funding gap" to increase students need for private student loans.  Rather than reduce tuition, Debtors marketed and promoted private student loans, known as Genesis loans, to its students.   Debtors represented that the Debtor did not have a financial interest in the loans.  Debtors did, however, have an interested in the loans as Debtors were obligated to purchase any loan for which payment is more than 90 days due.  Debtors took aggressive actions to collect.  More than 60% of students with Genesis loans have defaulted on the loan within three years.   When Debtors marketed, promoted, and facilitated these student loans, Debtors expected that most student-borrowers would default.  Federal law requires that no more than 90% of its revenue may come from federal financial aid provided under Title IV of the Higher Education Act.  Every Genesis loan dollar that Debtors induced its students to borrow, in effect, allowed Debtors to receive up to an additional nine dollars in Title IV aid.  As a result, Debtors had strong financial incentives to induce its students into taking out Genesis loans, even given students higher default rates. |

| | | |
|---|---|---|
| | | Id. at ¶¶7-12, 39-41, 89-118, and 146-149.<br><br>The DOE's Federal Student Aid office placed Corinthian on Heightened Cash Monitoring on June 12, 2014.  This required Corinthian to wait 21 days after submitting student enrollment data to receive Title IV funds.  The DOE placed Corinthian on heightened oversight after Corinthian failed to provide the DOE with satisfactory information regarding Corinthian's job placement data.  Per the Operating Agreement, Corinthian put a majority of hits campuses up for sale and will close the remaining campuses.  The Operating Agreement requires Corinthian to enter into an agreement with an independent monitor who will report to the DOE and have full access to Corinthian's personnel, financial forecasts, and cash receipts.  Id. at ¶¶14-18.<br><br>Corinthian brokered loans to its students by, among other things, serving as the single point of contact that introduced the students to the Genesis loan program, assisted them in completing the application for a Genesis loan, and submitted the application to the loan originator.  Corinthian, through its financial aid staff, provided substantial advice and assistance regarding private student loans and federal financial aid to students enrolling in its schools.  This included advising students on what financial aid and loan programs were available to them to pay for school, assisting students in completing the necessary applications and paperwork, and ensuring that such applications and paperwork were completed to ensure receipt of funds.  Id. at ¶28-29.<br><br>Debtors falsely implied urgency in the enrollment process by telling prospective students that seats might not be available in the future. Id. at ¶46. |

| | | |
|---|---|---|
| | | Debtors falsified job placement rates, deflated number of graduates wo were "available for employment, created fictitious employers and having friends falsely verify the employment, and paid employers to temporarily hire graduates. Id. at ¶¶58-83. |
| 10/27/2014 | *State of Wisconsin v. Corinthian Colleges, Inc.*, Milwaukee County Case No. 2014 CX 00006 | False, misleading and deceptive misrepresentations to induce students to enroll, including promises of externships, inflating job placement rates, and potential earnings. RJN Exh. E. at ¶¶55-69, 70-78, and 79-108.<br><br>Debtors falsely represented that they offered career training assessments or that students had been pre-selected and given priority status in the enrollment process. Id. at ¶¶28-31.<br><br>Debtor falsely told students that their credits were transferable to other programs. Id. at ¶33.<br><br>In January of 2011, the Wisconsin Educational Approval Board contacted Corinthian to express concerns about over-enrollment and the ability of the school to educate, train and place students. The president of Everest College, Milwaukee stated that he would monitor capacity and hire additional staff. However, enrollment continued to enroll high numbers of students and Corinthian hired inexperienced and untrained staff. By June 14, 2012, the WEAB ordered Everest Milwaukee to indefinitely suspend all enrollments. By then, the school had enrolled roughly 1600 students, far exceeding the school's institutional capacity. Id. at ¶¶35-39.<br><br>Debtors recruited Students unable to benefit from programs, including students with criminal backgrounds, and students who lacked sufficient reading skills. Id. at ¶¶40-54. |