## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| CORINTHIAN COLLEGES, INC., *et al.*[1] | § | |
| | § | Case No. 15-10952 (KJC) |
| | § | |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | **Hearing Date:  June 30, 2015 at 2:00 p.m. (ET)** |
| | § | **Objection Deadline:  June 23, 2015 at 4:00 p.m. (ET)** |

-----------------------------------------------------------------

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING DEBTORS TO ENTER INTO CONSULTING/AUCTION AGREEMENT WITH GREAT AMERICAN GLOBAL PARTNERS, LLC AND APPROVING THE TERMS THEREOF, (II) AUTHORIZING SALE OF ASSETS IN ACCORDANCE WITH AGREEMENT AND (III) GRANTING CERTAIN RELATED RELIEF

Corinthian Colleges, Inc. ("**Corinthian**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") respectfully request the entry of an order, pursuant to sections 105, 363, 364 and 554 of the title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors to enter into that certain Consulting/Auction Agreement, dated as of June 9, 2015 (the "**Consulting Agreement**"), with Great American Global Partners, LLC ("**GAGP**" or the "**Consultant**") relating to the sale of assets identified in the Consulting Agreement (the "**Assets**") and approving the terms thereof, (ii) authorizing the sale of the Assets in accordance

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Corinthian Colleges, Inc. (7312), Corinthian Schools, Inc. (0525), Rhodes Colleges, Inc. (7311), Florida Metropolitan University, Inc. (7605), Corinthian Property Group, Inc. (2106), Titan Schools, Inc. (3201), Career Choices, Inc. (1425), Sequoia Education, Inc. (5739), ETON Education, Inc. (3608), Ashmead Education, Inc. (9120), MJB Acquisition Corporation (1912), ECAT Acquisition, Inc. (7789), Pegasus Education, Inc. (2336), Grand Rapids Educational Center, Inc. (2031), Rhodes Business Group, Inc. (6709), Everest College Phoenix, Inc. (6173), CDI Education USA, Inc. (0505), SP PE VII-B Heald Holdings Corp. (0115), SD III-B Heald Holdings Corp. (9707), Heald Capital LLC (6164), Heald Real Estate, LLC (4281), Heald Education, LLC (1465), Heald College, LLC (9639), QuickStart Intelligence Corporation (5665), and Socle Education, Inc. (3477).  The Debtors' corporate headquarters is at 6 Hutton Centre Drive, Suite 400, Santa Ana, California 92707.

with the terms of the Consulting Agreement, and (iii) granting certain related relief.  In support

of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION & VENUE

1.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334 and venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding

under 28 U.S.C. § 157(b).[2]

## GENERAL BACKGROUND

2.       On May 4, 2015 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are

debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

3.       On May 13, 2015, the Office of the United States Trustee for the District

of Delaware (the "**U.S. Trustee**") appointed a statutory committee of unsecured creditors (the

"**Creditors' Committee**").  Additionally, the U.S. Trustee appointed an official committee of

student creditors (the "**Student Committee**", and together with the Creditors' Committee, the

"**Committees**") on May 15, 2015.

4.       Corinthian was founded in February 1995, and through acquisitions

became one of the largest for-profit post-secondary education companies in the United States and

Canada.  Corinthian offered career-oriented diploma and degree programs in diverse fields such

as  health  care,  business,  criminal  justice,  transportation  technology  and  maintenance,

construction trades, and information technology.  As of March 31, 2014, Corinthian operated

---

[2]       Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States
Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors hereby confirm their
consent to the entry of a final order by this Court in connection with this motion if it is later determined that
this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith
consistent with Article III of the United States Constitution.

2

over 100 campuses and provided educational opportunities to more than 74,000 students and had more than 10,000 employees.  It also offered degrees online.

5.      Among its acquisitions, in January 2010, Corinthian purchased Heald Capital, LLC, a Delaware limited liability company ("**Heald**").  Heald, through its subsidiaries, operated Heald College, a 150 year old regionally accredited institution with 12 campuses offering associate degree curricula in, among other fields, healthcare, business, legal, and information technology.

