# EXHIBIT A

## Consulting Agreement

**CONSULTING/AUCTION AGREEMENT**

This Consulting Agreement, dated as of June 9, 2015 (together with all Schedules, Exhibits and attachments hereto, (collectively, the "Agreement")), is made by and between Great American Global Partners, LLC, a California limited liability company, with a principal place of business at 21860 Burbank Boulevard, Suite 300 South, Woodland Hills, CA 91367 (the "Consultant") and Corinthian Colleges, Inc., a Delaware Corporation (Federal Employer Identification Number 33-0717312) ("CCI") and certain of its affiliated entities, including, but not limited to, Corinthian Schools, Inc. (Federal Employer Identification Number 95-4520525), Rhodes Colleges, Inc. (Federal Employer Identification Number 33-0717311), Everest College Phoenix, Inc. (Federal Employer Identification Number 45-2216173) and Sequoia Education, Inc. (Federal Employer Identification Number 94-3135739) (collectively, with CCI, the "Company").

**WITNESSETH:**

**WHEREAS**, the Company and certain of its affiliates filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on May 4, 2015, which cases are pending in the United States Bankruptcy Court for the District of Delaware (the "Court") and are being jointly administered under Case No. 15-10952 (KJC);

**WHEREAS**, the Company desires to retain Consultant to provide consulting services with respect to the management and disposition of the Assets (as defined below); and

**WHEREAS**, Consultant is willing to serve as the Company's consultant, for the purpose of providing such consulting services, upon the terms and conditions and in the manner set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **DEFINITIONS**

For the purpose of this Agreement, the terms listed below shall have the respective meanings indicated:

1.1   Except as set forth below, "Assets" shall mean the assets and equipment of the Company located and/or stored at the Facilities, as viewed, inspected and represented by the Company during Consultant's inspection and review on May 19, 2015 and May 20, 2015. Notwithstanding anything in this Agreement to the contrary, the Assets shall not include certain "Heald" historical items located at the Facilities and stored in seven (7) speed pack boxes, leased equipment located at the Facilities and 9 parts washers located at the Fremont, CA Facility, as the parties have agreed that such items shall not be part of the Sale and may be removed from the Facilities at any time prior to the Sale Termination Date.  Prior to June 30, 2015, the anticipated hearing date whereby the Court will consider entry of the Approval Order (the "Sale Hearing"), Consultant shall conduct and complete a follow-up review and inspection of the Assets to confirm that there has been no material adverse change to the Assets (the "Follow-Up

Inspection"). In the event that Consultant asserts, based on the Follow-Up Inspection, that there has been a material adverse change to the Assets, the parties shall attempt in good faith to resolve any such issues and make any related revisions or modifications to this Agreement; provided, however, that in the event that the parties are unable to resolve any issues identified in connection with the Follow-Up Inspection, the Court shall address such issues at the Sale Hearing.

  1.2 "Facilities" shall mean the Company's facilities located at 2131 Technology Place, Long Beach, CA 90810 and 420 Whitney Place, Fremont, CA 94539.

  1.3 "Sale" shall mean an orderly liquidation sale of the Assets to be conducted by Consultant on behalf of the Company, followed by an auction of the Assets at the Facilities and/or on the Internet, which auction Consultant anticipates will occur no later than 60 days after entry of the Approval Order, which date may be changed or extended if mutually agreed upon in writing by the Company and Consultant.

  1.4 "Sale Expenses" shall mean, with respect to the Sale, actual direct operating expenses reasonably incurred by Consultant in connection with the Sale. Sale Expenses do not include occupancy or those types of related costs for the Facilities (i.e., Rents, Mortgages, Trash, Dumpsters, Phone, Security, Utilities).

  1.5 "Sale Term" shall mean the period of time beginning on the date of entry of the Approval Order and ending on the Sale Termination Date.

  1.6 "Sale Termination Date" shall mean the date that is 60 days following the date of entry of the Approval Order, unless otherwise mutually agreed by Consultant and the Company.

