# Exhibit 1.B.



April 14, 2015

Jack D. Massimino                                    UPS Tracking #
President/Chief Executive Officer                    1ZA879640192788623
Corinthian Colleges, Inc.
6 Hutton Circle Drive, Suite 400
Santa Ana, CA  92707

      RE:  Notice of Intent to Fine Heald College, OPE-ID:  00723400

Dear Mr. Massimino:

This is to inform you that the United States Department of Education (Department) intends to fine Heald College, San Francisco, California, $29,665,000 based upon the violations set forth in this letter.  Heald College participates in the federal student financial assistance programs authorized under Title IV of the Higher Education Act of 1965 (HEA), as amended, 20 U.S.C. §§ 1070 *et seq*. and 42 U.S.C. §§ 2751 *et seq*. (Title IV, HEA programs).  The Department is taking this fine action pursuant to 20 U.S.C. § 1094(c)(1)(F) and 34 C.F.R. § 668.84.

This fine action is based upon the results of the Department's analysis of documentation submitted by Heald College's owner, Corinthian Colleges, Inc. (CCI), to the Department regarding Heald College's placement rates, and upon the findings of a program review conducted by the San Francisco-Seattle School Participation Division at Heald College's Stockton location and Heald College's Salinas location.  As discussed in detail below, the Department's findings demonstrate that Heald College failed to meet the fiduciary standard of conduct by misrepresenting its placement rates to current and prospective students and to its accreditors, and by failing to comply with federal regulations requiring the complete and accurate disclosure of its placement rates.  Therefore, as described below, I have determined that due to the serious violations committed by Heald College, a fine in the amount of $29,665,000 is warranted.

## HEALD COLLEGE FAILED TO ADHERE TO A FIDUCIARY STANDARD OF CONDUCT

On January 4, 2010, CCI purchased the Heald chain of schools (Heald), which then participated in the Title IV, HEA programs as individual entities with their own OPE–ID numbers.[1]  The Heald chain comprised Heald Concord (OPE-ID 02187500); Heald Fresno (OPE-ID 00809300); Heald Hayward (OPE-ID 00853200), with additional location Heald Modesto (OPE-ID 00853202); Heald Milpitas (San Jose) (OPE-ID 02593200); Heald Rancho Cordova (OPE-ID

---

[1] The OPE-ID is the institution's Office of Postsecondary Education Identification Number.  This is an eight-digit number assigned to an institution upon application to participate in Federal Student Aid programs.  It is used throughout multiple systems to identify a school entity (the first six digits) and its individual locations (the last two digits).



Jack D. Massimino
Corinthian Colleges, Inc.
Page 2

00747700); Heald Roseville (OPE-ID 02593100); Heald Salinas (OPE-ID 03034000); Heald San
Francisco (OPE-ID 00723400), with additional locations Heald Honolulu (OPE-ID 00723401)
and Heald Portland (OPE-ID 00723402); and Heald Stockton (OPE-ID 02593300). Heald and
the Department executed temporary Program Participation Agreements (PPAs) for each of the
Heald schools, effective February 22, 2010, and upon the Department's approval of CCI's
application for ownership, executed provisional PPAs for each of these schools, effective May 4,
2010. On June 24, 2013, Heald and the Department executed Heald College's current
provisional PPA, which merged the participating Heald schools into one participating entity
under OPE-ID 00723400. Hereinafter in this letter, "Heald College" and "Heald" are used
interchangeably to refer to the Heald chain of schools before and after the Department's approval
of the merger.

By entering into a PPA with the Department, an institution and its officers accept the
responsibility to act as fiduciaries in the administration of the Title IV programs. As fiduciaries,
an institution and its officers are subject to the highest standard of care and diligence in
administering the Title IV, HEA programs. 34 C.F.R. §§ 668.82(a) and (b). In order to meet its
fiduciary responsibilities to the Department, an institution must comply with all Title IV
statutory and regulatory requirements. 34 C.F.R. § 668.16(a). As described below, Heald
College and its officers have failed to adhere to a fiduciary standard of conduct with regard to the
calculation and disclosure of its job placement rates.

