## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **CORINTHIAN COLLEGES, INC.,** *et al.* | § | |
| | § | **Case No. 15-10952 (KJC)** |
| | § | |
| | § | **Jointly Administered** |
| **Debtors.** | § | |
| | § | **Re: Docket No. 363** |

-----------------------------------------------------------------

### DEBTORS' RESPONSE TO THE MOTION OF THE COMMITTEE OF STUDENT CREDITORS FOR AN ORDER APPLYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 362(A) AND 105(A) AND GRANTING RELATED RELIEF

Corinthian Colleges, Inc. ("**Corinthian**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") hereby file this response (the "**Response**") to the *Motion of the Committee of Student Creditors for an Order Applying the Automatic Stay Pursuant to 11 U.S.C. §§ 362(a) and 105(a) and Granting Related Relief* [Docket No. 363] (the "**Student Stay Motion**"), filed by the Official Committee of Student Creditors (the "**Student Committee**"). In support of this Response, the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

The Debtors' primary concern has always been the well-being of their students and alumni. By the Student Stay Motion, the Student Committee is seeking to extend the automatic stay afforded to the Debtors under section 362 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), to stay "all entities from any act to collect, assess or recover" any claim or funds provided pursuant to governmental or private student loan programs. There are a myriad of legal obstacles, jurisdictional, procedural and substantive, associated with seeking this type of relief with regards to non-debtor third parties. The Debtors leave the Student Committee to their burden of demonstrating that these legal obstacles have been satisfied.

The primary purpose of this Response, however, is to address the many baseless allegations contained in the Student Stay Motion (and characterized to the Court by the Student Committee as if they were established facts).  In recent years, U.S. private sector post-secondary education providers, such as the Debtors, have come under intense legislative, regulatory, political and press scrutiny.  This atmosphere resulted in a number of politically and ideologically driven investigations and other actions being taken by the Department of Education (the "**DOE**") and other governmental entities, including the Majority Committee Staff Report of the United States Senate Committee on Health and Education, Labor and Pensions (the "**HELP Committee**")[1] and the various state court complaints referenced in the Student Stay Motion. The Student Committee relies upon the unsupported allegations contained in these documents, while ignoring the evidence and positive outcomes generated by the Debtors' schools and without any reference to the responsive documents filed by the Debtors in such proceedings.[2] Indeed, the Debtors operated well-regarded and accredited educational institutions.[3]  Hundreds of thousands of students have obtained well-earned degrees and diplomas since July of 2006 (the

---

[1] The Student Committee's Request for Judicial Notice (the "**SC RJN**") fails to note that the report was *not* adopted by the HELP Committee as a whole, was merely a Majority *Staff* Report, and that the Minority Staff noted in the Minority Committee Staff Views that the majority's refusal to work in the HELP Committee's bipartisan tradition and the biased conduct throughout the process raised substantial doubt about the accuracy of the information contained in the report titled, "For-Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success" (Majority Staff Report)." *See* http://www.gpo.gov/fdsys/pkg/CPRT-112SPRT74931/pdf/CPRT-112SPRT74931.pdf at page 793.

[2] Contemporaneously with the filing of this Response, the Debtors have filed the *Debtors' Request for Judicial Notice of Documents Relevant to the Motion of the Committee of Student Creditors for an Order Applying the Automatic Stay Pursuant to 11 U.S.C. §§ 362(a) and 105(a) and Granting Related Relief* (the "**Debtors' RJN**"), whereby the Debtors request that the Court take judicial notice of publically available documents relevant and responsive to the documents cited in the Student Stay Motion.

[3] The Debtors' schools were all institutionally accredited by an accredited agency recognized by the DOE, including (depending on the institution) one of the following agencies:  the Western Association of Schools and Colleges, the Accrediting Council for Independent Colleges and Schools, the Accrediting Commission of Career Schools and Colleges or the Higher Learning Commission of the North Central Association.    Additionally, many of the programs offered by the Debtors' schools received programmatic accreditation.

earliest enrollment date noted in the student affidavits filed with the Student Stay Motion) and the Debtors believe -- backed by years of accreditor reviews and third-party audits -- that they have provided all of their students with a sound education that increased their skill set, employability and income potential.  Moreover, the mere allegations asserted against the Debtors by the DOE and in the state court complaints are unfounded and have never been adjudicated as true by an independent tribunal, but have been asserted as fact by the Student Committee to justify the relief that they are seeking in the Student Stay Motion.  Accordingly, the Debtors submit that it is necessary to respond to such allegations in this Response and to provide the Court with an accurate representation of the relevant facts.

