# EXHIBIT C



**CORINTHIAN COLLEGES, INC.**

6 Hutton Centre Drive Suite 400

Santa Ana, CA 92707

tel (714) 427-3000 fax (714) 427-3010

www.cci.edu

December 31, 2014

Michale S. McComis, Ed.D.
Executive Director
Accrediting Commission of Career Schools and Colleges
2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201

**Re: Corinthian's Response to the Commission's September 15th Letter**

Dear Dr. McComis:

Corinthian Colleges ("Corinthian") responds to the Commission's letter placing our ACCSC-accredited campuses on system-wide warning and requesting significant information regarding graduate placement, financial soundness and updates regarding other regulatory agencies. We appreciate the opportunity to respond to the Commission's requests and believe that our responses will not only assuage the Commission's concerns, but provide additional perspective for the Commission's future placement re-verification demands for other schools after Corinthian is no longer educating students.

### Placement Re-Verification

Since our placement verification efforts began in 2005, Corinthian has learned much about the challenges associated with meaningful re-verification. That knowledge increased significantly following analysis of the ACCSC-mandated third-party audits of the placements in our 2013 and 2014 Annual Reports. The essential characteristics of effective re-verification audits became much clearer. These elements of effective re-verification resulted in outcomes of the 2014 audit which provide evidence of the integrity of our processes—both historically and presently.

It is critically important to note that in preparation for the 2014 audit, we researched—and where possible implemented—fundamental survey elements gleaned from a variety of studies on key constructs regarding survey design. These important elements bear both on the outcomes of the 2013 audit as well as the present, much more robust metrics achieved in the 2014 audit. For example, as detailed in the accompanying response, survey characteristics such as recency, frequency, incentives, resources, demographics and duration of the audit period all factor significantly into response rates. In short, the concerns expressed by the Commission regarding the 2013 audit results *relate more to deficiencies with the audit process itself than with the integrity of Corinthian's underlying data, procedures and processes.*

The Commission has already received directly from CARS the results of its independent third-party audit of graduate employment records from the 2014 Annual Report. CARS selected and examined 5,254 graduate placement records, verifying as placed 85.57% of the sample (including "verified" and "placed but different"), claiming as invalid 3.62% and unable to contact 10.81% of the sample. A copy of the report is included as Exhibit 1 to our response.

Notably, while the response rate significantly improved in the 2014 audit, the "invalid" results between the 2013 and 2014 audits remained remarkably constant. This is an important point emphasizing that Corinthian's unable-to-verify placements should not be regarded as "invalid" simply because they were not contacted. In fact, when Corinthian's "unable to verify" rate declines—when the auditor is able to contact employers and graduates—most of the change in other categories is in the "verified as placed" rate. This significant fact undermines the September 15th letter's implicit conclusion that unable-to-verify placements were equivalent to "invalids." That unable-to-contact placements were likely "verified as placed" records that could not be reached strongly suggests a high degree of integrity in Corinthian's record keeping and placement reporting.

As directed by the Commission, the enclosed response provides detailed answers to the various requests on pages 6 and 7 of the September 15th letter regarding placement verification, including:

- A detailed description of the employment classification and verification process used by Corinthian-affiliated campuses;

- A detailed description as to how each campus determines the classification of graduates as employed in accordance with *Appendix VII Guidelines for Employment Classification, Substantive Standards of Accreditation* and specifically how the school defines and determines employment as sustainable and related to the program of study;

- A justification as to how the employment verification process used prior to the "Oral Employment Confirmation" represents "diligent efforts";

- A description of the Oral Employment Confirmation Process;

- A description of any changes made to the processes described above since Corinthian's last response to the Commission;

- A more detailed explanation as to why less than 30% of the total records reviewed in the audit of the 2013 Annual Report data could be verified by the independent third party auditor to match the school's record and justification as to why Corinthian believes that ACCSC can rely on the school's reported rates given the high percentage of records that could not be verified by the independent third party auditor;

- An analysis as to the efficacy of Corinthian's second-level review conducted by the "independent employment verification team at the CSC" in identifying and correcting the types of errors and inaccuracies found by the independent third-party auditor as described in this letter and a justification as to why the commission can rely on this process to produce accurate reporting;

- With regard to the 2013 Annual Report data, re-calculated Graduation and Employment Charts have been provided for programs where Corinthian has re-classified the employment status of any graduates based on the general findings outlined in the September 15th letter (e.g., the employment does not align to the majority of the program objectives, is not sustainable, etc.). We provide a matrix which shows the rate previously reported against the newly calculated rate and an explanation as to the reason(s) for the differences;

- An explanation for any student which the school reported as employed in a training related field that the independent third-party verified as not accurate;

- An explanation for any program where the independent third party is unable to verify 20% or more of the sample records due to an inability to contact either the employer or the graduate;

- A matrix that shows the graduate employment statistics reported to students aligned with the graduate data reported to ACCSC for each program grouped by campus location based on the data reported in the 2013 and 2014 Annual Reports;

- An explanation for any employment rate disclosed to students that differed from the rate reported to ACCSC;

- Attestations from each school signed by the school director that the employment rate information submitted to ACCSC and disclosed to students has been, to the best of their knowledge and belief, truthful and accurate as well as an attestation from the CEO of Corinthian stating the same on behalf of the system of schools; and

- Additional information that we believe will assist the Commission in making a determination regarding the school's compliance with accrediting standards related to placement.

In short, following the dedication of extensive resources in both time and money, the 2014 audit combined with Corinthian's responses to the above requests demonstrate the integrity of Corinthian's placement verification efforts, reporting and graduate results.

## Financial Soundness & Other Regulators

As requested, we also provide the following information regarding the financial soundness of our organization:

- An explanation regarding the absence of audited financial statements for the fiscal year ended June 30, 2014 in accordance with ACCSC Instructions for the Preparation and Submission of Financial Statements and related information; and

- A Management Discussion and Analysis examining and explaining the school's current financial condition, including a discussion that addresses school's financial performance goals and results, anticipated future demands, events, conditions, and trends that impact the school, and a discussion regarding how Corinthian believes it will be able to continue to operate and fulfill its obligations to students.

We also provide information regarding updates involving other regulatory agencies.

## Additional Requests

The response includes a description of the process being followed with the U.S. Department of Education Monitor regarding the sale of Corinthian campuses and the current status of the sale of any Corinthian campuses. We also respond to the inquiry regarding revised teach-out plans. Additionally, due to the Commission's placement of forty campuses on System-wide Warning, Corinthian was directed to inform all current and prospective students of such status. Our response includes evidence that we took immediate action and provided notice via written disclosures and websites on October 1, 2014.

**        **        **        **

Corinthian hopes these answers and the 2014 audit results have restored the Commission's trust in our organization and have convincingly demonstrated our current and historic commitment to compliance. We encourage the Commission to consider the lessons learned from our analysis of back-to-back audits as it requires audits of other institutions. Further, we believe the results of the third-party audit by CARS and the updates provided herein warrant the removal of the System-wide Warning.

We appreciate all the Commission has done over the years to assist us in educating students nationwide. It is difficult to express, both personally and collectively, our disappointment at being the first significant casualty of a concerted attack on vocational schools. We sincerely hope that the Commission successfully assists other institutions in navigating the current environment to the benefit of students, communities and employees.

We wish you the best in 2015.

Sincerely,

Jack D. Massimino
Chairman and Chief Executive Officer
Corinthian Colleges

Enclosures

# Accrediting Commission of Career Schools and Colleges

# Corinthian Colleges'

# Response to the System-wide Warning

# Letter dated September 15, 2014

*Corinthian System of Schools*

*December 31, 2014*

In light of the long prelude to the September 15th letter, we feel it important first to address directly the concerns expressed by the Commission regarding the third-party audit of the 2013 Annual Report placements and Corinthian's analysis of the audit.

### *2013 Audit Records Noted As "Unable to Verify"*

A significant concern in the September 15th letter was the high percentage of placements identified as "unable to verify" which was CARS' description of employers and graduates who could not be contacted or who failed to respond. CARS recognized, consistent with our own experience, that this inability to contact was in part due to employer fatigue at being contacted so many times to verify employment, missing employer personnel records, lack of employer and/or graduate cooperation, deliberate employer/graduate misreporting to the auditor, disgruntled graduates, a desire to conceal income, and outdated contact information. However, the 2014 audit combined with an analysis of academic studies related to obtaining survey responses, revealed significant reasons for the "unable to verify" percentage in the 2013 audit.

The elapsed time between placement and the audit contributed to the high number of records of employers and graduates that failed to respond to the auditor. In the 2013 audit, the auditor attempted to re-verify employment records for students, some of whom graduated from their programs more than *four years* earlier. This significant lapse of time demonstrably affects response rates.

The brief period for contacting employers and graduates contributed to the "unable to verify" percentage. The entire calling campaign for the 2013 audit lasted a mere *23 days*. There were multiple reasons why the campaign lasted such a short period of time, including the execution of administrative tasks (such as selection of an auditor, negotiation of the contract, collation and provision of materials to the auditor), inexperience in such third-party audits and lack of resources due to other regulatory agency demands. In contrast, the 2014 audit lasted for nearly twice as long at 43 days and resulted in a 10.81% "unable to verify" rate. It is apparent that 23 days is entirely insufficient to obtain survey responses from a large number of participants.

The small number of contact attempts contributed to the high number of employers and graduates that failed to respond to the auditor. The 2013 audit required the auditor to make up to a mere *nine* attempts to contact the employer (four by email and five by phone) before another maximum of *seven* attempts to contact the graduate (four by email and three by phone) were made. In total, only *sixteen* attempted contacts were made in the 2013 audit, far too few to obtain responses in a sizeable sample. In contrast, the 2014 audit required *thirty* employer attempts (fifteen by email and fifteen by phone) followed by *thirty* graduate attempts (fifteen by email and fifteen by phone), for a total of *sixty* contact attempts—a 375% increase in contact attempts. Although these increased contacts produced a number of angry graduates and employers (at least one of which now demands $30 from us for every verification), it increased the response rate significantly.

1

Stated another way, the recency of the data plus the extended contact campaign plus the additional contact attempts (and perhaps additional efforts relating to the contact data and method of contact) produced a response rate of nearly 90% in a sizeable sample of employers and graduates. This was achieved without any substantive change in Corinthian's placement process, record keeping, data gathering or other material element of obtaining and tracking graduate placement for the vast majority of the sample.

Notably, while the response rate significantly improved in the 2014 audit, the "invalid" results between the 2013 and 2014 audits remained remarkably constant. The contact rate does not appear to correlate to the measurement of the substantive "invalid" rate. Whether the contact rate is 50.1% as in the 2013 audit or almost 90% as in the 2014 audit, the invalid rate remained virtually constant at 3.5%. This is an important point emphasizing that Corinthian's unable-to-verify placements should not be regarded as "invalid" simply because they were not contacted. In fact, when Corinthian's "unable to verify" rate declines, most of the change in other categories is in the "verified as placed" rate. That is, Corinthian's unable-to-verify placements become "verified as placed" (with some increase in "placed but different") when the auditor is able to contact them. This significant fact undermines the September 15th letter's implicit conclusion that unable-to-verify placements were equivalent to "invalids" (*i.e.,* as if they were the result of Corinthian's poor—or worse—record keeping). The fact that unable-to-contact placements really were just "verified as placed" records that could not be reached strongly suggests a high degree of integrity in Corinthian's record keeping and placement reporting while also implying that the third-party re-verification process was simply not sufficiently robust or was otherwise flawed.

One factor common to both the 2013 and 2014 audits is the singular examination of only placed graduates. Limiting the data set to this cohort means the placement rate *will only decrease.* By design, the re-verification process can only verify graduates as placed as recorded, or deem placed records invalid; it cannot find graduates who could have been counted as placed but were not because graduates who were not recorded as placed are not included in the process. Expanding the data set to include all graduates would invariably find those who were placed during the cohort measurement period but were not claimed as placed in the reporting process and thus support the reported placement percentage. Therefore, the audit process is deficient in its design if the objective is to verify accurate placement percentage reporting.

In short, the concerns expressed by the Commission regarding the 2013 audit results *relate more to deficiencies with the audit process itself than with the integrity of Corinthian's underlying data, procedures and processes.*

Lastly, Corinthian understood the Commission's request to provide "an explanation for any program where the independent third party could not verify 20% or more of the sample records due to an inability to contact either the employer or the graduate" to refer to those programs where CARS failed to verify at least 20% of the program sample—in other words, programs where less than 20% of the sample could

be contacted to verify whether the placement was accurate or not. With this understanding of the ambiguous phrase, Corinthian only found 15 programs where CARS failed to verify 20% or more of the employment records. Corinthian now understands that the Commission was instead requesting an explanation for each program where less than 80% of the sample records could be verified. It is Corinthian's position, supported by academic studies referenced in section b.1 below and the efforts required in the 2014 audit, that generally it is extremely difficult to obtain response rates greater than 80%, particularly when using stale data for a brief contact campaign with few contact attempts. Corinthian's explanation for response rates below 80% in the 2013 audit are found above and in section b.1 below. Further, Corinthian notes that to calculate the correct unable-to-contact percentage, the following should be subtracted from 100%: the verified-as-placed percentage plus the placed-but-different percentage plus the invalid percentage (the sum of all categories where contact was made).

