# EXHIBIT D

RESPONSE OF CORINTHIAN COLLEGES, INC.
TO STAFF REPORT OF SENATOR TOM HARKIN,
"FOR PROFIT HIGHER EDUCATION" (S. PRT. 112-37)

FEBRUARY 1, 2013

For more than two years, Senator Tom Harkin, Chairman of the Health, Education, Labor, and Pensions (HELP) Committee, pursued a flawed investigation targeting private sector schools and their students. This ideologically driven inquiry appeared designed to support predetermined misperceptions about private sector schools. The investigation overlooked evidence of positive outcomes generated by the schools, and it relied heavily on defective research and biased testimony from a Wall Street short-seller and a discredited government official. As all minority members of the HELP Committee wrote in protest, the investigation "ignor[ed] more widespread problems in higher education and undermin[ed] the Committee's ability to provide meaningful solutions to these problems." *See* Letter from the Hon. Michael Enzi, *et al.*, to the Hon. Tom Harkin, at 1 (Apr. 13, 2011).

Senator Harkin's investigation culminated in his issuance of a staff report entitled, "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," S. Prt. 112-37 (July 30, 2012) ("Harkin report"). Although this report acknowledges that "[f]or-profit colleges have an important role to play in higher education," it uses twisted facts and unsubstantiated assumptions designed to cast private sector schools in a negative light. The report particularly misuses and misconstrues documents and information produced in confidence by private sector schools. For instance, it selectively discloses documents out of context to discredit the admissions practices of all private sector schools, and it grossly misapplies data to distort student outcomes. The report also is infected with a persistent prejudice that unfairly tarnishes the many achievements of private sectors schools and their students. Indeed, the minority staff of the HELP Committee concluded that the entirety of the Harkin report was plagued by "biased conduct," "numerous examples of malpractice," and "a disturbing pattern of abuse" that places "the overall accuracy and validity of the information contained in the [report] in doubt." *Id.*, at 793, 798.

Included in the Harkin report is a profile of Corinthian Colleges, Inc. ("the School" or "CCi"), which was one of many private sector schools that voluntarily cooperated with Senator Harkin's investigation, producing over 75,000 pages of documents. *See* Harkin report, 1: 408–34. As with the Harkin report in general, this profile is significantly biased against the School. The profile skews data from selected information to exaggerate the School's supposed shortcomings and deemphasize its many positive attributes. It also discloses business-sensitive documents and proprietary material that have caused the School competitive harm. The profile additionally draws sweeping conclusions from the findings of a faulty investigation of the Government Accountability Office (GAO), and it is rife with unsubstantiated inferences that disparage the School's value, reputation, and motivations. The profile fails to recognize the many educational opportunities and benefits the School offers to its more than 91,000 students— many of whom would not receive post-secondary education if private sector schools did not provide them opportunities—diminishing in numerous ways what the Department of Education has called "pioneer[ing] new approaches to enrolling, teaching, and graduating students." 75 Fed. Reg. 66,665, 66,671 (Oct. 29, 2010).

The sections below set forth the School's response to Senator Harkin's profile. Each section correlates with a section of the profile, responding to the most notable misstatements and unfounded criticisms of the School. Contrary to the conclusions of the Harkin report, the response shows that both students and taxpayers benefit greatly from the School's work enhancing educational opportunities and satisfying the demand for higher education.

**Company Overview**

The profile of the School in the Harkin report provides a brief overview of the School's structure, educational offerings, and enrollment. This overview is incomplete in its explanation of the School's plans for improving performance and growth, and it is inaccurate and misleading in its description of the School's accreditation credentials.

The profile cites an August 2012 investor call to suggest that the School's "growth strategy focuses on expanding short-term Diploma offerings across its campuses" and "increas[ing] the number of Associate degree offerings." Harkin report, 1: 409–10. The noted degree-expansion plans, however, reflect only a small part of the School's actual growth strategy. For instance, in the presentation that accompanied the investor call cited in the profile, most of the discussion of the School's "strategy" is focused on improving student outcomes, accreditation results, and performance efficiencies—not just expanding degree offerings. *See* CCi, Q4 12 Investor Presentation, 9–11. This presentation particularly emphasizes that the School's plans for growth are grounded firmly in a "continuing" effort to better its "graduate placement" rate (which reached 68.1 percent in 2011), "increasing instructor accountability for student retention," "piloting new entrance assessment tools," improving accreditation scores, reducing bad debt, and "closing campuses [and] programs that do not meet standards." *Id.* These are the growth initiatives that the School prioritizes and that its investors value. By not mentioning them, the profile presents a skewed perspective on what drives the School's growth and continued success.

