# EXHIBIT E

RLF1 3615725v.1

# DECLARATION OF
# MICHAEL ABBOTT

I, Michael Abbott, declare as follows:

1. I am competent to make this declaration and I have personal knowledge of the facts stated herein.

2. I have extensive experience in California's legislative and regulatory efforts to protect consumers, including the following:

- From January 1999 to November 1999, I was Chief Consultant to the California Assembly's Committee on Consumer Protection, Governmental Efficiency and Economic Development;
- From June 1995 to January 1999, I was a Senior Consultant to the Senate Committee on Business and Professions;
- From February 1993 to June 1995, I was the Principal Consultant to the Assembly Education Committee; and
- From January 1989 to January 1991, I was Senior Consultant to the Assembly Governmental Efficiency and Consumer Protection Committee.

3. From November 1999 to May 2004, I was Bureau Chief of the California Bureau for Private Postsecondary and Vocational Education (the "Bureau" or the "BPPVE").

4. Since I left the Bureau, I have been a consultant in private practice. As part of my consulting practice, I have provided analysis and advice to Corinthian Colleges, Inc. regarding legislative and regulatory matters from approximately June 2004 to the present for a monthly retainer of $3,000.

5. During the time I was the Bureau Chief, I oversaw the Bureau's administration and enforcement of the *Private Postsecondary and Vocational Education Reform Act of 1989* (the "Act"), including Article 7, which is the *Maxine Waters School Reform and Student Protection Act of 1989*.

6. My experience as a regulator attempting to enforce the completion and placement standards in the Act convinced me that these standards are so convoluted and contradictory that it is nearly impossible for schools and the staff in the Bureau to interpret, explain and apply them consistently. During my time as Bureau Chief, staff personnel adopted differing interpretations of the various provisions of the Act to such an extent that the Bureau had, I believe, nearly as many interpretations as staff people. The net result of this confusion was that Bureau staff were unable to provide meaningful guidance to schools that sought advice about the specific reporting and disclosure requirements under the Act.

7. Additionally, the completion and placement standards under the Act are redundant of accreditation standards on these same matters, yet the Act has different formulas for calculating completion and placement from those of the accreditation agencies. Moreover, there are multiple possible interpretations of the formulas for computing completion and placement under the Act, all of which conflict with the parallel accreditation calculations for completion and placement. I learned that well-meaning school employees in California were understandably confused about how to measure and report completion and placement outcomes to the Bureau, their respective accrediting agencies, and prospective students.

8. One prime example of confusing language in the Act relates to which students are permitted to be excluded from the computations of completion and job placement. Subsections (a) and (b) of Section 94854 of the Act require that institutions meet minimum standards of completion and placement. These subsections are further incorporated by reference into Section 94859(a)(2), which requires institutions to disclose to prospective students: (A) "the percentage of students completing the program of instruction," and (B) the "percentage of students who

2
**DECLARATION OF MICHAEL ABBOTT**

completed the program of instruction and obtained employment," both of which are to be "determined pursuant to Section 94854."

9. Subsection (c) of Section 94854 requires exclusions of certain categories of students from these calculations:

> (c) For the purposes of subdivisions (a) and (b), students who, as documented by the institution, have been prevented from completing the program or programs of instruction due to *death, disability, illness, pregnancy, military service, or participation in the Peace Corps or Domestic Volunteer Service* shall be excluded from the computations used to determine whether an institution has met the performance standards prescribed by those subdivisions. [Emphasis added]

As applied to the completion and placement calculation standards under the Act, this language caused considerable interpretive confusion. Under this provision, schools could clearly exclude students from their *completion* statistics who had failed to *complete* the program for one of the enumerated reasons. However, since Subsection (c) also applies to provisions that deal with "obtaining employment," schools were often confused about whether students who had had completed a program and *thereafter* died, became disabled, ill or pregnant, or joined the military, Peace Corps or Domestic Volunteer Service, should also be excluded from the calculations to determine whether a student had "obtained employment" under Sections 94854(a)(2) and 94854(b)(2).

10. The use of similar, but not identical, terminology in other parts of the Act also caused confusion among schools. For instance, the term "placement rate" seems intuitively related to the term "obtain employment." However, the Act makes no attempt to link them together. In Subsection 94854(f), the term "placement rate" is first used to provide a regulatory reprieve for institutions that fail to meet the "completion" and/or "obtaining employment" standards of 94854(a) and 94854(b):

> (f) (1) This subdivision applies only to an institution or any site that fails to meet any of the following:

3
**DECLARATION OF MICHAEL ABBOTT**

    (A)  Any of the standards established in subdivision (a) or (b) by 10 percent or less.

