# EXHIBIT 1

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                               **SUPERIOR COURT DEPARTMENT**
                                          **CIVIL ACTION NO. 14-1093**

| |
|---|
| COMMONWEALTH OF MASSACHUSETTS, |
| Plaintiff, |
| v. |
| CORINTHIAN COLLEGES, INC., and CORINTHIAN SCHOOLS, INC., |
| Defendants. |

## ANSWER OF DEFENDANTS CORINTHIAN COLLEGES, INC. AND CORINTHIAN SCHOOLS, INC.

Defendants Corinthian Colleges, Inc. and Corinthian School's Inc. (collectively, the "School") hereby answer the politically motivated complaint filed by the Attorney General of the Commonwealth of Massachusetts ("General Coakley" or "the Government") as follows:

### PRELIMINARY STATEMENT

The Government's untrue allegations and the aspersions cast on the School are demeaning to the School and its employees, to the School's students who are striving for a career and a better life, and to the employers who hire thousands of the School's qualified graduates. The Government's Complaint also indicts the oversight provided by the federal Department of Education, the School's accreditors; the Commonwealth's own Office of Consumer Affairs and Business Regulation, Department of Professional Licensure; and the Commonwealth of Massachusetts Department of Education, Office of Proprietary Schools. The Complaint suggests that the School's employees go to work every day for the express purpose of preying on students, which is insulting and preposterous. The School and its employees are passionately dedicated to providing quality career education where public education has often failed, and to helping

graduates find meaningful work in their fields of study. Most of the School's students have not succeeded in a traditional academic environment. Approximately one-third have tried community college before enrolling at one of our institutions. The School's students frequently have few people in their lives who can provide the support and encouragement they need to achieve a career goal. The School and its employees are committed to honoring the trust that their students place in them as educators, supporters, and members of a community that cares. The School's substantial and on-going investment in placement services has helped tens of thousands of graduates find work in their fields, even during the recent deep and prolonged recession.

As a career institution, the School is subject to a complex and often-conflicting web of federal and state regulation, along with myriad accreditation, licensing, and reporting requirements. The School has been, and continues to be, an industry leader in its commitment to integrity and to the implementation and enhancement of processes and training to promote compliance. The School has devoted substantial resources to not only meet these regulatory requirements, but to exceed them. Rather than acknowledging and commending the School's aspirational goals, the Government is seeking to damage the School or shutter it completely, based upon hardened political views that ignore significant facts. The Complaint is replete with cherry-picked, anonymous complaints intended to damage the School's reputation, and yet not a single one of these complaints was ever shared with the School despite numerous requests during a three-year-long investigation by the Attorney General's Office ("AGO").

Since May 2, 2011, the AGO has investigated the School for supposed violations of Massachusetts General Laws c. 93A ("Chapter 93A"). The School cooperated by providing the AGO with thousands of documents and inviting the General and her staff to inspect the School's Massachusetts campuses (which General Coakley repeatedly declined to do, apparently

considering such a visit to observe employees, students, and the facilities to be irrelevant.)
During the course of this investigation, the AGO has uncovered no evidence of any systemic
wrongdoing or violations of law by the School. Rather the AGO compiled (and concealed until
now) a laundry list of anonymous complaints, the likes of which could be replicated at any
school of sufficient size whether for-profit or not, and which were collected by some unexplained
method.

## INTRODUCTION

1.      Paragraph 1 of the Government's Complaint contains inflammatory introductory
statements and conclusions of law to which no response is required. The School denies that any
of the relief requested is warranted.

2.      The School denies the allegations in Paragraph 2.

3.      The School denies the allegations in Paragraph 3.

4.      The School denies the allegations in Paragraph 4. The School accurately reports
placement rates to its accreditors. The School only began showing placements rates for its
Massachusetts campuses on the School's website when required to do so by law in 2011. The
placement statistics reported on its website are the same as those reported to the accreditors. The
School has never used placement statistics in its Massachusetts advertising. The School does not
promise or guarantee employment after graduation. In fact, all incoming students are required to
read and initial a disclosure which expressly states that the School has *not* promised employment
to the student.

5.      The School denies the allegations in Paragraph 5. The School routinely turns
away potential students whose criminal history or medical conditions would prevent them from
obtaining employment when the School learns of those hindrances.

6.      The School admits that many of its students obtain student loans in order to pay tuition, that some of its graduates have not found employment, and that some former students are not current on their loan payments. Obtaining education improves the chances of employment, but does not guarantee employment as many of the Commonwealth's graduates from costly liberal arts programs well know. The School denies the remaining allegations in Paragraph 5. Each of the School's students received valuable training and education in return for tuition payments.

