UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 15-10952(KJC)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CORINTHIAN COLLEGES, INC., et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            824 North Market Street

            Wilmington, Delaware


            June 30, 2015

            1:04 PM


B E F O R E:

HON. KEVIN J. CAREY

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  AL LUGANO

1

2 Debtors' Second Motion for Entry of an Order (I) Authorizing

3 the Debtors to Reject Certain Unexpired Leases of

4 Nonresidential Real Property Effective Nunc Pro Tunc to the

5 Date That the Debtors Surrender Possession; (II) Approving the

6 Abandonment of Any Personal Property Remaining at the Lease

7 Locations; and (III) Granting Certain Related Relief [Docket

8 No. 171 -- filed May 21, 2015]

9

10 Debtors' Motion for Authorization to (A) Assume Employment

11 Agreements with PricewaterhouseCoopers, LLP and (B) Employ and

12 Retain PricewaterhouseCoopers, LLP as Tax Advisor Nunc Pro Tunc

13 to the Petition Date [Docket No. 268 -- filed June 2, 2015]

14

15 Debtors' Motion for Entry of Interim and Final Orders (I)

16 Prohibiting Utilities from Altering, Refusing, or Discontinuing

17 Service; (II) Approving the Debtors' Proposed Form of Adequate

18 Assurance of Payment for Utilities; and (III) Establishing

19 Procedures for Resolving Objections to the Debtors' Proposed

20 Form of Adequate Assurance [Docket No. 6 -- filed May 4, 2015]

21

22 Motion of the Committee of Student Creditors for an Order

23 Applying the Automatic Stay Pursuant to 11 U.S.C. Sections

24 362(a) and 105(a) and Granting Related Relief [Docket No.

25 363 -- filed June 8, 2015]

1

2    Debtors' Motion for Entry of an Order (I) Authorizing Debtors

3    to Enter Into Consulting/Auction Agreement with Great American

4    Global Partners, LLC and Approving the Terms Thereof, (II)

5    Authorizing Sale of Assets in Accordance with Agreement and

6    (III) Granting Certain Related Relief [Docket No. 375 -- filed

7    June 9, 2015]

8

9    Debtors' First Omnibus Motion for Entry of an Order Authorizing

10    the Debtors to Reject Certain Executory Contracts, Effective

11    Nunc Pro Tunc to June 2, 2015 [Docket No. 378 -- filed June 9,

12    2015]

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Jennifer Hamilton

**4**

1

2  A P P E A R A N C E S :

3  RICHARDS, LAYTON & FINGER, P.A.

4         Attorneys for Debtors

5  BY:   MARK D. COLLINS, ESQ.

6         MICHAEL J. MERCHANT, ESQ.

7         MARISA A. TERRANOVA, ESQ.

8

9

10  UNITED STATES DEPARTMENT OF JUSTICE

11         Office of the United States Trustee

12  BY:   TIMOTHY J. FOX, JR., ESQ.

13         RICHARD SCHEPACARTER, ESQ.

14

15

16  UNITED STATES DEPARTMENT OF JUSTICE

17         United States Department of Education

18  BY:   JOHN R. KRESSE, ESQ.

19         LLOYD H. RANDOLPH, ESQ.

20

21

22  BROWN RUDNICK LLP

23         Attorneys for Official Creditors' Committee

24  BY:   H. JEFFREY SCHWARTZ, ESQ.

25

1

2  THE ROSNER LAW GROUP LLC

3        Attorneys for Official Creditors' Committee

4  BY:   JULIA KLEIN, ESQ.

5

6

7  POLSINELLI PC

8        Attorneys for Student Committee

9  BY:   CHRISTOPHER A. WARD, ESQ.

10       SHANTI M. KATONA, ESQ.

11

12

13  ROBINS KAPLAN LLP

14       Attorneys for Student Committee

15  BY:  SCOTT F. GAUTIER, ESQ.

16       LORIE A. BALL, ESQ. (TELEPHONICALLY)

17

18

19  REED SMITH LLP

20       Attorneys for Great American Global Partners, LLC

21  BY:   J. CORY FALGOWSKI, ESQ.

22

23

24

25

1

2  BALLARD SPAHR, LLP

3         Attorneys for Watt Management Co.

4  BY:   LESLIE C. HEILMAN, ESQ.

5

6

7  SIDLEY AUSTIN LLP

8         Attorneys for Bank of America

9  BY:   JENNIFER C. HAGLE, ESQ.

10         ANNA GUMPORT, ESQ. (TELEPHONICALLY)

11

12

13  POTTER ANDERSON & CORROON, LLP

14         Attorneys for Bank of America

15  BY:   JEREMY RYAN, ESQ.

16

17

18  KATTEN MUCHIN ROSENMAN LLP

19         Attorneys for Watt Long Beach, LLC

20  BY:   BRIAN D. HUBEN, ESQ. (TELEPHONICALLY)

21

22

23  MORRISON & FOERSTER LLP

24         Attorneys for Campus Student Funding, LLC

25  BY:   LORENZO MARINUZZI, ESQ. (TELEPHONICALLY)

1

2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3        Attorneys for Patrick Fitzgerald Monitor

4  BY:   FELICIA PERLMAN, ESQ. (TELEPHONICALLY)

5

6

7  ALSO PRESENT:

8        MARK J. WEITZ, President, Great American Global Partners

9        (TELEPHONICALLY)

10

11        AMBER THOMPSON, Student Committee

12        CRYSTAL LOESER, Student Committee

13        JESSICA KING, Student Committee

14        KRYSTLE POWELL, Student Committee

15

16        AARON AMENT, Chief of Staff at United States Department

17        of Education, Office of the General Counsel

18

19        JEFF APPEL, Deputy Under Secretary of Education at the

20        United States Department of Education

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE CLERK:  All rise.

3           THE COURT:  Afternoon, everyone.

4           IN UNISON:  Good afternoon, Your Honor.

5           MR. COLLINS:  Your Honor, for the record, Mark Collins

6    of Richards, Layton & Finger on behalf of the debtors.

7           Your Honor, I thought what I would do is to begin the

8    hearing with just providing Your Honor with some -- an update

9    on the cases, what we've accomplished since we were last before

10   you, and then talk a little bit about where we hope to go in

11   the coming weeks.

12          THE COURT:  All right.

13          MR. COLLINS:  So Your Honor, we were last before you

14   on June 8th, which was really our only third -- our third

15   hearing in the case, as we were -- as we had just filed on May

16   4th of this year.  At that hearing, I outlined the debtors'

17   proposed time line for completing these Chapter 11 cases on an

18   expedited basis.

19          Your Honor may recall, with respect to the final cash

20   collateral hearing, that we were working on a very limited cash

21   collateral budget, and if we are to confirm a Chapter 11 plan

22   of liquidation in these cases, we really need to do so by the

23   end of August of this year.  This is an extremely thin case,

24   notwithstanding the notoriety that the cases have received in

25   the press.  The assets here are very limited and the cash is

1   very limited, and really, any disruption at all in the
2   expedited time line to get to confirmation will simply derail
3   the cases and the plan process and the result, moving to a
4   Chapter 7 scenario.
5           THE COURT:  I may have asked this question at the last
6   hearing, but I'll ask it again.  The debtor indicates it
7   intends to propose a plan.  Is it anticipated that any
8   distributions will be made to unsecured creditors?
9           MR. COLLINS:  We have set up the plan disclosure
10  statement, Your Honor, so that could be a possibility.  It
11  really depends upon, I think, the intangible assets that would
12  be moving over to the distribution trust.  There will be
13  certain hard -- you know, tangible assets that would go into
14  the trust, with first monies out of the trust paying whatever
15  remaining unpaid admin and priority claims we have.
16          Second, it would go to the lenders to satisfy their
17  adequate protection lien and claim, because Your Honor will
18  recall, as part of the cash collateral order, the banks receive
19  a dollar-for-dollar replacement lien for diminution in value
20  from and after the petition date.
21          It is estimated that we will utilize approximately
22  10.5 million dollars of cash during the Chapter 11 cases to
23  fund this process, and therefore they would have a replacement
24  lien and priority claim for that amount.  So we are proposing
25  that the first dollars out of the trust after payment of admin

1    and priority claims would be used to pay the banks' super-

2    priority admin claim.

3            Following that, Your Honor, there would be a pro rata

4    distribution out to all allowed unsecured creditors.  That

5    would include the deficiency claim of the lenders, which will

6    be sizeable.  As of now, I think they're owed approximately one

7    hundred million dollars.  Assume a ten million dollar payout,

8    they would then have a deficiency claim of approximately ninety

9    million dollars, and they would share pro rata on that

10   deficiency claim with general unsecured creditors.

11           The unknown part of this case really comes down to

12   claims and causes of action of the estate that will be moved

13   into that trust.  We have potential avoidance actions, I think,

14   of a limited amount.  There are potential claims and causes of

15   action against the Department of Education for what transpired

16   pre-bankruptcy.  And there are also potential claims and causes

17   of action that I think people will review with respect to

18   breaches of fiduciary duty and other commercial tort claims.

19           The value of those claims are unknown, but if they are

20   pursued and proceeds are obtained by the estate sufficient to

21   pass the lenders' adequate protection lien and claim, then,

22   yes, there would be a distribution out to unsecured creditors.

23           THE COURT:  Thank you.

24           MR. COLLINS:  Your Honor, following the hearing on

25   June 8th, in order to get to a disclosure statement hearing on

1   July 22nd, plan confirmation on August 26th, we need to move

2   very quickly with respect to the bar date.  We did file our

3   schedules very quickly, within, I think, thirty days of the

4   filing of the case.  As a result, we filed a bar date motion on

5   June 9th.  Your Honor granted that on June 18th.

6          We served out the notice to over 150,000 potential

7   creditors on June 20th, and that provided for a July 20 -- I'm

8   sorry, July 20th bar date.  So two days in advance of the

9   disclosure statement we'll actually have all of the claims

10  filed.  We also published notice in a number of newspapers,

11  including USA Today, L.A. Times, San Francisco Chronicle, and

12  Sacramento Bee -- Sacramento Bee.

13         As I mentioned at the June 8th hearing, the debtors'

14  goal is to file a combined plan and disclosure statement by

15  today, along with a motion to shorten notice of the disclosure

16  statement hearings so we can go forward on July 22nd, which is

17  the next omnibus hearing date in these cases.  We do expect,

18  Your Honor, to file our plan disclosure statement today or this

19  evening.  It is a -- obviously, a liquidating plan for all of

20  the debtors on a consolidated basis.

21         The board of directors of the debtors are meeting this

22  afternoon to consider, really for the first time, the plan of

23  liquidation, as if -- this is a very fast-moving process.  And

24  assuming we obtain board approval this afternoon, we will move

25  forward with the filing tonight or as soon as practicable

1    thereafter.

2          The plan itself is fairly straightforward.  It is a

3    liquidating plan.  It follows the absolute priority rule, and,

4    we believe, complies with Section 1129.  In addition to some of

5    the plan terms I noted at the outset, Your Honor, there will be

6    a distribution from cash on hand on the effective date of

7    250,000 dollars to go into the distribution trust, really, as

8    seed money to allow that trust to be established and to move

9    forward, and the waterfall following that is as I previously

10   explained.

11         Your Honor, we have had preliminary discussions with

12   the two committees and the lenders regarding this plan.  I've

13   outlined, generally, the terms for them.  They have not yet

14   seen the document, and so we understand that we're filing the

15   stay without committed support from the two committees, or even

16   from our bank lenders, regarding its terms, but we do believe

17   it is confirmable, in our perspective, and plan to move forward

18   in order to keep this process moving on time.

19         Your Honor, we also have had discussions with the two

20   committees and with the banks about setting up, instead of just

21   one liquidating trust under the plan to treat all general

22   unsecured creditors on a pro rata basis, there have been

23   discussions about forming a second trust, a trust solely for

24   the benefit of student creditors.  That trust would be funded

25   with certain of the assets and would be, again, solely for the

1    benefit of student creditors who have allowed claims.  And I

2    believe the Student Committee will also continue to have

3    discussions with the Education Department on other treatment

4    that may be afforded to students within that trust.

5         Unless and until there is an agreement, a consensual

6    agreement amongst all the creditor constituencies and the

7    debtors regarding the second trust, we will move forward with

8    our single trust structure because we believe it is capable of

9    being confirmed over, really, any objection.

10        If we do reach consensus on a second trust, we will

11   then be modifying the plan disclosure statement in advance of

12   the July 22nd hearing so that we can move forward.  So I just

13   wanted to note that for Your Honor, as we could have some

14   modified documents coming in to the Court in advance of the

15   July 22nd hearing that would contemplate a second trust

16   structure.

17        Your Honor, if we get there and the Court approves the

18   disclosure statement, we would then move the plan confirmation

19   on August 26th, along with -- and then we would propose dates

20   for both the voting deadline, objection deadline, reply

21   deadline, and the like.  But we do have a schedule, and we do

22   think if we're able to get to July 22nd, get an approved

23   disclosure statement, we can get the confirmation at the end of

24   August.

25        Unless Your Honor has any questions for me, I'll turn

1   the podium over to Ms. Terranova to walk through the agenda,

2   and then ultimately get to the Student Committee's stay motion.

3           THE COURT:  Very well.  Thank you.

4           MR. COLLINS:  Thank you.

5           MS. TERRANOVA:  Good afternoon, Your Honor.  Marisa

6   Terranova from Richards, Layton & Finger on behalf of the

7   debtors.

8           Today I'm going to walk you through the agenda and

9   then I will be covering items 8 and 13.  Your Honor has entered

10  orders on items 1 through 7, and we thank you.

11          Item number 8 is our second lease rejection

12  motion -- campus lease rejection motion, and that will be going

13  forward today on an uncontested basis.

14          Your Honor has entered an order with respect to item

15  number 9, and we thank you.

16          Item number 10 is the debtors' utilities motion.  The

17  debtors have resolved the objections to the utilities motion,

18  and those objections were withdrawn yesterday.  On May 27th,

19  Your Honor entered a final order approving the utilities

20  motion, and accordingly, the debtors believe that this motion

21  is now fully resolved.

22          Item number 11 is the Student Committee stay relief

23  motion, and that will be going forward today.

24          Item number 12 is the sale motion, and that will also

25  be going forward today.

1        And item number 13 is our first omnibus contract
2   rejection motion, and that will be going forward today on an
3   uncontested basis, notwithstanding the fact that it's listed as
4   a contested item.
5        If it is acceptable to Your Honor, I'd like to go a
6   little bit out of order and address items number 8 and 13
7   first, before turning over the podium for items 11 and 12?
8        THE COURT:  You may proceed.
9        MS. TERRANOVA:  Thank you, Your Honor.  Item number 8
10  is the debtors' second omnibus campus lease rejection motion.
11  Pursuant to this motion, the debtors seek to reject
12  approximately thirty-five leases for campus locations or
13  related properties, like parking lots and parking garages.
14  Following the filing of the motion, the debtors have
15  surrendered the premises associated with six of the thirty-five
16  leases.  The debtors intend to surrender the premises
17  associated with the remaining leases in the motion over the
18  next months, but today the debtors are only seeking an order
19  authorizing the rejection of the six -- or, five of the six
20  that have been surrendered.
21        There was one objection filed to the motion by a
22  landlord for one of the six leases.  The debtors and this
23  landlord are working diligently to resolve this objection, and
24  have agreed that the motion should not go forward with respect
25  to this lease today while the parties are trying to come to a

1    consensual resolution.  Accordingly, today the debtors are

2    seeking entry of an order substantially in the form attached to

3    the motion with a modified exhibit that only lists the five

4    leases and their related rejection effective date.  May I

5    approach with that form of order?

6              THE COURT:  You may.  Thank you.

7              Does anyone else wish to be heard in connection with

8    this motion?

9              I hear no response.

10             That order has been signed.

11             MS. TERRANOVA:  Thank you, Your Honor.

12             Item number 13 is the debtors' first omnibus contract

13   rejection motion.  The debtors received two objections to this

14   motion.  These objections, however, suggested that the

15   debt -- the objectors believed that the debtors were seeking to

16   disallow the claims that they had filed.

17             I've spoken to both objecting parties and I have

18   explained that we are not objecting to their claims, and that

19   the debtors are only seeking to reject their contracts with

20   them.  I also informed the objecting parties that to the extent

21   that the debtors do object to their claims at a later date,

22   they will receive adequate notice of such rej -- such

23   rejections and have a meaningful opportunity to respond.

24             I also informed the objecting parties that they have a

25   right to appear telephonically at this hearing, and I provided

1  them with CourtCall information.  I'm not sure if they are on

2  the line, but that was part of the reason that I had hoped to

3  do this item out of order in case they were, so then that they

4  might not have to appear for the rest of the hearing.

5          But I believe my explanation to them regarding the

6  claim rejection versus contract rejection issue has resolved

7  these objections, and therefore I respectfully request the

8  Court enter an order approving this motion.

9          THE COURT:  All right, this is the -- number 13 on

10  today's agenda.  It's the debtors' first omnibus motion for

11  rejection of certain executory contracts.  Does anyone else

12  wish to be heard in connection with this motion?

13          I hear no response.  I'll just note for the record

14  that the objectors were parties to long-term incentive

15  contracts.  In the absence of objection, based upon counsel's

16  explanation, I'm prepared to grant the relief that's been

17  requested.

18          MS. TERRANOVA:  May I approach, Your Honor?

19          THE COURT:  You may.

20          That order has been signed.

21          MS. TERRANOVA:  Thank you.

22          With that, I'd like to turn the podium over to the

23  Student Committee for their motion.

24          THE COURT:  All right, thank you.

25          MR. GAUTIER:  Good afternoon, Your Honor.  Scott

1  Gautier with Robins Kaplan, LLP, and Lorie Ball, my colleague,

2  is monitoring the proceedings by phone.  I'm joined by Chris

3  Ward and Shanti Katona of Polsinelli LLP (sic).  We're also

4  joined, Your Honor, in the gallery by four of the members of

5  the Student Committee.  We have Amber Thompson, Crystal

6  Loeser --

7            THE COURT:  I'm sorry.  Will you stand as your name

8  is --

9            MR. GAUTIER:  Oh.

10           THE COURT:  -- being called?

11           MR. GAUTIER:  Amber, will you stand?  I might get the

12 Crystals mixed up, but I think I am right.  Crystal Loeser and

13 Krystle Powell and Jessica King.

14           THE COURT:  Welcome.

15           MR. GAUTIER:  Michael Adorno and Tasha Courtright.

16 Tasha is -- Tasha is actually being married today and couldn't

17 be here, but we send out our best to her and we appreciate

18 these four students travelling here to be here.

19           I'm going to refer -- as I start my comments I thought

20 it would be a good idea to tell everybody I'm going to refer to

21 the Department of Education as "Ed".  And the reason I point

22 that out ahead of time, as I spoke to my wife and practiced

23 with others, people kept asking me who Ed was because it sounds

24 like a person.  So when I refer to Ed, it's not a person, I'm

25 referring to the Department of Education.  So hopefully that'll

 1    alleviate confusion.

 2            This is a very important day for the Student

 3    Committee.  The Student Committee is bringing this motion to

 4    provide an avenue to a successful Chapter 11 case for them and

 5    for everybody else.  By successful, we simply mean a case in

 6    which there's cooperation by the parties to reach a consensual

 7    resolution with respect to the assets and liabilities of the

 8    debtors' estates and the resulting treatment of --

 9            THE COURT:  And --

10            MR. GAUTIER:  -- the disparate classes of claims and

11    interests.

12            THE COURT:  And your submissions indicate that part of

13    the reason for a temporary halt to collection efforts -- and

14    I'll note for the record you've indicated you made a deal with

15    the -- a temporary arrangement with the private lenders, but

16    not with the government.  Other parties argue that the Court is

17    without jurisdiction to discharge the student loan debt in

18    connection with the confirmed plan, so how does -- how does a

19    stay help you sign on to a consensual plan?

20            MR. GAUTIER:  We don't believe that the Court is

21    without -- entirely without jurisdiction as to very important

22    matters that relate to the students' liabilities.  If

23    litigation needed to be brought to show that the students, as a

24    class, have a right to collective relief with respect to these

25    alleged student loan applications, one avenue would be to raise

1  state law defenses.  And in order to raise those state law

2  defenses, we need to show that the debtors were the bad actors,

3  that the debtors were guilty of the misconduct that has been

4  alleged by the only party objecting to the relief we're

5  seeking, Ed itself.

6          And we believe that if we establish the debtors'

7  misconduct and establish that the -- well, and another thing we

8  might establish or might not -- and I think we could still

9  establish the debtors' liability even if we did not -- but we

10 could establish, as well, that the debtors acted as Ed's agent

11 with respect to the administration of the Title IV Federal

12 Student Aid programs.  So if the lender itself -- Ed,

13 here -- has publically admitted that its agent acted improperly

14 with respect to these loans, and that determination -- whether

15 or not the debtors are culpable, whether or not the debtors are

16 liable -- should be established, or at least could be

17 established, certainly, in these proceedings with this Court

18 and the Court would have related jurisdiction, I believe, then,

19 to determine that the students were not liable with respect to

20 those alleged loans.

21         THE COURT:  Interesting.  Has such a claim ever been

22 made in a bankruptcy court?

23         MR. GAUTIER:  Not to the best of my knowledge.  This

24 is certainly a unique situation.  It's not a pleasant

25 situation.  This is -- there are -- there are reporters here,

1   there have been many court -- reported articles in the

2   newspapers, and this is an important case.  This is an

3   important day --

4           THE COURT:  I tend to think every case is important,

5   myself.

6           MR. GAUTIER:  I'm not going to disagree with you.

7           THE COURT:  Um-hum.  So you mentioned collective

8   action.

9           MR. GAUTIER:  So --

10           THE COURT:  I understand that class action waivers

11   have been executed by some or all of the students.  Is that so,

12   and do you believe them to be enforceable or unenforceable,

13   such clauses?

14           MR. GAUTIER:  We certainly believe that there are

15   arguments that class action waivers would be unenforceable and

16   we are not in a position today to fully litigate all the

17   issues --

18           THE COURT:  I don't think you need to be.

19           MR. GAUTIER:  -- that would be before the Court.

20   Thank you, Your Honor.  We agree.

21           But we do believe that there is sufficient grounds to

22   argue that class action waivers are not enforceable in this

23   case, based on the debtors' conduct.  And if we needed to, we

24   would get to that litigation.  But the real purpose of the

25   motion -- the real purpose of the motion is to avoid all that

1  litigation.

2         And whether or not the proceedings with respect to

3  student loan debt have to go forward in this forum, we

4  appreciate the fact that the debtors' Chapter 11 cases provide

5  a unique opportunity to reach agreement -- which I'm sure the

6  Court has seen before; we have certainly seen it

7  before -- between creditors.  Between Ed as a creditor, between

8  the students as a creditor, between the general unsecured trade

9  creditors.

10        Now, those agreements may not be necessary, they may

11 not be mandatory to get a plan done, but I really appreciate

12 debtors' counsel's comments just a few moments ago talking

13 about the fact that they have a single trust planned that's a

14 fairly simple, bare-bones plan.  And they believe it's

15 confirmable, but they are dedicated -- as well as the other

16 constituencies are dedicated -- to working on what might be a

17 more efficient plan, what might be a plan that affords some

18 treatment for creditors that is better than what can simply be

19 done for expedience purpose -- purposes in a quick liquidating

20 plan.  And we are going to take up the debtors and the banks

21 and the general unsecured creditors in trying to fashion that

22 relief.

23        And that's -- that's why we want stay relief.  That's

24 why we believe we need stay relief.  Because the students

25 believe that these obligations are the debtors' obligations and

1  that if, while we are trying to negotiate, the students

2  continue to need relief -- because they are being put upon.  We

3  needed this relief sooner.  We needed to be here sooner, not

4  later.  Our constituents are very upset by the allegations that

5  have been made, by the way they believe they have been treated,

6  and they're hurting.  These collection proceedings are going

7  forward.

8          THE COURT:  Well, let me ask this:  it seems to me

9  that either some or all of the declarations reflect that the

10 collection activities that are described in the declarations

11 are ones that are being pursued by the private lenders, not by

12 the government.  Am I wrong about that?

13         MR. GAUTIER:  Yes, Your Honor, I believe that's

14 incorrect.

15         THE COURT:  Okay.  Tell me how I'm wrong.

16         MR. GAUTIER:  The --

17         THE COURT:  You can drill down a little bit for me.

18         MR. GAUTIER:  Sure.  Quite simply, as I understand it,

19 the government acts through collectors just as private lenders

20 do.

21         THE COURT:  Um-hum.

22         MR. GAUTIER:  And those collection proceedings are

23 going forward.  The students, as they have attested in some of

24 their declarations, are subject to collection proceedings such

25 as wage garnishments and other proceedings.  What the

1  government, I believe, has alluded to in its papers -- I know

2  they've alluded to in their papers -- is the fact that there

3  are -- and I won't deny -- there are individual processes that

4  a student can look to --

5           THE COURT:  They haven't --

6           MR. GAUTIER:  -- to stop collection practices.

7           THE COURT:  They haven't alluded to those procedures.

8  They've put them out front as one of the reasons why you

9  shouldn't have a stay.  And if we just focus on that, alone --

10          MR. GAUTIER:  Sure.

11          THE COURT:  -- it seems to me the government has a

12 pretty good argument that by the simple filing of requesting

13 relief in this administrative process, within a matter of days,

14 any collection activity that had begun would cease.  Do you

15 dispute what the government says?

16          MR. GAUTIER:  Absolutely not.  Not in that regard,

17 Your Honor.

18          THE COURT:  Okay, so --

19          MR. GAUTIER:  And --

20          THE COURT:  So why is it such a burden when virtually

21 everybody lives Online today -- I'm assuming such relief can be

22 requested Online.  I don't know that, but I'm assuming it could

23 be.  Why is that such a burden?

24          MR. GAUTIER:  And that is -- that is something, Your

25 Honor, that, very honestly, I had to come to terms with myself

1  as counsel for the Student Committee.  It is something that

2  public counsel and other activist groups that have been working

3  with students for quite a long time had to convince me of.  I

4  don't know if I have enough time or if you'll -- we'll have

5  enough evidence, but I'll speak to it.

6         Students cannot be officially addressed, or the

7  student claims are not going to be officially addressed through

8  individualized proceedings.  We appreciate everything that Ed

9  is doing to attempt to simplify the process and spread relief

10  and spread the word to the former students.

11         THE COURT:  And it sounds like they've undertaken such

12  efforts.

13         MR. GAUTIER:  They have, and we appreciate that.  And

14  I don't deny that they have, but as Ed is well aware, the

15  debtors' marketing efforts were targeted at students that were

16  isolated, that were unable to see and plan well for the future.

17  And I'm using the debtors' own words as recited by the

18  California Attorney General in their 2013 complaint.  They

19  targeted students that have few people in their lives that care

20  about them.

21         As Ed notes and as you note, Your Honor, any student

22  that attended Heald may attain stoppage of collection

23  activities by filling out an attestation form and the relief

24  that we're seeking here, they would get.  And they've

25  publicized that.  And of the hundreds of thousands of students

1   that could get this immediate relief, to the best of my

2   knowledge, from Ed's papers, 180 -- 180 have sought that

3   relief.  Now, if I had some debts that I couldn't pay -- if I

4   had some debts that I could pay, and somebody told me that I

5   could stop them by filling out a form, I would rush right out

6   and fill out the form.  But these students, they don't

7   understand their rights.  They're not getting notice of their

8   rights.

9          I understand that we here in the courtroom, probably

10  all the people in the courtroom are Online, live in a certain

11  part in the world.  We watch the news.  We get the newspapers.

12  I don't know who these students are.  They probably don't live

13  in my neighborhood.  They probably don't work in my building.

