**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CORINTHIAN COLLEGES, INC., ET AL., | Case No. 15-10952 (KJC) |
| Debtors. | Jointly Administered |
| | Hearing Date:  July 22, 2015, at 3pm |

**OBJECTION OF THE PEOPLE OF THE STATE OF CALIFORNIA AND THE
COMMONWEALTH OF MASSACHUSETTS TO DEBTORS'
MOTION TO APPROVE DISCLOSURE STATEMENT [DOCKET NO. 521]**

    1.       The People of the State of California (the "People"),[1] by and through Kamala D. Harris, the Attorney General of the State of California, and the Commonwealth of Massachusetts (the "Commonwealth"), by and through Maura Healey, the Attorney General of the Commonwealth (collectively, the "States"), submit this objection (the "Objection") to *Debtors' Motion for the Entry of an Order (A) Approving the Disclosure Statement* (the "Disclosure Statement")*, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan of Liquidation* (the "Plan")*, (C) Approving the Forms of Ballot and Solicitation Materials, (D) Establishing Voting Record Date, (E) Fixing the Date, Time and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto, and (F) Approving Related Notice Procedures* (the "Motion") [Docket No. 521].

    2.       On October 10, 2013, the People filed a civil law-enforcement action in state court against Debtors Heald College, LLC; Corinthian Colleges, Inc.; Corinthian Schools, Inc.; Sequoia Education, Inc.; Career Choices, Inc.; MJB Acquisition Corporation; Titan Schools,

---

[1] Unless otherwise specified, capitalized terms used, but not otherwise defined, have the same meaning as in the Motion, the Plan, or the Disclosure Statement.

Inc.; Rhodes Colleges, Inc.; Florida Metropolitan University, Inc.; and Everest College Phoenix, Inc. alleging that Debtors violated California law by misrepresenting job placement rates to students, misrepresenting job placement rates to investors, advertising for programs that they do not offer, unlawfully using military seals in advertising, and inserting unlawful clauses into enrollment agreements that purport to bar any and all claims by students. *People v. Heald College, LLC et al.,* San Francisco Superior Court, Case No. 534793. On February 14, 2014, the People filed a First Amended Complaint additionally alleging that Debtors subjected students to unlawful debt-collection practices on loans that they did not own, and despite the fact that the proceeds of those loans have already been paid in full by the lender to Debtors; failed to disclose their role in the Genesis Private Student Loan Program; and misrepresented the transferability of credits. Finally, on June 25, 2014, the People filed a Supplemental Complaint additionally alleging that, among other things, Debtors violated consumer-protection laws because they failed to be honest with prospective students and parents about their poor financial condition and the future of their schools.

3.     On April 3, 2014, the Commonwealth filed a civil law-enforcement action in state court against Debtors Corinthian Colleges, Inc. and Corinthian Schools, Inc. alleging that Debtors violated Massachusetts consumer protection laws, M.G.L. c. 93A, by misrepresenting the urgency of enrollment and the need to enroll immediately in Corinthian schools; the schools' influence and historical success in finding jobs in the students' field of study; the employment opportunities available to the schools' Massachusetts graduates; the earnings of graduates; the assistance the schools provide graduates in obtaining employment in their fields of study;  the nature, character, and quality of the schools' programs; the transferability of credits; the availability of externships in the students' fields of study, together with the training provided by and employment opportunities accompanying externships; and the nature and availability of financial aid. In addition, the civil action alleged that Debtors' schools recruited and enrolled students that Debtors knew were unable to benefit from the programs and/or were legally unable to obtain employment in their fields of study. *Commonwealth of Massachusetts v. Corinthian*

*Colleges, Inc.*, Sup. Ct. C.A. 14-1093E.

4.      The People timely filed proofs of claim based on their pending enforcement action.  The Commonwealth intends to file proofs of claim based on its pending enforcement action prior to the November 2, 2015 deadline for governmental-unit filings.  In support of this objection, the States respectfully state the following:

## OBJECTION

5.      The Court should deny the Motion because the Disclosure Statement (i) does not contain adequate information as required by 11 U.S.C. § 1125, and (ii) describes a Plan that is patently unconfirmable.

