KAMALA D. HARRIS
Attorney General of California
FRANCES T. GRUNDER
Senior Assistant Attorney General
NICKLAS A. AKERS
Supervising Deputy Attorney General
NICHOLAS G. CAMPINS (SBN 238022)
DAVID A. JONES (SBN 250287)
ANGELA M. MUÑOZ (SBN 263971)
CAROLINE N. DESSERT (SBN 287783)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5500
  Fax:  (415) 703-5480
  E-mail:  Nicholas.Campins@doj.ca.gov
*Attorneys for* THE PEOPLE OF THE STATE OF
CALIFORNIA

ELECTRONICALLY

**F I L E D**

*Superior Court of California,*
*County of San Francisco*

**FEB 19 2014**

Clerk of the Court
BY: VANESSA WU
                    Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiff, <br><br> v. <br><br> HEALD COLLEGE, LLC; CORINTHIAN COLLEGES, INC.; CORINTHIAN SCHOOLS, INC.; SEQUOIA EDUCATION, INC.; CAREER CHOICES, INC.; MJB ACQUISITION CORPORATION; TITAN SCHOOLS, INC.; RHODES COLLEGES, INC.; FLORIDA METROPOLITAN UNIVERSITY, INC.; EVEREST COLLEGE PHOENIX, INC.; and DOES 1 through 100, INCLUSIVE, <br><br> Defendants. | Case No. CGC-13-534793 <br><br> Assigned to Hon. Curtis E.A. Karnow <br> Department 304 <br><br> **FIRST AMENDED COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER EQUITABLE RELIEF** <br><br> Verified Answer Required Pursuant to Code of Civil Procedure Section 446 |

FIRST AMENDED COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION
AND OTHER RELIEF (Case No. CGC-13-534793)

**EXHIBIT A**

1   The People of the State of California ("the People"), by and through Kamala D. Harris,

2   Attorney General, allege as follows:

3       1.    The People bring this action to hold Corinthian Colleges, Inc. and its subsidiaries

4   that operate Heald, Everest and Wyotech schools (collectively "CCI") accountable for violating

5   California law by: misrepresenting job placement rates to students; misrepresenting job placement

6   rates to investors; advertising for programs that it does not offer; unlawfully using military seals

7   in advertising; inserting unlawful clauses into enrollment agreements that purport to bar any and

8   all claims by students; subjecting students to unlawful debt collection practices on loans that CCI

9   does not own, and despite the fact that the proceeds of those loans have already been paid in full

10  by the lender to CCI; failing to disclose CCI's role in the Genesis Private Student Loan Program;

11  and misrepresenting the transferability of credits.

12      2.    CCI is engaging in these unlawful, unfair, and fraudulent practices in connection

13  with the sale of programs that are very expensive.  For example, Heald College in San Francisco

14  charges $39,510 in tuition and fees and $3,500 in books and supplies for an Associate of Applied

15  Science degree in Medical Assisting; Everest College in City of Industry charges $38,341 in

16  tuition and fees and $4,339 in books and supplies for its Criminal Justice Associate's degree;

17  Wyotech in Long Beach charges $35,000 in tuition and fees and $2,000 in books and supplies for

18  an Automotive Technology with Applied Service Management Associate's degree; and Everest

19  University Online's Brandon Campus charges $68,800 in tuition for an online Bachelor's degree

20  in "Paralegal."

21      3.    CCI is selling these expensive programs to students throughout California, many

22  of whom head single parent families and have annual incomes that are near the federal poverty

23  line ($19,530 for a three-person household).  CCI targets this demographic, which it describes in

24  internal company documents as composed of "isolated," "impatient," individuals with "low self-

25  esteem," who have "few people in their lives who care about them" and who are "stuck" and

26  "unable to see and plan well for future," through aggressive and persistent internet and

27  telemarketing campaigns and through television ads on daytime shows like Jerry Springer and

28  Maury Povich.

2

4.      CCI's unlawful, unfair, and fraudulent practices are all the more egregious in light of the fact that its Everest campuses are subject to a permanent injunction secured by the People in 2007 that bars many of the practices at issue.

5.      The People respectfully request that this Court use its equitable and legal authority to permanently end CCI's unlawful, unfair, and fraudulent practices.

**PLAINTIFF**

6.      Plaintiff is the People of the State of California.  The People bring this action by and through Kamala D. Harris, Attorney General.  The Attorney General is authorized by Business and Professions Code sections 17204, 17206, and 17207 to bring actions to enforce the Unfair Competition Law ("UCL"); by Business and Professions Code sections 17535, 17535.5, and 17536 to bring actions to enforce the Fair Advertising Law ("FAL"); and by Government Code sections 12658 and 12660 to bring actions to enforce the Corporate Securities Law of 1968 ("CSL").

**DEFENDANTS**

7.      Defendant Heald College, LLC, is, and at all times mentioned herein was, an LLC organized and existing under the laws of the State of California.  Heald College, LLC's principal place of business is in the City and County of San Francisco.  At all times relevant herein, Defendant Heald College, LLC has transacted and continues to transact business throughout California, including at campuses in Concord, Fresno, Hayward, Modesto, Rancho Cordova, Roseville, Salinas, San Francisco, San Jose, Stockton and online.  Heald College, LLC is a wholly owned subsidiary of Corinthian Colleges, Inc.

8.      Defendant Heald College, LLC, its agents, employees, officers, and others acting on its behalf, as well as subsidiaries, affiliates, and other entities controlled by Defendant Heald College, LLC, are referred to collectively herein as "Heald."

9.      Defendant Corinthian Colleges, Inc., is, and at all times mentioned herein was, a corporation organized and existing under the laws of the State of Delaware.  Corinthian Colleges, Inc.'s principal place of business is in Santa Ana, California in Orange County.  At all times relevant herein, Defendant Corinthian Colleges, Inc. has transacted and continues to transact

3

1  business throughout California, including at its headquarters in Santa Ana.  Corinthian Colleges,

2  Inc.'s direct and indirect subsidiaries operate schools and/or enroll students throughout California

3  and include Corinthian Schools, Inc.; Rhodes Colleges, Inc.; Florida Metropolitan University, Inc.;

4  Titan Schools, Inc.; Career Choices, Inc.; Sequoia Education, Inc.; MJB Acquisition Corporation;

5  Everest College Phoenix, Inc.; and Heald College, LLC.

6      10.    Corinthian Colleges, Inc.'s common stock has been listed on the Nasdaq National

7  Market System since February 1999 under the symbol "COCO."  Corinthian Colleges, Inc.'s

8  common stock qualifies as a security as defined in Corporations Code section 25019.   Corinthian

9  Colleges, Inc. qualifies as an issuer under Corporations Code sections 25010  and as a person

10  under Corporations Code section 25013.

11      11.    Defendant Corinthian Colleges, Inc., its agents, employees, officers, and others

12  acting on its behalf, as well as subsidiaries, affiliates, and other entities controlled by Defendant

13  Corinthian Colleges, Inc., are referred to collectively herein as "Corinthian Colleges, Inc."

14      12.    Defendant Corinthian Schools, Inc., is, and at all times mentioned herein was, a

15  corporation organized and existing under the laws of the State of Delaware.  Corinthian Schools,

16  Inc.'s principal place of business is in Santa Ana, California in Orange County.  At all times

17  relevant herein, Defendant Corinthian Schools, Inc. has transacted and continues to transact

18  business throughout California, including its Everest College campuses in Alhambra, Anaheim,

19  City of Industry, Gardena, Hayward, Los Angeles – Wilshire, Ontario, Ontario Metro, Reseda,

20  San Bernardino, San Francisco, San Jose, Torrance, and West Los Angeles and its Wyotech

21  campus in Long Beach.  Corinthian Schools, Inc. is a wholly owned subsidiary of Corinthian

22  Colleges, Inc.

23      13.    Defendant Corinthian Schools, Inc., its agents, employees, officers, and others

24  acting on its behalf, as well as subsidiaries, affiliates, and other entities controlled by Defendant

25  Corinthian Schools, Inc., are referred to collectively herein as "Corinthian Schools, Inc."

26      14.    Defendant Sequoia Education, Inc., is, and at all times mentioned herein was, a

27  corporation organized and existing under the laws of the State of California.  Sequoia Education,

28  Inc.'s principal place of business is in Santa Ana, California, in Orange County.  At all times

4

1  relevant herein, Defendant Sequoia Education, Inc. has transacted and continues to transact

2  business throughout California, including at its Wyotech campus in Fremont. Sequoia Education

3  Inc. is owned by Career Choices Inc.

4       15.    Defendant Sequoia Education, Inc., its agents, employees, officers, and others

5  acting on its behalf, as well as subsidiaries, affiliates, and other entities controlled by Defendant

6  Sequoia Education, Inc., are referred to collectively herein as "Sequoia Education, Inc."

7       16.    Defendant Career Choices, Inc., is, and at all times mentioned herein was, a

8  Corporation organized and existing under the laws of the State of California. Career Choices,

9  Inc.'s principal place of business is in Santa Ana, California, in Orange County. At all times

10  relevant herein, Defendant Career Choices, Inc. has transacted and continues to transact business

11  throughout California, including through Sequoia Education, Inc., which it owns. Career Choices

12  Inc. is a wholly owned subsidiary of Corinthian Colleges, Inc.

13       17.    Defendant Career Choices, Inc., its agents, employees, officers, and others acting

14  on its behalf, as well as subsidiaries, affiliates, and other entities controlled by Defendant Career

15  Choices, Inc., are referred to collectively herein as "Career Choices, Inc."

16       18.    Defendant MJB Acquisition Corporation, is, and at all times mentioned herein was,

17  a corporation organized and existing under the laws of Wyoming. MJB Acquisition

18  Corporation's principal place of business is in Santa Ana, California, in Orange County. At all

19  times relevant herein, Defendant MJB Acquisition Corporation has transacted and continues to

20  transact business throughout California, including at its Wyotech campus in West Sacramento.

