# EXHIBIT A



## STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET
### AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION

1.  **Basic Provisions ("Basic Provisions").**
    1.1   Parties: This Lease ("Lease"), dated for reference purposes only November 25 , 2002,
is made by and between SHACO, INC., a California corporation
_____ ("Lessor")
and CORINTHIAN COLLEGES, INC., a Delaware corporation
_____
_____
_____ ("Lessee"), (collectively the "Parties", or individually a "Party").
    1.2(a)   Premises: That certain portion of the Project (as defined below), including all improvements therein or to be provided by Lessor under
the terms of this Lease, commonly known by the street address of 217 Club Center Drive, "Suite A" .
located in the City of San Bernardino , County of San Bernardino , State of
California , with zip code 92408 , as outlined on Exhibit A attached hereto ("Premises") and
generally described as (describe briefly the nature of the Premises): approximately 24,158 rentable square feet
constituting "Suite A" of the Building located on Club Power Center Phase I as outlined on
Exhibit B-1 attached hereto.   The Project is located adjacent to buildings and land .
commonly referred to as "Club Power Center Phase I" and more particularly described on Exhibit B-2 attached hereto and incorporated
herein. Club Power Center Phase I and Club Power Center Phase II have reciprocal parking rights ("Club Power Center Reciprocal Parking
Rights").
In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the Common Areas (as
defined in Paragraph 2.7 below) as hereinafter specified, but shall not have any rights to the roof, exterior walls or utility raceways of the building containing
the Premises ("Building") or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located,
along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." (See also Paragraph 2)
    1.2(b)   Parking: See Addendum Paragraph 50 _____ unreserved vehicle parking spaces ("Unreserved Parking Spaces"); and
_____ reserved vehicle parking spaces ("Reserved Parking Spaces"). (See also Paragraph 2.6)
    1.3   Term: Eight (8) _____ years and -No- _____ months ("Original Term")
commencing on the earlier of the date the Premises are Substantially Completed (as defined below) or March 1, 2003
("Commencement Date") and ending February 28, 2011 ("Expiration Date"). (See also Paragraph 3)
    1.4   Early Possession: See Addendum Paragraph 51 ("Early Possession Date").
(See also Paragraphs 3.2 and 3.3)
    1.5   Base Rent: $30,922.24 per month ("Base Rent"), payable on the first (1st)
day of each month commencing on the Commencement Date . (See also Paragraph 4)
☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. (See Addendum Paragraph 52)
    1.6   Lessee's Share of Common Area Operating Expenses: Twenty-five & 52/100 percent (25.52%) ("Lessee's Share").
    1.7   Base Rent and Other Monies Paid Upon Execution:
          (a)   Base Rent: $-0- for the period N/A .
          (b)   Common Area Operating Expenses: $N/A for the period _____ .
          (c)   Security Deposit: $30,922.34 ("Security Deposit"). (See also Paragraph 5)
          (d)   Other: $N/A for _____ .
          (e)   Total Due Upon Execution of this Lease: $30,922.34 .
    1.8   Agreed Use: See Addendum Paragraph 53 .
_____ (See also Paragraph 6)
    1.9   Insuring Party. Lessor is the "Insuring Party". (See also Paragraph 8)
    1.10   Real Estate Brokers: (See also Paragraph 15)
          (a)   Representation: The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check
applicable boxes):
☐ N/A _____ represents Lessor exclusively ("Lessor's Broker");
☑ The Staubach Company _____ represents Lessee exclusively ("Lessee's Broker"); or
☐ N/A _____ represents both Lessor and Lessee ("Dual Agency").
          (b)   Payment to Brokers: Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the
brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or ____ % of the total Base
Rent for the brokerage services rendered by the Brokers).
    1.11   Guarantor. The obligations of the Lessee under this Lease are to be guaranteed by N/A .
_____ ("Guarantor"). (See also Paragraph 37)
    1.12   Addenda and Exhibits. Attached hereto is an Addendum or Addenda consisting of Paragraphs 50 through 68 and
Exhibits A through F , all of which constitute a part of this Lease.
2.   **Premises.**
    2.1   Letting. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all
of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may
have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision
whether or not the actual size is more or less.
    2.2   Condition. Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of
debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts
described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical,
plumbing, mechanical, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC") (See Addendum Paragraph 55), loading doors, if
any  and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date and that the structural
elements of the roof, bearing walls and foundation of the Unit shall be free of material defects. If a non-compliance with such warranty exists as of the Start
Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with

Initials _____                                                   Initials _____

© 1999 · American Industrial Real Estate Association                          FORM MTN 2 2/005

respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, (See Addendum Paragraph 55) and (ii) 30 days as to the remaining systems and other elements of the Unit. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, mechanical, electrical, plumbing and structural systems, roof, foundations, and/or bearing walls - see Paragraph 7).

2.3    Compliance. Lessor warrants that the improvements on the Premises and the Common Areas comply with the building codes that were in effect at the time that each such improvement, or portion thereof, was constructed, and also with all applicable laws, covenants or restrictions of record, regulations, and ordinances in effect on the Start Date ("Applicable Requirements"). Said warranty does not apply to the use to which Lessee will put the Premises or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, is are appropriate for Lessee's intended use. ;—and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense except as otherwise specifically set forth in this Lease. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)    Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds three (3) 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to three (3) 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days six (6) months thereafter or such shorter period as Lessee can occupy the Premises per Applicable Requirements. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)    If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor and Lessee shall allocate the obligation to pay for the portion of such costs reasonably attributable to the Premises pursuant to the formula set out in Paragraph 7.1(d); provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds three (3) months Base Rent or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days six (6) months prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 business days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessor shall promptly pay such deficiency to Lessee and Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor pursue any remedies available at law or in equity. If Lessee has an option to extend this Lease and property does so within the ten (10) business days after receipt of Lessor's termination notice, then such termination notice shall be null and void and the Capital Expenditure shall be treated as though it is not occurring during the last two (2) years of this Lease.

(c)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall be fully responsible for the cost thereof, and Lessee shall not have any right to terminate this Lease.

2.4    Acknowledgements. Lessee acknowledges that: (a) other than as specifically represented or warranted herein, it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, and (c) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5    Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

2.6    Vehicle Parking. Lessee shall be entitled to use the number of Unreserved Parking Spaces and Reserved Parking Spaces specified in Addendum Paragraph 50 Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking. Lessee shall not use more parking spaces than said number. Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "Permitted Size Vehicles." Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9. No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Lessor.

(a)    Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

(b)    Lessee shall not service or store any vehicles in the Common Areas.

(c)    If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.7    Common Areas - Definition. The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8    Common Areas - Lessee's Rights. Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time. In the event that any unauthorized storage shall occur then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9    Common Areas - Rules and Regulations. Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable nondiscriminatory rules and regulations ("Rules and Regulations") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees a copy of which Rules and Regulations shall be delivered to Lessee ten (10) days prior to their effectiveness (including any reasonable modifications thereto). Lessee agrees to abide by and conform to all such Rules and Regulations, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project, so long as Lessor comply with this Section 2.9. Lessor agrees to enforce the Rules and Regulations and to conduct Lessor's management of the Building and Project including controlling Lessor's employees, contractors, agents, invitees and other tenants in such a manner so as not to create or allow any nuisance, or unreasonable interference, annoyance or disturbance of Lessee in its quiet and peaceful possession of the Premises.

2.10    Common Areas - Changes. Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)    To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways, so long no fewer parking spaces are made available to Lessee at a comparable distance from the Premises, than as are available to Lessee on the Commencement Date. ;

(b)    To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises

Initials



Initials

© 1999 - American Industrial Real Estate Association

remains available;

(c) ~~To designate other land outside the boundaries of the Project to be a part of the Common Areas;~~

(d) ~~To add additional buildings and improvements to the Common Areas;~~

(e) To use the Common Areas while engaged in making additional Improvements, repairs or alterations to the Project, or any portion thereof; and

(f) To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

3. Term.

3.1 Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2 Early Possession. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent and all other amounts except for Insurance premiums and utilities (See Addendum Paragraph 51(v) )shall be abated for the period of such early possession. All other terms of this Lease (including but not limited to the obligations to pay ~~Lessee's Share of Common Area Operating Expenses, Real Property Taxes and~~ Insurance premiums and utilities and to maintain the Premises) shall, however, be in effect during such period. Any such early possession shall not affect the Expiration Date.

3.3 ~~Delay In Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until it receives possession of the Premises. If possession is not received within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. Except as otherwise provided, if possession is not tendered to Lessee by the Start Date and Lessee does not terminate this Lease, as aforesaid, any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession of the Premises is not delivered within 4 months after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.~~

3.4 Lessee Compliance. Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4. Rent.

4.1 Rent Defined. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2 Common Area Operating Expenses. See Addendum Paragraph 54. Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

(a) "Common Area Operating Expenses" are defined, for purposes of this Lease, as all costs incurred by Lessor relating to the ownership and operation of the Project, including, but not limited to, the following:

(i) The operation, repair and maintenance, in neat, clean, good order and condition of the following:

(aa) The Common Areas and Common Area Improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, and roof drainage systems.

(bb) Exterior signs and any tenant directories.

(cc) Any fire detection and/or sprinkler systems.

(ii) The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

(iii) Trash disposal, pest control services, property management, security services, and except as otherwise set forth herein, the costs of any environmental inspections.

(iv) ~~Reserves~~ set aside for maintenance and repair of Common Areas.

(v) Real Property Taxes (as defined in Paragraph 10).

(vi) The cost of the premiums for the insurance maintained by Lessor pursuant to Paragraph 8.

(vii) ~~Any deductible portion of~~ an insured loss concerning the Building or the Common Areas.

(viii) The cost of any Capital Expenditure to the Building or the Project not covered under the provisions of Paragraph 2.3 provided, however, that Lessor shall allocate the cost of any such Capital Expenditure over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such Capital Expenditure in any given month.

