# EXHIBIT C

## SECOND AMENDMENT TO LEASE
### (Corinthian Colleges Lease, San Bernardino, CA)

1.    **Identification of Parties**.    This Second Amendment to Lease (the "Amendment") dated for identification purposes only January 16, 2013 (the "**Effective Date**"), is made and entered into by and between **Shaco, Inc.**, a California corporation (the "**Landlord**") and **Corinthian Colleges, Inc.**, a Delaware corporation ("**Tenant**").

2.    **Recitals**.

2.1    Landlord and Tenant previously entered into that certain Standard Industrial/Commercial Multi-Tenant Lease-Net and Addendum dated on or about November 25, 2002 (the "**Original Lease**").

2.2    The parties amended the Original Lease and entered into that certain Amendment to Lease dated on or about August 31, 2009 (the "**First Amendment**").

2.3    The Original Lease as amended by the First Amendment is hereinafter referred to herein as the "**Lease**".

2.4    The premises leased by Tenant under the Lease are commonly known as Club Power Center Phase I, Suite A (the "**Premises**") at the property located at 217 Club Center Drive in San Bernardino, California (the "**Property**").

2.5    The Premises consists of 40,451 rentable square feet.

2.6    Pursuant to the terms of the Lease, the term of the Lease for the Premises is currently scheduled to expire on its terms on February 29, 2016.

2.7    Tenant desires to extend the term of the Lease for an additional 7 years beyond the current schedule expiration date, so that the Lease will end on February 28, 2023.

2.8    The Lease provided the Tenant with a tenant improvement allowance of $410,000 for construction of tenant improvements by Tenant in the Expansion Space (as such term is defined in the First Amendment).  The Tenant has not used any of this tenant improvement allowance.  In addition to the original $410,000, the Landlord has agreed to provide an additional $400,000 in tenant improvement funds for Tenant's improvements to the Expansion Space so that, in total, the Tenant will have $810,000 available from Landlord to improve the Expansion Space.

2.9    Landlord and Tenant now desire to amend the Lease to reflect the extension of the lease term, to increase the tenant improvement allowance and to amend certain other provisions the Lease subject to the terms and conditions set forth below.

2.10   Capitalized terms used in this Amendment and not otherwise defined shall have the same meanings set forth in the Lease.

3.    **Amendments.**  In consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

3.1    **Recitals.**    The foregoing recitals are incorporated herein by this reference.

3.2    **Term.**  The Expiration Date of the Lease is hereby extended by seven (7) additional years beyond the current scheduled expiration date (i.e. February 29, 2016) and, therefore, effective as of the Effective Date. The Expiration Date (as defined in Paragraph 1.3 of the Lease) shall be February 28, 2023, unless sooner terminated pursuant to the terms of the Lease.

3.3    **Base Rent for Existing Premises.**  Base Rent for the Premises shall continue to be paid in accordance with the terms of the Lease through February 28, 2013. Commencing March 1, 2013, the Base Rent for the Premises shall be as set forth on the rent schedule attached hereto as Exhibit A and incorporated herein by this reference.

3.4    **Improvements to Expansion Space/Additional Tenant Improvement Allowance.**  Notwithstanding anything to the contrary contained in the Original lease or the First Amendment, the terms and conditions of the amended and restated Work Letter Agreement attached hereto as Exhibit B and incorporated herein by this reference shall govern the improvement of the Expansion Space.

3.5    **Options to Renew.**  Tenant shall have the option to renew the Lease for two (2) additional five (5) year periods on the terms and conditions set forth in Exhibit C attached hereto and incorporated herein by this reference.

