IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: § § § Chapter 11 § CORINTHIAN COLLEGES, INC., *et al.* [1] § § Case No. 15-10952 (KJC) § § Jointly Administered Debtors. § § § Hearing Date: August 13, 2015 @ 1:30 p.m. (EDT) § Objection Deadline: August 6, 2015 @ 4:00 p.m. (EDT) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
AUTHORIZING REJECTION OF OPERATING AGREEMENT
BETWEEN THE DEBTORS AND THE DEPARTMENT OF EDUCATION**

Corinthian Colleges, Inc. ("**Corinthian**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), respectfully request the entry of an order, under sections 105(a), 365(a) and 554(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6006 and 6007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing the Debtors to reject that certain Operating Agreement, effective as of July 8, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the **"Operating Agreement"**),[2] between the Debtors and the United States Department of Education (the "**Dept. of ED**"). In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Corinthian Colleges, Inc. (7312), Corinthian Schools, Inc. (0525), Rhodes Colleges, Inc. (7311), Florida Metropolitan University, Inc. (7605), Corinthian Property Group, Inc. (2106), Titan Schools, Inc. (3201), Career Choices, Inc. (1425), Sequoia Education, Inc. (5739), ETON Education, Inc. (3608), Ashmead Education, Inc. (9120), MJB Acquisition Corporation (1912), ECAT Acquisition, Inc. (7789), Pegasus Education, Inc. (2336), Grand Rapids Educational Center, Inc. (2031), Rhodes Business Group, Inc. (6709), Everest College Phoenix, Inc. (6173), CDI Education USA, Inc. (0505), SP PE VII-B Heald Holdings Corp. (0115), SD III-B Heald Holdings Corp. (9707), Heald Capital LLC (6164), Heald Real Estate, LLC (4281), Heald Education, LLC (1465), Heald College, LLC (9639), QuickStart Intelligence Corporation (5665) and Socle Education, Inc. (3477). The Debtors' corporate headquarters is at 6 Hutton Centre Drive, Suite 400, Santa Ana, California 92707.

## JURISDICTION

This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334, and venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b).[3]

## BACKGROUND

### A. General Background

1. On May 4, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

2. On May 13, 2015, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed a statutory committee of unsecured creditors (the "**Creditors' Committee**"). Additionally, the U.S. Trustee appointed an official committee of student creditors (the "**Student Committee**") on May 15, 2015.

3. Corinthian was founded in February 1995, and through acquisitions became one of the largest for-profit post-secondary education companies in the United States and Canada. Corinthian offered career-oriented diploma and degree programs in diverse fields such as health care, business, criminal justice, transportation technology and maintenance, construction trades, and information technology. As of March 31, 2014, Corinthian operated over 100 campuses and provided educational opportunities to more than 74,000 students and had more than 10,000 employees. It also offered degrees online.

---

[3] Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors hereby confirm their consent to the entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

4. Among its acquisitions, in January 2010, Corinthian purchased Heald Capital, LLC, a Delaware limited liability company ("**Heald**"). Heald, through its subsidiaries, operated Heald College, a 150 year old regionally accredited institution with 12 campuses offering associate degree curricula in, among other fields, healthcare, business, legal, and information technology.

5. Additional information on the Debtors' business and capital structure, as well as a description of the reasons for filing these cases, is set forth in the *Declaration of William J. Nolan in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 10].

## B.    The Regulatory Environment

6. The Dept. of ED and various state regulatory agencies and national accrediting bodies regulate for-profit educators. As proprietary post-secondary institutions, the Debtors relied on funding from the Dept. of ED, pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* ("**Title IV**"). Title IV funds accounted for nearly ninety (90) percent of the Debtors' revenue prior to the Petition Date.

7. The federal government provides financial support for students attending post-secondary educational institutions in the United States through the federal student aid programs administered by the Dept. of ED under the Higher Education Act ("**HEA**"), 20 U.S.C. §§ 1001 *et seq.* ("**FSA Programs**"). The Dept. of ED promulgates regulations under the HEA and enforces the regulatory and statutory provisions governing the administration of FSA funds to students through post-secondary institutions. Post-secondary institutions must apply for and receive approval from the Dept. of ED in order to be eligible to participate in the FSA Programs. Once an institution has been certified by the Dept. of ED to participate in the FSA Programs, it is

assigned an OPEID number and may disburse FSA funds to eligible students attending an approved program. Many students rely principally on these FSA funds to finance their education.

