**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CORINTHIAN COLLEGES, INC., ET AL., | Case No. 15-10952 (KJC) |
| Debtors. | Jointly Administered |
| | Hearing Date: July 27, 2015, at 11 am |

**THE PEOPLE OF THE STATE OF CALIFORNIA AND THE COMMONWEALTH OF MASSACHUSETTS'S PROPOSAL REGARDING PREPETITION DISCOVERY**

1.       The People of the State of California (the "People"),[1] by and through Kamala D. Harris, the Attorney General of the State of California, and the Commonwealth of Massachusetts (the "Commonwealth"), by and through Maura Healey, the Attorney General of the Commonwealth (collectively, the "States"), submit this Proposal concerning Prepetition Discovery.

2.       As detailed in Paragraph 3, the States' seek discovery concerning debtors' payment of $18 million to the Prepetition Lenders at a time when Prepetition Lenders were closely involved in the management of Debtors' affairs.  Among other things, the States are concerned about the possibility that Prepetition Lenders may have used their control over debtors to structure the sale of debtors' schools in such a way as to funnel a significant portion of debtors' remaining assets to the Lenders themselves.  That involvement is crucial to understanding what, if any, potential causes of action Debtors may have against the Lenders (and that the Court would order released by confirming the Plan as written).  As is detailed in Paragraph 4, the People have met and conferred in good faith with Prepetition Lenders and

---

[1] Unless otherwise specified, capitalized terms used, but not otherwise defined, have the same meaning as in the Motion, the Plan, or the Disclosure Statement.

Debtors to obtain information necessary to evaluate what those claims might be, but only received the first set of documents from Debtors yesterday evening.

3.      Based solely on publicly available materials and testimony elicited at the § 341 Meeting of Creditors, it appears that in or about June 2014, Prepetition Lenders began to exert increasing control over the management of Debtors' Affairs:

a.      Lenders' new authority over Debtors affairs is memorialized in a Waiver and Amendment No. 2 to the Fourth Amended and Restated Credit Agreement, dated as of June 25, 2014 ("Second Amendment") giving Lenders a new role in the management of Debtors' operations.  *See* Exhibit A.  Under Amended Section 6.18, Lenders directed Creditors to appoint a Chief Restructuring Officer  ("CRO") and Lenders were given authority over the "terms, conditions, and scope of authority" of his employment:

> 6.18 CRO. On or prior to July 1, 2014 and at all times thereafter, engage William J. Nolan (or another representative of the Financial Advisor selected by the Domestic Borrower and reasonably acceptable to the Required Lenders) as chief restructuring officer of the Domestic Borrower ("CRO"), on terms, conditions and scope of authority acceptable to the Administrative Agent and the Required Lenders.

Exhibit A at 4.

b.      The CRO was one of only two Debtor representatives at the § 341 Meeting of Creditors.  *see* Exhibit B at 4:22 to 5:2, and he testified to the same effect:

> Q.  MR. CAMPINS: And you, Mr. Nolan, you were appointed at the behest of the lenders as one of the -- under the second amendment to the credit facilities.  Is that correct?
>
> A. MR. NOLAN: Absolutely, that's correct.  So just a little history: So we . . . showed on site June 2nd.  And that was 2014.  And that was also *the bank thought* that -- and the company agreed that bringing someone in to help them get through an amendment and to do some cost cutting profit improvement type work would be good, so --
> MR. OWEN: That's right.
> MR. NOLAN: So mutually *the bank and the company agreed that they would hire somebody*, so we were engaged to do that, to get

2

them through a bank amendment and then to -- also to look at ways
of improving cash flow.

Q. MR. CAMPINS: And you were made the chief restructuring
officer; is that correct?
A. MR. NOLAN: That was . . . what I just described is the plan,
really, up until the company got the June 2nd -- I mean 12th letter,
which created a change in circumstances and basically caused a
cash prices. So, as part of that, *the banks, as part of their
amendment, decided that the company needed a chief restructuring
officer*, and I happened to be there at the time.

*Id.* at 202:2-203:6 (emphasis added).

c.    Testimony elicited at the § 341 Meeting of Creditors establishes that Lenders were

actively involved in the asset sale process:

Q: MR. CAMPINS: Were the banks told, though, for example, the
names of the potential bidders prior to the signing of asset
purchase agreement?  For example, were they aware that Zenith
was going to be the purchaser --
A. Uh-huh.

Q: MR. CAMPINS: -- before the general public was aware?
A. MR. NOLAN: I believe so, yes.
MR. OWEN: Yeah.

Q. MR. CAMPINS: Did the banks review copies of the asset
purchase agreements --
A. MR. NOLAN: Yes.

*Id*. at 214:14-215:10.

d.    Testimony elicited at the § 341 Meeting of Creditors establishes that Lenders were

acutely aware of Debtors' regulatory issues.  For example, the Lenders were given copies

of correspondence with the U.S. Department of Education within 24 hours of receipt:

Q: MR. CAMPINS: So the creditors under this lending facility
were getting realtime access to all correspondence with, for
example, the Department of Education?
A.  MR. OWEN: Not real -- I mean within -- I think we said within
24 hours, yeah.

