# **EXHIBIT B**

# In The Matter Of:

*Corithian Colleges, Inc. et al.,*

*Transcript Via Electronic Recording*
*June 12, 2015*

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



Original File recording061215CorithianColleges.lh.txt
**Min-U-Script® with Word Index**

Page 1

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3   In re:                      ) Chapter 11
                                 )
 4   Corinthian Colleges, Inc.,  ) Case No. 15-10952 (KJC)
     et al.,                     ) Jointly Administered
 5                               )
             Debtors.            )
 6   _____)
 7
             TRANSCRIPT OF AN ELECTRONIC RECORDING
 8         OF A 341 MEETING HELD ON JUNE 12, 2015.
 9
10   APPEARANCES:
11   For U.S. Trustee's     RICHARD SCHEPACARTER, ESQ.
                            TIMOTHY J. FOX, ESQ.
12
     For the Debtors        MARK COLLINS, ESQ.
13                          AMANDA STEELE, ESQ.
                       RICHARDS LAYTON & FINGER, P.A.
14
     For Student Committee  SCOTT GAUTIER, ESQ.
15                          POLSINELLI P.C.
16   For California         NICK CAMPINS, ESQ.
                       CALIFORNIA DEPT. OF JUSTICE
17
18                         - - - - -
     Audio Operator:             ?
19
     Transcribed by:        WILCOX & FETZER LTD.
20                          1330 North King Street
                            Wilmington, Delaware  19801
21                          Ph:  (302) 655-0477
                            Fax: (302) 655-0479
22                          E-mail:  Depos@wilfet.com
23
24
```

Page 2

1  Proceedings recorded by electronic
2 sound recording. Transcript produced by
3 transcriptionist.
4  - - - - -
5  **MR. SCHEPACARTER:** Okay. This is the
6 first meeting of creditors in the Corinthian
7 Colleges cases, lead case numbers 15-10952 in front
8 of Judge Carey.
9  My name is Richard Schepacarter of
10 the United States Department of Justice, Office of
11 the United States Trustee. I'm a trial attorney.
12 And we also have Tim Fox, who also is a trial
13 attorney, as well.
14  Basically, the ground rules for today
15 is I am going to ask questions of the debtor under
16 Sections 341 and 343 of the Bankruptcy Code. And
17 then I will open it up to creditors for questions
18 from creditors.
19  Are there any creditors that intend
20 to ask questions today? Just raise your hand. You
21 are the only one?
22  **UNIDENTIFIED SPEAKER:** Yes.
23  **MR. SCHEPACARTER:** Okay. All right.
24 There is not anybody else. If you want to ask

Page 3

1 questions, you are more than welcome to.
2  Also, this is the only recording of
3 this. So if anybody is recording this or putting it
4 on -- I don't know whatever devices they use anymore
5 now -- Skype or whatever, Pinterest or -- I don't
6 even know -- (Laughter) -- I don't even know the
7 names, but -- I don't know how they actually work,
8 but you can't do that. This is the only and the
9 official recording.
10  And the testimony will be given
11 today, and it will be taken under oath from both of
12 the witnesses. Counsel can, you know, make sure the
13 representations and the like if any, if need be.
14  So, without any further ado, let's
15 start. Do either of you gentlemen have any aversion
16 to being sworn in?
17  **MR. OWEN:** No.
18  **MR. NOLAN:** No.
19  **MR. SCHEPACARTER:** Okay. Please both
20 raise your hands. Do you swear or affirm that the
21 testimony you give today will be the truth, the
22 whole truth, and nothing but the truth under penalty
23 of perjury?
24  **MR. NOLAN:** I do.

Page 4

1  **MR. OWEN:** I do.
2  **MR. SCHEPACARTER:** Okay. For the
3 record, what I want to do is I'll ask a question.
4 Mostly, they are going to be directed to you,
5 Mr. Owen.
6  **MR. OWEN:** Yep.
7  **MR. SCHEPACARTER:** But, Mr. Nolan, if
8 you have knowledge of it, you can more than, you
9 know, you're more than welcome to chime in or
10 correct if Mr. Owen makes a misstatement or
11 something like that?
12  **MR. NOLAN:** Okay. Thanks.
13  **MR. SCHEPACARTER:** All right.
14  **UNIDENTIFIED SPEAKER:** Do you want to
15 indicate that counsel is present?
16  **MR. SCHEPACARTER:** Yes. Before I
17 start, just for the record, state your name and your
18 position with the company.
19  **MR. OWEN:** Robert C. Owen. I'm the
20 Executive Vice President and Chief Financial
21 Officer.
22  **MR. SCHEPACARTER:** Okay. And you
23 are?
