# Exhibit 2

# Lease

# LEASE AGREEMENT

By and Between

**BB&S DEVELOPMENT, LLC,**
**an Oregon limited liability company,**

**as Landlord**

and

**HEALD COLLEGE, LLC,**
**a California limited liability company,**

**as Tenant**

Dated as of ~~July~~ August 6 , 2008

**Address**

**6035 NE 78th Court**
**Portland, Oregon 97218**

31275.6

* * * *

The mailing, delivery or negotiation of this Lease by Landlord and Tenant or their agents or attorneys shall not be deemed an offer by Landlord or Tenant to enter into this Lease or to enter into any other relationship with the other party, whether on the terms contained herein or on any other terms. This Lease shall not be binding upon Landlord or Tenant, and neither Tenant nor Landlord will have any obligations, or liabilities or any rights with respect thereto, or with respect to the Premises, unless and until both Landlord and Tenant have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without cause and for any reason, without recourse or liability.

* * * *

# TABLE OF CONTENTS

PAGE

1. Definitions ................................................................................................1

2. Premises Demised .....................................................................................2

3. Term .........................................................................................................2

4. Rental; Security Deposit ...........................................................................3

5. Delivery of Possession; AS IS ..................................................................4

6. Tenant Improvements ...............................................................................4

7. Tenant's Use of Premises Before Commencement Date ............................6

8. Use ...........................................................................................................6

9. Compliance with Legal Requirements ......................................................6

10. Environmental Compliance .....................................................................6

11. Repairs and Maintenance ........................................................................7

12. Operating Expenses ................................................................................8

13. Real Estate Taxes .................................................................................11

14. Non-Competition with Tenant's Business Operations ...........................12

15. Services and Utilities ............................................................................12

16. Alterations ...........................................................................................13

17. Assignment and Sublease ......................................................................15

18. Damage or Destruction .........................................................................16

19. Eminent Domain ...................................................................................17

(i)

31275.6

20. Insurance ...................................................................................................17

21. Subrogation and Waiver .............................................................................18

22. Indemnity ..................................................................................................19

23. Landlord's Estate ......................................................................................19

24. Subordination and Non-Disturbance ..........................................................19

25. Landlord's Right of Entry ..........................................................................19

26. Parking Facilities ......................................................................................20

27. Signs ........................................................................................................20

28. Rules and Regulations ...............................................................................20

29. Common Areas and Access .........................................................................21

30. Reasonable Consent ..................................................................................21

31. Tenant's Default; Rights and Remedies .......................................................21

32. Landlord's Default; Rights and Remedies ....................................................23

33. Holding Over .............................................................................................24

34. Quiet Enjoyment ........................................................................................24

35. Mutual Representation of Authority ............................................................25

36. Intentionally Omitted .................................................................................25

37. Real Estate Brokers ..................................................................................25

38. Business Hours .........................................................................................25

39. Attorneys' Fees .........................................................................................26

40. Estoppel Certificate ..................................................................................26

41. Recordable Memorandum ...........................................................................26

42. Option to Renew ........................................................................................26

(ii)

43. Confidentiality .................................................................................................................27

44. Governing Law ...............................................................................................................27

45. Notices ...........................................................................................................................27

46. Counterparts ...................................................................................................................28

47. Entire Agreement ............................................................................................................28

48. No Partnership ................................................................................................................28

49. Severability ....................................................................................................................28

50. Captions ..........................................................................................................................29

51. Words ..............................................................................................................................29

52. Exhibits ...........................................................................................................................29

53. Time ................................................................................................................................29

54. Successors .......................................................................................................................29

55. No Recourse ....................................................................................................................29

56. Waiver .............................................................................................................................29

57. Joint and Several Liability .............................................................................................30

**EXHIBIT A  THE PREMISES**................................................................................................1

**EXHIBIT B  THE LAND**........................................................................................................1

**EXHIBIT C  SERVICES**.........................................................................................................1

**EXHIBIT D  LANDLORD'S SUPERIOR INTERESTS** .........................................................1

(iii)

# LEASE AGREEMENT

THIS LEASE AGREEMENT made this _6th_ day of ~~July~~ _august,_ 2008, between BB&S
DEVELOPMENT, LLC, an Oregon limited liability company (("Landlord"), and HEALD
COLLEGE, LLC., a California limited liability company ("Tenant").

## W I T N E S S E T H:

1. Definitions.

The following terms are defined on the page listed below:

| TERM | PAGE |
|------|------|
| Additional Rent | 3 |
| Alterations | 13 |
| Base Year | 8 |
| BOMA Standards | 2 |
| Brokers | 25 |
| Building | 2 |
| Business Hours | 25 |
| Casualty | 16 |
| Commencement Date | 3 |
| Default Rate | 23 |
| Effective Date | 16 |
| Event of Default | 21 |
| Expiration Date | 3 |
| Fixed Rent | 3 |
| Fixtures | 14 |
| Hazardous Substances | 7 |
| Holidays | 25 |
| Land | 2 |
| Legal Requirements | 5 |
| Operating Expenses | 8 |
| Premises | 2 |
| Primary Term | 3 |
| Property | 2 |
| Real Estate Taxes | 12 |
| Rent | 3 |
| Scheduled Commencement Date | 2 |
| Substantial Damage | 16 |
| Substantial Taking | 17 |

(1)

31275.6

Superior Interest ................................................................................................ 19
Taking ................................................................................................................ 17
Tenant ................................................................................................................. 1
Tenant Affiliate ................................................................................................. 16
Tenant Improvement Allowance ........................................................................ 5
Tenant Improvements ......................................................................................... 5
Tenant's Property ................................................................................................ 6
Term .................................................................................................................... 3

2. <u>Premises Demised.</u>

(a)     Landlord leases and demises to Tenant and Tenant hires from Landlord the following space: That certain building ("<u>Building</u>") located at 6035 NE 78th Court, Portland, Oregon, 97218, containing approximately 39,600 rentable square feet and outlined on the plan attached as <u>Exhibit A</u> (the "<u>Premises</u>"). The Building is located on a parcel of land described on the attached <u>Exhibit B</u> (the "<u>Land</u>"). The Land, Building and other improvements on the Land are hereafter called the "<u>Property</u>".

(b)     The parties understand that the rentable square footage set forth in <u>Section 2(a)</u> is in accordance with the currently applicable standards of the Building Owners and Managers Association, ANSI Z65.1 1996 ("<u>BOMA Standards</u>"). Prior to the Commencement Date, Tenant may, at its sole cost, measure the rentable and usable square footage to determine if it is in accordance with applicable BOMA Standards. If Tenant disputes Landlord's measurement as set forth in <u>Section 2(a)</u> it shall promptly notify Landlord. If Landlord and Tenant cannot thereafter agree on the appropriate measurement within ten (10) days after Tenant's notice, then either party shall have the right to submit the issue to arbitration in accordance with the rules of the American Arbitration Association. If it is determined that the actual rentable square footage measured by BOMA Standards varies from the rentable square footage determined by Landlord, then the Fixed Rent (and any other provisions of this Lease based upon a specific rentable square footage) shall be retroactively adjusted to reflect the applicable square foot figure as agreed upon by the parties or, if applicable, as determined by arbitration. The losing party in any such arbitration action shall pay for all costs and expenses of the arbitration. Landlord and Tenant shall pay any retroactive adjustment within twenty (20) days after the arbitration award.

3. <u>Term.</u>

(a)     Landlord shall deliver the Premises to Tenant on or before October 1, 2008 (the "<u>Delivery Date</u>"). Upon the Delivery Date and continuing through until the Commencement Date (the "<u>Early Occupancy Period</u>"), Tenant and its agents, employees, contractors, and vendors shall be permitted to enter the Premises for the purposes of installing the Tenant Improvements (defined below). Tenant shall not be obligated to pay Rent or other charges under the Lease during the Early Occupancy Period, but any use or occupancy of the Premises by Tenant during the Early Occupancy Period shall otherwise be subject to, and in accordance with, the terms and

(2)

31275.6

conditions of this Lease. Landlord shall have no responsibility for any damage, theft, destruction or injury to Tenant or any of Tenant's property as a result of Tenant's presence or activities on, or use of, the Premises during the Early Occupancy Period, except to the extent caused by Landlord's active negligence or willful misconduct. Landlord makes no representations as to whether Tenant's occupancy of the Premises during the Early Occupancy Period will be in compliance with applicable building, safety or fire codes, and Tenant shall be responsible for, and assumes the risk of any non-compliance. Tenant shall indemnify and hold Landlord harmless from and against any loss, cost, liability, claim or action arising out of or relating to Tenant's use or occupancy of the Premises during the Early Occupancy Period. In the event Landlord fails to deliver the Premises on or before the Delivery Date and if such delay is not the result of the acts or omissions of Tenant or Tenant's architects, engineers or other agents, then Tenant shall receive two (2) days free Rent for each one (1) day beyond the Delivery Date. In the event Landlord fails to deliver the Premises on or before January 1, 2009 and if such delay is not the result of the acts or omissions of Tenant or Tenant's architects, engineers or other agents, then Tenant shall have the right to terminate this Lease upon written notice to Landlord.

(b)    The primary term of this Lease (the "Primary Term") shall commence on the first to occur of (i) the date Tenant occupies and commences use of the Premises for the purposes set forth in Section 8 hereof, or (ii) January 1, 2009 (the "Commencement Date"), and shall expire on 11:59 p.m. on the date (the "Expiration Date") which is ten (10) years after the Commencement Date. As used in this Lease, "Term" shall mean the Primary Term and any duly exercised Extension Term (defined below).