6.      Additional information on the Debtors' business and capital structure, as well as a description of the reasons for filing these cases, is set forth in the *Declaration of William J. Nolan in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**").

## SALE OF ASSETS AT WYOTECH LOCATIONS

### A.      The Miscellaneous Asset Sales

7.      As detailed in the First Day Declaration, the Debtors closed each of their campus locations effective as of April 27, 2015 and are in the process of liquidating their assets and winding down their operations.  In connection with such closures, the Debtors instructed the campus presidents at each of the closed locations to log and ship all equipment worth over $5,000 that was easily transportable (the "**Transferred Assets**") to the nearer of the Fremont and Long Beach, CA locations (the "**Wyotech Locations**") to allow the Debtors additional time to properly market the assets.  The assets that remained at the closed campus locations were either sold pursuant to miscellaneous asset sale procedures previously approved by the Court [Docket Nos. 23 & 224] (the "**Miscellaneous Asset Sale Orders**", with the sales consummated

thereunder referred to as the "**Miscellaneous Asset Sales**")[3] or abandoned in connection with the rejection of the underlying real property leases.

8.      To date, the Debtors have realized approximately $446,000 in gross proceeds as a result of sales conducted in accordance with the Miscellaneous Asset Sale Orders. Moreover, in an effort to reduce the administrative obligations of their estates, the Debtors have rejected approximately forty (40) leases of nonresidential real property and will be rejecting an additional nineteen (19) leases relating to teach-out locations on or before August 31, 2015.

B.      **The Wyotech Assets**

9.      The Wyotech Locations are multi-building campuses (with multiple real property leases) that offered career-oriented education in the automotive, electrical, plumbing, HVAC and healthcare career fields.  The assets located at the Wyotech Locations, including the Transferred Assets, have been consolidated into a single facility at each location, which has allowed the Debtors to reduce their administrative rent obligations at each location to a single real property lease.  The assets at the Wyotech Locations include machinery, equipment, vehicles, tooling, parts, accessories, manuals, rolling stock, material handling equipment, office furnishings, as well as the Transferred Assets (collectively, the "**Wyotech Assets**").

C.      **Marketing of the Wyotech Assets**

10.      As part of their marketing efforts, the Debtors and/or their advisors contacted over 300 interested parties to solicit interest in purchasing any of the Debtors' assets (including the Wyotech Assets).  In response to such efforts, the Debtors received various expressions of interest from contacted parties.  With regards to proposals received for the assets remaining at the Debtors' former campus locations, as discussed above, the Debtors were able to

---

[3]      The Debtors have also filed an additional motion seeking authority to conduct Miscellaneous Asset Sales at locations not covered by the previous Miscellaneous Asset Sale Orders.

consummate a number of smaller transactions in accordance with the procedures set forth in the Miscellaneous Asset Sale Orders.  The Miscellaneous Asset Sales enabled the Debtors to consummate such transactions in an expedited time frame, thereby allowing them to reject the underlying real property leases and stem the incurrence of any additional administrative rent obligations thereunder.

11.    The Debtors determined, however, that the potential value to be recovered from the Wyotech Assets justified conducting a more extended sale process (and incurring the rent associated with occupying such locations for a longer duration).  Accordingly, in response to initial expressions of interest, the Debtors and/or their advisors conducted more extensive conversations with thirteen interested purchasers, including national liquidation firms and key industry competitors relating to the sale of the Wyotech Assets.  In connection with such discussions, the Debtors requested that all parties submit bids for the Wyotech Assets on or before Friday, May 22, 2015.  To maintain their optionality, the Debtors requested that all bidders address three scenarios whereby they would either (i) acquire the Wyotech Assets for a guaranteed amount, (ii) serve as the Debtors' consultant in selling the Wyotech Assets on a commission basis, or (iii) some combination of (i) and (ii).  Eight (8) interested parties conducted site visits at the Wyotech Locations prior to the May 22, 2015 bid deadline.