  1.7 "Sales Taxes" shall mean all sales, excise, gross receipts and other taxes attributable to the Sale of the Assets (other than taxes on income) payable to any taxing authority having jurisdiction.

  1.8 "Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

  1.9 "Supervisors" shall mean the individual or individuals whom shall provide Services at the Facilities as set forth in Sections 2.2 and 2.3 of this Agreement.

  **2.** **RETENTION**

  2.1 Subject to the entry of the Approval Order, the Company hereby retains Consultant, and Consultant hereby agrees to serve, as an independent consultant to the Company in connection with the conduct of the Sale as set forth herein. With respect to the Sale, Consultant shall serve as the Company's sole and exclusive consultant relative thereto throughout the Sale Term. Consultant shall implement an orderly liquidation and auction for the liquidation of the Assets.

  2.2 On the terms and conditions set forth herein, Consultant shall provide the Company with the following Services with respect to the conduct of the Sale:

    (i)    provide full time Supervisors to supervise and conduct the Sale as further described in Section 2.3 below;

    (ii)    lot, tag, photograph and catalogue the Assets;

    (iii)    oversee the liquidation and disposal of the Assets from the Facilities; *provided* *however*, Consultant reserves the right to abandon at the Facilities any Assets that have not been sold by the Sale Termination Date;

    (iv)    determine and implement appropriate marketing to effectively sell the Assets during the Sale term;

    (v)    determine pricing of the Assets if sold prior to the Auction;

    (vi)    oversee execution of the Sale, invoicing and collection of proceeds from buyers;

    (vii)    provide such other related services deemed necessary or prudent by the Company and Consultant under the circumstances; and

    (viii)    provide the Company with reporting and reconciliation of all accounting information in form reasonably acceptable to the Company as set forth herein.

    2.3    In connection with the Sale, Consultant shall directly retain and engage the Supervisors.  The Supervisors are independent contractors engaged as agents of Consultant, and are not and shall not be deemed to be employees of the Company in any manner whatsoever.  In consideration of Consultant's engagement of the Supervisors, Sale Expenses shall include Supervisor expenses.

    2.4    All sales of Assets shall be made by Consultant as agent in fact for the Company.  Except for incurring Sale Expenses and as otherwise specifically provided in this Agreement, Consultant shall have no authority to enter into any contract, agreement or other arrangement or take any other action, by or on behalf of the Company, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of the Company without the Company's prior written consent.

    2.5    The Assets will be sold in such lots as Consultant may determine.  Title to the Assets shall remain with the Company throughout the Sale Term, unless and until paid for by, and transferred to, a purchaser through the Sale.

    2.6    Consultant is authorized to accept, as the Company's agent, cash, wires, nationally recognized bank credit cards and guaranteed checks as payment for the Assets sold.  Consultant shall ensure that all proceeds are deposited in the Sale Proceeds Account (defined below) no later than one (1) business day after receipt.

2.7     Consultant shall sell the Assets "as is", "where is", on a final basis, without any representations of any kind or nature whatsoever, including as to merchantability or fitness, and without warranty or agreement as to the condition of such Assets, and all sales receipts will reflect the same.  Consultant is acting solely in the capacity of agent for the Company and has no knowledge with respect to the fitness or usability of any of the Assets.  Consultant will not use, alter or repair any of the Assets for any particular purpose or otherwise.

2.8     Notwithstanding anything to the contrary set forth herein, Consultant shall exercise commercially reasonable efforts to sell all of the assets during the Sale Term.

**3.     EXPENSES**

3.1     Consultant shall be responsible for the payment of Sales Expenses, subject to reimbursement of such amounts from the proceeds of the Sales in accordance with the terms and limitations of Section 4.2 of this Agreement.  For the avoidance of doubt, any obligation of the Company to reimburse Consultant for any Sales Expenses, including any expenses relating to the Supervisors described in Section 2.3 above, shall be limited to the $100,000 in next available proceeds to be paid to Consultant in accordance with Section 4.2 of this Agreement.