## HEALD COLLEGE FAILED TO COMPLY WITH THE REGULATIONS GOVERNING DISCLOSURE OF ITS JOB PLACEMENT RATES

Effective July 1, 2010, institutions participating in the Title IV, HEA programs are required to
make available to enrolled or prospective students, through appropriate publications, mailings, or
electronic media, information concerning the placement of, and types of employment obtained
by, graduates of the institution's degree or certificate programs. 34 C.F.R. § 668.41(d)(5). The
information can be gathered from the institution's placement rate for any program, if it
calculated such a rate, or other relevant sources. 34 C.F.R. § 668.41(d)(5)(i). The institution is
required to identify the source of the information, as well as any timeframes and methodology
associated with it. 34 C.F.R. § 668.41(d)(5)(ii). An institution is required to disclose any
placement rate it calculates. 34 C.F.R. § 668.41(d)(5)(iii). An institution may satisfy the
requirement to disclose the information required under 34 C.F.R. § 668.41(d) to enrolled
students by posting the information on an internet website or an intranet website that is
reasonably accessible to the individuals to whom the information must be disclosed; and to
prospective students by posting the information on an internet website. 34 C.F.R. §§
668.41(b)(1) and (2). Note that this regulatory provision applies to all types of institutions, not
simply those which offer "gainful employment" programs.

All of Heald College's programs are gainful employment programs subject to the provisions of
34 C.F.R. § 668.6(b). Beginning July 1, 2011, an institution that offers an educational program
that prepares students for gainful employment in a recognized occupation, and that is required by
its accrediting agency or State to calculate a placement rate on a program basis, must disclose the
rate and identify the accrediting agency or State agency under whose requirements the rate was

Jack D. Massimino
Corinthian Colleges, Inc.
Page 3

calculated. 34 C.F.R. § 668.6(b). The institution must include the information required under 34 C.F.R. § 668.6(b)(1) in promotional materials it makes available to prospective students, post this information on its website, prominently provide the information in a simple and meaningful manner on the home page of its program website, and provide a prominent and direct link on any other Web page containing general, academic, or admissions information about the program to the single Web page that contains all the required information. 34 C.F.R. § 668.6(b)(2).

By entering into a PPA with the Department, an institution agrees, among other things, that:

> In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment…the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and…relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students.

34 C.F.R. § 668.14(b)(10).

On January 23, 2014, the Department sent a letter to CCI in which the Department requested that CCI provide a copy of school performance disclosure documents for every CCI location, including Heald College institutions, for the calendar years 2010, 2011, 2012, and, when available, 2013. The Department also asked that CCI provide the evidence upon which CCI relied to derive each of the placement rates cited in the disclosures, including a list of all students either placed or omitted from the placement calculation due to any type of waiver, and the academic, employment, and/or waiver information specified by the Department. The Department provided CCI 30 days to submit the required documentation and information, and sent reminder letters to CCI on April 11, 2014, April 22, 2014, May 13, 2014, June 12, 2014, July 23, 2014, and August 25, 2014.

Eventually, in its responses to the Department's requests, CCI assured the Department that CCI and its institutions "take pains to track and accurately report job placements." Letter to Martina Fernandez-Rosario and Gayle Palumbo, p. 2 (Apr. 15, 2014). CCI stated that, because many of its institutions' institutional and programmatic accreditors required annual reporting of placement outcomes in order to measure the school's or program's outcomes against a benchmark, CCI and its institutions had developed a robust process to confirm, and re-verify, the accuracy of the reported placement results. CCI represented that it went to great lengths in an effort to ensure that its internal and external reporting of placement statistics was accurate and reliable. *Id. See also* Letter to Robin Minor, p. 2 (February 11, 2014), Letter to Charles Engstrom (Feb. 1, 2013). Despite CCI's representations, the Department has found that CCI and Heald College failed to fully and accurately disclose its placement rates and the methodology used to calculate them in its school performance disclosure documents.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 4

**1. Heald College's placement rate disclosures omitted essential and material information concerning the methodology Heald used to calculate the rates.**

In response to the Department's requests for Heald College's school performance disclosure documents and backup documentation, CCI provided, for each of its institutions, documents entitled "2010 Annual Placement Disclosure," documents entitled "Program Disclosures," carrying an effective date of July 1, 2011, and documents entitled "Program Disclosures," carrying a publication date of July 1, 2012.