## FACTUAL REPONSE

### I.    Relevant Background[4]

1.    The Debtors operated in a highly-regulated industry, subject to DOE, state departments of education, accreditors and other regulatory oversight.  In the past several years, the Debtors, as well as the entire for-profit (i.e., tax-paying, as opposed to tax exempt or tax consuming) education sector, have faced increased scrutiny and review by various regulatory bodies including the DOE.  In January 2014, the Debtors received a letter from the DOE (the "**January 2014 Letter**") that requested extensive information from the Debtors regarding various educational statistics reported by the Debtors.  The Debtors devoted significant resources to responding to such requests and ultimately delivered to the DOE, in electronic or paper format, the equivalent of more than 1.2 million pages of responsive data.

---

[4]    The facts set forth in this section are supported by the *Declaration of William J. Nolan in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 10], which was filed with the Court on May 4, 2015.

2.     On June 12, 2014, the Debtors received a second letter from the DOE (the "**June 12 Letter**"), in which the DOE made additional information requests, asked questions about the documents and data that the Debtors had provided to that date, and stated that certain information requested in the January 2014 Letter remained outstanding.  In addition, and without notice, by the June 12 Letter, the DOE imposed the following:  (i) a twenty-one (21) day delay in the ability to draw down further Title IV funds, (ii) monthly updates on student information and disclosures, (iii) disclosures relating to adverse regulatory, accreditor or business actions, and (iv) immediate notice of the Debtors' intent to sell or close any location.

3.     The imposition of a twenty-one (21) day delay in access to Title IV funds by the DOE created a significant liquidity crisis for the Debtors.  Nearly ninety (90) percent of the Debtors' revenues came from Title IV funds and the three (3) week delay in revenue at the end of the fiscal year and during the summer months of low enrollment created an immediate and significant reduction in otherwise expected cash receipts, totaling approximately $100 million. The Debtors immediately began discussions with the DOE to regain access to Title IV funds to avoid an immediate closure of more than 100 schools with deleterious consequences on nearly 70,000 students.  After ten days of negotiations, on June 22, 2014, Corinthian and the DOE entered into a memorandum of understanding ("**MOU**") that provided for the immediate release of certain Title IV funds and established the framework for a transition plan to be memorialized in an operating agreement.

4.     On July 8, 2014, the Debtors and the DOE entered into an operating agreement (the "**Operating Agreement**"), under which the Debtors agreed to "teach-out" twelve (12) schools (meaning that the schools continued to teach existing students to allow them to complete their education before the school closes, but no new students were admitted) and to

pursue the sale of its remaining schools.  Under the Operating Agreement, among other things, the DOE permitted the Debtors to continue drawing Title IV funds (subject to weekly audit verification by an agreed upon third-party FSA audit firm) to operate the schools, and the Debtors agreed to produce certain additional documents within an agreed upon schedule, restrict Title IV funds from being used for certain prohibited expenditures, make refunds available to students in certain circumstances, and work with the DOE to establish a reserve for student refunds.

5.      The Debtors conducted an extensive marketing and sales process for all of its schools.  In May 2014, the Debtors engaged Barclays PLC ("**Barclays**") to explore strategic options for the Debtors, including a potential sale of some or all of its schools and operations. Following entry into the Operating Agreement, the Debtors directed Barclays to conduct a sale process, during which a substantial number of financial and strategic potential buyers were contacted, and various interested parties conducted extensive diligence.  The Debtors negotiated with a number of parties concerning the purchase of all of the schools or certain groups of schools operated by the Debtors.

6.      On November 19, 2014, the Debtors entered into an asset purchase agreement with Zenith Education Group, Inc. ("**Zenith**"), a subsidiary of Education Credit Management Corp. Group, for the sale of 56 Everest and WyoTech schools (the "**Asset Purchase Agreement**").  Zenith also agreed to complete the teach-out process at twelve (12) additional schools and entered into subleases with the Debtors for those locations.  Just before signing the definitive agreement, the Everest and WyoTech schools in California were excluded from the sale because the California Attorney General sought to impose significant economic and operational demands on Zenith as a buyer.  Zenith found those demands unacceptable and

5

decided to exclude all of those California schools from the Asset Purchase Agreement.  The sale to Zenith closed in early February of 2015.  As part of the sale, approximately 40,000 students were able to continue their studies and thousands of employees retained their jobs.