### *Graduate Employment Disclosures*

The September 15th letter appears to raise two distinct issues regarding graduate employment disclosures, the disclosure of the 2012 Annual Report placements in accordance with Commission standards and proof of modification of a small number of Gainful Employment disclosures.

Despite multiple reaccreditation site visits since January of 2013, the Commission's September 15, 2014 letter was the first time an issue had been raised regarding the disclosure of the 2012 Annual Report placement rates. Although it must be confusing to prospective students who view multiple placement rates such as an accreditation placement rate, a state placement rate, a federal placement rate, an institutional placement rate, a program placement rate and, where applicable a programmatic accreditation placement rate, each with different factors in the calculation formula, Corinthian now publishes separate and distinct disclosures specifically for ACCSC-accredited campuses. An example of the ACCSC program disclosure for Everest Alhambra is provided in Exhibit 2.

In Corinthian's response dated July 1, 2014, several Gainful Employment disclosures were identified as requiring modification. The September 15th letter requested evidence that the disclosures had been modified. As previously mentioned, Corinthian used the United States Department of Education's Gainful Employment Disclosure template as the vehicle for providing students and potential students information on placement rates. The web-based template was newly introduced in November of 2013 with a required implementation date of January 2014. While preparing the July 1st response, we discovered that of Corinthian's approximately 1,200 program offerings, 0.9% required a modification. Evidence that the modifications were made to the program websites can be found in Exhibit 3.

### *Classification and Record Keeping*

In the September 15th letter, the Commission broadly expressed concern in two areas: allegedly inaccurate information on forms and purportedly unrelated job titles.

3

### 1.   *Allegedly inaccurate information on forms*

While Corinthian expects employment verification forms to be thoroughly completed with precise information, sometimes we see sections that employers either neglected to complete or information, such as salary for instance, employers refused to provide based on policy or privacy reasons.  In some instances, graduates incorrectly remember and record the exact date they began their employment, particularly if the graduate completed his/her externship at the same location where they were hired after graduation.  Additionally, there are times when our own employees accidently omit information, transpose numbers or otherwise introduce human or data entry error to the employment verification forms.

As recognized by the Committee of Sponsoring Organizations of the Treadway Commission (a joint initiative of five major private-sector auditor associations), effective internal controls can provide only reasonable assurance, not absolute assurance, that management's control objectives are accomplished. Thus, while we endeavor to have no errors in our documentation, it is not reasonable to expect that deviation from our policies will *never* occur or that complete accuracy in our records will *always* occur— particularly when such forms are voluntarily completed by third-party employers and graduates. To reduce the likelihood of error, Corinthian relies on various processes to review, collect and confirm that the information is correct. For example, the Employment Verification Team calls each employer and/or graduate and at least orally confirms employment.  Corinthian's Internal Audit department randomly selects placements to re-verify and employer locations to visit.  These efforts provide an extra level of review for those instances when there are inconsistencies or incompleteness in information provided.  We believe these efforts produce materially accurate information on our forms.

### 2.   *Job titles purportedly appear unrelated*

Job titles slightly vary during the verification process depending on the employee we speak to at the work site.  For example, in both the 2013 and 2014 audits, varying job titles included: Lube Technician vs. Automotive Technician; Manager vs. Supervisor; Technician 3 vs. Entry-Level Technician; Line Lead vs. Shop Assistant; Sterile Processing Tech vs. Surgical Technician.  In all of these examples, CARS labeled those placement records "placed but different."  Of CARS' "placed but different" designation, a significant percentage contained corrected job titles.  The majority of these corrected job titles appear to be immaterial title differences such as the above.

Corinthian finds these differences immaterial and asks the Commission to consider the following scenarios:

a.   *Employers change job titles:*  Many employers change job titles for various reasons. Some employers, specifically smaller organizations, where there are no standard human resources practices, one person might call the employee a "manager" and another may refer to them as a "supervisor." These terms are interchangeable and synonymous;

b. *Employees may change jobs:*  Graduates may change jobs during their tenure with the same employer.  An individual may be hired in as a "supervisor" at the onset of the position, but over time may move into a new role and as such job titles may change.  When the campuses recorded the information, it was accurate as of the data entry date, but by the time a third-party auditor re-verifies, in some cases years later, the graduate's job may have changed.  In addition, third-party auditors do not ask qualitative and/or probing questions to understand those changes. The auditor simply asks "Is your job title a Medical Administrative Assistant?" and if the graduate states "No, my title is a Medical Office Specialist" the record is labeled "placed but different" even though the placement meets policy and accreditation standards;

c. *Third-Party Verification Systems:*  Differences in job title might also be the result of information gathered from third-party verification systems, such as The Equifax Work Number.  The Work Number typically includes a generic job title such as "Service Representative II" when the employer or graduate might actually be titled a "Sales Manager."  The job duties remain the same, but the title varies due to the party recording it.

Lastly, on page 3 of the September 15th letter, the Commission pointed out several examples of job titles that did not initially appear directly related to the program of study, such as:  Medical Assistants employed as Chiropractic Assistants; Medical Administrative Assistants employed as Schedulers; and Pharmacy Technicians employed as Visual Inspectors.  Corinthian examined these records from the 2013 audit and continues to stand by the reported placements.  A brief summary of the reasons for our constancy are found in the chart below:

| PROGRAM | JOB TITLE | SKILLS | COMMENTS |
|---|---|---|---|
| Medical Assistant | Chiropractic Assistant | Vitals, medical terminology, patient charts, rooming, assisting with x-rays, medical billing, and patient scheduling. | Corinthian orally confirmed employment with employer who stated the graduate was using on the job the skills she learned in her program. |

| PROGRAM | JOB TITLE | SKILLS | COMMENTS |
|---------|-----------|--------|----------|
| Medical Assistant | Massage Therapist | Vitals, medical terminology, patient charts, rooming, front office. | There was a data-entry error for 5 Medical Assisting graduate placements. They were incorrectly identified as Massage Therapists. Work location is in Medical Offices or Hospitals. This error can occur because the job title is selected from a drop-down menu where "massage therapist" is just below "medical assistant." |
| Medical Assistant | Phlebotomists | Specimen collection, labeling, testing, drawing blood, blood panel, urinalysis, patient care, front office | It is Corinthian's position that phlebotomy is a career path for Medical Assistant graduates that keeps their skills sharp and provides medical experience for future growth in the medical field; this is a reasonable entry-level position that affords future opportunities in a career. |
| Medical Assistant | Dental Assistant | N/A | We searched the records and could not find any Medical Assistants employed as Dental Assistants. Note: Corinthian does allow Medical Assistants to work in a dental office if the position requires assistance with oral surgery as the graduate would be using skills learned in the program. |
| Medical Administrative Assistant | Schedulers/ Receptionists | Patient scheduling, answering phones, patient charts/files and billing | All 9 Medical Administrative Assistant graduates were working in a medical office or clinic and were using skills learned in the program. |
| Medical Administrative Assistant | Optometrist Assistant | Patient scheduling, answering phones, medical records, and insurance verification | 1 Medical Administrative Assistant graduate working at an eye clinic using skills learned in the program. |
| Pharmacy Technician | Customer Service Representative | Pharmacy knowledge, dosage and calculations | Employer hires only certified Pharmacy Technicians, thus the education is a prerequisite to hiring. |

| PROGRAM | JOB TITLE | SKILLS | COMMENTS |
|---------|-----------|--------|----------|
| Pharmacy Technician | Visual Inspector | Pharmacy knowledge required, visual inspection of drugs | Pharmaceutical company which preferred certified Pharmacy Technicians, thus the education was integral to obtaining employment. |

Additional examples are provided in section a.ii. of the response and continue to support the notion that placement verification is a complex task, often requiring resources to research positions and debunking conclusions based merely on job titles. Clearly, job titles alone should not be used to determine if a job is a suitable placement. One must explore further to determine if the position meets the appropriate standards as set forth by the Commission.

### *Classification and Verification Process*

As noted above in the "Classifications and Record Keeping" section, there were slight discrepancies between start dates or job titles given by the graduate and/or employer to the campus, to the Employment Verification Team, and/or to CARS. A significant percentage of the 2013 audit's "placed but different" placements related to variations in start date. Of these, a sizeable portion involved a variation of fewer than seven days. In total, a large majority of the "placed but different" placements were so categorized by CARS due to immaterial variations in job title or starting date. We believe the non-substantive nature of these variances result in a reasonable verification of these placements as they satisfied the Commission's employment definition, including requirements of utilizing the skills learned in school in a position that was intended to be sustainable while earning an income.

The Commission also questioned Corinthian's process for obtaining oral verification of employment and our definition of "diligent efforts." A thorough response to these concerns is addressed below in sections a.iii-iv.

We believe the above responds to the various issues raised separately in the prelude to the September 15th letter, distinct from the specific requests.

### *RESPONSE TO SPECIFIC REQUESTS IN THE SEPTEMBER 15, 2014 LETTER*

We turn now to the specific requests made in the letter, following the format of those requests from the letter itself.

     *a.*     *With regard to the schools' internal employment classification process provide:*

          *i.*     *A detailed description of the employment classification and verification process used by Corinthian-affiliated schools.*

### *RESPONSE: Classification and Verification Process*

Corinthian is committed to its graduates and the placement assistance we provide. Each school has a Director of Career Services and multiple Career Services Representatives. The number of Career Services Representatives varies depending on student population. Further placement leadership is provided at the regional level. Each employee is required to attend a series of online training sessions and onsite workshops that address both classification and verification, in addition to the on-the-job training and guidance received from experienced leaders and coworkers on a daily basis. We explain the broad processes for these two aspects of placement below.

### Job Classification

The Career Services training covers a variety of compliance and regulatory topics including placement classification and employment verification. The classification process fits within the broader placement policy, found in the detailed, twenty-one-page policy regarding placement. See Exhibit 4, RAO23 "Policy Regarding Placement Verifications and Waivers." This policy remains available and easily accessible to employees via the school's intranet throughout their employment. The policy satisfies the Commission's placement requirements, and several areas of our placement policy, including the entire Placement Verification Team employment re-verification process, exceed minimum standards required by accrediting or regulatory agencies.

In addition, through this training Career Services staff learns how to manage externships, coach and develop students, and build employer partnerships. Corinthian's Career Services Training Map provides an example of the training our employees complete, including summaries of six of the twelve training modules that address placement classification and verification. See Exhibit 5.

A large majority of the jobs our graduates obtain are easily classified as "in field" based on the program name and the job title. For example, a Medical Assisting graduate working as a Medical Assistant in a doctor's office or Pharmacy Technician graduate working as a Pharmacy Technician at Walgreens are both easily classified. Unfortunately, as noted above and below, not all the job titles and responsibilities are as straightforward and easily identifiable. In fact, sometimes the job title or even the job description does not provide the necessary information for routine classification so additional research is needed.

To further assist Career Services personnel to navigate the challenges encountered in placement classification, Corinthian has created two job tools for campuses to reference. A job tool, also referred to as a job aid, provides guidance outside of a traditional training environment. Such tools or aids are designed to support performance and reduce mistakes by helping employees remember what to do and to promote completion of all required steps. The first tool is the "The Position Classification Table," found as Exhibit 6. This table was created by the Employment Verification Team in partnership with the Curriculum Support team at the Campus Support Center. The tool assists schools in determining if a particular job will meet policy requirements.

8

Further, the Position Classification Table provides program-by-program examples of job markets, job titles, and skills used so that Career Services employees target appropriate industries and build employer relationships with hiring managers whose open positions are in the field in which the graduate was trained.

The second tool is the "Employer Classification Table" found at Exhibit 7.  This tool was also created by the Employment Verification Team in consultation with the Curriculum Support team.  The Employer Classification Table includes employers and job titles of Open Job Opportunities ("OJOs").  The Table lists OJOs that have been approved and denied in the past by the Vice President of Compliance.  The Employer Classification Table primarily contains names and open positions of repeat employers of our graduates, such as large employers including Walgreens, CVS, etc.

To supplement the tools referenced above and to further assist with job classification, Corinthian instituted a "pre-approval" process in 2012 that has assisted campuses and field management in identifying appropriate OJOs. The process starts with the local campus becoming aware of an employer that is currently hiring for an open position.  If the Director of Career Services is uncertain if the position will meet policy standards, s/he will forward the job description to the Regional Director of Career Services.  If the Regional Director of Career Services is still uncertain, s/he will forward the request for review to the Divisional Director of Career Services.  If the Divisional Director is still uncertain, s/he forwards the request for review to the Vice President of Compliance who oversees the applicable policy and central Employment Verification Team. The Vice President of Compliance reviews the job description, the employer website, the campus catalog, applicable enrollment and marketing materials, the program outline and learning objectives and consults with the appropriate Curriculum Manager and sometimes the employer itself before rendering a decision as to whether the OJO may be accepted.  Please refer to Exhibit 8 for the Employment Verification Flow Chart describing the pre-approval process.  Since implementation in early 2012, this process has significantly reduced the number of misclassified employment records. While we continue to improve our classification process, we believe that it results in materially accurate categorization of placements.

**Placement Verification**

The above job classification process constitutes a part of the broader placement verification process.  In addition to helping students find employment, Corinthian takes pains to track and accurately report job placements.  The process by which this occurs is graphically represented in Exhibit 9.  The narrative explanation of the process is found below.