The profile also presents a false view of the School's accreditation achievements. The profile explains that the School's campuses are accredited by a number of national and regional accreditors, including the Accrediting Commission of Career Schools and Colleges (ACCSC). Harkin report, 1: 408–09. After mentioning ACCSC as an accreditor, however, the profile states off-handedly that "[t]he current chair of the board of ACCSC also serves as the executive vice president of operations for Corinthian." *Id.* at 409. The clear inference, reiterated in other sections of the Harkin report, is that ACCSC's accreditation oversight is compromised by a conflict of interest. *See id.*, at 1: 142–43. This inference is unsubstantiated and unfair. ACCSC is no different from other accreditors recognized by the Department of Education as "reliable authority as to the quality of education or training offered." It is a peer review organization governed by a board made up partly, but not exclusively, of representatives of the institutions it accredits. Peer review, or self-regulation, is utilized successfully in many sectors and professions. Like all accreditors recognized by the Department of Education, ACCSC has a conflict of interest policy that prevented CCi's executive from involvement in accreditation decisions regarding its campuses. Indeed, even the Harkin report suggests that ACCSC "stick[s] to tough standards" that are more stringent than other accrediting organizations. *See id.* at 1: 143–44.

**Federal Revenue**

Using 2010 data, the profile states that "83.1 percent of Corinthian's total revenue was comprised of Federal education funds," and it estimates that "Corinthian may have discounted up to 8 percent of revenue" from federal funds pursuant to the Ensuring Continued Access to Student Loans Act (ECASLA). *Id.*, at 410–11. The profile also notes that the School "tripled

3

the amount of Pell grants it collects in just 3 years." *Id.* at 412. These remarks lack both context and support.

The profile's discussion of the federal education funds received by the School has three major shortcomings. First, the profile's conception of what constitutes "federal education funds" is arbitrarily narrow. To properly compare CCi's and other institutions' receipt of federal funds, the profile should have defined "federal education funds" to include not just those dollars issued through loan and grant programs to students, but also the direct taxpayer subsidies received by educational institutions. Had the profile taken account of these subsidies, it would have made clear that the School's receipt of federal funding is well within the norm for educational institutions. This is because the School, as a private sector school, *does not receive* the direct taxpayer subsidies that public sector schools enjoy. In fact, when direct subsidies are counted, the total taxpayer cost of educating students at private sector schools, like CCi, is often substantially less than the cost of educating students at public sector schools. *See, e.g.*, Bradford Cornell & Simon M. Cheng, *An Analysis of Taxpayer Funding Provided for Post-Secondary Education: For-profit and Not-for-profit Institutions*, at 2 (prepared by Charles River Assocs. for Coal. for Educ. Success) (Sept. 8, 2010)

Second, the profile fails to acknowledge that a significant portion of the federal funds earned by the School and all other private sector schools are returned to the Treasury in the form of loans ultimately repaid by students and taxes paid by those schools. Each year, private sector schools pay hundreds of millions of dollars in federal and state taxes--taxes that public sector schools do not pay. CCi has paid more than $250 million in such taxes over the last five years.

Third, the profile fails to explain adequately that the School's substantial percentage of federal education funds received is the direct result of its largely lower-income student body, which appropriately is the focus of federal assistance. The School prides itself in serving the "non-traditional students" with "modest financial resources" that even Senator Harkin acknowledges are underserved by our higher education system. Harkin report, 1: 2. Among these students, about 64 percent are women, and 52 percent are minorities. Many are single parents who are working and raising families while they study. The average age of a CCi student is 30.

The School gives all these students a path to improve their financial situation. But because of their current limited means—about 85 percent have annual family incomes of less than $45,000—more than 90 percent of the School's students receive federal educational aid. This compares to 70 percent of private non-profit students and 49 percent of public students (who benefit from direct aid to public schools, which serves as indirect federal tuition assistance that holds their tuition below what private institutions must charge). It thus is unsurprising that a high percentage of the School's revenues come from federal education funds.

Similar contextual elements are missing from the profile's analysis of the School's increased receipt of need-based Pell grants between 2007 and 2010. As the Harkin report admits, the driving forces during this period were Congress's "repeated[ ] increase [in] the amount of Pell grant dollars available" and the struggling economy. Harkin report, 1: 412. Since 2009, Congress has committed at least $36 billion to mandatory Pell grant funding, with $17.6 billion spent in 2010. During the 2009 and 2010 academic years, moreover, Congress

allowed eligible students to receive two Pell awards in one year. *See id.*, at 1: 31 n.8. With the economy in recession, the number of eligible students also increased. Considering these facts, it is unremarkable that the School's share of received Pell grants increased in 2009 and 2010. Indeed, the three-fold increase in Pell grants received by CCi students from 2007 to 2010 was at the low end of the private sector schools investigated by Senator Harkin. In fact, the schools that Senator Harkin labeled "good for-profit schools" at the press conference announcing his report had Pell grant increases of more than 400 percent, 600 percent, and 2,000 percent over the same time period. *See id.*, at 1: 676, 717, 781. The profile is thus misguided in casting the School's increased receipt of Pell grants as a troubling indicator.

Relatedly, the fact that the School discounted certain federal funds pursuant to ECLASA in accounting for its share of federal education dollars is not noteworthy. The discounting of such funds is precisely what Congress intended under ECLASA. Having granted every student in America access to an additional $2,000 in Stafford loan eligibility to meet a looming crisis of student loan availability, Congress exempted private sector schools from reporting those funds in compliance with the 90/10 regulatory requirement of the Department of Education during a grace period that has now expired because it recognized that suddenly increasing Federal loan funds would make it impossible for many schools to remain in compliance with the 90-10 rule. *See* Higher Education Act of 1965, § 487(d)(4). The School therefore properly discounted the funds from its reported figures.