    (B)  Any of the standards established in subdivision (a), but has a *placement rate* of 42 percent or more for the course in which the standard was failed. [Emphasis added]

    (C)  Any of the standards established in subdivision (b), but has a *placement rate* of 42 percent or more for all courses in the aggregate. [Emphasis added]

11. The term "placement rate" is defined by Subsection 94854(k)(4). However, this subsection does not specify whether the term "placement rate" means the same thing as "obtaining employment" for the purposes of the standards outlined in 94854(a) and (b). Indeed, the definition itself is confusing It provides as follows:

    (k)  For the purposes of this section, the following definitions shall apply:

    \* \* \*

    (4)  "Placement rate" means the percentage of students who fulfilled the provisions of the following two subparagraphs:

        (A)  Began the program, did not cancel pursuant to Section 94867, and were originally scheduled at the time of enrollment to complete the program during the applicable time period described in subdivision (l).

        (B)  Completed the program, within the applicable time period described in subdivision (l) and started employment within six months of completing the program or, if employment requires taking a state licensure examination for which only graduates of the program may apply, then (i) started employment within six months of the date on which the state licensing agency announces the results of the first licensure examination reasonably available to students who completed the program, or (ii)

4
**DECLARATION OF MICHAEL ABBOTT**

>started employment within six months of the next reasonably available licensure examination date for any student who did not receive passing results on the first exam. The time period determined pursuant to this subparagraph shall not exceed 10 months beyond the date of completion of the program of instruction. The institution shall retain a record of the date of the first reasonably available licensure exam following the completion date of each student, the date the licensure agency announces the results of the first reasonably available licensure exam, and the date of the next reasonably available licensure exam for each student who did not pass the first exam.

While subsection 94854(k)(4) defines the term "placement rate" as a "percentage," it fails to include the necessary information for the mathematical calculation - i.e. what numbers should be used to calculate the percentage. It says that "placement rate" is the "percentage" of students who satisfy the requirements of [both] subsections (A) *and* (B). When a school compiles the number of students who satisfy the requirements of both subsections (A) and (B), it is unclear what number it should divide that number by in order to calculate the percentage. It could reasonably be either the number of students who "began the program" or the number of students who "completed the program." In other words, the definition specifies a mathematical numerator to calculate the percentage, but fails to specify a denominator.

12. Finally, to return to the matter of which graduates may be excluded from the calculations of "obtaining employment" and/or "placement rate," subsection 94854(n) of the Act provides as follows:

>(n)   In determining the placement rate for a particular time period as described in subdivision (l), an institution *may* exclude from the calculation a student who either:
>
>>(1)   Decides not to obtain employment and within six months of completing the program enrolls in a program to continue his or her education to obtain a higher level degree that is related to, or provides for

5
**DECLARATION OF MICHAEL ABBOTT**

>   the student to use, the same skills or knowledge
>   obtained in the program the student completed.
>
>   (2) Is in possession at the completion of the program of a
>   valid United States Immigration and Naturalization
>   Service Form I-20. [Emphasis added.]

Again, this provision of the Act is confusing and provides more questions than answers: Are these two categories of students the *only* categories that should be excluded from calculation of "placement rate"? Or, are these categories merely additive to the groups of students who are already required to be excluded from the calculations as required by 94854(c) (those who died or became disabled, ill or pregnant, or joined the military, Peace Corps or Domestic Volunteer Service)? And, again, does "placement rate" mean the same thing as "obtaining employment"?

13. Based on these confusing provisions, even after having spent nearly five years as Bureau Chief, I could not provide a definitive interpretation to a school seeking advice about how to measure and report its compliance with these confusing standards.

14. Finally, with regard to confirming the accuracy of student placement, Bureau personnel attempted sporadically to verify the placement results reported by schools under its jurisdiction. On the basis of these efforts, as well as other interactions with students attending vocational schools, I came to believe that the verification efforts would be exceedingly difficult because of the mobile nature of the students. Students served by schools under the Bureau's jurisdiction tended to be very transient. Indeed, it was very difficult to find students to do follow-up work regarding complaints or even to identify students who filed claims under the Student Tuition Recovery Fund. Thus, even students who had initially contacted the Bureau or may have been entitled to money often could not be found.

15. The contradictions and ambiguities in the Act discussed above are illustrative and not exhaustive. I believe even well-meaning and ethical schools often have difficulty interpreting and complying with these and many other provisions of the Act.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 5th day of June, 2006 at Sacramento, California.

_/s/ Michael Abbott_

MICHAEL ABBOTT

---
7
**DECLARATION OF MICHAEL ABBOTT**