7.      The School admits that most its students' and former students' debt incurred to pay tuition to the School are in the form of federal student loans. The School admits that most of its students also obtain a private loan to help pay for tuition. This is unfortunately necessary due to the federal "90/10" rule which prevents schools from receiving more than 90% of students' tuition in federal student loans. The unfortunate effect of that rule is to prevent low-income or no-income students from enrolling in training or educational programs unless they can somehow obtain 10% of their tuition money, usually through a private loan. Because lenders typically refuse to lend to this population of students and because of federal policy changes and the credit market squeeze beginning in 2008, the School has been forced to subsidize—with implicit federal approval—private loans so that students can obtain the funds needed for tuition. When students fail to repay these loans, the School does not bring lawsuits for repayment. The School denies the remaining allegations in Paragraph 7.

8.      The School lacks sufficient information to admit or deny the allegations in Paragraph 8. The two quotations in this Paragraph (and those in many subsequent paragraphs) constitute hearsay, and worse—anonymous hearsay. This Complaint is the first time the School has been made aware of *any* student complaint despite repeatedly asking the Government to

- 4 -

share any such complaints with the School so that they might be investigated, clarified, and resolved. Such an approach only seemed fair to students who had raised issues, perhaps more than three years earlier. Rather than provide the students with a meaningful response, the Government kept the complaints in its back pocket thinking solely of their strategic value with respect to media coverage and filing of a lawsuit. These are hardly the actions of a government or public servant—especially one running for governor—concerned primarily with the welfare of students. The Commonwealth's refusal to share these complaints over the course of three years only to then use them in a public pleading speaks volumes about the Government's intent and the merits of this lawsuit. The School does not know who these students are, how these statements were generated or recorded, what the context of these statements is, and has not had any opportunity to investigate them. Moreover this paragraph complains of the effects of state and federal collections law and the bankruptcy code. The School, of course, has no control over these laws.

## JURISDICTION AND VENUE

9. Paragraph 9 of the Government's complaint is a jurisdictional statement and contains conclusions of law to which no response is required. The School denies that it has committed any violations of G.L. c. 93A.

10. Paragraph 10 of the Government's complaint is a jurisdictional statement and contains conclusions of law to which no response is required.

11. Paragraph 11 of the Government's complaint is a jurisdictional statement and contains conclusions of law to which no response is required

## PARTIES

12.     The School admits the identity of the plaintiff but denies that it committed any unlawful conduct. The remaining allegations in Paragraph 12 are legal conclusions to which no response is required.

13.     The School admits the factual allegations in Paragraph 13.

14.     The School admits the factual allegations in Paragraph 14.

## STATEMENT OF FACTS

15.     The School notes that paragraphs 15 through 30 essentially cannibalize Senator Harkin's report, improperly citing it as a "Senate Report." As General Coakley and her staff well know, the report was so flawed in its methodology that the other Democrats on the HELP committee refused to sign it; hence, it is only a staff report from Senator Harkin himself. Elevating such an error-riddled report to the status of "fact" further reveals the intent behind this lawsuit. The School lacks sufficient information to admit or deny the allegations in Paragraph 15. The allegations in this Section I have little or nothing to do with the School, but appear to be the Government's attempt to condemn the School by association, and to color media coverage by disparaging the industry as a whole instead of presenting specific evidence of wrongdoing by the School. This tactic should not be rewarded, and these allegations should be given no weight.

16.     The School lacks sufficient information to admit or deny the allegations in Paragraph 16 which do not pertain to the School but refer to career schools in general.

17.     The School lacks sufficient information to admit or deny the allegations in Paragraph 17 which do not pertain to the School but refer to career schools in general.

18.     The School lacks sufficient information to admit or deny the allegations in Paragraph 18 which do not pertain to the School but refer to career schools in general.

19.     The School lacks sufficient information to admit or deny the allegations in Paragraph 19 which do not pertain to the School but refer to career schools in general.

20.     The School lacks sufficient information to admit or deny the allegations in Paragraph 20 which do not pertain to the School but refer to career schools in general.

21.     The School lacks sufficient information to admit or deny the allegations in Paragraph 21 which do not pertain to the School but refer to career schools in general.

22.     The School lacks sufficient information to admit or deny the allegations in Paragraph 22 which do not pertain to the School but refer to career schools in general.

23.     The School's mission is training and educating students in certain diploma programs and charges tuition for these accredited educational services. The School advertises its classes in an effort to help students improve their career prospects through education. The School admits that it uses multiple avenues to reach people who are under-consuming education, who will benefit from additional education, especially where it is career focused. The School denies that it sells any "product" in Massachusetts other than education and training services. Except as explicitly admitted herein, the School denies any remaining allegations in Paragraph 23.

24.     The School admits the factual allegations in Paragraph 24.

25.     The School denies the misleading quote to Senator Harkin's staff report and, upon information and belief, admits the factual allegations in Paragraph 25.

26.     The School admits that it serves a demographic failed by public education and that is eligible for federal student loans and grants. The School denies the inaccurate percentage rate and the other factual allegations in Paragraph 26.

27.     The School denies the misleading quote to Senator Harkin's staff report and all other factual allegations in Paragraph 27.