14  Some of them are homeless, quasi-homeless.  They are extremely

15  transient.  When we spoke to the debtor -- and I would point

16  that debtors' counsel --

17          THE COURT:  Okay, so I don't -- I'm -- this is a

18  serious question.

19          MR. GAUTIER:  Yes.

20          THE COURT:  I mean, with respect to homeless or

21  transient ex-students, I guess, at this point, it's not like

22  collection activity could catch up with them, anyway.  I --

23          MR. GAUTIER:  It further destroys their credit rating,

24  and at times it will catch up to them.  It's a further hurdle

25  in addressing the issues that they face in life.  And a lot of

1  them sought education -- which we applaud them for, which is

2  what the government want -- what the public wants them to do.

3  It may very well be -- and I'm not going to argue about it

4  today, but it may very well be that they were seriously misled

5  about their opportunities that would be afforded.  We don't

6  know that, but it's quite possible.

7          These students are not getting notice.  I think

8  there's evidence -- Ed's own pleadings evidence the fact, I

9  believe, that these students are not getting -- getting notice.

10  They're not taking advantage of what is available to them.  I

11  personally answer phone calls from students every day, and our

12  office handles phone calls just with respect to the Court's

13  proof of claim form.  The students -- even the ones that are

14  getting the notice - don't understand what's being asked of

15  them.  They don't understand what's being offered to them.  And

16  that --

17          THE COURT:  Well, I will say, in a lot of respects

18  that's not very different from creditors in other cases in many

19  instances.

20          MR. GAUTIER:  Not entirely, but the extent of the

21  students that may be affected could reach into the hundreds of

22  thousands.  Collective relief through the bankruptcy

23  proceeding -- through what we do every day in fashioning

24  Chapter 11 plans -- is the most efficient class-wide relief

25  that can be given.

1          THE COURT:  I don't -- I don't necessarily disagree

2    with that proposition, but in order to get to that endpoint,

3    you need to meet some legal standards, don't you?

4          MR. GAUTIER:  Yes, Your Honor.

5          THE COURT:  Whether you --

6          MR. GAUTIER:  I believe --

7          THE COURT:  Whether you say it's a matter of extending

8    the stay -- which, frankly, I think is a less elegant way of

9    achieving this relief -- or whether it's seeking an injunction

10   and applying the injunction standards.  But either way, you've

11   got a standard to meet.

12         MR. GAUTIER:  Yes, Your Honor.  You've raised two

13   issues in your comment.  On its face, you've raised the

14   standard issues.  You also, to some extent, might have raised

15   procedural issues.  And I wonder if the Court would like me

16   to --

17         THE COURT:  Well, the government has, I know.

18         MR. GAUTIER:  Yeah.  And if the Court would like, I

19   will address procedural issues, or if the Court's comfortable

20   with the procedure we've taken, I won't take the Court's time.

21         THE COURT:  Well, it's an open issue, but frankly, I'd

22   planned to talk to the government a little more about that.

23         MR. GAUTIER:  Thank you, Your Honor.  The cases -- the

24   cases that are out there that talk about extending the stay to

25   nondebtors talk mostly about directors and officers.

1   Certainly, we're not seeking relief for officers and directors,

2   as in the W.R. Grace case, the A.H. Robbins case, the Johns

3   Manville cases.  And --

4           THE COURT:  And of course, you recognize that those

5   are much more direct relationships with the debtor.  I think

6   there's a much greater identity of interest the cases talk

7   about than there would be here.  But tell me why you think I'm

8   wrong about that.

9           MR. GAUTIER:  It's a very different identity of

10  interest.  This is a unique identity of interest.  I don't -- I

11  certainly haven't found any cases where you have an identity of

12  interest that's similar, but there are certainly cases, and

13  I've brought a case -- it was not in our papers, but I can

14  bring it up if the Court would like to see it -- Tufaro v

15  Department of Human Services.  It's a New Jersey case, 1982,

16  that stands for the proposition that the schools -- the debtors

17  here -- can certainly be considered, under the appropriate

18  circumstances, to be an agent of Ed with respect to

19  administering Title IV financial student aid programs.

20          If we think about that, and we think about the fact

21  that Ed itself has done intensive investigations, essentially

22  fired its agent, blasting the agent publicly for a pattern of

23  consistently misleading Ed and the putative borrowers, its

24  former students, the resulting damages claims could be

25  staggering.  And we believe it's a very basic equitable

1   principle to recognize that if the debtor is guilty of

2   misconduct that Ed alleges misleading students, aggressively

3   marketing them with this misleading information to cause them

4   to enroll in their programs, then it's obvious that the

5   debtors, as the agents of the lender, Ed, and not the students,

6   are liable to repay the funds that they received through the

7   misconduct.

8         This is the -- this is the lender who has publicly

9   accused, alleged, I would even go so far as to say made an

10  admission of the misconduct of its agent.  So how can Ed, as a

11  lender, hold the students as the putative borrowers liable for

12  the misconduct, and how can it say that there is not an

13  identity of interest when we look at the funds that are

14  borrowed?  Either its agent owes the funds back to it or the

15  borrowers owe the funds back to it.

16        There is most certainly, we believe, an identity of

17  interest, and we believe that identity of interest makes stay

18  relief appropriate in the circumstance.

19        THE COURT:  So let's turn to the other prong of the

20  stay extension test as it's most commonly articulated.  If I

21  were to decline the relief -- to award the relief that you've

22  asked today, how would that hamper your ability to negotiate a

23  part in the plan?  How, by failing to grant the relief, would

24  it hinder the debtors' reorganization?

25        MR. GAUTIER:  It's a question of timing and resources,

1   Your Honor.  The students are hurting and we have significant

2   demands on us -- not just by the Student Committee, but by

3   other groups that are working with the students -- to halt

4   these collection practices, and the only way we can -- the most

5   efficient way we can think of to halt them is on a collective

6   basis.

7          And to do that on a collective basis, if we could do

8   it, would be through class action complaints, which may be

9   brought by us and it may be brought by others through adversary

10  proceedings, which is one of the reasons we didn't bring this

11  through adversary proceeding; we don't want to see more

12  adversary proceedings.  And if class-wide relief can't be

13  afforded, then there may be thousands, tens of thousands,

14  hundreds of thousands of individual complaints seeking to

15  establish the debtors' culpability with respect to the alleged

16  student loans.

17         THE COURT:  Look, I -- you know --

18         MR. GAUTIER:  We want to avoid that.

19         THE COURT:  I don't -- I don't -- I try not to predict

20  outcomes of cases, especially one which is, at this point,

21  unsettled, but it seems to me, if that were to come to pass,

22  this case would be in a Chapter 7 in no time, and pursuit of

23  those actions against the debtor, it seems to me, would be of

24  little consequence and there'd be little to be gained.  That's

25  just a visceral reaction.

1          So while what you pose might very well come to pass,

2   it just seems to me it would be a lot of activity, which would

3   end up resulting in not very much, if anything, for the

4   plaintiffs.

5          MR. GAUTIER:  Yes and no.

6          THE COURT:  Uh-huh.

7          MR. GAUTIER:  I agree with you.  We -- it's the very

8   basis of the motion.  We believe that it would blow up the

9   process, and we're trying very hard not to blow up the process.

10         As professionals for the Student Committee, as someone

11  who's practiced in Chapter 11 corporate law for twenty years, I

12  can see a light at the end of the tunnel, which is consensual

13  resolution and everybody working together through Chapter 11.

14         A plan is a unique -- the ability to do a Chapter 11

15  plan is very different from the ability to just fight this out

16  in Chapter 7.  There is no inter-creditor relief.  There are no

17  negotiations and settlements between creditors that can happen

18  in a Chapter 7 situation.  And that's why we want to preserve

19  the Chapter 11.  And we want to convince the other groups that

20  this activity -- this collection activity, as against the

21  students, which people believe clearly, on its face, by Ed's

22  own admissions is wrong --

23         THE COURT:  Good, yeah.

24         MR. GAUTIER:  -- and it will stop.

25         THE COURT:  Let me ask this:  is it your intention to

1   offer evidence in support of the relief that you request?

2           MR. GAUTIER:  We -- I don't believe that an

3   evidentiary hearing is necessary.  We submitted some requests

4   for judicial notice.  We've submitted declarations of the

5   students to support some basic factual assertions.  We don't

6   believe that those factual assertions are disputed, and so

7   we -- it was not my intent, unless the Court believes it's

8   necessary, to offer evidence at this hearing.  But we can

9   certainly move -- and I think the government is willing to

10  stipulate to move declarations and requests for judicial notice

11  into evidence on the agreement that we would permit cross-

12  examination of the -- of the students.

13          THE COURT:  All right, let's hold that for a moment.

14  I'd like to speak with the Department of Education, if I may.

15          MR. GAUTIER:  Thank you, Your Honor.

16          MR. RANDOLPH:  Good afternoon, Your Honor.  Lloyd

17  Randolph from the Department of Justice.  With me at counsel

18  table are my colleague John Kresse, Aaron Ament, who is the

19  Chief of Staff of the Office of General Counsel of the

20  Department of Education, and Jeff Appel, the Deputy Under

21  Secretary of the Department of Education.

22          We would like the opportunity to put some evidence in

23  the record, Your Honor, specifically on the balance of

24  hardships.  Mr. Appel is prepared to talk about that issue.

25  But I'm happy to do this in whatever sequence you prefer.

1          THE COURT:  I'd like to -- let's have a discussion

2   before we -- before we do that.  I understand that, under

3   statute, it's the Secretary's responsibility to administer the

4   laws that govern the student loan relationships, including the

5   collection.  Is it within the Secretary's discretion simply to

6   order a pause in that process?

7          MR. RANDOLPH:  I suppose he could, Your Honor.

8          THE COURT:  And so why wouldn't -- why wouldn't he do

9   that here?  Why shouldn't he do that here?

10          MR. RANDOLPH:  I think it depends on --

11          THE COURT:  And let's assume, for purposes of

12   the -- look, every party -- pretty much every party who comes

13   here, and often particularly the government, guards jealously

14   its prerogatives, and I can certainly understand why your

15   client may want to do so here.  But it's still -- I still

16   wonder why -- just simply as a matter of discretion, assuming

17   it's within the Secretary's authority, under these

18   circumstances, why you simply wouldn't pause for less than two

19   months?

20          MR. RANDOLPH:  I think you hit the nail on the head,

21   Your Honor, when you used the word "the Secretary's

22   discretion".  And necessarily, that means that the Secretary

23   gets to decide whether he'll do it and on what terms he'll do

24   it.  Here, he has said, yes, I'll do it if you, student

25   borrower, come and ask me for it.  What he's not prepared to

1  do --

2           THE COURT:  But --

3           MR. RANDOLPH:  -- is to provide a blanket for

4  everyone's stay, because some of these folks probably don't

5  have a basis for getting debt relief.  They don't --

6           THE COURT:  Okay, and I --

7           MR. RANDOLPH:  They may have attended --

8           THE COURT:  I accept that.

9           MR. RANDOLPH:  -- school far enough --

10          THE COURT:  I accept that.  But let me ask this:  when

11 I represented creditors, I was always concerned, if I had to

12 sue, I'd get a judgment quickly enough before the debtor's

13 assets were dissipated.  I mean, are you really worried here

14 that the student borrowers are going to take off for St. Barts

15 or something?

16          MR. RANDOLPH:  I suspect that's not a very

17 realistic --

18          THE COURT:  Yeah.

19          MR. RANDOLPH:  -- scenario for many of them, Your

20 Honor.  And I would note that we are working very hard to work

21 with them to provide reasonable relief.  What we have to do

22 here is balance their concerns, which we share.  And our

23 concern for that is evidenced by the extraordinary efforts that

24 the Department of Education has made to reach out to these

25 folks and to provide opportunities for them to have relief over

1  and against the rights that the United States has as a

2  creditor.

3         And the Secretary has exercised his discretion to make

4  relief available to every one of these students that comes and

5  asks.  And the process is not burdensome.  It's not difficult.

6  And it is not true, as the debtors -- as the student

7  representative's counsel indicated a moment ago, that only 180

8  have sought that relief.  Your Honor, I'm not sure where that

9  figure came from, but as Mr. Appel will testify, as of

10  yesterday, 4,967 students have already requested the relief,

11  and beyond that, Your Honor, the Department has already granted

12  or indicated an intention to grant discharge to 768 students

13  that have asked.  Now, that's how the Department has exercised

14  its discretion, and it continues to do as and, at present, it

15  is processing about 4,000 requests for administrative relief.

16         With respect, Your Honor, that process should

17  continue.  It is reasonable.  It is fair.  And when you boil

18  this case down, what it comes down to is this:  will this Court

19  tell a federal department, cut that out, when the "that" is

20  activity that the Department, as a creditor, has a right to do.

21  And beyond that, that the Department has said it will stop if

22  students will simply come to them and say, would you please put

23  my loan into forbearance?

24         THE COURT:  Does the Department have a view about what

25  the universe of potential applicants is for the administrative

1  relief?

2         MR. RANDOLPH:  It's my understanding, Your Honor, that

3  there are approximately 350,000 students that borrowed to

4  attend one of the debtors in the period from January 2010 to

5  the present.  So the numbers are very large.

6         THE COURT:  So in light of what the Student

7  Committee's counsel has said, why are you so confident that

8  you've actually been able to reach that many?

9         MR. RANDOLPH:  Well, the 350,000 is the entire number

10 of borrowers.  There are approximately 40,000, as I understand

11 it, currently in default.  And we have sent out -- I believe

12 the figure is 13,500 mail and e-mail notices with respect to

13 the closed school discharge opportunity.  It's important to

14 keep in mind these various categories.  350,000, roughly, Your

15 Honor, borrowed.  About 40,000 -- a little more than ten

16 percent of that -- are currently in default.

17        With respect to their avenues of relief, under Ed's

18 regulations, there are two means of obtaining a discharge of

19 the debt.  One is, hey, my school closed and I was a student

20 there within -- under the regulations, I think it's 120

21 days -- the Secretary has extended that look-back period for

22 about a year.

23        THE COURT:  But that's an easy one, though, right?

24        MR. RANDOLPH:  And that's a --

25        THE COURT:  Okay.

1          MR. RANDOLPH:  But pretty easy, yeah.  The other one

2     is:  do you have a state law claim against the school?  And for

3     that, the Department will discharge -- as I understand it,

4     through this administrative proceeding that the Department has

5     set up, if you can show that you have a state law claim, the

6     Department will discharge the student debt.  And that's

7     reasonable.  It involves an opportunity for these issues to be

8     put in front of experts in the application of the laws

9     applicable to these particular student loans.

10          Given the Department's general concern about the

11     welfare of these students, I envision that as the 768

12     discharges have already been granted, many others likely will

13     be granted.  The question is whether this Court should tell Ed

14     to stop when Ed has said it would if they would ask and when

15     this Court -- because these students are not Chapter 7 or 11 or

16     any other chapter of the Bankruptcy Code debtors, they don't

17     have a right to a discharge in bankruptcy.  They could get one

18     if they filed, I suppose, or at least attempt one, but the

19     point here is that the Student Committee is asking for relief

20     for nondebtors who have a very tenuous, and, indeed, adverse

21     relationship to the debtors, and this, the Court simply should

22     not do.

23          And that's before we get into all of the difficulties

24     that Ed would have in attempting to comply with the order that

25     the Student Committee has sought.  And it is on that that we'd

 1 | like the Under Secretary to testify.

 2 |         THE COURT:  So with 40,000 students in default, how

 3 | many of those are now subject to, we'll call it judicial

 4 | collection activity?

 5 |         MR. RANDOLPH:  I don't have the precise figure, Your

 6 | Honor.  It is my understanding that the initiation of judicial

 7 | collection activity takes years.  I don't think the Department

 8 | of Education even considers them in default until 270 days

 9 | after they have ceased to make a payment.  And then there is a

10 | lengthy process after that before the case gets referred to an

11 | Assistant U.S. Attorney for collection activity.  And the

12 | numbers that are typically referred are quite small.

13 |         THE COURT:  So let me --

14 |         MR. RANDOLPH:  Ed bends over --

15 |         THE COURT:  Let me approach it --

16 |         MR. RANDOLPH:  -- backwards to --

17 |         THE COURT:  -- another way, then.  Committee counsel

18 | says -- I thought, initially, from reading the submissions,

19 | that it was only the private lenders who had actually gotten

20 | involved in judicial collection activity, but that there's been

21 | an agreement with them to hold off on that for now.  Committee

22 | counsel says actually some of the government loans are, indeed,

23 | in judicial collection.  Is that true or not true?  Do you

24 | know?

25 |         MR. RANDOLPH:  It is my understanding, Your

1  Honor -- and that is perhaps the only thing that we agree with

2  them on -- that -- Ed works this way:  when a student defaults

3  on his loan, Ed sends that loan out to private collection

4  agents and then they begin making calls to encourage the

5  students to pay their debt in the same way that a private

6  lender would.  So yes, Ed relies on private collection agents

7  to encourage students to make payments --

8           THE COURT:  And have each of those --

9           MR. RANDOLPH:  -- on their student loan debt.

10          THE COURT:  -- defendants or defendants-to-be received

11 notice of the administrative process that's available to them?

12          MR. RANDOLPH:  I don't know that each of them has.

13          THE COURT:  Seems to me that would be --

14          MR. RANDOLPH:  I know that Ed has --

15          THE COURT:  -- an easy thing to do.

16          MR. RANDOLPH:  Yes, I'm -- well, I'm not sure that

17 it's as easy as you might think.  My understanding, with

18 respect to closed student discharges, Ed has sent out 13,500

19 notices, individualized, mailed, and e-mailed.  And I'm not

20 sure where, beyond that, the process stands, but we certainly

21 have tried, Your Honor, and I would suggest that it is a

22 legitimate function of the Student Committee also to be

23 reaching out to their clients and letting them know about these

24 opportunities.  And we have tried to facilitate that process.

25          I'm handed a note that says that in the last five

1    years, about 3,000 loans have been sent to U.S. Attorney's

2    offices for collection by Ed.  And that is for all student

3    loans in default, not just student loans to students at

4    Corinthian.  So the numbers are relatively small for the times

5    when Ed, through a judicial process, seeks to collect.

6           What I understand the major concern of the Student

7    Committee to be is they'd like the debt collectors to stop

8    calling.  And for that, all they have to do is write to their

9    good Uncle Ed and say:  would you please stop?  So, Your Honor,

10   if --

11          THE COURT:  So you're -- you're from the government

12   and you're here to help, in other words?

13          MR. RANDOLPH:  I think that's actually, at least in

14   this instance, true.  I'd be prepared to continue with the

15   argument, Your Honor, but if --

16          THE COURT:  I thought we were just having a discussion

17   now?

18          MR. RANDOLPH:  Well, we can -- we can continue with

19   the discussion, if that's the way you would prefer it, but --

20          THE COURT:  Well, here's what I'd like to do:  I'd

21   like to hear briefly from the debtor, which has filed a

22   response to the motion, and then, to the extent that the matter

23   isn't going to be worked out consensually, and it doesn't seem

24   to me that it is, I'll take whatever evidence the movant wants

25   to offer, and anyone else who's responded.

1          MR. RANDOLPH:  Thank you, Your Honor.

2          THE COURT:  All right.

3          MR. COLLINS:  Thank you, Your Honor.  Again, for the

4    record, Mark Collins on behalf of the debtors.

5          Your Honor, as I noted at the outset, the debtors'

6    goal in the Chapter 11 case is very simple and very clear, and

7    that is to confirm a plan by the end of August to avoid

8    conversion.  We do not believe conversion is in the best

9    interest of our creditors, including any former student of the

10   debtors' that has a valid claim against the estate, and we are

11   working as diligently as we can to get these cases to a

12   confirmed plan.

13         The relief this Student Committee is requesting in

14   this motion is certainly broad, and may well be unprecedented,

15   given the factual and procedural status of these proceedings.

16   But the debtors have agreed, as requested by the Student

17   Committee, to take no position on the underlying relief they

18   are seeking, relief that really affects solely the interplay

19   between Ed and the students that have outstanding loans to the

20   federal government, in order to keep the plan process moving

21   forward as best we can on a consensual basis.

22         THE COURT:  All right, so, Mr. Collins, to put you on

23   the spot, let me return to the standard, at least in the

24   framework of requesting an extension of the stay.  One of the

25   two parts of the standard is a question the Court has to

1  consider, and that is whether the litigation or, here,

2  collection activity directly affects the debtors' assets or its

3  ability to pursue a successful plan or reorganization or

4  liquidation under Chapter 11.

5          So when the debtor comes and says, we take no

6  position, it tells me -- well, let's put it this way:

7  normally, the debtor would come in screaming, oh, my goodness,

8  you're interfering with the 11; Judge, you have to enter a

9  stay.  I don't have that here.

10         MR. COLLINS:  You don't have that here, Your Honor,

11  and that's because if the stay is granted on a temporary basis,

12  we see no economic impact upon the debtors' estate because it's

13  simply between the lender -- the federal government -- and

14  their borrowers -- the students.  And in that regard, we have

15  decided to take no position.  We do, however, feel very

16  strongly about the allegations that have been made in the

17  motion.

18         THE COURT:  I'm aware of that.

19         MR. COLLINS:  And we want to be very clear, Your

20  Honor, that to the extent Your Honor grants any relief, that it

21  not be in any way tied to the prong on success of the

22  merits -- likelihood of success on the merits to be associated

23  with the underlying allegations.  We do think it's an

24  injunctive standard that should be applicable here, and that is

25  an important prong, and we would want clear in any order that

1    Your Honor is not finding that any of these allegations are

2    sufficient to meet that standard for -- or that part of the

3    injunctive relief test.

4               THE COURT:  Well, unless all four parts are met, the

5    relief isn't to be granted.  Am I -- am I not correct about

6    that?

7               MR. COLLINS:  You are correct about that, Your Honor.

8               THE COURT:  Um-hum.

9               MR. COLLINS:  And I think we have agreement between

10   counsel that the factual allegations are that:  simply

11   allegations.  They are not here to be proven today.  We tried

12   to supplement the record with a more fulsome counterpoint to

13   that number of allegations that were made.  And I'll leave it

14   at that, Your Honor.

15              THE COURT:  Thank you.

16              All right, let me turn back to the movants, Mr.

17   Gautier, and I'll ask whether you'd like to offer, now,

18   formally, anything into evidence?

19              MR. GAUTIER:  Your Honor, we -- I mean, we will offer

20   into evidence the stipulations and the declaration -- or the,

21   I'm sorry, the declarations and the requests for judicial

22   notice that we have proffered to the Court.

23              THE COURT:  Okay.  You need to identify them

24   specifically for the record.

25              MR. RANDOLPH:  Your Honor, while we have a break, I'll

1    just note that the Department of Education has stipulated to

2    the admissibility of the students' declaration.  We have not

3    stipulated, and we object to the admissibility of the lawyer

4    declaration that summarizes allegations and complaints.  We

5    also object to the introduction into evidence of the matters on

6    which the Student Committee has asked for judicial notice.

7    They are rank hearsay, allegations, press reports, and a

8    miscellany of other items.  They should not come in as

9    evidence.

10              MR. GAUTIER:  With respect to the request for judicial

11   notice in terms of the hearsay objection, Your Honor, we

12   would -- we would note that an exception to hearsay is an

13   admission of a party-in-interest.  And much of -- not all of,

14   but to the extent that we have asked for judicial notice of

15   proceedings, allegations of misconduct that have been made by

16   Ed or the government, that to the extent they are hearsay, they

17   are admissible.  That with request to -- with respect to the

18   request for judicial notice, we believe that the items that

19   we've offered are matters of public record or they are court

20   documents and they are admissible.

21              We would ask for the admission of -- we would move for

22   the admission of the declaration of Tasha Courthright, the

23   declaration of -- we have the declaration of Tasha Courtright,

24   we have the declaration of Amber Thompson, we have the

25   declaration of Brittany Ann Smith Jackl, we have the

1  declaration of Jessica King, the declaration of Crystal Loeser,

2  and the declaration of Michael Adorno-Miranda in support of the

3  Committee of Student Creditors motion for an order

4  supplementing or extending the automatic stay pursuant to 11

5  U.S.C. Sections 362(a) and 105(a) and granting related relief.

6  We have --

7          THE COURT:  All right, well the student declarations

8  are admitted by agreement.

9          MR. COLLINS:  Your Honor, if I may be heard on that,

10 please?

11         THE COURT:  Certainly.

12         MR. COLLINS:  Your Honor, we reluctantly object to the

13 entry of the declarations.  They are -- certainly have a lot of

14 hearsay in them, statements made by people that are not

15 identified regarding statements made to the students.  I don't

16 think it's relevant, those -- at least, those portions of the

17 affidavits are not relevant to the case being presented by the

18 movants as they said they are not here to prove factual

19 allegations.

20         To the extent the declarations are admitted solely

21 with respect to the fact that a student attended the schools,

22 has certain debt outstanding, is or is not in collection

23 default, that's one thing, but statements regarding what a

24 person told the student when they applied and what they knew or

25 did not know about loans they were taking out, we would object

1   being submitted into evidence, and again, not relevant for

2   today's hearing based upon our agreement that we were not going

3   to get into factual allegations today.

4            THE COURT:  There's no need to respond.  I'm going to

5   admit the student declarations.

6   (Declarations of Amber Thompson, Crystal Loeser, Tasha

7   Courtright, Brittany Ann Smith Jackl, Jessica King, and Michael

8   Adorno-Miranda was hereby received into evidence as Student

9   Committee's Exhibit Declarations of Students, as of this date.)

10           THE COURT:  Frankly, given the timing and the request

11  for this relief, I look at this, really, in essence, as a TRO

12  type of situation, and I tend to be a lit -- I think most

13  courts also tend to be a little bit more relaxed with respect

14  to those with respect to hearsay evidence.

15           With respect to the -- and I'll go down the -- and

16  with respect to the lawyer declaration, can you specifically

17  point that out to me, where it is in the binder?  What's been

18  referred to as the lawyer declaration?

19           MR. RANDOLPH:  I believe it's 365, Your Honor.  It's

20  the declaration of Cynthia C. Hernandez.

21           THE COURT:  Can you get a tab for me, Mr. Collins?

22           MR. COLLINS:  Yes, Your Honor.  And we'll get one, as

23  well.  11(ii).

24           THE COURT:  I have it.  Okay.  I'll sustain the

25  objection to the admission of that declaration, although I will

1   admit the complaints that have been offered, which are behind

2   tabs -- well, they're listed as Exhibit -- I'll just refer to

3   them as Exhibit B, Exhibit C, Exhibit D, E, F.

4   (Various legal complaints against the debtor were hereby

5   received into evidence as Student Committee's Exhibits B, C, D,

6   E, and F, as of this date.)

7           THE COURT:  I won't admit the Senate Committee report.

8   Does the Department have any objection to the notice of intent

9   to fine Heald College?

10          MR. RANDOLPH:  No, Your Honor.

11          THE COURT:  Okay, it's in.

12  (U.S. Dept. of Edu. Notice of Intent to Fine Heald College,

13  Apr. 14, 2015 was hereby received into evidence as Student

14  Committee's Exhibit H, as of this date.)

15          MR. RANDOLPH:  In fact, we attached it to a

16  declara -- I believe you're referring to the April 15th letter,

17  and rather than a news story, we attached to Mr. Appel's

18  declaration the actual notice.  I believe it's Exhibit B to

19  Appel's declaration.

20          THE COURT:  Okay, and with respect to the eligibility

21  information, any objection to the admission of that?  It's been

22  offered.  It's Exhibit I.

23          MR. COLLINS:  Yes, Your Honor, we would object to the

24  admission of this report.