### A.      The Disclosure Statement Is Woefully Inadequate

6.      The Disclosure Statement falls far short of providing "adequate information."  A debtor may solicit a plan only if the Court approves a disclosure statement that contains "adequate information," 11 U.S.C. § 1125(b), which is "information of a kind, and in sufficient detail . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  There are a number of glaring inadequacies with the Disclosure Statement.

7.      First, the Disclosure Statement describes—in the absolute barest terms—a sweeping release for Bank of America and other Prepetition Lenders of *any and all* pre-Effective Date causes of action that Debtors may have against them.  *See* Plan, Art. XII(C)(1).  The Disclosure Statement purports to provide this sweeping release in exchange for "good and valuable consideration."  *Id*.  However, the Disclosure Statement fails entirely to describe what causes of action Debtors are releasing, their value, and the specific consideration given in exchange.  Without this information, the Disclosure Statement cannot be approved.  *See e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321-22 (3d Cir. 2003) (stating that a disclosure statement did not contain adequate information when it failed to include causes of action which could generate significant assets for the estate).  Because a

release is functionally an injunction, *see In re Lower Bucks Hospital*, 571 Fed. App'x 139, 142-43 (3d Cir. 2014), Debtors are further required under the Federal Rules of Bankruptcy Procedure to "describe in specific and conspicuous language (bold, italic, or underlined texts) all acts to be enjoined and identify the entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c). Debtors fail to do this as well.

8.      As detailed below, the Disclosure Statement's lack of transparency concerning the nature of the conduct being released is fatal to the disclosure statement given the apparent involvement by the Prepetition Lenders in the management of Debtors' affairs as they wound down operations and the large cash transfer they received outside the bankruptcy process. Because the Disclosure Statement fails entirely to address any of this, it cannot be approved. *See, e.g.*, *In re Fierman*, 21 B.R. 314, 315 (Bankr. E.D. Pa. 1982) (denying approval of a disclosure statement and noting that "[a]lthough the existence of the litigation is disclosed, there is no explanation of the effect that these lawsuits may have on the disposition of the property or on the claims of the creditors").

9.      **Lenders Authority Over Debtors**. Lenders authority over Debtors affairs is memorialized in a Waiver and Amendment No. 2 to the Fourth Amended and Restated Credit Agreement, dated as of June 25, 2014 ("Second Amendment") giving Lenders a new role in the management of Debtors' operations. *See* Exhibit A. Under Amended Section 6.18, Lenders directed Creditors to appoint a Chief Restructuring Officer ("CRO") and Lenders were given authority over the "terms, conditions, and scope of authority" of his employment:

> 6.18 CRO. On or prior to July 1, 2014 and at all times thereafter, engage William J. Nolan (or another representative of the Financial Advisor selected by the Domestic Borrower and reasonably acceptable to the Required Lenders) as chief restructuring officer of the Domestic Borrower ("CRO"), on terms, conditions and scope of authority acceptable to the Administrative Agent and the Required Lenders.

Exhibit A at 4.

10.     In fact, the CRO was one of only two Debtor representatives at the § 341 Meeting

4

of Creditors. *see* Exhibit B at 4:22 to 5:2, and he testified to the same effect:

> Q.  MR. CAMPINS: And you, Mr. Nolan, you were appointed at the behest of the lenders as one of the -- under the second amendment to the credit facilities.  Is that correct?
>
> A. MR. NOLAN: Absolutely, that's correct.  So just a little history: So we . . . showed on site June 2nd.  And that was 2014.  And that was also *the bank thought* that -- and the company agreed that bringing someone in to help them get through an amendment and to do some cost cutting profit improvement type work would be good, so --
> MR. OWEN: That's right.
> MR. NOLAN: So mutually *the bank and the company agreed that they would hire somebody*, so we were engaged to do that, to get them through a bank amendment and then to -- also to look at ways of improving cash flow.
>
> Q. MR. CAMPINS: And you were made the chief restructuring officer; is that correct?
> A.  MR. NOLAN: That was . . . what I just described is the plan, really, up until the company got the June 2nd -- I mean 12th letter, which created a change in circumstances and basically caused a cash prices. So, as part of that, *the banks, as part of their amendment, decided that the company needed a chief restructuring officer*, and I happened to be there at the time.