21  MJB Acquisition Corporation is owned by Titan Schools, Inc.

22       19.    Defendant MJB Acquisition Corporation, its agents, employees, officers, and

23  others acting on its behalf, as well as subsidiaries, affiliates, and other entities controlled by

24  Defendant MJB Acquisition Corporation, are referred to collectively herein as "MJB Acquisition

25  Corporation."

26       20.    Defendant Titan Schools, Inc., is, and at all times mentioned herein was, a

27  corporation organized and existing under the laws of Delaware. Titan Schools, Inc.'s principal

28  place of business is in Santa Ana, California, in Orange County. At all times relevant herein,

**EXHIBIT A**

1   Defendant Titan Schools, Inc. has transacted and continues to transact business throughout

2   California, including through MJB Acquisition Corporation, which it owns. Titan Schools, Inc. is

3   a wholly owned subsidiary of Corinthian Colleges, Inc.

4        21.    Defendant Titan Schools, Inc., its agents, employees, officers, and others acting on

5   its behalf, as well as subsidiaries, affiliates, and other entities controlled by Defendant Titan

6   Schools, Inc., are referred to collectively herein as "Titan Schools, Inc."

7        22.    Defendant Rhodes Colleges, Inc., is, and at all times mentioned herein was, a

8   corporation organized and existing under the laws of Delaware. Rhodes Colleges, Inc.'s principal

9   place of business is in Santa Ana, California in Orange County. At all times relevant herein,

10   Defendant Rhodes Colleges, Inc. has transacted and continues to transact business throughout

11   California, including through its subsidiaries Florida Metropolitan University, Inc. and Everest

12   College Phoenix, Inc. Rhodes Colleges, Inc. is a wholly owned subsidiary of Corinthian Colleges,

13   Inc.

14        23.    Defendant Rhodes Colleges, Inc., its agents, employees, officers, and others acting

15   on its behalf, as well as subsidiaries, affiliates, and other entities controlled by Defendant Rhodes

16   Colleges, Inc., are referred to collectively herein as "Rhodes Colleges, Inc."

17        24.    Defendant Florida Metropolitan University, Inc., is, and at all times mentioned

18   herein was, a corporation organized and existing under the laws of the State of Florida. Florida

19   Metropolitan University, Inc.'s principal place of business is in Santa Ana, California, in Orange

20   County. At all times relevant herein, Defendant Florida Metropolitan University, Inc. has

21   transacted and continues to transact business throughout California, including through Everest

22   University Online, which it operates as part of institutions it owns with physical locations in

23   Brandon, Pompano Beach and Orlando, Florida. Florida Metropolitan University, Inc., is a

24   wholly owned subsidiary of Rhodes Colleges, Inc.

25        25.    Defendant Florida Metropolitan University, Inc., its agents, employees, officers,

26   and others acting on its behalf, as well as subsidiaries, affiliates, and other entities controlled by

27   Defendant Florida Metropolitan University, Inc., are referred to collectively herein as "Florida

28   Metropolitan University, Inc."

26. Defendant Everest College Phoenix, Inc., is, and at all times mentioned herein was, a corporation organized and existing under the laws of the State of Arizona. Everest College Phoenix, Inc.'s principal place of business is in Santa Ana, California, in Orange County. At all times relevant herein, Defendant Everest College Phoenix, Inc. has transacted and continues to transact business throughout California, including through its online school, Everest College Phoenix Online, which it operates as part of an institution it owns with physical locations in Phoenix and Mesa, Arizona. Everest College Phoenix, Inc. is owned by Rhodes Colleges, Inc.

27. Defendant Everest College Phoenix, Inc., its agents, employees, officers, and others acting on its behalf, as well as subsidiaries, affiliates, and other entities controlled by Defendant Everest College Phoenix, Inc., are referred to collectively herein as "Everest College Phoenix, Inc."

28. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants sued herein as Does 1 through 100, inclusive, presently are unknown to the People, who therefore sue these defendants by their fictitious names. The People will seek leave to amend this Complaint to allege the true names of Does 1 through 100 once they have been ascertained. Does 1 through 100 participated in some or all of the acts alleged herein.

29. Does 1 through 50, their agents, employees, officers, and others acting on their behalf, as well as subsidiaries, affiliates, and other entities controlled by Does 1 through 50, are referred to collectively herein as "DOE Defendants 1 to 50."

30. Does 51 through 100, their agents, employees, officers, and others acting on their behalf, as well as subsidiaries, affiliates, and other entities controlled by Does 51 through 100, are referred to collectively herein as "DOE Defendants 51 to 100."

31. Heald, Corinthian Colleges, Inc., Corinthian Schools, Inc.; Sequoia Education, Inc.; Career Choices, Inc.; MJB Acquisition Corporation; Titan Schools, Inc.; Rhodes Colleges, Inc.; Florida Metropolitan University, Inc.; Everest College Phoenix, Inc.; DOE Defendants 1 to 50; and DOE Defendants 51 to 100 are referred to collectively in this Complaint as "CCI," and/or "Defendants."

32.   Whenever reference is made in this Complaint to any act of "CCI," and/or "Defendants," that allegation shall mean that each Defendant acted individually and jointly with the other Defendants named in that cause of action.

33.   At all times mentioned herein, each of the Defendants acted as the principal, agent, or representative of each of the other Defendants, and in doing the acts herein alleged, each Defendant was acting within the course and scope of the agency relationship with each of the other Defendants, and with the permission and ratification of each of the other Defendants.

34.   At all relevant times, Defendants have controlled, directed, formulated, known and/or approved of, and/or agreed to the various acts and practices of each of the Defendants.

35.   Whenever reference is made in this Complaint to any act of any Defendant or Defendants, the allegation shall mean that the Defendant or Defendants did the acts alleged in this Complaint either personally or through the Defendant's or Defendants' officers, directors, employees, agents and/or representatives acting within the actual or ostensible scope of their authority.

36.   At all times mentioned herein, each Defendant knew that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing that other Defendants were engaging in such unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts alleged in this Complaint, and thereby aided and abetted the other Defendants in the unlawful conduct.

37.   Each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the defendants acted as the agents of the other defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of another.

38.   Each Defendant is a "person" as defined in Business and Professions Code section 17201.

39.   All of the conduct that forms the basis for this Complaint has been undertaken by Defendants by and through their agents, employees, officers, or others acting on their behalf.

8

## JURISDICTION AND VENUE

40.     This Court has original jurisdiction over this action pursuant to California Constitution article 6, section 10.

41.     This Court has jurisdiction over Defendants because each Defendant's principal place of business is in California or each Defendant otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

42.     The violations of law alleged in this Complaint occurred in the City and County of San Francisco and elsewhere throughout California.

43.     Venue is proper in this Court pursuant to Code of Civil Procedure section 395.5 because Heald College, LLC's principal place of business is in the City and County of San Francisco.

44.     Venue is also proper in this Court pursuant to Code of Civil Procedure section 393, subdivision (a) because violations of law that occurred in the City and County of San Francisco are a "part of the cause" upon which the People seek the recovery of penalties imposed by statute.

45.     Venue for the People's cause of action against Corinthian Schools, Inc. is proper in San Francisco pursuant to Business and Professions Code sections 17207, subdivision (b) and 17535.5, subdivision (b) because, as more particularly alleged herein, violations of the final judgment of the Los Angeles Superior Court in *People v. Corinthian Schools, Inc., et al.* (Super. Ct. L.A. County, 2007, No. BC374999) occurred in the City and County of San Francisco.

## DEFENDANTS' REPRESENTATIONS AND BUSINESS PRACTICES

46.     CCI operates nationally and regionally accredited schools throughout California and online.  The schools include Everest Colleges, Everest University, Everest College Phoenix, Heald Colleges, and Wyotech.

### Misrepresenting Job Placement Rates to Students

47.     From a date unknown to the People and continuing to the present, CCI's representations and advertisements related to job placement were untrue, misleading, or both.  For example, the data in the disclosures published on or about July 1, 2012 for all campuses in

9

California and online campuses does not match or agree with the data in CCI's own database systems and/or in student files. In numerous cases, the placement rate data in CCI's files shows that the placement rate is lower than the advertised rate.

48.    CCI's marketing studies show that student "[e]nrollment largely hinges on selling affordability & [job] placement." As Bob Bosic, Corinthian Colleges, Inc.'s Executive Vice President of Operations, stated: "Our students come to us primarily to gain skills and find a position that will help them launch a successful career."

49.    To help sell its programs to prospective students, CCI issues standardized disclosures for each campus related to job placement. The disclosures contain placement rates for each program. The consumer disclosures are published online and provided to students in hard copy as part of the enrollment process.

50.    The placement rates published by CCI are at times as high as 100 percent, leading prospective students to believe that if they graduate they will get a job. These placement rates are false and not supported by the data. In some cases there is no evidence that a single student in a program obtained a job during the time frame specified in the disclosures.