(ix) Any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(b) Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building, or other building. However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(c) The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(d) Lessee's Share of Common Area Operating Expenses shall be payable by Lessee within 10 business days after a reasonably detailed statement of actual expenses is presented to Lessee. At Lessor's option, however, an amount may be estimated by Lessor, at the beginning of each calendar year and thereafter adjusted no more than once during such calendar year, ~~from time to time~~ of Lessee's Share of annual Common Area Operating Expenses and the same shall be payable monthly or quarterly, as Lessor shall designate, during each ~~12 month period of the Lease term,~~ on the same day as the Base Rent is due hereunder. Lessor shall deliver to Lessee within 60 days after the expiration of each calendar year a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses incurred during the preceding year. If Lessee's payments under this Paragraph 4.2(d) during the preceding year exceed Lessee's Share as indicated on such statement, Lessor shall credit the amount of such over-payment against Lessee's Share of Common Area Operating Expenses next becoming due. If Lessee's payments under this Paragraph 4.2(d) during the preceding year were less than Lessee's Share as indicated on such statement, Lessee shall pay to Lessor the amount of the deficiency within 10 business days after delivery by Lessor to Lessee of the statement.

4.3 Payment. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any late charges which may be due.

5. Security Deposit. Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due Lessor or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 business days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. ~~If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent.~~ Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 14 days after the expiration or termination of this Lease, if Lessor elects to apply the Security Deposit only to unpaid Rent, and

Initials

Initials

© 1999 - American Industrial Real Estate Association

FORM MTN-9-5/07

otherwise within 30 days after the Premises have been vacated pursuant to Paragraph 7.4(c) below, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.      Use.
        6.1     Use. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that unreasonably disturbs occupants of or causes damage to neighboring premises or properties. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises, and is not in violation of existing exclusive use restrictions of other tenants. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.
        6.2     Hazardous Substances.
                (a)     Reportable Uses Require Consent. The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor or Lessee to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use without the consent of Lessor, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage. or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.
                (b)     Duty to Inform Lessor. If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.
                (c)     Lessee Remediation. (i) Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises or the Project (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, take all investigatory and/or remedial action reasonably required by a governmental authority or Applicable Requirements, recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or the Project or neighboring properties, that was caused or to the extent materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or, as to the Premises only, any third party. (ii) Lessor shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises or the Project (including through the plumbing or sanitary sewer system) and shall promptly, at Lessor's expense, take all investigatory and/or remedial action reasonably required by a governmental authority or Applicable Requirements, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or the Project or neighboring properties, that was caused or to the extent materially contributed to by Lessor, or pertaining to or involving any Hazardous Substance brought onto the Premises or the Project during the term of this Lease, by or for Lessor, or as to the Project not including the Premises, any third party.
                (d)     Lessee Indemnification. (i) Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and reasonable attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises or the Project by or for Lessee., or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement. (ii) Lessor shall indemnify, defend and hold Lessee, its agents, employees, lenders and ground lessee, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and reasonable attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises or the Project by or for Lessor. Lessor shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project). Lessor's obligations shall include, but not be limited to, the effects of any contamination or injury to person or the environment created or suffered by Lessor, and the costs of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessee and Lessor shall release Lessor from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessee in writing at the time of such agreement.
                (e)     Lessor Start Date Indemnification. Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which existed as a result of Hazardous Substances on the Premises prior to the Start Date. or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.
                (f)     Investigations and Remediations. Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Start Date. , unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.
                (g)     Lessor Termination Option. If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor pursuant to this Paragraph 6.2 (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessee's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination. See Paragraph 9.6(a) for additional of Rent provision. In addition, if a Lessor ren adiation that materially impairs Lessee's ability to use the Premises will last for more than six (6) months, then either party may terminate this L se within 30 days after receipt of knowledge of such time period by giving the other party a 30 day notice of termination.
        6.3     Lessee's Compliance with Applicable Requirements. Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole

Initials                                                    Page 4 of 13                                                    Initials

© 1998   American Industrial Real Estate Association

expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, and the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.

6.4         Inspection; Compliance.  Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a contamination is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority, each due to an act or omission by Lessee or for which Lessee is responsible pursuant to this Lease.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.

7.         Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.

7.1        Lessee's Obligations.

(a)         In General.  Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment (See Addendum Paragraph 55), electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2.  Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below.  Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b)         Service Contracts.  Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment (See Addendum Paragraph 55), (ii) boiler and pressure vessels, (iii) clarifiers, and (iv) any other equipment, if reasonably required by Lessor.  However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and if Lessor so elects, Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)         Failure to Perform.  If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 business days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly reimburse Lessor for the cost thereof.  If Lessor sends a notice to Lessee and the maintenance or repairs will take time to complete in excess of such ten (10) business days, it shall be sufficient if Lessee begins such maintenance and repairs and thereafter diligently prosecutes same to completion.

(d)         Replacement.  Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month).  Lessee shall pay interest on the unamortized balance at a rate that is commercially reasonable in the judgment of Lessor's accountants. Lessee may, however, prepay its obligation at any time.

7.2         Lessor's Obligations.  Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, including, without limitation, the mechanical, electrical, plumbing and structural systems of the Building and underground sewer and drainage piping, but only to the point that any utility or service provider's responsibility begins and not inside the Premises, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2.  Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises.  Lessee expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3         Utility Installations; Trade Fixtures; Alterations.

(a)         Definitions.  The term "Utility Installations" refers to all floor and window coverings, air lines, power panels, electrical distribution, security and fire protection systems, communication systems, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion.  "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)         Consent.  Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent which shall not be unreasonably withheld or delayed.  Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to $50,000.00 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one calendar year.  Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans.  Consent shall be  deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner.  Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials.  Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor  may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)         Indemnification.  Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein.  Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility.  If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof.  If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same.  If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4         Ownership; Removal; Surrender; and Restoration.

(a)         Ownership.  Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises.  Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations.  Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)         Removal.  By delivery to Lessee of written notice from Lessor not earlier than 90 and no later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations (but not including the Initial Tenant Improvements pursuant to the attached Work Letter and not including any Alterations or Utility Installations that specifically indicate in any request and consent that they need not be removed upon termination) be removed by the expiration or termination of this Lease.  Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)         Surrender; Restoration.  Lessee shall surrender the Premises by the Expiration Date  or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and

Initials _____                                                                                                                Initials _____

© 1999 - American Industrial Real Estate Association                    REVISED                                 FORM MTN  8-99/E

lear, casualty and condemnation excepted so long as any proceeds of insurance or condemnation related to such casualty or condemnation go to Lessor.

"Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good and customary maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Project) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.      Insurance; Indemnity.

8.1     Payment of Premiums.  The cost of the premiums for the insurance policies required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(a) and 8.3(b), shall be a Common Area Operating Expense.  Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2     Liability Insurance.

(a)     Carried by Lessee.  Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000, an "Additional Insured-Managers or Lessors of Premises Endorsement" and the Pollution Exclusion and is amended to cover contain the "Amendment of the Pollution Exclusion Endorsement" for damage caused by heat, smoke or fumes from a hostile fire.  The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease.  The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder.  All insurance carried by Lessee shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)     Carried by Lessor.  Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee.  Lessee shall not be named as an additional insured therein.

8.3     Property Insurance - Building, Improvements and Rental Value.

(a)     Building and Improvements.  Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Project Premises.  The amount of such insurance shall be equal to the full replacement cost of the Project Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof.  Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4.  If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss.  Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located.  If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence.

(b)     Rental Value.  Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance").  Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c)     Adjacent Premises.  Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d)     Lessee's Improvements.  Since Lessor is the insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4     Lessee's Property; Business Interruption Insurance.

(a)     Property Damage.  Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 $10,000 per occurrence.  The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Lessee shall provide Lessor with written evidence that such insurance is in force.

(b)     Business Interruption.  If Lessee assigns its interest in this Lease to an unaffiliated party, or Lessee is no longer a publicly traded company then thereafter the new Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c)     No Representation of Adequate Coverage.  Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5     Insurance Policies.  Insurance required herein may be umbrella type policies and shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least B+, V, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee and Lessor shall, prior to the Start Date, deliver to Lessee the other party certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessee the other party.  Lessee and Lessor shall, at least 30 days prior to the expiration of such policies, furnish Lessee the other party with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessee the other party may order such insurance and charge the cost thereof to Lessee the defaulting party, which amount shall be payable by Lessee to Lessee the defaulting party upon demand.  Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less.  If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.  Lessee may offset Rents against any amounts for insurance payable to Lessee by Lessor that are not paid within ten (10) business days of demand therefore.

8.6     Waiver of Subrogation.  Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein.  The effect of such releases and waivers is not limited by the amount of insurance carried or required; or by any deductibles applicable hereto.  The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7     Indemnity.  (See Addendum Paragraph 68)  Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, reasonable attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee.  If any action or proceeding is brought against Lessee by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessee and Lessor shall cooperate with Lessee in such defense.  Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8     Exemption of Lessor from Liability.  Except for Lessor's gross negligence or willful misconduct, Lessor shall not be liable for injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places.  Lessor shall not be liable for any damages arising from any act or neglect of any other tenant of Lessor nor from the failure of Lessor to enforce the provisions of any other lease in the Project.  Notwithstanding Lessor's negligence or breach of this Lease, Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom.

9.      Damage or Destruction.

9.1     Definitions.

(a)     "Premises Partial Damage" shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 6 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 9 month's Base Rent.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or

Initials                                                                                                                                                      Initials

destruction as to whether or not in Lessor's *reasonable opinion* the damage is Partial or Total.

(b)      "**Premises Total Destruction**" shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which (i) cannot reasonably be repaired in 3 6 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 9 month's Base Rent, or (ii) cause the Premises to be no longer usable for the Agreed Use pursuant to Applicable Requirements. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not in *Lessor's reasonable opinion* the damage is Partial or Total.

(c)      "**Insured Loss**" shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)      "**Replacement Cost**" shall mean the cost to repair or rebuild the Improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)      "**Hazardous Substance Condition**" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises.

9.2      **Partial Damage - Insured Loss**.  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations unless they are part of the initial Tenant Improvements) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $5,000 or less, and, in such event, Lessor shall make ~~any applicable insurance proceeds~~ the required funds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 business days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 business day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 business days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party. *If repairs to be made by Lessor are not completed within 6 months, then Lessee can, within 30 days thereafter, terminate this Lease on 30 days notice to Lessor.*

9.3      **Partial Damage - Uninsured Loss**.  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4      **Total Destruction**.  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate *as of the date of 60 days following* such Destruction *at the option of either party within 30 days after the Premises Total Destruction by written notice to the other party*.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5      **Damage Near End of Term**.  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if the loss is an insured loss and Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, ~~(a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs~~ on or before the earlier of (i) the date which is 10 business days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period ~~and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds~~, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option ~~and provide such funds or assurance~~ during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6      **Abatement of Rent; Lessee's Remedies**.