3.6    **Broker's Commission.**  Landlord shall have no obligation for payment of commissions or fees to any real estate broker, finder or intermediary in connection with the subject matter of this Amendment (including any rights or options set forth herein) except for the payment of a commission in the amount of $100,000 to Jones Lang LaSalle Americas and a commission in the amount of $42,000 to Western Consolidated, which commissions shall be paid by Landlord within ten (10) days following the mutual execution and delivery of this

2

Amendment. Tenant represents that it has not had any dealings with any real estate broker, finder or intermediary with respect to this Lease, other than Jones Lang LaSalle. Subject to the foregoing, each party hereto shall indemnify and hold harmless the other party hereto from and against any and all losses, damages, liabilities, losses, costs and expenses (including, but not limited to, reasonable attorneys' fees and related costs) resulting from any claims that may be asserted against such other party by any real estate broker, finder or intermediary arising from any act of the indemnifying party in connection with this Amendment.

4.    **Miscellaneous.**

4.1    <u>Entire Agreement</u>. This Amendment, together with the Lease, constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous communications, agreements and understandings of any kind, whether written or oral, with respect thereto. Any conflict between the terms of this Amendment and the terms of the Lease shall be resolved in the favor of this Amendment. Except as expressly amended hereby, the Lease is hereby ratified and shall remain unchanged and in full force and effect.

4.2    <u>Successors and Assigns</u>. The provisions of this Amendment shall be binding upon and inure to the benefit of the parties hereto, and to all their respective officers, directors, partners, principals, employees, representatives, agents, successors and assigns.

4.3    <u>California Law</u>. This Amendment shall be governed by and construed in accordance with California law.

4.4    <u>Counterparts</u>. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

4.5    <u>Tenant as Corporation or Partnership</u>. If Tenant executes this Lease as a corporation, then Tenant represents and warrants: (i) that such entity is duly qualified and in good standing to do business in California, (ii) that the individuals executing this Lease on Tenant's behalf are duly authorized to execute and deliver this Lease on its behalf in accordance with the by-laws of Tenant, and (iii) that this Lease is binding upon Tenant in accordance with its terms.

[signature page follows]

3



IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first set forth above.

**LANDLORD**

SHACO, INC.,
a California corporation

By: _____
Peter Ahn, President
2/4/2013

**TENANT**

CORINTHIAN COLLEGES, INC.
a Delaware corporation

By: _____

Its: _____
Beth Wilson
Executive Vice President
Corinthian Colleges, Inc.

Printed
Name: _____

4

## EXHIBIT "A" TO SECOND AMENDMENT TO LEASE
## RENT SCHEDULE

| Dates | RSF | Number of Months | Base Rent per Month per RSF | Base Rent per Month | Base Rent per Year |
|---|---|---|---|---|---|
| 3/1/13 - 2/28/14 | 40,451 | 12 | $ 13.32 | $ 44,900.61 | $ 538,807.32 |
| 3/1/14 - 2/28/15 | 40,451 | 12 | $ 13.72 | $ 46,248.98 | $ 554,987.72 |
| 3/1/15 - 2/29/16 | 40,451 | 12 | $ 14.13 | $ 47,631.05 | $ 571,572.63 |
| 3/1/16 - 2/28/17 | 40,451 | 12 | $ 13.72 | $ 46,248.98 | $ 554,987.72 |
| 3/1/17 - 2/28/18 | 40,451 | 12 | $ 14.13 | $ 47,636.45 | $ 571,637.35 |
| 3/1/18 - 2/28/19 | 40,451 | 12 | $ 14.56 | $ 49,065.54 | $ 588,786.47 |
| 3/1/19 - 2/29/20 | 40,451 | 12 | $ 14.99 | $ 50,537.51 | $ 606,450.07 |
| 3/1/20 - 2/28/21 | 40,451 | 12 | $ 15.44 | $ 52,053.63 | $ 624,643.57 |
| 3/1/21 - 2/28/22 | 40,451 | 12 | $ 15.91 | $ 53,615.24 | $ 643,382.88 |
| 3/1/22 - 2/28/23 | 40,451 | 12 | $ 16.38 | $ 55,223.70 | $ 662,684.36 |