8.  The Dept. of ED conducts periodic reviews to determine whether to renew the eligibility and certification of every institution participating in the FSA Programs. Post-secondary schools are also subject to audits and program compliance reviews by various external agencies, including the Dept. of ED, its Office of Inspector General and state licensing and accrediting agencies. The HEA and its implementing regulations also require that the administration of FSA Program funds be audited annually by an independent accounting firm. Additionally, to participate in the FSA Programs, an institution must be (a) legally authorized by a state to provide post-secondary education programs in that state and (b) accredited by an agency recognized by the Dept. of ED as a reliable authority on institutional quality and integrity. Accordingly, institutions participating in FSA Programs, such as the Debtors, are subject to extensive regulation and review by various agencies.

**C.    The Operating Agreement and Amendments Thereto**

9.  In January 2014, the Debtors received a letter from the Dept. of ED (the "**January 2014 Letter**") that requested extensive information from the Debtors regarding various educational statistics reported by the Debtors. The Debtors devoted significant resources to responding to such requests and ultimately delivered to the Dept. of ED, in electronic or paper format, the equivalent of more than 1.2 million pages of responsive data from January to August 2014.

10. On June 12, 2014, the Debtors received a letter from the Dept. of ED (the "**June 12 Letter**"), in which the Dept. of ED made additional information requests, asked

4

questions about the documents and data that the Debtors had provided to that date, and stated that certain information requested in the January 2014 Letter remained outstanding.  In addition, and without notice, by the June 12 Letter, the Dept. of ED imposed the following:  (a) a twenty-one (21) day delay in the ability to draw down further Title IV funds, (b) monthly updates on student information and disclosures, (c) disclosures relating to adverse regulatory, accreditor or business actions, and (d) immediate notice of the Debtors' intent to sell or close any location.

11.     The imposition of a twenty-one (21) day delay in access to Title IV funds by the Dept. of ED created a significant liquidity crisis for the Debtors.  Nearly ninety (90) percent of the Debtors' revenues came from Title IV funds and the three-week delay in revenue created an immediate and significant reduction in projected cash receipts.  This impact was exacerbated by this event occurring in the last month of the fiscal year (a low point for the Debtors' liquidity).  The Debtors immediately began discussions with the Dept. of ED to regain access to Title IV funds to avoid an immediate closure of more than 100 schools.  After ten (10) days of negotiations, on June 22, 2014, Corinthian and the Dept. of ED entered into a memorandum of understanding ("**MOU**") that provided for the immediate release of certain Title IV funds and established the framework for a transition plan to be memorialized in an operating agreement.

12.     On July 8, 2014, the Debtors and the Dept. of ED entered into the Operating Agreement, whereby the Debtors agreed to "teach-out" twelve (12) schools (meaning that the schools continued to teach existing students to allow them to complete their education before the school closes, but no new students were admitted), and to pursue the sale of its remaining schools.  Under the Operating Agreement, among other things, the Dept. of ED permitted the Debtors to continue drawing Title IV funds (subject to weekly audit verification by

an agreed upon third party FSA audit firm) to operate the schools, and the Debtors agreed to produce certain additional documents within an agreed upon schedule, restrict Title IV funds from being used for certain prohibited expenditures, make refunds available to students in certain circumstances, and work with the Dept. of ED to establish a reserve for student refunds.

13. The Operating Agreement also provided for oversight of the Debtors' compliance with the Operating Agreement and Title IV funding requirements by a monitor selected by the Dept. of ED. On July 18, 2014, the Dept. of ED selected Patrick Fitzgerald of Skadden, Arps, Slate, Meagher & Flom LLP as the monitor (the "**Monitor**") under the Operating Agreement. Under the terms of the Operating Agreement, the Monitor had significant oversight obligations relating to, among other things, the Debtors' draw-down and expenditure of Title IV funds, the implementation of the teach-out locations and the sales process (as described below).

14. The Debtors and the Dept. of ED have entered into three amendments to the Operating Agreement. The Debtors and the Dept. of ED entered into the First Amendment to the Operating Agreement, dated July 17, 2014 (the "**First Amendment**"), which, among other things, relieved the Monitor of his responsibility for "monitor[ing] the status of all school sales processes and provid[ing] monthly reports to the Department", as provided for in Section III.C.5 of the Operating Agreement. On September 12, 2014, pursuant to the Operating Agreement, the Debtors established a separate, segregated escrow account with Citibank NA to create a reserve (the "**Student Refund Reserve**") that would be available for student refunds. On that same date, the Debtors and the Dept. of ED entered into the Second Amendment to Operating Agreement, dated September 12, 2014 (the "**Second Amendment**"), which, among other things, established certain parameters with respect to the funding and release of funds from the Student Refund Reserve. Additionally, the Debtors and the Dept. of ED entered into the Third Amendment to

Operating Agreement, dated December 9, 2014 (the "**Third Amendment**"), relating to, among other things, the draw-down of Title IV funds, use of the Student Refund Reserve to provide refunds to the Dept. of ED for students who had discontinued their education and the application of proceeds under the Asset Purchase Agreement with Zenith (as such terms are defined herein and discussed in further detail below).  For the avoidance of doubt, the Debtors seek to reject the Operating Agreement and all amendments thereto, including the First Amendment, Second Amendment and the Third Amendment, pursuant to this Motion.