Q. MR. CAMPINS: So was there -- it sounds like there may have
been a policy that you had to provide any regulatory

3

correspondence, then, within 24 hours.  Is that what you are
saying?
A. MR. NOLAN: I think that's in --
MR. OWEN: In the amendment, yeah.
MR. NOLAN: -- the amendment, you will find that in the
agreement.
MR. OWEN: Yep.

*Id*. at 210:24-211:14.

e.    Testimony elicited at the § 341 Meeting of Creditors establishes that Lenders were paid

$18 million in February of this year:

Q. So in February of 2015 the lending syndicate led by Bank of
America was paid over $18 million?  Am I understanding that
correctly?
A. MR. NOLAN: Yeah.  You have to understand it was sort of all
-- it's all part of the Zenith sale.
MR. OWEN: It's all part of the transaction.
MR. NOLAN: Those two buildings were physical assets that
Zenith would then occupy.  Zenith agreed not to buy the physical
assets but to enter into a lease which then gave those two buildings
value.
So you had to have Zenith, the Zenith sale first, and arrange a
longer-term lease to create value.  And it was sold.  And so it was
really probably -- it was the biggest part of the bank's pay-down or
really the only part the bank got paid down as part of Zenith, if that
makes sense.
MR. OWEN: Yeah.

*Id.* at 236:22-237:19.

f.    When that cash payment made earlier this year is compared to Debtors' current cash

position, the need for discovery is plain:

Q:  MR. CAMPINS: So at that time the 18 million that went to the
bank, it's fair to say that's more than the cash on hand that exists in
debtors' estates now?
A. MR. NOLAN: That's our cash position today.
MR. OWEN: Yeah, yeah, about $6 million, something like that, if
you count the escrow accounts. Yeah.
Q.  MR. CAMPINS: Since February of 2015, the banks got three
times more than what the current cash position is?
A. MR. OWEN: Well, I mean, it depends how you define cash.
Right?  There is cash meaning the escrow accounts, as well, which
would be more than that.

4

*Id.* at 238:2-17.

**II.  Despite the People's Repeated Meet and Confer Attempts to Obtain Relevant Information, the People Only Obtained Access to Certain Documents Today.**

4.      Over one month ago, on June 23, 2014, the  People reached out to counsel for Prepetition Lenders to request a conference pursuant to Delaware Bankruptcy Court Local Rule 2004-1.  *See* Exhibit C.

5.      After several emails back and forth, counsel for Prepetition Lenders agreed to such a conference on  July 8, 2015.  *Id*.  During such conference, Prepetition Lenders suggested that the People obtain documents related to the same matters that she understood were to be produced by Debtors to the Unsecured Creditors Committee and forwarded counsel's information to the People.  *Id*.

6.      The People then attempted to obtain such documents from the Unsecured Creditors Committee without success.  Specifically, on July 22, 2015, certain documents were produced but then clawed back as inadvertently produced due to an apparent misunderstanding concerning confidentiality designations.  When it became apparent that the People and Debtors could not immediately agree on a confidentiality regime, consistent with professional courtesy, the People deleted the documents and agreed to re-request them as part of a proposed pre-confirmation discovery plan.  *See* Exhibit D.

7.      The People finally obtained access to the first set of documents last night from the Debtors directly and have not yet had a chance to review them in detail.  These documents have not yet been produced to the Commonwealth.

**III.  The States' Proposed Pre-Confirmation Discovery Plan.**

8.      The States' Proposed Discovery Plan is set forth in Exhibit E.  A brief explanation follows:

  a.  **Document Discovery to Debtors.**  The People are starting to review the documents produced by Debtors.  The documents should also be produced to the Commonwealth. The States do not envision further documentary discovery to debtors.

b. **Deposition of William Nolan.** Given Mr. Nolan's central role as CRO, the States propose a deposition to take place no later than August 14. The Deposition shall take place via video conference or telephone to minimize expense for all parties.

c. **Discovery to Prepetition Lenders.** The States propose the following pre-confirmation discovery to Prepetition Lenders:

A. Documents. Only to the extent not already produced by Debtors, the States propose that for the time period June 2014 to the petition date, Prepetition Lenders be ordered to produce (1) all communications between Prepetition Lenders and Debtors; and (2) all communications among Prepetition Lenders related to Debtors. Such production to take place by no later than August 7.

B. Deposition. Prepetition Lenders shall make a Corporate Representative available for a Deposition by no later than August 14. The Deposition shall take place via video conference or telephone to minimize expense.

## CONCLUSION

9. For these reasons, the States respectfully request that the Court adopt the Discovery Plan set forth in Exhibit E.

Dated:  July 24, 2015

KAMALA D. HARRIS
Attorney General of California

By: ___/s/ Bernard A. Eskandari_____
NICKLAS A. AKERS
Senior Assistant Attorney General
NICHOLAS G. CAMPINS
BERNARD A. ESKANDARI
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 897-2652
  Fax:  (213) 897-4951
  Email:  bernard.eskandari@doj.ca.gov

*Attorneys for the People of the State of California*

MAURA HEALEY
Attorney General of Massachusetts

By:   /s/ Peter Leight
PETER LEIGHT
GLENN KAPLAN
Assistant Attorneys General
  One Ashburton Place, 18th Floor
  Boston, MA 02108
  Telephone: (617) 727-2200
  Fax: (617) 722-0184
  Email: peter.leight@state.ma.us

*Attorneys for the Commonwealth of Massachusetts*