24  **MR. NOLAN:** William Nolan, Senior

Page 5

1  Managing Director at FTI and Chief Restructuring
2  Officer.
3      **MR. SCHEPACARTER:** Okay. And your
4  appearance, counsel.
5      **MR. COLLINS:** Yeah, Mark Collins of
6  Richards, Layton and Finger on behalf of the
7  Debtors.
8      **MS. STEELE:** Amanda Steele, Richards,
9  Layton and Finger, on behalf of the debtors.
10     **MR. SCHEPACARTER:** Okay. Let's get
11 started. Okay. I'm going to show you a couple of
12 things with respect to the global notes and the
13 signature.
14     Now, here is a signature page for one
15 of the debtors that were filed. I know a number of
16 schedules were filed. There is, what, 25 debtors, I
17 believe. So I want to show you a signature page and
18 you tell me if it's the same. Is that your
19 signature?
20     **MR. OWEN:** Yes, it is.
21     **MR. SCHEPACARTER:** Okay. And usually
22 they sign -- usually people sign with a corporate
23 title or not. Do you know why this is not signed as
24 a corporate officer or why your name is not affixed

Page 6

1  to the page here?
2      **MR. OWEN:** I do not know.
3      **MR. SCHEPACARTER:** Okay. Do you
4  know, Mr. Nolan?
5      **MR. NOLAN:** No. Other than there
6  wasn't a spot there, no, I don't know.
7      **MR. SCHEPACARTER:** Okay. All right.
8  And everywhere in these schedules and the statement
9  of financial affairs for all of the debtors that
10 were filed in this case, do you acknowledge that to
11 be your signature?
12     **MR. OWEN:** I do.
13     **MR. SCHEPACARTER:** Okay. And do you
14 maintain that everything in these schedules is true,
15 correct, and accurate to the best of your knowledge?
16     **MR. OWEN:** I do.
17     **MR. SCHEPACARTER:** Okay. Do you have
18 any amendments that need to be made to the
19 schedules?
20     **MR. OWEN:** Not at this time.
21     **MR. SCHEPACARTER:** Not at this time.
22 Okay. All right. Um, with respect to the global
23 notes that I am using, the global notes, I think
24 they are the same for all of the debtors, the global

Page 7

1  notes that were used. Turn to page two --
2      **MR. OWEN:** Uh-huh.
3      **MR. SCHEPACARTER:** -- of the global
4  notes. And at the bottom it says the schedules and
5  statements have been signed by Robert C. Owen,
6  Executive Vice President, and it has some other
7  titles there.
8      **MR. OWEN:** Uh-huh.
9      **MR. SCHEPACARTER:** Is that your title
10 --
11     **MR. OWEN:** Yes, it is.
12     **MR. SCHEPACARTER:** -- of every other
13 debtor except for Corinthian Colleges where you are
14 the Executive Vice President and CFO --
15     **MR. OWEN:** Correct.
16     **MR. SCHEPACARTER:** Correct.
17     **MR. OWEN:** Yes.
18     **MR. SCHEPACARTER:** And Heald College
19 LLC where you are the Chief Accounting Officer?
20     **MR. OWEN:** That's correct.
21     **MR. SCHEPACARTER:** Okay. And then
22 QuickStart Intelligence Corporation, Executive Vice
23 President, Treasurer, and Director?
24     **MR. OWEN:** That's correct.

Page 8

1      **MR. SCHEPACARTER:** Okay. So you
2  signed all the schedules in those capacities for
3  each of those debtors; correct?
4      **MR. OWEN:** That's correct.
5      **MR. SCHEPACARTER:** Okay. All right.
6  Now, did you have any -- did you have any assistance
7  in preparing the schedules?
8      **MR. OWEN:** Yes. Yeah, a lot of
9  assistance.
10     **MR. SCHEPACARTER:** Okay. All right.
11 Explain it.
12     **MR. OWEN:** Yeah. So, you know, the
13 Corinthian sold the majority -- a lot of the schools
14 to a company called Zenith Education in February.
15 Along with that transaction, a lot of the corporate
16 functions went across to Zenith. And so then that
17 includes the accounting functions.
18     So all the folks in the accounting
19 and finance department, for the most part, went
20 across to Zenith Education. So we entered --
21 Corinthian entered into a transition services
22 agreement with Zenith to provide, you know, those
23 sorts of services back to Corinthian.
24     So the Zenith staff are responsible

# Pages Removed

Page 197

1  transaction that occurred?