(c)    Within thirty (30) days following the Commencement Date, Landlord and Tenant will execute a document confirming the Commencement Date and the Expiration Date.

4.   Rental; Security Deposit.

(a)    From and after the Commencement Date, Tenant agrees to pay Landlord annual rent for the first year of the Term at the rate of Fourteen and 60/100 Dollars ($14.60) per rentable square foot of the Premises, payable monthly in advance in equal installments on the first day of each month of the Primary Term (the "Fixed Rent"). For the second year of the Term and each year thereafter (including any Extension Term) on the anniversary of the Commencement Date if such date is the first day of a month, or on the first day of the month following the anniversary of the Commencement Date, Fixed Rent shall be increased and Tenant shall pay annual base rent in an amount equal to one hundred three percent (103%) of the amount of annual Fixed Rent payable for the immediately preceding twelve (12) month period, payable monthly in advance in equal installments on the first day of each month of each year of the Term or Extended Term. Notwithstanding the foregoing, the first installment of Fixed Rent shall be paid by Tenant at the same time Tenant executes this Lease.

(b)    Tenant shall also pay all other sums of money that shall become due from Tenant under this Lease other than Fixed Rent ("Additional Rent"). As used in this Lease, "Rent" shall

(3)

31275.6

mean Fixed Rent and Additional Rent.  Rent for any month's partial occupancy shall be prorated based on the actual number of days in the month.

(c)     Notwithstanding any provision of the foregoing to the contrary, Tenant shall receive an abatement of Rent on 9,600 rentable square feet of the Premises for the first eighteen (18) full months of the Primary Term.

(d)     As security for the performance and observance by Tenant of all of the terms, provisions, and conditions of this Lease, Tenant shall deposit with Landlord a sum equal to the Fixed Rent for the  last month of the Primary Term ("Security Deposit").  Landlord shall return the Security Deposit, or balance thereof then held by Landlord, without interest, to Tenant within thirty (30) days after the termination of this Lease, provided such termination is not the result of a default by Tenant.  In the event Tenant defaults in respect to any of the terms, provisions and conditions of this Lease beyond any applicable notice and cure periods, then Landlord may, without further notice, apply all or part of the Security Deposit to cure any such default.

5. Delivery of Possession; AS IS.

Tenant acknowledges that prior to the execution of this Lease, Tenant has been furnished full access to, and has inspected the Premises.  Except as set forth below, Tenant accepts the Premises (including the security system) in its present condition, state of repair and operating order and in present "AS IS" condition; provided, however, Landlord warrants that the heating, ventilation and air conditioning unit is in good working order with an expected service life of no less than three (3) years from the date of this Lease.  Tenant further acknowledges that, except as expressly set forth in this Lease, neither Landlord nor any real estate agent or broker representing Landlord or Tenant has made any representation or warranty as to the present or future suitability of the Premises for the conduct of Tenant's business.  Notwithstanding any provision hereof to the contrary, upon the execution of this Lease and continuing through the Commencement Date, Tenant and its agents, employees, contractors, and vendors shall be permitted to enter the Premises for the purposes of conducting such investigations and inspections as Tenant may reasonably deem necessary to determine the existence of asbestos or other Hazardous Substances in the Premises ("Environmental Inspection"); provided, however, Tenant shall not conduct any destructive or invasive testing without the prior written consent of Landlord, which consent shall not be unreasonably withheld.  After making any Environmental Inspection, Tenant shall restore the Premises to its condition prior to such Environmental Inspection.  In the event that Tenant's Environmental Inspection reveals the existence of Hazardous Substances in the Premises, Tenant shall notify Landlord of same.  Landlord and Tenant will attempt to mutually agree on a reasonable plan of remediation, and Landlord shall implement such plan at Landlord's sole cost and expense.  Tenant's acceptance of the Premises as set forth herein shall be expressly subject to Tenant's review and approval of Tenant's Environmental Inspection, unless Tenant fails to perform its obligations under this Section 5, in which case Tenant shall be deemed to have accepted the Premises.

6. Tenant Improvements.

(4)

31275.6

Tenant will complete the construction of the Premises as necessary for the operation of Tenant's business, including the installation of Tenant's fixtures, telephone and data cabling, and security systems (collectively, the "Tenant Improvements").  Prior to commencing work on the Tenant Improvements, Landlord must approve Tenant's Building Plans (as defined below), which approval shall not be unreasonably withheld, conditioned or delayed.  Landlord's failure to disapprove of Tenant's Building Plans within ten (10) business days of receipt thereof shall be deemed Landlord's approval thereof.  Landlord may condition its approval on Tenant's agreement to remove certain Tenant Improvements or Fixtures from the Premises upon the expiration or earlier termination of the Term, at Tenant's sole expense, provided that it is reasonable to do so.  In instances where Landlord reasonably withholds its approval and Tenant is required to make changes to the Basic Plans in order to obtain Landlord's approval, Landlord will have no liability for any delays or additional costs incurred by Tenant in obtaining Landlord's approval.  Tenant shall have the right to perform all Tenant Improvement work ("Tenant's Work"), select the general contractor and competitively bid all of Tenant's Work; provided, however, the general contractor must be approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.  Landlord's failure to disapprove of Tenant's proposed general contractor within ten (10) business days of receipt of written notification shall be deemed Landlord's approval thereof.  Tenant's Work shall be completed in a good and workmanlike manner, and in compliance with all certificates, permits and approvals required by applicable laws, statutes, ordinances, orders, codes, rules and regulations of all federal, state, county, city and local departments and agencies ("Legal Requirements").  All materials used by Tenant shall be of good quality.  Landlord shall provide to Tenant a tenant improvement allowance (the "Tenant Improvement Allowance") in an amount equal to Twenty Dollars ($20.00) per rentable square foot in the Premises to be applied towards all hard and soft costs of the Tenant Improvements, including, without limitation, construction of the Premises, telephone and data cabling installation, architectural, project management, and engineering fees. .  The Tenant Improvement Allowance shall be disbursed to Tenant in installments, not more frequently than monthly, based on submittals to Landlord of invoices for work completed and conditional and/or final lien releases, as applicable.  Landlord shall disburse the amount necessary to pay such invoices within thirty (30) days following Landlord's receipt of such documentation.  No mark-ups or supervisory fees of Landlord shall be included in the costs for Tenant's Work.  Tenant shall be entitled to credit any unused portion of the Tenant Improvement Allowance toward its Rent obligations under this Lease, up to a maximum of Five Dollars ($5.00) per rentable square foot of the Premises.

For purposes of this Lease, Building Plans means (i) fully dimensional architectural floor plans showing partition layout, clearly identifying and locating equipment requiring special plumbing or mechanical systems, areas subject to above normal loads, special openings in the floor, ceiling, or walls, and other major or special features; (ii) fully dimensional plans locating telephone and electrical receptacles, outlets, and other items requiring electrical power (for special conditions, equipment, power requirements, and manufacturer's model numbers must be included); (iii) a lighting layout showing locations of all light fixtures and partitions; and (iv) any proposed alterations in or about the Premises.

(5)

7. Tenant's Use of Premises Before Commencement Date.

Tenant may, at any time after the Delivery Date and prior to the Commencement Date, without incurring any liability for payment of Rent, measure the Premises, design and layout the Tenant Improvements, and place and install its personal property, furniture, furnishings, signs, the Tenant Improvements, telecommunication equipment, equipment and trade fixtures ("Tenant's Property"), in the Premises at Tenant's risk and expense.  In exercising the foregoing rights, Tenant shall not cause any material interference with or delay to Landlord or to any existing tenant.  Tenant's indemnity in Section 22 shall apply to Tenant's entry under this Section 7.

8. Use.

Tenant shall have the right to use and occupy the Premises for general office and administrative use, and for the operation of a post-secondary school and training facility, including, without limitation, the installation of educational training classrooms and laboratories, and for any other purpose consistent with the Legal Requirements and the nature of the Building. Tenant shall be entitled to construct or install a lunch room, kitchen facilities and vending machines in the Premises for Tenant's and its employees, students, invitees and visitors use.

9. Compliance with Legal Requirements.

(a)     Tenant shall comply with all applicable Legal Requirements in the Premises.

(b)     Landlord represents and warrants that, to Landlord's actual knowledge, without inquiry or investigation, all applicable covenants, restrictions, easements and other matters of record, zoning and other Legal Requirements in effect as of the date hereof and as of the Commencement Date permit the use of the Premises for general office purposes, for a post-secondary educational school and for educational training classrooms, storage, and uses accessory and incidental thereto.

(c)     Landlord represents and warrants that, to Landlord's actual knowledge, without inquiry or investigation and except as otherwise disclosed in writing to Tenant, as of the Commencement Date, the Property, the Premises (other than any Tenant Improvements constructed by Tenant), the common areas and exterior entrances to the Building and to the Premises, are in compliance with all applicable Legal Requirements.  Landlord shall defend, indemnify and save Tenant harmless from any claims, fines, penalties, liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees, expert witness fees and other costs of defense) arising from Landlord's breach of its representations and warranties, covenants, and agreements contained in this Section 9.

10. Environmental Compliance.

(6)

(a)     Tenant agrees to comply with all applicable environmental laws, rules and regulations applicable to the Premises.