12.    The Debtors received bids from eight (8) different bidders for all or a portion of the Wyotech Assets.  Six (6) of the bids submitted were for substantially all of the Wyotech Assets.  Following receipt of the bids, the Debtors and/or their advisors contacted the four (4) highest bidders with follow-up questions, and informed the remaining bidders that they would not be part of the process moving forward absent substantial improvements to their bids. The Debtors provided all bidders with an opportunity to improve their bids following such

discussions.  After a series of discussions and negotiations with the highest bidders, the Debtors

identified two (2) bidders that had offered the greatest consideration for the Wyotech Assets, and

that the Debtors believed, based on discussions, might further increase their bids.

13.     Accordingly, on May 30, 2015, the Debtors notified each of the bidders of

their intent to conduct a telephonic auction for the Wyotech Assets on Monday, June 1, 2015 at

12:00 p.m. (Eastern Time).  At the Debtors' request, each of the bidders confirmed their intent to

attend the telephonic auction.  The Debtors commenced the telephonic auction by stating that the

bid submitted by GAGP was currently the best and highest bid received for the Wyotech Assets,

and identifying the most recent bids received from both parties.  The second highest bidder

appeared at the telephonic auction, but declined the opportunity to outbid GAGP.  Accordingly,

GAGP was then determined to be the highest and best bid for substantially all of the Wyotech

Assets (with the specific Wyotech Assets being defined in the Consulting Agreement and

referenced herein as the "Assets").  Counsel to the Committees and the Administrative Agent for

the Debtors' prepetition lenders were kept informed of the process (and the Debtors' evaluation

of bids received) and given an opportunity to appear at the telephonic auction.[4]

D.     **The Consulting Agreement**

14.     Pursuant to the terms of the Consulting Agreement, GAGP shall serve as

an independent consultant to the Debtors in connection with an orderly liquidation sale of the

Assets to be conducted by GAGP on behalf of the Debtors, followed by an auction of the Assets

at the Wyotech Locations and/or on the Internet.  GAGP anticipates that the auction of the Assets

will begin on the date that the Court enters an order approving the relief requested in this Motion

(referenced in the Consulting Agreement as the Approval Order) and last no more than sixty (60)

---

[4]     The financial advisor for the Creditors' Committee did participate in the telephonic auction for the
Wyotech Assets held on Monday, June 1, 2015.

days (the "**Sale Termination Date**"); provided that the Sale Termination Date may be changed or extended if mutually agreed upon in writing by the Debtors and GAGP.  The specific services to be provided by GAGP, as outlined in the Consulting Agreement, include the following:

(i)     provide full time Supervisors[5] to supervise and conduct the Sale as further described in Section 2.3 of the Consulting Agreement;

(ii)    lot, tag, photograph and catalogue the Assets;

(iii)   oversee the liquidation and disposal of the Assets from the Facilities; provided, however, Consultant reserves the right to abandon at the Facilities any Assets that have not been sold by the Sale Termination Date;

(iv)    determine and implement appropriate marketing to effectively sell the Assets during the Sale term;

(v)     determining pricing of the Assets if sold prior to the Auction;

(vi)    oversee execution of the Sale, invoicing and collection of proceeds from buyers;

(vii)   provide such other related services deemed necessary or prudent by the Company and Consultant under the circumstances; and

(viii)  provide the Company with reporting and reconciliation of all accounting information in form reasonably acceptable to the Company as set forth herein.

15.     Under the terms of the Consulting Agreement, GAGP has guaranteed the Debtors that the proceeds generated from the sale of the Assets shall be no less than $1.535 million (the "**Guaranteed Amount**").  GAGP is required to pay the Guaranteed Amount to the Debtors within 48 hours of the Court entering the Approval Order; which will subsequently be paid to GAGP from the first $1.535 million in proceeds collected from the sale of the Assets. The next available proceeds in the amount of an additional $100,000 shall be used to reimburse GAGP for the payment of Sale Expenses.  The Sale Expenses include actual direct operating

---

[5]     Capitalized terms not otherwise defined herein have the meanings given to them in the Consulting Agreement.

expenses reasonably incurred by GAGP in connection with the Sale, provided that GAGP shall not be responsible for occupancy or related costs for the Facilities (i.e., rents, mortgages, trash, dumpsters, phone, security or utility charges) unless the Sale extends beyond the anticipated Sale Termination Date.[6]  Any additional proceeds received from the sale (above $1.635 million) will be split 95 percent to the Debtors and 5 percent to GAGP.  GAGP will also charge buyers (i) a 15 percent buyer's premium with regards to Assets sold and (ii) a 3 percent bidding surcharge with regards to Assets sold pursuant to online bidding.