**4.     CONSULTANT'S FEES & BUYER'S PREMIUM**

4.1     Consultant hereby guarantees to the Company that the proceeds of the Assets generated from the Sale shall be no less than $1,535,000 (the "Guaranteed Amount"). Consultant shall pay the Guaranteed Amount no later than 48 hours after entry of the Approval Order.  The Guaranteed Amount shall be repaid from the proceeds of the auction as provided in Section 4.2 below.

4.2     After sufficient proceeds have been collected from the sale of the Assets to pay the Guaranteed Amount, Consultant shall be entitled to be paid the next available proceeds in the amount of an additional $100,000 to reimburse the payment of Sale Expenses and other costs. Any additional proceeds after $1,635,000 will be split 95% to the Company and 5% to Consultant. Consultant will also charge buyers a 15% Buyer's Premium and a 3% bidding surcharge with regards to Assets sold pursuant to online bidding.  Such premium and surcharge will be retained by Consultant.

4.3     All Sale Proceeds shall be deposited in a segregated sale proceeds account (the "Sale Proceeds Account").  Within 21 business days following the completion of the Sale, Consultant shall provide the Company with an accounting of the proceeds of the Sale and shall provide such other information that may be reasonably requested by the Company.

4.4     The Approval Order shall provide that Consultant maintains a security interest in the Assets, as permitted by section 546(b) of the Bankruptcy Code, to secure payment of the Guaranteed Amount.

4.5     Consultant shall not be required to file formal applications for approval of its compensation and reimbursement of expenses; *provided*, *however*, within 30 days of the Sale Termination Date, the Company or its counsel shall file on Consultant's behalf, with assistance from Consultant, a summary of proceeds realized and amounts paid, which summary shall be in

full satisfaction of any Bankruptcy Code requirements including, but not limited to, sections 327, 328, 330 and 331 of the Bankruptcy Code and Rule 2016 of the Federal Rules of Bankruptcy Procedure.

    5.    **REPRESENTATIONS AND WARRANTIES OF CONSULTANT**

    5.1    Consultant hereby represents, warrants and covenants in favor of the Company as follows:

    (a)    Subject to the entry of the Approval Order, Consultant has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby;

    (b)    This Agreement is a valid binding obligation of Consultant enforceable in accordance with its terms;

    (c)    To the best of Consultant's knowledge, no action or proceeding has been instituted or threatened affecting the consummation of this Agreement or the transactions contemplated herein;

    (d)    Prior to the date hereof, Consultant has inspected and reviewed the Assets, and the Consultant shall have no right to adjust the Guaranteed Amount or to change the disbursement allocation of the Sale Proceeds (as set forth in Section 4.2 above); <u>provided however</u>, that prior to June 30, 2015, Consultant shall conduct the Follow-Up Inspection to confirm that there has been no material adverse change to the Assets, and the parties shall attempt in good faith to resolve any issues identified during the Follow-Up Inspection and make any related revisions or modifications to this Agreement, with any unresolved issues identified during the Follow-Up Inspection to be addressed by the Court at the Sale Hearing.

    (e)    Consultant's use and occupancy of the Facilities shall be consistent with the terms of this Agreement; and

    (f)    Except as may be provided in the Approval Order, Consultant shall conduct the Sale in accordance with any and all state and all applicable standards and state and federal laws, rules, and regulations governing such transactions or events.