In the documents entitled "2010 Annual Placement Disclosure," which had neither a publication date nor an effective date, each Heald institution disclosed that, because it was accredited by the Accrediting Commission for Community and Junior Colleges of the Western Association of Schools and Colleges (WASC-Jr), and WASC-Jr had no prescribed placement rate methodology, it was the institution that determined the formula used to calculate its placement statistics. These disclosures each stated that the placement rates reported therein were the placement statistics for the most recent complete calendar year, and that Heald outcomes are calculated by calendar year, tracking graduate cohorts from January 1-December 31. These disclosures also stated that employment is calculated by taking the total number of graduates placed in the field and dividing this number by the total number of graduates less the number of graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., non-citizenship, or death.

Heald College also provided for each institution documents entitled "Program Disclosure," carrying an effective date of July 1, 2011, which affirmatively stated that the program disclosures contained therein were provided pursuant to federal regulations, effective July 1, 2011. These Program Disclosures also stated, in a footnote entitled "Institutional Accreditor," that, because WASC-Jr. had no prescribed methodology for calculating placement outcomes, the methodology used was at Heald's discretion. In each case, the Program Disclosure stated that placement rates were calculated as follows: "Heald College placement rate is calculated by taking the total graduates placed in the field, divided by the total number of graduates, minus graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., ineligibility to work in the U.S., or death. Time Frame: the cohort used are those graduates of a calendar year. Employment statuses are recorded up until June 30th of the following year." These Program Disclosures also stated that "Placement Rate NA" meant that there was no data to disclose because the program was too new or the placement rate was not required to be calculated.

Heald College further provided for each institution Program Disclosures with a publication date of July 1, 2012, which similarly stated that the program disclosures contained therein were being provided pursuant to federal law. These Program Disclosures also represented, in a footnote entitled "Institutional Accreditor," that because WASC-Jr. had no placement rate methodology, Heald College determined the placement rates. These Program Disclosures stated that Heald determined its placement rates by taking the total graduates placed in the field, divided by the total number of graduates, minus graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., ineligibility to work in the

Jack D. Massimino
Corinthian Colleges, Inc.
Page 5

U.S., or death; that the cohort used was the graduates of a calendar year; and that the employment statuses were recorded up until June 30th of the following year.

The Department has determined that in late 2013, Heald College switched to a web-based placement disclosure format. The web-based disclosures Heald College posted on its website contained the following language: "The job placement rate for students who completed this program in 2012-2013 is [] %." The placement rate disclosures also contained a link that stated "For further information about this job placement rate, <u>click here</u>." The link led to the following box:



After review of Heald's program disclosure documents and backup documentation, the Department has determined that Heald omitted from its school performance disclosure documents essential and material information concerning the timeframe and methodology used to determine its placement rates. Even more serious, Heald did not adhere to the methodology that it did set forth in those disclosures.

   a. **Heald College failed to disclose in its 2013/2014 web-based disclosures that its placement rates excluded students it classified as having deferred employment.**

The Department has determined that Heald's 2013/2014 web-based placement disclosures[2] failed to disclose that students whom the institution deemed to have deferred employment were excluded from the placement rate calculations. This information was material, and Heald College's omission of it was misleading, because the supporting documentation provided by Heald disclosed that Heald in fact classified high percentages of its graduates as having deferred employment. The Department has determined that Heald represented with regard to many of its programs that it placed 100% of its graduates in jobs, when in fact many of the graduates decided to continue their education, or been determined by Heald to be unavailable for employment prior to the end of the tracking period for one reason or another. For instance, Heald Portland's disclosure for the Criminal Justice AA program stated that the placement rate was 100%. And

---

[2] Heald College updated its web-based placement disclosures in early 2014.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 6

yet 58% of the graduates for that program were unavailable for employment. The Department
has concluded that Heald's failure to disclose the exclusion of students determined to have
deferred employment in its 2013/2014 web-based disclosures was particularly egregious because
Heald disclosed this aspect of its methodology in its prior placement rate disclosure documents
and thus clearly understood how to properly describe its methodology.