7.      Following the sale of non-California Everest and WyoTech campuses to Zenith, the Debtors continued to operate the Heald schools, all Everest and WyoTech schools in California, and fourteen (14) schools in Canada (through a non-Debtor Canadian subsidiary). The Debtors pursued sale options and teach-out options for the remaining schools.  Several parties engaged in diligence, and the Debtors entered into negotiations with at least three (3) potential buyers for the Heald schools, and held discussions with several other parties regarding the teach-out of the remaining thirteen (13) Everest and WyoTech schools in California.

8.      The signing of a definitive transaction agreement to sell Heald was to occur on April 15, 2015.  Ultimately, however, no agreement was reached for the sale or teach-out of any of the remaining schools because, on April 14, 2015, the DOE issued an intent-to-fine letter (the "**DOE Intent to Fine Letter**") seeking to impose a $30 million fine against the Heald schools and prohibiting Heald from enrolling new students.[5]  Despite multiple efforts by the Debtors and their advisors, as well as potential purchasers of Heald, to negotiate terms with the DOE for the sale of Heald, the DOE sought to impose significant financial and operational conditions on both Corinthian and the potential buyers that were not acceptable to the buyers or capable of performance, such as payment to the DOE of an amount equal to twice the sale price offered by the leading bidder and a demand that the buyer reduce Heald tuition by twenty (20) percent.  When sale efforts for the remaining schools ceased to be viable, both for the Heald schools and remaining Everest and WyoTech schools in California, the Debtors pursued teach-

---

[5]   A copy of the DOE Intent to Fine Letter is attached hereto as <u>Exhibit A</u>.

6

out arrangements with third parties in an effort to permit students to complete their education with minimal disruption. Ultimately, however, the DOE continued to insist that unaffiliated teach-out partners assume undefined liabilities of the Debtors in order to conduct teach-outs at the affected campuses on economically viable terms. Without the DOE's cooperation, no teach-out partners were willing to proceed.

9.      In the absence of a sale or teach-out options, the Debtors had no ability to continue operating in light of their cash position and cash forecast. Moreover, the DOE mandated that the Debtors post a significant letter of credit by May 17, 2015 to maintain eligibility for Title IV funds. After thoroughly considering their alternatives, the Debtors commenced the wind-down of operations. On Sunday, April 26, 2015, the Debtors announced the closure of their remaining twenty-nine (29) schools effective Monday, April 27, 2015, and provided notice to the relevant regulatory bodies.

## II.     Response to Allegations Relied Upon by Student Committee

10.      As noted above, the Student Committee presents as fact numerous allegations contained in various politically charged reports and documents that have never been proved or adjudicated. Indeed, the Debtors have vigorously (and publicly) contested each of these allegations and, despite the number and magnitude of the allegations extending over a period of many years, no government agency or plaintiff has established them before a neutral third party or in a court of law. Given the Student Committee's reliance on such allegations and failure to acknowledge the Debtors' positions in response thereto, the Debtors submit that it is necessary and appropriate to address a number of the allegations in this Response.

RLF1 12253230v.7

A.    **The Student Committee's Reliance on the Documents Cited in Their Request for Judicial Notice is Inappropriate and Misleading.**

i.    *The DOE Intent to Fine Letter*

11.    The Student Committee focuses primarily on the allegations regarding student placement rates contained in the DOE Intent to Fine Letter, various reports and attorney general complaints.  Pursuant to the DOE Intent to Fine Letter, the DOE cites unsubstantiated "findings" that the Debtors failed to disclose the methodology of its placement rate calculations to current and former students in the Heald College system (sprinkling in anecdotes from a mere five (5) nameless students in largely unidentified programs and campuses).  By attacking the disclosed methodology of every program, rather than the specific placements and rates themselves, the DOE sweepingly found that all 946 program disclosures at the Heald Colleges over a five (5) year period were misleading.[6]  Accordingly, had the DOE determined that the Debtors had adequately disclosed the methodology used for calculating placement rates, no finding of misleading figures would have been leveled.  Thus, the finding contained in the DOE Intent to Fine Letter does not support the position that the Debtors were intentionally falsifying placement rates or that the education provided was somehow deficient.