The determination that a graduate has obtained in-field employment begins with the Career Services department at each campus. Career services representatives determine the student's employment by contacting the student or employer to confirm that the student was hired and that the placement meets accreditation requirements. Campus-level verification activities are supervised at the campus by both the Director of

Career Services and the Campus President, who are responsible for ensuring campus-level accuracy of placement information. In turn, these individuals receive additional support and oversight from subject matter experts at the regional and divisional levels.

Corinthian's efforts in accurately tracking and reporting placements do not end there. In what we believe to have been an industry first, Corinthian implemented in 2005 a secondary verification process. This process is centralized at the Campus Support Center in Santa Ana, California and conducted through a Placement Verification Team consisting of employees whose sole job is to check and verify the placements reported by the campuses. This second-level verification is not required by the Commission or any state or federal law or regulation.  It is something Corinthian implemented on its own to confirm the reliability of its placement data. The Placement Verification Team has historically reviewed an impressive number of placements every year and in the last year has reviewed every placement before it can be entered as a "placement."  This second-level review helps to promote accuracy before placements are reported to the Commission and to prospective students.

Identifying when a student is "placed" in accordance with accreditation requirements is not always easy. The second-level review process adds another layer of oversight to promote compliance with accreditation standards when placements are reported.

Corinthian has improved its second-level verification process over time. Prior to 2013, the campus recorded a graduate as being "placed" in the student information system, CampusVue, after the initial campus-level determination of placement. The Placement Verification Team then attempted to re-verify all placements by contacting either the employer or the graduate.  When discrepancies resulted from the Placement Verification Team's efforts, the placement was put into "Open Verification," which meant it became part of additional follow up with the campus, asking for the campus to either remove the placement or provide justification to the Placement Verification Team why the placement should remain in the system. In most cases, this resulted in either the placement being removed or the campus providing sufficient proof of the placement such that the placement remained in the system. If the Placement Verification Team and the campus were unable to resolve whether a particular placement should remain, there was yet a further avenue and level of review available before an Appeals Panel.

Starting in May of 2013, after a pilot beginning in August 2012, Corinthian began rolling out a new process requiring students to be marked as "placed" in CampusVue only *after* the Placement Verification Team re-verifies the placement. The School uses the same process to resolve discrepancies between the campus and Placement Verification Team as described above, except that no placement is entered until after the discrepancy is resolved. This eliminates the possibility of having to revise placements after they are reported to the accreditor or other regulatory agencies in the event of a time-lag between the initial campus-level verification and the re-verification by the Placement Verification Team. The roll-out of this new process was completed in March of 2014.

10

Another improvement to the verification process is the "ten-plus"—now "five-plus"—rule.  Starting in approximately August of 2010, Corinthian increased scrutiny of placements with employers that hired more than ten graduates in a single reporting period.  For such employers, (1) the Placement Verification Team attempted to confirm the placement with both the employer *and* the student, and (2) campus leadership began to conduct physical site visits of employers that hired more than ten students during a reporting period to confirm the students were actually working there and that the employer was legitimate.  Effective May 2013, the School officially adopted a "five-plus" rule, requiring site visits by the Regional Vice President of Operations, as well as attempted verification from both student and employer, for all employers that hire five or more graduates in a reporting period.  The site visits usually take place within six months of the fifth student's first day of employment, after the placement is entered.

Corinthian has also improved its training, supervision and oversight for placements that are difficult to categorize as "placed" for purposes of meeting accreditation or other regulatory requirements.  As the varying and evolving definitions of "placement" among accreditors and regulators reflect, reaching the proper person to verify employment and determining whether a graduate's employment qualifies as a "placement" is not always easy and can be an art more than a science.  For example, the skills taught in the field of business may be applied to a wide variety of career positions and work environments, and job titles and/or descriptions may not always be sufficient to determine whether or not a position meets the Commission's definition of "placement."

To assist with overcoming these challenges, we developed and regularly revise classification tables for use by the Career Services department of each campus to determine appropriate classification of graduate placements.  We also train employees to further research any job titles or descriptions that are not immediately recognizable as meeting accreditation requirements, to ensure the placement is appropriately classified.

We also began using a Placement Verification Oversight Panel to further ensure appropriate classification of placements that are difficult to classify because of ambiguous job titles or descriptions. The panel consists of members from the Placement Verification and Accreditation & Licensing Departments who review, discuss, and research ambiguous job titles and descriptions to determine appropriate classification for placement.

In addition to continually improving our already-robust placement verification processes, we routinely audit those processes to promote compliance and accuracy. Corinthian's Internal Audit department—which existed even prior to the creation of the Placement Verification Team—employs full-time employees who conduct compliance audits for every single campus on an annual basis. Since April 2012, part of the annual audit has included a visit by the auditors to the physical locations of at least two

employers per campus, which are selected using risk-based criteria. The Internal Audit department reports to the Audit Committee of the Board of Directors.

Corinthian also has an Accreditation and Licensing department that periodically reviews placements, for instance to help campuses prepare for accreditor reviews and site visits. This adds an additional layer of internal oversight and review—and an added reason for campus Career Services personnel to be accurate in the first entry of placements into the system.

Our compliance policy further reinforces the accuracy of the campuses' placement reporting. Corinthian repeatedly communicates that it demands accuracy from its employees, and encourages employees to report any potential wrongdoing through any one of a variety of mechanisms. These include, but are not limited to, reporting through the employees' immediate supervisor or other employees at the campus, who are required to maintain an "open door" and "no-retaliation" policy when it comes to compliance matters; utilizing the Integrity Hotline, which is well-publicized to employees and is made available 24 hours a day, 7 days a week through the web, via phone, or via email, and which accepts anonymous tips to further encourage participation by employees; and/or contacting Human Resources, which also makes itself available to employees, including by giving out cell phone numbers for its personnel so that they may be reached at any time.

As demonstrated by Corinthian's Career Services training, standard operating procedures, thorough placement policy, tools including the pre-approval process and job classification tables, plus a dedicated team for its re-verification efforts, Corinthian strongly believes that the Commission can continue to rely on our classification and verification process and the accuracy of our reporting. The 2014 audit clearly supports such a conclusion. We long for the opportunity to demonstrate the integrity of our placement process in a court of law to rebut the allegations leveled against us in the media and by other agencies.

> ii.    *A detailed description as to how each school determines the classification of graduates as employed in accordance with Appendix VII Guidelines for Employment Classification, Substantive Standards, Standards of Accreditation and specifically how the school defines and determines employment as sustainable and related to the program of study.*

**RESPONSE:**  In addition to following the general process described above regarding classification and verification, each campus determines the classification of graduate employment by carefully examining each placement.  Campuses evaluate potential placements to ensure that the majority of the core skills learned in the program is a predominant component of the job.  In addition, campuses confirm with the employer and/or graduate that the position pays a monetary wage and is intended to be ongoing and sustainable.  Jobs with a pre-determined end date do not typically meet policy guidelines.  For example, a graduate who is hired to work for only one week while

covering for an employee who is on vacation is not allowable. On the other hand, if a graduate resigns or is terminated after only a week and the position was paid and intended to be ongoing and sustainable then the placement is acceptable. In the past, campuses have struggled with the definition of "ongoing and sustainable" when using employment agencies and positions that only hire contract workers, especially where the specific contract work might be temporary but the work with the agency will be ongoing, resulting in sustainable work to multiple, repeated temporary assignments. The placement pre-approval process mentioned above has been extremely helpful in classifying placements as well as the job aids and the training manual. When evaluating agencies, campuses must determine that the graduate is working in-field and that they are eligible to continue receiving assignments before the placement is deemed ongoing and sustainable. The same is true for contract workers. Campuses confirm with the employer or graduate that after the current contract is completed, there is an opportunity for future contracts. If so, the placement is acceptable.

Clearly, placement verification and re-verification constitute a complex process. Consider a Medical Assisting graduate working at Grifols employed in the position of Donor Processor. At first glance, one might not be familiar with the Grifols organization and immediately assume this position would be "out of field." After further review, Grifols is a "global healthcare company whose mission is to improve the health and well-being of people around the world" (www.grifols.com, accessed on December 12, 2014). The company is known for providing protein therapies for patients and has three divisions within the organization: Bioscience, Diagnostic, and Hospital. After reviewing the Donor Processor job description, found at Exhibit 10, one may still have questions as to whether the job would be considered "in field" and if the "position requires a direct use of the majority of the core skills as a predominant component of the job," Exhibit 4, CCi Placement Verification and Waiver Policy, at 2. To be certain, employees from the Compliance, Accreditation and Licensing, and Employer Partnership teams conducted a site visit to Grifols in Orange, California in the spring of 2013. The site visit revealed Donor Processors were working in several different areas of the center from the front desk admitting and scheduling, to answering phone calls from patients to drawing blood and operating hemoglobin machines to labeling, storing and freezing specimens to quality assurance. Furthermore, they worked closely with the registered nurses on duty as well as the physicians that visited the site weekly. The time-consuming verification and classification follow up clearly revealed that this position qualified as a Medical Assisting placement. We note that the audit procedure required by the Commission does not demand the auditor to engage in such an exploration of a qualified placement.

Another example is a Medical Assisting graduate working at Omnicare Call Centers as a Patient Care Representative. At first, Corinthian struggled with verifying a Medical Assistant working in a call center and the potential that s/he would lose their clinical skills while only working with patients over the phone. However, after reading the job description and speaking with the employer, Corinthian learned the organization required employees to have a background in medical assisting. Additionally, the job responsibilities included knowledge of medical insurance, consulting with patients via phone, ensuring appropriate patient therapies, reviewing patient care plans, and

13

working with registered nurses and physicians.  Out of an abundance of caution, the campus had a Program Advisory Committee ("PAC") member, a physician, visit the location to evaluate the position.  The physician agreed that the position was in fact a good fit for a Medical Assisting graduate and he provided his assessment in a written document, attached as Exhibit 11.

Also, at first glance, a Resolution Specialist at Walgreens may appear as if it may be out of field for a Pharmacy Technician graduate.  After further research, it was learned that Walgreens operates a call center that is responsible for resolving third-party rejections which requires understanding dosage administration, insurance authorization processes, familiarity with trade and generic drugs, drug classification and nomenclature.  In addition, the employer gives hiring preference to certified pharmacy technicians.  The skills used on this job are core skills learned in Corinthian's Pharmacy Technician diploma program, as found in Exhibit 12.

These examples demonstrate the detail with which the verification and classification process occurs at Corinthian, including at the campus level.  They also demonstrate the potential false negatives that might result from an audit that fails to delve deeper into the placements, accepting superficial conclusions that might prove inaccurate.

> iii.  *A justification as to how the employment verification process used **prior to** the "Oral Employment Confirmation" represents "diligent efforts."*

**RESPONSE:**  Campuses are directed to use the oral employment confirmation form <u>after</u> written documentation cannot be secured.  This form is utilized to document the oral conversation/confirmation that occurs if the employer/graduate does not or is not willing to provide written confirmation.  The steps prior to utilizing the Oral Employment Confirmation form are as follows:

a.     As noted previously, campuses identify employment either by notification through the graduate or employer.   Upon this notification, the campus will verbally confirm—either through email or the telephone—the employment information. However, the Career Services representative will enter the placement into the official student information system as a "pending" placement.   During the verbal discussion, the school will inform the employer/graduate that a written confirmation form will be provided to them to complete and return;

b.     The written confirmation forms are sent to employers and graduates for completion and noted in CampusVue;

c.     The campus will follow up using various methods (*e.g.* phone, email, text) at different intervals in time (*e.g.* one day, every few hours, morning vs. night, etc.) to attempt to secure the written confirmation.  All attempts are also noted in CampusVue;

d.      Only if the school is unable to secure the written confirmation after multiple attempts, will it then attempt another oral confirmation.  This confirmation will then be documented using the "Oral Employment Confirmation Form."  This form is included as Exhibit 13

The multiple attempts to obtain written verification, which must be documented into CampusVue, represent "diligent efforts" on behalf of the campuses.

Since the Commission's September 15th letter, Corinthian has emphasized the need to have both the employer and graduate oral verification form completed when written verification cannot be obtained.

    *iv.    A description of the Oral Employment Confirmation Process*

**RESPONSE:**  As detailed above in a.iii, the Oral Employment Confirmation process is described.

    *v.      A description of any changes made to the process described above since Corinthian's last response to the Commission.*

**RESPONSE:**  Please see response above in a.iii.  The updated procedure and an example of a completed oral verification form have been included as Exhibit 13.

    *b.      A more detailed explanation as to why less than 30% of the total records reviewed in the audit of the 2013 Annual Report data could be verified by the independent third party auditor to match the school's record and justification as to why Corinthian believes that ACCSC can rely on the school's reported rates given the high percentage of records that could not be verified by the independent third-party auditor.*

**RESPONSE**:  Due to the complexity of the re-verification process and the abundant academic literature available regarding survey research design, we worked closely with Charles River Associates and, in particular, Dr. Jonathan Guryan.  Dr. Guryan is an Associate Professor of Human Development and Social Policy and of Economics, Faculty Fellow at the Institute for Policy Research and a courtesy member of the Economics Department and the Kellogg School of Management at Northwestern University. He is also a Faculty Research Fellow at the National Bureau of Economic Research and a Research Consultant at the Federal Reserve Bank of Chicago.  Our collaboration resulted in material insights relating to the 2013 and 2014 audits.

We explain these insights below in four parts: a review of the academic literature; an analysis of recall bias in survey data; an examination of the "unable to verify" rate by time since employment; and a regression analysis of the 2013 and 2014 Annual Reports' placement information CARS audited.