**Spending**

The review of the School's spending in the Harkin report is especially deceptive. To preserve Senator Harkin's narrative and cast the School's as overly focused on marketing and profit, the review purposefully presents relevant data in a confusing and misleading manner. When properly presented, the data make clear that the School spends far less on marketing than its competitors and far more on the education of its students. It has consistently spent roughly three times the percentage of its expenses on education related services as it has on marketing and admissions.

The Harkin report lumps profit under its discussion of spending and thus betrays a fundamental misunderstanding of the difference between these two economic concepts. The report also says that CCi "dedicated" and "allocated" portions of its revenue to profit. But profit is not a form of spending, and for-profit organizations do not "dedicate" or "allocate" revenue to profit. It is elementary economics to say so, but profit is not something than an enterprise can simply "allocate." It is the difference between the revenue that an organization receives for its services in a competitive market and the costs (or spending) required to provide these services. The motive to realize profits impels organizations to improve their services to bring in more revenue and to provide those services as efficiently as possible to control their costs and spending. Moreover, the resulting profit does not line the pockets of owners. In CCi's case, it pays no dividends and re-invests profits in its schools and the educational services it provides. The mistaken manner in which the Harkin report discusses profit demonstrates the deep bias that Senator Harkin has had from the outset of his so-called investigation against profit-making activities.

Furthermore, the figure and graphs used in the Harkin report purporting to show the School's "profit" are deeply flawed and misleading. Although they claim to show profit, the figure and graphs actually show only "operating profit," which the report defines as "income *before tax* and other non-operating expenses including depreciation." Harkin report, 1: 412 n.1536 (emphasis added). In so doing, the figure and graphs grossly overstate the School's actual profit, which for the period from 2007–2010 was between 4 and 8 percent after the nearly $170 million that the School paid in taxes. This gross overstatement was flagged by the School before Senator Harkin issued his report. Nevertheless, no effort was made to present this part of the report in a way that reflects actual profit earned by CCi.

The comparative review of the School's profit is also unfair and inadequate. Burying in a footnote the fact that the School experienced a "net loss in 2011," the Harkin report emphasizes the School's spending in 2009. *Id.*, at 413 n.1538. Even in this banner year, the data shows that the School made 9 percent profit—calculated, again, before taxes. After interest expenses, taxes, and non-operating expenses, the School's net income was 5.2% of revenue in 2009. This profit percentage is less than half of the average profit margin of the schools investigated by Senator Harkin, and it is less than a quarter of the profit percentages realized by some schools. *See id.*, at 1: 564. But the Harkin report notes merely that the School "allocates a lower proportion than most to profit." *Id.* at 1: 413. This is a significant understatement in a report that accuses all private sectors schools of running up big profits for short-term gains. *See, e.g., id.*, at 1: 2–3. Moreover, the report attempts to downplay the School's modest profit margins by emphasizing that "the amount of profit Corinthian generated rose rapidly over the last several years," growing from $21 million in 2007 to $240.8 million in 2010. *Id.* at 1: 413. But these profit figures are unrelated to the spending-percentage accusations in the report, and they simply reflect the success of the School's programs.

Likewise, the profile of the School is biased in its discussion of the compensation of executives at the School. Although the profile acknowledges that CEO Jack Massimino's "compensation package for 2009 is *under half* the average for the publicly traded" private sector schools, it nonetheless complains that his compensation "drastically outpaces both compensation at public and non-profit colleges and universities." *Id.*, at 1: 414 (emphasis added). To begin with, Mr. Massimino's compensation is over-stated as it includes an estimated value of options and other equity awards that are vastly different from the value that he could ultimately receive. In addition, the profile notes that Mr. Massimino "received . . . more than eight times as much as the president of the University of California at Irvine." *Id.* at 1: 384. No reason is given for the inapt selection of the president of U.C. Irvine—a regional, public institution with roughly one quarter the students and one sixth as many faculty members as the School—as a comparative example. A more appropriate comparison might be to presidents of large private universities. During the same time period, the compensation of the presidents of Drexel University ($4.9 million) and Johns Hopkins ($3.8 million) exceeded that of Mr. Massimino, and 34 other private university presidents had compensation that ranged from $2.36 million (University of the Pacific) to $1.02 million (Northeastern University). *Almanac of Higher Education 2012, Salaries of Private-College Presidents 2009*. On that basis, Mr. Massimino's compensation is not unusual.

The profile also unreasonably critiques the fact that much of Mr. Massimino's compensation is based on the School's operating-profit performance. This critique, like the

6

Harkin report in general, is grounded in an erroneous perception that the operation of a for-profit enterprise is inconsistent with quality education. This is fundamentally wrong. There is no more reason the profit motive is inconsistent with educational quality than it would be with other critical services provided to the public like food production and distribution, news and information, housing, and health care, fields where profit-making enterprises predominate.