28.     The School denies the allegations in paragraph 28.

29.     It is not and has never been true that the "vast majority" of the School's students default on their loans. The School has created an ambitious financial literacy program that helps students remain in compliance with their loan terms, gives them helpful reminders, and refers qualified students to the federal government's deferral and forbearance options which must be approved by the federal government before becoming effective. The notion that the Government would cast this program as something nefarious is frankly incredible, especially when the Consumer Financial Protection Bureau chastised schools for not making their students aware of such programs. Except as explicitly admitted herein, the School denies the allegations in Paragraph 29.

30.     The School denies the allegations in Paragraph 30. The School notes that providing educational services is capital intensive and that it provides these services more efficiently than the Commonwealth's community colleges. Notwithstanding the increase in revenues, the School's profit margins are typically under 4%.

31.     The School denies the allegations in Paragraph 31 while noting that this paragraph could apply to virtually every other post-secondary educational institution during this recession and its aftermath. Studies covering this period indicate that nearly 50% of bachelor's degree graduates are un-employed or under-employed. The School, however, has a good rate of success in placing graduates in jobs related to their field of study, even during the worst years in terms of national unemployment.

32.     The School denies the allegations in Paragraph 32.

33.     The School denies the allegations in Paragraph 33 except it admits that its students typically experience challenging economic environments which can improve with

additional education. To suggest that students are subject to "hard sell" tactics is preposterous. On average, more than a month passes between the first contact with a prospective student and that student signing of an enrollment agreement. Students may then attend classes for up to two weeks while maintaining the right to withdraw from classes without any financial obligation—meaning that an average student has *more than six weeks* before incurring any financial obligation to the School. Moreover, "tapping into" federal financial aid is not a function of the School's "business plan," it's a function of the fact that School primarily serves those whom public policy at the federal and state level have deemed worthy of assistance. The School is proud to serve such students and is taken aback by these allegations from public servants who claim to be championing the cause of education for these students.

34.     The School denies the allegations in Paragraph 34. The School's admissions representatives, however, are trained using a state-of-the-industry program to comply with and indeed surpass state and federal regulations that dictate how they may engage with prospective students. The School offers quality educational services that include financial counseling, career services, and life lessons and wants all those who can benefit from these services to know about its offerings.

35.     The School lacks sufficient information to admit or deny whether the anonymous hearsay quotations in Paragraph 35 were actually made. The School denies that these are accurate descriptions of its activities. The School cannot answer for the behavior of an unknown and unrelated "lead generator" that is not even identified by the Complaint. The School denies the remaining allegations in Paragraph 35.

36.     The School denies that prospective students are subjected to increased pressure during on-campus meetings. In fact, most prospective students are encouraged to and attend such

meetings with trusted family members or friends who are able to help them make decisions. The School admits that the quoted language is accurate, but denies that this quotation in any way supports the allegation that prospective students are subjected to undue pressure. The quotation proves the exact opposite: that prospective students are encouraged to see the campus itself, to tour the facilities (two actions with the Government has steadfastly refused to do over the last three years) and to make an informed decision with trusted advisors before enrolling. The School does not benefit from students who enroll and then drop from the School prior to graduation. Except as explicitly admitted herein the School denies the allegations in Paragraph 36.

37.    The School lacks sufficient information to admit or deny whether the anonymous hearsay quotations in Paragraph 37 were actually made. The School denies that these are accurate descriptions of its activities, and denies all the remaining allegations in Paragraph 37.

38.    The School denies the allegations in Paragraph 38.

39.    The School denies the allegations in Paragraph 39.

40.    The School admits that Exhibit 1 is one of its advertising templates and denies that this advertisement is in any way false or misleading. The School admits that it tries to enroll as many students as it can responsibly teach and as will benefit from the education. Except as expressly admitted herein, the School denies any remaining allegations in Paragraph 40.

41.    The School denies the allegation in Paragraph 41.

42.    The School lacks sufficient information to admit or deny whether the anonymous hearsay quotations in Paragraph 42 were actually made. The School denies that these are accurate descriptions of its activities, notes that these allegations are contradicted by purported student quotations later in the Complaint, and denies all the remaining allegations in Paragraph 42.

43.     The School lacks sufficient information to admit or deny whether the anonymous hearsay quotations in Paragraph 43 were actually made. The School denies that these are accurate descriptions of its activities, notes that these allegations are contradicted by purported student quotations later in the Complaint, and denies all the remaining allegations in Paragraph 43.