25          MR. RANDOLPH:  As would we, Your Honor.  I think it's

1  hearsay.  It's eight years old.  And I don't see how that it

2  has any relevancy to the questions before the Court --

3          THE COURT:  Mr. Gautier --

4          MR. RANDOLPH:  -- on this motion.

5          THE COURT:  -- what's the relevance?

6          MR. GAUTIER:  Your Honor, if I may, these items are

7  not submitted to prove the truth of the matter asserted, but

8  rather to show that these allegations, that these -- that there

9  is a -- there are disputes.  There are significant disputes.

10  There is significant litigation and cause for litigation that

11  might be brought in the absence of the relief sought.  And so

12  we're not offering these to prove the truth of the matter

13  asserted in the documents, which would make them hearsay, but

14  rather just to evidence the fact that these disputes do exist.

15          THE COURT:  Well, Exhibit I, particularly, is a report

16  dated March 9th, 2007.  The objection's sustained.  All right.

17  Does that include everything, Mr. Gautier, in the way of

18  evidence?

19          MR. GAUTIER:  Yes, Your Honor.

20          THE COURT:  All right, thank you.

21          MR. COLLINS:  Your Honor, if I -- sorry.  If I may?

22  Given that the complaints were entered into evidence, if we

23  could, Your Honor, submit, also, into evidence the debtors'

24  notice of judicial -- notice of judicial relevant information

25  to the motion?  We simply attached -- and this set can be found

 1    under (iii), Your Honor, near the end of the binder -- simply

 2    our answers to the various complaints that were admitted into

 3    evidence.

 4              THE COURT:  Any objection?

 5              MR. GAUTIER:  No, Your Honor.

 6              THE COURT:  They're admitted for completeness

 7    purposes.

 8    (Debtors' response to various complaints entered into evidence

 9    was hereby received into evidence as Debtor's Exhibit Debtor's

10    response to complaints, as of this date.)

11              THE COURT:  Okay.

12              I'll hear from the Department.

13              MR. KRESSE:  Good afternoon, Your Honor.  John Kresse.

14    Your Honor, as mentioned before, we are offering into evidence

15    with, I believe, the agreement of counsel for the Student

16    Committee, the declaration of Mr. Appel, the Deputy Under

17    Secretary.  We understand there's no objection to that?

18              MR. GAUTIER:  Correct, Your Honor.

19              THE COURT:  All right, admitted without objection.

20    (Declaration of Deputy Under Secretary of Education at the US

21    Department of Education, Jeff Appel was hereby received into

22    evidence as Department of Education's Exhibit Declaration of

23    Jeff Appel, as of this date.)

24              MR. KRESSE:  All right.  And Your Honor --

25              THE COURT:  I will ask, however, does anyone wish to

1   cross-examine Mr. Appel?

2           I hear no response.

3           MR. KRESSE:  Thank you, Your Honor.  Regarding the

4   information, I think Mr. Randolph has updated the Court with

5   some of the numbers that were in Mr. Appel's declaration, one

6   of which was the number of closed school applications, which is

7   almost 5,000 now, and there were also the closed school

8   discharge applications.  There's also the borrowed -- borrower

9   defense, which is where the student has a state -- a state law

10  claim or asserts a state law claim.  There are 14 -- 1,414 of

11  those applications now before the Education Department.

12          And Your Honor, we would also proffer additional

13  information because the stay, at this point, is seeking only to

14  stop the Department from collection actions and no longer stop

15  its administrative proceedings, and that was done after we

16  submitted our objection and along with the reply of the Student

17  Committee.  So the Department has been looking into our

18  response as what -- how would the Department be able to deal

19  with a stay of collection activity.

20          And Mr. Randolph did address some of those issues,

21  generally, but we would proffer additional information, or

22  would like to proffer additional information which Mr. Appel

23  would be prepared to testify to, if necessary.

24          First of all, Your Honor, I think it was mentioned

25  before, there are approximately 40,000 Corinthian students

1   who've defaulted on their student loans out of a universe of

2   approximately 500,000 borrowers going back before 2010.  Mr.

3   Randolph referred to a number, 350,000, since 2010.  So that's

4   less than ten percent of the total universe that are in

5   default.  And so there's over -- certainly, with 40,000 in

6   default, then it's easy to do the arithmetic to determine that

7   the vast majority are repaying their loans.  The effect of

8   applying the stay to all the loans, which I'm not sure if --

9            Counsel for the Student Committee, are you suggesting

10  that the stay would apply to all the loans so that even those

11  who are making repayments would -- we would be stopping

12  collection, essentially, of -- from people who are actually

13  current and making their payments?

14           MR. GAUTIER:  Yes, Your Honor.  350,000 or so would be

15  the total number that I -- that I heard and we would stipulate

16  to.

17           MR. KRESSE:  All right, well, Your Honor, as I said,

18  there's about 500,000 who are borrowers from Corinthian

19  schools, 40,000 of them are in default at this point.  So in

20  any event, it's closer to 450,000 going back to the beginning.

21  So that would mean that the Department of Education would have

22  to inform its loan servicers that there are -- they could not

23  accept payments.  And there would be an additional complexity

24  to that because many students have had loans from -- regarding

25  multiple -- or for attending multiple institutions.  So they

1   have, in many cases, consolidated their loans with a single
2   servicer and so we would have to get the servicers to separate
3   out the payments that concerned Corinthian and the -- or the
4   debtors, and the payments that concerned other institutions.

5          So that would be an expense and a complication.  In
6   the case where a student -- the default would be that we would
7   have a total forbearance of payments or collection, but the
8   student would have the option of saying to the servicer, well,
9   I don't want you to -- I'm going to keep paying the other
10  portion that applied to the school that wasn't Corinthian.  So
11  obviously, that's a lot more work for the servicer and more
12  work -- obviously, more complication for the students.

13         In any event, under forbearance, interest continues to
14  run, so for those loans that weren't Corinthian loans, even if
15  the students stopped paying, the interest would continue to
16  accrue.

17         And it's hard to estimate, first of all, how long this
18  would take to get this taken care of given that the plan
19  confirmation is proposed for the end of August, less than two
20  months.  We don't know what the expense would be for another.

21         THE COURT:  Right, so wouldn't it be just easier to
22  hold up for the two months?

23         MR. KRESSE:  Well, holding up, Your Honor, by itself
24  requires, obviously, getting these servicers to determine
25  exactly who the people are who are affected out of these

1  500,000.

2          THE COURT:  If you were to limit it simply to those

3  who were in default and against whom judicial collection

4  activity has been commenced, it seems to me that's a very small

5  universe.

6          MR. KRESSE:  If it was just those who were with

7  judicial collection action, meaning sent to the U.S. Attorney's

8  Office, it is a very small universe, Your Honor.  We don't know

9  the exact number, it's just --

10          THE COURT:  It seems to me, if there's harm -- if

11  there's immediate harm, that's where it would be.

12          MR. KRESSE:  Correct, Your Honor.  I think that's a

13  fair statement.  I --

14          THE COURT:  Right, so why won't the Department agree

15  just to do that?

16          MR. KRESSE:  I don't know that, Your Honor -- that we

17  couldn't agree to that.  I think the issue is how long would it

18  take -- and it might take a couple of weeks just to figure out

19  which of the Corinthian borrowers are actually being collected

20  from through a lawsuit at one of the ninety-three U.S.

21  Attorney's offices throughout the country.  And some of those

22  have been distributed, as we understand it, to private law

23  firms who undertake these collections.  So yes, it's a small

24  universe.  There is work involved.  How quickly that could

25  happen, it could be a couple of weeks, Your Honor, before that

1  could happen, certainly.

2          THE COURT:  Well, it seems to me, the e-mail to the

3  U.S. Attorney's Office is an easy one.  The other may take a

4  little more time.

5          MR. KRESSE:  All right.  Fair point.  So Your Honor,

6  if we were going to apply this to all of the 40,000 who are

7  merely in default, which covers a wide swath, then much of the

8  testimony that I would -- we would proffer is not necessary,

9  but the details of people who are technically in default

10  include people who -- for whom no actual private collection

11  agency has taken any efforts to dun or whatever.  Stopping or

12  not making payments, technically, is a default, but it doesn't

13  mean the Department of Education has done anything about it.

14          So out of that 40,000 -- and we don't know, again,

15  exactly how many of those people fit into the various

16  categories, and they are divided among, I think, twenty-two

17  different private collection agencies.  So that's -- that's

18  an -- that's an added wrinkle that would take, again,

19  significant resources to sort all that out and figure out

20  exactly who those people are.  And it would take -- Your Honor,

21  we have done an estimate, and I apologize for the detail here,

22  but if it was 40,000 loans, which we think is the number in

23  default, and it only took ten minutes per loan to figure out

24  who was taking care of the loan and who to call and what the

25  status of it was, and you did that for, obviously, the 40,000,

1    essentially, it's about 830 days of work for a single person.

2    It would be twenty people working for about eight weeks, full

3    time, to get through those 40,000.

4              So in terms of getting it down before a plan could be

5    confirmed, it wouldn't happen regarding those 40,000.

6              THE COURT:  Listen, I'm prepared -- and since there's

7    been an additional proffer, I'll ask again, when you're

8    finished whether anyone wants to cross-examine Mr. Appel on

9    those -- on those facts -- asserted facts.

10             And I, in a lot of ways I look at -- I look at whether

11   it's big companies or the government in situations where lots

12   of individuals are involved -- I mean the -- you're kind of a

13   big lumbering bear that just takes you a while to gets things

14   done.  And I understand that and I accept that, at least

15   initially, absent evidence to the contrary, but my concern here

16   today is twofold.

17             One is -- and you've heard it from the debtor and

18   you've heard it from Student Committee counsel -- the classic

19   use of this forum is to try to bring people to consensus,

20   people with divergent interests, with lots of money at stake,

21   not just for the parties here, but for taxpayers at large, and

22   give them a chance to figure out how to exit.  Because it's

23   rare that anybody does well with an extended stay here.  But

24   for that time period, as the debtor is trying to work through

25   achieving consensus with the different constituents -- and by

1    the way, I happen to agree with committee counsel that with

2    consensus a lot can be accomplished here that might not

3    otherwise be achievable.

4             I would like to try to, again, without being too

5    tedious, focus you in a laser way on avoiding

6    whatever -- whatever real harm could occur to the student

7    borrowers between now and the time we get to confirmation,

8    hopefully, with a consensual plan.  And that means wage

9    garnishments and things like that that have immediate and a

10   direct adverse impact on people's lives and whether they can

11   buy groceries and pay rent and put gas in their cars and those

12   things.

13            MR. RANDOLPH:  Your Honor, I've stepped up because I

14   think the question for Mr. Kresse is whether he needs to put a

15   witness on the stand.  If nobody wants to cross-exam Deputy

16   Under Secretary Appel, I suppose we're back to argument, and

17   I'd be happy to answer that question, but if nobody wants to

18   cross-examine, then I would suggest that we go back to

19   argument.

20            THE COURT:  And I was having such a nice discussion,

21   here.

22            MR. RANDOLPH:  And I'm -- and I'm prepared to answer

23   that question.  I mean, we could take testimony from Mr. Appel

24   on that subject or we could go back to argument.  If we need

25   testimony, then I would suggest that he be put on the stand and

1    you could ask him or he could be cross-examined.

2              THE COURT:  You know, I attended a program that's

3    given here locally every summer that's attended by summer

4    interns and summer associates at law firms here in Delaware.

5    And the panel is a collection of judges from the various

6    courts, state and federal, and among trying to describe what

7    it's like trying to practice in Delaware, we also offer

8    sometimes solicited, but often unsolicited advice about what

9    lawyers-to-be and young lawyers should be considering.  And one

10   of them is when the judge seems concerned about something and

11   wants to press an issue, the lawyer should be sensitive to that

12   and follow up.

13             Now what I'm trying to do, since I think I have to be

14   more obvious than I've been so far, is try to press you into an

15   agreement in a very limited way to just find a way to avoid

16   immediate harm to individuals here without in any way making

17   any kind of judgment about the merits of the underlying claims.

18   So if what you're standing to say is, Your Honor, we're just

19   not going to consider that, just say that and sit down and

20   we'll get on with it.

21             MR. RANDOLPH:  I'm not going to say that, Your Honor.

22   What I was going to say is we certainly agree that the

23   opportunity for plan negotiations to bring consensus is a very

24   positive opportunity, and we are prepared to have discussions

25   to try to bring consensus.  Nothing that the debt -- that the

1    committee is asking for requires us to be forced to do

2    something for us to have that sort of consensual discussion.

3    If we can come to some agreement that can be reflected in a

4    reorganization plan, wonderful.  This issue will be avoided.

5          The question before the Court right now is not whether

6    we should be permitted to have those sorts of consensual

7    settlement discussions, but whether we should be forced, in the

8    meantime, to stop the administrative proceedings that we've

9    already started and forced to stop exercising our extant

10   rights.  That's the part that we find problematic.  We would be

11   delighted to work with the committee, as evidenced by all of

12   the efforts that we've already made to make available

13   administrative relief for the debtors.

14         THE COURT:  I would be inclined to stop --

15         MR. RANDOLPH:  The question is simply whether we

16   should be forced.

17         THE COURT:  -- the administrative process.  And maybe

18   I'm not being clear enough, although I think I am.  I'm just

19   looking for an agreement by the Department of an interim

20   agreement to relieve people of what might be immediate harm to

21   them.  And I understand that you're willing to consider things

22   in connection with the overall plan, but that's a little bit

23   away.  I'm concerned about today.

24         And if you're telling me -- it's okay.  People assert

25   their rights here all the time.  If you're telling me, Judge,

1   it just isn't in the cards today, just say that and I'll stop

2   talking.

3           MR. RANDOLPH:  I don't have any authority to offer

4   that -- what I understand you to be asking.  I just don't have

5   the authority to offer that.

6           THE COURT:  Not with your client here?

7           MR. RANDOLPH:  It's a question of --

8           THE COURT:  Or does it go -- must it go higher?

9           MR. RANDOLPH:  I suspect it would have to go higher,

10  Your Honor.

11          THE COURT:  Have you asked your client that?

12          MR. RANDOLPH:  I will right now.

13          THE COURT:  Will you do that?

14      (Pause)

15          MR. RANDOLPH:  Thank you for that opportunity, Your

16  Honor.  First, I am informed by the Deputy Secre -- Under

17  Secretary that he would need to take this matter higher before

18  making that sort of concession.  Second, I would note for the

19  Court that we're not sure that there are, as of this moment,

20  any Corinthian students already in judicial collection

21  proceedings.  Third, I would note that any that are can obtain

22  relief simply by asking us to stop those proceedings.  And then

23  lastly, I would note that we are really quite unsure how

24  quickly we could turn off whatever judicial collection

25  proceedings currently are underway.

1    My suggestion would be that if the Court wants us to

2    take this matter higher than the Deputy Under Secretary, that

3    you give us an opportunity to have that conversation and we

4    will get back with you promptly.  I can't promise that it will

5    be today, but we will endeavor to find out and respond

6    promptly.

7         THE COURT:  Thank you.

8         Let me ask, based on the additional proffer, does

9    anyone wish to cross-examine Mr. Appel with respect to simply

10   just the additional facts proffered?

11        I hear no response.

12        Okay, thank you.  Does the government have anything

13   else that it would like to offer in support of its objection to

14   the relief that's been requested today?

15        MR. RANDOLPH:  We don't have any additional evidence,

16   Your Honor.  We do have some additional argument, if you'd be

17   prepared to hear it.

18        THE COURT:  I will, in a minute.

19        Does debtor have anything it wishes to offer into

20   evidence?

21        MR. COLLINS:  Yes, Your Honor.  One additional

22   document.  I believe Your Honor admitted into evidence by

23   consent the Education Department's fine letter.  The debtors

24   did attach to our response Exhibit B to Docket number 465, our

25   request for a hearing and motion to dismiss the intended fine,

1  and we'd like that to be admitted into evidence, as well.

2          THE COURT:  Is there any objection?

3          MR. RANDOLPH:  No, Your Honor.

4          THE COURT:  Submitted without objection.

5  (Debtors' response to Department of Education's fine letter was

6  hereby received into evidence as Debtor's Exhibit B, as of this

7  date.)

8          MR. RANDOLPH:  Thank you.

9          THE COURT:  All right, I'll hear argument.

10      (Pause)

11          MR. GAUTIER:  We have heard and we would accept as

12  estimates that there are 500,000 Corinthian borrowers.  And on

13  behalf of the Student Committee of student creditors, we

14  believe that it is very possible, given some of the complaints

15  that are in evidence, that the debtors' misconduct would

16  dictate that, regardless of whether those students are paying

17  on these loan obligations, that the real obligation lies with

18  the debtors.

19          And we would submit that while we will accept the

20  number 40,000 as the number of Corinthian borrowers in

21  default -- I don't have reason to argue with that number -- but

22  that doesn't mean that simply because a student is making

23  payments, that the payments on an obligation, which it may not

24  be obligated, is not burdensome.  The release

25  has -- ultimately, the release of these obligations should have

1   nothing to do with whether or not a student is in default, but

2   on whether or not the debtors' misconduct has been proven or

3   whether settlement may have been reached such that litigation

4   regarding that misconduct is unnecessary.  And I certainly hope

5   that is the way that this comes out and this is determined.

6           Out of 40,000 students in default that are entitled,

7   by the testimony here today, to immediate relief, I think the

8   Department admits that it has requested -- or that it has

9   received 4- to 5,000 requests for that relief.  Ten percent

10  from people that are currently in default, and we would submit

11  that that is a small number.  And I submit that that is an

12  illustration of our argument as to why collective relief is

13  necessary.

14          We believe that the Chapter 11 process is the place

15  for that collective relief, and we believe that there is an

16  identity of interests, certainly, between the debtors and all

17  of the students, all 500 (sic) of them, with respect to this

18  debt that was administered through the debtors, the money was

19  received by the debtors, and may very well be owed back by the

20  debtors.

21          As to the four prongs that are typically looked at

22  with respect to this type of relief, there's the probability of

23  success.  The probability of success in the context of a motion

24  to extend the stay is not the probability of success of the

25  underlying litigation, which is why I don't believe that the

1  findings of conduct or misconduct are necessary, but the

2  probability of a successful plan, of a successful process of

3  consensual resolution -- consensual resolution that, hopefully,

4  in this case, can go beyond just monetary treatment, that can

5  include open discussion among creditors that are on similar

6  footing, mostly between Ed and the students.

7          And while we note and appreciate Ed's efforts, maybe

8  even their benevolence, if their comments are believed today --

9          THE COURT:  I take what the government has said as

10 being sincere expressions of their willingness and currently

11 hard work on trying to help where they can help.  I take --

12         MR. GAUTIER:  It think it was --

13         THE COURT:  -- them at their word.

14         MR. GAUTIER:  Your Honor, I think it was -- I know it

15 was you that said earlier that government parties guard

16 jealously their prerogative.

17         THE COURT:  Oh, so do private parties.

18         MR. GAUTIER:  Private parties and the government, yes.

19 I'm not lay -- again, we appreciate the administrative

20 proceedings.  Nobody wants them to stop.  Nobody wants the

21 government to stop its processes, but as the numbers show, no

22 matter how hard they try, we don't believe that an

23 individualized process, given the body of student creditors, is

24 going to afford the effective relief we need.  Therefore must

25 we have a stay unless we can sit together and pull everybody

1    into a consensual process.

2           I don't believe that we're going to be able to avoid

3    litigation, and that's not the most efficient way forward.

4    We're looking to this Court -- I mean, I think it is obvious to

5    Your Honor -- we are looking to you to help us protect this

6    Chapter 11 process to force people to the table, to force the

7    government to the table to come here and deal with this issue.

8           THE COURT:  I'm working on it.

9           MR. GAUTIER:  I appreciate it.  So the four prongs.

10   Probability of success:  think that we do have a probability of

11   success here, a probability of a consensual cooperative

12   process.

13          Balance of the harm:  the harm to the students versus

14   the harm to the government.  We accept the proffer that it may

15   be difficult for the government to stop collection proceedings.

16   We have 500,000 students that we're talking about who don't all

17   have access to notice, to a legal understanding and to the

18   resources to gain that legal understanding of what it is they

19   need to do, however simple that may seem to those of us

20   assembled here.  The numbers that the government produces that

21   4,000 out of -- or 5,000 out of 50,000 or if that's 10,000 out

22   of 40,000, the fact that all 40,000 students in default have

23   not simply gone to a computer, clicked the button and sought

24   the relief illustrates the point.

25          We need collective relief to protect the people that

1    our committee -- that Jessica, Amber -- I didn't forget her

2    name, I'm just a little choked up --

3              THE COURT:  Um-hum.

4              MR. GAUTIER:  -- Crystal and Krystle are here to

5    protect and are working hard to protect.  So we believe that

6    the balance certainly is to avoid the harm to the students and

7    public interest speaks for itself.

8              Affording students and the public the most efficient

9    path to resolution is certainly in the public interest, given

10   the situation here with billions of dollars being spent, with

11   the amount of publicity and the large interest of the public as

12   John Taxpayer in these cases.

13             And so we think the four prongs have been met.  We

14   think there is an identity of interest, we think there is a

15   unique circumstance here, we believe the Court does have

16   jurisdiction.  And on that, Your Honor, we would ask for the

17   relief requested.

18             THE COURT:  Thank you.

19             I'll hear from the Department.

20             MR. RANDOLPH:  Thank you, Your Honor.  In our papers

21   is a discussion of why injunctive relief cannot be granted

22   outside of an adversary proceeding.  And we --

23             THE COURT:  So let me ask this:  the cases are rife

24   with situations in which, when courts have concluded that due

25   process requirements have been satisfied and the, I'll say

1   defending party or responding party has had ample opportunity

2   to prepare and engage in defense of the relief that's been

3   requested, that it's not necessary to require that an adversary

4   be commenced.  So tell me here why you think the government has

5   been disadvantaged by the form of the -- by the vehicle that's

6   been used to request this relief.

7         MR. RANDOLPH:  Because we have not had an opportunity

8   for discovery.  Because a variety of allegations have been

9   made, even today, that don't seem to be matters on which we had

10  a clear understanding that that would be the committee's

11  position, but now they're arguing, such as the notion that the

12  debtors were our agent and we're somehow bound by what the

13  agent did.  Those are the sorts of things about which we should

14  have the kind of notice that would be provided in a complaint,

15  so that we could focus on those allegations.

16        Here, we are being pressed to a hearing within eleven

17  business days after the time this motion was filed, five days

18  after we've responded.  And that's not sufficient time, given

19  the complexities of this situation, for us to respond with the

20  fulsome response that we might like to offer before

21  extraordinary measures such as an injunction of a federal

22  agency are provided.

23        I also think that the law in this district, consistent

24  with the law in other places when the question of whether an

25  adversary must be filed has been raised, generally has

1    indicated that, yes, an adversary should be filed.  The Fifth

2    Circuit said that very expressly.  We've cited in our papers a

3    couple of cases in this district -- one a district court case,

4    one a bankruptcy court case, I believe, from last year, SS Body

5    Armor -- that indicate that an adversary should be filed before

6    injunctive relief should be offered.

7            And the two cases from this district that the Student

8    Committee has cited as examples on why they don't need to bring

9    an adversary, were both adversaries.  One was W.R Grace and Co.

10   v --

11           THE COURT:  I know the cases.

12           MR. RANDOLPH:  Okay.  And the language in Lernout is

13   not a case that involved a request for injunctive relief in the

14   case, we would submit, but the language in there about how you

15   don't really need to bring an adversary in every circumstance

16   involved very different circumstances from this situation.  The

17   question was not under 70017 but under 70018, which requires an

18   adversary proceeding to subordinate outside a plan an allowed

19   claim.  And the Court concluded that that section didn't apply

20   because the claim of the adversary complaint's defendants had

21   not been allowed.  So we just don't think that the comments

22   that the Court made in that case are anything other than dicta.

23           The other cases that the Student Committee cites do

24   not address whether an adversary proceeding is a requirement.

25   One of them, the Loewen Group case was one in which the

1  requested relief was brought in district court in an

2  independent action against nondebtor officers and directors.

3  The district court suspended that.  And the point here is that

4  because the case was brought against these nondebtors in a

5  district court, they had the same procedural protections as

6  they would have had in an adversary proceeding.

7          Each of the other cases that the Student Committee

8  cites were ones that do not say whether an adversary needed to

9  be brought to obtain injunctive relief, and the absence of any

10  comment on those cases suggests to me that the procedural

11  defect was never raised, so I don't think there is any

12  precedential value to those cases.

13          Collier says that appellate courts are near universal

14  in reversing injunctions issued by bankruptcy courts outside an

15  adversary proceeding.  That, to me, speaks volumes.

16          Let me turn to the merits, Your Honor.  You've talked

17  at length with the Student Committee's counsel about the

18  standard that ordinarily would apply, this special

19  circumstances standard.  Special circumstances -- or unusual

20  circumstances, I believe, is actually the language in the

21  case -- they're not present here.

22          The students lack an identity of interest with the

23  debtors, and it goes beyond merely the fact that the students

24  evidently intend to bring claims against the debtors.  The

25  concept of identity of interest in those cases is one in which

1    the debtors would be adversely affected by the absence of a

2    stay.  That's not going to happen here.

3         These students are not directors and officers of the

4    debtors, and the debtors have said, look, we can do this.  We

5    can do this within two months; get a plan confirmed.  So I

6    don't think that what we have on that prong is an unusual

7    circumstance meriting the extension of a stay to nondebtors.

8         If the -- and the argument that the Student Committee

9    makes is, as I understand it, if the students are relieved

10   from -- by Ed from an obligation to repay their loans, then Ed

11   may bring those claims against the debtors.  That is so, but

12   because that process -- that administrative process would be

13   one from which the debtors are absent, the debtors would remain

14   free in this court to relitigate the value of Ed's claims based

15   on those discharges.  So there isn't an identity of interest.

16        With respect to the four-prong standard, we disagree

17   with the Student Committee and its position that the question

18   on the merits is whether a plan can be confirmed.  Instead, the

19   focus should be on whether, on the merits, they can get the

20   kind of relief that they're looking for.  And we think not

21   because we don't think that this Court has subject matter

22   jurisdiction to decide claims that the government has against

23   nondebtors.

24        The students have not demonstrated that the relief

25   they seek is necessary to the debtors' reorganization.  They've

1    not demonstrated that it's fair to the party that would be

2    enjoined.  Enjoining the United States from pursuing its claims

3    would ordinarily be expected under the Third Circuit's

4    discussion in Gillman to offer some sort of compensation for

5    requiring that the government stay its hand.  The Third Circuit

6    there said that granting injunctions to protect nondebtor

7    parties on the basis of the theoretical identity of interest

8    alone would turn bankruptcy principles on their head.  That's

9    exactly what the Student Committee is asking for here, turning

10   bankruptcy principles on their head.  There isn't any evidence

11   in this record that the requested stay is fair to Ed, there's

12   no compensation to Ed for the stay, and we don't think that the

13   students likely would prevail on the merits.

14          With respect to the jurisdictional element, the

15   question is whether -- under the relating-to standard, is

16   whether the claims against the third party could conceivably

17   have any effect on the bankruptcy proceeding.  That's the Third

18   Circuit's decision in Packer, but --

19          THE COURT:  Pacquer (ph.), and I know it well.

20          MR. RANDOLPH:  Pacquer.

21          THE COURT:  I have no question in my mind that I have

22   jurisdiction to determine the relief that's before me to day,

23   which is separate, I think, from the underlying issue, again

24   depending how and when it might be raised.