*Id.* at 202:2-203:6 (emphasis added).

11.     **Lenders' Participation in the Asset Sales**.  Testimony elicited at the § 341

Meeting of Creditors establishes that Lenders were actively involved in the asset sale process:

> Q: MR. CAMPINS: Were the banks told, though, for example, the names of the potential bidders prior to the signing of asset purchase agreement?  For example, were they aware that Zenith was going to be the purchaser --
> A. Uh-huh.
>
> Q: MR. CAMPINS: -- before the general public was aware?
> A. MR. NOLAN: I believe so, yes.
> MR. OWEN: Yeah.
>
> Q. MR. CAMPINS: Did the banks review copies of the asset purchase agreements --
> A. MR. NOLAN: Yes.

*Id*. at 214:14-215:10.

12.     **Lenders Awareness of Regulatory Concern**.  Testimony elicited at the § 341

Meeting of Creditors establishes that Lenders were acutely aware of Debtors' regulatory issues.

For example, the Lenders were given copies of correspondence with the U.S. Department of

Education within 24 hours of receipt:

> Q: MR. CAMPINS: So the creditors under this lending facility
> were getting realtime access to all correspondence with, for
> example, the Department of Education?
> A.  MR. OWEN: Not real -- I mean within -- I think we said within
> 24 hours, yeah.
>
> Q. MR. CAMPINS: So was there -- it sounds like there may have
> been a policy that you had to provide any regulatory
> correspondence, then, within 24 hours.  Is that what you are
> saying?
> A. MR. NOLAN: I think that's in --
> MR. OWEN: In the amendment, yeah.
> MR. NOLAN: -- the amendment, you will find that in the
> agreement.
> MR. OWEN: Yep.

*Id*. at 210:24-211:14.

13.     **Lenders Receipt of $18 Million in February**.  Testimony elicited at the § 341

Meeting of Creditors establishes that Lenders were paid $18 million in February of this year:

> Q. So in February of 2015 the lending syndicate led by Bank of
> America was paid over $18 million?  Am I understanding that
> correctly?
> A. MR. NOLAN: Yeah.  You have to understand it was sort of all
> -- it's all part of the Zenith sale.
> MR. OWEN: It's all part of the transaction.
> MR. NOLAN: Those two buildings were physical assets that
> Zenith would then occupy.  Zenith agreed not to buy the physical
> assets but to enter into a lease which then gave those two buildings
> value.
> So you had to have Zenith, the Zenith sale first, and arrange a
> longer-term lease to create value.  And it was sold.  And so it was
> really probably -- it was the biggest part of the bank's pay-down or
> really the only part the bank got paid down as part of Zenith, if that
> makes sense.
> MR. OWEN: Yeah.

*Id.* at 236:22-237:19.

14.     When that cash payment made earlier this year is compared to Debtors' current cash position, the need for adequate disclosure of the claims in the Disclosure Plan is obvious:

> Q:  MR. CAMPINS: So at that time the 18 million that went to the bank, it's fair to say that's more than the cash on hand that exists in debtors' estates now?
> A. MR. NOLAN: That's our cash position today.
> MR. OWEN: Yeah, yeah, about $6 million, something like that, if you count the escrow accounts. Yeah.
> Q.  MR. CAMPINS: Since February of 2015, the banks got three times more than what the current cash position is?
> A. MR. OWEN: Well, I mean, it depends how you define cash. Right?  There is cash meaning the escrow accounts, as well, which would be more than that.

*Id.* at 238:2-17.