51.    These violations are all the more egregious given senior CCI executives' firsthand knowledge of the misconduct. More specifically, CCI management knew that CCI had a placement compliance problem:

> (a)    On or about September 23, 2011, CCI's CEO, Jack Massimino, e-mailed a presentation that was to be read by the ELT [Executive Leadership Team] in advance of an offsite meeting. One of the slides stated: "We have a placement compliance problem now."
>
> (b)    On or about December 7, 2011, the Accrediting Commission of Career Schools and Colleges (ACCSC) sent a letter to the Campus President of Everest College Hayward noting that "39 of the 167 [medical assistant] students reported as employed in field were employed by the same agency, Select Staffing" and that the documentation provided by Everest "did not clearly demonstrate that the employment at Select Staffing constitutes sustainable employment in a related

10

field." In response, Everest College Hayward admitted that the positions were

health screening fair positions but stated that the positions were valid placements.

On or about June 6, 2012, ACCSC sent a follow-up letter to the Campus President,

noting that "the majority of placements with Select Staffing resulted in two days of

employment and did not clearly demonstrate that the employment at Select

Staffing constitutes 'sustainable' employment for a reasonable period of time in a

field related to the graduate's educational program."

(c)     On or about February 10, 2012, CCI's Western Division President,

Nicole Carnagey, e-mailed the Executive Vice President of Operations, Bob Bosic,

to tell him that in 2011 Everest College Hayward and Everest College San

Francisco paid a temporary agency, Remedy Temp, "to place students to meet the

accreditation deadline and minimum placement %." Bosic responded, asking her

to find the answers to numerous questions regarding the placements and noted

"This is the [expletive omitted] that got [Everest College] Decatur in trouble and

the types of questions that need answering."

(d)     On or about March 20, 2012, An Everest College San Francisco internal

audit showing that 53 percent of student placement files reviewed were missing

employment verification forms was emailed to the CEO, Jack Massimino, and

other senior executives.

(e)     On or about April 13, 2012, an Everest Online internal audit presentation

emailed to David Poldoian, Executive Vice President of Corinthian Colleges,

Inc.'s Online Learning Division, showed a placement file error rate of 53.6 percent

to 70.6 percent.

(f)     On or about April 27, 2012, CCI's Executive Vice President of

Operations, Bob Bosic e-mailed all division presidents and stated "the placement

verification issues we discussed Monday were shared over the last two days and

were not well received. We will discuss Monday, but together we'll need to

demonstrate improvement. I will be interested in your thoughts on how we can

11

1   tighten this up so future audits reflect greater accuracy and completion of

2   documents."

3   (g)   On or about May 12, 2012,  CCI's Executive Vice President of Operations,

4   Bob Bosic, e-mailed the Chief Administrative Officer Ken Ord and Carmella

5   Cassetta, Senior Vice President and President, Online Learning a copy of a

6   presentation regarding placements which stated "No current guidelines and

7   training to define a placement – mistakes are repeated constantly because no clear

8   definition of a placement exists;" and "inconsistent processes on what passes as in-

9   field or related [placement]."

10   (h)   On or about May 18, 2012, CCI's Western Division President, Nicole

11   Carnagey and Executive Vice President of Operations, Bob Bosic exchanged e-

12   mails regarding the Renton, Washington Everest campus's failure of an internal

13   audit due to backdating of signatures on placement files.  The e-mails discussed

14   how Everest College Gardena (in California) "almost got hit" as well and saying

15   that "If the current RVPO [Regional Vice President of Operations] was there she

16   would have been in a world of [expletive omitted]."  The Executive Vice President,

17   Bob Bosic also told the Western Division President, Nicole Carnagey that "you are

18   correct that all the other campuses in yours and other divisions that made it

19   through [verification audits] this time are lucky."

20   (i)   On or about June 14, 2012, CCI's Executive Vice President of Operations,

21   Bob Bosic, e-mailed the CEO, Jack Massimino, regarding the findings of an

22   internal review of placement procedures and stated that the review found that there

23   was a  "Lack of workable definitions for a Placement" and that the lack of specific

24   definitions resulted "in subjective decisions at all levels;" that there "is no

25   consistent process for Placement (or other areas of Career Services) and lack of

26   SOP's [Standard Operating Procedures];" that there "is generally no training at the

27   process level for Placement (since there is no standard process);" and that

28   "Campus Vue [CCI's data management system] is not fully utilized [which]

12

[l]eads to poor data or lack of data availability as well as duplication of data across forms and the Placement Verification system."

(j)    On or about July 13, 2012, CCI's Vice President of Compliance, Michelle Reed e-mailed Beth Wilson, Executive Vice President, regarding results of a review of Wyotech Long Beach self-employment placements.  The review showed that the files for 28 of 74 such placements had missing documents, or included Craigslist ads that purported to be from the students in question, but that had in fact been created by CCI.  An additional 15 files were suspicious.  Despite these known irregularities, as of 8/12/2013, the Long Beach disclosures (published on 7/1/2012) had not been amended to take into account the audit's findings.

(k)    On or about July 16, 2012, CCI's Assistant Vice President of Student Outcomes e-mailed Division Presidents regarding Career Services Operating Procedures, with a copy to the Executive Vice President of Operations.  The emails stated that, **"[o]ver the past year, several campuses have had challenges providing adequate documentation for placements and waivers** [emphasis in original].  Issues that have surfaced during audits and Employment Verification reviews are missing key fields such as signatures, inconsistencies with CampusVue / other backup and in some cases, documentation that was never procured or cannot be found."

(l)    On or about August 28, 2012, the results of a third-party audit conducted by Hyper Core solutions on behalf of an accreditor, ACCSC, were e-mailed to CCI's Executive Vice President and Chief Academic Officer.  The review, which examined a random sample of 330 student records showed substantial issues at each CCI campus examined (Everest campuses including West Los Angeles, City of Industry and Reseda).  In particular, the review found that 30 percent of the placements could not be verified and that there were no records to substantiate a further 9 percent of the placements.  At Everest College West Los Angeles, only 30 percent of criminal justice program placements could be verified and 20 percent

13

1      were identified as no record found.  At the same campus, only 36 percent of dental

2      assistant program placements could be verified and 55 percent were identified as

3      no record found.

4      52.    The consumer disclosures provided to students by CCI and published online are

5 misleading and/or false for the reasons articulated above, including but not limited to the fact that

6 (a) the data in the system used to generate them do not support them; (b) the paper files do not

7 meet accreditor standards; and (c) CCI managers knew that the placement numbers were

8 unreliable and unsubstantiated and failed to publicly amend or qualify them.

9 **Misrepresenting Job Placement Rates to Investors**

10      53.    From a date unknown to the People and continuing to the present, Corinthian

11 Colleges, Inc. made representations to investors related to job placement that were false and/or

12 materially misleading when made.  Such representations include but are not limited to the

13 following:

14      (a)    On or about August 24, 2012, Corinthian Colleges, Inc. stated in its

15      Annual Report (Form 10-K) that:  "Our colleges endeavor to obtain information

16      regarding their students' employment following graduation. The reliability of that

17      information depends, to a large extent, on the completeness and accuracy of the

18      data provided to our colleges by graduates and their employers. Additionally, a

19      dedicated team at the campus support center conducts a verification process to

20      check the accuracy of the placement information gathered by our campuses.

21      Based on information received from these groups of people, we believe that

22      approximately 68.1% of our graduates in calendar year 2011 who were available

23      for placement have been placed in a job for which they were trained by June 30,

24      2012, using accrediting agency standards."

25      (b)    On or about August 20, 2012 and October 31, 2012,  Corinthian Colleges,

26      Inc.'s CEO used a version of a presentation with investors that stated "CY

27      [Calendar Year] 11 placement 68.1% vs. 67.6% in CY 10."

28

14

(c)      On or about January 24, 2013, Corinthian Colleges, Inc. incorporated its Annual Report (and the 68.1 percent job placement number) into a Registration Statement (Form S-8) for its Employee Stock Purchase Plan.

(d)      On or about January 31, 2013, March 11, 2013 and April 30, 2013, Corinthian Colleges, Inc.'s CEO made a presentation to investors that 33,316 of 48,930 eligible graduates in the 2011 graduation cohort were "placed in field."

(e)      On or about January 31, 2013, Corinthian Colleges, Inc.'s CEO stated in a call with investors that: "In the area of placement, we continue to achieve solid results for the 2012 cohort graduates. We currently expect our calendar 2012 placement rate to meet or slightly exceed our placement rate in calendar 2011, which was 68.1%."

(f)      On or about March 11, 2013,  Corinthian Colleges, Inc.'s CEO stated: "This is just a quick slide on information we've given you over the years around graduation and placement. And one of the things we're pretty proud of is in a pretty difficult time, we have done a pretty remarkable job in terms of placement. We have over 800 placement people in our organization today helping our students get jobs in the areas we trained them for. We're very tight on our definitions. And so if you're a medical assistant, for example, with us and you get a job at a doctor's or the hospital, those count.  If you get a job as an aide in a nursing home, that does not count even though you're making $10 to $12 an hour. So we're very tight on our definitions around what is and what isn't included in our placements. We've been averaging over the course of this very difficult time up to around 68%, 69%, and we're about there again this year."

54.    The statements concerning the 2011 graduation cohort were false when made and CCI senior executives knew they were false.  In fact, CCI's own data and files suggest that the actual rate is much lower and has been subject to manipulations and assumptions not disclosed to investors, included but not limited to:

(a)   On or about July 31, 2012, Beth Wilson Executive Vice President of CCI instructed her team to exclude 2011 graduates from what she deemed "Closed Schools" including Fife, Washington, Chicago, Illinois, Ft. Lauderdale, Florida, Decatur, Georgia and Arlington, Texas from the calculation to bring the placement rate higher.  This adjustment was not disclosed to investors.

(b)   The data used by CCI to generate the placement rate included a substantial number of placements that occurred outside the time frame specified by the disclosures.

(c)   The data used by CCI to generate the placement rate included a substantial number of double-counted placements.