(a)      **Abatement**.  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, ~~but not to exceed the proceeds received from the Rental Value insurance~~.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)      **Remedies**.  If Lessor shall be obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessor has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 30 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the ~~unconditional authorization of the~~ preparation and submission of the required plans for approval or permits to the proper governmental agency, or the beginning of the actual work on the Premises, whichever first occurs.

9.7      **Termination; Advance Payments**.  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.8      **Waive Statutes**.  Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.      **Real Property Taxes**.

10.1      **Definition**.  As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Project is located.  The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein, imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project or any portion thereof or a change in the Improvements thereon.  In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.  Real Property Taxes shall not include income or capital gains taxes imposed upon Lessor, inheritance, estate, succession, transfer, gift, franchise or capital stock tax or any income taxes arising out of or related to ownership and operation of income-producing real property.  Further, Lessor agrees that if a change in ownership occurs during the first three years of this Lease, Lessee's share of the Real Property Taxes shall not include any increase in Real Property Taxes caused by such change in ownership until the beginning of year four of the Lease and beginning in year four of the Lease, the Lessee's share of the Real Property Taxes shall include any increase in Real Property Taxes caused by a change of ownership, including but not limited to, a change of ownership that occurred in the first three years of this Lease.

10.2      **Payment of Taxes**.  Lessor shall pay the Real Property Taxes applicable to the Project, and except as otherwise provided in Paragraph 10.3, any such amounts shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3      **Additional Improvements**.  Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's

Initials

Initials

© 1999 · American Industrial Real Estate Association                    FORM MTN-2-2/99E

records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees. Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of the Tenant Improvements and any Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request.

10.4 Joint Assessment. If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned to the parcel assessor's work sheets or such other information as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5 Personal Property Taxes. Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11. Utilities. Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. Lessee shall contract directly for its own electrical service for the Premises and pay all costs associated therewith directly to such providers. Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's reasonable sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the dumpster and/or an increase in the number of times per month that the dumpster is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs.

12. Assignment and Subletting.

12.1 Lessor's Consent Required.

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b) A change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose, provided, however, that this shall not apply so long as Lessee is a publicly traded company and has not assigned its interest in this Lease to an unaffiliated party.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

12.2 Terms and Conditions Applicable to Assignment and Subletting. (See Addendum Paragraph 64-Lessee Affiliates)

(a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefore to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $750.00 $1,000 or 10% of the current monthly Base Rent applicable to the portion of the Premises which is the subject of the proposed assignment or sublease, whichever is greater, as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested.

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3 Additional Terms and Conditions Applicable to Subletting. The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13. Default; Breach; Remedies.

13.1 Default; Breach. A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 10 3 business days following written notice to Lessee.

(c) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41 (easements), or (viii) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 business days for an Estoppel



Initials

REVISED

Initials

© 1998 - American Industrial Real Estate Association

Certificate and for the others fifteen (15) business days following written notice to Lessee.

(d)        A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(e)        The occurrence of any of the following events:  (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 60 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 60 30 days; provided, however, in the event that any provision of this subparagraph (e) is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(f)        The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(g)        If the performance of Lessee's obligations under this Lease is guaranteed:  (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of the guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2        Remedies.  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  The costs and expenses of any such performance by Lessor shall be due and payable by Lessee upon receipt of invoice therefor.  If any check given to Lessee shall not be honored by the bank upon which it is drawn, Lessor, at its option, may require all future payments to be made by Lessee to be by cashier's check.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)        Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee:  (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises (however, any necessary renovation or alteration costs shall be amortized over the term of any new lease, and Lessee shall only be responsible for the portion applicable to the remaining term of this Lease), reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)        Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations.  Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)        Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located.  The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3        Inducement Recapture.  Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease.  Upon Breach of this Lease by Lessee, any such Inducement Provision shall be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee.  The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4        Late Charges.  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender.  Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a one-time late charge equal to 3% for the first two (2) times and thereafter 10% of each such overdue amount or $100, whichever is greater.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5        Interest.  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments.  The interest ("Interest") charged per annum shall be equal to the prime rate reported in the Wall Street Journal as published closest prior to the date when due plus 4%, but shall not exceed the maximum rate allowed by law.  Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6        Breach by Lessor.

(a)        Notice of Breach.  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor.  For purposes of this Paragraph, a reasonable time shall in no event be more than thirty (30) days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within said 30 day period and thereafter diligently pursued to completion.

(b)        Performance by Lessee on Behalf of Lessor.  In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the amount so paid subject to the offset limitation set forth in Addendum Paragraph 67__  an amount equal to the greater of one month's Base Rent or the Security Deposit, and to pay an excess of such expense under protest, reserving Lessee's right to reimbursement from Lessor, and Lessee may also pursue any other rights and remedies available at law or in equity.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

(c)        Lessor and Lessee agree that there are certain Building Services without which Lessee cannot occupy the Premises for the purpose for which it was originally leased.  The services are heating, ventilation, air conditioning, electrical service, parking as provided in Section 2.6, water and plumbing services.  Should Lessor fail to provide any one or more of these services for a continuous period of three days or longer, then, to the extent that Lessee's failure to provide these services causes Lessee to be unable to use the Premises for the purpose for which it was originally leased, Base Rent shall abate until such service or services are restored.  After a period of thirty (30) such days within which Lessee has failed on a continuous basis to provide any one or more of these services, Lessee, at its option, may cancel this lease upon written notice to the Lessor.  This cancellation right or the right to abate rent shall not apply in the situation where the service is not provided because of Force Majeure (see Addendum Paragraph 65 ) or any

Initials __        Initials __

*other reason not within Lessor's control.*

14.      **Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the floor area of the Unit, or more than 25% of Lessee's Reserved Parking Spaces, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 30 ~~40~~ days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.     .

15.      **Brokerage Fees.**

          15.1      **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.10 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that:  (a) if Lessee exercises any Option, (b) if Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with ~~the separate agreement between Lessor and schedule of the~~ Brokers in effect at the time of the execution of this Lease.

          15.2      **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. ~~If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.~~

          15.3      **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or other (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.      **Estoppel Certificates.**

          (a)      Each Party (as "Responding Party") shall within 10 business days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing on a *commercially reasonable* form ~~in form similar to the then most current~~ "Estoppel Certificate," ~~form published by the American Industrial Real Estate Association,~~ plus *such* additional information, confirmation and/or statements as may be reasonably requested *by the* Requesting Party.

          (b)      If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

          (c)      If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall, *within 10 days after written notice from Lessor,* deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth. *The requirements of this Section 16(c) shall not apply so long as Corinthian Colleges, Inc. remains the Lessee, has not assigned its interest in this Lease and is a publicly traded company.*

17.      **Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Except as provided in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined. Notwithstanding the above, and subject to the provisions of Paragraph 20 below, the original Lessor under this Lease, and all subsequent holders of the Lessor's interest in this Lease shall remain liable and responsible with regard to the potential duties and liabilities of Lessor pertaining to Hazardous Substances as outlined in Paragraph 6.2 above.

18.      **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.      **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.      **Limitation on Liability.** Subject to the provisions of Paragraph 17 above, the obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, the individual partners of Lessor or its or their individual partners, directors, officers or shareholders, and Lessee shall look to the Premises, *Project,* including *any rental income* and *insurance* or condemnation proceeds, which interest shall not be less than 20% of the value of the Project and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against the individual partners of Lessor, or its or their individual partners, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.      **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.      **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to negotiation, execution, delivery or performance by either Lessor or Lessee under this Lease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

23.      **Notices.**

          23.1 **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, ~~except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.~~  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

          23.2 **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 48 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.      **Waivers.** No waiver by *any party* ~~Lessor~~ of the Default or Breach of any term, covenant or condition hereof by *the other party* ~~Lessee~~, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by *the other party* ~~Lessee~~ of the same or of any other term, covenant or condition hereof. Any *party* ~~Lessor's~~ consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of such *party* ~~Lessor's~~ consent to, or approval of, any subsequent or similar act by the *other party* ~~Lessee~~, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

Initials

Initials

25.   Disclosures Regarding The Nature of a Real Estate Agency Relationship.
   (a)   When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:
   (i)   Lessor's Agent. A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Lessor. To the Lessee and the Lessor: (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
   (ii)   Lessee's Agent. An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
   (iii)   Agent Representing Both Lessor and Lessee. A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.
   (b)   Brokers have no responsibility with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Lease shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.
   (c)   Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.
26.   No Right To Holdover. Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination and such holdover shall be on a month to month basis. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.
27.   Cumulative Remedies. No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.
28.   Covenants and Conditions; Construction of Agreement. All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.
29.   Binding Effect; Choice of Law. This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.
30.   Subordination; Attornment; Non-Disturbance.
   30.1   Subordination. This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Device (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.
   30.2   Attornment. In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device or this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of such new owner, this Lease shall automatically become a new Lease between Lessee and such new owner, upon all of the terms and conditions hereof, for the remainder of the term hereof, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder arising from events occurring after such transfer and such new owner shall assume all of Lessor's obligations hereunder, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor unless such new owner actually received such security deposits.
   30.3   Non-Disturbance. With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement, with Lessor's reasonable cooperation.
   30.4   Self-Executing. The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.
31.   Attorneys' Fees. If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).
32.   Lessor's Access; Showing Premises; Repairs. Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times upon two (2) days notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary. All such activities shall be without abatement of rent or liability to Lessee. Lessor shall not interfere with or disrupt the normal operation of Lessee's business. Lessor, and any third parties entering the Premises at Lessor's invitation or request shall at all times strictly observe Lessee's rules relating to security on the Premises. Lessee shall have the right, in its sole discretion, to designate a representative to accompany Lessor, or any third parties, while they are on the Premises. Lessor may at any time place on the Premises any ordinary "For Sale" signs and Lessor may during the last 6 months of the term hereof place on the Premises any ordinary "For Lease" signs. Lessee may at any time place on the Premises any ordinary "For Sublease" sign.
33.   Auctions. Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.
34.   Signs. (See Addendum Paragraph 58) Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.
35.   Termination; Merger. Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the

Initials

© 1999 - American Industrial Real Estate Association

Initials

FORM MTN-3-9/98

mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.     Consents. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable out-of-pocket costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37. ———— Guarantor.

———— 37.1     Execution. The Guarantors, if any, shall each execute a guaranty in the form most recently published by the American Industrial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

———— 37.2     Default. It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.     Quiet Possession. Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof. Lessor shall warrant and defend said right of quiet possession against the acts of all persons whomsoever.