## EXHIBIT "B" TO SECOND AMENDMENT TO LEASE
## WORK LETTER AGREEMENT

In connection with the Amendment to which this Work Letter Agreement is attached and in consideration of the mutual covenants hereinafter contained, Landlord and Tenant agree as follows:

1.      Landlord's Work.  There is no Landlord's Work.  Tenant has accepted the Expansion Space from Landlord in its current "as-is, where-is, with all faults" condition.  Tenant hereby agrees that the Landlord shall have no obligation to pay for or perform any maintenance, repair or improvement to the Expansion Space whatsoever during the Term of the Lease (as the same may be extended).

2.      Tenant's Work.

        (b)    Tenant and its space planner ("Space Planner") shall prepare space plans for improvements to the Expansion Space (the "Tenant Improvements"). Tenant shall submit such space plans to Landlord for its review, and Landlord shall approve or disapprove the space plans within five (5) business days after receipt thereof. Landlord's approval shall not be unreasonably withheld, delayed or conditioned. If Landlord should fail to approve or disapprove the space plans within such five day period, then Landlord shall be deemed to have approved the space plans.

        (c)    Based on the approved space plans of the Expansion Space, an Architect selected by Tenant and reasonably approved by Landlord ("Architect") shall prepare final working drawings ("Working Drawings") for the Tenant Improvements. Tenant shall submit such Working Drawings to Landlord for its review, and Landlord shall approve or disapprove the Working Drawings within seven (7) business days after receipt thereof. Landlord's approval shall not be unreasonably withheld, delayed or conditioned. If Landlord should fail to approve or disapprove the Working Drawings within such seven day period, then Landlord shall be deemed to have approved the Working Drawings.

3.      Landlord shall provide a Tenant Improvement Allowance in the amount of $810,000.00 (the "Tenant Improvement Allowance") to be applied towards the cost to complete the Tenant Improvements (the "Cost"), which shall include the construction of the tenant improvements to the Expansion Space, architectural services and construction management. Landlord may have its own construction management service, which shall be paid for by the Landlord and shall not be part of the Tenant Improvement Allowance.  The Tenant Improvement Allowance shall be paid to or for the benefit or account of Tenant periodically as work progresses within 7 days of receipt of Tenant's written request; provided, however, Landlord shall not be required to disburse more than twice during any month and shall not be required to make more than twenty-four (24) disbursements of the Tenant Improvement Allowance in total. With each application for payment, the Tenant shall submit receipted invoices or invoices with check vouchers attached and any other evidence reasonably required by the Landlord to substantiate the amount set forth in the application for payment. At the time of submission of each application for payment, the Tenant shall deliver to the Landlord the following Mechanic's Lien Releases: (1) a

1

conditional waiver and release upon progress payment or a conditional waiver and release upon final payment, as appropriate (conditioned only upon receipt of payment), executed by the contractor and each subcontractor and material supplier intended to be paid out of the particular application for payment and covering all labor, services, equipment and material performed or supplied by the contractor and the particular subcontractor or material supplier since the last previous payment and (2) an unconditional waiver and release for any and all work covering all labor, services, equipment and material performed or supplied by the contractor and the particular subcontractor or material supplier which was covered for by the prior month's progress payment. Landlord shall holdback twenty percent (20%) of the Tenant Improvement Allowance as a final payment, constituting the entire unpaid balance, which shall be paid by the Landlord to the Tenant within thirty (30) days after the later of: (i) Landlord's receipt of a copy of temporary certificate of occupancy for the Expansion Space and (ii) the expiration of the statutory period for all mechanics' liens to be filed has expired (provided, however, that final payment shall not release the Tenant's responsibility to correct nonconforming work discovered by Landlord after final payment and to satisfy other requirements, if any, which necessarily survive final payment) and (iii) Landlord's receipt of evidence of the Actual Tenant Improvement Costs (as set forth below in subparagraph (b)). Notwithstanding the foregoing, in the event that any time prior to May 31, 2014 the Tenant submits to the Landlord evidence (reasonably required by the Landlord) which substantiates that the amount of "Actual Tenant Improvement Costs" (as defined below) incurred by Tenant in connection with the construction of the Tenant Improvements has exceeded $1,250,000.00, then in such event the twenty percent (20%) holdback referenced hereinabove shall be reduced to ten percent (10%) and if the holdback amount then held by Landlord exceeds such ten percent (10%) holdback, then the Landlord shall release to the Tenant the amount of holdback funds which is in excess of such 10%, within 30 days following Tenant's written request therefor. Concurrently with the final payment, the Tenant shall deliver to the Landlord full and complete lien releases executed by the contractor and each subcontractor and material supplier intended to be paid out of the particular payment and covering all labor, services, equipment and material performed or supplied by the contractor and the particular subcontractor or material supplier for the Tenant Improvements.