        **D.**      **Events Following Entry into Operating Agreement**

        15.      The Debtors conducted an extensive marketing and sales process for all of its schools.  In May 2014, the Debtors engaged Barclays PLC ("**Barclays**") to explore strategic options for the Debtors, including a potential sale of some or all of its schools and operations.  Following entry into the Operating Agreement, the Debtors directed Barclays to conduct a sale process, during which a substantial number of financial and strategic potential buyers were contacted, and various interested parties conducted extensive diligence.  The Debtors negotiated with a number of parties concerning the purchase of all of the schools or certain groups of schools operated by the Debtors.

        16.      On November 19, 2014, the Debtors entered into an asset purchase agreement with Zenith Education Group, Inc. ("**Zenith**"), a subsidiary of Education Credit Management Corp. Group, for the sale of fifty-six (56) Everest and WyoTech schools (the "**Asset Purchase Agreement**").  Zenith also agreed to complete the teach-out process at twelve (12) additional schools and entered into subleases with the Debtors for those locations.  Just before signing the definitive agreement, the Everest and WyoTech schools in California were excluded from the sale because the California Attorney General sought to impose significant

7

economic and operational demands on Zenith as a buyer. Zenith found those demands unacceptable and decided to exclude all of those California schools from the Asset Purchase Agreement.

17. The sale to Zenith closed in early February of 2015. As part of the sale, approximately 40,000 students were able to continue their studies and thousands of employees retained their jobs through Zenith. In addition, Zenith acquired the right to related Title IV funding and other school-related and accounting-related back office operations and information of the Debtors. To retain access to the back office services for the Debtors' continued operations following the transaction, the Debtors and Zenith entered into a transition services agreement for the remaining schools owned by the Debtors.

18. Following the sale of non-California Everest and WyoTech campuses to Zenith, the Debtors continued to operate the Heald schools, all Everest and WyoTech schools in California, and fourteen (14) schools in Canada (through a non-Debtor Canadian subsidiary). In February 2015, the Debtors' fourteen (14) career schools in Canada were shut down by the Province of Ontario as a result of the worsening financial condition of the Canadian subsidiaries and the Debtors, and the Canadian subsidiaries commenced insolvency proceedings in Canada shortly thereafter, which proceedings remain pending.

19. The Debtors pursued sale options and teach-out options for the remaining schools through Barclays and through another consultant who specializes in educational institution advice and transactions, Eduvize LLC. Several parties engaged in diligence, and the Debtors entered into negotiations with at least three potential buyers for the Heald schools, and held discussions with several other parties regarding the teach-out of the remaining thirteen (13) Everest and WyoTech schools in California.

20. The signing of a definitive transaction agreement to sell Heald was to occur on April 15, 2015. Ultimately, however, no agreement was reached for the sale or teach-out of any of the remaining schools because, on April 14, 2015, the Dept. of ED issued an intent-to-fine letter (the "**Intent to Fine Letter**")[4] seeking to impose a $30 million fine against the Heald schools and prohibiting Heald from enrolling new students. Despite multiple efforts by the Debtors and their advisors, as well as potential purchasers of Heald, to negotiate terms with the Dept. of ED for the sale of Heald, the Dept. of ED sought to impose significant financial and operational conditions on both Corinthian and the potential buyers that were not acceptable to the buyers or capable of performance. The California Attorney General also held negotiations with potential buyers over the terms under which it would agree not to continue pursuing the claims it had asserted in a lawsuit against Corinthian against the potential buyer. These negotiations, while protracted, were not successful. As a result of the Dept. of ED requirements and conditions and the unsuccessful negotiations with the California Attorney General's office, on April 22, 2014, the last potential buyer withdrew from the Heald sale process.

21. When sale efforts for the remaining schools ceased to be viable, both for the Heald schools and remaining Everest and WyoTech schools in California, the Debtors pursued teach-out arrangements with third parties in an effort to permit students to complete their education with minimal disruption. Ultimately, however, the Dept. of ED continued to insist that unaffiliated teach-out partners assume undefined liabilities of the Debtors in order to conduct teach-outs at the affected campuses on economically viable terms. Without the Dept. of ED's cooperation, no teach-out partners were willing to proceed.

---

[4] On May 5, 2015, the Debtors submitted a written request for a hearing and motion to dismiss the Intent to Fine Letter.