2  A. Somewhat familiar.
3  Q. What's your familiarity?
4  A. Well, I know that we sold some schools to
5  BioHealth several years ago, and that's about what I
6  know.
7  Q. Okay. And when you "sold," do you mean
8  you actually paid them a negative purchase price to
9  take the schools; is that correct?
10 A. Yeah, I believe, yeah, I think that's
11 probably right. Yeah.
12 Q. And was the head of BioHealth a former
13 Corinthian employee, to your knowledge?
14 A. Not that I am aware of.
15 Q. Do you know whether there are any existing
16 contracts in place between any of the debtors in
17 BioHealth?
18 A. The debtors in -- off the top of my head,
19 no.
20 Q. Do you know if BioHealth is a creditor?
21 A. I don't believe BioHealth is a creditor.
22 I don't recall.
23    UNIDENTIFIED SPEAKER: Is BioHealth a
24 stock deal, or were they an asset deal?

Page 198

1     MR. OWEN: It would have been an
2  asset deal, yeah.
3     BY MR. CAMPINS:
4  Q. Did Corinthian have responsibilities to
5  manage the BioHealth operations after the BioHealth
6  sale?
7  A. No.
8  Q. There was no transition services agreement
9  in place between Corinthian and BioHealth?
10 A. I think we provided some services, but we
11 didn't have responsibility for the operations. I
12 believe we continued to provide financial aid
13 processing for some period of time, but I'm not
14 aware -- that's all I can recall.
15 Q. With regards to the SOCAL, SOPY --
16 A. SOCAL?
17 Q. SOCAL Education subsidiary?
18 A. Uh-huh.
19 Q. That subsidiary was providing financial --
20 processed financial aid processing to other schools;
21 is that correct?
22 A. Some, yes.
23 Q. Is it providing any services to those
24 other schools?

Page 199

1  A. No.
2     MR. COLLINS: Today, you mean?
3     BY MR. CAMPINS:
4  Q. Today.
5  A. No.
6  Q. Where did those -- do you recall any other
7  schools in particular?
8  A. I don't. I think there was a dozen, I
9  think as many as a dozen or so that they were
10 providing some services to, whether it was financial
11 processing or cohort default management.
12 Q. What happened to those clients?
13 A. So as part of the terms of the asset
14 purchase agreement with Zenith, we exited that
15 business. Those contracts were terminated.
16 Q. Were those contracts assumed by Zenith or
17 --
18 A. They were not, and we didn't have the
19 capability to provide the service. I don't believe.
20 I don't believe they were assumed.
21 Q. How much revenue were those contracts
22 generating at the time?
23 A. Not very much.
24 Q. Do you have an estimate?

Page 200

1  A. Um, on an annual basis? Something less
2  than a million dollars. I suspect a fair bit less.
3  But I don't recall. It wasn't big enough to get my
4  attention.
5  Q. Taking a look at Schedule D of the
6  Corinthian Colleges Inc. schedules, can you locate
7  the -- what's termed the Senior Secured Credit
8  Facility Lien?
9  A. Yep.
10 Q. Can you confirm for me that the operative
11 agreement in place was the Fourth Amended and
12 Restated Credit Agreement dated May 17, 2012, as
13 amended several times?
14 A. I believe that's correct, yes.
15 Q. And the total amount that is listed as of
16 the petition date is 95.9 million?
17 A. That's correct.
18 Q. To your knowledge, as of the petition
19 date, which banks were creditors under this lending
20 facility? Which banks were members of the lending
21 facility?
22 A. Members was U.S. Bank, Union Bank, Bank of
23 Alest, and Onelast.
24 Q. And what was Bang of America's role?

Page 201

1  A.  They were the lead administrative agent.
2  Q.  In the DLA proceeding, the petition, how
3  did the company communicate with its lenders
4  concerning that credit facility, this credit
5  facility?
6  A.  How did we?  Primarily through the
7  professionals.  Right?  So through our attorneys and
8  FTI.
9  Q.  Um, who are the primary -- so who were the
10  primary points of contact for the lenders?  You said
11  FTI.  Are you referring to Mr. Nolan?
12  A.  Bill Nolan, yep.
13      MR. NOLAN:  To elaborate on that a
14  little.  So the bank had counsel, Sidley Austin, and
15  the bank had financial advisers, Carl Marks.  And
16  between ourselves, FTI, and Mummer Tolls, we would
17  interface with lead banks for professionals.  So a
18  lot of the work, interactions there, but we also --
19  well, Bob, as well, we interact with the agent,
20  Janet Sleeper.
21      MR. OWEN:  Yep.
22      UNIDENTIFIED SPEAKER:  She is at Bank
23  of America?