(b)     Tenant shall not generate, store, handle, transport, treat, dispose of or use on the Premises hazardous or toxic substances or wastes as defined under any applicable Legal Requirement ("Hazardous Substances"), except that Tenant's use on the Premises of cleaning supplies, copying fluids, other office and maintenance supplies and other substances normally and customarily used by tenants of space similar to the Premises shall not be deemed a violation of this Section 10(b).

(c)     Tenant shall defend, indemnify and save Landlord harmless from any claims, fines, penalties, liabilities, losses, damages, costs and expenses (including reasonable attorney's fees, expert witness fees and other costs of defense) which arise from Tenant's breach of its representations, warranties, covenants and agreements contained in this Section 10.

(d)     Landlord represents, warrants and covenants that, to Landlord's actual knowledge, without inquiry or investigation,  there has been no generation, handling, transportation, treatment, disposal or use of Hazardous Substances that has occurred in, on, under or about the Premises or the Property in violation of applicable Legal Requirements; that the soil, groundwater, and soil vapor on, under or about the Premises and the Property are free of Hazardous Substances and will be as of the Commencement Date; and that as of the Commencement Date the Property does not contain any PCBs, radon, or underground storage tanks.

(e)     Landlord shall defend, indemnify and save Tenant harmless from any claims, fines, penalties, liabilities, losses, damages, costs and expenses (including reasonable attorney's fees, expert witness fees and other costs of defense) which arise from Landlord's breach of its representations, warranties, covenants and agreements contained in this Section 10 and from the existence of Hazardous Substances on the Premises or the Property prior to the Commencement Date, unless and to the extent caused by the actions or omissions of Tenant, or Tenant's agents, employees, or contractors.

11. Repairs and Maintenance.

(a)     During the Term, Landlord shall perform diligently, promptly and in a good and workmanlike manner in compliance with all applicable Legal Requirements, all maintenance, repairs and replacements to (i) the structural components of the Building, including without limitation the roof, roofing system, exterior walls, bearing walls, support beams, foundations, columns, exterior doors and windows and lateral support to the Building; (ii) assure watertightness of the Building and the Premises (including caulking of the flashings) and repairs to the roof, roofing system, curtain walls, windows, and skylights if required to assure watertightness; (iii) the plumbing, lawn sprinkler, heating, ventilation and air conditioning systems, electrical and mechanical lines and equipment associated therewith, including without limitation elevators; (iv) the parking lots, areas and garages, common areas of the Property and

(7)

Building, including their lighting systems; (v) the exterior improvements to the Building, including walkways, shrubbery and landscaping; (vi) the glass including cleaning and replacements, (vii) the Building and the Premises caused by the negligence or willful misconduct of Landlord, its agents, independent contractors, representatives or employees, and (viii) any part of the Building and the Premises for which Tenant has not expressly assumed responsibility.

(b)     During the Term, Tenant shall, at its sole expense, (i) do its own redecorating of the interior of the Premises; (ii) be responsible for normal, routine, day-to-day maintenance and care of the interior of the Premises, and (iii) make all repairs caused by Tenant's negligence or willful misconduct, unless covered by any insurance policy maintained by Landlord (or would be covered under any insurance required to be carried by Landlord hereunder) or unless caused by the negligence or willful misconduct of Landlord, its agents, independent contractors, representatives or employees.

12. Operating Expenses.

(a)     Subject to the Rent abatement set forth in Section 4(c), commencing upon the Commencement Date, Tenant shall pay Landlord, on a monthly basis, for any increases in costs to Landlord for the operation and maintenance of the common area, parking lots and Building ("Operating Expenses") in accordance with this Lease over the Operating Expenses for the first twelve (12) months of the Primary Term ("Base Year").

(b)     The following items shall be excluded from Operating Expenses:

(i)     repairs or other work occasioned by (A) earthquake, fire, windstorm, or other casualty of the type against which Landlord has insured or is required to insure pursuant to the terms of this Lease, or for which Landlord is entitled to reimbursement, whether or not collected, from third parties, or (B) the exercise of the right of eminent domain;

(ii)     marketing costs, leasing commissions, finders' fees, attorney's fees, costs, and disbursements and other expenses incurred in connection with negotiations or disputes with tenants, other occupants, prospective tenants or other occupants, or the sale or refinancing of the Building, or legal fees incurred in connection with this Lease;

(iii)     costs incurred by Landlord for alterations which are capital improvements and replacements under generally accepted accounting principles consistently applied, and all other voluntary costs of a capital nature, including, but not limited to, capital improvements, capital repairs, capital equipment and capital tools all determined in conformity with generally accepted accounting principles consistently applied ("Capital Improvements"); provided, however, commencing on the fourth (4th) year of the Primary Term, Landlord may include in Operating Expenses costs for Capital Improvements which are involuntary in nature, provided same are amortized over the useful life of such Capital Improvement, in conformity with generally accepted accounting principles consistently applied;

(8)

31275.6

(iv)    depreciation and amortization;

(v)    costs incurred due to violation by Landlord or any tenant or other occupant of the terms and conditions of any lease or other rental arrangement covering space in the Building, or by Landlord's failure to adhere to standards of prudent conduct then observed by landlords of other comparable office buildings in the vicinity of the Building;

(vi)    amounts paid to subsidiaries or other affiliates of Landlord (i.e., persons or companies controlled by, under common control with, or which control, Landlord) for services on or to the Land, the Building or the Premises (or any portion thereof), to the extent only that the costs of such services exceed competitive costs of such services were they not so rendered by a subsidiary or other affiliate of Landlord;

(vii)    bad debt expenses, payments of principal, interest, late fees, prepayment fees or other charges on any debt or amortization payments on any mortgage or mortgages executed by Landlord covering the Land or the Building (or any portion thereof) now or in the future, rental concessions or negative cash flow guaranties, or rental payments under any ground or underlying lease or leases;

(viii)    Landlord's general administrative overhead expenses for services not specifically performed for the Building, or salaries of any officer or employee of Landlord (or any subsidiary or affiliate of Landlord) above the grade of building manager;

(ix)    any compensation paid to clerks, attendants, or other persons in commercial concessions operated by Landlord;

(x)    all items and services for which Tenant pays directly to third parties or for which tenants reimburse Landlord;

(xi)    advertising and promotional expenditures, and costs of signs in or on the Building identifying the owner of the Building or signs (other than the Building directory in the lobby of the Building) identifying other tenants of the Building or their employees, divisions, subsidiaries, subtenants or assignees;

(xii)    any costs, fines, or penalties incurred due to violations by Landlord of any governmental rule or authority;

(xiii)    costs for or relating to sculpture, paintings, or other art;

(xiv)    rentals and other related expenses incurred in the leasing of air conditioning systems, elevators, or other equipment ordinarily considered to be of a capital nature, except equipment which is used in providing janitorial services and which is not affixed to the Building;

(xv)    building, project, asset or other management fees in an aggregate amount in excess of three percent (3%) of the annual gross rental income of the Building for any year;

(9)

31275.6

(xvi)   any tax or assessment of any nature, including, without limitation, any mortgage tax or fee, other than as set forth in Section 13 ;

(xvii)   any costs necessitated by or resulting from the negligence or willful misconduct of Landlord, its agents, employees and/or independent contractors;

(xviii)  expenses and costs not normally, in accordance with generally accepted accounting principles, included by landlords of comparable office buildings in the vicinity of the Building;

(xix)    charitable or political contributions;

(xx)     cost of insurance premiums for insurance not customarily carried by owners of comparable office buildings in the area in which the Building is located;

(xxi)    expenses in connection with claims for personal injury or property damage alleged to have arisen from or in connection with the existence, condition or operation of the Building, including without limitation costs incurred in connection with the defense of such claims, to the extent that Landlord's expenses are reimbursed by insurance proceeds (or would be reimbursed by insurance proceeds under any insurance required to be carried by Landlord hereunder);

(xxii)   costs associated with the operation of the business of the partnership or entity which constitutes Landlord, or the operation of any parent, subsidiary or affiliate of Landlord, as the same are distinguished from the costs of operation of the Building, including without limitation partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee, costs of selling, syndicating, financing, mortgaging or hypothecating any of Landlord's interest in the Building, and costs of any disputes between Landlord and its employees or disputes of Landlord with third-party building management;

(xxiii)  costs and expenses due to termination or underfunding of any plan under ERISA or any other law or regulation governing employee pension plans or other benefits;

(xxiv)   expenses in connection with the design, installation, operation, maintenance, repair or replacement of telecommunications equipment or facilities; and

(xxv)    costs and expenses relating to the repair or replacement of the heating, ventilation and air conditioning systems.

(c)     Operating Expenses shall be computed in accordance with the following general principles:

(i)      Any Operating Expenses resulting from a change of policy or practice in the operation of the Building which causes an increase in Operating Expenses shall be included in Operating Expenses for a particular year only if such change in policy or practice is one which

(10)

31275.6

would have been made by a reasonably prudent operator of comparable office buildings in the area in which the Building is located All services rendered to and materials supplied to the Building shall be rendered or supplied at no greater cost than the market rate in arm's-length transactions for similar services or materials rendered or supplied for similar purposes in the same geographical location or trade area as the Building.  Landlord at all times shall operate and maintain the Building and all common areas in an economically reasonable manner and at costs not disproportionately high when compared to the cost experienced by other comparable office buildings in the area in which the Building is located.