###### E.    Disclosures Pursuant to Local Rules

16.    In accordance with Local Rule 6004, the Debtors make the following disclosures:

| Provision | Description of Provision |
|---|---|
| Sale | Pursuant to Article 2 of the Consulting Agreement, GAGP shall be retained as an independent consultant to the Debtors in connection with an orderly liquidation sale of the Assets to be conducted by GAGP on behalf of the Debtors, followed by an auction of the Assets at the Wyotech Locations and/or on the Internet. |
| Guaranteed Amount | Pursuant to Section 4.1 of the Consulting Agreement, the Guaranteed Amount shall be $1.535 million, which shall be paid to the Debtors within 48 hours of the Court entering the Approval Order.    The Guaranteed Amount shall subsequently be paid to GAGP from the first $1.535 |

---

[6]    Section 7.7 of the Consulting Agreement provides as follows:

In the event that the Sales extend beyond the date that is 60 days from the date of entry of the Approval Order, the Consultant shall be solely liable for any expenses incurred in connection with the maintenance or operation of the Facilities for such period, including but not limited to, occupancy costs, utilities, security, local telephone, trash services, property taxes and any other related costs.  Consultant acknowledges that, under applicable law, in the event the Sales are ongoing as of September 1, 2015 (or the first day of each subsequent month), its obligations under this Section will include an obligation to pay rent and related charges under the applicable leases for the entire month of September or applicable month thereafter (rather than on a *pro rata* or *per diem* basis for the actual days of occupancy).

| Provision | Description of Provision |
|---|---|
|  | million in proceeds collected from the sale of the Assets. |
| Sale Expenses | Pursuant to Section 4.2 of the Consulting Agreement, the next $100,000 in available proceeds (above the Guaranteed Amount) shall be used to reimburse GAGP for the payment of Sale Expenses.  The Sale Expenses include actual direct operating expenses reasonably incurred by GAGP in connection with the Sale, provided that GAGP shall not be responsible for occupancy or related costs for the Facilities (i.e., rents, mortgages, trash, dumpsters, phone, security or utility charges) unless the Sale extends beyond the anticipated Sale Termination Date.  See Section 7.7 of the Consulting Agreement regarding GAGP's obligations with respect to lease related obligations in the event that the Sale extends beyond sixty (60) days. |
| Shared Amount | Pursuant to Section 4.2 of the Consulting Agreement, proceeds received from the sale above $1.635 million (after covering the Guaranteed Amount and reimbursement of the Sale Expenses), and not counting GAGP's direct charges to the buyers with respect to (i) a fifteen (15) percent buyer's premium with regards to Assets sold and (ii) a three (3) percent bidding surcharge with regards to Assets sold pursuant to online bidding, will be split 95 percent to the Debtors and 5 percent to GAGP. |
| Follow-Up Inspection | Prior to June 30, 2015, the anticipated hearing date on this Motion, GAGP shall conduct and complete a follow-up review and inspection of the Assets to confirm that there has been no material adverse change to the Assets (the "Follow-Up Inspection").  In the event that GAGP asserts, based on the Follow-Up Inspection, that there has been a material adverse change to the Assets, the parties shall attempt in good faith to resolve any such issues and make any related revisions or modifications to the Agreement; provided, however, that in the event that the parties are unable to resolve any issues identified in connection with the Follow-Up Inspection, the Court shall address such issues at the hearing on the Motion. |
| Abandonment of Remaining Assets | Pursuant to Section 2.2(iii) of the Consulting Agreement, GAGP may abandon at the Facilities any Assets that have not been sold by the Sale Termination Date. |