    6.    **REPRESENTATIONS AND WARRANTIES OF COMPANY**

    6.1    The Company hereby represents, warrants and covenants in favor of Consultant as follows:

    (a)    Subject to the entry of the Approval Order, the Company has good and valid authority to consummate the transactions contemplated hereby, including the conduct of the Sale;

(b) To the best of the Company's knowledge, the Company has legal title to the Assets and, subject to the entry of the Approval Order, has legal authority to sell the Assets to the general public free and clear of any liens, claims or encumbrances;

(c) To the best of the Company's knowledge, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or government body has been instituted by or against the Company or has been settled or resolved, or is threatened against the Company or the Company's business or properties, that questions the validity of this Agreement or that, if adversely determined, would adversely affect the conduct of the Sale;

(d) To the best of the Company's knowledge, the Assets are in compliance with all applicable federal, state, or local product safety laws, rules and standards;

(e) Throughout the Sale Term, Consultant shall have the right, as reasonably required by Consultant, during normal business hours, to the uninterrupted use and occupancy of, and peaceful and quiet possession of, the Facilities to conduct the Sale and to allow the removal of the Assets from the Facilities. The Company shall through the Sale Termination Date make reasonable efforts to maintain in good working order, condition and repair, at its sole expense, all heating systems, air conditioning systems, elevators and all other mechanical devices reasonably necessary to allow for the conduct of the Sale and the removal of the Assets from the Facilities during such hours;

(f) Company consents to Consultant's use of the Company's branded names including without limitation "WyoTech" and "Corinthian Colleges, Inc." in connection with the Sale. Consultant may use such name in advertising of such sale and may also include Company as a "client" in its promotional, marketing and/or advertising materials; and

(g) To the extent available, the Company shall provide to Consultant, no later than one week after Court Approval Date, (i) all equipment records, maintenance logs and records, and other files relating to the Assets (ii) all documents in the Company's possession reasonably requested by Consultant prior to the Auction(s) and otherwise necessary to transfer title to the Assets, including vehicle titles, properly endorsed. Consultant acknowledges that the Company may not have all requested titles, records and maintenance logs, but that the Company will use its best efforts to locate and provide available documents in accordance with this Section.

7. **AFFIRMATIVE DUTIES OF CONSULTANT**

7.1     Consultant shall reimburse, indemnify, defend and hold the Company, as well as its agents and employees, harmless from and against any and all known or unknown losses, damages (including without limitation, any personal injury, death or property damages), liabilities, claims, actions, judgments, penalties and fines, court costs and legal or other expenses, or any claim or action therefore, by or on behalf of any person, which the Company may incur as a direct or indirect result of:  (i) Consultant's breach of this Agreement or any of its representations or warranties hereunder, including, but not limited to, collection of Sales Taxes from buyers; (ii) any claims asserted by Consultant's employees or agents, including Consultant's employees' or agents' payroll claims (wage claims, claims for taxes required to be withheld from wages, social security, etc.), or unemployment compensation claims; and (iii) grossly negligent or intentional acts or omissions of Consultant or its agents, employees, representatives or principals in connection with the Sale.

7.2     Subject to the Company's obligation to provide access to the Facilities as provided above, and without altering Consultant's right to abandonment as provided above, Consultant shall coordinate and manage the removal of the Assets and use its best efforts to ensure that the Assets that are sold pursuant to this Agreement are removed at buyers' cost from the Facilities.  Removal of items shall be supervised by Consultant, and Consultant shall take all reasonable precautions to ensure that such removal is conducted by buyers so as to avoid any damage to the Facilities.  Notwithstanding any provision in this Agreement to the contrary, Consultant shall not be responsible for any losses, damages, costs or expenses resulting from or related to the sale or removal of the Assets by buyers or their agents or representatives.

7.3     Consultant shall keep records of the sale price offered and paid for the Assets, the Sale Proceeds and Sale Expenses incurred by Consultant.

7.4     Consultant shall provide, at Consultant's sole expense, sufficient labor for the conduct of the Sale (including auctioneers, accounting, support and personnel to register bidders) and moving, transferring or consolidating Assets out of or within the Facilities (including sufficient insurance), payment for which shall be included as part of the Sale Expenses.

7.5     Except as may be provided in the Approval Order, Consultant shall be responsible, at its own cost and expense, for obtaining, with the assistance of the Company as may be required, any permits or licenses necessary to conduct the Sale.