### b. Heald College falsely represented in its 2013/2014 web-based disclosures that its placement rates were supported by attestations.

In its 2013/2014 web-based disclosures, Heald College stated in answer to the question, "How
were completers tracked," that "confirmation of graduate employed is obtained from the
employer and/or graduate via attestation." The Department's review of Heald College's backup
documentation, however, revealed that this was not the case. In many instances, the only
documentation Heald produced to substantiate the graduate's employment consisted of a
standardized Heald form, HC-CSV-120, with a section entitled "Employment Validation and
Verification Contact Info," which was signed only by Heald College Career Services personnel
and did not document any attestation by the employer or the student. In other instances, the only
documentation provided was a screen shot from Heald's CampusVue system purportedly
representing that the student had been placed.

### c. Heald College failed in all of its placement rate disclosures to identify with specificity the cohort whose results were being reported.

In the 2013/2014 web-based placement disclosures, Heald stated that the report covered
"….students who completed the program in 2012-2013," then indicated in its answer to the
question, "Who is included in the calculation of this rate?," that the cohort consisted of
"Graduates through 6/30/13 placed in field." And then, in answer to the question, "When were
the students employed," stated, "Schools can place graduates until June 30th for graduates of the
preceding calendar year." It is not possible to discern from these statements the beginning and
ending dates of the cohort of Heald graduates whose results were being tracked and reported in
the disclosure.

The same is true with regard to Heald College's July 1, 2011 and July 1, 2012 Program
Disclosures, and its 2010 Annual Placement Disclosure. In particular, although the timeframe
specified is a calendar year, none of these disclosure indicates *which* calendar year's graduates
were being covered in the disclosure. This is in contrast to the descriptions in the July 1, 2011
and July 1, 2012 Program Disclosures regarding the programmatic, as opposed to institutional,
placement rates disclosed in those documents. For example, the July 1, 2012 Program
Disclosure specified, with respect to the placement rates calculated for the Commission on
Accreditation of Allied Health Education Programs (CAAHEP)/Medical Assisting Education
Review Board (MAERB), a timeframe of July 1, 2009 through June 30, 2010, and the July 1,
2011 Program Disclosure specified, with respect to the placement rate calculated for the
Commission on Dental Accreditation (CODA), that the most recent statistics covered those
students who were scheduled to complete their programs in 2009.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 7

      **d. Heald College failed in all of its placement disclosures to state that it counted as placed graduates whose employment began prior to graduation, and in some cases even prior to the graduate's attendance at Heald.**

The Department has determined that in all of its placement disclosures, Heald failed to disclose that it counted as placed graduates who had obtained their jobs prior to graduation from the school, and in some cases, graduates who had obtained their jobs prior to the date they commenced their studies at Heald. With respect to the 2013/2014 web-based disclosures, Heald referred only to "Graduates…placed in the field" and "completers hired for jobs within the field." Similarly, in the July 1, 2011 and July 1, 2012 Program Disclosures, Heald referred only to the "percentage of graduates securing employment" and the "total graduates placed in the field."

The fact that Heald counted graduates who had obtained their employment prior to graduation as having been "placed" by the institution in its placement rates is material, and omission of this information is therefore misleading, because it is an indication that a Heald credential may not have been necessary in order for the graduate to secure the employment used to categorize the individual as having obtained employment in the field. The Department thus considers these placement rates to be false and misleading statements. *See* 34 C.F.R. § 668.71(c) (definition of "misrepresentation").