12.    Moreover, the finding of inadequate disclosure contained in the DOE Intent to Fine Letter (regarding the methodology for calculating placement rates) is flawed in many respects.[7]  For example:

(a)    The DOE has struggled to interpret its own placement disclosure requirements under its gainful employment regulations. Notwithstanding enactment of the regulations nearly four (4) years ago, there is still no standard for the calculation of placement rates and the

---

[6]  Notably, no finding regarding the quality of education was ever made against the Debtors' institutions (by the DOE or other governmental agencies).

[7]  *See* Debtors' Request for Hearing and Motion to Dismiss Intended Fine of Heald College, dated May 5, 2015, a copy of which is attached hereto as Exhibit B.

DOE's guidance on complying with the regulations is continuing to evolve. Up until 2013, the DOE allowed schools to use their own format for publishing placement rate disclosures. But for the 2013 disclosures, schools were required to use a template created by the DOE. This template limited the explanation of the placement calculation methodology to 100 characters, significantly lower than the 455 characters that the Debtors previously used to describe their methodology;

(b)     A review of many disclosures by other institutions using the DOE's placement template reveals almost identical descriptions under the category of "who's included in the calculation of this rate?" The fact that many other institutions have interpreted and implemented this disclosure in the same way as the Debtors reflects the inherent limitations of the template and the lack of any clear guidance on whether the disclosures were required to include certain aspects of the calculation methodology;

(c)     The DOE is critical of the use of student employment obtained prior to graduation, although no specifics are provided regarding these supposed violations. A broad review of the placement rate data revealed that high percentages of placements occurring before graduation were made in the student's last term or involved promotional opportunities for the graduate with the same employer by whom the student was employed prior to or during enrollment; and

(d)     The DOE is critical of the timing of reporting placement statistics to its programmatic accreditor. This assertion completely ignores the guidance of the Medical Assisting Education Review Board (the "**MAERB**:"), which makes accreditation recommendations for the status of accreditation of medical assisting programs, on how to report placement statistics. MAERB directs schools to include placements *up until the time the report is submitted*. *See* MAERB's 2014 Annual Report Instructions at p. 3 (www.maerb.org/Portals/0/2014ARFInstructions1.15.15.pdf). Thus, the relevant disclosures should cover graduates that were placed as of the report's submission.

13.     Moreover, the issuance of the DOE Intent to Fine Letter and imposition of the $30 million fine thereunder failed to comport with principles of fundamental fairness and due process, particularly due to the absence of any specificity in the DOE Intent to Fine Letter. As recently as March of this year, the Office of Hearing Appeals, which provides an independent forum for the resolution of disputes involving the DOE and recipients of federal education funds,

held that the DOE must identify the conduct underlying *each* fine, as well as justify the amount of each fine *separately*, emphasizing that, "since a fine is a punishment that results in the deprivation of a protected property interest, the concept of due process must be adhered to or else the action would violate the United States Constitution." *In the Matter of Lincoln University*, Docket No. 23-68-SF (March 16, 2015) at 5. Here, not a single program is identified, nor is a single student. Levying a $30 million fine in the absence of an opportunity to rebut the allegations, in the complete void of specifics justifying the fine, is the epitome of a due process violation. Even the timing of the DOE Intent to Fine Letter demonstrates that it was issued prematurely and without adequate notice to the Debtors, because the DOE was nearly two years into an incomplete program review; a review that had not issued a preliminary determination nor afforded the Debtors an opportunity to respond, much less a final program review or audit determination. In fact, many of the allegations relate to easily rebuttable allegations (where they can be identified) had the DOE simply asked for clarifying information and documentation.

14.    In fact, a 2014 third-party audit conducted at the request of the Accrediting Commission of Career Schools and Colleges (the "**ACCSC**"), which accredited dozens of campuses, verified the quality of the Debtors' placements and the accuracy of disclosures and reporting made by the Debtors. The independent third-party audit of graduate employment records from the 2014 ACCSC Annual Report was conducted by Collegiate Admission and Retention Solutions ("**CARS**"), an approved auditor.[8]  CARS selected and examined 5,254 graduate placement records, verifying as placed 85.57 percent of the sample (including "verified" and "placed but different"), claiming as invalid 3.62 percent and unable to

---

[8]    Copies of the CARS Report are available upon request, but not attached to this Response given its voluminous nature.

contact 10.81 percent[9] of the sample.  These figures strongly suggest a high degree of integrity in the Debtors' record keeping and placement reporting.