***Part I: Limitations on Response Rate Identified in Review of Academic Literature***

There exists substantial academic literature on survey research design. Academic studies discuss methods that contribute to high survey response rates, the range of response rates that are typical in surveys, and the difficulties researchers commonly face when attempting to survey respondents. There is consensus in this academic literature that obtaining a high response rate is both costly and difficult, that doing so requires planning (including before initial information is obtained), and that obtaining responses is more difficult and costly, and takes more time, for some respondents than others.

*Baseline Difficulty of Obtaining a High Response Rate*

The academic literature on survey research design concludes clearly that obtaining a high contact rate, or response rate, is difficult. Experts in survey research methodology point out that obtaining a high response rate is particularly difficult when attempting to survey the same group multiple times, something that is referred to as a longitudinal study. These studies explain that doing so requires a significant amount of time and planning, and is costly. Nurco et al. (1977)[1] noted that, "Longitudinal studies with high retention rates cannot be done cheaply." Ribisl et al. (1996) explained, "It appears that in most studies there is a subset of participants who will require extensive time and effort to find," and that "successful tracking of difficult-to-locate participants often takes substantial time commitment." As Olsen (2005) succinctly summarized, "Longitudinal surveys will suffer from attrition and nothing will change that."

Experts in survey research hold that there is no bright line response rate that is required for survey results to be considered valid. Though response rates of 70 to 80 percent are desirable, in practice response rates in academic studies vary significantly. Olsen (2005) summarizes response rates of major federally funded longitudinal studies, such as the National Longitudinal Surveys (NLS), versions which have been conducted since 1966 by the U.S. Bureau of Labor Statistics and the U.S. Census Bureau, and upon which many peer-reviewed published academic studies are based. By 1981, the NLS Young Men sample had a response rate of 65 percent, the NLS Mature Men sample had a response rate of 52.5 percent (74.8 percent corrected for mortality), the NLS Mature Women sample had a response rate of 69.7 percent (73.5 percent corrected for mortality) and the NLS Young Women sample had a response rate of 68.8 percent (69.4 percent corrected for mortality). Olsen (2005) also reports that the Survey of Program Participation, another large federally funded survey also conducted by the U.S. Census Bureau, had a response rate of 73.4 percent after three years, 58.7 percent after 4-5 years, and 53 percent after 9-10 years.

Furthermore, it has become more difficult over time to achieve high response rates as people have become more likely to refuse to participate. Experts on survey research have noted this decline. Schoeni et al. (2013) explain, "Response rates in

---

[1] A bibliography of the cited literature is found at Exhibit 14.

many large cross-sectional surveys in the United States have declined significantly over the past few decades, continuing a pattern that was observed for some major surveys beginning in the middle of the last century (Steeh, 1981; Curtin, Presser, and Singer, 2005; Astrostic, et al. 2001; de Leeuw and de Heer 2002)." Robert Groves, who subsequently was chosen to be the Director of the Census Bureau during the 2010 Census, wrote "Nonresponse to household surveys is growing, inflating the costs of surveys that attempt to achieve high response rates" (Groves 2006).

Experts on survey design agree that the increasing rate at which respondents refuse to participate in surveys has made it harder to achieve high response rates. Berinsky (2008) explains, "Unit non-response [the rate at which respondents do not participate in surveys] has become an increasingly serious problem over the last 40 years. Studies in the 1990s demonstrated that face-to-face surveys by academic organizations, such as the National Election Study (NES) and the General Social Survey (GSS), have non-response rates between 25 and 30%, up from 15 to 20% in the 1950s (Brehm, 1993; Luevano, 1994; Groves & Couper, 1998). Telephone surveys conducted by commercial polling houses, which produce the majority of polling information in circulation in the political world, are often even higher. For instance, in a study of polls conducted by the news media and government contractors, Krosnick, Holbrook, and Pfent (2005) found that the mean response rate for these surveys was 36%."

With regard to the CARS re-verification efforts the difficulty in achieving a high response rate may be even more difficult than that experienced by those collecting information for a longitudinal survey such as those described above.  As noted, response rates are higher after adjusting for mortality, but no similar adjustment is suggested or used for firms that no longer exist. Since approximately 20-25 percent of all firms shut down every year according to the U.S. Census Bureau, the effect on the unable-to-contact rate could be substantial.  In addition, the CARS re-verification process involves a third party attempting to contact an employer for which it has no direct relationship or prior contact to collect information on an historic hire.  In addition, increasing awareness and concern about privacy issues may make a third-party verification process even more difficult.

The more time that passes between the initial contact with respondents and the follow-up attempt, the lower response rates tend to be. Tracking individuals and firms becomes more difficult as time passes, in part, because contact information changes, people move, and firms close. As noted above, approximately 20-25 percent of firms shut down every year. According to the American Community Survey, a nationally representative survey conducted by the U.S. Census, between 11 and 12 percent of individuals in the U.S. move residences every year. One could have valid contact information for these firms and individuals and that contact information would not allow you to contact them a year later.

17

*Mobility of Graduates Compounds the Problem*

The academic literature on survey methods is clear that obtaining a high response rate takes time and resources. Some respondents are harder to reach than others. Respondents who are more mobile, who are more likely to change their address, phone number and contact information, and who have more demands on their time tend to be more difficult to reach. For these reasons individuals from lower socioeconomic status demographic groups tend to be more difficult to contact and survey. An example of the relationship between socioeconomic status and the difficulty of contacting can be seen in the studies that the U.S. Census Bureau conducts after every decennial census to measure rates of undercount. The undercount is the degree to which the U.S. Census misses individuals from different demographic groups in the official Census enumeration. In every census since 1980, when the Census began conducting undercount studies, the U.S. Census has undercounted African-American and Hispanic individuals at a higher rate than whites. Individuals who rent their place of residence are less likely to be counted in the Census than those who own their home (Mule, 2012).

*More Contact Attempts And Longer-Duration Surveys Lead to Higher Contact Rates*

Academic studies explain that achieving high response rates requires time, and that higher response rates come with more contact attempts.

Cotter et al. (2005) show that there is a strong relationship between the number of contact attempts (*i.e.*, an attempted phone call) and the response rate. Cotter et al. (2005) report response rates ranging from 20 to 40 percent from the first five contact attempts, 35 to 70 percent after 10 contact attempts, and 45 to 90 percent after 20 contact attempts. Similarly, Scott (2004) reports that two different studies showed response rates near 30 percent after 10 contact attempts, near 50 percent after 15 contact attempts, near 70 percent after 20 contacts and only reached 80 percent after 25 to 30 contact attempts. This strong relationship between the number of contact attempts and the response rate is consistent with the idea that some respondents are easier to reach while others require more time and more attempts.

As noted above in Section 1, the 2013 audit suffered both from a brief period for contacting employers and graduates as well as a small number of contact attempts. The entire calling campaign for the 2013 audit lasted a mere *23 days*. In contrast, the 2014 audit lasted for 43 days and resulted in nearly a 90% response rate. The 2013 audit required the auditor to make up to a mere *nine* attempts to contact the employer before another up to *seven* attempts to contact the graduate were made. In total, only *sixteen* attempted contacts were made in the 2013 audit. In contrast, the 2014 audit required up to *thirty* employer attempts followed by up to *thirty* graduate attempts, for a total of *sixty* contact attempts. Although the lengthened time period and these increased contacts produced a number of angry graduates and employers, they

increased the response rate significantly.  However, these two factors do not solely account for the improved response rate in the 2014 audit.

The academic literature on survey research methodology prescribes practices that have been found to increase researchers' ability to follow respondents over time, and increase response rates in longitudinal surveys (Desmond et al. (1995), Ribisl et al. (1996), Sullivan et al. (1996)). Experts in this area stress the importance of planning at the outset of the study to lay the groundwork for following respondents over time. Sullivan et al. (1996) explains, "Longitudinal data collection can be less daunting when a systematic program of tracking techniques is conceptualized before the research begins and is used throughout the research process (Capaldi & Patterson, 1987; Gregory, Lohr, & Gilchrist, 1992; Ribisl et al., in press; Rumptz et al., 1991; Showstack, Hargreaves, Glick & O'Brien, 1978)."

Specific practices that are recommended include: making respondents aware that they are going to be contacted in the future (Groves (2006)), explaining the purpose of the study and conveying the mission of the research to respondents as a way to get them excited about participating and responding to future contact attempts (on this point Scott (2004) stresses, "Those who do not understand the expectations for participation or who are not properly motivated will more likely refuse to participate, be more difficult to locate, and be unresponsive to calls."), and gathering information about respondents' social networks that can be used to track respondents who change their address, phone number or other contact information over time. One example strategy that some researchers use is to ask respondents for the contact information of three people who would be able to get in touch with them if they move or their phone number changes. Sullivan et al. (1996) concludes, "… it is important to make multiple contacts with participants by phone and in person but that identifying and gaining access to participants' social and community networks is crucial to attaining high retention rates."

The importance of this up-front planning highlights the difficulty in tracking people, and businesses, over time. It also points out a difference between the conditions under which academic researchers conduct longitudinal studies and the CARS re-verification audits. Longitudinal surveys conducted for academic research purposefully plan from the outset to be able to track respondents multiple times over months or years. The response rates these planned studies are able to achieve are enhanced because the subjects knew at the time the study began that they would be attempting to resurvey people in the future.  Such efforts geared toward future contact have not been utilized with Corinthian students and employers at the outset of their relationship with us.  Advance planning to contact graduates and employers years after the fact is very different than maintaining documentation substantiating a placement.

Another method experts recommend as necessary for achieving high response rates is to provide monetary incentives for responding (Desmond et al. (1995), Groves (2006), Schoeni et al. (2013), Ribisl et al. (1996)). Incentives can have large effects on the likelihood that respondents will participate in the survey. Lesser et al. (1999) finds that providing incentives increased response rates in mail surveys by 15 to 20

19

percentage points. In fact, at least one employer has demanded such an incentive—in this case $30 per response—in order to respond to the multiple verification requests imposed upon it by the campus, by the Placement Verification Team, by Internal Audit, by Corinthian's regional personnel per the five-plus rule and now by a second third-party audit mandated by the Commission.  With so much time-demanding contact unrelated to the employee's core job functions, employer fatigue and incentive demands are understandable.

The academic literature helps explain the response rate to the 2013 audit (and the improved response rate to the 2014 audit).

### Part II: Recall Bias in Survey Data

It is important to consider both the validity (or accuracy) and reliability of data collected using survey methods. The degree to which data is valid and reliable affects how much confidence should be placed in the data. Errors exist in all survey data; for example, the interviewer may incorrectly enter information into the computer or the survey respondent may give incorrect information, either intentionally or unintentionally. "Recall bias" is a type of bias that has been observed in survey data when individuals are asked about events that have occurred in the past. This type of error can occur because individuals asked about a past event or circumstance can forget the event, recall the event incorrectly, or recall the timing or duration of the event incorrectly.

Academic social scientists note that the degree of recall bias increases with the amount of time that has elapsed between the survey and the event or circumstance that is the subject of questioning.  (See, e.g., Dex, Shirley. 1995. "The Reliability of Recall Data: a Literature Review." *Bulletin de Méthodologie Sociologiqe* 49: 58-89.  In the field of labor economics, a body of literature dating back several decades examines the existence of recall bias and its impact on the reliability and validity of retrospective data on employment histories. For example, research by the current Chair of the U.S. Federal Reserve Bank, Janet Yellen, documents that it is common for survey respondents in standard labor market surveys to forget that they were unemployed when asked about unemployment spells that happened in the recent past (Akerloff, George and Janet Yellen. 1985. "Unemployment Through the Filter of Memory," *Quarterly Journal of Economics* 100(3): 747-773). Other studies that document recall bias in labor market survey data include: Evans and Leighton, 1995; Song, 2007; Mathiowetz and Duncan, 1988; and Pierret, 2001. In addition to the more customary recall bias that occurs when surveying individuals regarding their own employment histories, retrospective data that is collected from a new respondent (compared to similar data collected from an original respondent during an earlier time frame) is subject to additional error, as the new respondent may be relying on different information (i.e., employment records, personal memories) than the original respondent. (Fraser, Stuart, Francis J. Greene, and Kevin F. Mole. 2007. "Sources of Bias in the Recall of Self-Generated Data: The Role of Anchoring." *British Journal of Management* 18: 192-208.)

Recall bias likely contributed to the results of the 2013 audit, perhaps most notably in the "placed but different" category. For additional explanation of causes for the "placed but different" rates, please see the discussion in the section entitled *Classification and Record Keeping* on page _ above

### Part III: "Unable to Verify" Rate by Time Since Employment

The 2013 and 2014 audit data suggests that the age of the placement data being audited also likely contributed to the high "unable to verify" rate for the 2013 data.

In order to evaluate any effect of the staleness of employment data on the "unable to verify" rate, we measured the number of days between the later of the graduation date or the employment date and the final day of the CARS re-verification campaign. We then divided this number by 30, approximately measuring the number of months between the start of employment and the final date that CARS attempted to verify a placement. Figures 1 through 4 below illustrate the positive correlation that we found between the staleness of the placement data and the "unable to verify" rate.