### Tuition and Other Academic Charges

The claim in the Harkin report profile that the School's tuition prices are higher than many public and private sector schools is based on a selective and biased set of comparisons. The claim also incorporates a false suggestion that the actual costs of the School's programs were somehow camouflaged prior to implementation of certain unspecified regulations, and it unfairly accuses the School of deflecting prospective students' questions about such costs.

The comparisons at the heart of the profile's tuition-cost claim pluck the School's three most expensive programs from its hundreds of scholastic offerings and pit them against the most inexpensive similar programs located at schools of Senator Harkin's choosing. *See* Harkin report, 1: 415. For instance, a Medical Assistant diploma program at one campus of the School is compared to an unspecified "comparable program at Fresno City College," an Associate degree program in paralegal studies at one campus of the School is compared to a degree from Santa Ana College, and a Bachelor's degree program in Business at one campus of the School is compared to a supposedly identical program at U.C. Irvine. *See id.* No justification for these comparisons is given in the profile, which spends little time explaining whether the comparisons fairly illuminate the tuition costs of comparable programs. Additionally, no effort is made to consider the average cost of tuition for degree programs at the School, nor is any discussion devoted to the overall competitiveness of the School's pricing in its primary degree and diploma programs (*i.e.*, health care, business, criminal justice, and information technology). No mention is given either to the fact that the School employs more full-time faculty and spends more on per-student instruction than any other publicly traded private sector school. *See id.*, at 1: 427. The comparisons are misleading as well because they completely fail to account for the substantial taxpayer subsidy received by the named public sector schools which holds their tuition down but still represents a significant cost to the taxpayer. Failing to account for the subsidies presents a misleading picture that incorrectly implies the public institutions are offering similar programs at substantially lower costs.

The suggestion in the profile that the School disguises its tuition costs is also demonstrably false. The School publicizes the full tuition costs and fees associated with each of its programs, and it makes that information separately available to every prospective student during an admission interview. To be sure, the School does not frequently post prior-year tuition costs, which might make researching those past costs difficult. But Senator Harkin did not face this difficulty, as the School produced to the HELP Committee a voluminous chart that specified the tuition cost for every program at every School campus from 2007 to 2010. The assertions in the Harkin report that the School was "lacking in transparency regarding . . . costs" and that "committee staff was unable to reliably determine the cost of completing a degree at Corinthian's schools prior to new regulations" are simply unfounded. *Id.*, at 416, n.1549.

Furthermore, the Harkin report profile is misleading in its claim that School "recruiters are trained to discourage and deflect questions about costs from students." *Id.* at 417. The only cited support for this claim is a 2005 admissions representative training manual produced in confidence to the HELP Committee and the training transcript cited from it represents but one small aspect of the manual. As the School stressed to Senator Harkin before he issued his report, the manual in all respects emphasizes the importance of integrity, compliance, and serving student interests. *See* Letter from Michael Bopp to Hon. Tom Harkin, at 8 (June 27, 2012).

**Recruiting**

The profile claims that "[i]nternal company documents from the 2005-10 period make clear that recruiters employed by Corinthian were trained that selling the program, not advising students, is the primary responsibility of the position." Harkin report, 1: 418. It also opines that "[i]t is possible that these aggressive recruiting tactics result in a student body that is underprepared for college." *Id.* These assertions are baseless. The notion that CCi's working adult students could be the gullible victims of aggressive or slick marketing is insulting to them.

The claim about what internal documents from 2005–2010 show is based on only *one* document—the same 2005 admissions manual cited to make the case that the School's recruiters are trained to deflect questions about tuition costs. And this outdated manual is quoted out of context to support an argument it does not sustain. The quotes, moreover, are entirely unremarkable. They merely note that (1) the admissions representative position is at root a "sales position," (2) admissions directors regularly check on the work of admissions representatives, and (3) admissions directors may ask experienced admissions representatives to meet with more students than new admissions representatives. *Id.* In no way are these points the hallmarks of "aggressive recruiting tactics." *Id.*

Because the profile's claim of "aggressive recruiting tactics" fails, so too does the inference stacked on top of it that those alleged tactics are the cause of a supposedly "unprepared" student body. No evidence supports this inference. Indeed, the only support offered by Senator Harkin is the "analysis" of a biased Internet publication based on data from a regulation recently struck down as arbitrary and capricious. *See id.*, at 1: 419, n.1557; *see also Ass'n of Private Colls. & Univs. v. Duncan*, No. 1:11-CV-01314-RC, slip op. 29–31 (D.D.C. June 30, 2012). By contrast, the many successes of the School's students offer ample evidence that they overwhelmingly are prepared to improve their education and their lives.

More fundamentally, the Harkin report appears to complain that organizations like the School seek out students at all. It assumes that the traditional model—where students seek out well-known and long-established institutions, and are reminded of their existence through media coverage of their sports programs—is the only correct one. The School, however, is relatively new, does not field sports teams, and most importantly offers programs specifically geared to the real needs of non-traditional students. It must seek out these students, whose circumstances are not geared toward guiding them to postsecondary education, in order to make them aware of the educational opportunities the School offers. It strives to ensure that these individuals make good, informed decisions. There is nothing nefarious about this. On the contrary, it is helping the country to meet its workforce training needs.