44.     The School denies the allegations in Paragraph 44, noting that these allegations are contradicted by purported student quotations later in the Complaint,

45.     Although reaching beyond the statute of limitations, the School admits the factual allegations in Paragraph 45.

46.     Although reaching beyond the statute of limitations, the School admits the factual allegations in Paragraph 46.

47.     The School admits the factual allegations in Paragraph 47.

48.     The School admits the factual allegations in Paragraph 48.

49.     The School lacks sufficient information to admit or deny whether the anonymous hearsay quotations in Paragraph 49 were actually made—especially because the AGO refused repeated requests for these complaints over the last three years. The School denies that these are accurate descriptions of its classroom activities, and denies any remaining allegations in Paragraph 49. If the Government had accepted the School's repeated invitations to observe classes at either of its Massachusetts campuses, the AGO would have been able to see that these hearsay statements paint a very inaccurate picture of the quality of education at the School. One would think that an impartial, three-year investigation would include at least one campus visit before taking the important step of filing a complaint rife with unverified, anonymous allegations. These allegations also completely deny—and implicitly indict—the oversight

provided by the federal Department of Education delegated to accreditors, as well as the

Commonwealth's own Office of Consumer Affairs and Business Regulation, Department of

Professional Licensure (which has licensed and regulated the Massachusetts campuses since

August 1, 2012) and the Commonwealth of Massachusetts Department of Education, Office of

Proprietary Schools (prior to August 1, 2012).

      50.     The School lacks sufficient information to admit or deny whether the anonymous

hearsay quotations in Paragraph 50 were actually made—especially since the AGO refused

repeated requests for these complaints over the last three years. The School denies that these are

accurate descriptions of its classroom activities, and denies any remaining allegations in

Paragraph 50. If the Government had accepted the School's repeated invitations to observe

classes at either of its Massachusetts campuses, the AGO would have been able to see that these

hearsay statements paint a very inaccurate picture of the quality of education at the School. One

would think that an impartial, three-year investigation would include at least one campus visit

before taking the important step of filing a complaint rife with unverified, anonymous

allegations. These allegations also completely deny—and implicitly indict—the oversight

provided by the federal Department of Education delegated to accreditors, as well as the

Commonwealth's own Office of Consumer Affairs and Business Regulation, Department of

Professional Licensure (which has licensed and regulated the Massachusetts campuses since

August 1, 2012) and the Commonwealth of Massachusetts Department of Education, Office of

Proprietary Schools (prior to August 1, 2012).

      51.     The School lacks sufficient information to admit or deny whether the anonymous

hearsay quotations in Paragraph 51 were actually made—especially those concerning the period

outside the statute of limitations and since The AGO refused repeated requests for these

complaints over the last three years. The School denies that these are accurate descriptions of its classroom activities, and denies any remaining allegations in Paragraph 51. If the Government had accepted the School's repeated invitations to observe classes at either of its Massachusetts campuses, the AGO would have been able to see that these hearsay statements paint a very inaccurate picture of the quality of education at the School. One would think that an impartial, three-year investigation would include at least one campus visit before taking the important step of filing a complaint rife with unverified, anonymous allegations. These allegations also completely deny—and implicitly indict—the oversight provided by the federal Department of Education delegated to accreditors, as well as the Commonwealth's own Office of Consumer Affairs and Business Regulation, Department of Professional Licensure (which has licensed and regulated the Massachusetts campuses since August 1, 2012) and the Commonwealth of Massachusetts Department of Education, Office of Proprietary Schools (prior to August 1, 2012).

52.     The School denies the allegations in Paragraph 52.

53.     The School denies the allegations in Paragraph 53. Moreover, each new student reads and initials a plain-English disclosure paragraph which explicitly states that credits likely will not transfer, that the student should consult with a potential receiving institution prior to enrollment at the School, and that the student has not been promised that credits would transfer to any other institution. The Government is well aware of these disclosures.

54.     The School lacks sufficient information to admit or deny whether the anonymous hearsay quotation in Paragraph 54 was actually made. The School has not had a chance to investigate this complaint, but finds it unlikely that this student could have believed credits would necessarily transfer to another school after reading and initialing a disclaimer explicitly stating this was not the case. The School denies all remaining allegations in Paragraph 54.

55.     The School denies the allegations in Paragraph 55.

56.     The School states that the catalog speaks for itself and that no further response is required with respect to those quotations. The School admits that its curriculum makes use of externships and that these externships are often valuable educational experiences. Except as expressly admitted herein the School denies the remaining allegations in Paragraph 56.

57.     The School states that the catalog speaks for itself, and admits the remaining allegations in Paragraph 57.

58.     The School lacks sufficient information to admit or deny whether the anonymous hearsay quotations in Paragraph 58 were actually made. The School denies that these are accurate descriptions of its externship program, and denies all remaining allegations in Paragraph 58.

59.     The School lacks sufficient information to admit or deny whether the anonymous hearsay quotations in Paragraph 60 were actually made. The School denies that these are accurate descriptions of its externship program, and denies all remaining allegations in Paragraph 59. Some students do find their own externship opportunities, and the School supports that, but no student is required to obtain his or her own externship.

60.     The School denies the allegations in Paragraph 60.

61.     The School denies that it has used statistics concerning the placement of students in any advertising or recruitment material. The School admits that "career-preparation training" is part of the services it offers and advertises. Except as explicitly admitted herein the School denies the remaining allegations in Paragraph 61.

62.     The School states that statements in the catalog and its website speak for themselves and that no response is required with respect to these quotations in Paragraph 62. The

School admits that the excerpted quotation from the recorded telephone call in this Paragraph is accurate and further states that this statement is in no way a misrepresentation.