25          MR. RANDOLPH:  Okay.  And our -- with respect to the

1    issue before you today, if the question is, do you have

2    jurisdiction to decide whether the stay -- the automatic stay

3    is violated, we would agree.  You have jurisdiction to decide

4    that.  What we don't think you have jurisdiction to decide is

5    the validity of the government's claims against the students.

6              THE COURT:  I don't --

7              MR. RANDOLPH:  And that --

8              THE COURT:  I don't think I have to decide that today.

9              MR. RANDOLPH:  Okay.

10             THE COURT:  Even if I were -- even if I were able.

11             MR. RANDOLPH:  With respect to the likelihood that the

12   students would be irreparably harmed, we don't see irreparable

13   harm to any of them, Your Honor, from the continuation of

14   the -- or the ability of Ed to continue its collection actions

15   against them.  And the reason for that is very simple:  all

16   they have to do is ask, and we'll stop.  And that's true, not

17   only with respect to the actions of private debt collectors,

18   but it's also true with respect to judicial actions --

19             THE COURT:  I will tell you --

20             MR. RANDOLPH:  -- that have been brought.

21             THE COURT:  -- I am not yet convinced that notice has

22   been sufficient or broad enough to put people in a position to

23   ask.  I'm not saying it hasn't been.  I'm simply not yet

24   convinced that it has been.

25             MR. RANDOLPH:  The students in their papers and in

1  their argument here today keep talking about improved
2  efficiency, the improved efficiency in the process if the Court
3  would force Ed to stop.
4        THE COURT:  You know, it probably would be efficient.
5  I don't think that's dispositive, frankly.
6        MR. RANDOLPH:  I agree.  And it needs to be
7  irreparable harm, and we don't think that they would be
8  irreparabl -- irreparably harmed.  We think that the burdens on
9  Ed associated with stopping their current activities would be
10 quite onerous and, as you heard from the proffer, may not be
11 able to be finished within the next two months.  And so it
12 seems silly to us to ask Ed to start down an expensive and
13 problematic process that may not be able to be finished in time
14 for there to be any meaningful effect at all.
15        And then, lastly, with respect to the public interest,
16 even as narrowed, the requested stay would adversely affect the
17 public interest in two ways.  The public has an interest in the
18 fair determination of whether Ed's claims arising from student
19 loan debt to the United States should be discharged.  And the
20 public also has a significant financial interest in collecting
21 on any claims that should not be discharged.  And staying
22 collection activities would adversely affect both of these
23 interests.
24        With respect to the public's interest in a fair
25 determination of whether the student debt should be discharged,

1   we would have to divert significant resources from those

2   ongoing efforts to try to stop collection activities, and that

3   would redound to the public's detriment in a fair determination

4   of whether the discharges should be received.

5          And the public's pecuniary interest also would be

6   adversely effected for the various students who may not have a

7   valid defense on their student loan obligations.  There are

8   150,000 of them that were -- that borrowed before 2010.  I'm

9   not aware of any basis for those folks, under the closed school

10  discharge, to be able to be exonerated, and they may not have a

11  basis in state law for exoneration, either.

12         Those are the sorts of retail questions that would

13  require a variety of careful sorting through that best can be

14  done in Ed's ongoing proceedings and ought not be stopped or

15  slowed down by action that this Court has been asked by the

16  Student Committee, a committee consisting of seven people, to

17  do.

18         And so, for all those reasons, Your Honor, we submit

19  that the Court should deny the requested stay.  Thank you.

20         THE COURT:  Thank you.

21         Mr. Gautier, I'll give you the brief last word if

22  you'd like it.

23         MR. GAUTIER:  I'll be very brief, Your Honor.  I

24  address solely the procedural aspects.  7001, it refers to an

25  action to obtain objunction -- injunctive relief that

1   would -- that would be considered an adversary proceeding,

2   should be brought pursuant to an adversary proceeding.

3   Technically, it doesn't discuss or, to be read carefully, to

4   extend to motions to extend injunctive relief or to extend the

5   automatic stay under Section 362.

6           THE COURT:  Of course, there's nowhere in 362 where it

7   provides for extension, does it?

8           MR. GAUTIER:  The only place in 362 where it does

9   provide for an extension is not an extension as to the scope of

10  the stay, but only to the temporal timing of the stay.  And

11  where the timing of the stay, the extent of the

12  stay -- temporal extent of the stay is considered, and the

13  legislature has considered it, relief is sought by motion -- 11

14  U.S.C. 362(c)(3) or (c)(4).

15          As well, in Rule 4001, when we talk about relief from

16  the stay, which deals with injunctive relief, the legislature

17  prescribed that the more expeditious practice, motion practice,

18  would be used.  And we think that the court in In re Benjamin,

19  which is the only court that we could find that offered a

20  detailed discussion of it in a published opinion gave

21  a -- provided a very principled basis for permitted relief upon

22  motion, which is that the automatic stay talks to a fundamental

23  protection.

24          It is a fundamental part of bankruptcy proceedings in

25  a Chapter 11 proceeding like this, it can provide for a

1  successful proceeding.  And we hope that the Court entertains

2  the opportunity to help us to do that here.

3          THE COURT:  Thank you.

4          MR. GAUTIER:  Thank you, Your Honor.

5          MR. SCHWARTZ:  Good afternoon, Your Honor.  Jeffrey

6  Schwartz, Brown Rudnick, on behalf of the Official Committee of

7  unsecured creditors in this case.

8          Two quick points, Your Honor.  One, you had asked the

9  question at the outset as to whether there is a view that

10  there's an opportunity for general unsecured creditors to

11  obtain a dividend or distribution under a confirmed Chapter 11.

12  I just -- on behalf of the committee, the answer is:  yes, we

13  believe that to be very much the case.

14          It is a -- clearly a very limited estate.  The time

15  table for the confirmation of a plan is limited.  The committee

16  has been working with the Student Committee, the debtor, the

17  bank, and I believe that the plan that will be filed either

18  later today or tomorrow will largely get us there.  There are

19  some issues that remain, but not -- there shouldn't be issues

20  that are going to thwart or undermine reaching confirmation and

21  going effective.  That's what --

22          Two, in the interests of transparency, the

23  committee -- my committee had originally intended to object to

24  the motion, but in a conversation with the Student Committee

25  counsel, when we had pointed out that, as to the private

1  lenders, the entry -- or the issuance by this Court have been,

2  however you might want to charact -- one might characterize it,

3  the extension of the stay or the injunction -- would

4  res -- would likely result in put rights on behalf of the

5  private lenders, which would result in what we could identify

6  as at least 200 million more of claims, i.e. dilution, and that

7  was only as to one of the private lenders, and there are

8  others.  We haven't quantified what those others would be.

9         So Mr. Gautier, on behalf of his committee, did agree,

10 and he amended or stayed that part of his motion, and we

11 appreciate that.  I'm just making the Court aware, then, that

12 the -- as you've probably already surmised, the private lenders

13 are proceeding.  Now, there is no pending action against them.

14 So that is out there.

15        Obviously, my committee is predominantly vendors,

16 trade creditors, and they had nothing to do with this -- these

17 controversial elements that are between the Student Committee

18 and the government, and we hope that they can work something

19 out and that enables the plan to be more efficacious and in the

20 public interest, but within the time frame and to not disrupt

21 the progress or undermine the progress that has already been

22 made.

23        So that -- I appreciate Your Honor has paid -- has

24 done, actually, a great public service by airing these issues

25 thus far.  And if there's anything that you have -- any

1    questions you have of the Official Committee, we're more than

2    delighted to respond.

3              THE COURT:  I do not, but thank you.

4              MR. SCHWARTZ:  Thank you, Your Honor.

5              THE COURT:  All right.  I would like -- here's what

6    I'm going to do:  I'm going to leave the record open, but not

7    anticipating the submission of any further evidence, and

8    continue hearing on this motion to July 9th at 2 o'clock by

9    telephone only.

10             Between now and then, I would like the government to

11   consider whether -- as it said it would -- some limited

12   agreement -- I'm asking, not directing -- some limited

13   agreement can be reached to avoid any immediate harm to

14   Corinthian borrowers in default and for which judicial

15   collection proceedings have been commenced.

16             At the same time, I'd like all the parties to consider

17   whether there can be an additional or better or more effective

18   way of reaching students -- former students to make them aware

19   of the administrative process in which they can avail

20   themselves of the relief simply by filing an application.

21             On July 9th, I'll ask the parties to report to me on

22   what progress, if any, they've been able to make on either of

23   those issues.  And at which point I'll be prepared, if under

24   the circumstances it's appropriate, to rule on the motion.

25             This is a situation, which, in my experience, is

1  unique, and it does involve complexities.  And while the Court

2  tackles unique and complex situations all the time, I'll say

3  something that I think all of the parties know, and that is:

4  the arrangement they make among themselves is normally going to

5  be better than the one I impose.  But I leave the parties with

6  that thought.

7            Are there any questions with respect to this matter?

8            MR. RANDOLPH:  Thank you, Your Honor.  What time on

9  the 9th of July?

10           THE COURT:  2 o'clock in the afternoon.  Telephone

11 only.

12           MR. GAUTIER:  Your Honor, there should be no further

13 filings?

14           THE COURT:  There should be no further filings.

15           MR. GAUTIER:  Thank you.

16           THE COURT:  Unless it's to tell me you've resolved the

17 matter.

18           Are there any other questions?

19           Okay, that concludes that matter.  I understand we

20 have one remaining.  Can you let -- I am going to take a short

21 break before we address that, but let me know how much time you

22 may need with respect to that.

23           MR. MERCHANT:  Your Honor, Mike Merchant from

24 Richards, Layton & Finger on behalf of the debtors.  I was

25 actually going to request a short break because we walked in

1    today thinking we had a contested hearing, which I still don't

2    think would take more than a half an hour, but we just met in

3    the hallway and there might be a resolution.  So it may be much

4    quicker than that.

5             THE COURT:  You may have all the time you need, Mr.

6    Merchant.

7             MR. MERCHANT:  Thank you, Your Honor.

8             THE COURT:  We stand in recess.

9             MR. MERCHANT:  Okay.

10        (Recess from 3:00 p.m. until 3:20 p.m.)

11            THE CLERK:  All rise.

12            MR. MERCHANT:  Thank you, Your Honor.  Again, Mike

13   Merchant of Richards, Layton & Finger on behalf of the debtors.

14            That break was productive.  We were able to resolve

15   Mr. Schepacarter and Mr. Fox's objection to the motion.  We'll

16   be submitting a revised form of order under certification of

17   counsel, but if I can walk the Court through where we are, the

18   changes that have been made thus far, and read a proffer of Mr.

19   Nolan into the record in support of the motion?

20            THE COURT:  All right.

21            MR. MERCHANT:  That would be great.  So this is agenda

22   item number 12, which is docket number 375, and it's the motion

23   authorizing the debtors to enter into a consulting agreement

24   with Great American Global Partners, LLC, which I'll refer to

25   as GAGP.  And the agreement is the -- is the result of an

1   extensive post-petition marketing process conducted by the
2   debtors and their professionals.
3           And I'm going to read into the record in a moment the
4   affidavit of -- or the proffer of Mr. Nolan that goes through
5   the process that was followed and how we ultimately selected
6   GAGP.  It was really a bid process that was run, but at the end
7   of the day, the structure of the deal was that they are going
8   to serve as the consultant with respect to the debtors in
9   conducting the sales of more valuable equipment.
10          It's the equipment at two locations in California,
11  which we referred to as the WyoTech locations.  And the
12  equipment there is -- it consists of valuable equipment that
13  existed at those two locations right from the start of the
14  case, as well as the more valuable equipment that was located
15  at various campus locations in that area which we're able to
16  transfer to that location so that we could sell it in
17  accordance with one process over a greater period of time to
18  maximize value.
19          One moment, Your Honor.
20          There were -- the way the deal is structured, Your
21  Honor, there's a guaranteed amount, and then on top of that
22  there's sales expenses and then there's a proceeds sharing
23  formula above that.  The consulting agreement provides that the
24  guaranteed amount is 1.53 -- 1.535 million dollars.
25          But Section 1.1 of the consulting agreement also

1    provided for a final walk-through of the sale locations because

2    when Great American and other prospective bidders looked at

3    these assets, some of them were located in various locations.

4    Some were located in an annex, and there was no written

5    inventory of the assets that would be included in the sale.  So

6    we structured the agreement such that there would be a final

7    walk-through to verify the assets and to make any necessary

8    changes to the consulting agreement.

9            That walk-through took place last week, and Great

10   American did raise some issues in response to that walk-

11   through.  They initially requested a purchase price reduction

12   of 120,000 dollars off of the guaranteed amount.  The debtors

13   disputed the proposed reduction, but acknowledged that there

14   were some issues that needed to be addressed in connection with

15   the consulting agreement as a follow-up to that walk-through.

16   After negotiations with the parties, they agreed on a 50,000

17   dollar reduction to the guaranteed amount.  The balance of the

18   structure under the consulting agreement remains the same.

19           So I believe the guaranteed amount has been reduced

20   to -- give me one moment, Your Honor -- 1.485 million is the

21   guaranteed amount.  And then there's still 100,000 dollars'

22   worth of expense reimbursement above that in connection with

23   the sale.  And any proceeds above that would be shared, ninety-

24   five percent to the estate, five percent to the consultant.

25           The Office of the United States Trustee did file an

1   objection, Your Honor.  A bulk of the objection was

2   essentially, we think you're retaining these people as an

3   auctioneer, as a liquidator, therefore they should need to be

4   retained under Section 327(a) of the Bankruptcy Code.  When the

5   debtors assembled the motion, we basically constructed -- we

6   always viewed this as the equivalent of Great American coming

7   in and doing a going out of business sale, albeit it's dealing

8   with the sale of equipment and furniture.  I understand that

9   the U.S. Trustee disagrees with that because of some of the

10  differences with respect to the sale, but that was the basis

11  for why we set it up the way we set it up when we set it up

12  under Section 363 and not Section 327.

13          In an effort to resolve that objection, however, Great

14  American has agreed -- they've filed a -- Your Honor probably

15  hasn't seen it because it was just filed this morning, but they

16  filed an affidavit of disinterestedness that basically makes

17  the disclosures that would need to be made under a 327(a)

18  application.  Additionally, we've made certain revisions to the

19  proposed form of order that now provides that they are being

20  retained under Section 327(a) and has findings of the Court in

21  there regarding them being disinterested based on the affidavit

22  that was filed.

23          THE COURT:  Do you have a copy of the affidavit --

24          MR. MERCHANT:  I do, Your Honor.

25          THE COURT:  -- for me to take a look at?

1      MR. MERCHANT:  If I may approach with a blackline of

2  the order as it currently stands and a copy of the affidavit?

3      (Pause)

4      THE COURT:  All right, I've reviewed the affidavit.

5  Would you like to walk me through the blackline as it now

6  stands?

7      MR. MERCHANT:  Yes, Your Honor.

8      THE COURT:  If there's anything material, that is.

9      MR. MERCHANT:  No problem at all.  So Your Honor, on

10  page 2 of the blackline in the recital type language, that's

11  just noting the filing of the U.S. Trustee objection, the

12  Alexander affidavit, and the resolution of the follow-up

13  inspection.

14      If you go to finding I, Your Honor, that is the

15  finding based on the Alexander affidavit that GAGP is

16  disinterested and can be retained under Section 327(a) of the

17  Bankruptcy Code.

18      Paragraph 2 of the so ordered paragraphs reflects the

19  modification of the guaranteed amount.  Paragraph 4 provides

20  that the retention shall be under 327(a).  As the language

21  before Your Honor currently reads, it says in there "to the

22  extent necessary".  That "to the extent necessary" is being

23  stricken at the request of the United States Trustee.  There

24  will also be some additional changes that we will submit under

25  certification of counsel at the request of Mr. Schepacarter.  I

1   think what we filed in the revised order got us most of the way

2   there, but they do have additional comments and we have agreed

3   to add those additional comments.

4        Your Honor, in additional to the U.S. Trustee's

5   objection, there were some informal comments that we received

6   from the landlords of the two locations, and I think most of

7   those comments are reflected in paragraph 13 on.  In paragraph

8   13, it talks about the debtors and GAGP being able to abandon

9   assets at the end of the sales that couldn't be sold.  The

10  landlord has added language, "and any such abandoned property

11  may thereafter be disposed of by the effective landlord at its

12  sole and absolute discretion without further notice or without

13  any liability whatsoever to the debtors, GAGP, or any third

14  party."

15       In paragraph 14, GAGP has agreed to add the two

16  landlords as additional insureds under the public liability

17  policies in connection with GAP -- GAGP services.

18       Paragraph 15 relates to GAGP's liability with respect

19  to any damages to the property that are incurred during the

20  sale or removal of equipment or furniture from those locations.

21       And paragraph 16 simply echoes the debtors'

22  obligations to pay administrative rent under 365(b)(3) while

23  the sales are going on.  And of course there is an arrangement

24  under the consulting agreement to be reimbursed from GAGP to

25  the extent that the sales, which is contemplated to last sixty

1    days, actually extends into the month of September.

2              So I believe that covers all the changes to the order,

3    Your Honor.  We will have additional changes from the Office of

4    the United States Trustee that will be reflected in the

5    blackline attached to the certification of counsel.

6              THE COURT:  All right, thank you.

7              Does anyone else wish to be heard in connection with

8    this motion?

9              MR. SCHEPACARTER:  Good afternoon, Your Honor.  May it

10   please the Court, Richard Schepacarter, for the United States

11   Trustee.

12             I just want to first thank Mr. Merchant and Mr.

13   Falgowski, who are working through some of the changes with us

14   that we could -- so the debtors could present a consensual form

15   of order.

16             The changes that Your Honor will see will reflect some

17   of our comments and some of the things that we had objected to,

18   and I want to make it clear that Great American can be retained

19   under 327(a) and shall be retained by the debtors under 327(a),

20   along with some additional tweaks to the 363(m) and (n)

21   protections under the Code.

22             THE COURT:  Thank you.

23             MR. SCHEPACARTER:  Thank you, Your Honor.

24             THE COURT:  All right, then I'll await --

25             MS. HAGLE:  Good afternoon, Your Honor.  Jennifer

1   Hagle, Sidley Austin, on behalf of the Bank of America.

2              I just wanted to confirm, Your Honor, that Bank of

3   America supports the retention in connection with the sale of

4   these assets.  And under the cash collateral order, we are

5   being asked to agree to the taking of the lien by Great

6   American, which is pretty typical and standard with respect to

7   the liquidators, and we are willing to do that as long as our

8   lien does attach to the proceeds of the sale that will be used

9   in accordance with the cash collateral budget.

10             Briefly, and on a broader note, now that the crowds

11  have departed, I did want to articulate a broader thought to

12  Your Honor, and basically to echo what Your Honor's comments

13  were, that you hit the nail on the head.  This case is being

14  run on the thinnest of threads, and to the extent that the case

15  is going to be hijacked for any purpose, whether it be the

16  Department of Ed or the students, it's not going to be able to

17  withstand any level of litigation.  And the only alternative

18  will be, as Your Honor indicated, to convert.

19             There are no prospects of additional funds, DIP

20  financing, or otherwise.  So to the extent that that bears on

21  Your Honor's consideration of the difficult issues presented, I

22  thought it would be worth it for us to confirm that your

23  assumptions are, as usual, right on target.

24             THE COURT:  Thank you.

25             Anyone else wish to be heard?

1        I hear no further response.  I'll await submission of

2   an order under certification.

3        MR. MERCHANT:  Thank you, Your Honor.  I did have a

4   proffer to the extent that you would like me to read it into

5   the record.

6        THE COURT:  If, as part of your arrangement with the

7   U.S. Trustee, you've agreed to put it on, then you may do so.

8      (Pause)

9        MR. MERCHANT:  Your Honor, I believe we can shortcut

10  this if it's acceptable to Your Honor.  Mr. Nolan, who was

11  going to be -- I was going to proffer his testimony, but it is

12  a little bit long, is in the courtroom.  And Mr. Nolan was

13  involved in the preparation of the motion and oversaw the sale

14  process.  And the motion does set forth in detail the process

15  and the marketing process that was played out in the selection

16  of Great American.

17        So I can verify for the record that if Mr. Nolan was

18  called to testify, he would testify that he has reviewed the

19  motion thoroughly, was involved in the preparation of the

20  motion, and can verify all the facts set forth therein.  I

21  think that would be sufficient for purposes of establishing the

22  record.

23        THE COURT:  Does anyone wish to cross-examine Mr.

24  Nolan?

25        I hear no response.  All right, thank you.  I'm

1   satisfied.  I've reviewed the submissions, and in light of the

2   arrangements and changes made as a consequence of the U.S.

3   Trustee's objection, I am prepared to grant the relief that's

4   been requested, so I'll await submission of an order under

5   certification.

6           MR. COLLINS:  Thank you very much.

7           THE COURT:  All right.  There is one matter I wanted

8   to address.  Normally, in cases of this magnitude, I would

9   appoint a fee auditor, but what I also tell parties is when it

10  looks like there's to be -- or at least the goal, anyway, is a

11  quick exit, if we're one and done on the professional

12  applications, I won't appoint a fee auditor.

13          Mr. Collins, tell me what you're thinking.

14          MR. COLLINS:  Your Honor, we have simply filed one

15  monthly fee statement in accordance with the interim

16  compensation order.  No interim -- no interim fee applications

17  have been filed.  So I do think we should have a one and done

18  if we're able to confirm by the end of August.  And if it -- if

19  it moves a little bit, we're happy to push it out so we just

20  have one final fee application hearing.

21          THE COURT:  Okay.  Thank you.

22          MR. COLLINS:  Thank you, Your Honor.

23          THE COURT:  Is there anything else we need to talk

24  about today?

25          MR. COLLINS:  No, Your Honor.

1          THE COURT:  Thank you all very much.  That concludes

2     this hearing.  Court will stand adjourned.

3          MR. MERCHANT:  Thank you, Your Honor.

4        (Whereupon these proceedings were concluded at 3:35 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                        I N D E X
 3
 4                       EXHIBITS
 5    DEBTOR'S              DESCRIPTION          PAGE
 6    Debtor's response    Debtors' response    50
 7    to complaints        to various
 8                         complaints entered
 9                         into evidence
10    B                    Debtors' response    62
11                         to Department of
12                         Education's fine
13                         letter
14    STUDENT COMMITTEE'S
15    Declarations of      Declarations of      47
16    Students             Amber Thompson,
17                         Crystal Loeser,
18                         Tasha Courtright,
19                         Brittany Ann Smith
20                         Jackl, Jessica
21                         King, and Michael
22                         Adorno-Miranda
23
24
25
```

```
 1   B, C, D, E, F        Various legal        48
 2                        complaints against
 3                        the debtor
 4
 5   H                    U.S. Dept. of Edu.   48
 6                        Notice of Intent
 7                        to Fine Heald
 8                        College, Apr. 14,
 9                        2015
10
11   DEPARTMENT OF EDUCATION
12   Declaration of       Declaration of       50
13   Jeff Appel           Deputy Under
14                        Secretary of
15                        Education at the
16                        US Department of
17                        Education, Jeff
18                        Appel
19
20
21
22
23
24
25
```