15.     Beyond the lack of transparency over the Prepetition Lenders release, the Disclosure Statement omits the most basic information that creditors need to decide whether to accept or reject the Plan.  A disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  The Disclosure Statement identifies none of this.  It does not even state what, if any, distribution will be made to unsecured creditors, simply describing their estimated recovery as "Undetermined." Plan, Art. IV.  The Plan's centerpiece is a "Distribution Trust."  *See* Plan, Art. IX.  However, the trustee is never identified, nor is the agreement that will control and govern the trust.  This critical information is promised in a future "Plan Supplement," but no timeframe for its delivery is offered.  *Id.*  As for students—the hardest hit by Debtors' misconduct and one of the most important constituencies in this bankruptcy—the Disclosure Statement describes the possible creation of a "Student Claims Trust," but again provides no details, instead referring to the unspecified "Plan Supplement."  *See* Plan, Art. III(G).  Finally, the Disclosure Statement does not even include a liquidation analysis, which itself is fatal to approval.  *See e.g.*, *In re Multiut Corp.*, 449 B.R. 323, 344 (Bankr. N.D.Ill. 2011) ("Failure to attach a liquidation analysis violates

7

§ 1129(a)(7).").

16.     The Disclosure Statement fails to include any meaningful information about the sweeping releases provided to Bank of America and others, and fails to include even the simplest information concerning potential distributions to general unsecured creditors, including students. Without this information, it is hard to imagine how anyone could possibly make a meaningful decision to approve or reject the Plan.  Debtors have requested an expedited hearing on the Motion, yet have filed what amounts to a barebones disclosure to a Plan that provides broad releases, promising to supplement the document in the future.  "The need for expedition, however, is not a justification for abandoning proper standards."  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (citation omitted).  The Motion should be denied.

> ### B.     The Breadth of the Proposed Injunction and Retention of Exclusive Jurisdiction Render the Plan Patently Unconfirmable

17.     The Plan includes a broad discharge injunction that is not available to a liquidating debtor and undermines law enforcement.  Moreover, the Plan purports to invest exclusive jurisdiction in the Bankruptcy Court, which is contrary to applicable authorities.  For at least these reasons, the plan is "patently unconfirmable."

18.     "A plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'"  *Id.* at 154-55 (quoting *In re Monroe Well Serv., Inc.,* 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).  If a plan is "patently unconfirmable," then "the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."  *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012).  This is to avoid "the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan . . . does not comply with confirmation requirements."  *Id.*  Here, the Plan is patently unconfirmable for at least the following reasons.

19.     First, in Article XII(A) of the Plan, Debtors seek a permanent discharge injunction that is impermissible under 11 U.S.C. § 1141.  Corporate debtors are not entitled to a discharge provided by 11 U.S.C. § 524(a), if "(A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge . . . if the case were a [chapter 7 case]."  11 U.S.C. § 1141(d)(3).  All are true here: the Plan is a liquidation plan; Debtors are winding down and going out of business; and a chapter 7 discharge is available only to individuals, not corporations, 11 U.S.C § 727(a)(1).  Nonetheless, Debtors seek a permanent discharge injunction that tracks § 524(a), purporting to permanently enjoin "all entities who have held, hold or may hold claims against the Debtors" from taking any actions of any kind against Debtors, other than those consistent with the terms of the Plan.  Section 1141(d)(3) precludes Debtors from obtaining such an injunction.

20.     Second, even if the injunctive language of Article XII(A) were permissible in a liquidating Chapter 11—which it is not—this language is still improperly broad because it does not include a carve out for the commencement or continuation of an action or proceeding by a governmental unit to enforce its police or regulatory power.  Such actions are clearly excepted from the automatic stay, *see* 11 U.S.C. 362(b)(4), and it is well established that such actions are similarly excepted from "the post-discharge injunction under § 524(a)."  *In re Pincombe*, 256 B.R. 774, 783 (Bankr. D. Ill. 2000).  Thus, Debtors seek a permanent discharge injunction that is even *broader* than that provided by 11 U.S.C. § 524(a).