(d)   On or about November 16, 2012 (nearly three months after the disclosure of the 68.1 percent placement rate in the annual report), Michelle Reed, Vice President of Compliance, emailed a spreadsheet showing that a substantial number of placements and waivers for the 2011 graduation cohort had still not been verified.

55.   Corinthian Colleges, Inc.'s CEO and/or senior management were, at all relevant times, aware of the falsity, inaccuracy, and unreliability of job placement data and the statements they made concerning the data, yet they did not disclose that fact to consumers or investors, or take any action to make consumer disclosures and statements to investors accurate.

56.   Written illustrations of this knowledge include, but are not limited to, the allegations set forth in Paragraph 51 above. They demonstrate that Corinthian Colleges, Inc.'s CEO and/or senior management knew all of the following at the time the placement representations concerning the 2011 graduates were made to investors: (1) CCI had a placement compliance problem; (2) two CCI schools paid temporary agencies to employ graduates; (3) audits at CCI programs showed that over half of the placement files were missing; (4) there were company-wide placement verification issues, including a lack of any definitions or standard procedures; (5) placement files at one CCI campus were backdated; (6) self-employment files were being fabricated at one CCI campus; (7) campuses were not providing adequate or accurate

16

1   documentation; and (8) a third-party review ordered by ACCSC of 330 randomly selected files

2   found that 39 percent of placements could not be verified.

3       57.   Despite senior management's knowledge that the statements they made in

4   securities filings and to investors were false and/or materially misleading, none of the false

5   representations were amended and/or restated by Corinthian Colleges, Inc.  Instead, as alleged

6   herein, senior management continued to repeat and reinforce the false representations and make

7   new ones.  For example, CCI's CEO's knowingly false statement that CCI was "tight" on its

8   definitions of what constitutes a placement.

9       58.   The misstatements concerning the placement rate are material to investors because

10  a reasonable investor would consider the rate important in reaching an investment decision.   For

11  example, CCI's CEO considers the job placement rate to be "the most important metric in the

12  company."  It is material to investors for several reasons related directly to Corinthian Colleges,

13  Inc.'s ability to access government funds and enroll students;

14          (a)    *First,* as discussed above, placement drives enrollment.  The company-

15              wide graduate placement rate is an important measure of its ability to attract and

16              enroll new students.  A poor or unmarketable placement rate therefore leads to

17              fewer enrollments and less revenue.

18          (b)    *Second,* the majority of CCI's campuses are accredited by the Accrediting

19              Commission of Career Schools and Colleges (ACCSC) and/or the Accrediting

20              Council for Independent Colleges and Schools (ACICS).  Both accreditors require

21              schools to meet minimum placement rates by school and by program. The ACCSC

22              "Established Benchmark Employment Rate" is 70 percent and the ACICS standard

23              is 65 percent.  Where CCI's job placement rate as a company falls relative to the

24              65 and 70 percent requirements set by ACCSC and ACICS is therefore indicative

25              of CCI's ability to keep its campuses accredited and, relatedly, its ability to access

26              federal funds.

27          (c)    *Third,* if graduates cannot find work, they are likely to default on their

28              loans, including subprime loans for which CCI bears the risk of default.  The job

17

placement rate is also important to the cohort default rate (CDR), a measure used

by the Federal Department of Education and the California Student Aid

Commission.  For example, in California schools must keep their CDR rate below

15.5 percent to draw Cal Grant funds.

(d)        *Fourth*, CCI faces a substantial risk that its access to federal funds, which

account for almost all of its revenue, will be tied to how well its graduates perform

in the job market.  Specifically, the Federal Department of Education recently

announced the establishment of a negotiated rulemaking committee to establish

gainful employment regulations which will govern CCI's access to federal funds.

59.        Moreover, CCI's strategy is to close or sell campuses that are not meeting

placement outcomes.   This strategy is reflected in a May 5, 2012 e-mail exchange between the

Executive Vice President of Operations, Bob Bosic, and the Division President of Wyotech

Michael Stiglich, referring to job placement metrics.   Securities analyst reports concerning CCI

demonstrate that the market is aware of and concerned about CCI's strategy of closing

underperforming schools.

**Advertising for Programs that CCI Does Not Offer**

60.        Heald, Corinthian Schools, Inc., and Corinthian Colleges, Inc. do not offer

ultrasound technician programs, x-ray technician programs, radiology technician programs or

dialysis technician programs in California.

61.        Despite this fact, from a date unknown to the People and continuing to the present,

Heald, Corinthian Schools, Inc., and Corinthian Colleges, Inc. have nevertheless run millions of

online and mobile ads stating that they do offer ultrasound technician, x-ray technician, radiology

technician or dialysis technician programs, certificates, diplomas, or degrees at their California

campuses.  Illustrative examples are attached as Exhibit A hereto.

62.        Consumers are routinely tricked by these ads into entering their information to be

contacted by Heald, Corinthian Schools, Inc., and Corinthian Colleges, Inc.  on the internet or

into contacting Heald, Corinthian Schools, Inc., and Corinthian Colleges, Inc. directly.

63.    In some cases, a Heald, Corinthian Schools, Inc., or Corinthian Colleges, Inc. representative convinces the consumer to visit the campus without ever disclosing that the program is not offered, while in other cases the Heald, Corinthian Schools, Inc., and Corinthian Colleges, Inc. representative pressures the prospective student into considering a different program that is offered by Corinthian Colleges, Inc.

64.    The fact that these false ads mislead students is known by Heald, Corinthian Schools, Inc., and Corinthian Colleges, Inc.  Call center employees who try to tell prospective students the truth are disciplined by CCI managers.

**Unlawfully Using Military Seals In Advertising**

65.    From a date unknown to the People and continuing to the present, Heald and Corinthian Colleges, Inc. included the official seals of the United States Department of the Army, the United States Department of the Navy, the United States Department of the Air Force, the United States Marine Corps, and the United States Coast Guard in mailings, electronic messages, and Internet Web sites to solicit information, or to solicit the purchase of or payment for a product or service.

66.    The seals and related content were used in a manner that reasonably could be interpreted or construed as implying federal government connection, approval, or endorsement.

67.    For example, the seals were prominently displayed on Healdmilitary.com until recently and they continue to be prominently displayed in online ads run by Heald, an example of which is attached hereto as Exhibit B.

68.    Heald and Corinthian Colleges, Inc. have no expressed connection with or approval by the United States Department of the Army, the United States Department of the Navy, the United States Department of the Air Force, the United States Marine Corps and the United States Coast Guard.

69.    Heald and Corinthian Colleges, Inc. have never included the statutory disclaimers indicated by Business & Professions Code section 17533.6 on any mailings, electronic messages, and internet websites containing the seals of the United States Department of the Army, the

19

1  United States Department of the Navy, the United States Department of the Air Force, the United

2  States Marine Corps, or the United States Coast Guard.

3  **Inserting Unlawful Clauses into Enrollment Agreements**

4        70.    CCI enrollment agreements contain language that violates Civil Code section 1770,

5  subdivision a, paragraph 14, because they purports to confer rights and remedies on CCI that are

6  expressly prohibited by law.  The agreements contain clauses that are substantially identical to the

7  following language:

8                    GENERAL RELEASE OF CLAIMS.   I hereby release and hold

9                    this School harmless from and against any and all claims of any

10                    kind whatsoever, including allegations related to needle sticks,

11                    allied health and automotive practice and techniques, slips and falls

12                    and quality of equipment and instruction, (collectively, "Claims"),

13                    against the School (including its present and former parent

14                    companies, insurers, representatives and all persons acting by or

15                    through them), which I may have for any reason arising out of or

16                    relating to my education. I am aware of the risks involved with my

17                    education and knowingly assume those risks following my

18                    investigation into possible injuries and the nature and quality of my

19                    education.  I further agree that if I bring any Claim against the

20                    School, I shall reimburse the School for its attorney's fees and costs

21                    incurred as a result thereof.  I may opt out of this general release of

22                    Claims provision by delivering a written statement to that effect

23                    received by the School within 30 days of my first execution of an

24                    Enrollment Agreement with the School.

25        71.    Because the clause claims that CCI is exempt from responsibility from "any and

26  all claims of any kind whatsoever" and therefore from its "own fraud, or willful injury to the

27  person or property of another, or violation of law, whether willful or negligent," it is per se

28  invalid under Civil Code section 1668.

**EXHIBIT A**

72.    Nevertheless, in violation of Civil Code section 1770, subdivision (a), CCI continues to use the invalid clause to unlawfully represent that it has rights that it does not have (e.g., the right to fees if sued), and/or that students have obligations they do not have (e.g., the obligation to refrain from suing CCI under all circumstances).

**Unlawful Debt Collection**

73.    Federal regulations limit the amount of federal financial aid that an institution can receive.  In general, these rules require that for-profit colleges get no more than 90 percent of their revenue from federal student aid.  The remaining 10 percent must come from other sources, such as private loans, student tuition payments, or veterans' benefits.  In order to meet this requirement, CCI entered into a complex financial arrangement wherein third parties would make loans to CCI students in exchange for CCI paying up-front discount fees to the third parties and guaranteeing that it would to buy back non-performing loans.  Although CCI did not make the loans, and had been paid in full by the lenders to fund the students' education, CCI nonetheless had a strong incentive to engage in strong-arm debt-collection practices against its students—it did not want to have buy back non-performing loans.