39.     Options. If Lessee is granted an option, as defined below, then the following provisions shall apply:

39.1     Definition. "Option" shall mean: (a) the right to extend the term of or renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2     Options Personal To Original Lessee. Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3     Multiple Options. In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4     Effect of Default on Options.

(a)     Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b)     The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)     An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), (ii) Lessor gives to Lessee 3 or more notices of separate Default during any 12 month period, whether or not the Defaults are cured, or (iii) if Lessee commits a Breach of this Lease.

40.     Security Measures. Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

41.     Reservations. Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

42.     Performance Under Protest. If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.

43.     Authority. If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each party shall, within 30 days after request, deliver to the other party satisfactory evidence of such authority.

44.     Conflict. Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

45.     Offer. Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

46.     Amendments. This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations or rights hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

47.     Multiple Parties. If more than one person or entity is named herein as either Lessor or Lessee, such multiple Parties shall have joint and several responsibility to comply with the terms of this Lease.

48.     Waiver of Jury Trial. The Parties hereby waive their respective rights to trial by jury in any action or proceeding involving the Property or arising out of this Agreement.

49.     Mediation and Arbitration of Disputes. An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☒ is not  attached to this Lease.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1.     SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2.     RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

Initials

Initials

© 1999 • American Industrial Real Estate Association          FORM MTN-8-3/97

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: _____ | Executed at: _____ |
| on: November 27 , 2002 | on: November 27 , 2002 |
| By LESSOR: | By LESSEE: |
| SHACO, INC., a California corporation | CORINTHIAN COLLEGES, INC., a Delaware |
| | corporation |
| By: _____ | By: _Beth Wilson_ |
| Name Printed: _Peter Ann_ | Name Printed: _Beth Wilson_ |
| Title: _President_ | Title: _EVP Operations_ |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| Address: 333 South Grand Avenue, Suite 2020 | Address: 6 Hutton Center Drive, Suite 400 |
| Los Angeles, CA 90071 | Santa Ana, CA 92707-5764 |
| | Attn: Vice President and General Counsel |
| Telephone: (___) _____ | Telephone: (___) _____ |
| Facsimile: (___) _____ | Facsimile: (___) _____ |
| Federal ID No. _____ | Federal ID No. _____ |

These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are utilizing the most current form: American Industrial Real Estate Association, 700 South Flower Street, Suite 600, Los Angeles, CA 90017. (213) 687-8777.

©Copyright 1999 By American Industrial Real Estate Association.
All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

Initials

Initials

© 1999 • American Industrial Real Estate Association    FORM MTN-2-2/99E



# RENT ADJUSTMENT(S)
## STANDARD LEASE ADDENDUM

**Dated** November 25, 2002

**By and Between (Lessor)** SHACO, INC., a California corporation

**(Lessee)** CORINTHIAN COLLEGES, INC., a Delaware corporation

**Address of Premises:** 217 Club Center Drive, "Suite A"
San Bernardino, CA 92408-3752

Paragraph 52

**A.   RENT ADJUSTMENTS:**
The monthly rent for each month of the adjustment period(s) specified below shall be increased using the method(s) indicated below:

(Check Method(s) to be Used and Fill In Appropriately)

☐  I.  ~~Cost of Living Adjustment(s) (COLA)~~

~~a.   On (Fill in COLA Dates):~~

~~the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill In Urban Area):~~

~~All Items (1982-1984 = 100), herein referred to as "CPI".~~

~~b.   The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): ☐ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"):_____. The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly rent be less than the rent payable for the month immediately preceding the rent adjustment.~~

~~c.   In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.~~

☐  II.  ~~Market Rental Value Adjustment(s) (MRV)~~

~~a.   On (Fill in MRV Adjustment Date(s):~~

~~the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:~~

~~1)   Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached within thirty days, then~~

~~(a)   Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days. Any associated costs will be split equally between the Parties.~~

~~(b)   Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:~~

~~(i) Within 15 days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.~~

~~(ii) The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.~~

~~(iii) If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.~~

~~(iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, i.e. the one that is NOT the closest to the actual MRV.~~

~~2)   Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.~~

~~b.   Upon the establishment of each New Market Rental Value:~~

Initials: _JL_                                                           Initials: _RW_

**RENT ADJUSTMENT(S)**
Page 1 of 2

©2000 - American Industrial Real Estate Association                    REVISED                    FORM RA-3-8/00E

~~1) the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and~~
~~2) the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.~~

☑ III. **Fixed Rental Adjustment(s) (FRA)**

The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| March 1, 2004 | $31,849.91 |
| March 1, 2005 | $32,805.41 |
| March 1, 2006 | $33,789.57 |
| March 1, 2007 | $34,803.26 |
| March 1, 2008 | ~~$35,847.35~~ |
| March 1, 2009 | ~~$36,922.77~~ |
| March 1, 2010 | ~~$38,030.45~~ |

B. **NOTICE:**
Unless specified otherwise herein, notice of any such adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C. ~~BROKER'S FEE:~~
~~The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.~~

**NOTE:** These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are utilizing the most current form: AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION, 700 S. Flower Street, Suite 600, Los Angeles, Calif. 90017

Initials: _____

Initials: _____

©2000 - American Industrial Real Estate Association     REVISED     FORM RA-3-8/00E

# EXHIBIT A

## CLUB POWER CENTER
## PHASE II

### CORINTHIAN COLLEGES, INC
### PREMISES



**EXHIBIT B-1**
Page 1 of 2

**CLUB POWER CENTER**
PHASE I



## EXHIBIT B-1
### Page 2 of 2

### CLUB POWER CENTER
### PHASE I

### LEGAL DESCRIPTION OF PROPERTY

THE LAND REFERRED TO HEREIN IS SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF SAN BERNARDINO, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

PARCELS 2 AND 3 OF PARCEL MAP NO. 11148, AS SHOWN BY MAP ON FILE IN BOOK 135 PAGE(S) 30 AND 31, OF PARCEL MAPS, RECORDS OF SAN BERNARDINO COUNTY, CALIFORNIA;

EXCEPT THEREFROM THAT PORTION OF PARCEL 3 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHEASTERLY CORNER OF SAID PARCEL 3; THENCE SOUTH 89°47'54" WEST, A DISTANCE OF 520.17 FEET; THENCE NORTH 00°12'11" WEST, A DISTANCE OF 20.00; THENCE NORTH 89°47'54" EAST, A DISTANCE OF 520.23 FEET; THENCE SOUTH 00°01'25" EAST, A DISTANCE OF 20.00 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF LOT(S) 4, BLOCK 65 OF RANCHO SAN BERNARDINO, AS SHOWN BY MAP ON FILE IN BOOK 7 PAGE(S) 2, OF MAPS, RECORDS OF SAN BERNARDINO COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF PARCEL 2 OF PARCEL MAP 10423, RECORDED IN BOOK 114 PAGES 2 AND 3, OF PARCEL MAPS, RECORDS OF SAID COUNTY; THENCE NORTH 89°47'54" EAST, A DISTANCE OF 106.00 FEET; THENCE SOUTH 00°12'06" EAST, A DISTANCE OF 20.00 FEET; THENCE NORTH 89°47'54" EAST, A DISTANCE OF 465.32 FEET; THENCE SOUTH 00°12'11" EAST, A DISTANCE OF 207.17 FEET; THENCE NORTH 80°12'36" WEST, A DISTANCE OF 588.65 FEET; THENCE NORTH 00°01'04" WEST, A DISTANCE OF 125.03 FEET; THENCE NORTH 89°47'02" EAST, A DISTANCE OF 8.00 FEET TO THE POINT OF BEGINNING.



# EXHIBIT B-2

## CLUB POWER CENTER
## PHASE II



## EXHIBIT C

## TENANT IMPROVEMENTS

### WORK LETTER

In connection with the Lease to which this Work Letter is attached and in consideration of the mutual covenants hereinafter contained, Lessor and Lessee agree as follows:

1.     Tenant Improvements.

      (a)     Lessee and its space planner ("Space Planner") shall prepare space plans for improvements to the Premises (the **"Tenant Improvements"**). Lessee shall submit such space plans to Lessor for its review, and Lessor shall approve or disapprove the space plans within five (5) business days after receipt thereof. Lessor's approval shall not be unreasonably withheld, delayed or conditioned. If Lessor should fail to approve or disapprove the space plans then Lessor shall be deemed to have approved the space plans.

      (b)     Based on the approved space plans of the Premises, an Architect reasonably approved by Lessor and Lessee ("Architect") shall prepare final working drawings ("**Working Drawings**") for the Tenant Improvements. Lessee shall submit such Working Drawings to Lessor for its review, and Lessor shall approve or disapprove the Working Drawings within seven (7) business days after receipt thereof. Lessor's approval shall not be unreasonably withheld, delayed or conditioned. If Lessor should fail to approve or disapprove the Working Drawings then Lessor shall be deemed to have approved the Working Drawings.

      (c)     Lessor shall deliver the Premises to Lessee on the Early Possession Date, in its AS IS CONDITION, except that the following conditions shall be in existence in the Premises on the Early Possession Date, at Lessor's sole cost and expense (the "**Base Building Conditions**"):

           (i)     Flooring: Flooring shall have been stripped to sub-flooring so that all tiles are removed and the floor is patched.

           (ii)     HVAC: heating, ventilation and air conditioning capacity available to the Premises of at least fifty-three (53) tons, with such HVAC systems having been serviced immediately prior to delivery of the Premises to Lessee and in good working order and condition.

           (iii)     Exterior: All exterior walls in good painted condition; sufficient lighting in exterior perimeter and parking areas.

Shaco Inc. Corinthian Lease Work letter.doc

    (iv)    Electrical Capacity: Electrical power capacity in the Premises sufficient to meet Lessee's operational needs, which is eight (8) watts per rentable square foot of 120/208 volt, including all necessary primary distribution equipment, including transformers, panels, etc.