(a)     The Tenant hereby agrees that in the event that Tenant does not use all of the Tenant Improvement Allowance on or before May 31, 2014, then the unused portion of the Tenant Improvement Allowance shall be forfeited and in such event there shall be no reduction in the Base Rent payable hereunder.

(b)     On or before June 30, 2014, the Tenant shall submit evidence reasonably required by the Landlord to substantiate the amount of "Actual Tenant Improvement Costs" (as defined below) incurred by Tenant in connection with the construction of the Tenant Improvements.   Should the Tenant fail, on or before June 30, 2014, to submit evidence reasonably required by the Landlord to substantiate the total amount of "Actual Tenant Improvement Costs" (as defined below) incurred by Tenant in connection with the construction of the Tenant Improvements, then the parties hereby agree that the Actual Tenant Improvement Costs shall be conclusively deemed to be equal to the total amount of all receipted invoices substantiating the Costs which were received by Landlord from Tenant on or before June 30, 2014. The Landlord's agreement to provide a tenant improvement allowance of $810,000 was

2

based on the Tenant's representation that the Tenant will spend at least $1,250,000 on tenant improvements to the Expansion Space. Based on the foregoing, the Tenant hereby agrees that if the Actual Tenant Improvement Costs incurred by Tenant as of May 31, 2014 in connection with Tenant's improvement of the Expansion Space are less than $1,250,000, then the Tenant Improvement Allowance shall be reduced, dollar for dollar, for each dollar that the Actual Tenant Improvement Costs are less than $1,250,000, except that in no event shall the Tenant Improvement Allowance be reduced to be less than $400,000. For illustration purposes only, if the Actual Tenant Improvement Costs incurred by Tenant in connection with the improvement of the Expansion Space are $1,150,000, then the Tenant Improvement Allowance would be reduced by $100,000 from $810,000 to $710,000. For purposes of the foregoing, the term "Actual Tenant Improvement Costs" shall mean the actual, verifiable, out of pocket costs incurred by Tenant on or before May 31, 2014 for the design, permitting and construction of the Tenant Improvements, installation of base building systems for the Expansion Space and all related hard and soft construction costs.

(c)    Landlord hereby agrees that in the event that there remains any portion of the Tenant Improvement Allowance that is due and payable to Tenant hereunder as of June 30, 2014, and in the event that the Landlord thereafter fails to pay such amount to Tenant within thirty (30) days following receipt of Tenant's written request therefore, then in such event, the unpaid balance (plus interest at 5% per annum) shall be applied as a monthly credit toward Tenant's obligation to pay Base Rent until paid in full.

4.    Tenant shall have the right to have the construction contracts for the architect, the engineer, the general contractor and subcontractors put out to competitive bids with reputable contractors licensed by the State of California and reasonably acceptable to Landlord and Tenant, prior to the start of any construction or architectural work.