RLF1 12342514v.3

22.  In the absence of a sale or teach-out options, the Debtors had no ability to continue operating in light of their cash position and cash forecast.  Moreover, the Dept. of ED mandated that the Debtors post a significant letter of credit by May 17, 2015 to maintain eligibility for Title IV funds.  After thoroughly considering their alternatives, the Debtors commenced the wind-down of operations on April 23, 2015.  On Sunday, April 26, 2015, the Debtors announced the closure of their remaining twenty-nine (29) schools effective Monday, April 27, 2015 and provided notice to the relevant regulatory bodies.

## RELIEF REQUESTED

23.  By this Motion, the Debtors seek the entry of an order, substantially in the form attached hereto as Exhibit A (the "**Proposed Order**"), authorizing the Debtors to reject the Operating Agreement, including any and all amendments thereto, pursuant to section 365(a) of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

24.  Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a); *see also Univ. Med. Cent. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1075 (3d Cir. 1992).  For the benefit of the estate, a debtor may, under section 365 of the Bankruptcy Code, relieve itself of burdensome agreements where performance still remains.  *See In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (section 365 of the Bankruptcy Code "allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed.") (internal citations omitted); *see also Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39–40 (3d Cir. 1989).

25. The decision to assume or reject an executory contract or unexpired lease is a matter within the debtor's "business judgment." *See Sharon Steel Corp. v. Nat'l Fuel Gas Distr. Corp.,* 872 F.2d 36, 40 (3d Cir. 1989); *In re HQ Global Holdings, Inc., 290 B.R. 507, 513 (Bankr. D. Del. 2003).* The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001); *see also In re Fed. Mogul Global*, 293 B.R. at 126 (rejecting counterparty's argument that a finding of hardship is a prerequisite to application of the business judgment test); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (noting that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"). Accordingly, the court should not interfere with or second-guess the debtor's sound business judgment unless and until evidence is presented that establishes that the debtor's decision was one taken in bad faith or in gross abuse of its retained business discretion. *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987).

26. The Debtors have determined that Operating Agreement is not necessary in light of the Debtors' current business needs, nor is it a source of potential value for the Debtors' creditors or other parties in interest. The Operating Agreement relates primarily to the Debtors' access to Title IV funds and the continued operation of their schools. As discussed in detail above, the Debtors closed all campus locations effective as of April 27, 2015 and are in the process of liquidating their assets and winding down their estates. Accordingly, the Debtors no longer require additional access to Title IV funds and the operative provisions of the Operating Agreement are no longer relevant. Moreover, the Operating Agreement and related amendments

contain various obligations for the Debtors and third parties that are either burdensome or confusing given the current state of these Debtors' operations. For example, the Operating Agreement and related amendments create certain reporting obligations for the Debtors relating to the use of Title IV funds. Likewise, the documents establish responsibilities on behalf of the Monitor relating to oversight of the Debtors' draw-down and expenditure of Title IV funds and the implementation of the teach-out locations. The Operating Agreement and related amendments also create certain funding obligations on the part of the Debtors with respect to the Student Refund Reserve. Thus, the Debtors are simply incapable of satisfying many of these burdens given the status of their operations. Accordingly, when considered together with the lack of any benefit to be received under the Operating Agreement, the Debtors submit that rejection of the Operating Agreement (including any and all amendments thereto) is appropriate and a sound exercise of their business judgment.

## WAIVER OF BANKRUPTCY RULE 6004(h)

27. To implement the foregoing successfully, the Debtors seek a waiver of the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

28. Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted is intended or should be construed as: (i) an admission as to the validity or amount of any particular claim against a Debtor; (ii) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (iii) a promise or requirement to pay any particular claim; (iv) an implication or admission that any particular claim is of a type specified or defined in this Motion; (v) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or

any other applicable law; (vi) an admission that any of the Operating Agreement is integrated with any other contract; (vii) a waiver by the Debtors of their right to assert that the Operating Agreement was terminated prior to the Petition Date; or (viii) a concession or evidence that the Operating Agreement has not expired, been terminated, or otherwise currently is not in full force and effect.

## **NOTICE**

29.  The Debtors will provide notice of this Motion via first class mail to: (i) the U.S. Trustee; (ii) counsel to the Creditors' Committee; (iii) counsel to the Student Committee; (iv) counsel to Bank of America, N.A., in its capacity as Administrative Agent for the prepetition lenders; (v) the Internal Revenue Service; (vi) the Dept. of ED; and (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice is necessary under the circumstances.

## **NO PRIOR MOTION**

30.  The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other.

WHEREFORE, the Debtors respectfully request the entry of the Proposed Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested in its entirety and any other relief as is just and proper.

Dated: July 23, 2015
      Wilmington, Delaware

/s/ *Amanda R. Steele*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marisa A. Terranova (No. 5396)
Amanda R. Steele (No. 5530)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
Email: collins@rlf.com
      merchant@rlf.com
      terranova@rlf.com
      steele@rlf.com

Counsel for the Debtors and Debtors in Possession