24      MR. OWEN:  She is at Bank of America,

Page 202

1  yes.
2      MR. CAMPINS:  And you, Mr. Nolan, you
3  were appointed at the behest of the lenders as one
4  of the -- under the second amendment to the credit
5  facilities.  Is that correct?
6      MR. NOLAN:  Absolutely, that's
7  correct.  So just a little history:  So we
8  (inaudible -- loud movement of paperwork) actually
9  we showed on site June 2nd.  And that was 2014.  And
10  that was also the bank thought that -- and the
11  company agreed that bringing someone in to help them
12  get through an amendment and to do some cost cutting
13  profit improvement type work would be good, so --
14      MR. OWEN:  That's right.
15      MR. NOLAN:  So mutually the bank and
16  the company agreed that they would hire somebody, so
17  we were engaged to do that, to get them through a
18  bank amendment and then to -- also to look at ways
19  of improving cash flow.
20      MR. CAMPINS:  And you were made the
21  chief restructuring officer; is that correct?
22      MR. NOLAN:  That was the -- what I
23  just described is the plan, really, up until the
24  company got the June 2nd -- I mean 12th letter,

Page 203

1  which created a change in circumstances and
2  basically caused a cash prices.
3      So, as part of that, the banks, as
4  part of their amendment, decided that the company
5  needed a chief restructuring officer, and I happened
6  to be there at the time.
7      MR. CAMPINS:  And you were the chief
8  restructuring officer of which of the debtors?  Like
9  which company were you the officer of?
10      MR. NOLAN:  I guess really the
11  parent.
12      MR. OWEN:  Corinthian Colleges.
13      MR. CAMPINS:  And how did you first
14  come -- how was it that your name was advanced as
15  the chief restructuring officer?  How did that come
16  to you?
17      MR. NOLAN:  I think I was -- my name
18  was thrown out with a group of like three or four
19  others.  I'm not really sure.  I mean, the bank knew
20  of FTI, so it's possible that they -- do you know?
21      MR. OWEN:  You're talking about your
22  engagement?
23      MR. NOLAN:  Yeah.
24      MR. OWEN:  Well, so FTI was engaged

Page 204

1  before you became chief restructuring officer.
2      MR. NOLAN:  Right.  Right.
3      MR. OWEN:  That process or --
4      MR. NOLAN:  Before that in May.
5      MR. OWEN:  Yeah.  No.  We interviewed
6  a number of firms and talked with the banks and
7  ultimately selected FTI based on their experience
8  and qualifications.
9      MR. SCHEPACARTER:  Can I ask a
10  clarifying question to make the record clear?  The
11  bank amendment required the hiring of financial
12  adviser, is that correct, acceptable to the lenders?
13      UNIDENTIFIED SPEAKER:  The first one,
14  financial adviser.  That was in May?
15      MR. OWEN:  Right.  That was how FTI
16  got engaged.
17      MR. SCHEPACARTER:  And then there was
18  another amendment which required the company to
19  retain a chief restructuring officer --
20      MR. NOLAN:  After the June 12th
21  letter and as a part of the amendment -- the
22  June 12th letter, specifically.
23      MR. CAMPINS:  And specifically named
24  you?

Page 205

1  MR. OWEN: Yes. FTI had already been
2  engaged and were already working under the prior
3  deal. Yep.
4      BY MR. CAMPINS: (Of Mr. Owen)
5  Q. And how did -- so you said that you, being
6  Corinthian --
7  A. Yeah.
8  Q. -- got this -- retained FTI at the
9  suggestion of the banks?
10 A. Well, you know, I think the amendment
11 required that we engage a restructuring
12 professionals.
13     We solicited bids from a number of firms
14 and interviewed a number of firms and ultimately
15 selected FTI, which the bank approved their
16 selection.
17 Q. Did the banks state a preference for the
18 retention of FTI?
19 A. They did not. We had an approved list of
20 professionals that they would consider. And we
21 interviewed some of them, and we selected FTI, and
22 they agreed.
23 Q. So they essentially provided and approved
24 the list?

Page 206

1  A. I think there was a list of people that
2  were acceptable to them. I think we could have
3  deviated from it, but ultimately they also had to
4  approve the deal.
5  Q. How was the list transmitted?
6  A. I don't recall.
7  Q. Do you know if it was e-mail?
8  A. I don't know if it was e-mail. Somehow we
9  would have gotten the list. You know, it was awhile
10 ago.
11 Q. Did the company utilize a data room, a
12 platform to communicate with its lenders?