(ii)　　In no event shall any adjustment in Operating Expenses result in Landlord collecting more than one hundred percent (100%) of the actual increase in Operating Expenses incurred by it from Tenant and all the other tenants of the office space of the Building, and Landlord shall not recover the costs of any items more than once.

(iii)　　In determining the amount of Operating Expenses, if less than one hundred percent (100%) of the Rentable Area of the Building shall have been occupied by tenants at any time during any year (including the Base Year), Operating Expenses shall be determined for the year to be an amount equal to the like expenses which would normally be expected to be incurred had such occupancy been one hundred percent (100%) throughout the year.

(d)　　No more than one (1) time in any twelve (12) month period, Tenant shall be entitled, upon five (5) days prior written notice, and during normal Business Hours at Landlord's office or such other place in the area in which the Building is located as Landlord reasonably may designate, to inspect and examine and/or have a reputable independent CPA or consultant selected by Tenant audit the books and records of Landlord relating to the determination of Operating Expenses. If the audit discloses that the amount of Operating Expenses billed to Tenant was incorrect, the appropriate party shall pay to the other party the deficiency or overpayment, as applicable. All costs and expenses of the audit shall be paid by Tenant unless the audit shows that Landlord overstated or understated Operating Expenses for the subject calendar year by more than five percent (5%), in which case, Landlord shall pay all costs and expenses of the audit.

(e)　　Landlord shall maintain accurate and complete books and records evidencing Operating Expenses for a period of not less than five (5) years after Landlord issues a statement for any calendar year. The books and records shall be located at the Landlord's principal place of business.

(f)　　All assessments which may be paid in installments shall be paid by Landlord in the maximum number of installments permitted by law and not included in Operating Expenses or Real Estate Taxes except in the year in which the assessment is actually paid.

13. Real Estate Taxes.

(a)　　From and after the Commencement Date, Tenant shall pay to Landlord the increases in Real Estate Taxes (defined below) over the Base Year Real Estate Taxes that are

(11)

assessed against the Premises. If the Commencement Date occurs or the Term expires or terminates at any time other than the beginning or end of a taxable year, the increases in Real Estate Taxes over the Base Year Real Estate Taxes shall be prorated on the basis of a 365-day year, so as to include only that portion of the taxable year which is a part of the Term. If the Premises consist of an entire building that is not assessed separately from Landlord's other real property, Landlord shall use his best efforts to cause the Premises to be assessed as a separate tax parcel.

(b)    Landlord will promptly, and in no event less than thirty (30) days before delinquency, advise Tenant in writing of all Real Estate Taxes and shall deliver copies of all applicable tax bills or statements to Tenant. If a separate assessment of the Premises cannot be obtained, Landlord shall also advise Tenant in writing at that time of the amount of Real Estate Taxes. Tenant shall pay to Landlord the Real Estate Taxes prior to the later of (i) thirty (30) days after receipt by Tenant from Landlord of a copy of such statement referred to above, or (ii) fifteen (15) days prior to delinquency. Within thirty (30) days after the end of the applicable year, Landlord shall pay to Tenant any decreases in Real Estate Taxes. As used herein, the term "Real Estate Taxes" a) shall be construed to include all actual taxes, assessments, levies, charges, water and sewer charges, rapid transit and similar governmental charges and b) shall not be construed to include any income, gift, succession, excess profits, gross receipts, revenue, estate, rental, personal property, inheritance or franchise taxes paid or payable by Landlord, or any increase in taxes resulting from increased valuation caused by the sale or assignment or construction on or of any portion of the Premises, the Building, the Common Area and/or the Center, or due to any change in ownership of Landlord, notwithstanding the fact that any of the foregoing taxes may become a lien against the Premises and/or the Building. Landlord shall pay, or cause to be paid, all taxes that may become a lien against the Building and/or the Premises prior to delinquency and shall elect to pay assessments in installments, if permitted by applicable law.

14. Non-Competition with Tenant's Business Operations.

Tenant shall have the exclusive right in the Building to provide educational and training services. At all times during the Term, Landlord shall not: (i) lease to or permit any other space within the Building to be occupied or used by any person or entity offering educational and/or training services; or (ii) consent to any assignment or sublease that would violate the exclusive granted hereunder to Tenant. All new leases with other tenants or occupants covering any other space in the Building shall contain a reference to the exclusive granted hereunder to Tenant. Tenant's rights hereunder shall be enforceable by Tenant and any entity to whom Tenant has assigned this Lease or subleased substantially all of the Premises.

15. Services and Utilities.

(a)    Except as otherwise set forth in Section 15(b), Landlord shall provide, at its own expense, all services for the Premises (including, without limitation, during the construction of the Tenant Improvements) consistent with a comparable building, including those described on the attached Exhibit C.

(12)

31275.6

(b)     Tenant shall provide, at its own expense, electricity, gas, and its own cleaning and janitorial service for the Premises.

16.  Alterations.

(a)     Except as set forth in Section 16 (b), Tenant may, at its own expense, and without Landlord's prior consent, make such changes, alterations, additions or improvements to the Premises using licensed contractors selected by Tenant ("Alterations") and install such Tenant Property in the Premises as will, in the judgment of Tenant, better adapt the same for its needs, provided that Tenant complies with the following provisions:

(i)      The Alterations shall not result in a violation of or require a change in any certificate of occupancy or zoning designation applicable to the Building.

(ii)     The outside appearance of the Building shall not be materially adversely affected.

(iii)    The Alterations shall not weaken or impair the structure, or materially reduce the value of the Premises or the Building.

(iv)    No part of the Building outside of the Premises shall be physically affected.

(v)     The proper functioning of the building equipment shall not be materially adversely affected.

(vi)    At Landlord's request, Tenant shall submit to Landlord three (3) copies of as-built plans for the Alterations.

(b)     With respect to any Alterations that do not comply with Sections 16(a)(i) through 16(a)(vi), Tenant must obtain Landlord's prior written consent which shall not be unreasonably withheld, conditioned or delayed. In addition to the foregoing, Tenant must obtain Landlord's prior written consent to any Alterations that comply with Sections 16(a)(i) through 16(a)(vi) but will exceed a cost of $30,000 and are not purely cosmetic in nature, which consent will not be unreasonably withheld, conditioned or delayed. Landlord's failure to disapprove of any proposed Alterations by Tenant within ten (10) business days of receipt of request thereof shall be deemed Landlord's approval of such Alteration(s). Landlord may condition its consent on Tenant's agreement to remove the Alterations from the Premises upon the expiration or earlier termination of the Term, at Tenant's sole expense, if it is reasonable to do so.

(c)     Tenant agrees that all Alterations shall at all times comply with all applicable Legal Requirements and that Tenant, at its expense, shall (i) obtain all necessary municipal and other governmental permits, authorizations, approvals and certificates for the construction of such Alterations, (ii) deliver a copy of such items to Landlord and (iii) cause all Alterations to be

(13)

constructed in a good and workmanlike manner. Tenant, at its expense, shall promptly procure the cancellation or discharge of all notices of violation arising from or otherwise connected with Alterations issued by any public authority having or asserting jurisdiction. Landlord shall not charge Tenant any overhead or supervision fee related to any Alterations, including, without limitation the Tenant Improvements, except for the actual involvement of Landlord as it is expressly requested and agreed to by Tenant. Additionally, Tenant shall not be charged for the cost of any Building services provided to Tenant's contractors.

(d)    Throughout the making of all Alterations (other than mere decorations), Tenant, at its expense, shall carry or cause its contractors to carry (i) workers' compensation insurance in statutory limits covering all persons employed in connection with such Alterations, (ii) general commercial liability insurance covering any occurrence in or about the Premises in connection with such Alterations which complies with the requirements of Section 20.

(e)    Tenant shall indemnify Landlord against liability for any and all mechanics' and other liens filed in connection with Alterations. Tenant, at its expense, shall procure the discharge of any such lien either by paying the amount claimed to be due or by deposit or bonding proceedings within thirty (30) days after the filing thereof against any part of the Property. If Tenant fails to discharge any such lien within such thirty (30) day period, then, in addition to any other right or remedy, Landlord may, upon giving five (5) days prior written notice to Tenant, discharge the same either by paying the amount claimed to be due or by deposit or bonding proceedings if Tenant has not discharged the lien within the five (5) day notice period provided herein. Any amount so paid by Landlord, and all costs and expenses incurred by Landlord in connection therewith, shall be payable by Tenant upon demand.

(f)    Except for items constituting Tenant's Property, all Alterations and appurtenances attached to or built into the Premises at the commencement of or during the Term, whether or not at the expense of Tenant, and whether or not Landlord's consent is required (collectively "Fixtures"), shall be and remain a part of the Premises, shall be deemed the property of Landlord as of the date such Fixtures are completed, attached to or built into the Premises and shall not be removed by Tenant. Fixtures shall include electrical, plumbing, heating and sprinkling equipment, fixtures, outlets, venetian blinds, partitions, gates, doors, vaults, paneling, molding, shelving, radiator enclosures, cork, rubber, linoleum and composition floors, ventilating, silencing, air conditioning and cooling equipment, and all fixtures, equipment and appurtenances of a similar nature or purpose. Any Alterations which shall involve the removal of any Fixtures shall be promptly replaced, at Tenant's expense and free of superior title, liens, security interests and claims, with like property, of at least equal quality and value. Under no circumstances, shall Tenant be required at any time to remove or restore (i) any Alterations that do not require Landlord's consent, (ii) any Alterations that do require Landlord's consent, unless Landlord, at the time it gives such consent, expressly requires in writing removal or restoration of such Alterations; (iii) any of the Tenant Improvements constructed in accordance with Section 6, whether constructed by Landlord or Tenant or any additional initial tenant improvements, whether constructed by Landlord or Tenant, which are substantially similar to the Tenant

(14)

Improvements specified in Section 6, or (iv) any partitions, flooring, floor covering, pipes, wires, conduits run through a floor, ceiling, or partition, provided these are cut off or capped in accordance with all applicable Legal Requirements.