| Provision | Description of Provision |
|---|---|
| Buyer's Premium and Online Sales Surcharge | Pursuant to Section 4.2 of the Consulting Agreement, GAGP will charge buyers (i) a 15 percent buyer's premium with regards to Assets sold and (ii) a 3 percent bidding surcharge with regards to Assets sold pursuant to online bidding. |
| Payment Date | Pursuant to Section 4.1 of the Consulting Agreement, the Guaranteed Amount shall be paid to the Debtors within forty-eight (48) hours of entry of the Approval Order. With regards to any additional proceeds received, Section 4.3 of the Consulting Agreement contemplates that all Sale proceeds shall be deposited in a segregated account; and that GAGP shall provide the Debtors with an accounting of the proceeds of the Sale (and such other information that may be reasonably requested by the Debtors) within twenty-one (21) business days following the completion of the Sale. |
| Sale Period | Pursuant to Section 1.3 of the Consulting Agreement, GAGP anticipates that the Sale will conclude no later than sixty (60) days after entry of the Approval Order, which date may be changed or extended if mutually agreed upon in writing by the Debtors and GAGP. |
| No Additional Bidding Process | As detailed above, the Debtors conducted an auction process prior to filing this Motion and submit that they have maximized value for the sale of the Assets.  The Debtors are seeking approval of the Consulting Agreement at the hearing on the Motion and are not seeking to establish an additional bidding process with respect to the selection of GAGP as the Debtors' consultant.  GAGP, however, will be conducting an Auction of the Assets in accordance with the terms of the Consulting Agreement. |
| Relief from Bankruptcy Rule 6004(h) | As set forth herein, the Debtors seek relief from the stay requirements of Bankruptcy Rule 6004(h) |

RLF1 12068767v.4

## RELIEF REQUESTED

17.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as Exhibit B (the "**Approval Order**"), pursuant to sections 105(a), 363, 364 and 554 of the Bankruptcy Code and Bankruptcy Rule 6004, (i) authorizing the Debtors to enter into the Consulting Agreement relating to the sale of the Assets and approving the terms thereof, (ii) authorizing the sale of the Assets in accordance with the terms of the Consulting Agreement, and (iii) granting certain related relief.

## BASIS FOR RELIEF REQUESTED

### A.     The Debtors' Entry into the Consulting Agreement is a Sound Exercise of Debtors' Business Judgement.

18.     Bankruptcy Code section 363(b)(1) provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." The notice and hearing requirements contained in section 363(b)(1) are satisfied if appropriate notice and an opportunity for hearing are given in light of the particular circumstances. 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" to mean such notice and an opportunity for hearing "as [are] appropriate in the particular circumstances").

19.     Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (finding that the sale of substantially all of the Debtor's assets satisfied the sound business reason test). *See also Myers v. Martin (In re martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th

Cir. 1991)) (noting that the Court defers to the trustee's judgment so long as there is a legitimate business justification); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. S*ee Pitt v.F irst Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

20.    The proposed retention of GAGP under the terms of the Consulting Agreement is analogous to the retention of a liquidation firm to serve as the debtor's agent in selling inventory pursuant to a "going-out-of-business" sale. This Court has repeatedly accepted such an arrangement as an accepted method for the sale of assets in chapter 11 cases. *See, e.g. In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011) (authorizing debtors' entry into agency agreement to conduct full-scale liquidation of stores); *In re* Borders *Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (authorizing debtors' entry into agency agreement to conduct store closing sales on first day); *In re Goody's LLC*, No. 09-10124 (Bankr.

D. Del. Jan. 21, 2009) (authorizing debtors' assumption of prepetition agency agreement and to conduct full-scale liquidation through store closing sales at the outset of the case); *In re Circuit City Stores Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); *In re Whitehall Jewelers Holdings, Inc.*, No. 08-11261 (KG) (Bankr D. Del. Aug. 8, 2008) (authorizing debtors' entry into an agency agreement to conduct store closing sales); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) ( Bankr D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); *In re Sharper Image Corp.*, No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (authorizing debtor's entry into an agency agreement to conduct store closing sales).