7.6     Consultant shall maintain at Consultant's cost and expense throughout the Sale Term comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Consultant's services hereunder (including, without limitation, with respect to removing the Assets from the Facilities), of at least $1,000,000, and shall cause the Company to be an additional insured with respect to all such policies.  Consultant shall deliver a certificate evidencing such insurance to the Company within 5 days of execution of this Agreement.  In the event of a claim under such policies, Consultant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Consultant or Consultant's employees, agents or independent contractors.

7.7     In the event that the Sales extend beyond the date that is 60 days from the date of entry of the Approval Order, the Consultant shall be solely liable for any expenses incurred in

connection with the maintenance or operation of the Facilities for such period, including but not limited to, occupancy costs, utilities, security, local telephone, trash services, property taxes and any other related costs. Consultant acknowledges that, under applicable law, in the event the Sales are ongoing as of September 1, 2015 (or the first day of each subsequent month), its obligations under this Section will include an obligation to pay rent and related charges under the applicable leases for the entire month of September or applicable month thereafter (rather than on a *pro rata* or *per diem* basis for the actual days of occupancy).

**8. AFFIRMATIVE DUTIES OF COMPANY**

8.1 The Company shall be solely liable for any expenses (other than the Sale Expenses) incurred in connection with the maintenance or operation of the Facilities through the date that is 60 days following the date of entry of the Approval Order, including but not limited to, occupancy costs, utilities, security, local telephone, trash services, property taxes and any other related costs.

8.2 Sales Taxes shall be added to the sales prices of the Assets and collected by Consultant, on the Company's behalf. Consultant shall prepare all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable sales taxes to the appropriate taxing authorities, and the Company shall process all of the foregoing. The Company shall pay the same to the appropriate taxing authorities in accordance with applicable law.

8.3 The Company shall and hereby agrees to defend, indemnify, and hold harmless Consultant and its agents, employees, principals and Supervisors from any and all known or unknown losses, damages (including without limitation, any personal injury, death or property damage), liabilities, claims, actions (including removal of toxic waste), judgments, penalties and fines, court costs and legal or other expenses which the Consultant may incur as a direct or indirect consequence in whole or in part of: (i) the environmental condition of the real property on which the Facilities are located, and/or any asserted damage, if any, to adjacent land owners; (ii) any defect or failure not caused by the negligent and/or intentional misconduct of Consultant in product design or materials or storage, manufacture, distribution, sale or use by any person or entity of any product or goods; (iii) the Company's failure to pay over to the appropriate taxing authority any taxes required to be paid by the Company during the Sale term in accordance with applicable law or to pay any liability referred to in Section 8.2 hereof; (iv) negligent or intentional acts or omissions of the Company or its agents, employees, and representatives in connection with the Sale; (v) liens, claims, interests and encumbrances asserted against the Assets; and/or (vi) the breach by the Company of any of its representations, warranties or other obligations under this Agreement; provided, however, the Company's obligations under this Section shall not extend to any liabilities which are determined to have been caused by the fraud, gross negligence or willful misconduct of the Consultant.

8.4 The Company shall use reasonable efforts to obtain the entry of the Approval Order on or before June 30, 2015.

**9. CONDITIONS PRECEDENT**

9.1     The willingness of Consultant and the Company to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

    (a)     All representations and warranties of Consultant and the Company hereunder shall be true and correct in all material respects, and no Event of Default (as defined below) shall have occurred as of the date hereof and as of the date of entry of the Approval Order;

    (b)     The Court shall have entered an order(s) authorizing the Company to retain Consultant upon the terms set forth herein authorizing the Sale of the Assets free and clear of any liens, claims or encumbrances and authorizing the payment of Consultant's fee and the reimbursement of expenses without further order of Court as provided above (the "Approval Order") by no later than June 30, 2015.