Of additional concern, however, is that the Department's review of Heald's backup documentation disclosed that while some previously-employed Heald graduates signed documents indicating that they were waiving placement assistance because they were already working in the field, other previously-employed graduates' placement documents simply reflected verification by Heald Career Service personnel of the student's employment, with no indication that the students had waived placement services and were content with their prior job. Of even more concern is that follow-up interviews conducted with some of the previously-employed graduates revealed that although Heald staff made cursory notations on the employment validation forms to support their conclusion that the graduates were employed in the field, the graduates' jobs were not related to their field of study, nor had the students received promotions or increased responsibilities or otherwise progressed in those jobs because of their Heald education.

The number of graduates who obtained the jobs used to characterize them as placed prior to graduation was considerable and therefore also material to the placement rates. The Department's analysis of Heald's backup documentation revealed that, according to CCI's own data for 2012 graduates, over one-third (33.8%) of the graduates reported to have been "placed in field" started their jobs prior to January 1, 2012, and over one-quarter (25.5%) started their jobs prior to January 1, 2011.

      **e. Heald paid temporary agencies to hire its graduates to work at unsustainable temporary jobs at its own campuses and counted these graduates as placed.**

Jack D. Massimino
Corinthian Colleges, Inc.
Page 8

Follow-up interviews conducted with Heald graduates in order to determine the accuracy of Heald's reported placement rates and supporting documentation revealed that in some instances, Heald paid temporary agencies to hire Heald graduates and place them at temporary jobs at Heald locations, in order to allow Heald to falsely and misleadingly count these graduates as placed in their field of study in its placement rate disclosures. Heald failed to disclose this information when it published its placement rates, and the Department considers this to be a misleading statement that has the likelihood or tendency to deceive. 34 C.F.R. § 668.71(c) (definition of "misrepresentation").

In particular, the Department determined that during 2011, Heald paid agencies named Aerotek and Ultimate Staffing to place ten graduates from Heald's IT-Network Systems Administration (IT-NSA) programs in brief, temporary positions at its Fresno campus. Heald then counted these graduates as "placed in field" in its placement statistics. These ten graduates represented 35% of the total 28 graduates of the IT-NSA program at Fresno that Heald represented were placed in field. When interviewed, one of these graduates confirmed that he was employed for just two days moving computers, organizing cables, and replacing network cables, and another graduate confirmed that Aerotek employed him for less than two weeks.

**f. Heald College counted placements that were clearly out of the student's field, as in-field placements in its placement statistics.**

Although Heald claimed in all of its placement rate disclosures that the students reported as placed were employed in their field of study, the Department has determined through student interviews that in fact, Heald routinely and misleadingly characterized out-of-field placements jobs as in-field placements. Examples of this are as follows:

> Heald Honolulu classified a 2011 graduate of an Accounting program as employed in the field based upon a food service job at Taco Bell, where she started working in June 2006. The graduate stated that her job was to provide food service to customers, that she had not received a promotion or pay increase as a result of her Heald degree, and that the position was not in her field of study. Yet Heald counted her as placed in her field of study, based upon the employment validation form signed by Career Services personnel. Heald provided no documents substantiating that the student had waived placement services based upon her employment at Taco Bell.

> Heald Hayward counted a 2011 Business Administration graduate as placed in the field based upon a retail grocery position at Safeway, which the graduate stated was not in his field of study, and Heald substantiated the in-field placement by stating that the graduate's program's major skills were a component of his "primary job function or used at least half the time" by listing, as program skills, among other things, "providing customer service and problem-solving skills, knowledge of store's product and be approachable (sic)." The back-up documentation included an internal email chain, in which Heald Career Services staff forwarded information concerning the graduate's employment obtained through the work number to Heald's Corporate Director of Career

Jack D. Massimino
Corinthian Colleges, Inc.
Page 9

Services, who replied: "Not sure if this will fly. See what he does as a Courtesy Clerk – Money Transactions, etc…"

Heald Hayward counted another 2011 Business Administration graduate as placed in the field based upon a seasonal clerk position she obtained in Macy's Shipping and Receiving Department during November 2010, which the student stated ended prior to her graduation. The student also stated that she requested job placement assistance from Heald in order to find a job in her field of study, but was unsuccessful, and that Heald stopped returning her calls for assistance. Heald's backup documentation regarding the placement consisted of an employment validation signed by Heald Career Services personnel that justified the in-field placement by stating she "uses business software, apply accounting concepts balancing till and ringing up purchases, collecting money, merchandise the products and upsale (sic)."