15.     In short, the Student Stay Motion is premised on the false assertion that the Debtors have been adjudicated to have falsified placement rates to induce students to pay overpriced fees for an education.  In reality, at best they have shown that the DOE disagreed with the Debtors' disclosure practice regarding the placement rate calculation methodology.

ii.     *The July 2012 HELP Committee Report*

16.     In 2010, Senator Tom Harkin, the then-chairman of the HELP Committee, initiated an investigation of thirty (30) tax-paying education institutions.  The investigation commenced with an undercover report being issued by the Government Accounting Office (the "**GAO**") that was subsequently materially revised, with every revision being made in favor of the schools.  Further, as revealed in an internal GAO email authored by a member of the team that issued the report, political pressure from "congressional staffers" tainted the error-riddled report, the HELP Committee placed the GAO "under extreme short time frames" and demanded "to include details" that caused the GAO to go "back and stretch whatever [it] could find to come up with a number for the testimony.  This was done in haste and is where most of our corrections came from."  Jonathan Strong, *The Daily Caller*, "Political Pressure Tainted Error-Ridden GAO Report," May 17, 2011; s*ee also* Debtors' Response to HELP Committee Staff Report, a copy of which is attached hereto as Exhibit D.

---

[9]   The "unable to contact" rate is remarkably low in light of the structure of the audit.  A long history of academic literature on the topic of survey responses, including by current Federal Reserve Chairwoman Janet Yellen, identifies characteristics such as recency, frequency, incentives, resources, demographics and duration of the audit period as factoring significantly into response rates.  In short, a response rate of nearly 90 percent is uncharacteristically high considering the parameters of the audit.  *See* Debtors' Response to CARS' Report, a copy of which is attached hereto as Exhibit C.

17.     The GAO investigation culminated in a flawed staff committee report, dated July 30, 2012 (the "**HELP Committee Staff Report**"), that was critical of the for-profit sector of higher education.  While the Debtors' response is attached hereto as <u>Exhibit D</u>, the Debtors have highlighted some of the defects with the HELP Committee Staff Report below:

(a)     The HELP Committee Staff Report fails to adequately explain that the substantial percentage of federal education funds received by the Debtors was the direct result of their largely lower-income student body, which appropriately is the focus of federal assistance.  The Debtors prided themselves in serving the "non-traditional students" with "modest financial resources".  Historically, among the Debtors' students, about sixty-four (64) percent were women, and fifty-two (52) percent were minorities. Many of the Debtors' students were single parents who were working and raising families while taking classes.  The average age of Debtors' students was thirty (30) years old; and

(b)     The HELP Committee Staff Report's criticism of the financial aid students directed to the Debtors is misplaced.  The Debtors gave all students a path to improve their financial situation.  Due to the students' limited means, however, about eight-five (85) percent of the Debtors' students had annual family incomes of less than $45,000. Further, more than ninety (90) percent of the Debtors' students received federal educational aid, compared to approximately seventy (70) percent of private non-profit students and forty-nine (49) percent of public students (who benefit from direct aid to public schools, which serves as indirect federal tuition assistance that maintains tuition levels below the amounts that private institutions must charge).  The Debtors are proud of the demographic that they served.

### iii.     *The Attorney General Lawsuits*

18.     The Student Committee also cites to the complaints in the various attorney general lawsuits commenced against the Debtors (the "**Attorney General Lawsuits**"), but omits any reference to the Debtors' answers filed in response thereto.  The Attorney General Lawsuits are iterations of a similar refrain against career-oriented for-profit institutions.  For the Court's convenience, the answers filed by the Debtors in the California, Massachusetts, and Wisconsin suits are included in the Debtors' RJN.  *See* Debtors' RJN, Exhibits 1, 2 and 3.  As highlighted in

each of the answers, the allegations against the Debtors (which are repeated in the Student Stay

Motion) are out-of-context, misleading and simply inaccurate.

        19.    The allegations contained in the Attorney General Lawsuits lack

specificity and evidence of materiality, causation and damages.  For example, the allegations are

replete with supposed anecdotes, but fail to identify students by name, program or year such that

the Debtors could investigate and respond to the specific allegations.  Assuming *arguendo* that

the supposed anecdotes are true, the governmental agencies fail to state a material difference in

the student placement percentages or whether the alleged inaccuracies caused any damages to

students who graduated and obtained employment in their intended field of study.