An important distinction between the 2013 and the 2014 CARS audits is evident from these figures and is worth noting. In the 2013 audit, the shortest amount of time that elapsed between a placement and the end of the CARS campaign was 9 months, whereas in the 2014 audit some placements were re-verified within 3 months. The longest amount of time between placement and verification in the 2013 audit was 50 months, versus 45 months in the 2014 audit. The majority of re-verification attempts occurred within 14 and 32 months in the 2013 audit, but within 8 and 26 months in the 2014 audit. In the 2014 audit, CARS was working with data that was more recent and less stale.

Figure 1 illustrates the relationship between the staleness of data and the "unable to verify" rate using the 2013 CARS audit data by calculating an "unable to verify" rate for each 30-day bin, defined by the number of months between the start of employment and the end of the CARS campaign. For example, 50 percent of attempted placement re-verification 10 months following placement were deemed "unable to verify." The resulting points were graphed below, with the number of 30-day periods between placement and re-verification on the horizontal axis, and the proportion of graduates "unable to verify" on the vertical axis. There was an upward slope and correlation, with more graduates becoming "unable to verify" as more time passed between placement and re-verification (*i.e.*, as the contact information became more stale). Indeed, the data exhibits an upward, logarithmic trend as illustrated below, though the coefficient on the weighted logarithmic trend is not statistically significant.



Figure 2 illustrates the same data in a slightly different manner.  Here, we have the same horizontal and vertical axes as in Figure 1, but the data points are illustrated as bubbles depicted in sizes relative to the number of graduates in each month's bin. The figure shows that most graduates were re-verified between 14 and 32 months following their placement.  Here, the upward trend is illustrated using a weighted trend line, though its coefficient is also not statistically significant.



In the 2014 CARS audit data, the upward time trend is both larger in magnitude and statistically significant.  Importantly, the "unable to verify" rate was more strongly related to the staleness of the contact information, which suggests that as CARS increased the number of contact attempts in the new campaign, it was relatively more successful at contacting graduates and employers with more recent, less stale contact information. In other words, when CARS made more attempts (and, as the data as a whole became less stale in 2014), the "unable to verify" rate declined more for those with less stale contact information. Figure 3 is analogous to Figure 1 above, graphing the relationship between the "unable to verify" rate and the time between placement and re-verification over time, but using the 2014 CARS audit data.  Here, notice that the longest period between placement and re-verification was 45 months, while in the 2013 audit, re-verification could have occurred as many as four years, two months following placement.  Similarly, the shortest period between placement and re-verification was 3 months in the 2014 audit, but 9 months in the 2013 audit.  The upward time-trend can be seen more clearly in the new data than in the 2013 audit data, and here the weighted logarithmic trend line is both larger in magnitude and statistically significant: the older or more "stale" the placement data, the higher the "unable to verify" rate.



Figure 3
Percent 'Unable to Verify' by 30-Day Bin
New CARS Campaign
December 2014

$y = 0.049\ln(x) - 0.0236$

Number of 30-Day Periods between Placement and CARS Verification

Proportion of Graduates Unable to Be Verified

—— Percent 'Unable to Verify' by 30-Day Bins      —— Logarithmic Trendline

Source: CARS data.

Figure 4 is analogous to Figure 2, but uses data from the 2014 CARS audit.  In the 2014 audit, most graduates are re-verified between 8 and 26 months following placement.  Here again, the weighted linear trend line is both larger in magnitude (steeper) than that of the 2013 CARS audit and statistically significant: the staler the data, the more unlikely CARS was able to contact the graduate or their employer and get them to participate.



Figure 4
Percent 'Unable to Verify' by 30-Day Bin
New CARS Campaign
December 2014

Source: CARS data.

The impact of the stale data due to the time lag was clearly a significant factor in the response rate in both the 2013 and 2014 audits, and the improved methodology of the 2014 audit (and more recent data) likely contributed to a higher response rate.

### Part IV: Regression Analysis of 2013 and 2014 CARS Audits

Charles River Associates' analysis of data from the 2013 audit and the 2014 audit shows that the placed rate was higher, the invalid rate was essentially constant and the share of placements that CARS was unable to verify was lower in the 2014 audit as compared with the 2013 audit. In the 2014 audit, CARS attempted more calls to graduates and employers before deeming a placement "unable to verify." When CARS attempted more calls in the 2014 audit, they were able to reach more graduates and employers, and as a result the "unable to verify" rate declined and the verification rate increased. This pattern implies that those placements that CARS was unable to verify in the 2013 audit *were likely to have been valid placements*, and that had the original re-verification process included more attempts to contact the graduates and employers, these placements would have been classified as verified.

Charles River Associates conducted a statistical analysis of the 2013 and 2014 CARS audits. That analysis found that employer and student characteristics explain patterns in the likelihood a placement was deemed "unable to verify" or "invalid" in ways that should be expected given the experiences described by survey research experts in the academic literature.

Specifically, the analysis found that CARS was less likely to be able to contact employers that had changed addresses recently, were fewer than five years old, or that had a large number of employees. The analysis also found that CARS was less likely to be able to contact self-employed graduates (who had one phone number for CARS to contact rather than the typical two), graduates who had high absence rates while they were in school, and graduates who had an expected family contribution of zero (meaning they were low-income and had high financial need when they were in school). In addition, the analysis found that the more time had passed between the student's graduation and the CARS contact attempts the less likely CARS was able to contact the graduate or employer.

Together these findings suggest that contact information that was up-to-date at the time Corinthian verified placements and reported them to ACCSC had become stale by the time CARS attempted to re-verify. As time passed, companies moved and changed their contact information, graduates moved and changed their phone numbers, and there was turnover of employees at the companies where graduates were placed. The academic literature on longitudinal survey research warns that tracking survey respondents over time is particularly difficult, and statistical analysis suggests that the CARS experience was typical. The results from the 2014 CARS re-verification audit show that when more planning was possible, the data more recent and when CARS made more attempts to contact graduates and employers, it was possible to achieve a high response rate, one that would be considered high by the standards used in academic studies, and a low "invalid" rate.

The details of the statistical analysis Charles River Associates performed are as follows. They performed linear probability regression analysis to determine which, if any, characteristics of the graduate or of the firms at which the graduate was placed were associated with the likelihood that the placement would be classified as "unable to verify" or "invalid." Characteristics of the graduate were drawn from Corinthian's CampusVue database, and include the age and gender of the graduate, whether the placement was into self-employment, whether or not the graduate's expected family contribution (EFC) as a student was zero (an indicator of low income and resources prior to or during enrollment), the graduate's veteran status, the graduate's absence-rate during his or her degree program, whether the student graduated from a diploma or associate degree program, and a broad categorization of the student's field of study (based on two-digit CIP code) into "Trades and Repair Technicians," "Health," and "Other." Charles River Associates included several characteristics of the neighborhood where the graduate's campus is located: the percent of the population in the school's zip code with at least a four-year college degree, the percent of the population in the school's zip code living in the same house as last year, and the percent change in the number of employees working in the school's zip code. The former two were measured in the 2013 American Community Survey, and the latter was drawn from the County Business Patterns data, both produced by the U.S. Census Bureau. Finally, characteristics of the firm were found by matching proprietary data from Dun & Bradstreet to each graduate's CARS record by employer name, phone number, and address. These characteristics include whether the company was fewer than five years

old, whether the business recently moved, the total number of employees at all locations of the firm, and whether the graduate was working at a headquarter, branch, or the only location of the firm.

Tables 1 and 2 present analyses of the "unable to verify" rate, for the 2013 and 2014 CARS audits, respectively. Tables 3 and 4 present analyses of the "invalid" rate among those whom CARS was not unable to contact, for the 2013 and 2014 CARS audits, respectively. In each of the tables, the first column presents the coefficient, which can be interpreted as the effect that the characteristic has on the probability of the placement being found "unable to verify" or "invalid" as indicated by the table heading. The second column shows the p-value, or the statistical estimate of the probability that the effect of the variable on the "unable to verify" or "invalid" rate is zero; the lower the p-value, the less likely the relationship observed in the data is due to chance, and the more likely the variable had an effect on the "unable to verify" or "invalid" rate.  The third column states whether or not the coefficient is statistically significant at the 5-percent level, a standard threshold commonly used in social science.

Tables 1 and 2 present the results of linear regressions on the probability of the placement being "unable to verify" for the 2013 and 2014 audits, respectively. The results show that characteristics of firms and students contributed to the rate at which CARS was unable to contact graduates and businesses. In the 2013 audit, CARS was 10.5 percent less likely to contact firms that recently moved addresses than firms that had not changed address. It is perhaps not surprising that it was more difficult for CARS to contact firms that had moved, since their contact information may have changed between when Corinthian submitted the placement to ACCSC and when CARS conducted the re-verification audit. CARS was also 23 percent less likely to contact graduates who were self-employed, which may have resulted from a self-employed graduate having only one phone number to contact (the graduate and employer are the same) versus other graduates having two (both a graduate and an employer phone number). Students who graduated in health fields were about 10.3 percent more likely and those who graduated in "other" fields are about 13.1 percent more likely to be "unable to contact" than graduates from technical or trade fields. This indicates that the ability to contact was related to features of the types of businesses where graduates worked; some businesses are set up in a way that makes them easier for a third-party company like CARS to get them to participate in re-verification.

Characteristics of students also contributed to the unable to contact rate in the initial campaign. Graduates who missed class more often while they were in school were more likely to be unable to contact. This result is consistent with the finding in the academic literature on survey methodology that in every survey it is harder to get some individuals than others to participate. Perhaps the types of students who miss class regularly are also the types of students who resist participating when a third-party auditor calls them.

Table 2 shows that many of the patterns of "unable to verify" rates that we found for the 2013 audit were also present in the 2014 audit.  Self-employed graduates were

30.2 percent more likely to be unable to verify, and firms that recently moved were 7.7 percent more likely to be unable to contact.  Similarly, graduates who missed class more often (i.e. those with a higher absence rate) were more likely to be unable to contact in the 2014 CARS audit, as they were in the initial CARS campaign. The analysis also finds that graduates who attended campuses where a higher share of the population lived in the same house as the prior year had lower unable to contact rates. In other words, CARS had more difficulty contacting graduates who attend campuses in neighborhoods where more people move every year. This result suggests that graduates who were more likely to have moved since graduation were harder to contact.

Several characteristics were significant in the 2014 audit and were not significant in the 2013 audit. Females were less likely (2.4 percent) to be "unable to verify" while graduates with an EFC of zero were more likely (3.4 percent) to be "unable to verify." Age was also positively correlated with the "unable to verify" rate in the 2014 audit.

**Table 1**
**Linear Probability Regression:**
**Firm and Graduate Factors Correlated with Placement being**
**'Unable to Contact'**
**Initial CARS Cohort**

**August 2014**

| Variable | Coefficient | Probability that the Marginal Effect is Zero | Statistically Significant ? |
|---|---|---|---|
| *Characteristics of Graduate* | | | |
| Female | -0.015 | 56.8% | NO |
| Age | 0.000 | 81.0% | NO |
| Self-Employed | 0.230 | 0.0% | YES |
| Expected Family Contribution of Zero | 0.030 | 7.2% | NO |
| Veteran | -0.003 | 93.2% | NO |
| Absence Rate during Program | 0.005 | 0.0% | YES |
| *Characteristics of Degree* | | | |
| Associate Degree | -0.069 | 5.8% | NO |
| Health Field | 0.103 | 0.0% | YES |
| Other Field | 0.131 | 0.7% | YES |
| *Characteristics of Campus Neighborhood* | | | |
| Percent Change in # Employed 2011-12 | 0.100 | 25.2% | NO |
| Percent of Population with 4-year College Degree | -0.001 | 8.5% | NO |
| Percent of Population Living in Same House as Last Year | 0.000 | 82.9% | NO |
| *Characteristics of the Firm* | | | |
| Less Than 5 Years Old | 0.032 | 10.6% | NO |
| Log of Total Number of Employees | 0.020 | 0.1% | YES |
| HQ Location | 0.040 | 19.2% | NO |
| Branch Location | -0.030 | 59.7% | NO |
| Firm Has Recently Moved | 0.105 | 0.1% | YES |

Source: Data provided by CCI, CARS, 2013 ACS, 2011 & 2012 County Business Patterns, and Dun & Bradstreet.

Note: Linear probability model with dependent variable being 'unable to verify' placement status. The initial CARS campaign consisted of 4,420 placements that CARS attempted to re-verify between May 15, 2014, and August 20, 2014. 4,394 of these were non-duplicate graduates (unique individuals) that were match to a final employment record from the CCI CampusVue system. Each one of these records was matched to characteristics of the campus neighborhood by the campus zip code. 4,270 of these records were matched to proprietary, firm-level data from Dun & Bradstreet. Female, self-employment (identified by the employment verification team's placement status), veteran status, and "expected family contribution (EFC) of zero" are indicator variables. Information on expected family contribution came from the graduate's most recently filed FAFSA. Age is measured in years and "absence rate during program" is the raw percentage of classes missed by the graduate during the course of their program. Indicator variables were included for records missing age, EFC, or absence rate information. All characteristics of the degree are indicator variables. A degree was either an associate degree or a diploma (excluded). The field of study was determined based on the 2-digit CIP code of the degree; a degree was either "trades and repair technicians" (excluded), "health", or "other." Characteristics of the campus neighborhood came from the 2013 American Community Survey 5-year estimates at the zip-code level (percent of population with at least a 4-year college degree and percent of population living in the same house as last year) and from the 2011 and 2012 County Business Patterns at the zip-code level (percent change in number employed in 2011-2012). Characteristics of the firm came from proprietary firm-level data maintained by Dun & Bradstreet, and merged onto the CARS data based on employer name, address, and phone number.