**Outcomes**

The profile's review of student outcomes at the School is also flawed. The review concludes that "Corinthian's retention rate was slightly lower than the average," with a higher than average Associate degree withdrawal rate offset by a "much lower withdrawal rate" for students enrolled in "Certificate programs." Harkin report, 1: 420. This conclusion is inaccurate and incomplete.

When properly calculated, the School's student outcome rates are comparable to the average outcome rates of other private sector schools, which, in turn, are often better than the average outcome rates of public sector schools. For example, the GAO has determined that "students from for-profit schools had *higher* graduation rates for certificate programs" and "*similar* graduation rates for associate's degree programs," compared to public and non-profit schools. GAO Report, Postsecondary Education: Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools, GAO-12-143, at 63 (Dec. 2011) (emphases added). Likewise, a recent study from Harvard University found that private sector schools have a higher retention rate during students' first year than comparable public and non-profit schools (and, according to the study, first-year retention correlates with a higher probability of obtaining a degree). *See* David J. Denning, *et al.*, *The For-Profit Postsecondary School Sector*, 26 J. of Econ. Perspectives 139, 158 (Winter 2012). A study by the Parthenon Group also determined that 65 percent of students enrolled in a two-year or less private sector school obtained a degree, compared to 44 percent of comparable students at public sector schools. *See* Robert Lytle, *et al.*, *Parthenon Perspectives on Private Sector Post-Secondary Schools*, at 9 (Mar. 12, 2010). That study concluded as well that private sector students earned, on average, 50 percent more than their pre-enrollment income, whereas students of public sector schools earned only 30 percent more than their pre-enrollment income. *See id.*, at 13; *see also* Stephanie Riegg Cellini & Latika Chaudhary, *The Labor Market Returns to a For-Profit College Education*, NBER, at 27 (Aug. 2012) (finding income gains of private sector graduates "can be shown to be slightly higher than gains for public sector graduates"). Even the Harkin report acknowledges that, with regard to non-traditional students, "community colleges . . . have slightly worse comparable student outcomes than for-profit colleges." Harkin report, 1: 91.

The basis of the inaccurate calculation of the School's student outcome rates in the Harkin report is a self-described "independent" analysis of data conducted by majority staff of the HELP Committee ("majority staff"). This analysis uses a methodology not recognized by accreditors, the federal government, or state governments to reach conclusions that misrepresent the completion and withdrawal rates of students at the School. The analysis is reflected in a chart supposedly showing the "Status of Students Enrolled at Corinthian Colleges, Inc. in 2008–09, as of 2010" ("Status Chart").

Using information provided by the School, majority staff compiled the Status Chart by extracting out a subset of data reflecting all students who enrolled in the School from July 1, 2008–June 30, 2009. They then reconfigured that data to look at "where the students were" as of the cutoff date of the data in May 2010, less than one year after some of the students initially enrolled. This time-limited, student-tracking approach generated the purported "completion" and "withdrawal" numbers stated in the Status Chart.

9

The completion and withdrawal numbers in the Status Chart are misleading for at least three reasons. First, as the School explained in a September 22, 2010 letter to Senator Harkin, the data used by majority staff to generate the numbers are of "limited or no utility" for "deriv[ing] completion or drop rates. . . ." Letter from Michael D. Bopp to the Hon. Tom Harkin, at 2 (Sept. 22, 2010) ("Transmittal Letter"). The data specifically do not account for students who withdraw and then return to the School or who transfer between programs or campuses. As the School specifically explained in the Transmittal Letter:

- "[T]he figures [in the data] do not take into account that some students drop out of school and then later come back to school and complete their program. We refer to those students as 'reentries.' The figures . . . reflect some reentries multiple times because the format calls for information on a student level basis, and therefore it may inflate or alter aggregate numbers that could be compiled from the spreadsheets."

- "[T]he figures reflect a 'transfer'—a student who switches from one program to another—twice, once as an enrollee who dropped, and the other as an enrollee who may either drop or complete the subsequent program. Once again, this format potentially inflates or alters the aggregate drop numbers."

Transmittal Letter, at 5. Senator Harkin's report acknowledges these limitations, but it does nothing to account for them in a proper manner, leaving the impression that completion rates are lower than they actually are. *See* Harkin report, 1: 420 ("The dataset does not capture some students who withdraw and subsequently return, which is one of the advantages of the for-profit education model."); n.1560 ("Some students counted as withdrawals may have transferred to other institutions.").