63.     Graduate placement outcomes are important because they form one of the key bases for accreditation and eligibility for participation in federal student loan programs which assist students in obtaining an education. The School has been reporting accurate placement statistics to its accreditors for years and those accreditors have significantly more experience and expertise in regulating and vetting that reporting than the AGO does. The federally recognized accreditor for the School's Massachusetts campuses is the Accrediting Commission of Career Schools and Colleges ("ACCSC") which has not raised any systemic concern about those campuses' placement report that is similar in nature to what the Government has alleged here. That is because the deficiencies alleged by the Government simply do not exist. The School further states that the annual statement speaks for itself and no further response is required with respect to that quotation. Except as expressly admitted herein the School denies any remaining allegations in Paragraph 63.

64.     The Schools states that the website speaks for itself and no further response is required with respect to those quotations. The School admits the remaining factual allegations in Paragraph 64.

65.     The Schools states that the website speaks for itself and no further response is required with respect to those quotations. The School admits the remaining factual allegations in Paragraph 65.

66.     The School admits that it has used the two advertisements described in Paragraph 66 and included as Exhibits 2 and 3, and states that these advertisements are in no way false or misleading.

- 15 -

67.    The School admits that the quotation of the recorded telephone call in Paragraph 67 is accurate and states that this statement is in no way false or misleading.

68.    The School admits that it reported placement statistics to its accreditor from 2009 to the present. The School denies that it reported these statistics to prospective students or to the public prior to 2011 when it became required by law to do so. The School denies that placement statistics are included in advertising materials. The School's placement statistics have been materially accurate. Except as expressly admitted herein the School denies any remaining allegations in Paragraph 68.

69.    The School denies the allegations in Paragraph 69 and further states that the School calculates and reports student placement statistics as it is required to do, based on formulae and criteria established by ACCSC and by the United States Department of Education's Program Integrity Rules. The School has robust compliance, accreditation, and licensing processes in place to ensure that its reports are accurate and comply with the applicable rules and regulations. The allegations raised by the Government concerning the School's placement reporting have not been raised by the School's accreditor, ACCSC, because those allegations are unfounded. Notably neither the Commonwealth's Department of Education nor its Department of Professional Licensing has raised such concerns.

70.    The School lacks sufficient information to admit or deny whether the anonymous hearsay quotations in Paragraph 70 were actually made. The School does not know who has made these anonymous claims and has not had an opportunity to investigate them. The School denies that its admissions representatives make any promises about future placement statistics and denies that they misrepresent past statistics. The School denies that the excerpts from selected recorded telephone calls are properly transcribed. Those recorded statements are very

different in character to the statements that two former students allegedly recall. The School denies the remaining allegations in Paragraph 70.

71.     The School denies the allegations in Paragraph 71 and notes that the Government fails to supply any evidence of this allegation, not even anonymous hearsay. Moreover, all of the School's students read and initial a disclosure explicitly stating that employment is not guaranteed and agreeing that they have not been promised employment after graduation. The School has had this plain-English, up-front disclosure in place for years.

72.     The School admits that the placement statistics reproduced on the chart in Paragraph 72 were reported to the School's accreditor and states that these statistics are accurate. The School reiterates that these disclosures on the website are required by federal law as of July 2011. The School admits the allegations contained in the first sentence of Paragraph 72. The School states that the remaining allegations in Paragraph 72 are only partially accurate and therefore denies them.

73.     The School denies the allegations in Paragraph 73. Moreover, the description of the "sample" used by The AGO is incorrect. The Government did not sample "all graduates" in medical assistant program, but rather a sample of students hand-picked by the Government and with improper sampling techniques.

74.     The School denies the allegations in Paragraph 74. The Government lacks a good faith basis for making the allegation that the School's "Actual Graduate Placement Rate" was 27% and 23% respectively. The AGO obtained these numbers by sending a pre-populated, written survey to employers asking them to verify the employment of graduates that had been hired three to six years prior. The employers had little or no incentive to do anything more than a cursory investigation to find employment records for these students. The School, conversely, has

submitted to the Government contemporaneous signed verifications of employment that were submitted to the School either by these employers or by the graduates themselves. Nevertheless, in each case The AGO chose to use its own after-the-fact survey results instead of the School's contemporaneous evidence. But The AGO's allegation is false and misleading for even more striking reasons. This allegation leads the court to believe that the majority of the School's placements are simply fabricated. But in fact the AGO's own survey found only 13 instances out of 378 where the employer reported that the graduate in question had never been hired. The School has contemporaneous evidence that these graduates were in fact hired, strongly implying that these 13 employers simply did not put in the effort to determine whether a hire actually occurred three to six years in the past. The remainder of the difference between the School's reported statistics and the Government's alleged calculation concerns 107 graduates that were accurately reported as placed, but which the Government contends did not hold their jobs for a long enough period of time (which the Government arbitrarily placed at two months), or that their jobs were not sufficiently related to the education provided by the School. Moreover the graduates allegedly placed in "unrelated" jobs were not placed in menial jobs, but rather in positions that increased the graduates' pre-enrollment income or were in the allied health field. Each of these 107 placements is unquestionably proper based on the standards established by the federally-recognized accreditor, which the School is required by law to use in calculating placement rates and which it is required by law to report on its website. The Government is seeking to impose an aspirational, arbitrary, and *ex post facto* standard for determining what constitutes a proper placement.