```
 1                         RULINGS
 2                                      PAGE      LINE
 3  Debtors' motion for entry of an order (I)    16        10
 4  authorizing the debtors to reject certain
 5  unexpired leases of nonresidential real
 6  property effective nunc pro tunc to the date
 7  that the debtors surrender possession; (II)
 8  approving the abandonment of any personal
 9  property remaining at the lease locations;
10  and (III) granting certain related relief
11  granted
12  Debtors' first omnibus motion for entry of    17        15
13  an order authorizing the debtors to reject
14  certain executory contracts, effective nunc
15  pro tunc to June 2, 2015 granted
16  Debtors' motion for entry of an order (i)     89         1
17  authorizing debtors to enter into
18  consulting/auction agreement with Great
19  American Global Partners, LLC and approving
20  the terms thereof, (ii) authorizing sale of
21  assets in accordance with agreement and
22  (iii) granting certain related relief
23  granted as amended on the record pending
24  certification of counsel
25
```

1                    C E R T I F I C A T I O N

2

3    I, Jennifer Hamilton, certify that the foregoing transcript is

4    a                    cord of the proceedings.

5

6

7                                        July 5, 2015

8    _____      _____

9    JENNIFER HAMILTON                     DATE

10

11   eScribers, LLC

12   700 West 192nd Street, Suite #607

13   New York, NY 10040

14   (973)406-2250

15   operations@escribers.net

16

17

18

19

20

21

22

23

24

25

## A

**AARON (2)**
7:16;33:18
**abandon (1)**
85:8
**abandoned (1)**
85:10
**ability (5)**
30:22;32:14,15;
43:3;72:14
**able (14)**
13:22;37:8;51:18;
65:2;72:10;73:11,
13;74:10;78:22;
80:14;81:15;85:8;
87:16;89:18
**above (3)**
81:23;82:22,23
**absence (4)**
17:15;49:11;69:9;
70:1
**absent (2)**
56:15;70:13
**absolute (2)**
12:3;85:12
**Absolutely (1)**
24:16
**accept (7)**
35:8,10;52:23;
56:14;62:11,19;
65:14
**acceptable (2)**
15:5;88:10
**access (1)**
65:17
**accomplished (2)**
8:9;57:2
**accordance (3)**
81:17;87:9;89:15
**accordingly (2)**
14:20;16:1
**accrue (1)**
53:16
**accused (1)**
30:9
**achievable (1)**
57:3
**achieving (2)**
28:9;56:25
**acknowledged (1)**
82:13
**acted (2)**
20:10,13
**action (13)**
10:12,15,17;21:8,
10,15,22;31:8;54:7;
69:2;74:15,25;77:13
**actions (6)**
10:13;31:23;
51:14;72:14,17,18
**activist (1)**

25:2
**activities (5)**
23:10;25:23;73:9,
22;74:2
**activity (13)**
24:14;26:22;32:2,
20,20;36:20;39:4,7,
11,20;43:2;51:19;
54:4
**actors (1)**
20:2
**acts (1)**
23:19
**actual (2)**
48:18;55:10
**actually (12)**
11:9;18:16;37:8;
39:19,22;41:13;
52:12;54:19;69:20;
77:24;79:25;86:1
**add (2)**
85:3,15
**added (2)**
55:18;85:10
**addition (1)**
12:4
**additional (19)**
51:12,21,22;
52:23;56:7;61:8,10,
15,16,21;78:17;
84:24;85:2,3,4,16;
86:3,20;87:19
**Additionally (1)**
83:18
**address (7)**
15:6;28:19;51:20;
68:24;74:24;79:21;
89:8
**addressed (3)**
25:6;7;82:14
**addressing (1)**
26:25
**adequate (3)**
9:17;10:21;16:22
**adjourned (1)**
90:2
**admin (3)**
9:15,25;10:2
**administer (1)**
34:3
**administered (1)**
63:18
**administering (1)**
29:19
**administration (1)**
20:11
**administrative (13)**
24:13;36:15,25;
38:4;40:11;51:15;
59:8,13,17;64:19;
70:12;78:19;85:22
**admissibility (2)**
45:2,3

**admissible (2)**
45:17,20
**admission (7)**
30:10;45:13,21,
22;47:25;48:21,24
**admissions (1)**
32:22
**admit (3)**
47:5;48:1,7
**admits (1)**
63:8
**admitted (8)**
20:13;46:8,20;
50:2,6,19;61:22;62:1
**Adorno (1)**
18:15
**Adorno-Miranda (2)**
46:2;47:8
**advance (3)**
11:8;13:11,14
**advantage (1)**
27:10
**adversaries (1)**
68:9
**adversary (18)**
31:9,11,12;66:22;
67:3,25;68:1,5,9,15,
18,20,24;69:6,8,15;
75:1,2
**adverse (2)**
38:20;57:10
**adversely (4)**
70:1;73:16,22;
74:6
**advice (1)**
58:8
**affect (2)**
73:16,22
**affected (3)**
27:21;53:25;70:1
**affects (2)**
42:18;43:2
**affidavit (8)**
81:4;83:16,21,23;
84:2,4,12,15
**affidavits (1)**
46:17
**afford (1)**
64:24
**afforded (3)**
13:4;27:5;31:13
**Affording (1)**
66:8
**affords (1)**
22:17
**Afternoon (12)**
8:3,4;11:22,24;
14:5;17:25;33:16;
50:13;76:5;79:10;
86:9,25
**again (11)**
9:6;12:25;42:3;
47:1;55:14,18;56:7;

**57:4;64:19;71:23;
80:12**
**against (17)**
10:15;31:23;
32:20;36:1;38:2;
42:10;48:4;54:3;
69:2,4,24;70:11,22;
71:16;72:5,15;77:13
**agencies (1)**
55:17
**agency (2)**
55:11;67:22
**agenda (4)**
14:1,8;17:10;
80:21
**agent (9)**
20:10,13;29:18,22,
22;30:10,14;67:12,
13
**agents (3)**
30:5;40:4,6
**aggressively (1)**
30:2
**ago (2)**
22:12;36:7
**agree (11)**
21:20;32:7;40:1;
54:14,17;57:1;
58:22;72:3;73:6;
77:9;87:5
**agreed (7)**
15:24;42:16;
82:16;83:14;85:2,
15;88:7
**agreement (24)**
13:5,6;22:5;33:11;
39:21;44:9;46:8;
47:2;50:15;58:15;
59:3,19,20;78:12,13;
80:23,25;81:23,25;
82:6,8,15,18;85:24
**agreements (1)**
22:10
**AH (1)**
29:2
**ahead (1)**
18:22
**Aid (2)**
20:12;29:19
**airing (1)**
77:24
**albeit (1)**
83:7
**Alexander (2)**
84:12,15
**allegations (15)**
23:4;43:16,23;
44:1,10,11,13;45:4,
7,15;46:19;47:3;
49:8;67:8,15
**alleged (5)**
19:25;20:4,20;
30:9;31:15

**alleges (1)**
30:2
**alleviate (1)**
19:1
**allow (1)**
12:8
**allowed (4)**
10:4;13:1;68:18,
21
**alluded (3)**
24:1,2,7
**almost (1)**
51:7
**alone (2)**
24:9;71:8
**along (4)**
11:15;13:19;
51:16;86:20
**alternative (1)**
87:17
**although (2)**
47:25;59:18
**always (2)**
35:11;83:6
**AMBER (6)**
7:11;18:5,11;
45:24;47:6;66:1
**amended (1)**
77:10
**AMENT (2)**
7:16;33:18
**America (4)**
6:8,14;87:1,3
**American (10)**
5:20;7:8;80:24;
82:2,10;83:6,14;
86:18;87:6;88:16
**among (4)**
55:16;58:6;64:5;
79:4
**amongst (1)**
13:6
**amount (10)**
9:24;10:14;66:11;
81:21,24;82:12,17,
19,21;84:19
**ample (1)**
67:1
**ANDERSON (1)**
6:13
**Ann (2)**
45:25;47:7
**ANNA (1)**
6:10
**annex (1)**
82:4
**anticipated (1)**
9:7
**anticipating (1)**
78:7
**apologize (1)**
55:21
**appear (2)**

16:25;17:4

**APPEL (13)**
7:19;33:20,24;
36:9;50:16,21,23;
51:1,22;56:8;57:16,
23;61:9

**appellate (1)**
69:13

**Appel's (3)**
48:17,19;51:5

**applaud (1)**
27:1

**applicable (2)**
38:9;43:24

**applicants (1)**
36:25

**application (4)**
38:8;78:20;83:18;
89:20

**applications (6)**
19:25;51:6,8,11;
89:12,16

**applied (2)**
46:24;53:10

**apply (4)**
52:10;55:6;68:19;
69:18

**applying (2)**
28:10;52:8

**appoint (2)**
89:9,12

**appreciate (10)**
18:17;22:4,11;
25:8,13;64:7,19;
65:9;77:11,23

**approach (4)**
16:5;17:18;39:15;
84:1

**appropriate (3)**
29:17;30:18;78:24

**approval (1)**
11:24

**approved (1)**
13:22

**approves (1)**
13:17

**approving (2)**
14:19;17:8

**approximately (8)**
9:21;10:6,8;15:12;
37:3,10;51:25;52:2

**Apr (1)**
48:13

**April (1)**
48:16

**area (1)**
81:15

**argue (4)**
19:16;21:22;27:3;
62:21

**arguing (1)**
67:11

**argument (10)**

24:12;41:15;
57:16,19,24;61:16;
62:9;63:12;70:8;
73:1

**arguments (1)**
21:15

**arising (1)**
73:18

**arithmetic (1)**
52:6

**Armor (1)**
68:5

**ARPS (1)**
7:2

**arrangement (4)**
19:15;79:4;85:23;
88:6

**arrangements (1)**
89:2

**articles (1)**
21:1

**articulate (1)**
87:11

**articulated (1)**
30:20

**aspects (1)**
74:24

**assembled (2)**
65:20;83:5

**assert (1)**
59:24

**asserted (3)**
49:7,13;56:9

**assertions (2)**
33:5,6

**asserts (1)**
51:10

**assets (12)**
8:25;9:11,13;
12:25;19:7;35:13;
43:2;82:3,5,7;85:9;
87:4

**Assistant (1)**
39:11

**associated (4)**
15:15,17;43:22;
73:9

**associates (1)**
58:4

**Assume (2)**
10:7;34:11

**assuming (4)**
11:24;24:21,22;
34:16

**assumptions (1)**
87:23

**attach (2)**
61:24;87:8

**attached (5)**
16:2;48:15,17;
49:25;86:5

**attain (1)**
25:22

**attempt (2)**
25:9;38:18

**attempting (1)**
38:24

**attend (1)**
37:4

**attended (5)**
25:22;35:7;46:21;
58:2,3

**attending (1)**
52:25

**attestation (1)**
25:23

**attested (1)**
23:23

**Attorney (2)**
25:18;39:11

**Attorneys (10)**
5:3,8,14,20;6:3,8,
14,19,24;7:3

**Attorney's (4)**
41:1;54:7,21;55:3

**auctioneer (1)**
83:3

**auditor (2)**
89:9,12

**August (7)**
8:23;11:1;13:19,
24;42:7;53:19;89:18

**AUSTIN (2)**
6:7;87:1

**authority (3)**
34:17;60:3,5

**authorizing (2)**
15:19;80:23

**automatic (4)**
46:4;72:2;75:5,22

**avail (1)**
78:19

**available (4)**
27:10;36:4;40:11;
59:12

**avenue (2)**
19:4,25

**avenues (1)**
37:17

**avoid (7)**
21:25;31:18;42:7;
58:15;65:2;66:6;
78:13

**avoidance (1)**
10:13

**avoided (1)**
59:4

**avoiding (1)**
57:5

**await (3)**
86:24;88:1;89:4

**award (1)**
30:21

**aware (5)**
25:14;43:18;74:9;
77:11;78:18

**away (1)**
59:23

**B**

**back (10)**
30:14,15;44:16;
52:2,20;57:16,18,24;
61:4;63:19

**backwards (1)**
39:16

**bad (1)**
20:2

**balance (5)**
33:23;35:22;
65:13;66:6;82:17

**BALL (2)**
5:16;18:1

**BALLARD (1)**
6:2

**Bank (6)**
6:8,14;12:16;
76:17;87:1,2

**bankruptcy (12)**
20:22;27:22;
38:16,17;68:4;
69:14;71:8,10,17;
75:24;83:4;84:17

**banks (3)**
9:18;12:20;22:20

**banks' (1)**
10:1

**bar (3)**
11:2,4,8

**bare-bones (1)**
22:14

**Barts (1)**
35:14

**based (7)**
17:15;21:23;47:2;
61:8;70:14;83:21;
84:15

**basic (2)**
29:25;33:5

**basically (3)**
83:5,16;87:12

**basis (16)**
8:18;11:20;12:22;
14:13;15:3;31:6,7;
32:8;35:5;42:21;
43:11;71:7;74:9,11;
75:21;83:10

**Beach (1)**
6:19

**bear (1)**
56:13

**bears (1)**
87:20

**Bee (2)**
11:12,12

**begin (2)**
8:7;40:4

**beginning (1)**

52:20

**begun (1)**
24:14

**behalf (11)**
8:6;14:6;42:4;
62:12;76:6,12;77:4,
9;79:24;80:13;87:1

**behind (1)**
48:1

**believes (1)**
33:7

**bends (1)**
39:14

**benefit (2)**
12:24;13:1

**benevolence (1)**
64:8

**Benjamin (1)**
75:18

**best (6)**
18:17;20:23;26:1;
42:8,21;74:13

**better (3)**
22:18;78:17;79:5

**beyond (5)**
36:11,21;40:20;
64:4;69:23

**bid (1)**
81:6

**bidders (1)**
82:2

**big (2)**
56:11,13

**billions (1)**
66:10

**binder (2)**
47:17;50:1

**bit (7)**
8:10;15:6;23:17;
47:13;59:22;88:12;
89:19

**blackline (4)**
84:1,5,10;86:5

**blanket (1)**
35:3

**blasting (1)**
29:22

**blow (2)**
32:8,9

**board (2)**
11:21,24

**body (2)**
64:23;68:4

**boil (1)**
36:17

**borrowed (5)**
30:14;37:3,15;
51:8;74:8

**borrower (2)**
34:25;51:8

**borrowers (13)**
29:23;30:11,15;
35:14;37:10;43:14;

52:2,18;54:19;57:7;
62:12,20;78:14
**both (4)**
13:20;16:17;68:9;
73:22
**bound (1)**
67:12
**breaches (1)**
10:18
**break (4)**
44:25;79:21,25;
80:14
**BRIAN (1)**
6:20
**brief (2)**
74:21,23
**briefly (2)**
41:21;87:10
**bring (9)**
29:14;31:10;
56:19;58:23,25;68:8,
15;69:24;70:11
**bringing (1)**
19:3
**Brittany (2)**
45:25;47:7
**broad (2)**
42:14;72:22
**broader (2)**
87:10,11
**brought (10)**
19:23;29:13;31:9,
9;49:11;69:1,4,9;
72:20;75:2
**Brown (1)**
76:6
**budget (2)**
8:21;87:9
**building (1)**
26:13
**bulk (1)**
83:1
**burden (2)**
24:20,23
**burdens (1)**
73:8
**burdensome (2)**
36:5;62:24
**business (2)**
67:17;83:7
**button (1)**
65:23
**buy (1)**
57:11

**C**

**c4 (1)**
75:14
**California (2)**
25:18;81:10
**call (2)**
39:3;55:24

**called (2)**
18:10;88:18
**calling (1)**
41:8
**calls (3)**
27:11,12;40:4
**came (1)**
36:9
**Campus (5)**
6:24;14:12;15:10,
12;81:15
**can (52)**
11:16;13:12,23;
22:18;23:17;24:4,
21;27:25;29:13,17;
30:10,12;31:4,5;
32:12,17;33:8;
34:14;38:5;41:18,
18;42:11,21;47:16,
21;49:25;57:2,10;
59:3,3;60:21;64:4,4,
11,25;70:4,5,18,19;
74:13;75:25;77:18;
78:13,17,19;79:20;
80:17;84:16;86:18;
88:9,17,20
**capable (1)**
13:8
**cards (1)**
60:1
**care (3)**
25:19;53:18;55:24
**careful (1)**
74:13
**carefully (1)**
75:3
**cars (1)**
57:11
**case (34)**
8:15,23;10:11;
11:4;17:3;19:4,5;
21:2,4,23;29:2,2,13,
15;31:22;36:18;
39:10;42:6;46:17;
53:6;64:4;68:3,4,13,
14,22,25;69:4,21;
76:7,13;81:14;87:13,
14
**cases (29)**
8:9,17,22,24;9:3,
22;11:17;22:4;
27:18;28:23,24;29:3,
6,11,12;31:20;42:11;
53:1;66:12,23;68:3,
7,11,23;69:7,10,12,
25;89:8
**cash (8)**
8:19,20,25;9:18,
22;12:6;87:4,9
**catch (2)**
26:22,24
**categories (2)**
37:14;55:16

**cause (2)**
30:3;49:10
**causes (3)**
10:12,14,16
**cease (1)**
24:14
**ceased (1)**
39:9
**certain (6)**
9:13;12:25;17:11;
26:10;46:22;83:18
**certainly (22)**
20:17,24;21:14;
22:6;29:1,11,12,17;
30:16;33:9;34:14;
40:20;42:14;46:11,
13;52:5;55:1;58:22;
63:4,16;66:6,9
**certification (5)**
80:16;84:25;86:5;
88:2;89:5
**chance (1)**
56:22
**changes (8)**
80:18;82:8;84:24;
86:2,3,13,16;89:2
**Chapter (22)**
8:17,21;9:4,22;
19:4;22:4;27:24;
31:22;32:11,13,14,
16,18,19;38:15,16;
42:6;43:4;63:14;
65:6;75:25;76:11
**charact (1)**
77:2
**characterize (1)**
77:2
**Chief (2)**
7:16;33:19
**choked (1)**
66:2
**Chris (1)**
18:2
**CHRISTOPHER (1)**
5:9
**Chronicle (1)**
11:11
**Circuit (2)**
68:2;71:5
**Circuit's (2)**
71:3,18
**circumstance (4)**
30:18;66:15;
68:15;70:7
**circumstances (7)**
29:18;34:18;
68:16;69:19,19,20;
78:24
**cited (2)**
68:2,8
**cites (2)**
68:23;69:8
**claim (17)**

9:17,24;10:2,5,8,
10,21;17:6;20:21;
27:13;38:2,5;42:10;
51:10,10;68:19,20
**claims (26)**
9:15;10:1,12,14,
16,18,19;11:9;13:1;
16:16,18,21;19:10;
25:7;29:24;58:17;
69:24;70:11,14,22;
71:2,16;72:5;73:18,
21;77:6
**class (5)**
19:24;21:10,15,
22;31:8
**classes (1)**
19:10
**classic (1)**
56:18
**class-wide (2)**
27:24;31:12
**clauses (1)**
21:13
**clear (6)**
42:6;43:19,25;
59:18;67:10;86:18
**clearly (2)**
32:21;76:14
**CLERK (2)**
8:2;80:11
**clicked (1)**
65:23
**client (3)**
34:15;60:6,11
**clients (1)**
40:23
**closed (6)**
37:13,19;40:18;
51:6,7;74:9
**closer (1)**
52:20
**Co (2)**
6:3;68:9
**Code (4)**
38:16;83:4;84:17;
86:21
**collateral (5)**
8:20,21;9:18;87:4,
9
**colleague (2)**
18:1;33:18
**collect (1)**
41:5
**collected (1)**
54:19
**collecting (1)**
73:20
**collection (38)**
19:13;23:6,10,22,
24;24:6,14;25:22;
26:22;31:4;32:20;
34:5;39:4,7,11,20,
23;40:3,6;41:2;43:2;

46:22;51:14,19;
52:12;53:7;54:3,7;
55:10,17;58:5;60:20,
24;65:15;72:14;
73:22;74:2;78:15
**collections (1)**
54:23
**collective (8)**
19:24;21:7;27:22;
31:5,7;63:12,15;
65:25
**collectors (3)**
23:19;41:7;72:17
**College (2)**
48:9,12
**Collier (1)**
69:13
**COLLINS (25)**
8:5,5,13;9:9;
10:24;14:4;42:3,4,
22;43:10,19;44:7,9;
46:9,12;47:21,22;
48:23;49:21;61:21;
89:6,13,14,22,25
**combined (1)**
11:14
**comfortable (1)**
28:19
**coming (3)**
8:11;13:14;83:6
**commenced (3)**
54:4;67:4;78:15
**comment (2)**
28:13;69:10
**comments (10)**
18:19;22:12;64:8;
68:21;85:2,3,5,7;
86:17;87:12
**commercial (1)**
10:18
**committed (1)**
12:15
**Committee (55)**
5:3,8,14;7:11,12,
13,14;13:2;14:22;
17:23;18:5;19:3,3;
25:1;31:2;32:10;
38:19,25;39:17,21;
40:22;41:7;42:13,
17;45:6;46:3;48:7;
50:16;51:17;52:9;
56:18;57:1;59:1,11;
62:13;66:1;68:8,23;
69:7;70:8,17;71:9;
74:16,16;76:6,12,15,
16,23,23,24;77:9,15,
17;78:1
**committees (3)**
12:12,15,20
**Committee's (7)**
14:2;37:7;47:9;
48:5,14;67:10;69:17
**commonly (1)**

30:20
**companies (1)**
56:11
**compensation (3)**
71:4,12;89:16
**complaint (2)**
25:18;67:14
**complaints (10)**
31:8,14;45:4;48:1,
4;49:22;50:2,8,10;
62:14
**complaint's (1)**
68:20
**completeness (1)**
50:6
**completing (1)**
8:17
**complex (1)**
79:2
**complexities (2)**
67:19;79:1
**complexity (1)**
52:23
**complication (2)**
53:5,12
**complies (1)**
12:4
**comply (1)**
38:24
**computer (1)**
65:23
**conceivably (1)**
71:16
**concept (1)**
69:25
**concern (4)**
35:23;38:10;41:6;
56:15
**concerned (5)**
35:11;53:3,4;
58:10;59:23
**concerns (1)**
35:22
**concession (1)**
60:18
**concluded (3)**
66:24;68:19;90:4
**concludes (2)**
79:19;90:1
**conduct (2)**
21:23;64:1
**conducted (1)**
81:1
**conducting (1)**
81:9
**confident (1)**
37:7
**confirm (5)**
8:21;42:7;87:2,22;
89:18
**confirmable (2)**
12:17;22:15
**confirmation (8)**

9:2;11:1;13:18,23;
53:19;57:7;76:15,20
**confirmed (7)**
13:9;19:18;42:12;
56:5;70:5,18;76:11
**confusion (1)**
19:1
**connection (9)**
16:7;17:12;19:18;
59:22;82:14,22;
85:17;86:7;87:3
**consensual (14)**
13:5;16:1;19:6,19;
32:12;42:21;57:8;
59:2,6;64:3,3;65:1,
11;86:14
**consensually (1)**
41:23
**consensus (6)**
13:10;56:19,25;
57:2;58:23,25
**consent (1)**
61:23
**consequence (2)**
31:24;89:2
**consider (6)**
11:22;43:1;58:19;
59:21;78:11,16
**consideration (1)**
87:21
**considered (4)**
29:17;75:1,12,13
**considering (1)**
58:9
**considers (1)**
39:8
**consistent (1)**
67:23
**consistently (1)**
29:23
**consisting (1)**
74:16
**consists (1)**
81:12
**consolidated (2)**
11:20;53:1
**constituencies (2)**
13:6;22:16
**constituents (2)**
23:4;56:25
**constructed (1)**
83:5
**consultant (2)**
81:8;82:24
**consulting (7)**
80:23;81:23,25;
82:8,15,18;85:24
**contemplate (1)**
13:15
**contemplated (1)**
85:25
**contested (2)**
15:4;80:1

**context (1)**
63:23
**continuation (1)**
72:13
**continue (8)**
13:2;23:2;36:17;
41:14,18;53:15;
72:14;78:8
**continues (2)**
36:14;53:13
**contract (3)**
15:1;16:12;17:6
**contracts (3)**
16:19;17:11,15
**contrary (1)**
56:15
**controversial (1)**
77:17
**conversation (2)**
61:3;76:24
**conversion (2)**
42:8,8
**convert (1)**
87:18
**convince (2)**
25:3;32:19
**convinced (2)**
72:21,24
**cooperation (1)**
19:6
**cooperative (1)**
65:11
**copy (2)**
83:23;84:2
**Corinthian (11)**
41:4;51:25;52:18;
53:3,10,14;54:19;
60:20;62:12,20;
78:14
**corporate (1)**
32:11
**CORROON (1)**
6:13
**CORY (1)**
5:21
**Counsel (20)**
7:17;25:1,2;26:16;
33:17,19;36:7;37:7;
39:17,22;44:10;
50:15;52:9;56:18;
57:1;69:17;76:25;
80:17;84:25;86:5
**counsel's (2)**
17:15;22:12
**counterpoint (1)**
44:12
**country (1)**
54:21
**couple (3)**
54:18,25;68:3
**course (3)**
29:4;75:6;85:23
**COURT (205)**

8:3,12;9:5;10:23;
13:14,17;14:3;15:8;
16:6;17:8,9,19,24;
18:7,10,14;19:9,12,
16,20;20:17,18,21,
22;21:1,4,7,10,18,
19;22:6;23:8,15,17,
21;24:5,7,11,18,20;
25:11;26:17,20;
27:17;28:1,5,7,15,
17,18,21;29:4,14;
30:19;31:17,19;32:6,
23,25;33:7,13;34:1,
8,11;35:2,6,8,10,18;
36:18,24;37:6,23,25;
38:13,15,21;39:2,13,
15,17;40:8,10,13,15;
41:11,16,20;42:2,22,
25;43:18;44:4,8,15,
22,23;45:19;46:7,11;
47:4,10,21,24;48:7,
11,20;49:2,3,5,15,
20;50:4,6,11,19,25;
51:4;53:21;54:2,10,
14;55:2;56:6;57:20;
58:2;59:5,14,17;
60:6,8,11,13,19;
61:1,7,18;62:2,4,9;
64:9,13,17;65:4,8;
66:3,15,18,23;68:3,
4,11,19,22;69:1,3,5;
70:14,21;71:19,21;
72:6,8,10,19,21;
73:2,4;74:15,19,20;
75:6,18,19;76:1,3;
77:1,11;78:3,5;79:1,
10,14,16;80:5,8,17,
20;83:20,23,25;84:4,
8;86:6,10,22,24;
87:24;88:6,23;89:7,
21,23;90:1,2
**CourtCall (1)**
17:1
**Courthright (1)**
45:22
**Courtright (3)**
18:15;45:23;47:7
**courtroom (3)**
26:9,10;88:12
**courts (3)**
47:13;58:6;66:24;
69:13,14
**Court's (3)**
27:12;28:19,20
**covering (1)**
14:9
**covers (2)**
55:7;86:2
**credit (1)**
26:23
**creditor (5)**
13:6;22:7,8;36:2,
20

**creditors (23)**
9:8;10:4,10,22;
11:7;12:22,24;13:1;
22:7,9,18,21;27:18;
32:17;35:11;42:9;
46:3;62:13;64:5,23;
76:7,10;77:16
**Creditors' (1)**
5:3
**cross- (1)**
33:11
**cross-exam (1)**
57:15
**cross-examine (5)**
51:1;56:8;57:18;
61:9;88:23
**cross-examined (1)**
58:1
**crowds (1)**
87:10
**CRYSTAL (6)**
7:12;18:5,12;46:1;
47:6;66:4
**Crystals (1)**
18:12
**culpability (1)**
31:15
**culpable (1)**
20:15
**current (2)**
52:13;73:9
**currently (7)**
37:11,16;60:25;
63:10;64:10;84:2,21
**cut (1)**
36:19
**Cynthia (1)**
47:20

### D

**damages (2)**
29:24;85:19
**date (8)**
9:20;11:2,4,8,17;