21.     Finally, Article XV of the Plan purports to grant to this Court exclusive jurisdiction over various aspects of this case.  "[A] Plan may not delegate unlimited authority to a bankruptcy judge, and that provision is meaningful only to the extent that core jurisdiction is otherwise found." *In re Spiers Graff Spiers*, 190 B.R. 1001, 1008 (Bankr. N.D. Ill. 1996). "While chapter 11 plans and confirmation orders commonly provide bankruptcy courts with exclusive jurisdiction, this language does not divest any other court of concurrent jurisdiction." *In re Ventilex USA, Inc.* 509 B.R. 140, 146 (Bankr. S.D. Ohio 2014) (citing authorities; footnote

omitted).  Accordingly, to the extent that the Plan divests any other court of jurisdiction—

including the San Francisco Superior Court and the Massachusetts Superior Court in which the

States' enforcement actions against Debtors are pending—the Plan is unconfirmable.

22.      These deficiencies are facial defects in the Plan that cannot be cured by a creditor

vote and that concern facts not in dispute.  *See In re Am. Capital Equip.*, 688 F.3d at 154-55.  For

these reasons too, the Motion should be denied.

**C.     The Plan's Recitation of Debtors' History Lacks Objectivity and
Neutrality and Improperly Includes Inflammatory Language**

23.      The Court should also deny Debtors' Motion for the independent reason that the

Disclosure Statement's recitation of Debtors' history is presented in an inflammatory manner

rather than objectively and neutrally.  Debtors decry the state and federal enforcement actions

against them as "politically and ideologically driven."  Plan, Art.III(C).  This is simply

inaccurate.  To the contrary, these lawsuits and investigations have been brought by a bi-partisan

group of Attorneys General joined by federal agencies, including the Consumer Financial

Protection Bureau, the U.S. Securities and Exchange Commission, and the U.S. Department of

Education based on Debtors' alleged unlawful actions.  The U.S. Department of Education's

recent decisions to fine Debtors $30 million for their misrepresentations to students (on April 14,

2015) and to offer loan discharges, premised on Debtors' misconduct, to more than 40,000 of

Debtors' former students (on June 8, 2015) underscore the meritorious nature of the States'

claims.  Debtors' unsubstantiated rhetoric is misleading and inflammatory, and it has no place in

a disclosure statement or plan.  *See In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983)

("This history should be provided in a neutral, objective and noninflammatory manner.

Litigation issues are to be described in an objective professional tone, free of any

mischaracterizations of the issues to be resolved in such litigation.").  The Motion should be

denied on this basis.

**<u>RESERVATION OF RIGHTS</u>**

24.      To the extent any objection, in whole or in part, contained herein is deemed to be

10

an objection to confirmation of the Plan, the States reserve the right to assert such objection, as well as any other objections, to confirmation of the Plan.  Furthermore, to the extent that Debtors file any supplements or amendments to the Disclosure Statement or Plan, the States reserve the right to object.

## **CONCLUSION**

25.    For these reasons, the States respectfully request that the Court deny the Motion.

Dated:  July 15, 2015

KAMALA D. HARRIS
Attorney General of California

By:    /s/ Bernard A. Eskandari
NICKLAS A. AKERS
Senior Assistant Attorney General
NICHOLAS G. CAMPINS
BERNARD A. ESKANDARI
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 897-2652
  Fax:  (213) 897-4951
  Email:  bernard.eskandari@doj.ca.gov

*Attorneys for the People of the State of California*

MAURA HEALEY
Attorney General of Massachusetts

By:    /s/ Peter Leight
PETER LEIGHT
GLENN KAPLAN
Assistant Attorneys General
  One Ashburton Place, 18th Floor
  Boston, MA 02108
  Telephone: (617) 727-2200
  Fax: (617) 722-0184
  Email: peter.leight@state.ma.us

*Attorneys for the Commonwealth of Massachusetts*