74.    In or about June 2011 and continuing to the present, CCI entered into a financial arrangement with a third party, ASFG, LLC (which has subsequently changed its name to Campus Student Funding, LLC) (hereafter, "ASFG") under which another non-party, Liberty Bank, N.A., ("Liberty"), provides private loans to CCI students.  Under this program, when a loan is made to a CCI student, Liberty pays the amount borrowed to CCI to be applied toward the student's balance at CCI.  Concurrently, ASFG purchases the loan from Liberty, and CCI pays ASFG a large upfront discount fee.  ASFG also has the right to force CCI to purchase the loan at face value, less the discount fee, if it becomes more than 90 days past due.

75.    Because it took the place of a similar program operated by CCI with another third party, Genesis Lending Services, Inc., and because it uses a similar lending and servicing platform, the loans made under the student loan program operated by CCI and ASFG are commonly referred to as "Genesis Loans" by CCI employees and students.  As used herein, the

21

1 | "Genesis Private Student Loan Program" refers to the program operated by CCI and ASFG
2 | beginning in or about June 2011.

3 |       76.    As explained above, once a CCI student takes out a Genesis Loan the lender,
4 | Liberty, pays the full amount borrowed directly to CCI to pay the student's tuition and/or other
5 | fees. In spite of this, CCI routinely engages in unlawful debt collection practices that are
6 | intended to strong-arm students into making payments on these loans while the loans are still
7 | owned by ASFG.

8 |       77.    The unlawful and unfair debt collection practices engaged in by CCI in connection
9 | with the Genesis Private Student Loan Program include but are not limited to the following:

10 |       (a)    Pulling students who are behind on their loan payments (often by only a
11 | few days) from class during instruction time and subjecting them to collection
12 | activities. CCI employees refer to this practice in emails as a "best practice."

13 |       (b)    Barring students who are behind on their loan payments from attending
14 | class until they make up any late payments.

15 |       (c)    Barring students who are behind on their loan payments from attending
16 | externships, potentially depriving them of an opportunity to gain experience in
17 | their field of study.

18 |       (d)    Dropping students who are behind on their loan payments from their
19 | educational programs.

20 |       78.    CCI undertakes these unlawful and unfair debt collection practices with little
21 | regard for the unique circumstances of each student. For example, in the following email
22 | exchange, two Everest College Gardena employees (Joanna Montenegro and Lisa Miller) discuss
23 | the collection of Genesis loan payments from a student (name redacted by CCI) who had just
24 | given birth and was on a parental leave of absence:

25 |     [Montenegro]: [referring to a list of students]: Let's do our best to get these students to
26 | pay, remember we have helping save their credit. For every late payment the student is
27 | charged a $25 late fee and the delinquency is reported to the credit bureau. This will also
28 | allow us to reach our goal of 97% Genesis collection.

[Miller]:  REDACTED is now LOA – for baby.

[Montenegro]:  When a student is on LOA they are still required to make payments.  If she does not make payments while on LOA she will accrue a large debt that she will need to pay in full prior to being allowed to return from LOA.  We will attempt to call her in hopes we can reach her.

[Miller]:  She just gave birth to a little girl this am. I will text her ☺

79.    CCI executives encourage these unlawful and unfair debt collection practices, as their bonuses are in part based on collection of Genesis Private Student Loan Program payments from students and the number of loans made under the Genesis Private Student Loan Program that are co-signed by a non-student.  For example, in a June 21, 2012 email to the Central and Western Division Presidents (Mark Ferguson and Nicole Carnagey), the subject of which was "Genesis Collection and Cosigner Results" the Executive Vice President of Operations, Bob Bosic stated: "Ferguson [the Central Division President], is she [the Western Division President] kicking your [expletive omitted] on this also? When are you going to man up and when will her beatings stop?"

80.    The unlawful and unfair debt collection practices are all the more egregious given the vulnerable population of students to which many of the Genesis Private Student Loan Program loans are made.  Evidence of this vulnerability is manifest in emails among CCI financial aid and collections personnel. These emails refer to homeless and quasi-homeless students in reference to loan originations associated with the Genesis Private Student Loan Program:

(a)    On or about April 26, 2012, Everest College Torrance employees (Sally Mounlasy, Jennifer Luciano, and Grace Cisneros) engaged in the following exchange:

[Mounlasy]:  Student is homeless and they still want to do paperwork

[Cisneros]:  At least you don't need documentation

[Mounslay]: How is she gonna pay genesis and stay in school?

1                 [Luciano]: That's what im saying?!?  If she doesn't even have a bathroom

2                 to take a shower.  You are getting ME in deep [expletive omitted]!

3                 [Mounlasy]:  have fun!

4        (b)      On or about January 9, 2013, Wyotech Sacramento's Director of Student

5       Finance, Karen Vindelov,  wrote her counterpart in Daytona, Kareena Salter,

6       asking how she was able to find co-signers for the Genesis loans.  In her email, she

7       noted that:  "When I was at Everest Online we did great with getting co-signers but

8       somehow here in Sac it is really hard.  We have some diverse demographics here

9       and where we fall short is on the older burned their bridges folks, the quasi-

10      homeless etc."

11 **Failure to Disclose CCI's Role in the Genesis Private Student Loan Program**

12       81.     From on or about June 2011 and continuing to the present, CCI provided preferred

13 lender lists to students and consumers (including but not limited to lists available online) in which

14 CCI failed to disclose information regarding the Genesis Private Student Loan Program and its

15 role in that program, including but not limited to the following facts:

16       (a)      CCI has a business and financial relationship with the entities involved in

17       the Genesis Private Student Loan Program, and Genesis loans are offered to CCI

18       students and included on lender lists as a result of that business and financial

19       relationship;

20       (b)      CCI funds and promotes the Genesis Private Student Loan Program by,

21       among other things, paying its business partners upfront discount fees to make

22       Genesis loans;

23       (c)      CCI supports and promotes the Genesis Private Student Loan Program by

24       obligating itself to purchase loans made through the Genesis Student Loan

25       Program once the student borrower goes into default for more than 90 days; and

26       (d)      CCI will bar the student borrower from class, and engage in other

27       aggressive in-school debt collection practices, if he or she fails to make payments.

28

82. Instead of disclosing this information, CCI falsely states in its preferred lender lists that "we do not promote or endorse this lender."

83. This conduct continued until on or after January 1, 2013 in violation of Education Code section 69800, subdivision (c), which requires that schools include in their private loan lender lists "general information about the loans available through the lender" and that they "disclose the basis for each lender's inclusion on the list."

**Misrepresenting Transferability of Credits**

84. From a date unknown to the People and continuing to the present, Heald and Corinthian Colleges, Inc. are engaging in false and misleading advertising regarding the transferability of credits earned at Heald, including without limitation the transferability of those credits to the California State University ("CSU") system and its campuses.

85. For example, they publish advertisements, including those attached hereto as Exhibit C.

86. The advertisements suggest that a number of purported "partner colleges," including CSU, "accept Heald credits toward bachelor's degree programs." However, the advertisements fail to disclose important limitations on the transferability of Heald credits, including but not limited to the following facts:

(a) Only a fraction of Heald's diploma, certificate, and AAS credits transfer to CSU, and students in those programs will therefore be able to transfer only a handful of their Heald units to CSU;

(b) Students who only complete a Heald diploma, certificate, or AAS program will be ineligible to transfer to six of the eight CSU campuses listed by Heald as "partner colleges." This is because those six campuses will only accept transfer applicants who have completed at least sixty transferable semester units.

87. These misrepresentations are reinforced by Heald enrollment advisers who tell students that all or most of their credits will be transferable to CSU and other colleges.

FIRST AMENDED COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION
AND OTHER RELIEF (Case No. CGC-13-534793)
**EXHIBIT A**

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

## VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17500

### (UNTRUE OR MISLEADING REPRESENTATIONS)

88.    The People reallege all paragraphs set forth above and incorporate them by reference as though they were fully set forth in this cause of action.

89.    From a date unknown to the People and continuing to the present, Defendants, and each of them, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that constitute violations of Business and Professions Code section 17500 et seq., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Defendants' services, as described in Paragraphs 47 to 52, 60 to 69, and 81 to 87.  Defendants' untrue or misleading representations include, but are not limited to, the following:

(a)    Defendants' statements regarding job placement rates, including but not limited to their published job placement disclosures that were posted online and provided to students during the enrollment process;

(b)    Heald's, Corinthian Schools, Inc.'s, and Corinthian Colleges, Inc.'s advertisements for programs, certificates, diplomas, or degrees they do not offer in California;

(c)    Heald's and Corinthian Colleges, Inc.'s  unlawful use of United States government seals in advertisements.

(d)    Defendants' failure to disclose CCI's role in the Genesis Private Student Loan Program.

(e)    Heald's and Corinthian Colleges, Inc.'s statements regarding the transferability of credits, including but not limited to their published advertisements that were posted online.

90.    At the time the representations set forth in Paragraph 89 were made, Defendants knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

**EXHIBIT A**

**SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200**

**(UNFAIR COMPETITION)**

91.    The People reallege all paragraphs set forth above and incorporate them by reference as though they were fully set forth in this cause of action.

92.    Defendants, and each of them, have engaged in and continue to engage in, have aided and abetted and continue to aid and abet, and have conspired to and continue to conspire to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code section 17200 *et seq.*, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

93.    The business acts and practices engaged in by Defendants that violate the Unfair Competition Law include:

        (a)    As to all Defendants, publishing and/or providing students with untrue, misleading, unreliable, and/or inaccurate job placement rate information.

        (b)    As to Heald, Corinthian Schools, Inc. and Corinthian Colleges, Inc., running ads for programs, certificates, diplomas, or degrees they do not offer in California.

        (c)    As to Heald, Corinthian Schools, Inc. and Corinthian Colleges, Inc., failing to disclose to students on the phone that Defendants do not offer certain programs, certificates, diplomas, or degrees in California.