Prior to the execution of this Lease, Lessee has made such tests and inspections as it deems appropriate regarding the Base Building Conditions, and Lessee's execution of this Lease shall be deemed conclusive proof of the existence, adequacy and sufficiency of all such Base Building Conditions and delivery of the Premises with such Base Building Conditions in existence on the Early Possession Date, subject to Lessor's completion of the HVAC work set forth on Schedule No. 1, if required, as set forth below. The foregoing notwithstanding, Lessee may, at Lessee's option, replace the Existing HVAC Units with New HVAC Units as part of the Tenant Improvements and the cost of such replacement New HVAC Units shall be paid from the Tenant Improvement Allowance or, at Lessee's option, from the Lessee's own funds, provided however, if Lessee does not replace the Existing HVAC Units as part of the Tenant Improvements, then Lessor shall at Lessor's sole costs and expense, upon the written request of Lessee, make the suggested upgrades to the HVAC systems set forth in Schedule No. 1 which is attached to this Work Letter and incorporated herein by this reference.

2.    Lessor shall provide a Tenant Improvement Allowance in the amount of $35.00 per square foot contained in the Premises (in the total amount of $845,530) (the "**Tenant Improvement Allowance**") to be applied towards the cost to complete the Tenant Improvements (the "**Cost**"), which shall include the initial construction of the Premises, architectural and MEP services. Lessor and Lessee may have their own construction management services, which shall be paid for by the Lessor and/or Lessee individually and shall not be part of the Tenant Improvement Allowance. The Tenant Improvement Allowance, shall be paid to or for the benefit or account of Lessee periodically as work progresses within 7 days of receipt of Lessee's written request; provided, however, Lessor shall not be required to disburse more than twice during any month and shall not be required to make more than fifteen (15) disbursements of the Tenant Improvement Allowance in total. With each application for payment, the Lessee shall submit receipted invoices or invoices with check vouchers attached and any other evidence reasonably required by the Lessor to substantiate the amount set forth in the application for payment. At the time of submission of each application for payment, the Lessee shall deliver to the Lessor the following Mechanic's Lien Release:  a conditional waiver and release upon progress payment or a conditional waiver and release upon final payment, as appropriate (conditioned only upon receipt of payment), executed by the contractor and each subcontractor and material supplier intended to be paid out of the particular application for payment and covering all labor, services, equipment and material performed or supplied by the contractor and the particular subcontractor or material supplier since the last previous payment.  Lessor shall holdback ten percent (10%) of the Tenant Improvement Allowance as a final payment, constituting the entire unpaid balance, which shall be paid by the Lessor to the Lessee within thirty (30) days after Substantial Completion (provided, however, that final payment shall not release the Lessee's responsibility to correct nonconforming work discovered by Lessor after final payment

and to satisfy other requirements, if any, which necessarily survive final payment). Concurrently with the final payment, the Lessee shall deliver to the Lessor full and complete lien releases executed by the contractor and each subcontractor and material supplier intended to be paid out of the particular payment and covering all labor, services, equipment and material performed or supplied by the contractor and the particular subcontractor or material supplier for the Tenant Improvements.

3.      Lessee shall have the right to have the construction contracts for the architect, the engineer, the general contractor and subcontractors put out to competitive bids with reputable contractors licensed by the State of California and reasonably acceptable to Lessor and Lessee, prior to the start of any construction or architectural work.

4.      The following process shall be implemented for the construction of the Tenant Improvements :

        (a)     The criterion for choice on all contractors, sub contractors and main engineers shall be the lowest bid, unless Lessee reasonably selects a contractor, sub-contractor or main engineer who has not submitted the lowest bid, which selection by Lessee shall only be effective if approved by Lessor. Lessor shall be deemed to have approved such selection unless Lessor specifically disapproves such selection within 3 business days of Lessor's receipt of a request from Lessee for Lessor's approval of Lessee's selection of a contractor, sub-contractor or main engineer that did not submit the lowest bid along with an explanation by Lessee for such selection. Lessor's approval shall not be unreasonably withheld or delayed and any disapproval shall contain a specific reason or reasons for such disapproval. Lessee shall provide Lessor copies of all bids prior to Lessee's acceptance of any bid. Lessor shall be permitted to provide a reasonable level of oversight (at its sole cost) to ensure code compliance, structural integrity of improvements and impact on other lessees in the Building.

        (b)     The Lessor shall approve (or provide written comments thereto) Lessee's plans and specifications for the construction/alteration of the Premises within ten (10) business days of receipt. Any such approval shall not be unreasonably withheld, delayed or conditioned.

        (c)     Lessor shall provide connections for all utilities during the construction of the Tenant Improvements (i.e., electrical, HVAC, etc.) at the cost of Lessee, except that any such costs can be paid from and applied against the Tenant Improvement Allowance.

        (d)     Lessee or its contractors shall be allowed to place a forty (40) cubic-yard dumpster in an area adjacent to the Premises during construction.

        (e)     There shall be no charge for after-hours contractor or subcontractor access.

        (f)     If reinforcing of the floor is required, Lessee shall have the right, at its sole cost and expense, to reinforce the floor in any areas specified by Lessee's structural engineer as specified and designed by Lessee's structural engineer.

        (g)     No construction management or coordination fee shall be payable to Lessor.



Shaco Inc. Corinthian Lease Work letter.doc

(h)     All work shall be performed in accordance with Applicable Requirements, and shall be in a good and workmanlike manner, free and clear of mechanic's liens.

5.     After approval of the Working Drawings, Lessee shall diligently commence and prosecute to completion the Tenant Improvements.

6.     Lessee acknowledges and agrees that Lessee at its sole cost shall be responsible for obtaining, delivering and installing in the Premises all necessary and desired furniture, telephone equipment, computer cabling, telephone cabling, telephone service, business equipment, art work and other similar items, and that Lessor shall have no responsibility whatsoever with regard thereto.

7.     In connection with the Tenant Improvement work, Lessee must provide all insurance and documentation required from Lessee by the Lease.

8.     No mechanic's or materialmen's liens are permitted at any time and shall be discharged, by Lessee, by release or statutory bond within 30 days of the date of recording.  Lessee shall provide Lessor with at least 10 days advance notice before commencement of construction so the Premises can be posted with Lessor's notices of non-responsibility.

BRYMAN COLLEGE

217 Club Center Drive, Suite A

San Bernardino, California

*Schedule No. 1*

## Equipment Schedule

Unit #2   Carrier   Model # 50PQ012-600DA   Serial # Y884011      460 Volt 3 Phase

         The compressor has been replaced on this unit within the last six

         years. 1 - Single pole contactor pitted, 3 - 2 pole contactors pitted should be

         replaced. Drain pan rusted with debris in it.

Unit #3   Carrier   Model # 50PQ012-600DA   Serial # Y884012      460 Volt 3 Phase

         1 - Single pole contactor pitted, 3 - 2 pole contactors pitted should be

         replaced. Drain pan rusted with debris in it.

Unit #4   Carrier   Model # 50PQ012-600DA   Serial # X888437      460 Volt 3 Phase

         1st Stage is running. Found unit iced up due to loose belt, unit possibly

         running continuously. 1 - Single pole contactor pitted, 3 - 2 pole contactor

         pitted should be replaced. Drain pan is rusted with debris in it.

Unit #5   Carrier   Model # 50PQ012-600DA   Serial # Y884010      460 Volt 3 Phase

         1 - Single pole contactor pitted, 3 - 2 pole contactors pitted should be

         replaced. Drain pan rusted with debris in it.

Unit #6   Carrier   Model # 50PQ012-600DA   Serial # Y884003      460 Volt 3 Phase

         1 - Single pole contactor pitted, 3 - 2 pole contactors pitted, should be replaced,

         Drain pan rusted with debris in it.

Unit #7   Carrier   Model # 5 Ton Nomenclature Covered by Disconnect   460 Volt 3 Phase

         Condenser coil plugged in compressor compartment. Ductwork at unit needs to

         be sealed. Filter located in ductwork on roof. Cover for filter is worn out and

         warped, need to fabricate new cover.



# EXHIBIT D

## CLUB POWER CENTER
## PHASE I

### PARKING AREA OF PHASE I

### 4 RESERVED SPACES HIGHLIGHTED



# EXHIBIT E

## CLUB POWER CENTER
## PHASE I

### PARKING AREA OF PHASE I

### PROHIBITED SPACES HIGHLIGHTED



EXHIBIT F
Page 1 of 3



37.5" LARGE CAPS
30" SMALL CAPS

CREATED EXCLUSIVELY FOR   BRYMAN COLLEGE
ADDRESS        E. CAROLINE ST                  CITY
SIGN LOCATION   SAN BERNARDINO, CA      CITY
DESIGN NO.     #9497                              DATE:   10-24-02
DESIGNER      SPH                                SCALE  3/32" = 1' 0"
ACCOUNT REPRESENTATIVE   JIM GRAFF
CLIENTS APPROVAL                                 DATE
LANDLORDS APPROVAL
PRIMARY WIRING OF ADEQUATE VOLTAGE & CIRCUITS TO SIGN  FURNISHED AND CONNECTED BY CLIENT

US SIGNS

Corporate Office          Buffalo Regional Office
1900 Anreg  Ste 200        4053 Maple RD
Houston, TX  77057        Amherst, New York 14226
FAX 713 977 7481          FAX 716 831 0774
713 977 7900              716 831-7800

NOTES:
CHANNEL LTRS – 2051 BLUE FACES / RETAINERS 1" DARK BRONZE JEWELITE
/ RETURNS .040 DARK BRONZE ALUMINUM / BACKS .080 DARK BRONZE
ALUMINUM / NEON DOUBLE TUBE HORIZON BLUE / 30 M.A. TRANSFORMERS

The purchaser agrees to hold the seller harmless against any costs to obtain by damage which may occur as a result of defective foundations, including but not limited to above, gas lines or any underground elements which the purchaser or others only does.