5.    The following process shall be implemented for the construction of the Tenant Improvements:

(a)    The criterion for choice on all contractors, sub-contractors and main engineers shall be the lowest bid, unless Tenant reasonably selects a contractor, sub-contractor or main engineer who has not submitted the lowest bid, which selection by Tenant shall only be effective if approved by Landlord, such approval not to be unreasonably withheld. Landlord shall be deemed to have approved such selection unless Landlord specifically disapproves such selection within 3 business days of Landlord's receipt of a request from Tenant for Landlord's approval of Tenant's selection of a contractor, sub-contractor or main engineer that did not submit the lowest bid along with an explanation by Tenant for such selection. Landlord's approval shall not be unreasonably withheld or delayed and any disapproval shall contain a specific reason or reasons for such disapproval. Tenant shall provide Landlord copies of all bids prior to Tenant's acceptance of any bid. Landlord shall be permitted to provide a reasonable level of oversight (at its sole cost) to ensure code compliance, structural integrity of improvements and impact on other lessees in the Building.

(b)    Tenant shall provide and pay for, at Tenant's sole cost and expense, connections for all utilities during the construction of the Tenant Improvements.

3



(c)     Tenant or its contractors shall be allowed to place a forty (40) cubic-yard dumpster in an area adjacent to the Expansion Space during construction.

(d)     There shall be no charge for after-hours contractor or subcontractor access.

(e)     If reinforcing of the floor is required, Tenant shall have the right, at its sole cost and expense, to reinforce the floor in any areas specified by Tenant's structural engineer as specified and designed by Tenant's structural engineer.

(f)     No construction management or coordination fee shall be payable to Landlord.

(g)     All work shall be performed in accordance with Applicable Requirements, and shall be in a good and workmanlike manner, free and clear of mechanic's liens. Notwithstanding anything to the contrary contained in the Lease, Tenant shall be solely responsible for and complete, at Tenant's sole cost and expense, any ADA compliance work whether inside or outside the Expansion Space caused by or required due to a change of use of the Expansion Space from retail to any other use or by any alterations or Utility Installations by Tenant or caused by or due to the design or construction of Tenant Improvements; provided, however, that Landlord shall remain responsible for and complete, at Landlord's sole cost and expense, any ADA compliance work applicable to the Property (other than the interior or exterior of the Existing Premises or the Expansion Space) to the extent such ADA compliance work would have been required had the Expansion Space been improved by Tenant as typical retail space.

(h)     Tenant hereby represents and warrants and agrees that: (i) it is thoroughly familiar with all aspects of the Expansion Space and that it meets its needs; (ii) it has accepted the Expansion Space in its "as–is, where is" and "all faults" condition; and (iii) the Expansion Space, the Existing Premises, the buildings comprising the Property, the common areas, the parking areas and the Property are complete and are in good, sanitary and satisfactory condition. Nothing herein shall relieve the Landlord of its repair and maintenance obligations (if any) set forth in the Lease.

6.     After approval of the Working Drawings, Tenant shall diligently commence and prosecute to completion the Tenant Improvements.

7.     Tenant acknowledges and agrees that Tenant at its sole cost shall be responsible for obtaining, delivering and installing in the Expansion Space all necessary and desired furniture, telephone equipment, telephone service, business equipment, art work and other similar items, and that Landlord shall have no responsibility whatsoever with regard thereto.

8.     In connection with the Tenant Improvement work, Tenant must provide all insurance and documentation required from Tenant by the Lease.



9.     No mechanic's or materialmen's liens are permitted at any time and shall be discharged, by Tenant, by release or statutory bond within 30 days of the date of recording. Tenant shall provide Landlord with at least 10 days advance notice before commencement of construction so the Expansion Space can be posted with Landlord's notices of non-responsibility.