13 A. We did.
14 Q. What was the name of that platform?
15 A. It was Introing with the Professionals.
16 Primarily, right, it was --
17 Q. Was it also known as SyndTrak?
18 A. No.
19 Q. No?
20    MR. NOLAN: No, it's a competing sort
21 of.
22    MR. OWEN: SyndTrak is Bank of
23 America's internal. I think so. Which we could
24 have access to.

Page 207

1  MR. NOLAN: I think the database was
2  administered by Barclays. Is that right?
3     MR. OWEN: Yeah. We had the
4  contract. I think, for purposes of the sales
5  process, it was Barclays' administrator. I'm not
6  sure if we did for the banking, the professionals.
7     BY MR. CAMPINS: (Of Mr. Owen)
8  Q. And who was the company's principal
9  contact at Bank of America immediately pre-petition?
10 Was it still Janet Sleeper?
11 A. Yes.
12 Q. Okay. Who was the principal point of
13 contact at U.S. Bank for the company?
14 A. Bill Umscheid.
15 Q. Do you know the spelling of that?
16 A. U-M-S-C-H-E-I-D.
17 Q. Who was the main contact at Union Bank?
18 A. Kevin something. Right now I don't know.
19 I don't remember the other three.
20 Q. Okay. And how often in the period, let's
21 say the six months preceding the petition, how often
22 was the company communicating with the lending
23 facility?
24 A. So in terms of the company communicating,

Page 208

1  in terms of professionals communicating with the
2  other professionals? Pretty frequently.
3     MR. NOLAN: At least once a week.
4     MR. OWEN: Yeah, we had a once-a-week
5  call.
6     MR. NOLAN: And we would go through
7  cash flows with their adviser, their adviser, Carl
8  Marks, once a week. And maybe more on an ad hoc
9  basis.
10    MR. CAMPINS: Were those two separate
11 calls, or is that the same call?
12    MR. NOLAN: They would be two
13 separate calls.
14    MR. CAMPINS: So the weekly call, who
15 was on the weekly call?
16    MR. NOLAN: It would have been
17 myself, Tom Womper from Tolls, and Jennifer Hagle
18 from Sidney and Austin. And Joe D'Angelo from Carl
19 Marks. And there might have been other people on
20 and off from those firms. That was the adviser.
21    MR. CAMPINS: Okay. And can you
22 describe what was Carl Marks' role in all that?
23    MR. NOLAN: They were financial
24 adviser to the bank group.

Page 209

1    **MR. CAMPINS:** Was Mr. Marks given
2    credentials to look at the financial statements, you
3    know, live?  Could he query the company systems?
4    **MR. NOLAN:** No.  No.
5    **MR. CAMPINS:** So all the information
6    he obtained was -- how did he obtain the company's
7    financial information?
8    **MR. OWEN:** It was Joe D'Angelo was
9    the representative.  Carl Marks is the firm.
10   **MR. CAMPINS:** Oh, sorry.  Joe
11   D'Angelo.  My apology.
12   **MR. OWEN:** Yep.
13   **MR. CAMPINS:** So Joe D'Angelo, how
14   did Joe D'Angelo obtain the financial information on
15   a weekly basis?
16   **MR. NOLAN:** Mostly through
17   (inaudible)
18   **MR. OWEN:** Yeah, we provided it
19   through the data room.
20   **MR. CAMPINS:** Did any other creditors
21   besides the money facility have access to
22   Interlinks?
23   **MR. NOLAN:** Creditors didn't.
24   **MR. OWEN:** Not that I'm aware of, no.

Page 210

1    **MR. CAMPINS:** What type of -- what
2    types of information were uploaded to Interlinks
3    other than financial information?
4    **MR. NOLAN:** Well, I think they had,
5    um --
6    **MR. OWEN:** So you're talking about
7    for the creditors?  Not the sale process?  You are
8    talking about --
9    **MR. NOLAN:** The lenders.
10   **MR. CAMPINS:** I'm talking about
11   specifically for the lending facility that was led
12   by Bank of America.
13   **MR. OWEN:** Okay.
14   **MR. CAMPINS:** What types of
15   information other than financial information were
16   uploaded to that?
17   **MR. NOLAN:** I mean, so, as part of
18   our agreement, we had to share all regulatory
19   correspondence.  But I don't know whether that was
20   on Interlinks or whether Stan just sent it over to
21   the --
22   **MR. OWEN:** Yeah.
23   **MR. NOLAN:** I don't know.
24   **MR. CAMPINS:** So the creditors under

Page 211

1    this lending facility were getting realtime access
2    to all correspondence with, for example, the
3    Department of Education?
4    **MR. OWEN:** Not real -- I mean
5    within -- I think we said within 24 hours, yeah.