(g)     Notwithstanding the foregoing, in the event that Tenant desires to construct or install a Fixture that will exceed a cost of $30,000, Tenant shall obtain Landlord's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed.  Landlord's failure to disapprove of any proposed Alterations by Tenant within ten (10) business days of receipt of request thereof shall be deemed Landlord's approval of such Alteration(s).  Landlord may condition its consent on Tenant's agreement to remove the Fixture from the Premises upon the expiration or earlier termination of the Term, at Tenant's sole expense, if it is reasonable to do so.

17.  Assignment and Sublease.

(a)     Tenant may, with the prior written consent of the Landlord, which shall not be unreasonably withheld, conditioned or delayed, assign this Lease or sublet the whole or any part of the Premises.  It shall be deemed unreasonable for Landlord to withhold its consent if such assignment or sublease meets all of the following conditions:

(i)     Tenant is not in default of its obligations under this Lease beyond any applicable cure period;

(ii)     the assignee is financially sound and assumes all of the obligations of this Lease, or the sublessee agrees not to violate the terms and conditions of this Lease;

(iii)     such assignment or sublease will not permit the use of the Premises for any purpose forbidden by this Lease; and

(iv)     Tenant furnishes Landlord with the name of the proposed assignee or sublessee and the basic business terms of the proposed assignment or sublease.

In the event Tenant shall so sublet a portion of the Premises or assign this Lease pursuant to this Section 17(a), fifty percent (50%) of all of the sums or other economic consideration received by Tenant as a result of such subletting or assignment whether denominated rent or otherwise, under the sublease or assignment, which exceed in the aggregate, the total sums which Tenant is obligated to pay Landlord under this Lease (prorated to reflect obligations allocable to that portion of the Premises subject to such sublease) after netting out Tenant's out-of-pocket expenses in connection with the sublease or assignment, including, without limitation, all brokerage commissions, marketing expenses, attorneys' fees, improvement allowances and other economic concessions (space planning allowances, moving allowances, etc.) incurred in connection with the sublease or assignment, shall be payable to Landlord as additional rent under this Lease without affecting or reducing any other obligations of Tenant hereunder.

(15)

(b)     Any assignment of this Lease or any sublease of the Premises shall not relieve Tenant of any of its obligations under this Lease, except as provided in Section 17(d).

(c)     Landlord's failure to respond within thirty (30) days after receipt of Tenant's request and the information specified in Section 17(a)(iv) shall be deemed approval of the proposed assignment or sublease.

(d)     The consent of the Landlord need not be obtained if the assignment or sublease is to any present or future affiliate (including any wholly-owned subsidiary thereof) of Tenant, or to any unaffiliated new entities that may be formed by Tenant pursuant to a corporate reorganization or that results from a merger or consolidation with Tenant, including any subsidiary or affiliated entity thereof (collectively, a "Tenant Affiliate"), so long as such assignment is not a subterfuge by Tenant to avoid its obligations under this Lease and the Tenant Affiliate has a total net worth at least equal to Tenant's total net worth at the time Tenant executes this Lease.  Tenant shall give Landlord written notice of any assignment to a Tenant Affiliate, including the effective date of the assignment ("Effective Date"), together with a copy of the relevant sublease or assignment document, a corporate representation as to the relationship of the parties and audited financial statements confirming that the Tenant Affiliate has a total net worth at least equal to Tenant's total net worth on the execution date of this Lease.  Upon the Effective Date of the assignment, Tenant shall be released and discharged from all further duties under this Lease as to Tenant obligations on, or after the Effective Date, and Landlord shall look only to the Tenant Affiliate for performance of Tenant's obligations related thereto.  Landlord acknowledges that the Premises may be occupied by one or more Tenant Affiliates and their employees and that such use of the Premises shall not be considered an assignment or sublease, unless Tenant elects to treat it as such.  Any of Landlord's representations, warranties, covenants, agreements, guarantees and indemnities made for the benefit of Tenant or any rights or privileges granted by Landlord to Tenant shall also inure to the benefit of such Tenant Affiliate and their employees.

18. Damage or Destruction.

(a)     If the Premises shall be so damaged by fire, other casualty, acts of God or the elements (a "Casualty") so that they cannot be restored or made suitable for Tenant's business needs within one hundred twenty (120) days from the date of the Casualty ("Substantial Damage"), either Landlord or Tenant may terminate this Lease by written notice given to the other party within thirty (30) days after the date of the Casualty.  If the Lease is so terminated, the termination shall be effective as of the date of the Casualty and the Rent shall abate from that date, and any Rent paid for any period beyond such date shall be refunded to Tenant.

(b)     If this Lease is not terminated as provided in Section 18(a), then Landlord shall, at its sole cost and expense, restore the Premises as speedily as practical to the condition existing prior to the Casualty.  During the restoration period, the Rent shall abate for the period during which the Premises are not suitable for Tenant's business needs.  If only a portion of the Premises is damaged, the Rent shall abate proportionately based upon the portion of the Premises that are not suitable for Tenant's business needs.

(16)

31275.6

(c)     If Landlord, subject to force majeure not to exceed sixty (60) days, does not restore the Premises as required in Section 18(b) within one hundred twenty (120) days after the date of the Casualty, Tenant may terminate this Lease without incurring any liability to Landlord subsequent to the Casualty, provided (i) Tenant gives Landlord not less than thirty (30) days prior written notice, and (ii) Landlord does not complete the restoration during such thirty (30) day period.

19.  Eminent Domain.

(a)     If there is a taking of the Property or the Premises by right or threat of eminent domain (a "Taking") which results in the remainder of the Premises being unable to be restored to a condition suitable for Tenant's business needs within one hundred twenty (120) days from the date of the Taking ("Substantial Taking"), this Lease shall terminate.  In such event, the Rent shall abate from the date of the Taking, and any Rent for any period beyond such date shall be returned to Tenant.

(b)     If there shall be a Taking which does not constitute a Substantial Taking, this Lease shall not terminate but Landlord shall, at its sole cost and expense, with due diligence, restore the Premises as speedily as practical to its condition before the Taking including without limitation any Tenant Improvements constructed by Landlord or Tenant Improvements for which Landlord gave Tenant an allowance, including the construction allowance.  During the restoration period, the Rent shall abate for the period during which the Premises are not suitable for Tenant's business needs.  If only a portion of the Premises is taken, the Rent shall abate proportionately based upon the portion of the Premises that are not suitable for Tenant's business needs.

(c)     Tenant shall not be entitled to any part of the payment or award for a Taking, provided that Tenant may file a claim for any loss of Tenant's Property or for any improvements to the Premises paid for by Tenant; moving expenses; or for damages for cessation or interruption of Tenant's business.

20.  Insurance.

(a)     Landlord shall, from and after the date of execution of this Lease and throughout the Term, carry and maintain all-risk insurance, with vandalism, twelve (12) months' rental loss, and inflation and plate glass endorsements on the Property, with an insurance company reasonably acceptable to Tenant, in an amount equal to one hundred percent (100%) of the full replacement cost (replacement cost new, including debris removal and demolition) of the Property. Tenant shall be named as an additional insured under each such policy.

(b)     Landlord shall maintain, at its expense but included as an Operating Expense, during the Term, public liability insurance, insuring Landlord against claims for personal injury and death occurring on the Property (other than the Premises) in the amount(s) of not less than One Million Dollars ($1,000,000.00) for injury or death of any one person, Two Million Dollars

(17)

31275.6

($2,000,000.00) total for injury or death in any one accident, and One Million Dollars ($1,000,000.00) property damage.  Landlord shall name Tenant as an additional insured under such policy.

(c)     Tenant shall maintain, at its expense, during the Term, public liability insurance, insuring Tenant against claims for personal injury and death occurring in the Premises in the amount(s) of not less than One Million Dollars ($1,000,000.00) for injury or death of any one person, Two Million Dollars ($2,000,000.00) total for injury or death in any one accident, and One Million Dollars ($1,000,000.00) property damage.  Tenant shall name Landlord, and any mortgagee of which Landlord has advised Tenant, as additional insureds under such policy.

(d)     Tenant shall maintain such worker's compensation insurance as is required by applicable law.

(e)     Landlord and Tenant shall each furnish the other with certificates with respect to the insurance required to be carried hereunder on or before the Commencement Date.  The certificates shall provide that such insurance is in full force and effect and that coverage will not be reduced in any amount or otherwise limited or cancelled without thirty (30) days' prior written notice (ten (10) days prior written notice for non-payment of premiums) to the other party.  Renewal certificates shall be furnished to the other party not less than thirty (30) days prior to the expiration of each such policy.  In addition, each party shall deliver to the other party, within thirty (30) days after a written request therefor, a duplicate original of any policy required to be carried hereunder.  Any blanket insurance policy or policies that insure Tenant or Landlord against the risks and for the amounts herein specified shall be deemed to satisfy the obligation of that party hereunder.  All insurance required by this Section 20 shall be with an insurance company licensed to do business in the State where the Premises are located with a general policyholder's rating of not less than "A-" and a financing rating of not less than Class "VIII", as rated by the most current available "Bests" Insurance Reports, and shall be primary and non-contributing.