21.     The Debtors submit that their entry into the Consulting Agreement is a sound exercise of their business judgment.  The Consulting Agreement will allow the Debtors to use a national liquidation firm with substantial experience and expertise in conducting an orderly sale of the Assets over a two-month period.  Moreover, under the terms of the Consulting Agreement, the Debtors will realize a guaranteed amount of $1.535 million (which shall be paid to the Debtors within forty-eight (48) hours of entry of the Approval Order), while still being able to share in additional recoveries in the event that the proceeds from the Sale exceed $1.635 million.  Indeed, Section 4.2 of the Consulting Agreement, provides that any proceeds received from the sale above $1.635 million (after covering the Guaranteed Amount and reimbursement of the Sale Expenses) will be split ninety-five (95) percent to the Debtors and five (5) percent to GAGP.  The Debtors submit that this proposed structure minimizes the Debtors' risk (by securing payment of the Guaranteed Amount) while at the same time motivating GAGP to maximize the proceeds received from the sale of the Assets.

22.     Further, as detailed above, the Debtors' entry into the Consulting Agreement is the result of an extensive marketing process whereby the Debtors contacted over 300 prospective purchasers with the goal of maximizing the value received for the Wyotech Assets.  The Debtors received bids from eight (8) bidders to purchase all or a portion of the Wyotech Assets, with six (6) of the bidders seeking to purchase substantially all of the Wyotech Assets.  The Debtors were ultimately able to identify GAGP as having submitted the highest and best bid for the Assets, following a series of negotiations with interested bidders and a telephonic auction held on June 1, 2015.  The Debtors and their advisors kept counsel to the Committees and the Administrative Agent for the prepetition lenders informed with respect to the process and the Debtors' evaluation of the bids received.  Based on the process conducted to date, and the decision of the second highest bidder not to overbid at the telephonic auction, the Debtors submit that they have maximized the value to be received for the Assets and that no further bidding process for the Assets is warranted.  Accordingly, the Debtors' submit that their entry into the Consulting Agreement is a sound exercise of the Debtors' business judgment.

23.     Moreover, the Debtors submit, and will demonstrate at the hearing on the Motion, that the Consulting Agreement is the result of good faith arms'-length negotiations. GAGP is not an "insider" of the Debtors, as such term is defined under section 101(31) of the Bankruptcy Code, and is not in any way affiliated with the Debtors.

**B.     The Court Should Authorize the Sale of Assets at the Wyotech Locations Free and Clear of All Liens, Claims and Encumbrances.**

24.     Pursuant to the terms of the Consulting Agreement, GAGP shall serve as an independent consultant to the Debtors in connection with an orderly liquidation sale of the Assets to be conducted by GAGP on behalf of the Debtors, followed by an auction of the Assets at the Wyotech Locations and/or on the Internet.  The Debtors' request that the Court approve

14

and authorize this arrangement and that any sales effectuated by GAGP (in its capacity as consultant to the Debtors) be free and clear of any liens, claims and encumbrances.

25.     The Debtors have determined, in the sound exercise of their business judgment, that the use of GAGP as consultant is the best way to maximize the value received for the Assets.  As discussed above, GAGP is a national liquidation firm with substantial experience and expertise in conducting asset sales of this type.  Accordingly, the Debtors believe that GAGP's experience and expertise will allow the Debtors to receive the maximum potential recovery from the sale of the assets.  Section 2.5 of the Consulting Agreement provides that the Debtors shall maintain title to the Assets through the Sale Term (as defined in the Consulting Agreement).  Accordingly, GAGP will be conducting a sale of estate assets on the Debtors' behalf, with the Debtors realizing a potential upside pursuant to the proceeds sharing formula set forth in the Consulting Agreement.  Accordingly, the Debtors request that the Court authorize and approve any sales of the Assets by GAGP.