## 10.  DEFAULTS

10.1    The following shall constitute "Events of Default" hereunder:

    (a)     The failure by Consultant or the Company to perform any of the respective material obligations hereunder, which failure shall continue uncured 7 days after receipt of written notice thereof to the defaulting party; or

    (b)     Any representation or warranty made by the Company or Consultant proves untrue in any material respect as of the date made and through the Sale Termination Date; or

    (c)     The Sale is terminated, materially interrupted or impaired at the Facilities for any reason other than (i) an Event of Default by Consultant, (ii) any other material breach or action by Consultant not authorized hereunder or (iii) circumstances outside of the Company's reasonable control.

10.2    In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon 7 business day's written notice to the other party.

## 11.  MISCELLANEOUS

11.1    Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

    (i)     in the case of Consultant:

Great American Global Partners, LLC
21860 Burbank Blvd, Suite 300

        Woodland Hills, CA 91367
        Attn:  Adam Alexander
        Managing Partner – GA Global Partners
        email:  aalexander@gaglobl.com

    (ii)    in the case of Company:

        Corinthian Colleges, Inc.
        6 Hutton Centre Dr., Suite #400
        Santa Ana, CA 92707-8762
        Attn: William Nolan
        Chief Restructuring Officer
        email: William.Nolan@fticonsulting.com

        with a copy to:

        FTI Consulting
        214 North Tryon Street
        Suite 1900
        Charlotte, North Carolina 28202
        Attn:  William J. Nolan
        Senior Managing Director, Corporate Finance & Restructuring
        email: William.Nolan@fticonsulting.com

        with a copy to:

        Richards, Layton & Finger, P.A.
        920 N. King Street
        Wilmington, Delaware 19801
        Attn:   Mark D. Collins, Esq.
                Michael J. Merchant, Esq.
        email:  Collins@rlf.com
                 Merchant@rlf.com

    11.2    This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California, without reference to any conflict of laws provisions.

    11.3    In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

    11.4    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by the Company and Consultant.

    11.5    Neither the Company nor Consultant shall assign this Agreement without the express written consent of the other.  This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

       11.6    This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument. Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

       11.7    Nothing contained hereof shall be deemed to create any relationship between Consultant and the Company other than the consulting relationship provided herein. It is stipulated that the parties are not partners or joint venturers.

11.8 In the event of a dispute under this Agreement, the non-breaching party shall be entitled to reimbursement from the breaching party of all costs and expenses incurred in enforcing this Agreement, including without limitation all reasonable legal fees and court costs.

**GREAT AMERICAN GLOBAL PARTNERS, LLC**

By: _____/s/ Adam F. Alexander_____
      Adam F. Alexander
Its: _____Managing Member_____

**CORINTHIAN COLLEGES, INC.**

By: _____

Its: _____

**CORINTHIAN SCHOOLS, INC.**

By: _____

Its: _____

**RHODES COLLEGES, INC.**

By: _____

Its: _____

**EVEREST COLLEGE PHOENIX, INC.**

By: _____

Its: _____

**SEQUOIA EDUCATION, INC.**

By: _____

Its: _____

11.8    In the event of a dispute under this Agreement, the non-breaching party shall be entitled to reimbursement from the breaching party of all costs and expenses incurred in enforcing this Agreement, including without limitation all reasonable legal fees and court costs.

**GREAT AMERICAN GLOBAL PARTNERS, LLC**

By : _____

Its: _____

**CORINTHIAN COLLEGES, INC.**

By: */s/ William J. Nolan*

Its: Chief Restructuring Officer

**CORINTHIAN SCHOOLS, INC.**

By: */s/ William J. Nolan*

Its: Chief Restructuring Officer

**RHODES COLLEGES, INC.**

By: */s/ William J. Nolan*

Its: Chief Restructuring Officer

**EVEREST COLLEGE PHOENIX, INC.**

By: */s/ William J. Nolan*

Its: Chief Restructuring Officer

**SEQUOIA EDUCATION, INC.**

By: */s/ William J. Nolan*

Its: Chief Restructuring Officer