## 2. Heald Stockton misrepresented the job placement rates for its medical assistant program to its programmatic accreditor

Heald Stockton advertised in its catalogs that "The Medical Assisting program is accredited by the Commission on Accreditation of Allied Health Education Programs (CAAHEP) upon the recommendation of the Medical Assisting Education Review Board (MAERB)."[3] MAERB requires that approved programs report annual placement rates of its medical assisting graduates. A program review conducted by the Department at Heald Stockton from July 29, 2013 to August 2, 2013 revealed that in its 2012 Annual Report to MAERB, which Heald Stockton submitted to MAERB on November 21, 2012, Heald Stockton reported that, of the 359 medical assisting students who graduated between January 1, 2007 through December 31, 2011, 281 students were placed, resulting in a 78.27% placement rate, which exceeded the MAERB minimum placement rate of 60%.

Upon review of documentation obtained during the program review, however, the Department determined that as an initial matter, Heald Stockton's backup data reflected only 209 placements rather than 281. In addition, of those 209 placements, (1) Heald Stockton reported as placed at least 23 students who had in fact completed Heald Stockton's diploma program in Medical Assisting, which is not accredited by MAERB, rather than the 98 credit-hour Associates in Applied Science (AAS) program; (2) Heald Stockton counted 13 students twice, and counted one student three times;[4] (3) although Heald Stockton's 2012 Annual Report was only to include those students placed between January 1, 2007 and December 31, 2011, Heald Stockton claimed 70 placements that occurred after December 31, 2011; and, (4) according to notations made on the backup data, Heald Stockton reported four students as placed when in fact they had waived placement. The Department's recalculation revealed that the correct number of placements was only 109, rather than 281, and that the correct number of graduates was 333, rather than 359.

---

[3] This accreditation entitles an individual to take the state medical assisting test without first obtaining two years of medical assisting experience.

[4] A number of these students were either in the unaccredited program or were placed after the end of the cohort period (December 31, 2011). The net duplications represent over-reporting of three placements.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 10

The correct placement rate was thus only 32.7%, far below MAERB threshold of 60%. Heald
Stockton therefore misrepresented the 2012 programmatic placement rate for its Medical
Assisting program to MAERB.

### 3. CCI and Heald's backup documentation did not support its claimed placement rates

The failure of Heald's backup documentation to support the placement rates that Heald disclosed
for its educational programs was not limited to the programmatic placement rate that Heald
Stockton reported to the MAERB. The Department's review of the backup documentation
revealed numerous instances wherein, even if all of the placements were accepted as bona fide
in-field placements, the data still do not support the placement rates that Heald calculated and
disseminated. The placement data were missing key fields, most notably the level of the
student's program of study, and contained numerous duplicates. Enclosure A contains examples
of placement rates that were not supported by Heald's backup data, and the actual rate that
Heald's backup data did support.

Title IV regulations define misrepresentation as, among other things, any false, erroneous or
misleading statement an eligible institution makes directly or indirectly to a student, prospective
student or any member of the public, or to an accrediting agency, to a State agency, or to the
Secretary. A misleading statement includes any statement that has the likelihood or tendency to
deceive. 34 C.F.R. § 668.71(c) (definition of "misrepresentation"). A substantial
misrepresentation is any misrepresentation on which the person to whom it was made could
reasonably be expected to rely, or has reasonably relied, to that person's detriment. 34 C.F.R. §
668.71(c) (definition of "substantial misrepresentation.") An eligible institution is deemed to
have engaged in substantial misrepresentation when the institution makes a substantial
misrepresentation about the nature of its educational program, its financial charges, or the
employability of its graduates. 34 C.F.R. § 668.71(b).