        20.    The Debtors' answers to each of the Attorney General Complaints

highlight the Debtors' responses to the allegations contained therein.[10]  While the Debtors will

not belabor the Court with a point-by-point response to each of the allegations contained in the

complaints, the following verbatim excerpt from the Debtors' Answer in the 2013 California

lawsuit is illustrative of the Debtors' position with respect to the allegations contained in all of

the Attorney General Complaints:

> "The Government's false allegations and the aspersions cast on the School's
> relationship with its students are offensive and demeaning—to the School and
> its employees; to its students who are striving for a career and a better life; and to the
> employers who hire its thousands of qualified graduates. The Government's
> Complaint also implies that state regulators and accreditation agencies have failed

---

[10]   Among the documents relied upon by the Student Committee is the 2007 complaint and stipulated judgment between the Debtors the California Attorney General.  The investigation and related suit focused on differing interpretations of California's Maxine Waters Act formula for calculating student placement rates.  In fact, the former Bureau Chief of the California Bureau of Private Post-Secondary Vocational Educational who was charged with enforcing the Maxine Waters Act, testified that "as a regulator attempting to enforce the completion and placement standards in the Act convinced me that it is nearly impossible for schools and the staff in the Bureau to interpret, explain and apply them consistently.  During my time as Bureau Chief, staff personnel adopted differing interpretations of the various provisions of the Act to such an extent that the Bureau had, I believe, nearly as many interpretations as staff people."  Declaration of Michael Abbott, ¶ 6 (attached hereto as <u>Exhibit E</u>).  Although the Debtors disputed the allegations contained in the complaint, they entered into the stipulated judgment in an effort to resolve the matter and bring finality to the dispute.

to provide proper oversight of the School. This is ill informed and demonstrably untrue. The Complaint suggests that the School's employees go to work every day for the express purpose of preying on students. This is insulting and preposterous. The School and its employees are passionately dedicated to providing quality career education, to helping students overcome academic and personal obstacles that stand in the way of completing their programs, and to helping graduates find meaningful work in their fields of study. Most of the School's students have not succeeded in a traditional academic environment; over 40% have tried community college before enrolling at one of its institutions. The School's students have few people in their lives who can provide the support and encouragement they need to achieve a career goal. The School and its employees are committed to honoring the trust that its students place in its institutions. Its campus teams work in concert to teach, mentor, counsel, coach and cheerlead their students to success. Across the School's network of campuses, it has one career services employee for every 108 students; in a typical community college, that ratio is one counselor for approximately 1,000 students, including all types of counseling, from personal to academics to career. The School's substantial and on-going investment in placement services has helped tens of thousands of graduates find work in their fields, even during the recent deep and prolonged recession.  As a career institution, the School is subject to a complex, oft-times conflicting, and extensive web of federal and state regulation, along with myriad accreditation, licensing and reporting requirements. The School has been, and continues to be an industry leader in its commitment to integrity and to the implementation and enhancement of processes and training to promote compliance. The School has devoted substantial resources to not only meet these regulatory requirements, but to exceed them. Rather than acknowledging and commending the School's aspirational goals, the Government is seeking to punish the School. The Complaint is replete with selective, misleading and out-of-context quotations that attempt to turn the School's commitment to high standards against it. In California, the School has cooperated extensively with the Government. It has done so openly and because it has confidence in its internal controls and its people. The School provided several hundred thousand pages of documents, voice recordings and answers to new questions posed on an almost-weekly basis by the Government. The School repeatedly offered to present information and explanation on any issues about which the Government had concerns. Without accepting those offers and without any notice, the Government filed this Complaint—a document built on a foundation of misquoted, deceptively excerpted, and—at best—misunderstood materials. For example, the Government cites a slide from a presentation in paragraph 51(e) for the proposition that there was a "placement file error rate of 53.6 percent to 70.6 percent." In reality, that slide does not even include the word "placement," and the internal review in question did not reflect a single suspect, let alone false placement, contrary to the Government's insinuation. The School will address and expose those mischaracterizations in due course before this Court in a process that begins with this Verified Answer."