29

**Table 2**
**Linear Probability Regression:**
**Firm and Graduate Factors Correlated with Placement being**
**'Unable to Contact'**
**New CARS Cohort**

**December 2014**

| Variable | Coefficient | Probability that the Marginal Effect is Zero | Statistically Significant ? |
|---|---|---|---|
| *Characteristics of Graduate* | | | |
| Female | -0.036 | 0.1% | YES |
| Age | 0.001 | 3.8% | YES |
| Self-Employed | 0.302 | 0.0% | YES |
| Expected Family Contribution of Zero | 0.031 | 0.1% | YES |
| Veteran | -0.032 | 6.6% | NO |
| Absence Rate during Program | 0.002 | 0.1% | YES |
| *Characteristics of Degree* | | | |
| Associate Degree | 0.056 | 1.4% | YES |
| Health Field | 0.005 | 60.6% | NO |
| Other Field | -0.012 | 48.2% | NO |
| *Characteristics of Campus Neighborhood* | | | |
| Percent Change in # Employed 2011-12 | 0.054 | 34.1% | NO |
| Percent of Population with 4-year College Degree | 0.000 | 50.4% | NO |
| Percent of Population Living in Same House as Last Year | -0.002 | 0.1% | YES |
| *Characteristics of the Firm* | | | |
| Less Than 5 Years Old | 0.022 | 5.1% | NO |
| Log of Total Number of Employees | 0.000 | 91.1% | NO |
| HQ Location | -0.007 | 68.9% | NO |
| Branch Location | -0.066 | 9.7% | NO |
| Firm Has Recently Moved | 0.077 | 0.1% | YES |

Source: Data provided by CCI, CARS, 2013 ACS, 2011 & 2012 County Business Patterns, and Dun & Bradstreet.

Note: Linear probability model with dependent variable being 'unable to verify' placement status. The new CARS campaign consisted of 5,254 placements that CARS attempted to re-verify between October 21, 2014, and December 20, 2014. 4,998 of these were non-duplicate graduates (unique individuals) that were matched to a final employment record from the CCI CampusVue system. Each one of these records was matched to characteristics of the campus neighborhood by the campus zip code. 4,937 of these records were matched to proprietary, firm-level data from Dun & Bradstreet. Female, self-employment (identified by the employment verification team's placement status), veteran status, and "expected family contribution (EFC) of zero" are indicator variables. Information on expected family contribution came from the graduate's most recently filed FAFSA. Age is measured in years and "absence rate during program" is the raw percentage of classes missed by the graduate during the course of their program. Indicator variables were included for records missing age, EFC, or absence rate information. All characteristics of the degree are indicator variables. A degree was either an associate degree or a diploma (excluded). The field of study was determined based on the 2-digit CIP code of the degree; a degree was either "trades and repair technicians" (excluded), "health", or "other." Characteristics of the campus neighborhood came from the 2013 American Community Survey 5-year estimates at the zip-code level (percent of population with at least a 4-year college degree and percent of population living in the same house as last year) and from the 2011 and 2012 County Business Patterns at the zip-code level (percent change in number employed in 2011-2012). Characteristics of the firm came from proprietary firm-level data maintained by Dun & Bradstreet, and merged onto the CARS data based on employer name, address, and phone number.

Tables 3 and 4 present analyses of the likelihood of placements being deemed "invalid" by CARS, among those placements that CARS was able to contact. The previous analyses investigated patterns in the ability of CARS to contact graduates and employers; these analyses investigate patterns of verification among those CARS was able to contact. The overall "invalid" rate was low in both the 2013 and 2014 CARS audits.  The analyses in tables 3 and 4 investigate an outcome that occurred infrequently, but show which student and employer characteristics were associated with this infrequent outcome happening relatively more often. Table 3 shows results for the 2013 CARS audit. The results show that the placement of a self-employed graduate was 25.3 percent more likely to be found "invalid" than that of a non-self-employed graduate.

Table 4 presents similar results for the 2014 audit. The results show that in the 2014 audit, the placement of a self-employed graduate was actually 4 percent *less* likely to be found "invalid" than that of a non-self-employed graduate.  Additionally, the placements of graduates working at firms fewer than five years old were 2 percent more likely to be considered "invalid."  Other statistically significant graduate characteristics include an EFC of zero (1.3 percent more likely to be "invalid") and the absence rate during the program (a 10 percentage-point increase in the absence rate is associated with a 1 percentage-point increase in the probability of being "invalid").  Additionally, placements at firms that had recently moved were 5.1 percent more likely to be deemed "invalid."

Table 3
Linear Probability Regression:
Firm and Graduate Factors Correlated with Placement being 'Invalid'
Initial CARS Cohort

August 2014

| Variable | Coefficient | Probability that the Marginal Effect is Zero | Statistically Significant ? |
|---|---|---|---|
| *Characteristics of Graduate* | | | |
| Female | 0.005 | 78.3% | NO |
| Age | 0.001 | 9.7% | NO |
| Self-Employed | 0.253 | 3.8% | YES |
| Expected Family Contribution of Zero | 0.010 | 39.6% | NO |
| Veteran | -0.009 | 67.8% | NO |
| Absence Rate during Program | 0.001 | 14.4% | NO |
| *Characteristics of Degree* | | | |
| Associate Degree | 0.002 | 93.5% | NO |
| Health Field | 0.018 | 36.7% | NO |
| Other Field | -0.044 | 14.1% | NO |
| *Characteristics of Campus Neighborhood* | | | |
| Percent Change in # Employed 2011-12 | -0.074 | 35.6% | NO |
| Percent of Population with 4-year College Degree | 0.000 | 77.3% | NO |
| Percent of Population Living in Same House as Last Year | 0.000 | 93.4% | NO |
| *Characteristics of the Firm* | | | |
| Less Than 5 Years Old | 0.028 | 6.1% | NO |
| Log of Total Number of Employees | -0.003 | 41.3% | NO |
| HQ Location | -0.032 | 6.5% | NO |
| Branch Location | -0.015 | 73.3% | NO |
| Firm Has Recently Moved | 0.009 | 73.1% | NO |

Source: Data provided by CCI, CARS, 2013 ACS, 2011 & 2012 County Business Patterns, and Dun & Bradstreet.

Note: Linear probability model with dependent variable being 'invalid' placement status. The initial CARS campaign consisted of 4,420 placements that CARS attempted to re-verify between May 15, 2014, and August 20, 2014. 4,394 of these were non-duplicate graduates (unique individuals) that were match to a final employment record from the CCI CampusVue system. Each one of these records was matched to characteristics of the campus neighborhood by the campus zip code. 4,270 of these records were matched to proprietary, firm-level data from Dun & Bradstreet. Female, self-employment (identified by the employment verification team's placement status), veteran status, and "expected family contribution (EFC) of zero" are indicator variables. Information on expected family contribution came from the graduate's most recently filed FAFSA. Age is measured in years and "absence rate during program" is the raw percentage of classes missed by the graduate during the course of their program. Indicator variables were included for records missing age, EFC, or absence rate information. All characteristics of the degree are indicator variables. A degree was either an associate degree or a diploma (excluded). The field of study was determined based on the 2-digit CIP code of the degree; a degree was either "trades and repair technicians" (excluded), "health", or "other." Characteristics of the campus neighborhood came from the 2013 American Community Survey 5-year estimates at the zip-code level (percent of population with at least a 4-year college degree and percent of population living in the same house as last year) and from the 2011 and 2012 County Business Patterns at the zip-code level (percent change in number employed in 2011-2012). Characteristics of the firm came from proprietary firm-level data maintained by Dun & Bradstreet, and merged onto the CARS data based on employer name, address, and phone number.

**Table 4**
**Linear Probability Regression:**
**Firm and Graduate Factors Correlated with Placement being 'Invalid'**
**New CARS Cohort**

**December 2014**

| Variable | Coefficient | Probability that the Marginal Effect is Zero | Statistically Significant ? |
|---|---|---|---|
| *Characteristics of Graduate* | | | |
| Female | 0.004 | 56.1% | NO |
| Age | 0.001 | 7.8% | NO |
| Self-Employed | -0.042 | 0.0% | YES |
| Expected Family Contribution of Zero | 0.013 | 2.6% | YES |
| Veteran | 0.000 | 97.0% | NO |
| Absence Rate during Program | 0.002 | 0.1% | YES |
| *Characteristics of Degree* | | | |
| Associate Degree | -0.010 | 28.7% | NO |
| Health Field | -0.003 | 63.0% | NO |
| Other Field | 0.014 | 23.5% | NO |
| *Characteristics of Campus Neighborhood* | | | |
| Percent Change in # Employed 2011-12 | 0.009 | 83.1% | NO |
| Percent of Population with 4-year College Degree | 0.000 | 49.2% | NO |
| Percent of Population Living in Same House as Last Year | 0.000 | 31.7% | NO |
| *Characteristics of the Firm* | | | |
| Less Than 5 Years Old | 0.020 | 1.8% | YES |
| Log of Total Number of Employees | -0.004 | 9.6% | NO |
| HQ Location | -0.007 | 48.4% | NO |
| Branch Location | -0.001 | 94.6% | NO |
| Firm Has Recently Moved | 0.051 | 1.1% | YES |

Source: Data provided by CCI, CARS, 2013 ACS, 2011 & 2012 County Business Patterns, and Dun & Bradstreet.

Note: Linear probability model with dependent variable being 'invalid' placement status. The new CARS campaign consisted of 5,254 placements that CARS attempted to re-verify between October 21, 2014, and December 20, 2014. 4,998 of these were non-duplicate graduates (unique individuals) that were matched to a final employment record from the CCI CampusVue system. Each one of these records was matched to characteristics of the campus neighborhood by the campus zip code. 4,937 of these records were matched to proprietary, firm-level data from Dun & Bradstreet. Female, self-employment (identified by the employment verification team's placement status), veteran status, and "expected family contribution (EFC) of zero" are indicator variables. Information on expected family contribution came from the graduate's most recently filed FAFSA. Age is measured in years and "absence rate during program" is the raw percentage of classes missed by the graduate during the course of their program. Indicator variables were included for records missing age, EFC, or absence rate information. All characteristics of the degree are indicator variables. A degree was either an associate degree or a diploma (excluded). The field of study was determined based on the 2-digit CIP code of the degree; a degree was either "trades and repair technicians" (excluded), "health", or "other." Characteristics of the campus neighborhood came from the 2013 American Community Survey 5-year estimates at the zip-code level (percent of population with at least a 4-year college degree and percent of population living in the same house as last year) and from the 2011 and 2012 County Business Patterns at the zip-code level (percent change in number employed in 2011-2012). Characteristics of the firm came from proprietary firm-level data maintained by Dun & Bradstreet, and merged onto the CARS data based on employer name, address, and phone number.

33

In short, there are many statistically supportable and literature-explained reasons why the 2013 audit results were what they were. Importantly, these reasons are independent of deficiencies in Corinthian's underlying data, and relate to the audit methodology and to the characteristics of the employers and people involved.

> c.    An analysis as to the efficacy of Corinthian's second-level review conducted by the "independent employment verification team at the CSC" in identifying and correcting the types of errors and inaccuracies found by the independent third-party auditor as described in this letter and a justification as to why the commission can rely on this process to produce accurate reporting.

**RESPONSE:**  Corinthian is proud of its secondary placement verification, also referred to as re-verification, which is a voluntary additional step added to ensure the accuracy of its reporting, above and beyond what Corinthian's accreditors and other regulators require. The Campus Support Center Employment Verification Team, which consists of 15 staff members, one verification manager, one quality assurance and training manager and one director, is located apart from the campuses which initially input placement data. To demonstrate job responsibilities and reporting structure, job descriptions for each position as well as the organizational chart are attached as Exhibit 15.

As noted above, the Employment Verification Team, before 2014, attempted to re-verify 100% of placements entered by campuses into CampusVue. Typically the Employment Verification Team was able to re-verify 85-90 percent of the placements that the campuses had previously verified. The Employment Verification Team attempted to re-verify the placements by contacting the employer and/or the graduate to ensure that the information was accurate. In particular, the team sought to determine: (1) whether the placement data on file matched information provided by employers and graduates; and (2) whether the placement met accreditor standards. Placements failing to meet these standards in this process were removed from the system. In this way, the Employment Verification Team identified and corrected errors and inaccuracies, including those ostensibly identified in the 2013 CARS audit.

Also as described above, between May 2013 and March 2014 a new process was implemented which systemically prevented the entry of placement into CampusVue until the placement has been re-verified by the Employment Verification Team. This ensures that 100 percent of all placements in the system have been re-verified. Importantly only re-verified placements are used for internal and external reporting purposes. During the re-verification process if a discrepancy arises, the placement is classified as an "Open Verification," requiring the campus to either remove the "pending" placement or submit additional documentation to demonstrate to the Verification Team that the placement should remain. As before, however, if the Employment Verification Team and the campus are unable to resolve the status of the placement, an "Appeals Panel" provides the final level of review. Campuses requesting an appeal must submit all documentation as well as an appeal form, attached as Exhibit

34

16, describing the rationale for appealing the Employment Verification team's determination. The Appeals Panel consists of members of the Compliance, Accreditation & Licensing Departments and a neutral field representative.