Second, the completion and withdrawal numbers in the Status Chart are seriously flawed because majority staff calculated them on the basis of a time frame that is unrealistic and biased against the School. The majority staff's decision to assess the completion and retention rates of July 1, 2008–June 30, 2009 enrollees only up to May 2010 lacks any reasoned justification. No accreditor or any other government agency uses such a limited time frame for completion or retention assessments. And, as the School noted in its Transmittal Letter, any attempt to measure the progress of the School's students in a strict linear fashion simply does not work given the School's student demographics. Because the School serves a high proportion of non-traditional students, "the lifespan of a student is far more complex, with many students withdrawing and reentering, or transferring between programs or schools." Transmittal Letter, at 4. It therefore cannot be assumed, as majority staff does, that "students simply start, and then graduate, withdraw or stay in school" within a narrow, traditional time frame. *Id.* Indeed, the Harkin report acknowledges as much but does not attempt to present completion and withdrawal figures overall in an impartial, accurate manner. *See* Harkin report, 1: 420, n.1559 ("This dataset did not include Corinthian students who enrolled prior to July 1, 2008. The inclusion of these students could possibly have resulted in a lower overall percentage of students withdrawing.").

Third, the majority staff inflated the School's withdrawal numbers in the Status Chart by counting against the School the many students who suspend their studies on account of military duties, medical developments, or other bases for waivers. By comparison, the Accrediting Council for Independent Colleges and Schools ("ACICS") does not count these students in its withdrawal calculations because it recognizes that such withdrawals are beyond the control of educational institutions. This is especially true for the School, which serves a number of military personnel and students with family commitments. These students should not be characterized as "drop outs" simply because they are compelled to leave the School to fulfill important obligations.

If majority staff had wanted to calculate more accurate completion and withdrawal numbers for the School, they could have utilized the retention-rate standard used by ACICS. The School made this point in its Transmittal Letter submitting the data used by the majority staff in its analysis, explaining how the ACICS standard works and why it is an appropriate measurement of outcomes at the School:

> Based upon the information requested, an appropriate measurement—one employed by accreditors and that may be of interest to the Committee—is the retention rate. Retention measures how many of our students either continue or complete their programs year-over-year versus how many discontinue their studies by withdrawing. The table below uses the data from the exhibits the School is producing. This table presents the following information across a majority of CCi campuses by the fiscal years requested in your letter: beginning population, new starts, number of students graduating or completing, number of students withdrawing, and number of students still enrolled.
>
> | Fiscal Year | (A) Beginning Population | (B) New Starts | Total Completion in Year | (C) Total Withdrawals | Total Ending Population | Retention Rate |
> |---|---|---|---|---|---|---|
> | 2007-2008 | 61,178 | 100,731 | 40,131 | 50,533 | 71,243 | 69% |
> | 2008-2009 | 71,246 | 120,638 | 45,179 | 57,086 | 89,595 | 70% |
> | 2009-2010 | 89,478 | 137,109 | 58,167 | 65,551 | 102,856 | 71% |
>
> From this raw data, retention can be calculated by using the following formula: retention = $(A + B - C) / (A + B)$. In this formula, "A" is the "beginning population," "B" is "new starts" and "C" is "total withdrawals." As seen in the table, applying this formula to the above information from the produced charts, the School has retention rates of 69%, 70%, and 71% over the three fiscal years listed above. The retention standard required by ACICS (which accredits 44 of our schools and uses similar retention methodology) is 60%. The School and our hardworking students easily satisfy this standard.

Transmittal Letter, at 2. The fact that majority staff ignored this accepted methodology for calculating withdrawal and retention rates strongly suggests that Senator Harkin sought to employ statistics to further a predetermined narrative and not to present fairly statistics provided by the School relating to student retention.

**Student Loan Defaults**

The profile of the School in the Harkin report is also misguided in its criticism of the School's cohort default rate (CDR), which measures the number of students in a given period

11

that default on their student loans. Focusing on the School's 2008 three-year trial CDR—which was subject to change and was explicitly not used by regulators or accreditors in any assessment of the School or its students—the profile asserts that the School has "the highest default rate of any publicly traded company examined," and wrongly claims this high rate "raises serious questions regarding the quality of the programs Corinthian provides, and whether its students . . . earn high enough wages to repay the debt they take on." *Id.* The profile also asserts that, "[h]ad the 3-year cohort default rate provision been in effect in 2011, Corinthian would have faced the loss of access to title IV financial aid dollars." *Id.*

As the Harkin report obliquely notes, the CDR limit currently is based on a two-year measurement period but is in the process of shifting to a three-year period. *See* Harkin report, 1: 133. The School is adjusting to and preparing for this new measurement and continuously working to improve its CDR. In fact, it has had significant success in lowering both its two-year and three-year CDRs so that they are well within applicable limits.

Of course, given the lower incomes and greater demands faced by many of its students, the School's CDR has been higher than many institutions that serve a less-disadvantaged student demographic. But the School has worked to educate its students about their obligation to repay their debts and to assist them in finding employment opportunities needed to do so. And it is simply not the case that the School, or any of its current campuses, is in danger of losing access to Title IV funds because of a high CDR.