75.     The School denies the allegations in Paragraph 75.

76.    The School admits the statements in Paragraph 76 were made and accurately transcribed, but cited entirely improperly in the Government's complaint. The Government implies that the School counted placements after Mr. Massimino publicly stated they should not be counted. General Coakley and her staff are aware, however, that Mr. Massimino is speaking of a voluntary, internal policy change that was made *after* the sample of students examined by the Government.  At the time those placements were reported they were valid under the School's policy and would still be valid today under the federal recognized accreditor's standards.  In essence, the Government is accusing the School of raising its placement standards above what the government requires and then twisting that into a violation of state law.

77.    Everest admits that its accreditor holds the School to meaningful standards. That does not mean, however, that the accreditor found fault with the veracity of the School's reported placements. It simply means that in certain years that campus fell below the minimum threshold for placement rate or graduate rate set by the accreditor and was required to develop a placement plan to assist students in a tough economic environment. Schools that repeatedly fail to meet those thresholds lose accreditation and eligibility for federal student loan participation. Falling below those standards, however, can occasionally occur, especially during the difficult years of 2008 through 2011 when unemployment was at its highest. The School admits that it did not advertise its "on reporting" status to the public, and was not required to do so by any law or regulation. The School lacks sufficient information to admit or deny whether the statements attributed to Mr. Bonkowski—who was terminated for cause—were actually made by him. The School was not aware of any of the statements made by Mr. Bonkowski until this Complaint was filed. The School denies the remaining allegations in Paragraph 77.

78.    In Paragraph 78, and those immediately following, the Commonwealth is using the alleged testimony of a disgruntled former employee of the School who was himself the perpetrator of the acts he described. As soon as the School learned of these acts it terminated Mr. Bonkowski and self-reported the situation to its accreditor and to the Government. The School also recalled the improper placements made in violation of School policy and corrected its statistics reported to the accreditor.  The Commonwealth conceals these facts in its Complaint and presents Mr. Bonkowski as if we were a whistleblower as opposed to the wrongdoer. This was an isolated event which the School's internal compliance program quickly identified and dealt with. The School further states that it does not create the policy on what constitutes a placement, the accreditor does. The School lacks sufficient information to admit or deny whether the statements attributed to Mr. Bonkowski were actually made by him. The School denies the remaining allegation contained in Paragraph 78.

79.    The School denies the allegations as stated in Paragraph 79. These allegations refer to the improper acts taken by Mr. Bonkowski who was terminated for cause as a result. Although the School initially counted these placements due to Mr. Bonkowski's deception, the School's compliance department detected this issue and reversed those improper placements.

80.    The School lacks sufficient information to admit or deny whether the statements attributed to Ms. Garrow-Pruitt in Paragraph 80 were actually made by her. The School denies that her statements are accurate. Ms. Garrow-Pruitt aided Mr. Bonkowski in arranging the health fair that she complains of and she was also terminated for that reason.

81.    The School lacks sufficient information to admit or deny whether the statements attributed to Mr. Bonkowski in Paragraph 81 were actually made by him. The School denies that Deetra Dennis knew of Mr. Bonkowski's violation of School policy at the time of the health fair.

The remainder of Mr. Bonkowski's statements in Paragraph 81 are an accurate description of the acts he himself committed without the School's knowledge (and was terminated for once the School learned of them), except that these placements were not ultimately counted by the School.

82.     The School denies the allegations in Paragraph 82.

83.     The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 83 were actually made. The School has not had an opportunity to investigate these specific complaints (due to the AGO's refusal to provide them to the School over these three years) but denies that its admissions staff or its advertisements make representations about potential future wages.  In fact, each student signs a plain-English disclosure informing them that no wage or salary range is guaranteed and the students affirm that no admissions representative has made such a representation to them. Such claims fly in the face of such disclosures and the training and oversight provided by the School relating to its admissions representatives.

84.     The School lacks sufficient information to admit or deny the allegations in Paragraph 84, but notes that such a figure is nearly twice the minimum wage that many of the School's students are earning prior to enrollment.

85.     The School denies the allegations in Paragraph 85.

86.     The School states that the website speaks for itself and no further response is required with respect to that quotation in Paragraph 86. The School admits that it promises to help graduates obtain employment and states that it does so. In fact the School has approximately one career services employee for every 108 students. By way of comparison, community colleges typically have one counselor of any kind (not just for career services) for every 1,000 students.