12:6;16:4,21;47:9;
48:6,14;50:10,23;
62:7
**dated (1)**
49:16
**dates (1)**
13:19
**day (6)**
19:2;21:3;27:11,
23;71:22;81:7
**days (9)**
11:3,8;24:13;
37:21;39:8;56:1;
67:17,17;86:1
**deadline (1)**
13:20,20,21
**deal (5)**
19:14;51:18;65:7;

CORINTHIAN COLLEGES, INC., et al.

Case No. 15-10952(KJC)

June 30, 2015

81:7,20

**dealing (1)**
83:7

**deals (1)**
75:16

**debt (15)**
16:15;19:17;22:3;
35:5;37:19;38:6;
40:5,9;41:7;46:22;
58:25;63:18;72:17;
73:19,25

**debtor (13)**
9:6;26:15;29:5;
30:1;31:23;41:21;
43:5,7;48:4;56:17,
24;61:19;76:16

**debtors (59)**
8:6;11:20,21;13:7;
14:7,17,20;15:11,14,
16,18,22;16:1,13,15,
19,21;20:2,3,10,15,
15;22:20;29:16;
30:5;36:6;37:4;
38:16,21;42:4,16;
53:4;59:13;61:23;
62:18;63:16,18,19,
20;67:12;69:23,24;
70:1,4,4,11,13,13;
79:24;80:13,23;81:2,
8;82:12;83:5;85:8,
13;86:14,19

**debtors' (29)**
8:16;11:13;14:16;
15:10;16:12;17:10;
19:8;20:6,9;21:23;
22:4,12,25;25:15,17;
26:16;30:24;31:15;
42:5,10;43:2,12;
49:23;50:8;62:5,15;
63:2;70:25;85:21

**debtor's (4)**
35:12;50:9,9;62:6

**debts (2)**
26:3,4

**decide (6)**
34:23;70:22;72:2,
3,4,8

**decided (1)**
43:15

**decision (1)**
71:18

**declara (1)**
48:16

**declaration (21)**
44:20;45:2,4,22,
23,23,24,25;46:1,1,
2;47:16,18,20,25;
48:18,19;50:16,20,
22;51:5

**declarations (12)**
23:9,10,24;33:4,
10;44:21;46:7,13,20;
47:5,6,9

**decline (1)**
30:21

**dedicated (2)**
22:15,16

**default (21)**
37:11,16;39:2,8;
41:3;46:23;52:5,6,
19;53:6;54:3;55:7,9,
12,23;62:21;63:1,6,
10;65:22;78:14

**defaulted (1)**
52:1

**defaults (1)**
40:2

**defect (1)**
69:11

**defendants (2)**
40:10;68:20

**defendants-to-be (1)**
40:10

**defending (1)**
67:1

**defense (3)**
51:9;67:2;74:7

**defenses (2)**
20:1,2

**deficiency (3)**
10:5,8,10

**Delaware (2)**
58:4,7

**delighted (2)**
59:11;78:2

**demands (1)**
31:2

**demonstrated (2)**
70:24;71:1

**deny (3)**
24:3;25:14;74:19

**departed (1)**
87:11

**Department (39)**
7:16,20;10:15;
13:3;18:21,25;
29:15;33:14,17,20,
21;35:24;36:11,13,
19,20,21,24;38:3,4,
6;39:7;45:1;48:8;
50:12,21,22;51:11,
14,17,18;52:21;
54:14;55:13;59:19;
62:5;63:8;66:19;
87:16

**Department's (2)**
38:10;61:23

**depending (1)**
71:24

**depends (2)**
9:11;34:10

**Dept (1)**
48:12

**Deputy (7)**
7:19;33:20;50:16,
20;57:15;60:16;61:2

**derail (1)**
9:2

**describe (1)**
58:6

**described (1)**
23:10

**destroys (1)**
26:23

**detail (2)**
55:21;88:14

**detailed (1)**
75:20

**details (1)**
55:9

**determination (4)**
20:14;73:18,25;
74:3

**determine (4)**
20:19;52:6;53:24;
71:22

**determined (1)**
63:5

**detriment (1)**
74:3

**dicta (1)**
68:22

**dictate (1)**
62:16

**differences (1)**
83:10

**different (6)**
27:18;29:9;32:15;
55:17;56:25;68:16

**difficult (3)**
36:5;65:15;87:21

**difficulties (1)**
38:23

**diligently (2)**
15:23;42:11

**dilution (1)**
77:6

**diminution (1)**
9:19

**DIP (1)**
87:19

**direct (2)**
29:5;57:10

**directing (1)**
78:12

**directly (1)**
43:2

**directors (5)**
11:21;28:25;29:1;
69:2;70:3

**disadvantaged (1)**
67:5

**disagree (3)**
21:6;28:1;70:16

**disagrees (1)**
83:9

**disallow (1)**
16:16

**discharge (9)**
19:17;36:12;
37:13,18;38:3,6,17;
51:8;74:10

**discharged (3)**
73:19,21,25

**discharges (4)**
38:12;40:18;
70:15;74:4

**disclosure (9)**
9:9;10:25;11:9,14,
15,18;13:11,18,23

**disclosures (1)**
83:17

**discovery (1)**
67:8

**discretion (6)**
34:5,16,22;36:3,
14;85:12

**discuss (1)**
75:3

**discussion (9)**
34:1;41:16,19;
57:20;59:2;64:5;
66:21;71:4;75:20

**discussions (6)**
12:11,19,23;13:3;
58:24;59:7

**disinterested (2)**
83:21;84:16

**disinterestedness (1)**
83:16

**dismiss (1)**
61:25

**disparate (1)**
19:10

**disposed (1)**
85:11

**dispositive (1)**
73:5

**dispute (1)**
24:15

**disputed (2)**
33:6;82:13

**disputes (3)**
49:9,9,14

**disrupt (1)**
77:20

**disruption (1)**
9:1

**dissipated (1)**
35:13

**distributed (1)**
54:22

**distribution (6)**
9:12;10:4,22;12:6,
7;76:11

**distributions (1)**
9:8

**district (7)**
67:23;68:3,3,7;
69:1,3,5

**divergent (1)**
56:20

**divert (1)**
74:1

**divided (1)**
55:16

**dividend (1)**
76:11

**Docket (2)**
61:24;80:22

**document (1)**
12:14;61:22

**documents (3)**
13:14;45:20;49:13

**dollar (2)**
10:7;82:17

**dollar-for-dollar (1)**
9:19

**dollars (8)**
9:22,25;10:7,9;
12:7;66:10;81:24;
82:12

**dollars' (1)**
82:21

**done (11)**
22:11,19;29:21;
51:15;55:13,21;
56:14;74:14;77:24;
89:11,17

**down (9)**
10:11;23:17;
36:18,18;47:15;
56:4;58:19;73:12;
74:15

**drill (1)**
23:17

**due (1)**
66:24

**dun (1)**
55:11

**during (2)**
9:22;85:19

**duty (1)**
10:18

**E**

**earlier (1)**
64:15

**easier (1)**
53:21

**easy (6)**
37:23;38:1;40:15,
17;52:6;55:3

**echo (1)**
87:12

**echoes (1)**
85:21

**economic (1)**
43:12

**Ed (39)**
18:21,23,24;20:5,
12;22:7;25:8,14,21;
29:18,21,23;30:2,5,
10;38:13,14,24;

39:14;40:2,3,6,14,
18;41:2,5,9;42:19;
45:16;64:6;70:10,
10;71:11,12;72:14;
73:3,9,12;87:16
**Ed's (9)**
20:10;26:2;27:8;
32:21;37:17;64:7;
70:14;73:18;74:14
**Edu (1)**
48:12
**Education (20)**
7:17,19,20;10:15;
13:3;18:21,25;27:1;
33:14,20,21;35:24;
39:8;45:1;50:20,21;
51:11;52:21;55:13;
61:23
**Education's (2)**
50:22;62:5
**effect (3)**
52:7;71:17;73:14
**effected (1)**
74:6
**effective (6)**
12:6;16:4;64:24;
76:21;78:17;85:11
**efficacious (1)**
77:19
**efficiency (2)**
73:2,2
**efficient (6)**
22:17;27:24;31:5;
65:3;66:8;73:4
**effort (1)**
83:13
**efforts (8)**
19:13;25:12,15;
35:23;55:11;59:12;
64:7;74:2
**eight (2)**
49:1;56:2
**either (6)**
23:9;28:10;30:14;
74:11;76:17;78:22
**elegant (1)**
28:8
**element (1)**
71:14
**elements (1)**
77:17
**eleven (1)**
67:16
**eligibility (1)**
48:20
**else (8)**
16:7;17:11;19:5;
41:25;61:13;86:7;
87:25;89:23
**e-mail (2)**
37:12;55:2
**e-mailed (1)**
40:19

**enables (1)**
77:19
**encourage (2)**
40:4,7
**end (10)**
8:23;13:23;32:3,
12;42:7;50:1;53:19;
81:6;85:9;89:18
**endeavor (1)**
61:5
**endpoint (1)**
28:2
**enforceable (2)**
21:12,22
**engage (1)**
67:2
**enjoined (1)**
71:2
**Enjoining (1)**
71:2
**enough (6)**
25:4,5;35:9,12;
59:18;72:22
**enroll (1)**
30:4
**enter (3)**
17:8;43:8;80:23
**entered (5)**
14:9,14,19;49:22;
50:8
**entertains (1)**
76:1
**entire (1)**
37:9
**entirely (2)**
19:21;27:20
**entitled (1)**
63:6
**entry (3)**
16:2;46:13;77:1
**envision (1)**
38:11
**equipment (7)**
81:9,10,12,12,14;
83:8;85:20
**equitable (1)**
29:25
**equivalent (1)**
83:6
**especially (1)**
31:20
**ESQ (13)**
5:4,9,10,15,16,21;
6:4,9,10,15,20,25;
7:4
**essence (1)**
47:11
**essentially (4)**
29:21;52:12;56:1;
83:2
**establish (1)**
20:6,7,8,9,10;
31:15

**established (3)**
12:8;20:16,17
**establishing (1)**
88:21
**estate (6)**
10:12,20;42:10;
43:12;76:14;82:24
**estates (1)**
19:8
**estimate (2)**
53:17;55:21
**estimated (1)**
9:21
**estimates (1)**
62:12
**even (12)**
12:15;20:9;27:13;
30:9;39:8;52:10;
53:14;64:8;67:9;
72:10,10;73:16
**evening (1)**
11:19
**event (2)**
52:20;53:13
**everybody (5)**
18:20;19:5;24:21;
32:13;64:25
**everyone (1)**
8:3
**everyone's (1)**
35:4
**evidence (35)**
25:5;27:8,8;33:1,
8,11,22;41:24;44:18,
20;45:5,9;47:1,8,14;
48:5,13;49:14,18,22,
23;50:3,8,9,14,22;
56:15;61:15,20,22;
62:1,6,15;71:10;78:7
**evidenced (1)**
35:23;59:11
**evidentiary (1)**
33:3
**evidently (1)**
69:24
**exact (1)**
54:9
**exactly (4)**
53:25;55:15,20;
71:9
**examination (1)**
33:12
**examples (1)**
68:8
**exception (1)**
45:12
**executed (1)**
21:11
**executory (1)**
17:11
**exercised (2)**
36:3,13
**exercising (1)**

59:9
**exhibit (14)**
16:3;47:9;48:2,3,
3,3,14,18,22;49:15;
50:9,22;61:24;62:6
**Exhibits (1)**
48:5
**exist (1)**
49:14
**existed (1)**
81:13
**exit (2)**
56:22;89:11
**exonerated (1)**
74:10
**exoneration (1)**
74:11
**expect (1)**
11:17
**expected (1)**
71:3
**expedience (1)**
22:19
**expedited (2)**
8:18;9:2
**expeditious (1)**
75:17
**expense (3)**
53:5,20;82:22
**expenses (1)**
81:22
**expensive (1)**
73:12
**experience (1)**
78:25
**experts (1)**
38:8
**explained (2)**
12:10;16:18
**explanation (2)**
17:5,16
**expressions (1)**
64:10
**expressly (1)**
68:2
**ex-students (1)**
26:21
**extant (1)**
59:9
**extend (4)**
63:24;75:4,4,4
**extended (2)**
37:21;56:23
**extending (3)**
28:7,24;46:4
**extends (1)**
86:1
**extension (7)**
30:20;42:24;70:7;
75:7,9,9;77:3
**extensive (1)**
81:1
**extent (16)**

16:20;27:20;
28:14;41:22;43:20;
45:14,16;46:20;
75:11,12;84:22,22;
85:25;87:14,20;88:4
**extraordinary (2)**
35:23;67:21
**extremely (2)**
8:23;26:14

**F**

**face (1)**
26:25;28:13;32:21
**facilitate (1)**
40:24
**fact (11)**
15:3;22:4,13;24:2;
27:8;29:20;46:21;
48:15;49:14;65:22;
69:23
**facts (4)**
56:9,9;61:10;
88:20
**factual (6)**
33:5,6;42:15;
44:10;46:18;47:3
**failing (1)**
30:23
**fair (8)**
36:17;54:13;55:5;
71:1,11;73:18,24;
74:3
**fairly (2)**
12:2;22:14
**FALGOWSKI (2)**
5:21;86:13
**far (5)**
30:9;35:9;58:14;
77:25;80:18
**fashion (1)**
22:21
**fashioning (1)**
27:23
**fast-moving (1)**
11:23
**Federal (6)**
20:11;36:19;
42:20;43:13;58:6;
67:21
**fee (5)**
89:9,12,15,16,20
**feel (1)**
43:15
**FELICIA (1)**
7:4
**few (2)**
22:12;25:19
**fiduciary (1)**
10:18
**Fifth (1)**
68:1
**fight (1)**

32:15

**figure (7)**
36:9;37:12;39:5;
54:18;55:19,23;
56:22

**file (4)**
11:2,14,18;82:25

**filed (19)**
8:15;11:4,10;
15:21;16:16;38:18;
41:21;67:17,25;68:1,
5;76:17;83:14,15,16,
22;85:1;89:14,17

**filing (7)**
11:4,25;12:14;
15:14;24:12;78:20;
84:11

**filings (2)**
79:13,14

**fill (1)**
26:6

**filling (2)**
25:23;26:5

**final (5)**
8:19;14:19;82:1,6;
89:20

**financial (2)**
29:19;73:20

**financing (1)**
87:20

**find (4)**
58:15;59:10;61:5;
75:19

**finding (3)**
44:1;84:14,15

**findings (2)**
64:1;83:20

**fine (5)**
48:9,12;61:23,25;
62:5

**Finger (4)**
8:6;14:6;79:24;
80:13

**finished (3)**
56:8;73:11,13

**fired (1)**
29:22

**firms (2)**
54:23;58:4

**first (11)**
9:14,25;11:22;
15:1,7;16:12;17:10;
51:24;53:17;60:16;
86:12

**fit (1)**
55:15

**Fitzgerald (1)**
7:3

**five (6)**
15:19;16:3;40:25;
67:17;82:24,24

**FLOM (1)**
7:2

**focus (4)**
24:9;57:5;67:15;
70:19

**FOERSTER (1)**
6:23

**folks (3)**
35:4,25;74:9

**follow (1)**
58:12

**followed (1)**
81:5

**Following (4)**
10:3,24;12:9;
15:14

**follows (1)**
12:3

**follow-up (2)**
82:15;84:12

**footing (1)**
64:6

**forbearance (3)**
36:23;53:7,13

**force (3)**
65:6,6;73:3

**forced (4)**
59:1,7,9,16

**forget (1)**
66:1

**form (10)**
16:2,5;25:23;26:5,
6;27:13;67:5;80:16;
83:19;86:14

**formally (1)**
44:18

**former (4)**
25:10;29:24;42:9;
78:18

**forming (1)**
12:23

**formula (1)**
81:23

**forth (2)**
88:14,20

**forum (2)**
22:3;56:19

**forward (16)**
11:16,25;12:9,17;
13:7,12;14:13,23,25;
15:2,24;22:3;23:7,
23;42:21;65:3

**found (2)**
29:11;49:25

**four (6)**
18:4,18;44:4;
63:21;65:9;66:13

**four-prong (1)**
70:16

**Fox's (1)**
80:15

**frame (1)**
77:20

**framework (1)**
42:24

**Francisco (1)**
11:11

**frankly (4)**
28:8,21;47:10;
73:5

**free (1)**
70:14

**front (2)**
24:8;38:8

**full (1)**
56:2

**fully (2)**
14:21;21:16

**fulsome (2)**
44:12;67:20

**function (1)**
40:22

**fund (1)**
9:23

**fundamental (2)**
75:22,24

**funded (1)**
12:24

**Funding (1)**
6:24

**funds (5)**
30:6,13,14,15;
87:19

**furniture (2)**
83:8;85:20

**further (7)**
26:23,24;78:7;
79:12,14;85:12;88:1

**future (1)**
25:16

## G

**GAGP (8)**
80:25;81:6;84:15;
85:8,13,15,17,24

**GAGP's (1)**
85:18

**gain (1)**
65:18

**gained (1)**
31:24

**gallery (1)**
18:4

**GAP (1)**
85:17

**garages (1)**
15:13

**garnishments (2)**
23:25;57:9

**gas (1)**
57:11

**GAUTIER (62)**
5:15;17:25;18:1,9,
11,15;19:10,20;
20:23;21:6,9,14,19;
23:13,16,18,22;24:6,
10,16,19,24;25:13;

26:19,23;27:20;28:4,
6,12,18,23;29:9;
30:25;31:18;32:5,7,
24;33:2,15;44:17,19;
45:10;49:3,6,17,19;
50:5,18;52:14;
62:11;64:12,14,18;
65:9;66:4;74:21,23;
75:8;76:4;77:9;
79:12,15

**gave (1)**
75:20

**General (9)**
7:17;10:10;12:21;
22:8,21;25:18;
33:19;38:10;76:10

**generally (3)**
12:13;51:21;67:25

**gets (3)**
34:23;39:10;56:13

**Gillman (1)**
71:4

**given (3)**
27:25;38:10;
42:15;47:10;49:22;
53:18;58:3;62:14;
64:23;66:9;67:18

**Global (3)**
5:20;7:8;80:24

**goal (3)**
11:14;42:6;89:10

**goes (2)**
69:23;81:4

**Good (12)**
8:4;14:5;17:25;
18:20;24:12;32:23;
33:16;41:9;50:13;
76:5;86:9,25

**goodness (1)**
43:7

**govern (1)**
34:4

**government (31)**
19:16;23:12,19;
24:1,11,15;27:2;
28:17,22;33:9;
34:13;39:22;41:11;
42:20;43:13;45:16;
56:11;61:12;64:9,15,
18,21;65:7,14,15,20;
67:4;70:22;71:5;
77:18;78:10

**government's (1)**
72:5

**Grace (2)**
29:2;68:9

**grant (4)**
17:16;30:23;
36:12;89:3

**granted (7)**
11:5;36:11;38:12,
13;43:11;44:5;66:21

**granting (2)**

46:5;71:6

**grants (1)**
43:20

**Great (12)**
5:20;7:8;77:24;
80:21,24;82:2,9;
83:6,13;86:18;87:5;
88:16

**greater (2)**
29:6;81:17

**groceries (1)**
57:11

**grounds (1)**
21:21

**GROUP (2)**
5:2;68:25

**groups (3)**
25:2;31:3;32:19

**guaranteed (7)**
81:21,24;82:12,17,
19,21;84:19

**guard (1)**
64:15

**guards (1)**
34:13

**guess (1)**
26:21

**guilty (2)**
20:3;30:1

**GUMPORT (1)**
6:10

## H

**HAGLE (3)**
6:9;86:25;87:1

**half (1)**
80:2

**hallway (1)**
80:3

**halt (3)**
19:13;31:3,5

**hamper (1)**
30:22

**hand (2)**
12:6;71:5

**handed (1)**
40:25

**handles (1)**
27:12

**happen (6)**
32:17;54:25;55:1;
56:5;57:1;70:2

**happy (3)**
33:25;57:17;89:19

**hard (7)**
9:13;32:9;35:20;
53:17;64:11,22;66:5

**hardships (1)**
33:24

**harm (12)**
54:10,11;57:6;
58:16;59:20;65:13,

Case 15-10952-JTD   Doc 545   Filed 07/08/15   Page 102 of 112

CORINTHIAN COLLEGES, INC., et al.
Case No. 15-10952(KJC)                                                                                    June 30, 2015

13,14;66:6;72:13;
73:7;78:13
**harmed (2)**
72:12;73:8
**head (4)**
34:20;71:8,10;
87:13
**Heald (2)**
25:22;48:9,12
**hear (11)**
16:9;17:13;41:21;
50:12;51:2;61:11,
17;62:9;66:19;88:1,
25
**heard (10)**
16:7;17:12;46:9;
52:15;56:17,18;
62:11;73:10;86:7;
87:25
**hearing (22)**
8:8,15,16,20;9:6;
10:24,25;11:13,17;
13:12,15;16:25;
17:4;33:3,8;47:2;
61:25;67:16;78:8;
80:1;89:20;90:2
**hearings (1)**
11:16
**hearsay (8)**
45:7,11,12,16;
46:14;47:14;49:1,13
**HEILMAN (1)**
6:4
**help (6)**
19:19;41:12;
64:11,11;65:5;76:2
**hereby (6)**
47:8;48:4,13;50:9,
21;62:6
**here's (2)**
41:20;78:5
**Hernandez (1)**
47:20
**hey (1)**
37:19
**higher (4)**
60:8,9,17;61:2
**hijacked (1)**
87:15
**hinder (1)**
30:24
**hit (2)**
34:20;87:13
**hold (4)**
30:11;33:13;
39:21;53:22
**holding (1)**
53:23
**homeless (2)**
26:14,20
**honestly (1)**
24:25
**Honor (147)**

8:4,5,7,8,13,19;
9:10,17;10:3,24;
11:5,18;12:5,11,19;
13:13,17,25;14:5,9,
14,19;15:5,9;16:11;
17:18,25;18:4;
21:20;23:13;24:17,
25;25:21;28:4,12,23;
31:1;33:15,16,23;
34:7,21;35:20;36:8,
11,16;37:2,15;39:6;
40:1,21;41:9,15;
42:1,3,5;43:10,20,
20;44:1,7,14,19,25;
45:11;46:9,12;47:19,
22;48:10,23,25;49:6,
19,21,23;50:1,5,13,
14,18,24;51:3,12,24;
52:14,17;53:23;54:8,
12,16,25;55:5,20;
57:13;58:18,21;
60:10,16;61:16,21,
22;62:3;64:14;65:5;
66:16,20;69:16;
72:13;74:18,23;76:4,
5,8;77:23;78:4;79:8,
12,23;80:7,12;81:19,
21;82:20;83:1,14,24;
84:7,9,14,21;85:4;
86:3,9,16,23,25;
87:2,12,18;88:3,9,
10;89:14,22,25;90:3
**Honor's (2)**
87:12,21
**hope (4)**
8:10;63:4;76:1;
77:18
**hoped (1)**
17:2
**hopefully (3)**
18:25;57:8;64:3
**hour (1)**
80:2
**HUBEN (1)**
6:20
**Human (1)**
29:15
**hundred (1)**
10:7
**hundreds (3)**
25:25;27:21;31:14
**hurdle (1)**
26:24
**hurting (2)**
23:6;31:1

**I**

**idea (1)**
18:20
**identified (1)**
46:15
**identify (2)**

44:23;77:5
**identity (13)**
29:6,9,10,11;
30:13,16,17;63:16;
66:14;69:22,25;
70:15;71:7
**ie (1)**
77:6
**iii (1)**
50:1
**illustrates (1)**
65:24
**illustration (1)**
63:12
**immediate (7)**
26:1;54:11;57:9;
58:16;59:20;63:7;
78:13
**impact (2)**
43:12;57:10
**important (7)**
19:2,2;21:2,3,4;
37:13;43:25
**impose (1)**
79:5
**improperly (1)**
20:13
**improved (2)**
73:1,2
**incentive (1)**
17:14
**inclined (1)**
59:14
**include (4)**
10:5;49:17;55:10;
64:5
**included (1)**
82:5
**including (3)**
11:11;34:4;42:9
**incorrect (1)**
23:14
**incurred (1)**
85:19
**indeed (2)**
38:20;39:22
**independent (1)**
69:2
**indicate (2)**
19:12;68:5
**indicated (5)**
19:14;36:7,12;
68:1;87:18
**indicates (1)**
9:6
**individual (2)**
24:3;31:14
**individualized (3)**
25:8;40:19;64:23
**individuals (2)**
56:12;58:16
**inform (1)**
52:22

**informal (1)**
85:5
**information (8)**
17:1;30:3;48:21;
49:24;51:4,13,21,22
**informed (3)**
16:20,24;60:16
**initially (3)**
39:18;56:15;82:11
**initiation (1)**
39:6
**injunction (4)**
28:9;10;67:21;
77:3
**injunctions (2)**
69:14;71:6
**injunctive (9)**
43:24;44:3;66:21;
68:6,13;69:9;74:25;
75:4,16
**inspection (1)**
84:13
**instance (1)**
41:14
**instances (1)**
27:19
**instead (2)**
12:20;70:18
**institutions (2)**
52:25;53:4
**insureds (1)**
85:16
**intangible (1)**
9:11
**intend (2)**
15:16;69:24
**intended (2)**
61:25;76:23
**intends (1)**
9:7
**intensive (1)**
29:21
**intent (3)**
33:7;48:8,12
**intention (2)**
32:25;36:12
**inter-creditor (1)**
32:16
**interest (25)**
29:6,10,10,12;
30:13,17,17;42:9;
53:13,15;66:7,9,11,
14;69:22,25;70:15;
71:7;73:15,17,17,20,
24;74:5;77:20
**Interesting (1)**
20:21
**interests (5)**
19:11;56:20;
63:16;73:23;76:22
**interfering (1)**
43:8
**interim (4)**

59:19;89:15,16,16
**interns (1)**
58:4
**interplay (1)**
42:18
**into (35)**
9:13;10:13;12:7;
27:21;33:11;36:23;
38:23;44:18,20;
45:5;47:1,3,8;48:5,
13;49:22,23;50:2,8,
9,14,21;51:17;55:15;
58:14;61:19,22;62:1,
6;65:1;80:19,23;
81:3;86:1;88:4
**introduction (1)**
45:5
**inventory (1)**
82:5
**investigations (1)**
29:21
**involve (1)**
79:1
**involved (7)**
39:20;54:24;
56:12;68:13,16;
88:13,19
**involves (1)**
38:7
**irreparabl (1)**
73:8
**irreparable (2)**
72:12;73:7
**irreparably (2)**
72:12;73:8
**isolated (1)**
25:16
**issuance (1)**
77:1
**issue (9)**
17:6;28:21;33:24;
54:17;58:11;59:4;
65:7;71:23;72:1
**issued (1)**
69:14
**issues (15)**
21:17;26:25;
28:13,14,15,19;38:7;
51:20;76:19,19;
77:24;78:23;82:10,
14;87:21
**Item (11)**
14:11,14,16,22,24;
15:1,4,9;16:12;17:3;
80:22
**items (7)**
14:9,10;15:6,7;
45:8,18;49:6
**IV (2)**
20:11;29:19

**J**

**Jackl (2)**
45:25;47:7

**January (1)**
37:4

**jealously (2)**
34:13;64:16

**JEFF (4)**
7:19;33:20;50:21,
23

**Jeffrey (1)**
76:5

**JENNIFER (2)**
6:9;86:25

**JEREMY (1)**
6:15

**Jersey (1)**
29:15

**JESSICA (5)**
7:13;18:13;46:1;
47:7;66:1

**John (3)**
33:18;50:13;66:12

**Johns (1)**
29:2

**joined (2)**
18:2,4

**Judge (3)**
43:8;58:10;59:25

**judges (1)**
58:5

**judgment (2)**
35:12;58:17

**judicial (20)**
33:4,10;39:3,6,20,
23;41:5;44:21;45:6,
10,14,18;49:24,24;
54:3;7;60:20,24;
72:18;78:14

**JULIA (1)**
5:4

**July (10)**
11:1,7,8,16;13:12,
15,22;78:8,21;79:9

**June (6)**
8:14;10:25;11:5,5,
7,13

**jurisdiction (9)**
19:17,21;20:18;
66:16;70:22;71:22;
72:2,3,4

**jurisdictional (1)**
71:14

**Justice (1)**
33:17

## K

**KAPLAN (2)**
5:13;18:1

**KATONA (2)**
5:10;18:3

**KATTEN (1)**
6:18

**keep (5)**
12:18;37:14;
42:20;53:9;73:1

**kept (1)**
18:23

**kind (4)**
56:12;58:17;
67:14;70:20

**KING (4)**
7:13;18:13;46:1;
47:7

**KLEIN (1)**
5:4

**knew (1)**
46:24

**knowledge (2)**
20:23;26:2