        (d)    As to Heald and Corinthian Colleges, Inc., unlawfully using official United States government seals to imply a connection to, approval by, or endorsement by the United States Department of the Army, the United States Department of the Navy, the United States Department of the Air Force, the United States Marine Corps, and the United States Coast Guard, when Heald and Corinthian Colleges, Inc. have no such endorsement.

        (e)    As to Corinthian Colleges, Inc., making untrue statements of material fact related to job placement rates and related information to investors.

27

(f)    As to Corinthian Colleges, Inc., omitting material facts from statements to investors related to job placement rates.

(g)    As to all Defendants, including clauses in enrollment agreements that falsely state that Defendants are immune from liability from any and all claims of any kind whatsoever.

(h)    As to all Defendants, engaging in unfair and unlawful debt collection practices in connection with the Genesis Private Student Loan Program.

(i)    As to all Defendants, failing to make disclosures regarding the Genesis Private Student Loan Program and CCI's Role in that program, and falsely stating that "we do not promote or endorse this lender."

(j)    As to Heald and Corinthian Colleges, Inc., publishing and/or providing students with untrue, misleading, unreliable, and/or inaccurate information concerning the transferability of credits earned at Heald.

94.    These business acts and practices are unlawful because they violate laws including.

(a)    Business and Professions Code section 17500, as more particularly alleged in Paragraphs 47 to 52, 60 to 69, 81 to 87 and  88 to 90.

(b)    Corporations Code section 25400, subdivision (d), as more particularly alleged in Paragraphs 53 to 59 and 106 to 115.

(c)    Corporations Code section 25401, as more particularly alleged in Paragraphs 53 to 59 and 97 to 105.

(d)    Business and Professions Code section 17533.6, as more particularly alleged in Paragraphs 65 to 69.

(e)    Civil Code section 1770, subdivision (a), paragraph 2, as more particularly alleged in Paragraphs 60 to 69.

(f)    Civil Code section 1770, subdivision (a), paragraph 3, as more particularly alleged in Paragraphs 65 to 69.

(g)    Civil Code section 1770, subdivision (a), paragraph 9, as more particularly alleged in Paragraphs 60 to 64.

28

(h)   Civil Code section 1770, subdivision (a), paragraph 14, as more particularly alleged in Paragraphs 70 to 72.

(i)   Civil Code section 1788.17, as more particularly alleged in Paragraphs 73 to 80.

(j)   Education Code section 69800, subdivision (c) as more particularly alleged in Paragraphs 81 to 83.

95.   These business acts and practices are unfair in that Defendants have:

(a)   caused students to pay tens of thousands of dollars, undertake huge credit obligations, and/or spend years of their lives in educational programs because they hoped to get a job and believed they would get a job based on Defendants' untrue and misleading representations;

(b)   in the case of Heald, Corinthian Schools, Inc. and Corinthian Colleges, Inc., caused consumers to call them, visit their campuses, and/or enroll at one of their schools by misleading them into believing they offer programs, certificates, diplomas, or degrees they do not offer;

(c)   in the case of Heald and Corinthian Colleges, Inc., caused consumers, including service members and veterans, to call them, visit their campuses, enroll at one of their schools, and/or use federal benefits they accrued through service to their country under the false pretense that they have a connection with, approval of, or endorsement of the United States Department of the Army, the United States Department of the Navy, the United States Department of the Air Force, the United States Marine Corps, and/or the United States Coast Guard;

(d)   included clauses in enrollment agreements that falsely stated that they are immune from liability from any and all claims of any kind whatsoever, and thereby dissuading students with valid legal claims from taking legal action;

(e)   engaged in unfair debt collection practices in connection with the Genesis Private Student Loan Program including pulling students from class during

29

1  instruction time, barring students from attending class, barring students from

2  attending externships, and dropping students altogether from their programs;

3       (f)    caused students to undertake huge credit obligations without disclosing

4  critical facts about the Genesis Private Student Loan Program and CCI's

5  relationship with that program;

6       (g)    in the case of Heald and Corinthian Colleges, Inc., caused consumers to

7  call them, visit their campuses, and/or enroll at one of their schools by misleading

8  them concerning the transferability of credits earned at Heald to other schools,

9  including CSU;

10       (h)    engaged in conduct that is immoral, unethical, oppressive, unscrupulous,

11  and/or substantially injurious to consumers.

12      96.    These business acts and practices are fraudulent in that Defendants' untrue and

13  misleading representations regarding: their job placement rates; their ads for programs,

14  certificates, diplomas, or degrees they do not offer; their unauthorized use of official United

15  States government seals;  their use of enrollment agreements that falsely state that Defendants are

16  immune from liability; the Genesis Private Student Loan Program and CCI's role in that program;

17  and the transferability of credits earned at Heald to other schools are likely to deceive the public.

18  **THIRD CAUSE OF ACTION AGAINST**

19  **CORINTHIAN COLLEGES, INC. AND DOE DEFENDANTS 1 TO 50**

20  **VIOLATION OF CORPORATIONS CODE SECTION 25401**

21  **(SECURITIES FRAUD)**

22      97.    The People reallege all paragraphs set forth above and incorporate them by

23  reference as though they were fully set forth in this cause of action.

24      98.    Pursuant to Corporations Code section 25401, it is " unlawful for any person to

25  offer or sell a security in this state or buy or offer to buy a security in this state by means of any

26  written or oral communication which includes an untrue statement of a material fact or omits to

27  state a material fact necessary in order to make the statements made, in the light of the

28  circumstances under which they were made, not misleading."

30

99.    Corinthian Colleges, Inc. and DOE Defendants 1 to 50 offered for sale and sold Corinthian Colleges, Inc.'s common stock, which is traded on the Nasdaq National Market System, to investors in California.

100.    Corinthian Colleges, Inc. and DOE Defendants 1 to 50 offered for sale and sold Corinthian Colleges, Inc.'s common stock to employees in California and  to employees of its subsidiaries in California via an employee stock purchase program.  On or about February 1, 2013, Corinthian Colleges, Inc. filed a Registration Statement (Form S-8) with the Securities and Exchange Commission for the plan.

101.    Corinthian Colleges, Inc.'s common stock qualifies as a security as defined in Corporations Code section 25019.

102.    Corinthian Colleges, Inc. qualifies as an issuer under Corporations Code sections 25010 and as a person under Corporations Code section 25013.

103.    Corinthian Colleges, Inc.'s and DOE Defendants 1 to 50's misrepresentations were made in connection with the offer and sale of securities within the meaning of Corporations Code section 25017.

104.    Corinthian Colleges, Inc.'s and DOE Defendants 1 to 50's misrepresentations took place within the State of California within the meaning of Corporations Code section 25008.

105.    In offering for sale and/or selling its common stock, Corinthian Colleges, Inc. and DOE Defendants 1 to 50 misrepresented the job placement rate of its graduates; the methodology it used to calculate the job placement rate of its graduates; the number of graduates it placed; the number of eligible graduates; the reliability of its placement and placement verification process; the stringency of its definitions regarding job placements; its compliance with accreditor mandated policies; and its compliance with its own policies.  Corinthian Colleges, Inc. and DOE Defendants 1 to 50 violated Corporations Code section 25401 because these statements were untrue and misleading by virtue of the omission of material facts, including without limitation, those set forth in paragraphs 51 and 54 to 59, above.

//

31

1

## FOURTH CAUSE OF ACTION AGAINST

2

## CORINTHIAN COLLEGES, INC. AND DOE DEFENDANTS 1 TO 50

3

## VIOLATION OF CORPORATIONS CODE SECTION 25400, SUBDIVISION (D)

4

## (SECURITIES FRAUD)

5      106.    The People reallege all paragraphs set forth above and incorporate them by

6  reference as though they were fully set forth in this cause of action.

7      107.    Pursuant to Corporations Code section 25400, subdivision (d), it is "It is unlawful

8  for any person, directly or indirectly, in this state . . . If such person is a broker-dealer *or other*

9  *person* selling or offering for sale or purchasing or offering to purchase the security, to make, for

10  the purpose of inducing the purchase or sale of such security by others, any statement which was,

11  at the time and in the light of the circumstances under which it was made, false or misleading

12  with respect to any material fact, or which omitted to state any material fact necessary in order to

13  make the statements made, in the light of the circumstances under which they were made, not

14  misleading, and which he knew or had reasonable ground to believe was so false or misleading."

15      108.    Corinthian Colleges, Inc. and DOE Defendants DOE Defendants 1 to 50 offered

16  for sale, sold, and/or induced the purchase or sale of Corinthian Colleges, Inc.'s common stock by

17  others, which is traded on the Nasdaq National Market System, to investors in California.

18      109.    Corinthian Colleges, Inc. and DOE Defendants 1 to 50 offered for sale, sold,

19  and/or induced the purchase or sale of Corinthian Colleges, Inc.'s common stock by its

20  employees in California and  to employees of its subsidiaries in California via an Employee Stock

21  Purchase Plan.  On or about February 1, 2013, Corinthian Colleges, Inc. filed a Registration

22  Statement (Form S-8) with the Securities and Exchange Commission for the plan

23      110.    Corinthian Colleges, Inc.'s common stock qualifies as a security as defined in

24  Corporations Code section 25019.

25      111.    Corinthian Colleges, Inc. qualifies as an issuer under Corporations Code sections

26  25010 and as a person under Corporations Code section 25013.

27

28

**EXHIBIT A**

112.    Corinthian Colleges, Inc.'s and DOE Defendants 1 to 50's misrepresentations were made in connection with the offer and sale of securities within the meaning of Corporations Code section 25017.