THIS DESIGN AND ENGINEERING IS SUBMITTED AS OUR PROPOSAL, AND THE RIGHT TO USE AND REPRODUCE OR EXHIBIT IN ANY FORM, IS NOT AUTHORIZED WITHOUT WRITTEN PERMISSION BY US SI



EXHIBIT F
Page 2 of 3



37.5" LARGE CAPS
30" SMALL CAPS

CREATED EXCLUSIVELY FOR    BRYMAN COLLEGE
ADDRESS        E. CAROLINE ST                    CITY
SIGN LOCATION    SAN BERNARDINO, CA              CITY
DESIGN NO.      #9496              DATE:    10-24-02
DESIGNER    SPH                    SCALE  1/8" = 1' 0"
ACCOUNT REPRESENTATIVE    JIM GRAFF
CLIENTS APPROVAL                                  DATE
LANDLORDS APPROVAL
PRIMARY WIRING OF ADEQUATE VOLTAGE & CIRCUITS TO SIGN  FURNISHED AND CONNECTED BY CLIENT

SIGNS

Corporate Office
1800 Herring Ave 200
Hamilton, TX 77467
FAX 713 977 7901
713 977 7900

Buffalo Regional Office
1051 Maple RD
Amherst, New York 14276
FAX 716 831 0279
716-831 7008

NOTES:

CHANNEL LTRS – 3051 BLUE FACES / RETAINERS 1" DARK BRONZE JEWELITE
/ RETURNS .040 DARK BRONZE ALUMINUM / BACKS .080 DARK BRONZE
ALUMINUM / NEON DOUBLE TUBE HORIZON BLUE / 30 M.A. TRANSFORMERS

The purchaser agrees to hold this entire business against any count by seller for the designs which may occur as a result of driving it and foundations, including but not limited to errors, gouge lists of city's underground utilities which are not purchases or others may direct at

THIS DESIGN AND ENGINEERING IS SUBMITTED AS OUR PROPOSAL, AND THE RIGHT TO USE AND REPRODUCE OR EXHIBIT IN ANY FORM IS NOT AUTHORIZED WITHOUT WRITTEN PERMISSION BY US SIG



EXHIBIT F
Page 3 of 3



CREATED EXCLUSIVELY FOR     NIT
ADDRESS     E. CAROLINE ST                    CITY
SIGN LOCATION    SAN BERNARDINO, CA          CITY
DESIGN NO.     #9498                          DATE:     10-24-02
DESIGNER     SPH                              SCALE     NONE
ACCOUNT REPRESENTATIVE    JIM GRAFF
CLIENTS APPROVAL                              DATE
LANDLORDS APPROVAL
PRIMARY WIRING OF ADEQUATE VOLTAGE & CIRCUITS TO SIGN  FURNISHED AND CONNECTED BY CLIENT

NOTES:

THIS DESIGN AND ENGINEERING IS SUBMITTED AS OUR PROPOSAL, AND THE RIGHT TO USE AND REPRODUCE OR EXHIBIT IN ANY FORM IS NOT AUTHORIZED WITHOUT WRITTEN PERMISSION BY US SIGNS



# ADDENDUM TO
## STANDARD INDUSTRIAL/COMMERCIAL LEASE

| | |
|---|---|
| Dated: | November 25, 2002 |
| By and Between (Lessor) | Shaco, Inc. |
| (Lessee) | Corinthian Colleges, Inc. |
| Address of Premises: | 217 Club Center Drive, Suite A |
| | San Bernardino, CA |

---

THIS ADDENDUM is made a part of that certain Lease set forth above. If there is any conflict between the terms and provisions of the Lease and the terms and provisions of this Addendum, this Addendum shall control. Capitalized terms not otherwise defined herein shall have the meaning set forth in the Lease.

50. Parking Facilities.

(a) Lessee shall designate, four (4) reserved parking spaces, to be marked with the name Lessee designates, located around the Building in a specific location to be submitted to and approved by Lessor (the "**Reserved Spaces**"). Lessee, its employees, agents, customers and visitors shall also have the non-exclusive right to use any of the remaining parking spaces located on the Project as depicted on Exhibit D attached hereto and incorporated herein (the "**Parking Area**"), which are to be used in common with all other tenants of the Building and the Project. All parking shall be provided at no cost to Lessee during the Term.

(b) Lessor hereby covenants that it will not lease any space in the Building located on the Project to any tenant whose use of the Parking Area would cause less than two hundred (200) parking spaces within the Parking Area to be available for the use of Lessee, its employees, agents, customers and visitors.

(c) Lessee hereby acknowledges that its use of the Parking Area shall be in common with other tenants of Club Center Phase I and Club Center Phase II and that while the Reserved Spaces will be marked as reserved for Lessee's use, such Reserved Spaces are subject to the Club Center Reciprocal Parking Rights.

(d) Lessee shall prohibit its employees, management and students from parking in the parking area noted on Exhibit E attached hereto and incorporated herein, which Exhibit E may be attached to this Lease, upon the approval of Lessee, subsequent to the execution hereof.



Shaco Corinthian Addendum.doc

51.　Lessee's Use of Premises Before Commencement Date.　Upon the execution of this Lease by the parties hereto and the delivery of the Security Deposit (as defined below) by Lessee to Lessor (the "Early Possession Date"), Lessee and its employees, agents and contractors may enter into the Premises, without incurring any liability for payment of Rent except as set forth in Paragraph 3.2,, for the purpose of commencing and completing the Tenant Improvements and installing and arranging Lessee's furnishings, fixtures, equipment and other property and otherwise making the Premises ready for Lessee's use and occupancy; provided, however, that in connection with the access permitted hereunder, Lessee covenants (i) to comply with all reasonable standards and regulations established by Lessor to ensure the maintenance of the Premises in a safe condition; (ii) that such access shall be at the sole risk of Lessee and shall be deemed to be a license; (iii) that prior to exercising such right, Lessee shall deliver to Lessor a certificate of insurance evidencing the insurance coverage that Lessee is obligated to obtain and maintain pursuant to this Lease; (iv) that Lessee shall indemnify and hold Lessor harmless from and against any and all claims arising from, or claimed to arise from, or out of the performance of any work by or on behalf of Lessee in the Premises (excepting any such claims arising out of the performance of such work by Lessor, its contractors, employees or agents), or for any other reason whatsoever arising out of Lessee's access to or being in the Premises prior to the Commencement Date; and (v) Lessee shall arrange for all utilities to be put into Lessee's name at time of Early Possession Date, it being understood that utility bills incurred during construction shall be paid by Lessee but may be, at Lessee's option, offset against the Tenant Improvement Allowance as referenced in Exhibit C.

52.　Rent Increases.　See RENT ADJUSTMENTS – Standard Lease Addendum, designated Paragraph 52, which is attached hereto and incorporated herein by this reference.

53.　Use.　Lessee shall have the right to use and occupy the Premises for post-secondary educational and training services and general office use to support its post secondary educational and training services on the Premises and for any other purpose consistent with Applicable Requirements which is consistent with Lessee's normal conduct of business (the "Agreed Use"), which use shall include, without limitation, lunch room, kitchen facilities and vending machines in the Premises for Lessee's and its employees', students', invitees' and visitors' use.　Any change in the use of the Premises shall not violate the use restrictions applicable to Units B and C, if any.　Lessor represents and warrants that all applicable covenants, restrictions, easements and other Applicable Requirements (other than zoning) in effect as of the date hereof and as of the Start Date permit the use of the Premises for the Agreed Use.

54.　Common Area Operating Expenses.　Notwithstanding any other provision of this Lease to the contrary, Common Area Operating Expenses shall include all costs for maintenance of the exterior of the Building, including painting and parking lot resurfacing and striping, as well as replacement of the roof and HVAC systems when repair is not practicable.

　　　(a)　Notwithstanding any other provision of this Lease to the contrary, the following shall be excluded from Common Area Operating Expenses:



2

(i)    Repairs or other work occasioned by (i) fire, windstorm, or other casualty of the type against which Lessor has insured or is required to insure pursuant to the terms of this Lease, or for which Lessor is entitled to reimbursement, whether or not collected, from third parties, with the exception of any deductible amount not covered by insurance, or (ii) the exercise of the right of eminent domain;

(ii)    Marketing costs, leasing commissions, finders' fees, attorney's fees, costs and disbursements and other expenses incurred in connection with negotiations or disputes with tenants, other occupants, prospective tenants or other occupants, or the sale or refinancing of the Building, or legal fees incurred in connection with this Lease, except in defense of the Common Areas;

(iii)    Expenses, including permits, license, design, space planning, and inspection costs, incurred in tenant build-out, renovating or otherwise improving or decorating, painting or redecorating space for tenants or other occupants of space;

(iv)    Lessor's costs of electricity and other services sold or provided to tenant s in the Building and for which Lessor is entitled to be reimbursed, whether or not collected, by such tenants as a separate additional charge or rental over and above the basic rent or escalation payment payable under the lease with such Lessee;

(v)    Costs incurred by Lessor for alterations which are considered capital improvements and replacements under generally accepted accounting principles consistently applied, and all other costs of a capital nature, including, but not limited to, capital improvements, capital repairs, capital equipment and capital tools all determined in conformity with generally accepted accounting principles consistently applied; excepting replacement and/or repair of roof, HVAC, painting of exterior, repair and/or resurfacing and restripping of parking lot.

(vi)    Depreciation and amortization;

(vii)    Expenses in connection with non-Building standard services or benefits of a type which are not provided to Lessee but which are provided to other tenant s or occupants of the Building, or for which Lessee is charged directly but which are provided to another tenant or occupant of the Building without direct charge;

(viii)    Costs incurred due to violation by Lessor or any tenant or other occupant of the terms and conditions of any lease or other rental arrangement covering space in the Building,



(ix)    Amounts paid to subsidiaries or other affiliates of Lessor (i.e., persons or companies controlled by, under common control with, or which control, Lessor) for services on or to the Project, the Building or the Premises (or any portion thereof), to the extent only that the costs of such services exceed competitive costs of such services were they not so rendered by a subsidiary or other affiliate of Lessor;

(x)    Bad debt expenses, payments of principal, interest, late fees, prepayment fees or other charges on any debt or amortization payments on any mortgage or mortgages executed by Lessor covering the Project or the Building (or any portion thereof) now or in the future, rental concessions or negative cash flow guaranties, or rental payments under any ground or underlying lease or leases;

(xi)    Lessor's general administrative overhead expenses for services not specifically performed for the Building, or salaries of any officer or employee of Lessor (or any subsidiary or affiliate of Lessor) above the grade of building manager;

(xii)    Any compensation paid to clerks, attendants, or other persons in commercial concessions operated by Lessor;

(xiii)    All items and services for which Lessee pays directly to third parties or for which tenant s reimburse Lessor;

(xiv)    Advertising and promotional expenditures, and costs of signs in or on the Building identifying the owner of the Building or signs (other than the Building directory in the lobby of the Building) identifying other tenant s of the Building or their employees, divisions, subsidiaries, subtenant s or assignees;

(xv)    Any costs, fines, or penalties incurred due to violations by Lessor of any governmental rule or authority, excepting any violation caused by Lessee which shall be paid by Lessee;

(xvi)    Costs for or relating to sculpture, paintings, or other art;