_____
Tenant's Initials

_____
Landlord's Initials

5

### EXHIBIT "C" TO SECOND AMENDMENT TO LEASE
### OPTION TO RENEW

Landlord hereby grants to Tenant two (2) successive options (each an "Extension Option") to extend the Term as to the entire Premises only for an additional period of five (5) years each (each an "Option Term"), on the same terms, covenants and conditions as provided for in the Lease (as the same may be amended from time to time), except that the economic lease terms during the Option Term shall be as set forth in this Exhibit C.

(a)     Base Rent for each year of each Option Term shall be adjusted to equal ninety percent (90%) of the "fair market rent" for the Premises. The "fair market rent" determination as described herein shall mean the rental income that the Premises would most probably command in the open market; indicated by the current rents paid and asked for comparable space as of the date of the determination.

(b)     Each Extension Option must be exercised, if at all, by written notice ("Extension Notice") delivered by Tenant to Landlord no earlier than the date which is three hundred sixty-five (365) days and no later than the date which is two hundred seventy (270) days prior to the expiration of the prior Term.

(c)     Within thirty (30) days following Tenant's due and timely exercise of the Extension Option as provided herein, Landlord shall provide Tenant with written notice of Landlord's good faith determination of fair market Base Rent for the Premises for each of five (5) years of the applicable Option Term. Tenant shall have thirty (30) days ("Tenant's Review Period") after receipt of Landlord's notice of the fair market determination within which to notify the Landlord in writing that Tenant either: (x) unconditionally accepts the schedule of Landlord's fair market Base Rent determination or (y) rejects the Landlord's fair market determination. Failure of Tenant to timely object to the fair market determination submitted by Landlord in writing within Tenant's Review Period shall conclusively be deemed Tenant's approval and acceptance thereof. If Tenant timely rejects the Landlord's fair market determination, then Tenant shall submit to the Landlord, together with Tenant's rejection notice, Tenant's good faith determination of fair market Base Rent for the Premises for each of the five (5) years of applicable Option Term and in such event, the Landlord and Tenant shall submit their dispute to binding "baseball arbitration" in accordance with the following provisions:

i.     Landlord and Tenant shall mutually designate an arbitrator whose determination of fair market rent (which shall be either the five year fair market Base Rent schedule proposed by Landlord or the five year fair market rent Base Rent schedule proposed by Tenant in the Tenant's rejection notice, but no other amounts) shall be final and binding upon Landlord and Tenant.

ii.     If Landlord and Tenant shall fail to agree upon the choice of such arbitrator within thirty (30) days after Landlord shall have received the Tenant's rejection notice, then either party may apply to Judicate West or any successor thereto having jurisdiction to designate an arbitrator. The arbitrator shall be a panel member at Judicate West who shall have had at least fifteen (15) years' experience in the business of appraising or managing real estate or acting as a real estate agent or broker in Southern California.

iii.     The arbitrator shall conduct such hearings and investigations as he may deem appropriate and shall, within thirty (30) days after his designation, determine which of the two (2) proposals shall be the fair market rent, and that choice by the arbitrator shall be binding

1



upon Landlord and Tenant, provided that the arbitrator shall not have the power to add to, modify, or change any of the provisions of this Lease. Each party shall pay its own counsel fees and expenses, if any, in connection with any arbitration under this clause, and the parties shall share equally all other expenses and fees of any such arbitration.

(d)     The Extension Option is not assignable separate and apart from this Lease, nor may the Extension Option be separated from this Lease in any manner, either by reservation or otherwise.

(e)     Tenant shall have no right to exercise the Extension Option, notwithstanding any provision of the grant of the Extension Option to the contrary, and Tenant's exercise of the Extension Option may be nullified by Landlord and deemed of no further force or effect, if Tenant shall be in default (beyond all applicable notice and cure periods) of any monetary obligation or material non-monetary obligation under the terms of this Lease as of Tenant's exercise of the Extension Option in question.

(f)     In the event that Tenant does not timely exercise its first Extension Option, all future options to extend shall automatically lapse.

_____
Tenant's Initials

_____
Landlord's Initials

2