6    **MR. CAMPINS:** So was there -- it
7    sounds like there may have been a policy that you
8    had to provide any regulatory correspondence, then,
9    within 24 hours.  Is that what you are saying?
10   **MR. NOLAN:** I think that's in --
11   **MR. OWEN:** In the amendment, yeah.
12   **MR. NOLAN:** -- the amendment, you
13   will find that in the agreement.
14   **MR. OWEN:** Yep.
15   **MR. CAMPINS:** Did the banks offer any
16   input on the company's interaction with its
17   regulators?
18   **MR. NOLAN:** No.  No.  But, you know,
19   they voiced their position, right, as to what they
20   wanted.  But I don't think they -- I'm not -- I
21   don't think so.  I mean, but can you elaborate on
22   the question?
23   **MR. OWEN:** Yeah, what's the question?
24   **MR. CAMPINS:** Well, what was their

Page 212

1    position on the company's interaction with its
2    regulators?
3    **MR. NOLAN:** Oh, I don't think they
4    had -- they didn't have a view on that.  They never
5    expressed it.  I mean, their position was, "We would
6    like to be repaid."
7    **MR. OWEN:** Right.
8    **MR. NOLAN:** I mean, so that was
9    pretty consistent.
10   **UNIDENTIFIED SPEAKER:** So it was more
11   informational?
12   **MR. NOLAN:** Yes.  Yes.  They didn't
13   have a view on the --
14   **MR. CAMPINS:** Did representatives of
15   the banks ever reach out to any of their contacts in
16   the federal government?
17   **MR. NOLAN:** I wouldn't know.
18   **MR. OWEN:** Not that I am aware of.
19   Not that I know of.
20   **MR. NOLAN:** But some of them were big
21   banks.  I just don't know.
22   **MR. COLLINS:** And for what purpose
23   was it?
24   **MR. CAMPINS:** I'm just asking if he

Page 213

1 has -- if they have any knowledge of those sorts of
2 contacts.
3   MR. NOLAN: No.
4   MR. CAMPINS: Did any of the banks
5 ever express concern about the status of the
6 interaction between regulators and the companies,
7 the debtors?
8   MR. NOLAN: Again, I think they
9 expressed their view that they wanted to be repaid.
10   MR. CAMPINS: Right.
11   MR. NOLAN: And interactions with the
12 Department of Education or otherwise was making it
13 difficult for --
14 A. For them to get repaid, yeah.
15   MR. NOLAN: You know, if it was, for
16 instance, you're aware of the Second Amendment to
17 the Operating Agreement where there was proceeds
18 that had to be split 65/35. Of course, they had a
19 view on it. Right?
20   MR. OWEN: Right.
21   MR. NOLAN: It wouldn't have been
22 their first choice. And I can't speak for them, but
23 they had a view.
24   MR. CAMPINS: During the asset sales

Page 214

1 process, were the banks being consulted about
2 potential bidders?
3 A. Of course, yes.
4   MR. NOLAN: Yes. That was, in fact,
5 one of the main reasons for the weekly update calls.
6   MR. OWEN: Right. The process,
7 status of the process.
8 Q. Were they told the identities of the
9 potential bidders?
10   MR. NOLAN: Usually not first to
11 preserve the --
12   MR. OWEN: Confidentiality.
13   MR. NOLAN: -- leaks, but yes.
14   MR. CAMPINS: Were they told before
15 the information was publicly released?
16   MR. NOLAN: I don't think we ever
17 released until we actually had --
18   MR. OWEN: A signed deal, yeah.
19   MR. NOLAN: A signed deal and an AK.
20   MR. OWEN: Yeah. They had to approve
21 it, right, so --
22   MR. CAMPINS: Were the banks told,
23 though, for example, the names of the potential
24 bidders prior to the signing of asset purchase

Page 215

1 agreement? For example, were they aware that Zenith
2 was going to be the purchaser --
3 A. Uh-huh.
4   MR. CAMPINS: -- before the general
5 public was aware?
6   MR. NOLAN: I believe so, yes.
7   MR. OWEN: Yeah.
8   MR. CAMPINS: Did the banks review
9 copies of the asset purchase agreements --
10   MR. NOLAN: Yes.
11   MR. CAMPINS: -- in draft form?
12   MR. OWEN: Sure. It required their
13 consent.
14   MR. CAMPINS: Did the banks provide
15 amendments or input on the asset purchase
16 agreements.