21.  Subrogation and Waiver.

Notwithstanding anything to the contrary contained herein, Landlord and Tenant hereby release and waive any rights each may have against the other and its officers, agents and employees on account of any loss or damages occasioned to Landlord, Tenant, their respective property or the Premises or the Building, and arising from any risk covered by the insurance obtained hereunder, whether due to the negligence of either party, their agents, employees, officers, contractors, licensees, invitees or other persons.  The parties hereby grant to each other, on behalf of any insurer providing insurance to either of them, a waiver of any right of subrogation that any such insurer may have or acquire against the other party and its officers, agents and employees by virtue of payment of any loss under such insurance and all policies obtained by either Tenant or Landlord shall contain appropriate waiver of subrogation clauses.  The foregoing waivers of subrogation shall be operative only so long as available without invalidating any of either Landlord's or Tenant's policies of insurance.

(18)

31275.6

22. <u>Indemnity</u>.

(a)     Tenant shall defend, indemnify and save harmless Landlord, its affiliates, and their officers, directors, shareholders and partners, against all claims, liabilities, losses, fines, penalties, damages, costs and expenses (including reasonable attorneys' fees and other costs of litigation) because of injury, including death, to any person, or damage or loss of any kind to any property caused by any action or omission of Tenant, or any failure on the part of Tenant to perform its obligations under this Lease, except to the extent caused by the negligence or willful misconduct of Landlord, or its employees, contractors, agents or representatives.

(b)     Landlord shall defend, indemnify and save harmless Tenant and Tenant Affiliates, their officers, directors, shareholder and partners, against all claims, liabilities, losses, fines, penalties, damages, costs and expenses (including reasonable attorneys' fees and other costs of litigation) because of injury, including death, to any person, or damage or loss of any kind to any property caused by any action or omission of Landlord, or any failure on the part of Landlord, to perform its obligations under this Lease, except to the extent caused by the negligence or willful misconduct of Tenant, or its employees, contractors, agents or representatives.

23. <u>Landlord's Estate</u>.

Landlord covenants that Landlord has a valid fee simple absolute estate in the Property and that the same is subject to no encumbrances, liens or defects in title affecting the Building or the Premises, or the rights granted Tenant under this Lease, except for those liens and encumbrances approved in writing by Tenant, or for which Landlord has provided Tenant with written subordination, non-disturbance and attornment agreements, reasonably satisfactory in form and substance to Tenant.

24. <u>Subordination and Non-Disturbance</u>.

Landlord may subordinate Tenant's interest in this Lease to the lien of any mortgage or deed of trust which may now or hereafter be placed on the Property, provided that Tenant receives an SNDA (defined below) from the holder of such Superior Interest (defined below). Landlord will use commercially reasonable efforts to obtain and deliver to Tenant from any present or future mortgagee, trustee, fee owner, prime lessor or any person having an interest in the Premises superior to this Lease (a "<u>Superior Interest</u>") a written subordination and non-disturbance agreement ("<u>SNDA</u>") in a commercially reasonable form providing that so long as Tenant performs all of the terms, covenants and conditions of this Lease and agrees to attorn to the mortgagee, beneficiary of the deed of trust, purchaser at a foreclosure sale, prime lessor or fee owner, Tenant's rights under this Lease shall not be disturbed and shall remain in full force and effect for the Term, and Tenant shall not be joined by the holder of any mortgage or deed of trust in any action or proceeding to foreclose thereunder. Landlord represents and warrants that, as of the date hereof, the only Superior Interest to this Lease is set forth on <u>Exhibit D</u>.

25. <u>Landlord's Right of Entry</u>.

(19)

31275.6

(a)     Landlord has the right to enter the Premises at any reasonable time upon twenty-four (24) hours prior notice to Tenant, or without notice in case of emergency, for the purpose of performing maintenance, repairs, and replacements to the Premises as are permitted under this Lease.

(b)     During Business Hours and upon reasonable notice to Tenant, Landlord may, during the Term, show the Premises to prospective purchasers and mortgagees, and, during the six (6) months prior to expiration of this Lease, to prospective tenants.

(c)     In exercising its rights under this Section 25, Landlord shall not interfere with or disrupt the normal operation of Tenant's business. Landlord, and any third parties entering the Premises at Landlord's invitation or request, shall at all times strictly observe Tenant's rules relating to security on the Premises. Tenant shall have the right, in its sole discretion, to designate a representative to accompany Landlord, or any third parties, while they are on the Premises.

26.  Parking Facilities.

Tenant, its employees, agents, customers and visitors shall have the right to use the entire parking lot that services the Premises. All parking shall be provided at no cost to Tenant during the Term. .

27.  Signs.

Tenant, at Tenant's sole cost and expense, shall have the right to install maximum signage on the Building and/or Property as may be permitted by all applicable Legal Requirements, including appropriate custom signage on all entrance doors, signs and directories, subject to Landlord's reasonable consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord's failure to respond within twenty (20) days after receipt of Tenant's request shall be deemed approval of the proposed signage. As part of Landlord's landscaping obligations hereunder, Landlord shall trim all trees affecting Tenant's signage in order to minimize obstruction of such signage; provided, however, Landlord shall not be required to remove any trees or take any other related actions which would require Landlord to obtain a permit from any applicable government agency(ies).

28.  Rules and Regulations.

Tenant agrees to comply with all reasonable written rules and regulations which the Landlord may establish for the protection and welfare of the Tenant, the Building and all the other tenants and occupants, provided that all such rules and regulations shall be uniformly applicable to all tenants and occupants and shall not interfere with Tenant's use of the Premises. Tenant shall be given a copy of the rules at least ten (10) days before they become effective. In the event of a conflict between the rules and regulations and the provisions of this Lease, the provisions of this Lease shall prevail. Landlord agrees to enforce the rules and regulations and to

(20)

31275.6

conduct Landlord's management of the Building including controlling Landlord's employees, contractors, agents, invitees and other tenants in such a manner so as to not create or allow any nuisance, interference, annoyance or disturbance of Tenant in its quiet and peaceful possession of the Premises.

29.  Common Areas and Access.

Tenant shall have full and unimpaired access to the Building and the Premises at all times, and if access to a public road is via private roads or streets, Tenant shall have the right to use such roads and streets for ingress and egress to the Building and the Premises.  Tenant shall have the right to use the stairways, halls, entrances, rest rooms, and other facilities in and about the Property in common with the Landlord's other tenants, provided that Tenant shall also have a dedicated entry to the Building and Premises.

30.  Reasonable Consent.

Whenever this Lease requires the consent of either party, such consent, unless specifically stated otherwise in this Lease, shall not be unreasonably withheld, conditioned or delayed. Whenever this Lease grants either party the right to take action, exercise discretion, establish rules and regulations, or make an allocation or other determination, such party shall act reasonably and in good faith and take no action which might result in the frustration of the other party's reasonable expectations concerning the benefits to be enjoyed under this Lease.  If either party withholds its consent or approval, such party shall, upon request, promptly deliver to the other party a written statement specifying in detail the reason or reasons why such consent or approval was withheld or refused. Unless specified otherwise, whenever a party's consent or approval is required under this Lease, such party shall be deemed to have consented or approved any such request unless the party delivers written notice of such disapproval within fifteen (15) days after any such request is submitted.

31.  Tenant's Default; Rights and Remedies.

(a)     The occurrence of any one or more of the following matters constitutes an "Event of Default" by Tenant under this Lease:

(i)     failure by Tenant to pay Fixed Rent within ten (10) days after receipt of written notice of such failure to pay on the due date; provided, however, if Tenant has failed to timely pay its rent on two (2) prior occasions during the prior twelve (12) month period, Landlord will not be required to give Tenant written notice of failure to pay and Tenant's failure to pay on the due date will be deemed an Event of Default.

(ii)     failure by Tenant to pay Additional Rent within twenty (20) days after receipt of written notice of such failure to pay on the due date.

(21)

(iii)     failure by Tenant to observe or perform any other covenant, agreement, condition or provision of this Lease, if such failure continues for thirty (30) days after receipt of written notice from Landlord to Tenant, except that if the default cannot be cured within the thirty (30) day period, it shall not be considered an Event of Default if Tenant commences to cure such default within such thirty (30) day period and proceeds diligently thereafter to seek to effect such cure.

(b)     If an Event of Default by Tenant occurs, Landlord may at its option:

(i)     declare the Term ended and re-enter the Premises and take possession thereof and remove all persons therefrom, and Tenant shall have no further claim thereon or hereunder; or

(ii)     without declaring this Lease ended, re-enter the Premises and occupy the whole or any part thereof for and on account of Tenant and collect the Rent that may thereafter become payable; or

(iii)     even though Landlord may have re-entered the Premises, Landlord may thereafter elect to terminate this Lease and all of the rights of Tenant in or to the Premises.