26.     Section 363 of the Bankruptcy Code provides in relevant part that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Where a debtor has shown some "articulated business justification," the sale of assets under section 363 should be approved. *See In re Del. and Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business judgment" test for section 363 asset sales); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d. Cir. 1986) (applying business judgment rule*); In re Lionel Corp.*, 722 F.2d at 1070-71 (same).

27.     The Debtors submit that ample business reasons exist for selling the Assets in accordance with the Consulting Agreement.  As previously described to the Court, the Debtors have ceased all operations and have begun an orderly liquidation of their assets.  The liquidation of the Assets at the Wyotech Locations is the most likely path to maximize recoveries for the Debtors' estates, their creditors and other parties-in-interests to wind-down the Debtors' business.  The Assets will be monetized most efficiently and expeditiously through an orderly process conducted by an experienced liquidation firm.  Moreover, the structure set forth in the Consulting Agreement will minimize the administrative expenses of the estates by reallocating a significant portion of the risk and costs associated with the Sale from the Debtors to GAGP.  If the Debtors are not allowed to commence the sale of the Assets in the proposed manner, the Debtors would suffer significant detriment from the resulting delay, added postpetition expenses and further time and efforts required to reformulate a different liquidation strategy.

28.     To facilitate the sale of the Assets, the Debtors request authority to sell the Assets on a final "as is" basis, free and clear of all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code allows a debtor to sell property "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is met:

(a)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(b)     the party asserting the lien, claim or interest consents to the sale;

(c)     the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property;

(d)     the interest is the subject of a bona fide dispute; or

(e)     such entity could be compelled to accept a money satisfaction of such claim.

11 U.S.C. § 363(f); *see also In re Elliott*, 94 B.R. 343, 345 (E.D. Pa 1988) (noting that section 363(f) is written in the disjunctive, thereby allowing sales "free and clear" if any subsection is met).

29.     To the extent there are any entities with an interest in any of the Assets that have not already consented to the Sale, such entity could be compelled to accept a money satisfaction of such interest.   Specifically, the Debtors propose that any liens, claims or encumbrances asserted against the Assets attach to the Guaranteed Amount and any additional proceeds payable to the Debtors under the terms of the Consulting Agreement, in the same priority and subject to the rights, claims, defenses and objections, if any, of all parties with respect thereto.

C.     <u>Security Interest in Assets Pending Recovery of Guaranteed Amount</u>

30.     As discussed above, GAGP has guaranteed to the Debtors that the proceeds of the Assets generated from the Sale shall be no less than $1.535 million.  GAGP shall pay the Guaranteed Amount to the Debtors no later than forty-eight (48) hours following entry of the Approval Order, well in advance of GAGP recovering any proceeds in connection with the Sale.   Indeed, the Consulting Agreement provides that the first $1.535 million in proceeds collected from the sales of the Assets shall be used to repay GAGP for the Guaranteed Amount. Accordingly, GAGP's advancement of the Guarantee Amount constitutes an extension of credit pursuant to the Consulting Agreement.   As such, pursuant to Section 4.4 of the Consulting Agreement, the Debtors have consented to providing GAGP with a security interest in the Assets to secure payment of the Guaranteed Amount.   Moreover, the Debtors submit that the advancement of the Guaranteed Amount constitutes a good faith extension of credit under section 364(e) of the Bankruptcy Code and, as such, the reversal or modification on appeal of the

17

Court's authorization to consummate the transactions contemplated by the Consulting Agreement and the security interest thereunder should not affect the validity of such transactions unless such authorization has been stayed pending appeal.

**D.      Authority to Abandon Assets Not Sold Pursuant to Sale**

31.      GAGP is incentivized under the terms of the Consulting Agreement to use its best efforts to sell all of the Assets for the highest possible price.  Indeed, GAGP and the Debtors split any proceeds recovered over $1.635 million, with ninety-five (95) percent of such proceeds going to the Debtors and five (5) percent of such proceeds going to GAGP.  Moreover, GAGP will charge buyers a fifteen (15) percent buyer's premium for any Assets sold and a three (3) percent bidding surcharge with regards to Assets sold pursuant to online bidding.  That said, the Debtors and GAGP anticipate that there may be certain Assets that they are unable to sell.  Accordingly, the Debtors and GAGP seek authorization to abandon at the WyoTech Locations any Assets that have not been sold by the Termination Date.