The Department has determined that Heald's inaccurate or incomplete placement rate disclosures
were misleading or false; that they overstated the employment prospects of graduates of Heald's
programs; and that current and prospective graduates of Heald could reasonably have been
expected to rely to their detriment upon the information in Heald's placement rate disclosures.
Therefore, the Department has determined that the statements in these disclosures constituted
substantial misrepresentations by Heald.

Congress enacted the statutory consumer information requirements, and misrepresentation
provisions, in order to ensure that institutions fully disclose information needed by students to
inform their decision whether to attend an institution, and to hold institutions accountable for
false information that they provide. Heald College's substantial misrepresentations concerning
its placement rates evidence a blatant disregard for the statutes and regulations governing the
Title IV, HEA programs.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 11

As of October 2, 2012,[5] the Title IV, HEA program regulations permit a fine of up to $35,000 for each violation of any provision of Title IV. or of any regulation or agreement implementing that Title. 34 C.F.R. § 668.84(a). In determining the amount of a fine, the Department considers both the gravity of the offense and the size of the institution. 34 C.F.R. § 668.92. Pursuant to the Secretary's decision in *In the Matter of Bnai Arugath Habosem*, Dkt. No. 92-131-ST (Aug. 24, 1993), the size of an institution is based on whether an institution is above or below the median funding levels for the Title IV, HEA programs in which it participates. Thus, if the institution's funding levels for the Title IV, HEA programs in which it participates is below the median amount for institutions participating in those programs, the institution will be considered small.

In the case of Heald College, the latest year for which complete funding data is available is the 2013-14 award year. According to Department records, students enrolled at Heald College received $66,944,957 in Federal Pell Grant funds, $139,462,899 in Direct Loan program funds, and $3,713,508 in campus-based program funds during the 2013-14 award year. The latest information available to the Department indicates that the median funding level for schools participating in the Federal Pell Grant program for the 2013-14 award year is $1,571,915; for institutions participating in the Direct Loan programs, it is $2,964,093, and for institutions participating in the campus-based programs, it is $266,597. Accordingly, Heald College is not a small institution, because its Federal Pell Grant, Direct Loan, and campus-based funding levels exceed the median funding levels.

The violations involved in this case are severe, and the potential harm to the government and to students is also severe. After considering the gravity of the violations and the size of Heald College, I have set the fine amount as follows:

For Heald's dissemination of program disclosure documents that did not meet regulatory requirements concerning disclosure of the institution's methodology, and which disclosed rates that were false or misleading, as set forth in this letter, I have set the fine amount at $27,500 for each of the 464 placement rates discussed in this letter that were disclosed in the documents disseminated prior to October 2, 2012, and $35,000 for each of the 482 placement rates discussed in this letter that were disseminated after October 2, 2012, totaling $29,630,000.[6] The Department requires that institutions fully disclose the method used to calculate its placement rates, count only bona fide placements in its placement rates, and accurately calculate those rates.

For Heald Stockton's misrepresentation of its job placement rates for its medical assistant program to its programmatic accreditor, I have set the fine amount at $35,000. Heald's failure to provide MAERB with accurate placement data deprived MAERB of important information required to evaluate the success of Heald Stockton's program.

---

[5] See 77 Fed. Reg. 60047 (2012), http://www.gpo.gov/fdsys/pkg/FR-2012-10-02/pdf012-24248.pdf. The amount was previously $27,500.

[6] The amounts per violation represent the maximum amounts allowed under the HEA for the time periods in question. See n.5 and accompanying text, *supra*.

Jack D. Massimino
Corinthian Colleges. Inc.
Page 12

The fine of $29,665,000 will be imposed on May 5, 2015, unless by that date the Department receives a request for a hearing or written material indicating why the fine should not be imposed. Heald College may submit both a written request for a hearing and written material indicating why the fine should not be imposed. If Heald College chooses to request a hearing or to submit written material, you must write to me, via overnight mail, at:

> Administrative Actions and Appeals Service Group
> U.S. Department of Education
> Federal Student Aid/PC/SEC
> 830 First Street, NE
> Room 84F2
> Washington, DC 20002-8019

If Heald College files a timely request for a hearing, the case will be referred to the Office of Hearings and Appeals, which is a separate entity within the Department. That office will arrange for assignment of Heald College's case to an official who will conduct a hearing. Heald College is entitled to be represented by counsel at the hearing and otherwise during the proceedings. If Heald College does not request a hearing, but submits written material instead, I shall consider that material and notify Heald College of the amount of the fine, if any, that will be imposed.