14

Debtors' RJN, Exhibit 3, pp. 2-3; *see also* Debtors' RJN, Exhibits 1 and 2 (similar responses contained in the Debtors' Massachusetts and Wisconsin Answers).

> **B.     The Quality of Education Provided by the Debtors Has Not Been Challenged in the Investigations, Reports or Attorney General Lawsuits.**

21.     Notwithstanding the assertions contained in the Student Stay Motion, the quality of the education provided by the Debtors has never been attacked in the various investigations, reports or Attorney General Lawsuits.  As recently as last week, Albert Gray, the president and CEO of the Accrediting Council for Independent Colleges and Schools (the "**ACICS**"), which accredited fifty-five (55) of the Debtors' campus locations, defended the quality of the Debtors' education in testifying before Congress.  Indeed, Mr. Gray testified at the hearing that "Corinthian collapsed because of financial pressure … the accreditation process was not the issue."  Allie Grassgreen, *PoliticoPro*, "Senators Grill Accreditor Over Handling of Corinthian Colleges", June 17, 2015, a copy of which is attached hereto as Exhibit F. Significantly, Mr. Gray also testified that while ACICS monitored or sanctioned some of the Debtors' campuses after internal reviews, it never found any evidence of students being lied to or defrauded (notwithstanding the myriad of state and federal investigations suggesting otherwise).

> **C.     The Student Committee's Focus on Tuition Rates is Misleading and Provides an Incomplete Comparison between Private and Public Institutions.**

22.     A common misconception, perpetuated in the Student Stay Motion, is that private sector educational institutions are more expensive to operate than their public sector counterparts, implying that the profit-motive causes harm to private sector students.  As stated in the Student Stay Motion:  "The cost of education at the Debtors' schools was much higher than similar not-for-profit schools . . . . ," proceeding to make comparisons between the tuition at the Debtors' institutions and the tuition at public schools.  Student Stay Motion, ¶¶ 12-13.

23.     As a well-recognized study, examining three significant government databases,[11] has found:  "Another important measure of educational outcomes is the actual expense to society associated with generating a graduate.  Private sector schools receive nearly all of their revenues through tuition, a tuition that is frequently both higher than public schools and supported by federal grants and guaranteed student loans.  This leads to the common misconception that private sector operators are more expensive to operate than their public sector counterparts.  The available data, however, indicates otherwise, as public schools receive the majority of their income directly through state and local funding."  Parthenon Group, *Private Sector Post-Secondary Schools—Do They Deliver Value to Students and Society?*, Feb. 2010 at 3.[12]

---

[11]    The three databases included:  (i) the NCES Beginning Post-Secondary Survey, a longitudinal study of 19,000 students from public and private schools who were followed for five (5) years recording hundreds of variables, including employment status and income outcomes; (ii) the Integrated Post-Secondary Education Data System, a survey of ~7,000 institutions reporting on completion, revenues and expenditures; and (iii) the National Post-Secondary Student Aid Study, a collection of student aid information for 114,000 students at 1,600 institutions plus data from the 2007-2008 school year.

[12]    A copy of the Parthenon Group study is attached hereto as <u>Exhibit G</u>.

24.    The Parthenon Group's study results are graphically represented as follows:



25.    Thus, while the public sector charges less in *tuition* due to the direct public subsidies it receives, the *total cost* per positive student outcome (completion or transfer) is practically equivalent to private institutions.  This is significant in many ways, including the value that the Debtors' schools provided in light of the better outcomes, particularly for non-traditional students and driven by structural and curriculum differences, when compared to the public sector.  Indeed, the Parthenon Group's study also included the follow graph comparing student outcomes (five (5) years post-enrollment) at two (2) year or shorter private and public institutions:



As reflected in the chart, private institutions (such as Corinthian) have higher overall and minority graduation rates and overall positive outcome percentages. In short, the criticism regarding cost in the Student Stay Motion, with its intended implications, is not only misplaced, it is demonstrably incorrect.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court take into consideration the Debtors' factual representations contained herein in considering the Student Stay Motion.

Dated: June 24, 2015
      Wilmington, Delaware

/s/ *Mark D Collins*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marisa A. Terranova (No. 5396)
Amanda R. Steele (No. 5530)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Facsimile:  302-651-7701
Email: collins@rlf.com
      merchant@rlf.com
      terranova@rlf.com
      steele@rlf.com

Attorneys for the Debtors and Debtors in Possession

RLF1 12253230v.7