Corinthian believes that the improved process has increased not only the contact rate with employers by reducing the time between hiring of the graduate and contact by the Employment Verification Team, but has also increased the accuracy of the placement data.  In sum, the Employment Verification Team has reduced potential issues with incomplete and inaccurate documentation and has enhanced accuracy in counting proper placements by closer examination of job titles, job duties, and sustainability of employment.

> *d.    With regard to the 2013 Annual Report data, provide re-calculated Graduation and Employment Charts where Corinthian has re-classified the employment status of any graduates based on the general findings outlined in this letter (e.g., the employment does align to the majority of the program objectives, is not sustainable, etc.). Provide a matrix which shows the rate previously reported against the newly calculated rate and an explanation as to the reason(s) for the differences.*

**RESPONSE**:  After reviewing the audit from the 2013 Annual Report, Corinthian found three out of 4,293 placements submitted to CARS we now believe to be "out of field."  This amounts to an overall change of 0.00069%.  All three placements have been removed from CampusVue.  Based on this finding, two Graduation and Employment Charts have been updated and are included as Exhibit 17.  A matrix outlining the changes is below:

| School | Program | Reported Placed | Reported Available Grads | Reported Placement Percent | Adjusted Placed | Adjusted Available | Adjusted Percentage |
|---|---|---|---|---|---|---|---|
| Atlanta West | MA | 53 | 108 | 49% | 52 | 108 | No change |
| Fremont | Motorcycle Technology | 21 | 30 | 70% | 20 | 30 | 67% |
| Fremont | Commercial HVAC | 73 | 108 | 68% | 72 | 108 | 67% |

As the Commission can see, this change did not move the campuses below a required benchmark.  Because the 2014 ACCSC disclosures are already posted on the campuses' websites and because the differences were so minor, there were no revisions to the 2013 disclosures. With the new centralized verification process implemented as described above in section c, these types of errors, immaterial as they may be, are less likely to occur.

e.     *An independent Third-Party Audit for at least 33% of Employment Records for the Graduate and Employment Charts submitted in the 2014 Annual Report by each ACCSC-accredited Corinthian school.*

      i.     *The audit must be conducted by an acceptable third party.  The independent third-party auditor must secure or attempt to secure verification from the employer or the graduate either verbally or in writing for at least 33% of the graduate employment data for each program at each school submitted in the school's 2014 ACCSC Annual Report.*

**RESPONSE:**  Corinthian contracted with CARS to conduct the third-party placement review of at least 33% of the school's 2014 ACCSC Annual Report.   CARS is headquartered in Birmingham, Alabama and is an ACCSC-approved auditor.  Please see CARS audit report in Exhibit 1.

      ii.     *Corinthian must submit minimally the following information for each ACCSC-accredited institution:*

           a.     *A detailed description as provided by the independent third-party auditor of the methodology, scope, and specific investigative processes used to select the sample and to verify the placements at Corinthian's ACCSC-accredited schools;*

**RESPONSE:**  In Appendix I to its December 21, 2014 letter to the Commission, CARS provided a detailed description of the methodology, scope and specific investigative processes that it used to select the sample and verify placements at Corinthian's ACCSC-accredited campuses.  That description is incorporated herein. Please see CARS report in Exhibit 1.

           b.     *A signed certification from the independent third-party auditor attesting to the accuracy of the information;*

**RESPONSE:**  A copy of CARS' signed certification is included in Exhibit 1.

           c.     *A list of all the employment records selected for verification organized by campus location and by program;*

**RESPONSE**:  A copy of the spreadsheet listing the employment records selected for verification is included in Exhibit 1.  The spreadsheet was also attached as Appendix II to CARS' December 21, 2014 letter to the Commission.

      iii.     *The audit findings are to be grouped by campus location and by program including the following for each employed graduate in the sample:*

- *The graduate name, place of employment and descriptive job title/position*
- *Status/Results*
- *The source of that verification*
- *The date of the verification*
- *How long the graduate has been in the position*
- *Reason Placement in Not Accurate*
- *Reason for Unable to Verify*
- *A detailed summary of the findings per school location, by program, including:*
  - *The number of inaccurate placements*
  - *The number of placement unable to verify*

**RESPONSE:**  A copy of the audit findings is included in Exhibit 1, organized as directed.

> iv.    *Corinthian must submit, based upon the findings of the audit, the following:*
>
> a.    *An explanation for any student which the school reported as employed in a training related field that the independent third-party verified as not accurate;*

**RESPONSE:**  We consider "verified as not accurate" to apply to both "invalid" and "placed but different" CARS' categories.  Please see Exhibit 18 for an explanation of placements that were deemed "invalid" by CARS.  Additionally, CARS classified other placements as "placed but different."  Please see Exhibit 19 for an explanation of placements that were deemed "placed but different" by CARS.  The vast majority of the differences between Corinthian's records and CARS' audit findings relate to variances in job title and start date.  We address both below.

Job titles slightly vary during the verification process depending on the employee we speak to at the work site.  For example, in the 2014 audit, varying job titles included: Part-time Back Office vs. Front and Back Office; Lube Technician vs. Automotive Technician; Manager vs. Supervisor; Technician 3 vs. Entry-Level Technician; Line Lead vs. Shop Assistant; Sterile Processing Tech vs. Surgical Technician.  In all of these examples, CARS labeled those placement records "placed but different."  In the 2014 audit, 35.5% of CARS' "placed but different" designation contained corrected job titles.  The majority appear to be immaterial title differences such as these.

As stated earlier, Corinthian finds these differences immaterial and asks the Commission to consider the following scenarios:

1.    *Employers change job titles:*  Many employers change job titles for various reasons. Some employers, specifically smaller organizations, where there are no standard human resources practices, one person might call the

37

employee a "manager" and another may refer to them as a "supervisor." These terms are interchangeable and synonymous;

2.    *Employees may change jobs:*  Graduates may change jobs during their tenure with the same employer.  An individual may be hired in as a "supervisor" at the onset of the position, but over time may move into a new role and as such job titles may change.  When the campuses recorded the information, it was accurate as of the data entry date, but by the time a third-party auditor re-verifies, in some cases years later, the graduate's job may have changed.  In addition, third-party auditors do not ask qualitative and/or probing questions to understand those changes. The auditor simply asks "Is your job title a Medical Administrative Assistant?" and if the graduate states "No, my title is a Medical Office Specialist" the record is labeled "placed but different" even though the placement meets policy and accreditation standards;

3.    *Third-Party Verification Systems:*  Differences in job title might also be the result of information gathered from third-party verification systems, such as The Equifax Work Number.  The Work Number typically includes a generic job title such as "Service Representative II" when the employer or graduate might actually be titled a "Sales Manager."  The job duties remain the same, but the title varies due to the party recording it; and

4.    *Data Entry Errors:*  Job titles are often entered into the system via drop-down menus in the software.  Inadvertently clicking on the incorrect job title can lead to data entry errors.  For example, "massage therapist" is found on the drop-down menu just below "medical assistant."  The close proximity on the menu can lead to accidentally selecting inaccurate job titles for certain graduates.

We recognize that there are some title discrepancies that appear more significant.  We believe the majority of these significant title discrepancies are addressed by the four points immediately above.

The other broad category relating to the descriptor "verified as not accurate" is the start date.  More than half the 2014 audit's "placed but different" placements related to variations in start date.  Nearly 40% of these involved a variation of fewer than seven days.  There are a variety of reasons explaining differences in the start date as found in the student records and as reported to the auditor.  These reasons include data entry error (which we believe explains variations of more than a year, especially where key pads have consecutive numbers adjacent to each other), recall bias as explained above, confusion regarding start date by an employer or graduate when an externship led to employment, employees entering the verification date instead of the employment start date, to name a few.

In total, approximately 86% of the "placed but different" placements were so categorized by CARS due to immaterial variations in job title or starting date.  We

believe the non-substantive nature of these variances result in a reasonable verification of these placements as they satisfied the Commission's employment definition, including requirements of utilizing the skills learned in school in a position that was intended to be sustainable while earning an income.

> b.  An explanation for any program where the independent third-party is unable to verify 20% or more of the sample records due to an inability to contact either the employer or the graduate;

**RESPONSE:**  Corinthian calculates the correct unable-to-contact percentage by subtracting from 100% the following:  the verified-as-placed percentage plus the placed-but-different percentage plus the invalid percentage (the sum of all categories where contact was made).  Please see Exhibit 20 for a program-by-program explanation regarding the 54 programs where CARS could not contact for re-verification at least 80 percent of the placements.  The reasons detailed in section b.1 above largely explain the lower contact rate.  We note that the overall contact rate for all programs exceeded this 80% threshold.

> f.  A matrix that shows the graduate employment statistics reported to students aligned with the graduate data reported to ACCSC for each program grouped by campus location based on the data reported in the 2013 and 2014 Annual Reports.

**RESPONSE:**  Please see Exhibit 21 for the 2013 and 2014 Annual Reports with signatures.

> g.  An explanation for any employment rate disclosed to students that differed from the rate reported to ACCSC, if any.

**RESPONSE:**  Employment rates included in the 2014 Annual Report did not differ from employment rates disclosed to students.

> h.  Attestations from each school signed by the school director that the employment rate information submitted to ACCSC and disclosed to students has been, to the best of their knowledge and belief, truthful and accurate as well as an attestation from the CEO of Corinthian stating the same on behalf of the system of schools.

**RESPONSE:**  Signed attestations from each campus are included in Exhibit 21. We note that the signed attestations from Everest in Brighton, Massachusetts and in North Aurora, Illinois are not included as both campuses are closed.  Please find the attestation of Jack Massimino, Corinthian's Chief Executive Officer, in Exhibit 22.

*i.      Additional information that the school believes will assist the Commission in making a determination regarding the school's compliance with accrediting standards in the area cited above.*

We believe we have provided sufficient information to demonstrate our compliance with the Commission's standards.

## 2.      Financial Soundness, Compliance with Other Regulatory Agencies, and Ongoing Operations

*Preliminary Background:*  On November 20, 2014, Corinthian signed a definitive agreement with non-profit Zenith Education Group, Inc. (Zenith), an affiliate of ECMC Group, Inc. (ECMC Group) under which Zenith will acquire 56 Everest and WyoTech campuses in 17 states as well as online programs. Under the agreement Zenith will also acquire 12 schools that are currently being taught out and closed, and will continue the teach-out process until complete. In total, the schools being purchased represent all of Corinthian's U.S.-based Everest and WyoTech campuses located outside of California. The acquisition is expected to close in January 2015, subject to regulatory approvals and other conditions.

Corinthian also owns Heald College, which has 12 campuses in three Western states; 13 Everest and WyoTech campuses in California; and 14 Everest campuses in Ontario, Canada. Collectively, these 39 schools serve approximately 20,000 students. Ten of these campuses are accredited by ACCSC.  Corinthian expects to continue to operate these schools until it finds suitable buyers for them.

*a.      Audited financial statements for the fiscal year ended June 30, 2014 in accordance with ACCSC Instructions for the Preparation and Submission of Financial Statements and related information.*

**RESPONSE**:  As previously disclosed in a Report on Form 8-K attached as Exhibit 23, filed  with the U.S. Securities and Exchange Commission (the "SEC"), on July 7, 2014, Corinthian entered into an Operating Agreement, subsequently amended (the "Operating Agreement") with the U.S. Department of Education ("ED") which became effective on July 8, 2014, and which, among other things, required Corinthian to produce certain documents within certain time periods, provide certain financial and other information to an independent Monitor and to subject a large part of Corinthian's operations and financial activities to oversight by that Monitor, to teach out and close 12 of its schools, and to pursue selling the remainder of its Title IV-eligible schools. The efforts required to comply with the terms of the Operating Agreement have put significant constraints on Corinthian's resources, preventing it from obtaining and compiling the information required to complete and file its Annual Report on Form 10-K for the fiscal year ended June 30, 2014 in a timely manner. Nevertheless, as described below, Corinthian has been compiling and producing to the Monitor weekly cash flow projections and variance reports that detail the current financial situation at Corinthian.