Finally and most tellingly, the Harkin report misses the mark by failing to focus on the most crucial outcomes indicators for CCi's programs. If as the profile claims the key issue is whether the School's graduates are achieving their educational goals—getting jobs and improved earnings—the profile should have focused directly on placement rates and earnings gains, not on improperly calculated completion rates that beg the question and CDRs that at best get at those issues inferentially. Over the last four years, the School's verified placement rate in the fields for which it trains students has ranged from 78 to 68 percent. The public institutions to which the Harkin report invidiously compares the School do not even have placement rates that would allow any judgment to be made about their performance. And the Parthenon report cited above confirms, with Department of Education data, that private sector institutions and the School help students to achieve healthy income gains that outpace public institutions' graduates.

**Default Management**

With no hint of inconsistency, the profile of the School in the Harkin report also criticizes the School for its efforts to lower the very default rates that it says are too high. The profile casts these efforts as "default manipulation," *id.*, at 1: 133, and it warns they are "troubling for taxpayers" because they mean "taxpayers and policymakers fail to get an accurate assessment of repayment and default rates. . . . [by] undermin[ing] the validity of the default rate indicator." *Id.*, at 1: 426. This is among the more absurd claims in the Harkin report.

Recognizing that high default rates are detrimental to its students and its own outlook, the School has, as the profile suggests, focused resources on reducing the number of students in default. *See id.*, at 1: 423. Because students are benefitted most by avoiding default—rather than entering it and then struggling to get out—the School's default-management efforts have

emphasized helping students take advantage of the deferment and forbearance options Congress itself, including Senator Harkin, made available to them. This approach is the very one encouraged by the Obama Administration for all students facing challenges in repaying their educational loans, and it has proven results. *See, e.g.*, Dep't of Educ., *Your Federal Student Loans*, at 29–32 (Dec. 2010).

Working with default management specialists, the School has benefitted thousands of its students by informing them of governmentally mandated loan-repayment options and helping them choose the best repayment plan. This effort utilizes an array of informative platforms and initiatives, with some more successful than others. Yet the Harkin report attempts to cast CCi's efforts in a negative light regardless of intent or achieved results. And while the Harkin report attempts to denigrate particular types of innovative default management practices, it does even this in an inaccurate manner. For instance, the conceptual program mentioned in the Harkin report that proposed "offering students gift cards to McDonald's" for contacting default management specialists never was put in place. *Id.*, at 1: 424 – 25; *see also, id.* n.1585 (acknowledging the program was "altered before implementation"). The truth is, the School's default management efforts have experienced great success, dramatically reducing the rate of student defaults. As of March 2012, for example, the School's three-year trial rate for its 2009 student cohort was down 7.3 percent, and its two-year default rate for the 2009 and 2010 cohorts was a remarkably low 6.7 percent. *See id.*, at 1: 425. These reductions are not "default manipulation" as Senator Harkin suggests but the results of significant investments and hard work by CCi.

### Instruction and Academics

The profile is also biased in its presentation of data measuring the School's instructional and academic performance. It diminishes the School's sector-leading expenditures on student instruction, it makes scant mention of the School's top ranking in full-time faculty hires, and it attempts to tar the entirety of the School's academic offerings with the flimsiest of anecdotal evidence.

The data in the Harkin report shows that the School spends *the most* on instruction per student of any publicly traded private sector school. *See* Harkin report, 1: 427 (noting the School spent $3,969 per student on instruction and stating that the "amount that publicly traded for-profit companies spent on instruction ranges from $892 to $3,969 per student per year"). Rather than forthrightly acknowledging this fact, however, the profile merely mentions that "Corinthian's per student spending is in the upper range of the for-profit colleges the committee examined." *Id.* The profile then seeks to further diminish the School's sector-leading instructional expenditure by comparing it to the per-student expenditures of the University of California in Los Angeles (UCLA) and the University of Southern California (USC). *See id.* This comparison is utterly unfair. It is simply unreasonable to expect the School to match the spending of two of the most well-established research universities in the country that serve very different student populations and have very different missions. A far better comparison is to the instructional expenditures of community colleges, which often are far less than the School's instruction-based spending. Indeed, even a view of the expenditures of the hand-picked community colleges in the Harkin report shows that the School spends more on student instruction than most. *See id.*, at 1: 1081.

Furthermore, with regard to full-time faculty employment, the profile states simply that the School "employed more full-time faculty than average." *Id.*, at 1: 427. But the data shows that the School employed *more than twice as many* full-time faculty than the average private sector school. Whereas 20 percent of the faculty at the average private sector school is full-time, 40 percent of the faculty at CCi is full time. *See id.* ("In 2010, Corinthian employed 2,577 full-time and 3,857 part-time faculty."). Moreover, the profile makes no mention of the School's sterling faculty-to-student ratio. Using 2010 data, the School's ratio is 1:17. *See id.*, at 1: 409, 427. By contrast, Strayer University, which Senator Harkin labeled a "good for-profit school," has a faculty-to-student ratio of 1:25, and U.C. Irvine, to which the Harkin report elsewhere compares the School, has a ratio of 1:26. *See id.*, at 714, 726.