87.    The School admits that it used the advertisements described in Paragraph 87 and attached as Exhibits 1, 5, and 6, none of which are false or misleading in any way. The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 87 were actually made.  The School denies that its admissions representatives promise potential students that they will obtain employment.

88.    The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 88 were actually made. The School has not had an opportunity to investigate any of these complaints and therefore denies them. The School has a robust career services department that assists students in all aspects of obtaining a job including mock interviews and résumé writing. The School has successfully placed thousands of graduates in jobs during some of the worst years of unemployment in recent memory.

89.    The School admits that it has used the advertisement listed as Exhibit 5 and states that the advertisement speaks for itself and is in no way false or misleading. The School denies the remaining allegations in Paragraph 89.

90.    The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 90 were actually made. The School has not had an opportunity to investigate this complaint and therefore denies it. The School denies the remaining allegations in Paragraph 90.

91.    The School denies the allegations in Paragraph 91.

92.    The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 92 were actually made. The School has not had an opportunity to investigate these complaints and therefore denies them. However, the School is transparent with students regarding their financial obligations and makes clear disclosures to the

student orally and in writing before any debt is incurred.  The School denies the remaining allegations in Paragraph 92.

93.     The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 93 were actually made. The School has not had an opportunity to investigate this complaint and therefore denies it. The School denies the remaining allegations in Paragraph 93.

94.     The School denies the allegations in Paragraph 94.

95.     The School denies the allegations in Paragraph 95.  Such allegations manifest a material misunderstanding of the School's operations, incentives, and oversight.  The School does not benefit—in fact, it is punished by its accreditor—when students withdraw prior to completion.  Enrolling students as alleged in this paragraph would only harm the School's retention percentage and make absolutely no business sense.

96.     The School lacks sufficient information to admit or deny whether the statements attributed to Mr. Bonkowski in Paragraph 96 were actually made. The School lacks sufficient information to admit or deny why Mr. Bonkowski fired Ms. Burnham. For the reasons explained above, however, Mr. Bonkowski's statements are untrustworthy. However, this statement actually underscores why it would be counterproductive for the School to admit students who could not reasonably be expected to complete their courses—the School would very quickly lose accreditation for failing to meet the accreditor's retention threshold. In addition, the School only retains tuition money from students for the time during which those students are enrolled. Once a student drops out or is dropped by the School, the School collects no further tuition from that student; students only pay for the classes attended.

97.    The School lacks sufficient information to admit or deny whether the statements attributed in Paragraph 97 to Ms. Garrow-Pruitt were actually made. The School denies that her alleged statement is accurate.

98.    The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 98 were actually made. The School has not had an opportunity to investigate these complaints and therefore denies them. The School denies the remaining allegations in Paragraph 98.

99.    The School denies the allegations in Paragraph 99.

100.    The School admits that it does not offer language courses. It denies the remaining allegations in Paragraph 100.

101.    The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 101 were actually made. The School has not had an opportunity to investigate this complaint and therefore denies it. The School denies the remaining allegations in Paragraph 101.

102.    The School denies the allegations in Paragraph 102.

103.    The School states that the catalog speaks for itself and that no further response is required with respect to that quotation. The School denies the remaining allegations in Paragraph 103.

104.    The School denies the allegations in Paragraph 104.

105.    The School lacks sufficient information to admit or deny whether the anonymous hearsay statements contained in Paragraph 105 were actually made. The School has not had an opportunity to investigate this complaint and therefore denies it. The School notes that

independent third-party proctors were hired for these positions and the School is unaware of any improprieties in this area. The School denies the remaining allegations in Paragraph 105.

106.    The School lacks sufficient information to admit or deny whether the statements attributed to Ms. Garrow-Pruitt were actually made. The School denies that her alleged statement is accurate. The School denies the remaining allegations Paragraph 106.

107.    The School denies the allegations in Paragraph 107.

108.    The School admits that it created a private loan program in partnership with Genesis and subsidized those loans, just as it had with Sallie Mae and other lenders prior to the changes in federal law and the change in market conditions in 2007-2008. Following the changes to the student lending market, the School needed to create this program because of the federal "90/10" rule which requires students to pay for at least 10% of their tuition costs using non-federal money. Because the School serves primarily low-income or no-income students, these students typically cannot afford to pay 10% of their tuition out-of-pocket and traditional lenders will not make loans to them. For several years, the federal government approved these institutional loans as part of the 10% side of the ledger. The School denies that Genesis "markets" to prospective students, who are informed that they can use funds from any lender. However, many students are only eligible for Genesis private loans. Notably, the Genesis does not lend to any student unless the federal government has approved the student for government loans and/or grants.

109.    The School admits the factual allegations in Paragraph 109, and further states that the only "subprime borrowers" served by the Genesis program are the School's own students.

110.    The School admits the factual allegations in Paragraph 110.

111.    The School denies the factual allegations in Paragraph 111 especially to the extent they imply that the Genesis and ASFG programs were not created with students in mind and do not comply with the federal 90/10 rule. These programs were and are compliant.