**Kresse (12)**
33:18;50:13,13,
24;51:3;52:17;
53:23;54:6,12,16;
55:5;57:14

**KRYSTLE (3)**
7:14;18:13;66:4

## L

**LA (1)**
11:11

**lack (1)**
69:22

**landlord (4)**
15:22,23;85:10,11

**landlords (2)**
85:6,16

**language (6)**
68:12,14;69:20;
84:10,20;85:10

**large (3)**
37:5;56:21;66:11

**largely (1)**
76:18

**laser (1)**
57:5

**last (8)**
8:9,13;9:5;40:25;
68:4;74:21;82:9;
85:25

**lastly (2)**
60:23;73:15

**later (3)**
16:21;23:4;76:18

**LAW (13)**
5:2;20:1,1;32:11;
38:2,5;51:9,10;
54:22;58:4;67:23,
24;74:11

**laws (2)**
34:4;38:8

**lawsuit (1)**
54:20

**lawyer (4)**
45:3;47:16,18;

**58:11**

**lawyers (1)**
58:9

**lawyers-to-be (1)**
58:9

**lay (1)**
64:19

**Layton (4)**
8:6;14:6;79:24;
80:13

**lease (4)**
14:11,12;15:10,25

**leases (5)**
15:12,16,17,22;
16:4

**least (8)**
20:16;38:18;
41:13;42:23;46:16;
56:14;77:6;89:10

**leave (3)**
44:13;78:6;79:5

**legal (4)**
28:3;48:4;65:17,
18

**legislature (2)**
75:13,16

**legitimate (1)**
40:22

**lender (6)**
20:12;30:5,8,11;
40:6;43:13

**lenders (12)**
9:16;10:5;12:12,
16;19:15;23:11,19;
39:19;77:1,5,7,12

**lenders' (1)**
10:21

**length (1)**
69:17

**lengthy (1)**
39:10

**Lernout (1)**
68:12

**LESLIE (1)**
6:4

**less (4)**
28:8;34:18;52:4;
53:19

**letter (3)**
48:16;61:23;62:5

**letting (1)**
40:23

**level (1)**
87:17

**liabilities (2)**
19:7,22

**liability (4)**
20:9;85:13,16,18

**liable (4)**
20:16,19;30:6,11

**lien (6)**
9:17,19,24;10:21;
87:5,8

**lies (1)**
62:17

**life (1)**
26:25

**light (3)**
32:12;37:6;89:1

**likelihood (2)**
43:22;72:11

**likely (3)**
38:12;71:13;77:4

**limit (1)**
54:2

**limited (9)**
8:20,25;9:1;10:14;
58:15;76:14,15;
78:11,12

**line (3)**
8:17;9:2;17:2

**liquidating (4)**
11:19;12:3,21;
22:19

**liquidation (3)**
8:22;11:23;43:4

**liquidator (1)**
83:3

**liquidators (1)**
87:7

**listed (2)**
15:3;48:2

**Listen (1)**
56:6

**lists (1)**
16:3

**lit (1)**
47:12

**litigate (1)**
21:16

**litigation (10)**
19:23;21:24;22:1;
43:1;49:10,10;63:3,
25;65:3;87:17

**little (13)**
8:10;15:6;23:17;
28:22;31:24,24;
37:15;47:13;55:4;
59:22;66:2;88:12;
89:19

**live (2)**
26:10,12

**lives (3)**
24:21;25:19;57:10

**LLC (5)**
5:2,20;6:19,24;
80:24

**Lloyd (1)**
33:16

**LLP (10)**
5:13,19;6:2,7,13,
18,23;7:2;18:1,3

**loan (14)**
19:17,25;22:3;
34:4;36:23;40:3,3,9;
52:22;55:23,24;

**62:17;73:19;74:7**

**loans (20)**
20:14,20;31:16;
38:9;39:22;41:1,3,3;
42:19;46:25;52:1,7,
8,10,24;53:1,14,14;
55:22;70:10

**locally (1)**
58:3

**located (3)**
81:14;82:3,4

**location (1)**
81:16

**locations (9)**
15:12;81:10,11,13,
15;82:1,3;85:6,20

**LOESER (5)**
7:12;18:6,12;46:1;
47:6

**Loewen (1)**
68:25

**Long (6)**
6:19;25:3;53:17;
54:17;87:7;88:12

**longer (1)**
51:14

**long-term (1)**
17:14

**look (9)**
24:4;30:13;31:17;
34:12;47:11;56:10,
10;70:4;83:25

**look-back (1)**
37:21

**looked (2)**
63:21;82:2

**looking (5)**
51:17;59:19;65:4,
5;70:20

**looks (1)**
89:10

**LORENZO (1)**
6:25

**LORIE (2)**
5:16;18:1

**lot (7)**
26:25;27:17;32:2;
46:13;53:11;56:10;
57:2

**lots (3)**
15:13;56:11,20

**lumbering (1)**
56:13

## M

**magnitude (1)**
89:8

**mail (1)**
37:12

**mailed (1)**
40:19

**major (1)**

41:6

**majority (1)**
52:7

**makes (3)**
30:17;70:9;83:16

**making (8)**
40:4;52:11,13;
55:12;58:16;60:18;
62:22;77:11

**Management (1)**
6:3

**mandatory (1)**
22:11

**Manville (1)**
29:3

**many (9)**
21:1;27:18;35:19;
37:8;38:12;39:3;
52:24;53:1;55:15

**March (1)**
49:16

**MARINUZZI (1)**
6:25

**Marisa (1)**
14:5

**MARK (3)**
7:8;8:5;42:4

**marketing (4)**
25:15;30:3;81:1;
88:15

**married (1)**
18:16

**material (1)**
84:8

**matter (14)**
24:13;28:7;34:16;
41:22;49:7,12;
60:17;61:2;64:22;
70:21;79:7,17,19;
89:7

**matters (4)**
19:22;45:5,19;
67:9

**maximize (1)**
81:18

**May (44)**
8:15,19;9:5;13:4;
14:18;15:8;16:4,6;
17:18,19;22:10,10;
25:22;27:3,4,21;
31:8,9,13;33:14;
34:15;35:7;42:14;
46:9;49:6,21;55:3;
62:23;63:3,19;65:14,
19;70:11;73:10,13;
74:6,10;79:22;80:3,
5;84:1;85:11;86:9;
88:7

**maybe (2)**
59:17;64:7

**MEAGHER (1)**
7:2

**mean (10)**

19:5;26:20;35:13;
44:19;52:21;55:13;
56:12;57:23;62:22;
65:4

**meaning (1)**
54:7

**meaningful (2)**
16:23;73:14

**means (3)**
34:22;37:18;57:8

**meantime (1)**
59:8

**measures (1)**
67:21

**meet (3)**
28:3,11;44:2

**meeting (1)**
11:21

**members (1)**
18:4

**mentioned (4)**
11:13;21:7;50:14;
51:24

**MERCHANT (16)**
79:23,23;80:6,7,9,
12,13,21;83:24;84:1,
7,9;86:12;88:3,9;
90:3

**merely (2)**
55:7;69:23

**meriting (1)**
70:7

**merits (7)**
43:22,22;58:17;
69:16;70:18,19;
71:13

**met (3)**
44:4;66:13;80:2

**Michael (3)**
18:15;46:2;47:7

**might (18)**
17:4;18:11;20:8,8;
22:16,17;28:14;
32:1;40:17;49:11;
54:18;57:2;59:20;
67:20;71:24;77:2,2;
80:3

**Mike (2)**
79:23;80:12

**million (7)**
9:22;10:7,7,9;
77:6;81:24;82:20

**mind (2)**
37:14;71:21

**minute (1)**
61:18

**minutes (1)**
55:23

**miscellany (1)**
45:8

**misconduct (11)**
20:3,7;30:2,7,10,
12;45:15;62:15;

63:2,4;64:1

**misleading (3)**
29:23;30:2,3

**misled (1)**
27:4

**mixed (1)**
18:12

**modification (1)**
84:19

**modified (2)**
13:14;16:3

**modifying (1)**
13:11

**moment (6)**
33:13;36:7;60:19;
81:3,19;82:20

**moments (1)**
22:12

**monetary (1)**
64:4

**money (3)**
12:8;56:20;63:18

**monies (1)**
9:14

**Monitor (1)**
7:3

**monitoring (1)**
18:2

**month (1)**
86:1

**monthly (1)**
89:15

**months (6)**
15:18;34:19;
53:20,22;70:5;73:11

**more (20)**
22:17;28:22;29:5;
31:11;37:15;44:12;
47:13;53:11,11,12;
55:4;58:14;75:17;
77:6,19;78:1,17;
80:2;81:9,14

**morning (1)**
83:15

**MORRISON (1)**
6:23

**most (9)**
27:24;30:16,20;
31:4;47:12;65:3;
66:8;85:1,6

**mostly (2)**
28:25;64:6

**motion (55)**
11:4,15;14:2,12,
12,16,17,20,20,23,
24;15:2,10,11,14,17,
21,24;16:3,8,13,14;
17:8,10,12,23;19:3;
21:25,25;32:8;
41:22;42:14;43:17;
46:3;49:4,25;61:25;
63:23;67:17;75:13,
17,22;76:24;77:10;

78:8,24;80:15,19,22;
83:5;86:8;88:13,14,
19,20

**motions (1)**
75:4

**movant (1)**
41:24

**movants (2)**
44:16;46:18

**move (10)**
11:1,24;12:8,17;
13:7,12,18;33:9,10;
45:21

**moved (1)**
10:12

**moves (1)**
89:19

**moving (4)**
9:3,12;12:18;
42:20

**much (11)**
29:5,6;32:3;34:12;
45:13;55:7;76:13;
79:21;80:3;89:6;
90:1

**MUCHIN (1)**
6:18

**multiple (2)**
52:25,25

**must (3)**
60:8;64:24;67:25

**myself (2)**
21:5;24:25

---

# N

**nail (2)**
34:20;87:13

**name (2)**
18:7;66:2

**narrowed (1)**
73:16

**near (2)**
50:1;69:13

**necessarily (2)**
28:1;34:22

**necessary (12)**
22:10;33:3,8;
51:23;55:8;63:13;
64:1;67:3;70:25;
82:7;84:22,22

**need (21)**
8:22;11:1;20:2;
21:18;22:24;23:2;
28:3;44:23;47:4;
57:24;60:17;64:24;
65:19,25;68:8,15;
79:22;80:5;83:3,17;
89:23

**needed (6)**
19:23;21:23;23:3,
3;69:8;82:14

**needs (2)**

78:8,24;80:15,19,22;
83:5;86:8;88:13,14,
19,20

57:14;73:6

**negotiate (2)**
23:1;30:22

**negotiations (3)**
32:17;58:23;82:16

**neighborhood (1)**
26:13

**New (1)**
29:15

**news (2)**
26:11;48:17

**newspapers (3)**
11:10;21:2;26:11

**next (3)**
11:17;15:18;73:11

**nice (1)**
57:20

**ninety (1)**
10:8

**ninety- (1)**
82:23

**ninety-three (1)**
54:20

**nobody (4)**
57:15,17;64:20,20

**Nolan (5)**
80:19;81:4;88:10,
12,17,24

**nondebtor (2)**
69:2;71:6

**nondebtors (5)**
28:25;38:20;69:4;
70:7,23

**normally (3)**
43:7;79:4;89:8

**note (13)**
13:13;17:13;
19:14;25:21;35:20;
40:25;45:1,12;60:18,
21,23;64:7;87:10

**noted (2)**
12:5;42:5

**notes (1)**
25:21

**notice (25)**
11:6,10,15;16:22;
26:7;27:7,9,14;33:4,
10;40:11;44:22;
45:6,11,14,18;48:8,
12,18;49:24,24;
65:17;67:14;72:21;
85:12

**notices (2)**
37:12;40:19

**noting (1)**
84:11

**notion (1)**
67:11

**notoriety (1)**
8:24

**notwithstanding (2)**
8:24;15:3

**nowhere (1)**

75:6

**number (25)**
11:10;14:11,15,16,
22,24;15:1,6,9;
16:12;17:9;37:9;
44:13;51:6;52:3,15;
54:9;55:22;61:24;
62:20,20,21;63:11;
80:22,22

**numbers (6)**
37:5;39:12;41:4;
51:5;64:21;65:20

**O**

**object (7)**
16:21;45:3,5;
46:12,25;48:23;
76:23

**objected (1)**
86:17

**objecting (5)**
16:17,18,20,24;
20:4

**objection (23)**
13:9,20;15:21,23;
17:15;45:11;47:25;
48:8,21;50:4,17,19;
51:16;61:13;62:2,4;
80:15;83:1,1,13;
84:11;85:5;89:3

**objections (5)**
14:17,18;16:13,
14;17:7

**objection's (1)**
49:16

**objectors (2)**
16:15;17:14

**objunction (1)**
74:25

**obligated (1)**
62:24

**obligation (3)**
62:17,23;70:10

**obligations (6)**
22:25,25;62:17,
25;74:7;85:22

**obtain (5)**
11:24;60:21;69:9;
74:25;76:11

**obtained (1)**
10:20

**obtaining (1)**
37:18

**obvious (3)**
30:4;58:14;65:4

**obviously (6)**
11:19;53:11,12,
24;55:25;77:15

**occur (1)**
57:6

**o'clock (2)**
78:8;79:10

**off (4)**
35:14;39:21;
60:24;82:12

**offer (12)**
33:1,8;41:25;
44:17,19;58:7;60:3,
5;61:13,19;67:20;
71:4

**offered (6)**
27:15;45:19;48:1,
22;68:6;75:19

**offering (2)**
49:12;50:14

**Office (7)**
7:17;27:12;33:19;
54:8;55:3;82:25;
86:3

**officers (4)**
28:25;29:1;69:2;
70:3

**offices (2)**
41:2;54:21

**Official (3)**
5:3;76:6;78:1

**officially (2)**
25:6,7

**often (2)**
34:13;58:8

**old (1)**
49:1

**omnibus (5)**
11:17;15:1,10;
16:12;17:10

**one (44)**
10:6;12:21;15:21,
22;19:25;24:8;
31:10,20;36:4;37:4,
19,23;38:1,17,18;
42:24;46:23;47:22;
51:5;54:20;55:3;
56:17;58:9;61:21;
68:3,4,9,25,25;
69:25;70:13;76:8;
77:2,7;79:5,20;
81:17,19;82:20;89:7,
11,14,17,20

**onerous (1)**
73:10

**ones (3)**
23:11;27:13;69:8

**ongoing (2)**
74:2,14

**Online (3)**
24:21,22;26:10

**only (19)**
8:14;15:18;16:3,
19;20:4;31:4;36:7;
39:19;40:1;51:13;
55:23;72:17;75:8,10,
19;77:7;78:9;79:11;
87:17

**open (3)**
28:21;64:5;78:6

**opinion (1)**
75:20

**opportunities (3)**
27:5;35:25;40:24

**opportunity (13)**
16:23;22:5;33:22;
37:13;38:7;58:23,
24;60:15;61:3;67:1,
7;76:2,10

**option (1)**
53:8

**order (30)**
9:18;10:25;12:18;
14:14,19;15:6,18;
16:2,5,10;17:3,8,20;
20:1;28:2;34:6;
38:24;42:20;43:25;
46:3;80:16;83:19;
84:2;85:1;86:2,15;
87:4;88:2;89:4,16

**ordered (1)**
84:18

**orders (1)**
14:10

**ordinarily (2)**
69:18;71:3

**originally (1)**
76:23

**others (5)**
18:23;31:9;38:12;
77:8,8

**otherwise (2)**
57:3;87:20

**ought (1)**
74:14

**out (46)**
9:14,25;10:4,22;
11:6;15:6;17:3;
18:17,22;24:8;
25:23;26:5,5,6;
28:24;32:15;35:24;
36:19;37:11;40:3,18,
23;41:23;46:25;
47:17;52:1;53:3,25;
54:18;55:14,19,19,
23;56:22;61:5;63:5,
6;65:21,21,21;76:25;
77:14,19;83:7;
88:15;89:19

**outcomes (1)**
31:20

**outlined (2)**
8:16;12:13

**outset (3)**
12:5;42:5;76:9

**outside (3)**
66:22;68:18;69:14

**outstanding (2)**
42:19;46:22

**over (11)**
9:12;11:6;13:9;
14:1;15:7,17;17:22;
35:25;39:14;52:5;

81:17

**overall (1)**
59:22

**oversaw (1)**
88:13

**owe (1)**
30:15

**owed (2)**
10:6;63:19

**owes (1)**
30:14

**own (3)**
25:17;27:8;32:22

**P**

**Packer (1)**
71:18

**Pacquer (2)**
71:19,20

**page (1)**
84:10

**paid (1)**
77:23

**panel (1)**
58:5

**papers (7)**
24:1,2;26:2;29:13;
66:20;68:2;72:25

**Paragraph (7)**
84:18,19;85:7,7,
15,18,21

**paragraphs (1)**
84:18

**parking (2)**
15:13,13

**part (11)**
9:18;10:11;17:2;
19:12;26:11;30:23;
44:2;59:10;75:24;
77:10;88:6

**particular (1)**
38:9

**particularly (2)**
34:13;49:15

**parties (18)**
15:25;16:17,20,
24;17:14;19:6,16;
56:21;64:15,17,18;
71:7;78:16,21;79:3,
5;82:16;89:9

**Partners (3)**
5:20;7:8;80:24

**parts (2)**
42:25;44:4

**party (8)**
20:4;34:12,12;
67:1,1;71:1,16;85:14

**party-in-interest (1)**
45:13

**pass (3)**
10:21;31:21;32:1

**path (1)**

66:9

**Patrick (1)**
7:3

**pattern (1)**
29:22

**pause (6)**
34:6,18;60:14;
62:10;84:3;88:8

**pay (6)**
10:1;26:3,4;40:5;
57:11;85:22

**paying (4)**
9:14;53:9,15;
62:16

**payment (2)**
9:25;39:9

**payments (9)**
40:7;52:13,23;
53:3,4,7;55:12;
62:23,23

**payout (1)**
10:7

**PC (1)**
5:7

**pecuniary (1)**
74:5

**pending (1)**
77:13

**people (23)**
10:17;18:23;
25:19;26:10;32:21;
46:14;52:12;53:25;
55:9,10,15,20;56:2,
19,20;59:20,24;
63:10;65:6,25;
72:22;74:16;83:2

**people's (1)**
57:10

**per (1)**
55:23

**percent (5)**
37:16;52:4;63:9;
82:24,24

**perhaps (1)**
40:1

**period (4)**
37:4,21;56:24;
81:17

**PERLMAN (1)**
7:4

**permit (1)**
33:11

**permitted (2)**
59:6;75:21

**person (4)**
18:24,24;46:24;
56:1

**personally (1)**
27:11

**perspective (1)**
12:17

**petition (1)**
9:20

**ph (1)**
71:19
**phone (3)**
18:2;27:11,12
**place (3)**
63:14;75:8;82:9
**places (1)**
67:24
**plaintiffs (1)**
32:4
**plan (45)**
8:21;9:3,7,9;11:1,
14,18,19,22;12:2,3,5,
12,17,21;13:11,18;
19:18,19;22:11,14,
17,17,20;25:16;
30:23;32:14,15;42:7,
12,20;43:3;53:18;
56:4;57:8;58:23;
59:4,22;64:2;68:18;
70:5,18;76:15,17;
77:19
**planned (1)**
22:13;28:22
**plans (1)**
27:24
**played (1)**
88:15
**pleadings (1)**
27:8
**pleasant (1)**
20:24
**please (4)**
36:22;41:9;46:10;
86:10
**pm (3)**
80:10,10;90:4
**podium (3)**
14:1;15:7;17:22
**point (12)**
18:21;26:15,21;
31:20;38:19;47:17;
51:13;52:19;55:5;
65:24;69:3;78:23
**pointed (1)**
76:25
**points (1)**
76:8
**policies (1)**
85:17
**POLSINELLI (2)**
5:7;18:3
**portion (1)**
53:10
**portions (1)**
46:16
**pose (1)**
32:1
**position (7)**
21:16;42:17;43:6,
15;67:11;70:17;
72:22
**positive (1)**

**58:24**
**possibility (1)**
9:10
**possible (2)**
27:6;62:14
**post-petition (1)**
81:1
**potential (5)**
10:13,14,16;11:6;
36:25
**POTTER (1)**
6:13
**POWELL (2)**
7:14;18:13
**practicable (1)**
11:25
**practice (3)**
58:7;75:17,17
**practiced (2)**
18:22;32:11
**practices (2)**
24:6;31:4
**pre-bankruptcy (1)**
10:16
**precedential (1)**
69:12
**precise (1)**
39:5
**predict (1)**
31:19
**predominantly (1)**
77:15
**prefer (2)**
33:25;41:19
**preliminary (1)**
12:11
**premises (2)**
15:15,16
**preparation (2)**
88:13,19
**prepare (1)**
67:2
**prepared (11)**
17:16;33:24;
34:25;41:14;51:23;
56:6;57:22;58:24;
61:17;78:23;89:3
**prerogative (1)**
64:16
**prerogatives (1)**
34:14
**prescribed (1)**
75:17
**PRESENT (5)**
7:7;36:14;37:5;
69:21;86:14
**presented (2)**
46:17;87:21
**preserve (1)**
32:18
**President (1)**
7:8
**press (4)**

**8:25;45:7;58:11,**
14
**pressed (1)**
67:16
**pretty (4)**
24:12;34:12;38:1;
87:6
**prevail (1)**
71:13
**previously (1)**
12:9
**price (1)**
82:11
**principle (1)**
30:1
**principled (1)**
75:21
**principles (2)**
71:8,10
**priority (5)**
9:15,24;10:1,2;
12:3
**private (17)**
19:15;23:11,19;
39:19;40:3,5,6;
54:22;55:10,17;
64:17,18;72:17;
76:25;77:5,7,12
**pro (3)**
10:3,9;12:22
**probability (7)**
63:22,23,24;64:2;
65:10,10,11
**probably (7)**
26:9,12,13;35:4;
73:4;77:12;83:14
**problem (1)**
84:9
**problematic (2)**
59:10;73:13
**procedural (6)**
28:15,19;42:15;
69:5,10;74:24
**procedure (1)**
28:20
**procedures (1)**
24:7
**proceed (1)**
15:8
**proceeding (14)**
27:23;31:11;38:4;
66:22;68:18,24;69:6,
15;71:17;75:1,2,25;
76:1;77:13
**proceedings (23)**
18:2;20:17;22:2;
23:6,22,24,25;25:8;
31:10,12;42:15;
45:15;51:15;59:8;
60:21,22,25;64:20;
65:15;74:14;75:24;
78:15;90:4
**proceeds (4)**

**10:20;81:22;**
82:23;87:8
**process (37)**
9:3,23;11:23;
12:18;24:13;25:9;
32:9,9;34:6;36:5,16;
39:10;40:11,20,24;
41:5;42:20;59:17;
63:14;64:2,23;65:1,
6,12;66:25;70:12,12;
73:2,13;78:19;81:1,
5,6,17;88:14,14,15
**processes (2)**
24:3;64:21
**processing (1)**
36:15
**produces (1)**
65:20
**productive (1)**
80:14
**professional (1)**
89:11
**professionals (2)**
32:10;81:2
**proffer (12)**
51:12,21,22;55:8;
56:7;61:8;65:14;
73:10;80:18;81:4;
88:4,11
**proffered (2)**
44:22;61:10
**program (1)**
58:2
**programs (3)**
20:12;29:19;30:4
**progress (3)**
77:21,21;78:22
**promise (1)**
61:4
**promptly (2)**
61:4,6
**prong (3)**
30:19;43:21,25;
70:6
**prongs (3)**
63:21;65:9;66:13
**proof (1)**
27:13
**properties (1)**
15:13
**property (2)**
85:10,19
**propose (2)**
9:7;13:19
**proposed (4)**
8:17;53:19;82:13;
83:19
**proposing (1)**
9:24
**proposition (2)**
28:2;29:16
**prospective (1)**
82:2

**prospects (1)**
87:19
**protect (5)**
65:5,25;66:5,5;
71:6
**protection (3)**
9:17;10:21;75:23
**protections (2)**
69:5;86:21
**prove (3)**
46:18;49:7,12
**proven (2)**
44:11;63:2
**provide (7)**
19:4;22:4;35:3,21,
25;75:9,25
**provided (6)**
11:7;16:25;67:14,
22;75:21;82:1
**provides (4)**
75:7;81:23;83:19;
84:19
**providing (1)**
8:8
**public (14)**
25:2;27:2;45:19;
66:7,8,9,11;73:15,
17,17,20;77:20,24;
85:16
**publically (1)**
20:13
**publicity (1)**
66:11
**publicized (1)**
25:25
**publicly (2)**
29:22;30:8
**public's (3)**
73:24;74:3,5
**published (2)**
11:10;75:20
**pull (1)**
64:25
**purchase (1)**
82:11
**purpose (4)**
21:24,25;22:19;
87:15
**purposes (4)**
22:19;34:11;50:7;
88:21
**Pursuant (3)**
15:11;46:4;75:2
**pursue (1)**
43:3
**pursued (2)**
10:20;23:11
**pursuing (1)**
71:2
**pursuit (1)**
31:22
**push (1)**
89:19

put (13)
  23:2;24:8;33:22;
  36:22;38:8;42:22;
  43:6;57:11,14,25;
  72:22;77:4;88:7
putative (2)
  29:23;30:11

**Q**

quantified (1)
  77:8
quasi-homeless (1)
  26:14
quick (3)
  22:19;76:8;89:11
quicker (1)
  80:4
quickly (5)
  11:2,3;35:12;
  54:24;60:24
Quite (6)
  23:18;25:3;27:6;
  39:12;60:23;73:10

**R**

raise (3)
  19:25;20:1;82:10
raised (6)
  28:12,13,14;
  67:25;69:11;71:24
RANDOLPH (58)
  33:16,17;34:7,10,
  20;35:3,7,9,16,19;
  37:2,9,24;38:1;39:5,
  14,16,25;40:9,12,14,
  16;41:13,18;42:1;
  44:25;47:19;48:10,
  15,25;49:4;51:4,20;
  52:3;57:13,22;
  58:21;59:15;60:3,7,
  9,12,15;61:15;62:3,
  8;66:20;67:7;68:12;
  71:20,25;72:7,9,11,
  20,25;73:6;79:8
rank (1)
  45:7
rare (1)
  56:23
rata (3)
  10:3,9;12:22
rather (3)
  48:17;49:8,14
rating (1)
  26:23
re (1)
  75:18
reach (6)
  13:10;19:6;22:5;
  27:21;35:24;37:8
reached (2)
  63:3;78:13

reaching (3)
  40:23;76:20;78:18
reaction (1)
  31:25
read (4)
  75:3;80:18;81:3;
  88:4
reading (1)
  39:18
reads (1)
  84:21
real (4)
  21:24,25;57:6;
  62:17
realistic (1)
  35:17
really (15)
  8:14,22;9:1,11;
  10:11;11:22;12:7;
  13:9;22:11;35:13;
  42:18;47:11;60:23;
  68:15;81:6
reason (5)
  17:2;18:21;19:13;
  62:21;72:15
reasonable (1)
  35:21;36:17;38:7
reasons (3)
  24:8;31:10;74:18
recall (2)
  8:19;9:18
receive (2)
  9:18;16:22
received (14)
  8:24;16:13;30:6;
  40:10;47:8;48:5,13;
  50:9,21;62:6;63:9,
  19;74:4;85:5
recess (2)
  80:8,10
recital (1)
  84:10
recited (1)
  25:17
recognize (2)
  29:4;30:1
record (15)
  8:5;17:13;19:14;
  33:23;42:4;44:12,
  24;45:19;71:11;
  78:6;80:19;81:3;
  88:5,17,22
redound (1)
  74:3
reduced (1)
  82:19
reduction (3)
  82:11,13,17
REED (1)
  5:19
refer (5)
  18:19,20,24;48:2;
  80:24

referred (5)
  39:10,12;47:18;
  52:3;81:11
referring (2)
  18:25;48:16
refers (1)
  74:24
reflect (2)
  23:9;86:16
reflected (3)
  59:3;85:7;86:4
reflects (1)
  84:18
regard (2)
  24:16;43:14
regarding (11)
  12:12,16;13:7;
  17:5;46:15,23;51:3;
  52:24;56:5;63:4;
  83:21
regardless (1)
  62:16
regulations (2)
  37:18,20
reimbursed (1)
  85:24
reimbursement (1)
  82:22
rej (1)
  16:22
reject (2)
  15:11;16:19
rejection (10)
  14:11,12;15:2,10,
  19;16:4,13;17:6,6,11
rejections (1)
  16:23
relate (1)
  19:22
related (4)
  15:13;16:4;20:18;
  46:5
relates (1)
  85:18
relating-to (1)
  71:15
relationship (1)
  38:21
relationships (2)
  29:5;34:4
relatively (1)
  41:4
relaxed (1)
  47:13
release (2)
  62:24,25
relevance (1)
  49:5
relevancy (1)
  49:2
relevant (4)