113.    Corinthian Colleges, Inc.'s and DOE Defendants 1 to 50's misrepresentations took place within the State of California within the meaning of Corporations Code section 25008.

114.    In offering for sale, selling, or inducing the purchase and/or sale of its common stock by others, Corinthian Colleges, Inc. and DOE Defendants 1 to 50 misrepresented the job placement rate of its graduates; the methodology it used to calculate the job placement rate of its graduates; the number of graduates it placed; the number of eligible graduates; the reliability of its placement and placement verification process; the stringency of its definitions regarding job placements; its compliance with accreditor mandated policies; and its compliance with its own policies.  Corinthian Colleges, Inc. and DOE Defendants 1 to 50 violated Corporations Code section 25400, subdivision (d) because these statements were untrue and misleading by virtue of the omission of material facts, including without limitation, those set forth in paragraphs 51 and 54 to 59, above.

115.    At the time it made the misrepresentations set forth in paragraphs 53 and 114, above, Corinthian Colleges, Inc. and DOE Defendants 1 to 50 knew or had reasonable ground to believe the representations were false and/or misleading as set forth in more detail in paragraphs 51 and 54 to 59, above.

### FIFTH CAUSE OF ACTION AGAINST

### CORINTHIAN SCHOOLS, INC. AND DOE DEFENDANTS 51 TO 100

### VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17207

### (VIOLATING INJUNCTION)

116.    The People reallege all paragraphs set forth above and incorporate them by reference as though they were fully set forth in this cause of action.

117.    On July 31, 2007, the Los Angeles Superior Court in *People v. Corinthian Schools, Inc., et al.* (Super. Ct. L.A. County, 2007, No. BC374999), entered a final judgment permanently enjoining and restricting Corinthian Schools, Inc. and Titan Schools, Inc., their predecessors,

33

1  agents, employees, officers, directors, representatives, successors, partners, assigns and any and

2  all persons acting in concert or participating with Corinthian Schools, Inc. (with the exception of

3  Wyotech campuses) from engaging in or performing, directly or indirectly, certain statements and

4  activities related to advertising and student enrollment, including but not limited to the following:

5         (a)    Paragraph 7, subdivision (A) prohibits making or causing to be made any

6         "statement related to Defendants' own students' employment or salaries that is not

7         substantiated by Defendants' records" or "any statement based on information in

8         Defendants' records that Defendants know or should know is inaccurate";

9         (b)    Paragraph 7, subdivision (D) prohibits making or causing to be made any

10         "untrue, misleading or deceptive statement" in connection with any matter relating

11         to the offer of any program of instruction;

12         (c)    Paragraph 8, subdivision (A) prohibits "making or causing to be made any

13         statement regarding any student whom Defendants' records state is self-employed

14         unless Defendants possess documents evidencing the student's self-employment."

15  The final judgment was issued, in part, pursuant to Business and Professions Code section 17203.

16      118.   Corinthian Schools, Inc. and DOE Defendants 51 to 100 intentionally violated the

17  final judgment in the following manner:

18         (a)    Publishing and/or providing students with untrue, misleading, unreliable,

19  unsubstantiated, and/or inaccurate job placement rate information, as more fully alleged in

20  Paragraphs 47 to 52, and including without limitation: (i) publishing and/or providing students

21  with job placement data for its Hayward and San Francisco campuses without notifying them that

22  it had paid a temporary agency to place students to meet accreditation deadlines; (ii) publishing

23  and/or providing students with job placement data for medical assistant programs for its Hayward

24  campus without notifying them that a substantial percentage of the placements were to health

25  screening fairs, the majority of which resulted in two days of employment and were not

26  sustainable; and (iii) failing at the Reseda, West Los Angeles, and City of Industry campuses to

27  maintain documents sufficient to substantiate employment of its graduates at those campuses.

28

1         (b)     Running ads for programs, certificates, diplomas, or degrees they do not

2   offer, including but not limited to ultrasound technician, x-ray technician, radiology technician, or

3   dialysis technician programs, certificates, diplomas, or degrees in California, as more fully

4   alleged in Paragraphs 60 to 64.

5         (c)     Failing to disclose to students on the phone that Defendants do not offer

6   certain programs, certificates, diplomas, or degrees, including but not limited to ultrasound

7   technician, x-ray technician, radiology technician, or dialysis technician programs, certificates,

8   diplomas, or degrees in California, as more fully alleged in Paragraph 63.

9       119.    Violations of the final judgment constitute intentional violation of an injunction

10   within the meaning of Business and Professions Code section 17207.

11   **SIXTH CAUSE OF ACTION AGAINST**

12   **CORINTHIAN SCHOOLS, INC. AND DOE DEFENDANTS 51 TO 100**

13   **VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17535.5**

14   **(VIOLATING INJUNCTION)**

15       120.    The People reallege all paragraphs set forth above and incorporate them by

16   reference as though they were fully set forth in this cause of action.

17       121.    On July 31, 2007, the Los Angeles Superior Court in *People v. Corinthian Schools,*

18   *Inc., et al.* (Super. Ct. L.A. County, 2007, No. BC374999) entered a final judgment permanently

19   enjoining and restricting Corinthian Schools, Inc. and Titan Schools, Inc. their predecessors,

20   agents, employees, officers, directors, representatives, successors, partners, assigns and any and

21   all persons acting in concert or participating with Corinthian Schools, Inc. (with the exception of

22   Wyotech campuses) from engaging in or performing, directly or indirectly, certain statements and

23   activities related to advertising and student enrollment, including but not limited to the following:

24         (a)     Paragraph 7, subdivision (A) prohibits making or causing to be made any

25         "statement related to Defendants' own students' employment or salaries that is not

26         substantiated by Defendants' records" or "any statement based on information in

27         Defendants' records that Defendants know or should know is inaccurate";

28

**EXHIBIT A**

     (b)     Paragraph 7, subdivision (D) prohibits making or causing to be made any "untrue, misleading or deceptive statement" in connection with any matter relating to the offer of any program of instruction;

     (c)     Paragraph 8, subdivision (A) prohibits "making or causing to be made any statement regarding any student whom Defendants' records state is self-employed unless Defendants possess documents evidencing the student's self-employment."

The final judgment was issued, in part, pursuant to Business and Professions Code section 17535.

122.     Corinthian Schools, Inc. and DOE Defendants 51 to 100 intentionally violated the final judgment in the following manner:

     (a)     Publishing and/or providing students with untrue, misleading, unreliable, unsubstantiated, and/or inaccurate job placement rate information, as more fully alleged in Paragraphs 47 to 52, and including without limitation: (i) publishing and/or providing students with job placement data for its Hayward and San Francisco campuses without notifying them that it had paid a temporary agency to place students to meet accreditation deadlines; (ii) publishing and/or providing students with job placement data for medical assistant programs for its Hayward campus without notifying them that a substantial percentage of the placements were to health screening fairs, the majority of which resulted in two days of employment and were not sustainable; and (iii) failing at the Reseda, West Los Angeles, and City of Industry campuses to maintain documents sufficient to substantiate employment of its graduates at those campuses.

     (b)     Running ads for programs, certificates, diplomas, or degrees they do not offer, including but not limited to ultrasound technician, x-ray technician, radiology technician, or dialysis technician programs, certificates, diplomas, or degrees in California, as more fully alleged in Paragraphs 60 to 64.

     (c)     Failing to disclose to students on the phone that Defendants do not offer certain programs, certificates, diplomas, or degrees, including but not limited to ultrasound technician, x-ray technician, radiology technician, or dialysis technician programs, certificates, diplomas, or degrees in California, as more fully alleged in Paragraph 63.

123.    Violations of the final judgment constitute intentional violation of an injunction within the meaning of Business and Professions Code section 17535.5.

### **PRAYER FOR RELIEF**

WHEREFORE, the People respectfully request that the Court enter judgment in favor of the People and against Defendants, jointly and severally, as follows:

1.    That Defendants, their successors, agents, representatives, employees, assigns and all persons who act in concert with Defendants be permanently enjoined from making any untrue or misleading statements in violation of Business and Professions Code section 17500, including, but not limited to, the untrue or misleading statements alleged in this Complaint, under the authority of Business and Professions Code section 17535;

2.    That Defendants, their successors, agents, representatives, employees, assigns and all persons who act in concert with Defendants be permanently enjoined from engaging in unfair competition as defined in Business and Professions Code section 17200, including, but not limited to, the acts and practices alleged in this Complaint, under the authority of Business and Professions Code section 17203;

3.    That the Court make such orders or judgments as may be necessary, including preliminary injunctive and ancillary relief, to prevent the use or employment by any Defendant of any practice which violates Business and Professions Code section 17500, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any such practice, under the authority of Business and Professions Code section 17535;

4.    That the Court make such orders or judgments as may be necessary, including preliminary injunctive and ancillary relief, to prevent the use or employment by any Defendant of any practice which constitutes unfair competition or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition, under the authority of Business and Professions Code section 17203;

**EXHIBIT A**

5. That the Court assess a civil penalty of $2,500 against each Defendant for each violation of Business and Professions Code section 17500, in an amount according to proof, under the authority of Business and Professions Code section 17536;

6. That the Court assess a civil penalty of $2,500 against each Defendant for each violation of Business and Professions Code section 17200, in an amount according to proof, under the authority of Business and Professions Code section 17206;

7. That the Court assess a civil penalty of $6,000 against Corinthian Schools, Inc. for each violation of the final judgment issued by the Los Angeles Superior Court in *People v. Corinthian Schools, Inc., et al.* (Super. Ct. L.A. County, 2007, No. BC374999) in an amount according to proof, under the authority of Business and Professions Code section 17207;