(xvii)    Building, project, asset or other management fees in an aggregate amount in excess of three percent (3%) of the annual gross rental income of the Building for any year;

(xviii)    Any tax or assessment of any nature, including, without limitation, any mortgage tax or fee other than Real Estate Taxes;

(xix)   Any costs necessitated by or resulting from the gross negligence or willful misconduct of Lessor, its agents, employees and/or independent contractors;

(xx)    Charitable or political contributions;

(xxi)   Costs associated with the operation of the business of the partnership or entity which constitutes Lessor, or the operation of any parent, subsidiary or affiliate of Lessor, as the same are distinguished from the costs of operation of the Building, including without limitation corporate accounting and legal matters, costs of defending any lawsuits with any mortgagee, costs of selling, syndicating, financing, mortgaging or hypothecating any of Lessor's interest in the Building, and costs of any disputes between Lessor and its employees or disputes of Lessor with third-party building management;

(xxii)  Costs and expenses due to termination or underfunding of any plan under ERISA or any other law or regulation governing employee pension plans or other benefits;

(xxiii) Cost of electricity and other utilities consumed by other tenants or occupants in excess of levels provided to Lessee on a per rentable square foot basis;

(xxiv)  Costs of installing, operating, and maintaining any specialty services operated by Lessor, including, without limitation, any luncheon club, athletic facility, telecommunications facilities, public meeting rooms, art galleries, concierge, or retail facility;

(xxv)   Cost of insurance premiums for insurance not reasonably necessary or customarily carried by owners of similar buildings in the area in which the Building is located;

(xxvi)  Costs incurred to cure or correct any latent defects or any violation of, or to otherwise comply with, any laws, statutes, ordinances, codes or other governmental rules, regulations or requirements now in force as of the Start Date, or with the requirements of any board of fire underwriters or other similar body now in effect.  Note that this only applies to laws in effect on the Start Date, not subsequent changes in law;

(xxvii) The HVAC Costs paid by Lessee pursuant to Paragraph 55 shall not be included in Common Area Operating Expenses; and

(xxviii)Expenses in connection with the design, installation, operation, maintenance, repair or replacement of telecommunications equipment or facilities (other than fire or other life safety equipment).



(b)     <u>General Principles</u>. Common Area Operating Expenses shall be computed in accordance with the following general principles:

        (i)     Any Common Area Operating Expenses resulting from a change of policy or practice in the operation of the Building which causes an increase in Operating Expenses shall be included in Operating Expenses for a particular year only if such change in policy or practice is one which would have been made by a reasonably prudent operator of comparable buildings in the area in which the Building is located and such increase is being charged to all of the tenant s of the Building. All services rendered to and materials supplied to the Building shall be rendered or supplied at no greater cost than the market rate in arm's-length transactions for similar services or materials rendered or supplied for similar purposes in the same geographical location or trade area as the Building.

        (ii)     In no event shall any adjustment in Common Area Operating Expenses result in Lessor collecting more than one hundred percent (100%) of the actual increase in Common Area Operating Expenses incurred by it from Lessee and all the other tenant s of the Building, and Lessor shall not recover the costs of any items more than once.

        (iii)     All assessments which may be paid in installments shall be paid by Lessor in the maximum number of installments permitted by law and not included in Common Area Operating Expenses or Real Estate Taxes except in the year in which the assessment is actually paid.

(c)     <u>Lessee Audit Rights</u>.

        (i)     If Lessee objects to Lessor's determination of Common Area Operating Expenses, Lessee shall so advise Lessor, stating with specificity its reasons therefor. If Lessor and Lessee are unable, despite their good faith reasonable efforts, to agree upon the amount of Common Area Operating Expenses, then, within thirty (30) days of Lessor's receipt of Lessee's objections thereto, either party may submit the matter to arbitration with a mutually acceptable third-party arbitration service.

        (ii)     Once a year, within sixty (60) days after Lessee's receipt of the reasonably detailed statement showing Lessee's actual share of the Common Area Operating Expenses for the prior year pursuant to Paragraph 4.2(d) of the Lease, Lessee shall be entitled, upon ten (10) business days prior written notice, and during normal business hours at Lessor's office or such other place in the area in which the Building is located as Lessor may reasonably designate, to inspect and examine and/or have a reputable independent CPA or consultant selected by Lessee audit the books and records of Lessor relating to the determination of Common Area



Operating Expenses. If the audit discloses that the amount of Common Area Operating Expenses billed to Lessee was incorrect, the appropriate party shall pay to the other party the deficiency or overpayment, as applicable. All costs and expenses of the audit shall be paid by Lessee unless the audit shows that Lessor overstated or understated Common Area Operating Expenses for the subject calendar year by more than five percent (5%) in which case, Lessor shall pay all costs and expenses of the audit.

(iii)   Lessor shall maintain accurate and complete books and records evidencing Common Area Operating Expenses for a period of not less than five (5) years after Lessor issues a statement for any calendar year. The books and records shall be located in the Office of the Lessor.

55.     Service Contracts. Lessor will contract for a maintenance contract for HVAC, which will include the six existing HVAC units ("Existing HVAC Units") which are presently in good working condition, having been serviced within 30 days prior to the delivery of the Premises and any new HVAC units (the "New HVAC Units") which are installed as part of the Tenant Improvement Plans or at any time during the term of this Lease. Lessee will pay 100% of costs of maintenance contract, and reasonable and necessary repairs for the Existing HVAC Units and the New HVAC Units ("The HVAC Costs"). Lessor will keep the maintenance contract current and will authorize the repairs and replacements as suggested by the maintenance company. Lessor will be responsible to initially pay The HVAC Costs and then Lessor will bill Lessee and Lessee shall promptly pay Lessor for The HVAC Costs, it being understood that The HVAC Costs are Lessee's sole responsibility. Lessee shall be responsible to contact the service company directly for any disruption of service emergencies. The cost of replacing HVAC units shall be subject to the provisions of Paragraph 7.1(d) of the Lease, except that Lessee may, at Lessee's option, replace the Existing HVAC Units with New HVAC Units (i) as part of the Tenant Improvements and the cost of such replacement New HVAC Units shall be paid from the Tenant Improvement Allowance or, at Lessee's option, from Lessee's own funds; or (ii) at any other time during the term of this Lease at Lessee's option and paid for by Lessee from Lessee's own funds, unless such replacement is pursuant to Paragraph 7.1(d) of this Lease. Lessee's option to replace the Existing HVAC Units as set forth above does not change the Lessor's obligations with respect to the HVAC system as set forth in this Lease.

56.     Tenant Improvements; Base Building Conditions; Completion Guaranty.

(a)     Lessee will complete the Tenant Improvements as described in and in accordance with the work letter attached hereto and incorporated herein as Exhibit C (the "**Tenant Improvements**") in a good and workmanlike manner and in compliance with all Legal Requirements. All materials used by Lessee shall be new and of good quality.

(b)     Within five (5) days after execution of this Lease by both parties and prior to Lessee's commencement of the Tenant Improvements, Lessee shall deliver to Lessor a letter of credit in the amount of $1,000,000 in form reasonably acceptable to Lessor and issued by a financial institution reasonably acceptable to Lessor (the "**Completion Letter of Credit**"),



7

which Completion Letter of Credit shall guaranty Lessee's performance of the terms of this Lease with respect to completion of the Tenant Improvements. Lessor shall be entitled to draw on the Completion Letter of Credit only upon Lessee's failure to Substantially Complete the Tenant Improvements in breach of the terms of this Lease. The Completion Letter of Credit shall be released by Lessor and returned to Lessee, and shall be of no further force and effect thirty (30) days after the Substantial Completion of the Tenant Improvements and the occupancy of the Premises by Lessee.

      (c)    Lessor hereby covenants that the Base Building Conditions set forth in <u>Exhibit C</u> hereto have been satisfied, or will have been satisfied in time sufficient for Lessee to commence and complete the Tenant Improvements.

57.   <u>Substantial Completion</u>. The Premises shall be deemed "Substantially Completed" upon the occurrence of all of the following: (i) construction by Lessee of the Tenant Improvements for which Lessee is responsible, all in accordance with the provisions of this Lease, and Lessee's delivery to Lessor of a certificate of Lessee's architect to that effect; (ii) all proposed means of ingress, egress, parking and loading areas are available for Lessee's use; (iii) a final or temporary certificate of occupancy shall have been issued and remain in effect for the Premises; (iv) the Premises shall comply with all certificates, permits and approvals required by applicable laws, statutes, ordinances, orders, codes, rules and regulations of all federal, state, county, city and local departments and agencies; and (v) the remaining work required to make the Premises fully completed consists solely of minor details of construction, mechanical adjustments or decoration, which will not interfere with Lessee's use and enjoyment of the Premises. Lessee's taking occupancy of the Premises shall not relieve Lessee of its obligation to proceed diligently to fully complete the Premises, to obtain a final certificate of occupancy, and to complete all punch-list items within thirty (30) days after the Commencement Date.

58.   <u>Signs</u>.

      (a)    Lessee, at Lessee's sole cost and expense and in accordance with (i) the rules of any protective covenants applicable to the Project (a copy of which Lessor has delivered to Lessee), (ii) Lessor's approval, which shall not be unreasonably conditioned, withheld or delayed, and (iii) Applicable Requirements, may install (i) an exterior monument sign in front of the Building identifying Lessee's business, and (ii) a sign illuminated across the front/top of the Building, in accordance with the Signage Diagram attached hereto and incorporated herein as <u>Exhibit F</u>, and hereby approved by Lessor. Lessee, at Lessee's sole cost and expense, shall maintain any such monument and Building sign in a first-class condition during the Term and any extended term of this Lease.

      (b)    At no cost to Lessee, Lessee shall have the right to use the freeway sign located on Redlands Boulevard in San Bernardino, California, behind the Carl's Jr. Restaurant, which currently reads "Wickes." Lessee, at Lessee's sole cost and expense, shall (i) obtain any required governmental permits and approvals, (ii) install such signage, and (iii) maintain such signage. Such freeway sign may only be used by Lessee to advertise its business and may not be sublet to any other party.



59.    Option to Renew.

(a)    Lessor hereby grants to Lessee the exclusive and irrevocable option to renew this Lease for two (2) additional terms of five (5) years each by giving Lessor written notice at least six (6) months, but not more than nine (9) months, prior to the Expiration Date of the original Term or any applicable renewal period, or earlier pursuant to the terms of Section 2.3(b) of the Lease. Options may only be exercised consecutively.