17   MR. COLLINS: If you recall --
18   MR. NOLAN: I wasn't close enough to
19 the documentation process to say definitively. I
20 don't know.
21   MR. CAMPINS: Do you know who at the
22 company would know whether the banks provided
23 written comments on the draft asset purchase
24 agreements?

Page 216

1   MR. NOLAN: Maybe Stan, yeah, he
2 owned the documents.
3   MR. CAMPINS: Okay. Between the
4 execution of the credit facility in 2012 and then
5 June 2014 -- in other words, before the company was
6 placed on heightened cash monitoring by the
7 Department of Education -- how often did the company
8 communicate with its lending syndicate about its
9 interactions with its regulators?
10   MR. OWEN: From when?
11   MR. CAMPINS: From the time that the,
12 you know, May 12 -- May 17, 2012 when the Fourth
13 Amended Credit Agreement was signed until the
14 sometime where the corporation -- where the company
15 was placed on heightened cash monitoring by the
16 Department of Education?
17   MR. OWEN: Which is a little over two
18 years later.
19   MR. CAMPINS: Right. How often --
20   MR. OWEN: Did we communicate in that
21 two-year period?
22   MR. CAMPINS: No. How often did you
23 communicate with them specifically about the
24 company's interactions with the Department of

# Pages Removed

Page 233

1 America?
2 A.  Again, not that I'm aware of.  There
3 weren't any significant deficiencies or material
4 weaknesses or things identified.  If they were, they
5 would have been publicly disclosed.
6 Q.  When did the company sell QuickStart?
7    MR. NOLAN: Last year?  Right?
8    MR. OWEN: Sometime in August of last
9 year, sometime around there.
10    MR. CAMPINS: And how much was it
11 sold for?
12    MR. NOLAN: A couple million?
13    MR. OWEN: A few million?  I don't
14 know.  Three?  Three?  Two and a half?  Three and a
15 half?  I can't recall.
16    MR. CAMPINS: And what percentage of
17 those proceeds went to the lending syndicate led by
18 Bank of America to repay the credit facility?
19    MR. NOLAN: I think it went to the
20 creditors, the lenders, didn't it?
21    MR. OWEN: I think so.  Yeah.  I
22 think, for the most part.  I don't know if we're in
23 the 35/65.
24    MR. NOLAN: No, I think it went to

Page 234

1 the bank.  From memory.
2    MR. CAMPINS: When did the company
3 sell its property in Tampa?
4    MR. OWEN: Later in -- I think later
5 in the fall.  October/November.
6    MR. NOLAN: Sounds about right.
7    MR. OWEN: Sometime in the fall.
8    MR. CAMPINS: How much did it sell
9 for?
10    MR. OWEN: Like a million dollars.
11    MR. NOLAN: Yeah, just a little less.
12    MR. CAMPINS: And what percentage of
13 those proceeds went to the lending syndicate led by
14 Bank of America?
15    MR. NOLAN: I think they went to it.
16    MR. OWEN: I believe those went to
17 it, as well.  Yeah.
18    MR. CAMPINS: When did the company
19 sell its property in Thornton, Colorado?
20    MR. OWEN: February.
21    MR. NOLAN: The 15th.
22    MR. OWEN: Right.  Yeah.
23    UNIDENTIFIED SPEAKER: And so would
24 it be related to the Zenith sale?

Page 235

1    MR. OWEN: Right.  They entered into
2 it, and we sold the properties.
3    UNIDENTIFIED SPEAKER: To Zenith or
4 to Delora --
5    MR. OWEN: Well, Blares sold the
6 store capital, and I forget who the purchaser was
7 for Thornton as a medical build.  I can't recall.
8    MR. CAMPINS: And how much did they
9 sell for?
10    UNIDENTIFIED SPEAKER: Blares was 20.
11    MR. NOLAN: No, it was like 18 or
12 something.
13    MR. OWEN: Eighteen, nineteen,
14 something like that.
15    UNIDENTIFIED SPEAKER: Thornton must
16 have been 750, something like that.
17    MR. CAMPINS: Can you repeat those
18 numbers?  I'm sorry.  Just to be formal.
19    UNIDENTIFIED SPEAKER: (inaudible)
20    MR. CAMPINS: And how much was the
21 other property?
22    MR. NOLAN: I think like seventeen
23 and a half.
24    UNIDENTIFIED SPEAKER: Seventeen

Page 236

1 million.
2    MR. OWEN: 17 million, something like
3 that, yeah.
4    (Many speakers began talking at the same
5 time, making any one conversation inaudible to the
6 reporter.)
7    MR. CAMPINS: Okay.  And where were
8 those proceeds deposited?