Should Landlord have re-entered the Premises under the provisions of subparagraph (ii) above, Landlord shall not be deemed to have terminated this Lease, or the liability of Tenant to pay Rent thereafter to accrue, or its liability for damages under any of the provisions hereof, by any such reentry or by any action in unlawful detainer, or otherwise, to obtain possession of the Premises, unless Landlord shall have notified Tenant in writing that it has so elected to terminate this Lease, and Tenant further covenants that the service by Landlord of any notice pursuant to the unlawful detainer statutes of the State in which the Premises are located and the surrender of possession pursuant to such notice shall not (unless Landlord elects to the contrary at the time or at any time subsequent to the serving of such notices and such election be evidenced in such notice or by any other written notice to Tenant) be deemed to be a termination of this Lease.  In the event of any entry or taking possession of the Premises as aforesaid, Landlord shall have the right, but not the obligation, to remove therefrom all or any part of the personal property located therein and may place the same in storage at a public warehouse at the expense and risk of Tenant.

Should Landlord elect to terminate this Lease under the provisions of subparagraphs (i) or (iii) above, Landlord may recover from Tenant as damages:

1.     the worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

2.     the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss Tenant proves could have been reasonably avoided; plus

(22)

3.    the worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

4.    any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, any costs or expenses incurred by Landlord in maintaining or preserving the Premises after such Event of Default, preparing the Premises for such reletting, leasing commissions or any other costs necessary or appropriate to relet the Premises; provided, however, that any costs or expenses incurred by Landlord in preparing the Premises for such reletting or any leasing commissions incurred by Landlord in such reletting shall be amortized over the term of the new lease and Landlord may only recover from Tenant as damages the portion of such costs and expenses that are allocable to the remaining Term of this Lease.

As used in subsections (1) and (2) above, the "worth at the time of award" is computed by allowing interest at the annual rate (referred to herein as the "Default Rate") equal to the lesser of (a) Wells Fargo Bank's "Prime Rate" (being the interest rate announced by Wells Fargo Bank, N.A., in San Francisco, California as the base rate of interest for loans or obligations making reference thereto) in effect at the time plus three percent (3%) or (b) the maximum rate permitted by law. As used in subparagraph (3) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank situated nearest to the location of the Premises at the time of award plus one percent (1%).

Upon an Event of Default by Tenant, Landlord may, but shall not be obligated to, make any payment or perform any obligation which Tenant has failed to perform. All of Landlord's expenditures incurred to correct the failure to perform shall be reimbursed by Tenant upon demand with interest from the date of expenditure at the Default Rate. Landlord's right to correct Tenant's failure to perform is for the sole protection of Landlord and the existence of this right shall not release Tenant from the obligation to perform all of the covenants herein required to be performed by Tenant, or deprive Landlord of any other right which Landlord may have by reason of an Event of Default of this Lease by Tenant, whether or not Landlord exercises its right under this Section 31.

32. Landlord's Default; Rights and Remedies.

(a)    The occurrence of the following constitutes an "Event of Default" by Landlord under this Lease:

Failure by Landlord to observe or perform any covenant, agreement, condition or provision of this Lease, if such failure shall continue for thirty (30) days after receipt of written notice from Tenant to Landlord, except that if such default cannot be cured within such thirty (30) day period, it shall not be considered an Event of Default if Landlord commences to cure the default within the thirty (30) day period and proceeds diligently thereafter to seek to effect such

(23)

cure, provided that in a situation requiring immediate response, Tenant need only give Landlord such notice as is practical under the circumstances.

(b)     If an Event of Default by Landlord occurs, Tenant shall have the right, but not the obligation, to spend any monies to cure such Event of Default.  If Tenant spends any money to cure such Event of Default by Landlord, then Tenant shall also be entitled to interest on such expenditure at the Default Rate.

(c)     Following a Landlord default, Tenant shall have all rights and remedies available at law or in equity, including the right to set off against Rent the amount required to cure such Event of Default, plus interest on such expenditure at the Default Rate.  Under no circumstances shall Tenant's offset of rent under the provisions of this Lease give Landlord the right to terminate this Lease or Tenant's right to possession of the Premises.

(d)     Landlord and Tenant agree that there are certain Building services and amenities without which Tenant cannot occupy the Premises for the purpose for which it was originally leased.  The services and amenities are heating, ventilation, air conditioning, electrical service, elevator service, water and plumbing services and available parking at the Premises.  Should Landlord fail to provide any one or more of these services or amenities for a continuous period of three (3) days or longer, then, to the extent that Landlord's failure to provide such services or amenities causes Tenant to be unable to use the Premises for the purpose for which it was originally leased, Rent shall abate until such services or amenities are restored.  After a period of thirty (30) such days during which Landlord has failed on a continual basis, after receiving written notice from Tenant,  to provide any one or more of these services or amenities, Tenant, at its option, may cancel this Lease upon written notice to Landlord; provided, however, if the service or amenity cannot reasonably be resumed during such thirty (30) day period, Tenant shall have no right to cancel this Lease so long as Landlord takes reasonable steps necessary to resume such services or amenities within such thirty (30) day period and proceeds diligently thereafter to resume such services or amenities.

33.  Holding Over.

Should Tenant remain in possession of the Premises after the expiration of this Lease, Tenant shall be a tenant from month-to-month of the Premises, under all the terms and conditions of this Lease at a Fixed Rent of one hundred fifty percent (150%) of the then applicable Fixed Rent prorated on a daily basis.  Such month-to-month tenancy may be terminated by either Landlord or Tenant as of the end of any calendar month upon at least thirty (30) days prior written notice.

34.  Quiet Enjoyment.

Landlord covenants that Tenant may quietly and peaceably have, enjoy and hold the Premises and rights hereunder for the full Term without hindrance, provided that no Event of Default by Tenant exists under this Lease. Landlord shall defend, indemnify, and hold Tenant

(24)

31275.6

harmless from and against any and all losses, costs, expenses, liabilities, claims, causes of action and damages of whatsoever kind that may result to Tenant, including reasonable attorneys' fees incurred by Tenant, arising from the disturbance of Tenant's quiet possession: (i) by Landlord; (ii) by persons deriving title from Landlord; (iii) because of liens or encumbrances incurred or suffered by Landlord; (iv) because of title paramount to Landlord's; or (v) because of any defect in Landlord's power or authority to execute and undertake Landlord's obligations under this Lease. Landlord's duty to indemnify Tenant under this Section 34 shall survive the expiration or earlier termination of this Lease.

35. Mutual Representation of Authority.

(a)     Landlord and Tenant represent and warrant to each other that they have full right, power and authority to enter into this Lease without the consent or approval of any other entity or person and each party makes these representations knowing that the other party will rely thereon.

(b)     The signatories on behalf of Landlord and Tenant further represent and warrant that each has full right, power and authority to act for and on behalf of Landlord and Tenant in entering into this Lease.

36. Intentionally Omitted.

37. Real Estate Brokers.

The parties warrant that they have had no dealings with any real estate broker or agent in connection with this Lease, except for Studley, Inc. ("Tenant's Broker") and Cushman & Wakefield of Oregon, Inc. ("Landlord's Broker", and, collectively with Tenant's Broker, the "Brokers"). Each party covenants to pay, hold harmless and indemnify the other from and against any and all costs, expenses or liabilities for any compensation, commissions and charges claimed by any other broker or agent other than the Brokers with respect to this Lease or the negotiation thereof, based upon alleged dealings with the indemnifying party. Landlord agrees to pay a commission to each Broker in accordance with a separate agreement(s). Landlord hereby agrees that if it fails to pay Tenant's Broker any commission hereafter owing under the terms of such separate agreement between Landlord and Tenant's Broker within ninety (90) days following the accrual of such obligation, then Tenant shall have the right to make such payment on Landlord's behalf and thereafter deduct from any Rent thereafter payable under this Lease, all sums so paid by Tenant and all necessary and incidental costs and expenses, including reasonable attorney's fees, incurred by Tenant in making such payments, together with interest thereon at the Default Rate, from the date of payment.

38. Business Hours.

"Business Hours" shall mean the period from 6:00 A.M. to 11:00 P.M. on Monday to Friday and 7:00 A.M. to 6:00 P.M. on Saturday, except on Holidays. "Holidays" shall mean New

(25)

31275.6

Years Day, Memorial Day, Independence Day (July 4th), Labor Day, Thanksgiving and Christmas.

39. Attorneys' Fees.

Should either party commence an action against the other to enforce any obligation hereunder, the prevailing party shall be entitled to recover its costs, reasonable attorneys' fees and disbursements and court costs (including fees and costs at trial or on appeal) from the other, whether or not such action is pursued to judgment.

40. Estoppel Certificate.

(a)     Tenant agrees, upon not less than twenty (20) days prior written request by Landlord, to deliver to Landlord a statement in writing signed by Tenant certifying (i) that this Lease is unmodified and in full force and effect (or if there have been modifications, identifying the modifications); (ii) the date upon which Tenant began paying Fixed Rent and the dates to which the Fixed Rent has been paid; (iii) that, to Tenant's actual knowledge, Landlord is not in default under any provision of this Lease, or, if in default, the nature thereof; and (iv) that there has been no prepayment of Fixed Rent other than that provided for in this Lease.

(b)     Landlord, upon not less than twenty (20) days prior written request from Tenant, shall furnish a statement in writing to Tenant covering the matters set forth in Section 40(a), to the extent applicable to Landlord.

41. Recordable Memorandum.

Landlord and Tenant agree not to record this Lease, but each party agrees, upon request by the other, to execute a memorandum of this Lease in recordable form and in compliance with applicable law.