32.      Bankruptcy Code section 554(a) provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).  The Debtors anticipate rejecting the real property leases relating to the Wyotech Locations on or immediately following the Sale Termination Date.  In order to effectively reject such leases, the Debtors will need to surrender possession of the premises to the respective landlords.  The Debtors submit that the ability to abandon unsold Assets (in consultation with GAGP) will allow the Debtors to surrender possession as soon as practicable, thereby stemming the incurrence of continuing administrative rent under the leases.

**E.      Relief from Restrictive Provisions of Real Property Leases Impeding the Debtors' Ability to Sell the Assets.**

33.     The leases with respect to each of the Wyotech Locations may contain provisions purporting to restrict or prohibit the Debtors from conducting liquidation or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See, e.g., In re Ames Dep't Stores, Inc.*, 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in Chapter 11 case where debtor sought to conduct going-out-of-business sale).

34.     As such, to the extent that such provisions or restrictions exist in the leases, such landlords may not interfere with or otherwise seek to restrict the Debtors and/or GAGP from conducting the Sale.  Accordingly, the Debtors request that the Court authorize the Debtors and/or the GAGP to conduct the Sale without interference by any landlords or other persons affected, directly or indirectly, by the sale of the Assets.  Bankruptcy courts in this District have held that similar restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable.  *See, e.g., In re Tweeter Home Entm't Group, Inc.*, Ch. 11 Case No. 07-10787

19

(PJW) (Jointly Administered) (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); *In re Three A's Holdings, L.L.C.*, Ch. 11 Case No. 06-10886 (RLS) (Jointly Administered) (Bankr. D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to conduct store closing sales).

F.    **Waiver of Stay Under Bankruptcy Rule 6004(h)**

35.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* 10 COLLIER ON BANKRUPTCY ¶ 6004.11 at 6004-19 (citing Advisory Committee on the Federal Rules of Bankruptcy Procedure, Committee Notes on Rules – 1999 Amendment at subdivision (g) (1999)). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 at 6004-20 (15th ed. 2008). The treatise further provides that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

36.    The Debtors submit that under the circumstances, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h). Any delay in the Debtors' ability to sell the Assets would be detrimental to the Debtors and their estates and creditors. Accordingly, the Debtors seek a waiver of the 14-day stay of any order approving this Motion and request that each sale under the procedures described in this Motion, be deemed immediately approved when consummated thereunder.

## NOTICE

37.     The Debtors will provide notice of this Motion to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) proposed counsel to the Creditors' Committee; (iii) proposed counsel to the Student Committee; (iv) counsel to Bank of America, N.A., in its capacity as Administrative Agent for the Lenders; (v) the Department of Education; (vi) the Internal Revenue Service; (vii) the Securities and Exchange Commission; (viii) the United States Attorney for the District of Delaware; (xi) any banking or financial institution that holds the Debtors' accounts; (x) any other known party holding liens with respect to the Assets; (xi) any landlords with respect to the Wyotech Locations; (xii) the Office of the Attorney General for the State of California; and (xiii) all parties entitled to notice of this Motion pursuant to Bankruptcy Rule 2002.

38.     The Debtors submit that no other or further notice is necessary under the circumstances.

## NO PRIOR MOTION

39.     The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other.

RLF1 12068767v.4

WHEREFORE, the Debtors respectfully request the entry of the Approval Order, substantially in the form attached hereto as <u>Exhibit B</u>, granting the relief requested in its entirety and any other relief as is just and proper.

Dated: June 9, 2015
      Wilmington, Delaware

*/s/ Amanda R. Steele*

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marisa A. Terranova (No. 5396)
Amanda R. Steele (No. 5530)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Facsimile:  302-651-7701
Email:  collins@rlf.com
       merchant@rlf.com
       terranova@rlf.com
       steele@rlf.com

Attorneys for the Debtors and Debtors in Possession