**Any request for a hearing or written material that Heald College submits must be received by May 5, 2015; otherwise, the $29,665,000 fine will be imposed on that date.**

Heald College has applied for recertification to continue to participate in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq*. (Title IV, HEA programs). Heald College's PPA will continue to operate on a month-to-month basis while the Department considers the application for recertification in light of the findings addressed in this letter, along with pending program reviews. *See* 34 C.F.R. § 668.13(b)(2).

If Heald has any questions or desires additional explanation of Heald College's rights with respect to this action, please contact Kathleen Hochhalter of my staff at 303/844-4520.

> Sincerely,
>
> Robin S. Minor
> Acting Director
> Administrative Actions and Appeals Service Group

Enclosure

cc: Dr. Mary Ellen Petrisko, President, WASC Senior College and University Commission, via
    mepetrisko@wascsenior.org

Jack D. Massimino
Corinthian Colleges, Inc.
Page 13

    Bobbi Lum-Mew, Program Administrator, Hawaii Post-Secondary Education Authorization Program, via Bobbi.Lum-Mew@dcca.hawaii.gov

    Juan Báez-Arévalo, Director of Private Post-secondary Education, Office of Degree Authorization, Oregon Office of Student Access and Completion, via juan.baez-arevalo@ode.state.or.us

    Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil

    Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov

    Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

Enclosure A
PLACEMENT RATES BASED ON CCI'S DATA

| Grad. Year | Campus Name | Program | No. of Grads | Reported Campus Placement Rate | Adjusted Placement Rate from CCI's Data |
|---|---|---|---|---|---|
| 2010 | Heald San Jose | Medical Insurance Billing and Coding (AA Degree) | 60 | 100% | 64% |
| 2010 | Heald Concord | Business Administration - Software Technologies Emphasis (AA Degree) | 3 | 100% | 66% |
| 2010 | Heald Concord | Medical Insurance Billing and Coding (AA Degree) | 33 | 100% | 66% |
| 2010 | Heald Concord | Office Skills (Certificate) | 8 | 100% | 71% |
| 2010 | Heald Hayward | Medical Insurance Billing and Coding (AA Degree) | 43 | 100% | 75% |
| 2010 | Heald San Francisco | Office Skills (Certificate) | 7 | 67% | 50% |
| 2010 | Heald Portland | Medical Assisting (AA Degree) | 61 | 73% | 57% |
| 2010 | Heald Rancho Cordova | Office Skills (Certificate) | 5 | 75% | 60% |
| 2011 | Heald Hayward | Medical Office Administration (AA Degree) | 48 | 100% | 38% |
| 2011 | Heald Hayward | Paralegal (AA Degree) | 33 | 100% | 63% |
| 2011 | Heald Rancho Cordova | Medical Office Administration (AA Degree) | 38 | 100% | 70% |
| 2011 | Heald Concord | Pharmacy Technology (AA Degree) | 22 | 100% | 73% |
| 2011 | Heald San Francisco | Medical Office Administration (AA Degree) | 29 | 100% | 75% |
| 2011 | Heald Rancho Cordova | Medical Insurance Billing and Coding (AA Degree) | 27 | 100% | 78% |
| 2011 | Heald Concord | IT Network Systems Administration (AA Degree) | 11 | 100% | 80% |
| 2011 | Heald Hayward | IT Network Systems Administration (AA Degree) | 34 | 100% | 82% |
| 2011 | Heald Fresno | Office Skills (Certificate) | 4 | 67% | 50% |
| 2011 | Heald San Jose | Paralegal (AA Degree) | 26 | 100% | 83% |