Corinthian is acutely aware of its responsibility to provide audited financial statements to its regulators, including ACCSC, annually and as such we are currently working to engage an audit firm with the intent of having audited financial statements available for submission to the Commission.

      b.      *A Management Discussion and Analysis examining and explaining the school's current financial condition to include:*

           i.      *A discussion that addresses the school's financial performance goals and results;*

**RESPONSE**:  As has been well documented, the unprecedented actions taken by the Department of Education in its letter of June 12, 2014 created a liquidity crisis that threatened the survival of Corinthian and its schools.  Relentless cash management became the focus of management and continues going forward.  Put simply, management's goal is to survive until a sale of the assets is concluded.  Exhibit 24 is a cash flow projection through the end of fiscal 2015 (June 30, 2015). *We ask for confidential treatment of this sensitive business information, including reasonable advance notice if the Commission intends to release this to another entity or person.* The cash flow assumes that all Corinthian assets outside of California will be sold in early January. Corinthian will then be comprised of Everest and WyoTech in California, Heald College, and the Canadian schools.  Corinthian continues to work aggressively to sell the remaining schools as quickly as possible.  The cash flow illustrates Corinthian's ability to meet its obligations, particularly to students.

           ii.      *A financial improvement plan;*

**RESPONSE**:  As discussed above, in the Operating Agreement entered into with ED, Corinthian agreed to pursue selling its remaining schools.  As the Commission is aware, Corinthian has entered into an Asset Purchase Agreement with Zenith Education for the sale of all the Everest and WyoTech schools located outside of California and Canada. The successful completion of the transaction will ensure that students attending those schools are able to complete their education and meet their career goals.  Corinthian continues to work aggressively to sell the remaining assets as quickly as possible.  Interest has been expressed and there are active discussions with several potential purchasers for the schools.

iii.    *Anticipated future demands, events, conditions, and trends that impact the school;*

**RESPONSE**: It is important to note that the Operating Agreement does not require that Corinthian sell all of its schools, but rather that we actively pursue the sale of the remaining U.S.-based schools.  Nevertheless, it is Corinthian's view that the sale of all of its remaining schools is the only viable alternative to ensure all students have the opportunity to complete their education and meet their career goals. We continue to work diligently to ensure that happens.  It is also important to note that while ten Everest and WyoTech schools located in California are currently accredited by the Commission, Corinthian is in the process of changing their accreditation to ACICS pursuant to a plan that has been vetted with ED.  This change will streamline the accreditation of Corinthian's institutions in California and help facilitate a sale. ACICS has already granted initial accreditation to these ten locations.  ED has indicated that it will address reassignment of the primary institutional accreditor to ACICS for these locations after the closing of the Zenith transaction, after which we will seek the withdrawal of accreditation by the Commission for these locations.

iv.    *Specific comments relative to the school's financial position and condition, its revenues and costs, assets, and liabilities, and other obligations and commitments;*

**RESPONSE**:  As discussed in the response to Item i above, attached is the business-sensitive, confidential Exhibit 24 which projects Corinthian's cash flows through June 30, 2015.  Inherent in those cash flow projections are the revenues and costs of the enterprise as well as the conversion of assets and liabilities into cash on a go-forward basis.  These amounts are identified in detail on pages 8-13 of the Exhibit and demonstrate Corinthian's continuing financial viability.

v.    *A discussion regarding how Corinthian believes it will be able to continue to operate and fulfill its obligations to students.*

**RESPONSE**:  Corinthian believes the obligation to those students attending the Everest and WyoTech schools, excluding California and Canada, will be met by Zenith Education after the sale of the schools has been concluded in early January 2015.  We believe Corinthian will be able to meet its obligations to the remaining students as the go forward entity is anticipated to be cash flow positive.  Corinthian expects to continue to operate the remaining schools until it finds suitable buyers for them.

c.    *An update on any regulatory actions being taken by any regulatory agency.*

**RESPONSE:**  There have been no material developments on any regulatory actions taken by any regulatory agency.

d.      *An update on any actions (legal or other) being taken by any governmental authority.*

**RESPONSE**:  There have been no material actions, legal or otherwise, taken by any governmental authority, that have not been previously disclosed to the Commission.

e.      *A description of the process being followed with the U.S. Department of Education Monitor regarding the sale of Corinthian campuses and he current status of the sale of any Corinthian campuses.*

**RESPONSE**:  Pursuant to the Operating Agreement effective July 8, 2014, as amended, former United States Attorney Patrick Fitzgerald of the law firm Skadden, Arps, Slate, Meagher & Flom LLP was appointed an independent Monitor over Corinthian and its operations.  Corinthian has provided full access to all documents and records requested by the Monitor. The Monitor, with the assistance of the accounting firm Weworski & Associates, reviews and verifies the Title IV federal fund draws made by Corinthian on a weekly basis.  The Monitor also receives and reviews with Corinthian and its restructuring consultants a 13-week projected cash flow statement that is updated weekly and that also includes a weekly variance report.  These statements include a summary of both Title IV and non-Title IV cash receipts and disbursements to enable the Monitor to determine whether expenditures made each week are allowable. A copy of the most recent 13-week cash flow statement provided to the Monitor is attached as Exhibit 25.  *We ask for confidential treatment of this sensitive business information, including reasonable advance notice if the Commission intends to release this to another entity or person.*

The Monitor also has met with and regularly reviews with Corinthian teach-out plans to ensure that they are being implemented in accordance with their terms. The Monitor also receives from Corinthian on a regularly scheduled basis information concerning student complaints, student disclosures proscribed by the Operating Agreement, litigation matters, material developments with its financial situation and lenders, and other matters that come to the attention of the Monitor. Regular meetings include a telephonic weekly meeting with between the Monitor and Corinthian's CEO, General Counsel, outside counsel, and outside restructuring firm to review open items.

f.      *Updated Institutional Teach-out plans as necessary due to changing circumstances or a Corinthian decision to close a campus.*

**RESPONSE:**  There have been no changed circumstances to the status of the schools therefore we have not updated any teach-out plans since our original submission to the Commission.

<u>Summary</u>

As noted above, the 2014 audit results were measurably better than those of the 2013 audit.  This improvement resulted from the implementation of fundamental elements gleaned from a variety of studies on key constructs regarding survey design.

These important elements clearly impacted the outcomes of the 2013 audit as well as the present, much more robust metrics achieved in the 2014 audit. For example, recency, frequency, resources, demographics and duration of the audit period all factor significantly into response rates.  Importantly, the concerns expressed by the Commission regarding the 2013 audit results *relate more to deficiencies with the audit process itself than with the integrity of Corinthian's underlying data, procedures and processes*.

At Corinthian we continue to believe that our goals, our policies and practices regarding placement verification have met or exceeded our peers in the industry.  They have evolved on an upward improvement slope over time.  We firmly believe this audit result contradicts and refutes the unprecedented negative and distorted press accounts and unfounded government allegations.  We appreciate the opportunity to respond to the Commission.

As requested by the Commission, this report thoroughly responds to all issues raised. Corinthian hopes that we have restored the Commission's trust in our organization and have made a strong statement through our actions that we have always been committed to and continue to be committed to compliance.  Further, we believe the results of the third-party audit by CARS and the updates provided herein warrant the removal of the System-wide Warning.



CORINTHIAN
COLLEGES, INC.

6 Hutton Centre Drive Suite 400
Santa Ana, CA 92707
tel (714) 427-3000 fax (714) 427-3010
www.cci.edu

December 31, 2014

Michale S. McComis, Ed.D.
Executive Director
Accrediting Commission of Career Schools and Colleges
2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201

### Re: Corinthian's Response to the Commission's September 15th Letter

Dear Dr. McComis:

Corinthian Colleges ("Corinthian") responds to the Commission's letter placing our ACCSC-accredited campuses on system-wide warning and requesting significant information regarding graduate placement, financial soundness and updates regarding other regulatory agencies. We appreciate the opportunity to respond to the Commission's requests and believe that our responses will not only assuage the Commission's concerns, but provide additional perspective for the Commission's future placement re-verification demands for other schools after Corinthian is no longer educating students.

### Placement Re-Verification

Since our placement verification efforts began in 2005, Corinthian has learned much about the challenges associated with meaningful re-verification. That knowledge increased significantly following analysis of the ACCSC-mandated third-party audits of the placements in our 2013 and 2014 Annual Reports. The essential characteristics of effective re-verification audits became much clearer. These elements of effective re-verification resulted in outcomes of the 2014 audit which provide evidence of the integrity of our processes—both historically and presently.

It is critically important to note that in preparation for the 2014 audit, we researched—and where possible implemented—fundamental survey elements gleaned from a variety of studies on key constructs regarding survey design. These important elements bear both on the outcomes of the 2013 audit as well as the present, much more robust metrics achieved in the 2014 audit. For example, as detailed in the accompanying response, survey characteristics such as recency, frequency, incentives, resources, demographics and duration of the audit period all factor significantly into response rates. In short, the concerns expressed by the Commission regarding the 2013 audit results *relate more to deficiencies with the audit process itself than with the integrity of Corinthian's underlying data, procedures and processes.*

The Commission has already received directly from CARS the results of its independent third-party audit of graduate employment records from the 2014 Annual Report. CARS selected and examined 5,254 graduate placement records, verifying as placed 85.57% of the sample (including "verified" and "placed but different"), claiming as invalid 3.62% and unable to contact 10.81% of the sample. A copy of the report is included as Exhibit 1 to our response.

Notably, while the response rate significantly improved in the 2014 audit, the "invalid" results between the 2013 and 2014 audits remained remarkably constant. This is an important point emphasizing that Corinthian's unable-to-verify placements should not be regarded as "invalid" simply because they were not contacted. In fact, when Corinthian's "unable to verify" rate declines—when the auditor is able to contact employers and graduates—most of the change in other categories is in the "verified as placed" rate. This significant fact undermines the September 15th letter's implicit conclusion that unable-to-verify placements were equivalent to "invalids." That unable-to-contact placements were likely "verified as placed" records that could not be reached strongly suggests a high degree of integrity in Corinthian's record keeping and placement reporting.

As directed by the Commission, the enclosed response provides detailed answers to the various requests on pages 6 and 7 of the September 15th letter regarding placement verification, including:

- A detailed description of the employment classification and verification process used by Corinthian-affiliated campuses;

- A detailed description as to how each campus determines the classification of graduates as employed in accordance with *Appendix VII Guidelines for Employment Classification, Substantive Standards of Accreditation* and specifically how the school defines and determines employment as sustainable and related to the program of study;

- A justification as to how the employment verification process used prior to the "Oral Employment Confirmation" represents "diligent efforts";

- A description of the Oral Employment Confirmation Process;

- A description of any changes made to the processes described above since Corinthian's last response to the Commission;

- A more detailed explanation as to why less than 30% of the total records reviewed in the audit of the 2013 Annual Report data could be verified by the independent third party auditor to match the school's record and justification as to why Corinthian believes that ACCSC can rely on the school's reported rates given the high percentage of records that could not be verified by the independent third party auditor;

- An analysis as to the efficacy of Corinthian's second-level review conducted by the "independent employment verification team at the CSC" in identifying and correcting the types of errors and inaccuracies found by the independent third-party auditor as described in this letter and a justification as to why the commission can rely on this process to produce accurate reporting;

- With regard to the 2013 Annual Report data, re-calculated Graduation and Employment Charts have been provided for programs where Corinthian has re-classified the employment status of any graduates based on the general findings outlined in the September 15th letter (e.g., the employment does not align to the majority of the program objectives, is not sustainable, etc.). We provide a matrix which shows the rate previously reported against the newly calculated rate and an explanation as to the reason(s) for the differences;

- An explanation for any student which the school reported as employed in a training related field that the independent third-party verified as not accurate;

- An explanation for any program where the independent third party is unable to verify 20% or more of the sample records due to an inability to contact either the employer or the graduate;

- A matrix that shows the graduate employment statistics reported to students aligned with the graduate data reported to ACCSC for each program grouped by campus location based on the data reported in the 2013 and 2014 Annual Reports;

- An explanation for any employment rate disclosed to students that differed from the rate reported to ACCSC;

- Attestations from each school signed by the school director that the employment rate information submitted to ACCSC and disclosed to students has been, to the best of their knowledge and belief, truthful and accurate as well as an attestation from the CEO of Corinthian stating the same on behalf of the system of schools; and

- Additional information that we believe will assist the Commission in making a determination regarding the school's compliance with accrediting standards related to placement.

In short, following the dedication of extensive resources in both time and money, the 2014 audit combined with Corinthian's responses to the above requests demonstrate the integrity of Corinthian's placement verification efforts, reporting and graduate results.

## Financial Soundness & Other Regulators

As requested, we also provide the following information regarding the financial soundness of our organization:

- An explanation regarding the absence of audited financial statements for the fiscal year ended June 30, 2014 in accordance with ACCSC Instructions for the Preparation and Submission of Financial Statements and related information; and

- A Management Discussion and Analysis examining and explaining the school's current financial condition, including a discussion that addresses school's financial performance goals and results, anticipated future demands, events, conditions, and trends that impact the school, and a discussion regarding how Corinthian believes it will be able to continue to operate and fulfill its obligations to students.

We also provide information regarding updates involving other regulatory agencies.

## Additional Requests

The response includes a description of the process being followed with the U.S. Department of Education Monitor regarding the sale of Corinthian campuses and the current status of the sale of any Corinthian campuses. We also respond to the inquiry regarding revised teach-out plans. Additionally, due to the Commission's placement of forty campuses on System-wide Warning, Corinthian was directed to inform all current and prospective students of such status. Our response includes evidence that we took immediate action and provided notice via written disclosures and websites on October 1, 2014.

**        **        **        **

Corinthian hopes these answers and the 2014 audit results have restored the Commission's trust in our organization and have convincingly demonstrated our current and historic commitment to compliance. We encourage the Commission to consider the lessons learned from our analysis of back-to-back audits as it requires audits of other institutions. Further, we believe the results of the third-party audit by CARS and the updates provided herein warrant the removal of the System-wide Warning.

We appreciate all the Commission has done over the years to assist us in educating students nationwide. It is difficult to express, both personally and collectively, our disappointment at being the first significant casualty of a concerted attack on vocational schools. We sincerely hope that the Commission successfully assists other institutions in navigating the current environment to the benefit of students, communities and employees.

We wish you the best in 2015.


Sincerely,


Jack D. Massimino
Chairman and Chief Executive Officer
Corinthian Colleges

Enclosures

Exhibits to *Corinthian Colleges' Response to the System-wide Warning Letter dated September 15, 2014* intentionally omitted due to voluminous nature.


Exhibits may be obtained from Debtors' counsel upon request.