Perhaps in an effort to further distract from these positive figures, the profile goes on to declare that "an undercover GAO investigation raises serious questions about the quality of Corinthian's programs." *Id.*, at 1:427. Explaining that three GAO investigators enrolled in three different online courses at the School, the profile claims that the whole of the School's scholastic experience is called into question by the failure of one teacher at one campus to report quickly enough the investigators' "repeated[ ] submi[ssion of] plagiarized work." *Id.*, at 1: 427–30. The absurdity of this claim is belied by the profile itself, which acknowledges—albeit in a footnote—that the School ultimately *failed* all three of the undercover GAO investigators precisely because of the poor quality and plagiarized nature of their work. *See id.*, at 428 n.1601.

Moreover, reliance on the GAO investigation is completely misplaced. That investigation was exposed as slipshod, inaccurate in its findings, and tainted by undue influence by Chairman Harkin's staff. The GAO official who engineered it was demoted. None of its findings with respect to the School withstand scrutiny.

**Staffing**

The profile notes correctly that the School employs far fewer recruiters than most private sector schools, and it emphasizes that "Corinthian has a relatively robust career services program compared to other education companies examined the committee [sic]." *Id.*, at 1: 431. "However," the profile states, "investigations from the attorney general of California and the Texas Workforce Commission have both documented serious problems with the integrity of the campuses' job placement claims." *Id.* The mention of these investigations is immaterial for two reasons. First, the investigations have nothing to do with the investment that the School makes in staffing its recruiting and career services departments. Second, both of the investigations occurred years ago, had the complete cooperation of the School, and involved discrete instances of certain employees failing to follow the School's protocols and code of conduct.

**Regulatory Strategies**

The profile's final critique of the School pertains to its compliance with Department of Education regulations. Again, this critique lacks both facts and context. *See id.*, at 1: 431–32.

"Corinthian," the profile states, "is clearly struggling to ensure that the amount of title IV Federal financial aid dollars it receives does not exceed 90 percent," which is the limit set for recipients of such funds. *Id.*, at 1: 431. The profile then links the School's tuition increases to "a

14

means to comply with 90/10," stating that "Corinthian announced the tuition increases 'as if they are somehow the victims' when in reality the company knowingly pursued this kind of revenue growth strategy notwithstanding the existence of 90/10." *Id.* The profile also cites a document produced to the HELP Committee that it claims "show[s] that some of the school's administrators were concerned about tuition increases and the effect it would have on students." *Id.* These attacks are unfair.

The School did not raise tuition merely under the guise of complying with the 90/10 regulation; it most recently raised tuition precisely because of that regulation. In particular, the recent increases in federal loan and Pell Grant availability have affected all private sector schools' ability to meet the 90/10 requirement, because the schools mainly serve students who are eligible for the entirety of Title IV funding. The School explained these "unintended consequences of 90/10" to Senator Harkin before he issued his report, emphasizing that the regulation caused "students to incur more expense" with each increase in available federal funds and explaining how "the 90/10 requirement keeps career colleges out of lower-income settings where they could accomplish much good." *See* Letter from Michael Bopp to Hon. Tom Harkin, at 8 (June 27, 2012). Thus, it is wrong for the profile to claim that the School's occasional tuition increases would occur "notwithstanding the existence of 90/10."

It relatedly is unfair to portray the loan programs sponsored in part by the School as merely pieces of a 90/10 strategy. *See id.*, at 1: 432–33. Those lending programs were coordinated in the face of the recent economic downturn and liquidity crisis, and pursuant to directives of Congress and the Department of Education, to help students obtain extra financial assistance that they otherwise might not have been able to receive. In particular, a huge shortfall in available student funding occurred in 2008 when Sallie Mae withdrew from making certain private student loans to students attending private sector schools. Due to the liquidity crisis, students could not cover this shortfall with loans from other private lenders. Mindful that changed economic circumstances were creating potential educational-access issues, Congress encouraged private sector schools to institute their own loan programs by amending the Higher Education Act to allow the schools to count the net present value of institutional loans made to their students as revenue for purposes of the 90/10 rule. *See* Higher Education Opportunity Act, P.L. 110-315 (Aug. 14, 2008). It was in response to these developments that CCi instituted its lending programs to help its students who could not pursue higher education without additional financial aid. Thus, the portrayal of the School's lending programs as merely 90/10 strategies completely ignores the fact that the School was thrust into sponsoring those programs by the credit crisis and the initiatives of Congress; it did not pursue them voluntarily or based on some nefarious motive. Moreover, the portrayal of the loan programs in the Harkin profile is inconsistent with the larger complaint of the Harkin report that private sector schools are too dependent on federal funding. In fact, the critique reveals that the true complaint of Senator Harkin is not that the School receives too many federal funds, but that it receives any funds at all.

**Conclusion**

The profile of the School in the Harkin report is just one more example of ideology overriding reality in Senator Harkin's attack on private sector schools, which long predated his "investigation" of the career schools sector. The profile twists the facts to fit a preconceived

narrative, proving that the School never had a hope of receiving fair treatment in the Harkin investigation or report.

       The School provides a strong education and new opportunities to thousands of students each year, helping them to better their lives through sector-leading investments in student instruction, facilities, and post-graduation services. This work is vital to meeting the growing demand for an educated workforce. There is no doubt that students and taxpayers benefit greatly from the investment they make in the School.