112.    The School denies the allegations in Paragraph 112, particularly that it is "steering" students into these loans.  The School would prefer not to participate in these loans.

113.    The School denies the allegations in Paragraph 113, particularly that it is "steering" students into these loans.  The School would prefer not to participate in these loans.

114.    The School admits that federal loans have, at times, been less costly than Genesis and Plan C loans, but notes that Genesis and Plan C loans are substantially less than other unsecured loans available to the School's students. The School would happily assist students in paying for their tuition using solely federal student loans if that were allowed by law. The School does not want to participate in the lending business but is forced to so by the state of the law on federal student loans and by current credit markets. Fewer than half of the School's students need these loans and they are typically very small compared to federal student loans—leading to the irony of this allegation: the School is accused of lending to the very students the government is lending to, but the School lends a fraction of the amount lent by the government. All material terms are disclosed to students. In-school payments on these loans are small, typically less than $35 per month, and students are given opportunities to work with the School in the event of delinquency. The School does not sue students who default on these loans. Except as explicitly admitted herein, the School denies any remaining allegations in Paragraph 114.

115.    It is disingenuous for the Commonwealth to allege that the School "steered" students to these loans when the Complaint itself admits that these students had no other loan options. The School denies the allegations of Paragraph 115.

116.    The School denies the allegations of Paragraph 116, particularly that the School "steered" students into these loans.

117.    The School admits that it reviewed the Genesis program, but denies the remaining allegations in Paragraph 117, particularly that it lent to students it knew would be unable to repay their loans.  Again, the School only lends to students that the federal government has found to be creditworthy.

118.    The School denies the allegations in Paragraph 118.

## COUNT I
### (Violations of G.L. c. 93A)

119.    The School realleges, as if fully set forth herein, its responses to paragraphs 1 through 118, inclusive of the Complaint.

120.    The School denies the allegations in Paragraph 120.

121.    The School denies the allegations in Paragraph 121.

122.    The School denies the allegations in Paragraph 122.

123.    The School denies the allegations in Paragraph 123.

124.    The School denies the allegations in Paragraph 124.

## COUNT II
### (Violations of 940 CMR 3.10 and 3.16)

125.    The School realleges, as if fully set forth herein, its responses to paragraphs 1 through 124, inclusive of the Complaint.

126.    The School denies the allegations in Paragraph 126.

127.    The School denies the allegations in Paragraph 127.

128.    The School denies the allegations in Paragraph 128.

129.    The School denies the allegations in Paragraph 129.

130.    The School denies the allegations in Paragraph 130.

## AFFIRMATIVE DEFENSES

The School asserts the following affirmative defenses to the Complaint.  In asserting these affirmative defenses, the School does not assume the burden to establish any fact or proposition where that burden is properly imposed on the Commonwealth.

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

This Court lacks subject matter jurisdiction over all or some of the claims asserted by the Plaintiff.

### Third Affirmative Defense

The Government's claims are barred, in whole or in part, by the political question and separation of powers doctrine.

### Fourth Affirmative Defense

The Government's claims are barred because Plaintiff failed to join one or more indispensable parties.

### Fifth Affirmative Defense

The Government's lacks standing to assert all or some of its claims in this lawsuit.

### Sixth Affirmative Defense

The Government's claims are preempted, in whole or in part, by federal law.

### Seventh Affirmative Defense

The Government's claims against the School are barred because the School has complied with all applicable laws or regulations of the federal government and the Commonwealth of Massachusetts.

### Eighth Affirmative Defense

The Government's claims against the School are barred, in whole or in part, by the applicable statutes of limitations and repose.

### Ninth Affirmative Defense

The Government's claims are barred, in whole or in part, because they violate the *Ex Post Facto* rule insofar as the Commonwealth seeks to impose liability retroactively for conduct that was not actionable at the time it occurred.

### Tenth Affirmative Defense

The Government's claims against the School are barred, in whole or in part, by the doctrines of laches, estoppel and waiver.

### Eleventh Affirmative Defense

The School reserves the right to allege other affirmative defenses as they may become known during the course of discovery.

**WHEREFORE**, the defendants, Corinthian Colleges, Inc. and Corinthian Schools, Inc., pray that this court:

1.  Dismiss the complaint with prejudice;

2.  Award the defendants costs, including reasonable attorneys' fees; and

3.  Award such other and further relief as the court deems just and proper.

Respectfully submitted,

CORINTHIAN COLLEGES, INC., and
CORINTHIAN SCHOOLS, INC.,

By their attorneys,

Thomas F. Holt, Jr. (BBO #238830)
William Potter (BBO #664302)
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
+1 617 261 3100

Dated:  May 8, 2014

## CERTIFICATE OF SERVICE

I, William Potter, do hereby certify that on this 8th day of May 2013, I caused the within **Answer** to be served by first class mail, postage prepaid, upon Glen Kaplan at the following address:

Glenn Kaplan, AAG
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108

William Potter