  46:16,17;47:1;
  49:24

relief (75)
  14:22;17:16;
  19:24;20:4;22:22,23,
  24;23:2,3;24:13,21;
  25:9,23;26:1,3;
  27:22,24;28:9;29:1;
  30:18,21,21,23;
  31:12;32:16;33:1;
  35:5,21,25;36:4,8,
  10,15;37:1,17;38:19;
  42:13,17,18;43:20;
  44:3,5;46:5;47:11;
  49:11;59:13;60:22;
  61:14;63:7,9,12,15,
  22;64:24;65:24,25;
  66:17,21;67:2,6;
  68:6,13;69:1,9;
  70:20,24;71:22;
  74:25;75:4,13,15,16,
  21;78:20;89:3
relies (1)
  40:6
relieve (1)
  59:20
relieved (1)
  70:9
relitigate (1)
  70:14
reluctantly (1)
  46:12
remain (2)
  70:13;76:19
remaining (3)
  9:15;15:17;79:20
remains (1)
  82:18
removal (1)
  85:20
rent (2)
  57:11;85:22
reorganization (4)
  30:24;43:3;59:4;
  70:25
repay (2)
  30:6;70:10
repaying (1)
  52:7
repayments (1)
  52:11
replacement (2)
  9:19,23
reply (2)
  13:20;51:16
report (4)
  48:7,24;49:15;
  78:21
reported (1)
  21:1
reporters (1)
  20:25
reports (1)
  45:7
representative's (1)

relief (continued)
36:7
represented (1)
  35:11
request (12)
  17:7;33:1;45:10,
  17,18;47:10;61:25;
  67:6;68:13;79:25;
  84:23,25
requested (14)
  17:17;24:22;
  36:10;42:16;61:14;
  63:8;66:17;67:3;
  69:1;71:11;73:16;
  74:19;82:11;89:4
requesting (3)
  24:12;42:13,24
requests (5)
  33:3,10;36:15;
  44:21;63:9
require (2)
  67:3;74:13
requirement (1)
  68:24
requirements (1)
  66:25
requires (3)
  53:24;59:1;68:17
requiring (1)
  71:5
res (1)
  77:4
resolution (8)
  16:1;19:7;32:13;
  64:3,3;66:9;80:3;
  84:12
resolve (2)
  15:23;80:14;83:13
resolved (4)
  14:17,21;17:6;
  79:16
resources (4)
  30:25;55:19;
  65:18;74:1
respect (44)
  8:19;10:17;11:2;
  14:14;15:24;19:7,
  24;20:11,14,19;22:2;
  26:20;27:12;29:18;
  31:15;36:16;37:12,
  17;40:18;45:10,17;
  46:21;47:13,14,15,
  16;48:20;61:9;
  63:17,22;70:16;
  71:14,25;72:11,17,
  18;73:15,24;79:7,22;
  81:8;83:10;85:18;
  87:6
respectfully (1)
  17:7
respects (1)
  27:17
respond (5)
  16:23;47:4;61:5;

67:19;78:2

**responded (2)**
41:25;67:18

**responding (1)**
67:1

**response (14)**
16:9;17:13;41:22;
50:8,10;51:2,18;
61:11,24;62:5;
67:20;82:10;88:1,25

**responsibility (1)**
34:3

**rest (1)**
17:4

**result (5)**
9:3;11:4;77:4,5;
80:25

**resulting (3)**
19:8;29:24;32:3

**retail (1)**
74:12

**retained (5)**
83:4,20;84:16;
86:18,19

**retaining (1)**
83:2

**retention (2)**
84:20;87:3

**return (1)**
42:23

**reversing (1)**
69:14

**review (1)**
10:17

**reviewed (3)**
84:4;88:18;89:1

**revised (2)**
80:16;85:1

**revisions (1)**
83:18

**Richard (1)**
86:10

**Richards (4)**
8:6;14:6;79:24;
80:13

**rife (1)**
66:23

**right (35)**
8:12;16:25;17:9,
24;18:12;19:24;
26:5;33:13;36:20;
37:23;38:17;42:2,
22;44:16;46:7;
49:16,20;50:19,24;
52:17;53:21;54:14;
55:5;59:5;60:12;
62:9;78:5;80:20;
81:13;84:4;86:6,24;
87:23;88:25;89:7

**rights (6)**
26:7,8;36:1;59:10,
25;77:4

**rise (2)**

8:2;80:11

**Robbins (1)**
29:2

**ROBINS (2)**
5:13;18:1

**ROSENMAN (1)**
6:18

**ROSNER (1)**
5:2

**roughly (1)**
37:14

**Rudnick (1)**
76:6

**rule (3)**
12:3;75:15;78:24

**run (3)**
53:14;81:6;87:14

**rush (1)**
26:5

**RYAN (1)**
6:15

---

**S**

---

**Sacramento (2)**
11:12,12

**sale (11)**
14:24;82:1,5,23;
83:7,8,10;85:20;
87:3,8;88:13

**sales (3)**
81:9,22;85:9,23,25

**same (4)**
40:5;69:5;78:16;
82:18

**San (1)**
11:11

**satisfied (1)**
66:25;89:1

**satisfy (1)**
9:16

**saying (2)**
53:8;72:23

**scenario (2)**
9:4;35:19

**schedule (1)**
13:21

**schedules (1)**
11:3

**Schepacarter (5)**
80:15;84:25;86:9,
10,23

**school (8)**
35:9;37:13,19;
38:2;51:6,7;53:10;
74:9

**schools (3)**
29:16;46:21;52:19

**SCHWARTZ (3)**
76:5,6;78:4

**scope (1)**
75:9

**SCOTT (2)**

5:15;17:25

**screaming (1)**
43:7

**Second (8)**
9:16;12:23;13:7,
10,15;14:11;15:10;
60:18

**Secre (1)**
60:16

**Secretary (11)**
7:19;33:21;34:22;
36:3;37:21;39:1;
50:17,20;57:16;
60:17;61:2

**Secretary's (4)**
34:3,5,17,21

**Section (9)**
12:4;68:19;75:5;
81:25;83:4,12,12,20;
84:16

**Sections (1)**
46:5

**seed (1)**
12:8

**seek (2)**
15:11;70:25

**seeking (11)**
15:18;16:2,15,19;
20:5;25:24;28:9;
29:1;31:14;42:18;
51:13

**seeks (1)**
41:5

**seem (3)**
41:23;65:19;67:9

**seems (11)**
23:8;24:11;31:21,
23;32:2;40:13;54:4,
10;55:2;58:10;73:12

**selected (1)**
81:5

**selection (1)**
88:15

**sell (1)**
81:16

**Senate (1)**
48:7

**send (1)**
18:17

**sends (1)**
40:3

**sensitive (1)**
58:11

**sent (4)**
37:11;40:18;41:1;
54:7

**separate (2)**
53:2;71:23

**September (1)**
86:1

**sequence (1)**
33:25

**serious (1)**

26:18

**seriously (1)**
27:4

**serve (1)**
81:8

**served (1)**
11:6

**service (1)**
77:24

**servicer (3)**
53:2,8,11

**servicers (3)**
52:22;53:2,24

**Services (2)**
29:15;85:17

**set (8)**
9:9;38:5;49:25;
83:11,11,11;88:14,
20

**setting (1)**
12:20

**settlement (2)**
59:7;63:3

**settlements (1)**
32:17

**seven (1)**
74:16

**shall (2)**
84:20;86:19

**SHANTI (2)**
5:10;18:3

**share (2)**
10:9;35:22

**shared (1)**
82:23

**sharing (1)**
81:22

**short (2)**
79:20,25

**shortcut (1)**
88:9

**shorten (1)**
11:15

**show (5)**
19:23;20:2;38:5;
49:8;64:21

**sic (2)**
18:3;63:17

**SIDLEY (2)**
6:7;87:1

**sign (1)**
19:19

**signed (2)**
16:10;17:20

**significant (6)**
31:1;49:9,10;
55:19;73:20;74:1

**silly (1)**
73:12

**similar (2)**
29:12;64:5

**simple (5)**
22:14;24:12;42:6;

65:19;72:15

**simplify (1)**
25:9

**simply (23)**
9:2;19:5;22:18;
23:18;34:5,16,18;
36:22;38:21;43:13;
44:10;49:25;50:1;
54:2;59:15;60:22;
61:9;62:22;65:23;
72:23;78:20;85:21;
89:14

**sincere (1)**
64:10

**single (4)**
13:8;22:13;53:1;
56:1

**sit (2)**
58:19;64:25

**situation (8)**
20:24,25;32:18;
47:12;66:10;67:19;
68:16;78:25

**situations (3)**
56:11;66:24;79:2

**six (3)**
15:15,19,19,22

**sixty (1)**
85:25

**sizeable (1)**
10:6

**SKADDEN (1)**
7:2

**SLATE (1)**
7:2

**slowed (1)**
74:15

**small (6)**
39:12;41:4;54:4,8,
23;63:11

**SMITH (3)**
5:19;45:25;47:7

**sold (1)**
85:9

**sole (1)**
85:12

**solely (5)**
12:23,25;42:18;
46:20;74:24

**solicited (1)**
58:8

**somebody (1)**
26:4

**somehow (1)**
67:12

**someone (1)**
32:10

**sometimes (1)**
58:8

**soon (1)**
11:25

**sooner (2)**
23:3,3

CORINTHIAN COLLEGES, INC., et al.

Case No. 15-10952(KJC)

June 30, 2015

**sorry (4)**
11:8;18:7;44:21;
49:21
**sort (4)**
55:19;59:2;60:18;
71:4
**sorting (1)**
74:13
**sorts (3)**
59:6;67:13;74:12
**sought (7)**
26:2;27:1;36:8;
38:25;49:11;65:23;
75:13
**sounds (2)**
18:23;25:11
**SPAHR (1)**
6:2
**speak (2)**
25:5;33:14
**speaks (2)**
66:7;69:15
**special (2)**
69:18,19
**specifically (3)**
33:23;44:24;47:16
**spent (1)**
66:10
**spoke (2)**
18:22;26:15
**spoken (1)**
16:17
**spot (1)**
42:23
**spread (2)**
25:9,10
**SS (1)**
68:4
**St (1)**
35:14
**Staff (2)**
7:16;33:19
**staggering (1)**
29:25
**stake (1)**
56:20
**stand (6)**
18:7,11;57:15,25;
80:8;90:2
**standard (11)**
28:11,14;42:23,
25;43:24;44:2;
69:18,19;70:16;
71:15;87:6
**standards (2)**
28:3,10
**standing (1)**
58:18
**stands (4)**
29:16;40:20;84:2,
6
**start (3)**
18:19;73:12;81:13

**started (1)**
59:9
**state (9)**
20:1,1;38:2,5;
51:9,9,10;58:6;74:11
**statement (11)**
9:10;10:25;11:9,
14,16,18;13:11,18,
23;54:13;89:15
**statements (3)**
46:14,15,23
**States (9)**
7:16,20;36:1;71:2;
73:19;82:25;84:23;
86:4,10
**status (2)**
42:15;55:25
**statute (1)**
34:3
**stay (41)**
12:15;14:2,22;
19:19;22:23,24;
24:9;28:8,24;30:17,
20;35:4;42:24;43:9,
11;46:4;51:13,19;
52:8;10;56:23;
63:24;64:25;70:2,7;
71:5,11,12;72:2,2;
73:16;74:19;75:5,10,
10,11,12,12,16,22;
77:3
**stayed (1)**
77:10
**staying (1)**
73:21
**stepped (1)**
57:13
**still (5)**
20:8;34:15,15;
80:1;82:21
**stipulate (2)**
33:10;52:15
**stipulated (2)**
45:1,3
**stipulations (1)**
44:20
**stop (20)**
24:6;26:5;32:24;
36:21;38:14;41:7,9;
51:14,14;59:8,9,14;
60:1,22;64:20,21;
65:15;72:16;73:3;
74:2
**stoppage (1)**
25:22
**stopped (2)**
53:15;74:14
**stopping (3)**
52:11;55:11;73:9
**story (1)**
48:17
**straightforward (1)**
12:2

**stricken (1)**
84:23
**strongly (1)**
43:16
**structure (4)**
13:8,16;81:7;
82:18
**structured (2)**
81:20;82:6
**Student (85)**
5:8,14;6:24;7:11,
12,13,14;12:24;13:1,
2;14:2,22;17:23;
18:5;19:2,3,17,25;
20:12;22:3;24:4;
25:1,7,21;29:19;
31:2,16;32:10;34:4,
24;35:14;36:6;37:6,
19;38:6,9,19,25;
40:2,9,18,22;41:2,3,
6;42:9,13,16;45:6;
46:3,7,21,24;47:5,8;
48:5,13;50:15;51:9,
16;52:1,9;53:6,8;
56:18;57:6;62:13,13,
22;63:1;64:23;68:7,
23;69:7,17;70:8,17;
71:9;73:18,25;74:7,
16;76:16,24;77:17
**students (73)**
13:4;18:18;19:23;
20:19;21:11;22:8,
24;23:1,23;25:3,6,
10,15,19,25;26:6,12;
27:7,9,11,13,21;
29:24;30:2,5,11;
31:1,3;32:21;33:5,
12;36:4,10,12,22;
37:3;38:11,15;39:2;
40:5,7;41:3;42:19;
43:14;46:15;47:9;
51:25;52:24;53:12,
15;60:20;62:16;
63:6,17;64:6;65:13,
16,22;66:6,8;69:22,
23;70:3,9,24;71:13;
72:5,12,25;74:6;
78:18,18;87:16
**students' (2)**
19:22;45:2
**subject (4)**
23:24;39:3;57:24;
70:21
**submission (3)**
78:7;88:1;89:4
**submissions (3)**
19:12;39:18;89:1
**submit (7)**
49:23;62:19;
63:10,11;68:14;
74:18;84:24
**submitted (6)**
33:3,4;47:1;49:7;

51:16;62:4
**submitting (1)**
80:16
**subordinate (1)**
68:18
**substantially (1)**
16:2
**success (7)**
43:21,22;63:23,23,
24;65:10,11
**successful (6)**
19:4,5;43:3;64:2,
2;76:1
**sue (1)**
35:12
**sufficient (6)**
10:20;21:21;44:2;
67:18;72:22;88:21
**suggest (3)**
40:21;57:18,25
**suggested (1)**
16:14
**suggesting (1)**
52:9
**suggestion (1)**
61:1
**suggests (1)**
69:10
**summarizes (1)**
45:4
**summer (3)**
58:3,3,4
**super- (1)**
10:1
**supplement (1)**
44:12
**supplementing (1)**
46:4
**support (6)**
12:15;33:1,5;46:2;
61:13;80:19
**supports (1)**
87:3
**suppose (3)**
34:7;38:18;57:16
**sure (9)**
17:1;22:5;23:18;
24:10;36:8;40:16,
20;52:8;60:19
**surmised (1)**
77:12
**surrender (1)**
15:16
**surrendered (2)**
15:15,20
**suspect (2)**
35:16;60:9
**suspended (1)**
69:3
**sustain (1)**
47:24
**sustained (1)**
49:16

**swath (1)**
55:7

**T**

**tab (1)**
47:21
**table (4)**
33:18;65:6,7;
76:15
**tabs (1)**
48:2
**tackles (1)**
79:2
**talk (8)**
8:10;28:22,24,25;
29:6;33:24;75:15;
89:23
**talked (1)**
69:16
**talking (4)**
22:12;60:2;65:16;
73:1
**talks (2)**
75:22;85:8
**tangible (1)**
9:13
**target (1)**
87:23
**targeted (2)**
25:15,19
**Tasha (6)**
18:15,16,16;45:22,
23;47:6
**Taxpayer (1)**
66:12
**taxpayers (1)**
56:21
**technically (3)**
55:9,12;75:3
**tedious (1)**
57:5
**telephone (2)**
78:9;79:10
**TELEPHONICALLY (7)**
5:16;6:10,20,25;
7:4,9;16:25
**telling (2)**
59:24,25
**tells (1)**
43:6
**temporal (2)**
75:10,12
**temporary (3)**
19:13,15;43:11
**ten (5)**
10:7;37:15;52:4;
55:23;63:9
**tend (3)**
21:4;47:12,13
**tens (1)**
31:13
**tenuous (1)**

38:20

**terms (7)**
12:5,13,16;24:25;
34:23;45:11;56:4

**Terranova (7)**
14:1,5,6;15:9;
16:11;17:18,21

**test (2)**
30:20;44:3

**testify (5)**
36:9;39:1;51:23;
88:18,18

**testimony (5)**
55:8;57:23,25;
63:7;88:11

**that'll (1)**
18:25

**theoretical (1)**
71:7

**thereafter (2)**
12:1;85:11

**there'd (1)**
31:24

**therefore (4)**
9:23;17:7;64:24;
83:3

**therein (1)**
88:20

**thin (1)**
8:23

**thinking (2)**
80:1;89:13

**thinnest (1)**
87:14

**third (8)**
8:14,14;60:21;
71:3,5,16,17;85:13

**thirty (1)**
11:3

**thirty-five (2)**
15:12,15

**THOMPSON (4)**
7:11;18:5;45:24;
47:6

**thoroughly (1)**
88:19

**though (1)**
37:23

**thought (7)**
8:7;18:19;39:18;
41:16;79:6;87:11,22

**thousands (5)**
25:25;27:22;
31:13,13,14

**threads (1)**
87:14

**throughout (1)**
54:21

**thus (2)**
77:25;80:18

**thwart (1)**
76:20

**tied (1)**

**Times (3)**
11:11;26:24;41:4

**timing (4)**
30:25;47:10;
75:10,11

**Title (2)**
20:11;29:19

**Today (32)**
11:11,15,18;14:8,
13,23,25;15:2,18,25;
16:1;18:16;21:16;
24:21;27:4;30:22;
44:11;47:3;56:16;
59:23;60:1;61:5,14;
63:7;64:8;67:9;72:1,
8;73:1;76:18;80:1;
89:24

**today's (2)**
17:10;47:2

**together (2)**
32:13;64:25

**told (2)**
26:4;46:24

**tomorrow (1)**
76:18

**tonight (1)**
11:25

**took (2)**
55:23;82:9

**top (1)**
81:21

**tort (1)**
10:18

**total (3)**
52:4,15;53:7

**trade (2)**
22:8;77:16

**transfer (1)**
81:16

**transient (2)**
26:15,21

**transparency (1)**
76:22

**transpired (1)**
10:15

**travelling (1)**
18:18

**treat (1)**
12:21

**treated (1)**
23:5

**treatment (4)**
13:3;19:8;22:18;
64:4

**tried (3)**
40:21,24;44:11

**TRO (1)**
47:11

**true (6)**
36:6;39:23,23;
41:14;72:16,18

**trust (17)**

9:12,14,14,25;
10:13;12:7,8,21,23,
23,24;13:4,7,8,10,
15;22:13

**Trustee (7)**
82:25;83:9;84:11,
23;86:4,11;88:7

**Trustee's (2)**
85:4;89:3

**truth (2)**
49:7,12

**try (7)**
31:19;56:19;57:4;
58:14,25;64:22;74:2

**trying (9)**
15:25;22:21;23:1;
32:9;56:24;58:6,7,
13;64:11

**Tufaro (1)**
29:14

**tunnel (1)**
32:12

**turn (7)**
13:25;17:22;
30:19;44:16;60:24;
69:16;71:8

**turning (2)**
15:7;71:9

**tweaks (1)**
86:20

**twenty (2)**
32:11;56:2

**twenty-two (1)**
55:16

**two (21)**
11:8;12:12,15,19;
16:13;28:12;34:18;
37:18;42:25;53:19,
22;68:7;70:5;73:11,
17;76:8,22;81:10,13;
85:6,15

**twofold (1)**
56:16

**type (3)**
47:12;63:22;84:10

**typical (1)**
87:6

**typically (2)**
39:12;63:21

**U**

**ultimately (3)**
14:2;62:25;81:5

**Um-hum (4)**
21:7;23:21;44:8;
66:3

**unable (1)**
25:16

**Uncle (1)**
41:9

**uncontested (2)**
14:13;15:3

**Under (43)**
7:19;12:21;29:17;
33:20;34:2,17;37:17,
20;39:1;43:4;50:1,
16,20;53:13;57:16;
60:16;61:2;68:17,
17;71:3,15;74:9;
75:5;76:11;78:23;
80:16;82:18;83:4,12,
17,20;84:16,20,24;
85:16,22,24;86:19,
19,21;87:4;88:2;
89:4

**underlying (5)**
42:17;43:23;
58:17;63:25;71:23

**undermine (2)**
76:20;77:21

**undertake (1)**
54:23

**undertaken (1)**
25:11

**underway (1)**
60:25

**unenforceable (2)**
21:12,15

**unique (7)**
20:24;22:5;29:10;
32:14;66:15;79:1,2

**UNISON (1)**
8:4

**United (9)**
7:16,20;36:1;71:2;
73:19;82:25;84:23;
86:4,10

**universal (1)**
69:13

**universe (4)**
36:25;52:1,4;54:5,
8,24

**unknown (2)**
10:11,19

**Unless (6)**
13:5,25;33:7;44:4;
64:25;79:16

**unnecessary (1)**
63:4

**unpaid (1)**
9:15

**unprecedented (1)**
42:14

**unsecured (9)**
9:8;10:4,10,22;
12:22;22:8,21;76:7,
10

**unsettled (1)**
31:21

**unsolicited (1)**
58:8

**unsure (1)**
60:23

**unusual (2)**
69:19;70:6

**up (19)**
9:9;12:20;18:12;
22:20;26:22,24;
29:14;32:3,8,9;38:5;
53:22,23;57:13;
58:12;66:2;83:11,11,
11

**update (1)**
8:8

**updated (1)**
51:4

**upon (6)**
9:11;17:15;23:2;
43:12;47:2;75:21

**upset (1)**
23:4

**USA (1)**
11:11

**USC (2)**
46:5;75:14

**use (1)**
56:19

**used (5)**
10:1;34:21;67:6;
75:18;87:8

**using (1)**
25:17

**usual (1)**
87:23

**utilities (3)**
14:16,17,19

**utilize (1)**
9:21

**V**

**valid (2)**
42:10;74:7

**validity (1)**
72:5

**valuable (3)**
81:9,12,14

**value (5)**
9:19;10:19;69:12;
70:14;81:18

**variety (2)**
67:8;74:13

**various (9)**
37:14;48:4;50:2,8;
55:15;58:5;74:6;
81:15;82:3

**vast (1)**
52:7

**vehicle (1)**
67:5

**vendors (1)**
77:15

**verify (3)**
82:7;88:17,20

**versus (2)**
17:6;65:13

**view (2)**
36:24;76:9

**CORINTHIAN COLLEGES, INC., et al.**

**viewed (1)**
　83:6
**violated (1)**
　72:3
**virtually (1)**
　24:20
**visceral (1)**
　31:25
**volumes (1)**
　69:15
**voting (1)**
　13:20

### W

**wage (2)**
　23:25;57:8
**waivers (3)**
　21:10,15,22
**walk (4)**
　14:1,8;80:17;84:5
**walk- (1)**
　82:10
**walked (1)**
　79:25
**walk-through (4)**
　82:1,7,9,15
**wants (9)**
　27:2;41:24;56:8;
　57:15,17;58:11;
　61:1;64:20,20
**WARD (2)**
　5:9;18:3
**watch (1)**
　26:11
**waterfall (1)**
　12:9
**Watt (2)**
　6:3,19
**way (23)**
　23:5;28:8,10;31:4,
　5;39:17;40:2,5;
　41:19;43:6,21;
　49:17;57:1,5;58:15,
　15,16;63:5;65:3;
　78:18;81:20;83:11;
　85:1
**ways (2)**
　56:10;73:17
**week (1)**
　82:9
**weeks (4)**
　8:11;54:18,25;
　56:2
**WEITZ (1)**
　7:8
**Welcome (1)**
　18:14
**welfare (1)**
　38:11
**weren't (1)**
　53:14
**what's (4)**

27:14,15;47:17;
　49:5
**whatsoever (1)**
　85:13
**Whereupon (1)**
　90:4
**who's (2)**
　32:11;41:25
**who've (1)**
　52:1
**wide (1)**
　55:7
**wife (1)**
　18:22
**willing (3)**
　33:9;59:21;87:7
**willingness (1)**
　64:10
**wish (7)**
　16:7;17:12;50:25;
　61:9;86:7;87:25;
　88:23
**wishes (1)**
　61:19
**withdrawn (1)**
　14:18
**within (10)**
　11:3;13:4;24:13;
　34:5,17;37:20;
　67:16;70:5;73:11;
　77:20
**without (10)**
　12:15;19:17,21,
　21;50:19;57:4;
　58:16;62:4;85:12,12
**withstand (1)**
　87:17
**witness (1)**
　57:15
**wonder (2)**
　28:15;34:16
**wonderful (1)**
　59:4
**word (4)**
　25:10;34:21;
　64:13;74:21
**words (2)**
　25:17;41:12
**work (10)**
　26:13;35:20;
　53:11,12;54:24;56:1,
　24;59:11;64:11;
　77:18
**worked (1)**
　41:23
**working (13)**
　8:20;15:23;22:16;
　25:2;31:3;32:13;
　35:20;42:11;56:2;
　65:8;66:5;76:16;
　86:13
**works (1)**
　40:2

**world (1)**
　26:11
**worried (1)**
　35:13
**worth (2)**
　82:22;87:22
**WR (2)**
　29:2;68:9
**wrinkle (1)**
　55:18
**write (1)**
　41:8
**written (1)**
　82:4
**wrong (4)**
　23:12,15;29:8;
　32:22
**WyoTech (1)**
　81:11

### Y

**year (4)**
　8:16,23;37:22;
　68:4
**years (4)**
　32:11;39:7;41:1;
　49:1
**yesterday (2)**
　14:18;36:10
**young (1)**
　58:9

### 1

**1 (1)**
　14:10
**1,414 (1)**
　51:10
**1.1 (1)**
　81:25
**1.485 (1)**
　82:20
**1.53 (1)**
　81:24
**1.535 (1)**
　81:24
**10 (1)**
　14:16
**10,000 (1)**
　65:21
**10.5 (1)**
　9:22
**100,000 (1)**
　82:21
**105a (1)**
　46:5
**11 (22)**
　8:17,21;9:22;
　14:22;15:7;19:4;
　22:4;27:24;32:11,13,
　14,19;38:15;42:6;
　43:4,8;46:4;63:14;

**world (1)**
　65:6;75:13,25;76:11
**1129 (1)**
　12:4
**11ii (1)**
　47:23
**12 (3)**
　14:24;15:7;80:22
**120 (1)**
　37:20
**120,000 (1)**
　82:12
**13 (7)**
　14:9;15:1,6;16:12;
　17:9;85:7,8
**13,500 (2)**
　37:12;40:18
**14 (3)**
　48:13;51:10;85:15
**15 (1)**
　85:18
**150,000 (2)**
　11:6;74:8
**15th (1)**
　48:16
**16 (1)**
　85:21
**180 (3)**
　26:2,2;36:7
**18th (1)**
　11:5
**1982 (1)**
　29:15

### 2

**2 (4)**
　78:8;79:10;84:10,
　18
**20 (1)**
　11:7
**200 (1)**
　77:6
**2007 (1)**
　49:16
**2010 (4)**
　37:4;52:2,3;74:8
**2013 (1)**
　25:18
**2015 (1)**
　48:13
**20th (2)**
　11:7,8
**22nd (5)**
　11:1,16;13:12,15,
　22
**250,000 (1)**
　12:7
**26th (2)**
　11:1;13:19
**270 (1)**
　39:8
**27th (1)**
　14:18

### 3

**3,000 (1)**
　41:1
**3:00 (1)**
　80:10
**3:20 (1)**
　80:10
**3:35 (1)**
　90:4
**327 (1)**
　83:12
**327a (7)**
　83:4,17,20;84:16,
　20;86:19,19
**350,000 (5)**
　37:3,9,14;52:3,14
**362 (3)**
　75:5,6,8
**362a (1)**
　46:5
**362c3 (1)**
　75:14
**363 (1)**
　83:12
**363m (1)**
　86:20
**365 (1)**
　47:19
**365b3 (1)**
　85:22
**375 (1)**
　80:22

### 4

**4 (1)**
　84:19
**4- (1)**
　63:9
**4,000 (2)**
　36:15;65:21
**4,967 (1)**
　36:10
**40,000 (16)**
　37:10,15;39:2;
　51:25;52:5,19;55:6,
　14,22,25;56:3,5;
　62:20;63:6;65:22,22
**4001 (1)**
　75:15
**450,000 (1)**
　52:20
**465 (1)**
　61:24
**4th (1)**
　8:16

### 5

**5,000 (3)**
　51:7;63:9;65:21

**CORINTHIAN COLLEGES, INC., et al.**
**Case No. 15-10952(KJC)**                                                    June 30, 2015

**50,000 (2)**
  65:21;82:16
**500 (1)**
  63:17
**500,000 (5)**
  52:2,18;54:1;
  62:12;65:16

**7**

**7 (6)**
  9:4;14:10;31:22;
  32:16,18;38:15
**7001 (1)**
  74:24
**70017 (1)**
  68:17
**70018 (1)**
  68:17
**768 (2)**
  36:12;38:11

**8**

**8 (4)**
  14:9,11;15:6,9
**830 (1)**
  56:1
**8th (3)**
  8:14;10:25;11:13

**9**

**9 (1)**
  14:15
**9th (5)**
  11:5;49:16;78:8,
  21;79:9