8. That the Court assess a civil penalty of $6,000 against Corinthian Schools, Inc. for each violation of the final judgment issued by the Los Angeles Superior Court *People v. Corinthian Schools, Inc., et al.* (Super. Ct. L.A. County, 2007, No. BC374999) in an amount according to proof, under the authority of Business and Professions Code section 17535.5;

9. For a permanent and preliminary injunction enjoining Corinthian Colleges and its agents, servants, and employees, and all persons acting under, in concert with, or for it, from directly or indirectly or in any other manner engaging in the conduct as above alleged in violation of Corporations Code sections 25401 and/or 25400, subdivision (d);

10. That the Court assess a civil penalty of $25,000 against Corinthian Colleges, Inc. for each violation of Corporations Code sections 25401 and/or 25400, subdivision (d) in an amount according to proof, under the authority of Government Code section 12660;

11. For an order disgorging all profits and compensation obtained by Corinthian Colleges, Inc. as a result of its violations of Corporations Code sections 25401 and/or 25400, subdivision (d);

FIRST AMENDED COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION
AND OTHER RELIEF (Case No. CGC-13-534793)
**EXHIBIT A**

12.     For an order requiring Corinthian Colleges, Inc. to make restitution to the purchasers of its common stock in the principal amount paid by each purchaser by means of the unlawful conduct alleged hereinabove, less the amount of any repayment of principal to any such purchaser by Corinthian Colleges, Inc. with interest from the date of purchase of the common stock on the amount of any such principal amounts remaining unpaid;

13.     For an order awarding damages to the purchasers of Corinthian Colleges, Inc.'s common stock in an amount sufficient to compensate the purchasers for loss suffered as a result of Corinthian Colleges, Inc.'s violations of Corporations Code sections 25401 and/or 25400, subdivision (d);

14.     For the People's costs and attorneys fees in prosecuting Corinthian Colleges, Inc.'s violations of Corporations Code sections 25401 and/or 25400, subdivision (d) under the authority in Code of Civil Procedure section 1021.8, subdivision (a);

15.     That the People recover their costs of suit, including costs of investigation;

16.     That the People receive all other relief to which they are legally entitled; and

17.     That the Court award such other relief that it deems just, proper, and equitable.

Dated: February 13, 2014

Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California

NICHOLAS G. CAMPINS
Deputy Attorney General
*Attorneys for* THE PEOPLE OF THE
STATE OF CALIFORNIA

SF2013510363
40889622.doc

FIRST AMENDED COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION
AND OTHER RELIEF (Case No. CGC-13-534793)

EXHIBIT A

# EXHIBIT A

**Radiology Certificate** 1 (888) 418 9547
www.heald.edu/Medical ▾
Earn Your Medical Degree at Heald College® Request Info.
Financial Aid - Business - Technology - Healthcare
875 Howard Street, San Fransisco, CA

**Radiology Tech Degree** 1 (888) 418 9547
www.heald.edu/Medical ▾
Earn Your Medical Degree at Heald College® Request Info.
Business - Healthcare - Financial Aid - Technology
875 Howard Street, San Fransisco, CA

**Radiology Tech Majors** 1 (888) 418 9547
www.heald.edu/Medical ▾
Earn Your Medical Degree at Heald College® Request Info.
Financial Aid - Business - Technology - Healthcare
📍 25500 Industrial Boulevard, Hayward, CA - (888) 418-9547

**Ultrasound Certificate**
mobi.heald.edu/
Earn Your Medical Degree at Heald College® Request Info.
📞 (888) 418-9547 - Financial Aid

**Ultrasound Certificate** 1 (888) 418 9547
www.heald.edu/Medical ▾
Earn Your Medical Degree at Heald College® Request Info.
Financial Aid - Business - Technology - Healthcare
📍 875 Howard Street, San Fransisco, CA - (888) 418-9547

**Ultrasound Tech Diploma** 1 (888) 418 9547
www.heald.edu/Medical ▾
Earn Your Medical Degree at Heald College® Request Info.
Financial Aid - Business - Technology - Healthcare
📍 2910 Prospect Park Drive, Rancho Cordova, CA - (888) 418-9547

**Ultrasound Tech Univ.** 1 (888) 418 9547
www.heald.edu/Medical ▾
Enroll in Medical College at Heald College® Request Info.
Financial Aid - Business - Technology - Healthcare
📍 5130 Commercial Circle, Concord, CA - (888) 418-9547

**Ultrasound Tech Majors** 1 (888) 418 9547
www.heald.edu/Medical ▾
Earn Your Medical Degree at Heald College® Request Info.
Financial Aid - Business - Technology - Healthcare
📍 875 Howard Street, San Fransisco, CA - (888) 418-9547

**X Ray Tech Degree** 1 (888) 418 9547
www.heald.edu/Medical ▾
Earn Your Medical Degree at Heald College® Request Info.
Financial Aid - Healthcare - Business - Technology
875 Howard Street, San Fransisco, CA

**X Ray Tech Certificate** 1 (888) 418 9547
www.heald.edu/Medical ▾
Earn Your Medical Degree at Heald College® Request Info.
Financial Aid - Business - Technology - Healthcare
25500 Industrial Boulevard, Hayward, CA

**Dialysis Tech Training** 1 (877) 904 9925
goto.everest.edu/ ▾
Study to be a Dialysis Technician Training Nearby - More Info Here!
Request Info - Apply Now - Health Care Programs - Business Programs

**Dialysis Technician** 1 (855) 661 7858
goto.everest.edu/ ▾
Learn to be a Dialysis Technician Training Nearby - More Info Here!
Request Info - Apply Now - Health Care Programs - Business Programs
814 Mission Street, Ste 500, San Francisco, CA

**Radiology Technician** 1 (866) 219 6637
www.everest.edu/Radiology-Technician ▾
Classes Starting Soon. Get Info. 9-Month Program. Request Catalog.
Everest has 105 followers on Google+
Official Site - Career Training - Health Programs - Business Programs
2215 W Mission Road, Alhambra, CA

**Radiology Tech Program** 1 (855) 843 1713
goto.everest.edu/Radiology ▾
Become a Radiology Technician. Training Nearby - More Info Here!
Request Info - Apply Now - Health Care Programs - Business Programs
📍 22336 Main Street, 1st Floor, Hayward, CA - (866) 617-3545

**Radiology Tech School** 1 (855) 317 0946
goto.everest.edu/Radiology ▾
Training for a Career as an X-Ray Technician at Everest College Now!
Request Info - Apply Now - Health Care Programs - Business Programs
814 Mission Street, Ste 500, San Francisco, CA

**Radiology Tech School** 1 (866) 261 4354
www.everestcollege.edu/Medical ▾
Day & Evening Classes. 9-month program. Request Info.
Official Site - Legal Programs - Health Programs - Business Programs
1231 Cabrillo Avenue, Suite 201, Torrance, CA

**Ultrasound Santa Ana** 1 (866) 617 3545
www.everest.edu/Ultrasound-Technician ▾
Start Your Career with Everest®. Flexible Programs. Learn More.
Everest has 101 followers on Google+
Official Site - Career Training - Health Programs - Business Programs
📍 500 West Santa Ana Blvd, Santa Ana, CA - (866) 737-3808

**X-Ray Training School** 1 (855) 661 7855
goto.everest.edu/ ▾
Training for a Career as an X-Ray Technician at Everest College.
Request Info - Apply Now - Health Care Programs - Business Programs
814 Mission Street, Ste 500, San Francisco, CA

EXHIBIT A

# EXHIBIT B

EXHIBIT A



# EXHIBIT C



## PARTNER COLLEGES

For students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer guidance with a number of accredited institutions that accept Heald credits toward bachelor's degree programs:

- Alliant International University
- Argosy University
- California State University (CSU) system
- California State University, Chico
- California State University, East Bay
- California State University, Fresno
- California State University, Monterey Bay
- California State University, Sacramento
- California State University, San Jose
- California State University, Stanislaus
- Capella University
- Chapman University
- City University
- Franklin University
- Golden Gate University
- Hawaii Pacific University
- Kaplan University
- Menlo College
- National University
- Notre Dame de Namur
- Portland State University
- Sonoma State University
- TUI University
- University of Hawaii, Manoa
- University of San Francisco
- University of Pacific
- Warner Pacific College
- Wayland Baptist University
- William Jessup University

It is always up to the receiving institution to make the final determination regarding acceptance of transfer credits and class standing.

For more information, please contact Heald College at 1-800-88-HEALD or visit www.heald.edu.

**Heald**

## Accreditation - Partner Colleges

For those students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions. Those institutions accept Heald credits toward bachelor's degree programs.*

- Alliant International University
- Argosy University
- California State University (CSU) system
- California State University, Chico
- California State University, East Bay
- California State University, Fresno
- California State University, Monterey Bay
- California State University, Sacramento
- California State University, Stanislaus
- Capella University
- Chapman University College/Brandman University
- City University
- Franklin University
- Golden Gate University
- Hawaii Pacific University
- Kaplan University
- Menlo College
- National University
- Notre Dame de Namur
- Palo Alto University
- Portland State University
- San Jose State University
- Sonoma State University
- TUI University
- University of Hawaii
- University of San Francisco
- University of the Pacific
- Warner Pacific College
- Wayland Baptist University

*It is always up to the receiving institution to make the final determination regarding acceptance of transfer credits and class standing.*

Request More Information

Home | View Full Site
© 2014 Corinthian Colleges, Inc. | Legal

For more information about our graduation rates, the median debt of students who completed a program, and other important information, please visit our website at http://www.heald.edu/disclosures

**EXHIBIT A**