(b)    Except for the provisions of this Lease regarding the Work Letter, the Tenant Improvements and the options to extend (all of which only apply to the original Term and not to any renewal terms), the renewal shall be on the same terms and conditions as this Lease, except that the Base Rent shall be ninety percent (90%) of Fair Market Rent. **"Fair Market Rent"** shall be determined as follows:

(i)    Within fifteen (15) days after Lessee exercises its option to renew, Lessor will advise Lessee of its determination of Fair Market Rent for the renewal term. Lessee may accept the rate as quoted, or may enter into negotiations with Lessor with respect to the Fair Market Rent, which negotiations shall continue for a period not to exceed ninety (90) days. Both parties hereby agree to negotiate on a diligent, good faith basis.

(ii)    If, by the end of such ninety (90) day period, Lessor and Lessee have not reached agreement on the Fair Market Rent for the applicable renewal term, then the parties may elect to either extend the negotiation period, or either party may, at its option, elect to terminate the negotiation, in which event Lessee's option to renew the Lease shall expire and be of no further effect.

(iii)    If Lessor and Lessee do reach agreement on the Fair Market Rent during such ninety (90) day period, or any subsequent negotiation period, then within fifteen (15) days of reaching such agreement, Lessor shall deliver to Lessee an amendment to the Lease documenting the renewal of the Lease and the applicable terms thereof, which amendment shall be in form reasonably satisfactory to Lessee. Lessee shall execute and deliver such amendment to Lessor within thirty (30) days of its receipt thereof.

(c)    Notwithstanding the foregoing, the new Fair Market Rent shall not be less than the rent payable for the month immediately preceding the rent adjustment.

60.    Right of First Offer.

(a)    There exists within the Building at the time of the execution of this Lease three (3) Units: Unit A which is the subject of this Lease; Unit B, being approximately 51,596 square feet which is occupied by Wickes Furniture; and Unit C being approximately 19,010 square feet which is vacant.

    (b)     A covenant exists in the Wickes lease which prevents the Lessor from leasing any space in Unit C or Unit B for the use of post-secondary educational, training services and general office use which is consistent with Lessee's normal conduct of business.

    (c)     If, and when, the Wickes lease has terminated or the use restrictions therein have been revoked or modified so as to permit the use of Units B or C for the Agreed Use, Lessee shall thereafter be granted a continuing right of first offer to lease any such space which becomes available for lease in either Units B or C of the Project, at a rental rate equal to Lessee's then-current Base Rent rate under this Lease and otherwise subject to all of the terms and conditions of this Lease. If at any time during the Term, and after the termination of the Wickes lease or the use restrictions therein have been revoked or modified so as to permit the use of Units B or C for the Agreed Use, any such space in any of Units B or C on the Project becomes available for lease, Lessor shall first notify Lessee in writing of the availability thereof (**"Offer Notice"**), and Lessee shall have ten (10) business days to accept Lessor's offer as set forth in the Offer Notice by delivering written notice of such acceptance to Lessor within such ten (10) business day period. Failure by Lessee to so notify Lessor within such ten (10) business day period shall be deemed a conclusive waiver by Lessee of any rights to lease such space. In the event Lessee notifies Lessor within such ten (10) business day period of its acceptance of the offer, Lessee and Lessor agree to enter into an amendment to this Lease evidencing the expansion of the Premises hereunder. Lessor and Lessee hereby agree that upon the commencement of the term of the lease for such expansion space, Lessee shall be granted three (3) months rental abatement as to Base Rent only on such expansion space, to allow Lessee to complete its leasehold improvements in such expansion space.

    (d)     If Lessor fails to lease the space specified in an Offer Notice within one hundred eighty (180) days following Lessee's waiver or deemed waiver of its rights therefor, then Lessor shall be required to again provide notice to Lessee of the availability of such space, in the form of an Offer Notice, and Lessee shall have the right to accept Lessor's offer in accordance with this Section.

    (e)     Notwithstanding the foregoing in this Paragraph 60, until such time as the Wickes lease has terminated or the use restrictions therein have been revoked or modified so as to permit the use of Units B or C for the Agreed Use, Lessor shall have the right to lease any space in Unit C to any party free of any right of first offer of Lessee, and Lessor can reconfigure Unit C in any manner and lease such unit in smaller segments, and only after the Wickes lease has terminated or the use restrictions therein have been revoked or modified so as to permit the use of Units B or C for the Agreed Use, will Lessee have any right of first offer regarding Units B or C. So long as the use restrictions in the Wickes lease are in effect, Lessor shall not grant a right of first offer regarding Units B or C to any party other than Lessee.

61.    <u>Non-Competition with Lessee's Business Operations</u>. Lessor hereby agrees that all future leases for available space in units B and C on the Project will be to tenants whose business operations are not competitive with the Agreed Use so long as Lessee is conducting such operations in the Premises. Lessee shall be entitled to any legal or equitable remedies in the event that Lessor violates or threatens to violate the terms of this Paragraph, including, without limitation, an injunction to stop such violation or threatened violation.



62.   <u>Americans with Disabilities Act Compliance</u>.  Lessor represents and warrants that as of the Commencement Date, the Project, the Common Areas, including parking areas, and access to the Building shall be in compliance with the Americans with Disabilities Act ("ADA").  Lessor hereby covenants that if the exterior portions of the Building or the Project, including the parking area and access thereto, do not comply with the ADA, either at the time of execution of this Lease or at any time during the Term of this Lease, Lessor shall, at its sole cost and expense, make any changes, alterations or other construction which may be necessary in order to restore such compliance; and Lessor further covenants that the cost of such changes, alterations or other construction shall not be deemed operating expenses or Common Area Operating Expenses of the Project, the Building or the Premises and shall not be charged to Lessee.  Lessee hereby covenants to keep the interior portions of the Premises in compliance with the ADA, at its sole cost and expense.  Lessee further covenants and agrees that; notwithstanding anything in this paragraph 62 to the contrary, Lessee shall be responsible for and complete, at Lessee's sole cost and expense, any ADA compliance work whether inside or outside the Premises caused by any change in Lessee's use of the Premises or by any alterations or Utility Installations by Lessee, but not including the initial Tenant Improvements.  Each party shall defend, indemnify and save the other party harmless from any claims, fines, penalties, liabilities, losses, damages, costs and expenses (including reasonable attorney's fees, expert witness fees and other costs of defense) arising from the failure of such party to comply with its obligations under this Paragraph 62.  Lessor hereby acknowledges that Lessee has notified Lessor of the potential noncompliance of certain portions of the Building (front and side entrances/exits) with the ADA, and Lessor hereby agrees that any changes, alterations or construction to such portions of the Building required pursuant to the ADA shall be at the sole cost and expense of Lessor, and shall not be charged to the Lessee either directly or as operating expenses.

63.   <u>Confidentiality</u>.  Neither Lessor nor Lessee shall make, nor shall it authorize any broker or other agent to make, any public announcement or press release concerning this transaction unless it has received the written consent of the other party hereto, which will not be unreasonably withheld or delayed.

64.   <u>Assignment or Sublease to a Lessee Affiliate</u>.  The consent of the Lessor need not be obtained for an assignment or sublease if the assignment or sublease is to any present or future affiliate (including any wholly-owned subsidiary thereof) of Lessee, or to any new entities that may be formed by Lessee pursuant to a corporate reorganization or merger, including any subsidiary or affiliated entity thereof (collectively a "Lessee Affiliate").  Lessee shall give Lessor written notice of any assignment to a Lessee Affiliate, including the effective date of the assignment.  Lessor acknowledges that the Premises may be occupied by one or more Lessee Affiliates and their employees and that such use of the Premises shall not be considered an assignment or sublease, unless Lessee elects to treat it as such.  Any of Lessor's representations, warranties, covenants, agreements, guaranties and indemnities made for the benefit of Lessee or any rights or privileges granted by Lessor to Lessee, including options to extend and rights of first offer, shall also inure to the benefit of such Lessee Affiliate.



65.    Force Majeure.  For purposes hereof, the term "force majeure" shall mean events beyond the Lessor's control, which are limited to acts of the other party, acts of God, war, civil commotion, strikes, and fire, flood and other casualty.

66.    Hazardous Substances Existing as of the Start Date.  Lessor represents and warrants that, except as otherwise disclosed to Lessee in writing, to the best of Lessor's knowledge without inquiry, as of the date of execution of this Lease and as of the Start Date, (i) the Premises are free from asbestos and other Hazardous Substances and (ii) there have never been any Hazardous Substances or other types of environmental pollution on the Project.

67.    Offsets.  Notwithstanding any other provision of this Lease, whenever Lessee is entitled to an offset against Rents pursuant to the terms of this Lease, such offset shall be limited to a maximum of $10,000.00 per month and an aggregate cap of $75,000.00.

68.    Indemnity.    (a)    Lessee Indemnity.  Lessee shall indemnify, defend and hold harmless Lessor, its agents, employees and contractors from and against any and all claims, demands, penalties, costs, liabilities, losses and expenses (including reasonable attorneys' fees actually incurred) to the extent arising from or based upon any alleged act, omission or negligence of Lessee or Lessee's agents, employees contractors or invitees or otherwise arising in connection with the Premises and Lessee's use of the common areas associated therewith, except to the extent caused by the negligence or willful misconduct of Lessor. Notwithstanding the foregoing, nothing contained in this section shall override (or be deemed to override) the waivers contained in Paragraph 8.6 of this Lease.  This provision shall survive the expiration or earlier termination of this Lease.

          (b)    Lessor Indemnity.  Lessor shall indemnify, defend and hold harmless Lessee its agents, employees and contractors from and against any and all claims, demands, penalties, costs, liabilities, losses and expenses (including reasonable attorneys' fees actually incurred) to the extent arising from or based upon any alleged act, omission or negligence of Lessor or Lessor's agents, employees or contractors, except to the extent caused by the negligence or willful misconduct of Lessee.  Notwithstanding the foregoing, nothing contained in this section shall override (or be deemed to override) the waivers contained in Paragraph 8.6 of this Lease.  This provision shall survive the expiration or earlier termination of this Lease.

LESSOR:                                                LESSEE:

SHACO, INC.,                                           CORINTHIAN COLLEGES, INC.,
a California corporation                               a Delaware corporation

By: _____                         By: _____
Peter Ann, President

**END OF ADDENDUM**

249728_7.doc

12