9    MR. NOLAN: They went to the banks?
10    MR. OWEN: To the banks.
11    MR. CAMPINS: 100 percent?
12    MR. NOLAN: Yes.
13    MR. CAMPINS: And when did that last
14 transaction take place?
15    MR. OWEN: In February.
16    MR. NOLAN: February.
17    MR. OWEN: Yeah, towards the end of
18 February.
19    MR. CAMPINS: February of what year?
20    MR. OWEN: This year, '15.  Yeah,
21 after the Zenith transaction.
22    mr. cmap:  Okay.  So in February of
23 2015 the lending syndicate led by Bank of America
24 was paid over $18 million?  Am I understanding that

Page 237

1 correctly?
2   MR. NOLAN: Yeah. You have to
3 understand it was sort of all -- it's all part of
4 the Zenith sale.
5   MR. OWEN: It's all part of the
6 transaction.
7   MR. NOLAN: Those two buildings were
8 physical assets that Zenith would then occupy.
9 Zenith agreed not to buy the physical assets but to
10 enter into a lease which then gave those two
11 buildings value.
12   So you had to have Zenith, the Zenith
13 sale first, and arrange a longer-term lease to
14 create value. And it was sold.
15   And so it was really probably -- it
16 was the biggest part of the bank's pay-down or
17 really the only part the bank got paid down as part
18 of Zenith, if that makes sense.
19   MR. OWEN: Yeah.
20   MR. CAMPINS: And at the time that
21 payment was made, were debtors already insolvent?
22   MR. NOLAN: I don't think anyone has
23 looked at that.
24   UNIDENTIFIED SPEAKER: Yeah, we

Page 238

1 haven't made a determination on that part.
2   MR. CAMPINS: Okay. So at that time
3 the 18 million that went to the bank, it's fair to
4 say that's more than the cash on hand that exists in
5 debtors' estates now?
6   MR. NOLAN: That's our cash position
7 today.
8   MR. OWEN: Yeah, yeah, about
9 $6 million, something like that, if you count the
10 escrow accounts. Yeah.
11   MR. CAMPINS: Since February of 2015,
12 the banks got three times more than what the current
13 cash position is?
14   MR. OWEN: Well, I mean, it depends
15 how you define cash. Right? There is cash meaning
16 the escrow accounts, as well, which would be more
17 than that.
18   MR. CAMPINS: Um, you spoke a little
19 bit about the Genesis private lending program?
20   MR. OWEN: Uh-huh.
21   MR. CAMPINS: You said that there
22 was -- the loans performed at what you expected?
23   MR. OWEN: Generally, yes.
24   MR. CAMPINS: What was the default

Page 239

1 rate on those private loans?
2   MR. OWEN: It varied, but around -- I
3 think we probably said around 50 percent.
4   MR. CAMPINS: Was there a sale of
5 notes related to the Genesis program to a group
6 called Turnstyle?
7   MR. OWEN: There was.
8   MR. CAMPINS: When did that take
9 place?
10   MR. NOLAN: In August.
11   MR. OWEN: In July or August of last
12 year, 2014. And that was publicly disclosed,
13 as well, in AK.
14   BY MR. CAMPINS:
15 Q.  What was the book value of the notes that
16   were sold to Turnstyle?
17 A.  I will refer you to the AK, which is
18   publicly -- which is publicly available which had
19   that information. I don't recall off the top of my
20   head.
21 Q.  Was it over 500 million?
22 A.  The book value?
23 Q.  The value, yeah, the stated value of the
24   loans?

Page 240

1 A.  The book value, no. But I don't know,
2   when you say --
3 Q.  I mean, how much was owed on the loans?
4   How much did the students owe on the loans, I guess
5   is the way of putting it in plain English.
6   UNIDENTIFIED SPEAKER: You mean the
7 unpaid principal balance.
8   BY MR. CAMPINS:
9 Q.  The unpaid principal balance. What was
10   the unpaid principal balance of those loans?
11 A.  I can't recall, but I think that was -- I
12   think -- yeah, I can't recall without -- I can't
13   recall.
14 Q.  It isn't hundreds of millions?
15 A.  I believe that's right, yeah.
16 Q.  And how much was it sold to Turnstyle for?
17 A.  I can't recall that in terms of --
18   MR. NOLAN: Nineteen.
19   MR. OWEN: 19 million, yeah.
20   BY MR. CAMPINS:
21 Q.  How was Turnstyle selected as a buyer?
22 A.  Through a bid process.
23 Q.  How was that bid process conducted?
24 A.  We solicited bids from interests -- from