42. Option to Renew.

Landlord hereby grants to Tenant the exclusive and irrevocable option to renew this Lease for two (2) additional terms of five (5) years each (each, an "Extension Term") by giving Landlord written notice at least two hundred seventy (270) days but not more than three hundred and sixty (360) days prior to the Expiration Date of the Primary Term or any applicable Extension Term. Each of the Extension Terms shall commence on the day following expiration of the preceding term.

The terms and conditions of the Lease for each Extension Term will be identical with the terms and conditions during the Primary Term, except for Fixed Rent and except that Tenant will no longer have any option to renew this Lease, if such option has already been exercised. The Fixed Rent for any Extension Term will be the greater of a) an amount equal to One hundred and

(26)

31275.6

three percent (103%) of the Fixed Rent during the last calendar month of the preceding term or b) a reasonable rental for the Extension Term, as determined below.

If the parties do not agree on the Fixed Rent amount for the Extension Term within sixty (60) days after notice of election to renew, the Fixed Rent will be determined by arbitration. The arbitrator shall be an independent real estate appraiser having knowledge of valuation of comparable commercial properties. In the event that Landlord and Tenant are unable to agree on a single arbitrator, each of Landlord and Tenant will appoint an arbitrator and the two arbitrators selected by the Landlord and Tenant shall choose a third arbitrator to conduct the arbitration. In the event that any party or arbitrator fails to appoint an arbitrator as required by this paragraph within twenty (20) days, either party may apply to the presiding judge of the judicial district where the Premises are located to appoint the required arbitrator. The arbitrator shall return his or her decision within thirty (30) days after his or her appointment and the decision of the arbitrator shall be final and binding on the parties.

43. <u>Confidentiality</u>.

No party shall make, nor authorize any broker to make, any public announcement or press release concerning this transaction unless it has received the written consent of all other parties hereto.

44. <u>Governing Law</u>.

This Lease shall be construed and interpreted in accordance with the laws of the state where the Premises are located, except for its conflict of law rules.

45. <u>Notices</u>.

Any notice by either party to the other shall be in writing and shall be deemed to be duly given only if delivered personally or sent by registered or certified mail return receipt requested, or overnight delivery service, to the following:

If to Tenant:     Heald College, LLC
                  601 Montgomery Street
                  14th Floor
                  San Francisco, California 94111
                  Attention: James Sparkman, SVP Corporate Development

If to Landlord:   BB&S Development, LLC
                  1500 NW 18th Ave, Suite 116
                  Portland, Oregon 97209
                  Attention: Gary W. Stachlowski

(27)

31275.6

With a copy to:      Cosgrave Vergeer Kester LLP
                     805 SW Broadway
                     Eighth Floor
                     Portland, OR 97205
                     Attention:  Richard W. Miller

                     C&R Real Estate Services Co.
                     1440 SW Taylor Ave.
                     Portland, OR  97205
                     Attention:  Jim Nicolaisen

Notice shall be deemed to have been given on the date received, if delivered personally or by overnight delivery service, or, if mailed, three (3) business days after the date postmarked.

46.  <u>Counterparts</u>.

This Lease may be executed in one or more counterparts each one of which shall be deemed an original.

47.  <u>Entire Agreement</u>.

This Lease contains all of the terms, covenants, conditions, warranties and agreements of the parties relating in any manner to Tenant's rental, use and occupancy of the Premises.  No prior agreement or understanding pertaining to the same shall be valid or of any force or effect. Both Landlord and Tenant acknowledge and agree that this Lease was extensively negotiated by both parties hereto, and that this Lease shall not be construed against either Landlord or Tenant. This Lease may not be amended, altered or modified in any way except in writing signed by the parties hereto.

48.  <u>No Partnership</u>.

It is agreed that nothing contained in this Lease shall be deemed or construed as creating a partnership or joint venture between Landlord and Tenant or between Landlord and any other party, or cause Tenant to be responsible in any way for the debts or obligations of Landlord or any other party.

49.  <u>Severability</u>.

If any provision of this Lease or application thereof to any person or circumstances shall to any extent be invalid, the remainder of this Lease (including the application of such provision to persons or circumstances other than those to which it is held invalid) shall not be affected thereby, and each provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

(28)

31275.6

50. <u>Captions</u>.

The captions of the Sections hereof are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

51. <u>Words</u>.

The words "Landlord" and "Tenant", as used herein, shall include the plural as well as the singular. Words used in the neuter gender include the masculine and feminine. The words "hereof," "herein," "hereunder," "hereto," and other words of similar import refer to this Lease in its entirety. The words "include" and "including" shall be interpreted as if followed by the words "without limitation."

52. <u>Exhibits</u>.

All exhibits, schedules or riders attached to this Lease, if any, are incorporated herein by this reference and made a part hereof, and any reference in the body of the Lease or in the exhibits, schedules, or riders to the "Lease" shall mean this Lease, together with all exhibits, schedules and riders.

53. <u>Time</u>.

Time is of the essence hereof.

54. <u>Successors</u>.

Each and every covenant, term and condition contained herein shall be binding upon and inure to the benefit of each of the parties, its successors and assigns. Each and all of the covenants, provisions and conditions of this Lease to be performed by or on the part of Landlord, whether to be performed on the Premises or elsewhere, and whether affirmative or negative in nature, are also intended to and shall bind Landlord, its successors and assigns, at any time and from time to time, and shall inure to the benefit of the Tenant, its successors and assigns, and shall run with the Land for the Term.

55. <u>No Recourse</u>.

The obligations of Landlord and Tenant under this Lease shall be without recourse to any partner, officer, trustee, beneficiary, shareholder, director, unitholder or employee of Landlord and Tenant or to any of their assets.

56. <u>Waiver</u>.

No waiver of any default or breach of any covenant by either party hereunder shall be implied from the other party's failure to act on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the

(29)

waiver, and then said waiver shall be operative only for the time and to the extent therein stated. Waivers of any covenant, term or condition contained herein by either party shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by either party requiring further consent or approval shall not be deemed to waive or render unnecessary their consent or approval to or of any subsequent similar acts.

57. Joint and Several Liability.

If there is more than one individual or entity defined as "Tenant" or "Landlord" hereunder or more than one assignee or sublessee under this Lease, the obligations imposed under this Lease upon each such individual or entity be joint and several.

*[Remainder of Page Intentionally Blank; Signatures on Following Page(s).]*

(30)

31275.6

IN WITNESS WHEREOF, the parties hereto have duly executed this Lease as of the day and year first above written.


**"LANDLORD"**

BB&S DEVELOPMENT, LLC,
an Oregon limited liability company


By: _Herb Shapiro_____
Name: _Herb Shapiro_____
Title: _Managing Member_____




**"TENANT"**

HEALD COLLEGE, LLC,
a California limited liability company


By: _____
Name: _Nolan A. Miura_____
Title: _President & CEO_____


(31)

## EXHIBIT A

## THE PREMISES
### (Section 2(a))



A-1

31275.6



First Floor Plan

ITT BUILDING
Columbia Boulevard
Portland, Oregon
Land and Park
ITT Educational School

ANKROM MOISAN

A-2

31275.6

**EXHIBIT B**

**THE LAND**

(Section 2(a))

PARCEL I:  Lot 1, Block 2, PORT-AIR BUSINESS CENTER, in the City of Portland, County of Multnomah and State of Oregon.

PARCEL II:  Parcel 1 of PARTITION PLAT NO. 1992-147, a duly filed plat, in the City of Portland, County of Multnomah and State of Oregon.

PARCEL III:  The South 5 feet of Parcel 2, PARTITION PLAT NO. 1992-147, a duly filed plat, in the City of Portland, County of Multnomah and State of Oregon.

31275.6

## EXHIBIT C

## SERVICES

(Section 15(a))

1.      Water and all other utilities (except telephone, janitorial, electrical, and gas) including operating, maintenance, and replacement costs if necessary.  Landlord is responsible to provide initial utility service to the Premises and subsequently maintain and repair utility services up to the point of distribution within the Premises.  Tenant shall remain responsible for maintenance and repair of all portions of its utility service located exclusively within its Premises.

2.      The use and maintenance of the passenger elevators (if building is so equipped), with at least one (1) passenger elevator available for Tenant's use twenty-four (24) hours per day, seven (7) days per week.

3.      Pest extermination.  Landlord shall be responsible for extermination on the exterior of the Building  while Tenant shall be responsible for extermination within the Building.

4.      All exterior landscaping and maintenance (including snow and ice removal).

5.      Rubbish removal.  Tenant must collect all rubbish within its Premises and transport same to an exterior area designated for pick-up by the Landlord (Landlord being responsible to remove rubbish from such exterior area only).  Tenant may only deposit typical "office" rubbish in such pick-up area (e.g., no wiring, telephone systems, boxes, etc.).

6.      Exterior (by Landlord) and interior (by Tenant) glass cleaning as needed; provided that Landlord shall not be required to clean the exterior glass more than four (4) times in any twelve (12) month period.

31275.6

## EXHIBIT D

## LANDLORD'S SUPERIOR INTERESTS

(Section 24)

Deed of Trust dated July 1, 1999, with Landlord as Grantor, US Bank National Association, as Beneficiary and US Bank Trust Company as Trustee, recorded in the records of the Multnomah County Recorder as document number 99130195.

D-1

31275.6