## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **CORINTHIAN COLLEGES, INC.**, *et al.*[1] | § | |
| | § | **Case No. 15-10952 (KJC)** |
| | § | |
| | § | **Jointly Administered** |
| Debtors. | § | |
| | § | Re: Docket Nos. 655 742, 776, 794, 808, 815, |
| | § | 818, 819, 822, 823, 824, 825, 826 and 827 |

------------------------------------------------------------

### DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION

Corinthian Colleges, Inc. ("**CCI**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") hereby file this omnibus response (the "**Omnibus Response**") in response to objections [Docket Nos. 742, 776, 794, 808, 815, 818, 819, 822, 823, 824, 825, 826 and 827] (collectively, the "**Objections**") filed to the *Debtors' Second Amended and Modified Combined Disclosure Statement* (the "**Disclosure Statement**") *and Chapter 11 Plan of Liquidation* [Docket No. 655] (as may be amended or modified, the "**Plan**")[2] and in support of the Plan. In support of this Omnibus Response, the Debtors respectfully represent as follows:

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Corinthian Colleges, Inc. (7312), Corinthian Schools, Inc. (0525), Rhodes Colleges, Inc. (7311), Florida Metropolitan University, Inc. (7605), Corinthian Property Group, Inc. (2106), Titan Schools, Inc. (3201), Career Choices, Inc. (1425), Sequoia Education, Inc. (5739), ETON Education, Inc. (3608), Ashmead Education, Inc. (9120), MJB Acquisition Corporation (1912), ECAT Acquisition, Inc. (7789), Pegasus Education, Inc. (2336), Grand Rapids Educational Center, Inc. (2031), Rhodes Business Group, Inc. (6709), Everest College Phoenix, Inc. (6173), CDI Education USA, Inc. (0505), SP PE VII-B Heald Holdings Corp. (0115), SD III-B Heald Holdings Corp. (9707), Heald Capital LLC (6164), Heald Real Estate, LLC (4281), Heald Education, LLC (1465), Heald College, LLC (9639), QuickStart Intelligence Corporation (5665), and Socle Education, Inc. (3477). The Debtors' corporate headquarters is at 6 Hutton Centre Drive, Suite 400, Santa Ana, California 92707.

[2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan. As discussed herein, the Debtors will be filing a third amended and modified version of the Plan contemporaneously with this Omnibus Response, which the Debtors believe will address many of the issues raised in the Objections.

## INTRODUCTION

The Plan is the result of extensive negotiations between the Debtors, the Administrative Agent (on behalf of the Prepetition Secured Parties), the Creditors' Committee and the Student Committee.  Since the Court's approval of the Disclosure Statement on July 27, 2015, the Debtors have continued to negotiate with such parties, as well as various other parties (including the Dept. of ED and other governmental entities), in an effort to resolve outstanding issues and potential objections to the Plan.  As a result of such efforts, contemporaneous with the filing of this Omnibus Response, the Debtors will be filing the *Debtors' Third Amended and Modified Combined Disclosure Statement and Chapter 11 Plan of Liquidation*.  The Debtors submit that the third amended and modified Plan addresses substantially all of the issues raised in the Objections.  There are, however, a number of outstanding Objections, which the Debtors believe are not supported by the facts and circumstances of these Chapter 11 Cases or applicable law.  Accordingly, the Debtors have filed this Omnibus Response to address these outstanding Objections and to apprise the Court as to the status of all Objections filed to the Plan.

This Omnibus Response is separated into three sections:  (i) the first section addresses the Objections that have been filed with respect to the injunction and release provisions contained in Section XIII of the Plan; (ii) the second section addresses a number of issues that are unique to the Objection filed by the Dept. of ED; and (iii) the third section addresses issues raised in the Objection filed by the WARN Claimants (as defined herein).  Additionally, for the Court's convenience, the Debtors have attached hereto as Exhibit A a chart identifying the Debtors' responses to specific issues raised in each of the Objections (many of which are resolved by modifications contained in the third amended and modified Plan) (the

"**Status Chart**").  To avoid duplicity, specific objections that are addressed by the Debtors in the body of this Omnibus Response are not repeated in the Status Chart.

**DEBTORS' OMNIBUS RESPONSE**

**I.**     **The Injunction and Release Provisions of the Plan**

      **A.**     **The Plan Injunction is Essential to the Implementation of the Plan.**

           1.     The centerpiece of the Plan is the creation of two trusts:  (i) the Distribution Trust, for the benefit of all Holders of Allowed Claims (other than Student Claims and Government Education Claims); and (ii) the Student Trust, for the benefit of the Holders of all Student Claims and Government Education Claims.  In accordance with Sections IX.B and X.B of the Plan, on the Effective Date, the Distribution Trust Assets and the Student Trust Assets will be transferred to their respective trusts.  The Distribution Trust Assets and the Student Trust Assets shall then be used or distributed by the Distribution Trustee or Student Trustee, as the case may be, in the manner provided in the Plan and the applicable trust agreement.  As is typical in liquidating chapter 11 plans, Section XIII.A of the Plan contains an injunction necessary to implement this two trust structure, accomplish the purposes of the Plan and to protect the trusts' respective assets from actions or litigation by prepetition creditors after the Effective Date.  A copy of the applicable injunctive provision, as revised in connection with the third amended and modified Plan, is attached to this Omnibus Response as Exhibit B.

           2.     As discussed further below, without such injunction, the two trust structure and overall purpose of the Plan would be rendered meaningless.  *See* 11 U.S.C. § 1123(a)(5)  (requiring that a plan provide an adequate means of implementation).  Some objectors to the Plan, however, assert that the injunction is inappropriate because the Plan is a liquidating plan as opposed to a plan of reorganization.  Courts examining whether an injunction

3

is critical to the proposed plan often have phrased this consideration as whether the relief is "essential to the debtor's reorganization." *In re Cont'l Airlines,* 203 F.3d 203, 214 (3d Cir. 2000); *see also In re Spansion, Inc.,* 426 B.R. 114, 142-43 n.47 (considering "essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success"). While the majority of cases have examined injunctions in the context of reorganization cases, as opposed to liquidating plans in chapter 11, courts have not held that reorganization of a going concern business is a mandatory precondition to such relief. *See e.g.*, *In re Medford Crossings North, LLC*, No. 07-25115, 2011 WL 182815, at *18 (Bankr. D.N.J. Jan. 20, 2011) (denying third party release and injunction on other grounds, but rejecting argument that a liquidating plan is per se ineligible for such relief); *Official Comm. of Unsecured Creditors v. Bechtle (In re Labrum & Doak)*, 237 B.R. 275, 283, 305 (Bankr. E.D. Pa. 1999) (approving of a post-confirmation permanent injunction even though the debtor-partnership filed a chapter 11 liquidating plan); *see also In re Fidelis, Inc.* 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012) ("[E]ven though this Case is a liquidation, the same principal applies as in a reorganization. A release of a non-debtor is appropriate only if, without it, there would be little likelihood of accomplishing of the goal of a chapter 11: the confirmation of a successful plan of liquidation that benefits the creditors, including the unsecured creditors.").

3.      Indeed, Courts have routinely approved injunctions in chapter 11 liquidating plans. *See In re Optim Energy, LLC, et al.*, Case No. 14-10262 (BLS) [Docket No. 1159] (Bankr. D. Del. July 30, 2015); *In re Refco Public Commodity Pool, L.P. f/k/a S&P Managed Futures Index Fund,* LP, Case No. 14-11216 (BLS) [Docket No. 217] (Bankr. D. Del. Sept. 9, 2014); In *re Coldwater Creek Inc. et al.*, Case No. 14-10867 (BLS) [Docket No. 981] (Bankr. D. Del. Sept. 17, 2014); *In re GSE Envtl., Inc.. et al.*, Case No. 14-11126 (MFW)

[Docket No. 340] (Bankr. D. Del. July 24, 2014); *In re THQ Inc., et al.*, Case No. 12-13398 (MFW) [Docket No. 929] (Bankr. D. Del. July 17, 2013); *In re B456 Systems, Inc., et al.*, Case No. 12-12859 (KJC) [Docket No. 1675] (Bankr. D. Del. May 20, 2013); *In re Food Processing Liquidation Holdings, LLC, et al*., Case No. 11-13139 (KG) [Docket No. 698] (Bankr. D. Del. April 26, 2012); *In re UBI Liquidating Corp., et al.*, Case No. 10-13005 (KJC) [Docket No. 1447] (Bankr. D. Del. Oct. 19, 2011); *see e.g.*, *In re MCorp Fin., Inc.*, 160 B.R. 941 (S.D. Texas 1993) (approving an injunction in a liquidating plan); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 666-68, 685-87 (Bankr. D.D.C. 1992); *Polygram Distrib., Inc. v. B-A Sys., Inc. (In re Burstein-Applebee Co.)*, 63 B.R. 1011, 1012, 1018-20 (Bankr. W.D. Mo. 1986) (approving permanent non-debtor injunction in a liquidating chapter 11).

4.    Rather than focusing on whether a chapter 11 plan contemplates reorganization or liquidation, the proper inquiry is whether the injunction is critical to the implementation of the proposed plan. *See Fidelis*, 481 B.R. 520.  This approach is consistent with the well-established principle that a chapter 11 plan is an appropriate means to effectuate the orderly liquidation of a debtor's business. *See In re Insilco Techs., Inc.*, 480 F.3d 212, 214 n.1 (3d Cir. 2007) (stating that it is "not uncommon for debtors to use the Chapter 11 process to liquidate … because [it] provides more flexibility and control in determining how to go about selling off various aspects of the debtor's business and distributing the proceeds."); *In re EBC I, Inc.*, 380 B.R. 348, 364 (Bankr. D. Del. 2008) ("[A] debtor can liquidate its assets under chapter 11 as well as under chapter 7 of the Bankruptcy Code."); *see also Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 517 n.3 (8th Cir. 2004) (recognizing that liquidation under chapter 11 is permitted by most courts); *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352 (5th Cir. 1989) (discussing

the propriety of liquidating reorganizations and noting that "although Chapter 11 is titled 'Reorganization', a plan may result in the liquidation of the debtor").

5.      The injunction is critical to the Plan and appropriate in the context of these Chapter 11 Cases.  As discussed above, on the Effective Date, all of the Debtors' assets will be transferred to either the Distribution Trust or Student Trust, as applicable.  The trusts' purposes, among others, is to hold these assets and use such assets for the benefit of the appropriate creditors, whether by distribution or other means (for example, the Student Trust may implement one or more Student Claims Benefit Programs).  In order to effectuate this two trust structure and accomplish the overall purpose of the Plan, the Plan (as amended) contains a limited injunction which enjoins all Persons or Entities who may hold Claims against the Debtors from taking certain actions against the Estates (which encompasses the Debtors' property pursuant to section 541 of the Bankruptcy Code), the Distribution Trust, the Student Trust, or any of their respective property or assets (collectively defined in the Plan as the Estate Assets).  Notably, the injunctive provision only applies to the Estate Assets (the very assets being transferred to the trusts under the terms of the Plan), does not apply to the Debtors and specifically provides that the Debtors are not receiving a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.  Without the injunction, the Estate Assets, which are being transferred to the trusts for the benefit of the Debtors' creditors, would be left unprotected from litigation and other actions of the Debtors' prepetition creditors.  As a result, the Debtors' creditors could attempt to take self-help post-confirmation against the very assets that have been transferred to the trusts for the benefit of all creditors (thereby eviscerating the very purpose of the Plan).  If this was to occur, the creation of the trusts and the terms of the Plan would be rendered meaningless because any creditor could

seek recovery of the Estate Assets in a manner inconsistent with the terms of the Plan, thereby depleting the assets available for fair and equitable distribution to similarly situated creditors.

6.      Indeed, these Chapter 11 Cases were commenced to implement an orderly liquidation of the Estate Assets for the benefit of all Holders of Allowed Claims against the Debtors.   The Plan, which was heavily negotiated and is overwhelmingly supported by the Prepetition Secured Parties, the Creditors Committee and the Student Committee accomplished this purpose.   In the absence of the injunction, however, one-off creditors could completely disregard the orderly distribution structure of the Plan (which comports with the priority scheme of the Bankruptcy Code) in an effort to recover a disproportionate share of the Estate Assets. Accordingly, the proposed injunction is critical to accomplishing the Plan's overall objectives.

## B.      The Debtor Releases Are Permissible Under Applicable Law.

7.      The Debtor Releases provided in the Plan are permissible under section 1123(b)(3)(A) of the Bankruptcy Code.  A debtor may release claims in a plan provided that the court finds that the decision to grant the release is a valid exercise of the debtor's business judgment, is fair and reasonable, and in the best interests of the estate.  *See In re Spansion*, 426 B.R. at 143; *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (approving releases and discharges of claims and causes of action pursuant to section 1123(b)(3)(A) as a valid exercise of debtor's business judgment); *In re General Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that the language contained in the plan purports to release any causes of action . . . such provision is authorized by § 1123(b)(3)(A), subject to compliance with provisions of the [Bankruptcy Code] requiring that the plan be fair and equitable as to creditors and that the plan be proposed in good faith.").  Where a compromise is integrated into a chapter 11 plan, the court should apply a similar standard employed under

Bankruptcy Rule 9019 and consider all factors relevant to a full and fair assessment of the settlement. *See In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) (approval of a settlement under Bankruptcy Rule 9019 is warranted where it is "fair and equitable."); *Coram HealthCare*, 315 B.R. at 335 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

8.     Certain courts have applied a similar, albeit distinct, analysis of a release on behalf of a debtor's estate by looking to whether: (1) an identity of interest exists between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan is being made by the released party; (3) the release is necessary to the plan; (4) there is an overwhelming acceptance of the plan and release by creditors; and (5) the plan provides a mechanism to pay all or substantially all of the claims of the creditors and interest holders affected by the release. *See In re Zenith Elecs. Corp.,* 241 B.R. 92, 110 (quoting *In re Master Mortgage Inv. Fund Inc.*, 168 B.R. 930, 937 (Bankr. W.D. MO. 1994)). The *Zenith* factors are not a conjunctive test, but instead are applied to weigh the equities based on the specific circumstances of the case. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citation omitted).

9.     Irrespective of whether the Court applies a Bankruptcy Rule 9019 standard or the five *Zenith* factors enumerated above, the Debtor Releases under the Plan are appropriate and should be approved. Consistent with Bankruptcy Rule 9019, the Plan is the culmination of extensive and good faith negotiations between the Debtors, the Creditors' Committee, the Student Committee and the Prepetition Secured Parties and is in best interest of the Debtors' Estates. Critically, and as discussed further below, the Debtor Releases are in exchange for significant consideration provided by the Prepetition Secured Parties that have enabled the

Debtors to propose a consensual plan that benefits its Estates and creditors. Without the concessions of the Prepetition Secured Parties, the Debtors would long ago have converted these cases to chapter 7.

10.     Further, the Debtors submit that each *Zenith* factor supports the Debtor Releases here. <u>First</u>, there is an identity of interest between the Debtors and the parties to be released. The Administrative Agent, the Prepetition Lenders, their respective Related Persons and the Professionals (collectively, the "**Debtor Releasees**"), as stakeholders and critical participants in the Plan process, share a common goal with the Debtors in seeing the Plan succeed. The Debtor Releases are essential components to the global resolution embodied in the Plan and the ability for the Debtors to propose a consensual liquidating chapter 11 plan. Based on the foregoing, an identity of interest exists between the Debtors and the Debtor Releasees.

11.     <u>Second</u>, each of the Debtor Releasees have made substantial contributions to the Debtors and their Estates and aided in the chapter 11 process. Significantly, the Plan provides for the Prepetition Secured Parties to release any Liens they may otherwise have upon, and forgo any recoveries from, the Student Refund Reserve, thereby enabling the Debtors to transfer their rights and interests in those funds (in the approximate amount of $4.3 million) to the Student Trust, which, subject to the terms of the Student Trust Agreement, may result in the implementation of one or more Student Claims Benefit Programs. In addition, the Prepetition Secured Parties have agreed to, among other things, (i) allow the Debtors or the Distribution Trustee to satisfy first out of the Prepetition Secured Parties' collateral all Allowed and accrued, but unpaid, Administrative, Priority Tax and Other Priority Claims (other than Student 507(a)(7) Deposit Claims, which shall be satisfied from the Student Trust Assets); (ii) reduce the Prepetition Secured Parties' Pro Rata share of any Distributions from the Distribution Trust on

account of the Prepetition Lenders Deficiency Claims by approximately fifteen (15) percent; (iii) release their Liens on the proceeds of Avoidance Actions (in addition to various other remaining assets of the Debtors and their Estates), and allow such proceeds to be transferred to the Distribution Trust free and clear of such Liens for the benefit of all Beneficiaries thereof; and (iv) release their Liens on Cash Collateral to allow the use of the Distribution Trust Seed Money to provide necessary initial funding for the Distribution Trust.  On this basis, the Debtor Releases are warranted.

12.    Third, the Debtor Releases are essential to the Plan itself.  As noted above, the Debtor Releases are the consideration for the substantial contribution provided by the Administrative Agent and the Prepetition Secured Parties.  The concessions by the Prepetition Secured Parties are the foundation of the structure of the Plan.  Without such concessions and as discussed further below, the Debtors would not be able to, among other things, satisfy the Administrative Priority Tax and other Priority Tax Claims lodged against the Debtors' estates, thereby rendering the Plan not feasible.  Moreover, the assets being transferred to the Distribution Trust and Student Trust, respectively, are also the result of the consideration being provided by the Prepetition Secured Parties.  Indeed, the assets being transferred to such trusts serve as the backbone to the Plan and the Creditors' Committee and Student Committee would likely not support the Plan absent such consideration.  In the absence of the Debtor Releases, the Debtor Releasees would be unwilling to make these concessions which are so necessary to the Plan.

13.    Fourth, as evidenced by the *Declaration of Catherine Nownes-Whitaker of Rust Consulting/Omni Bankruptcy Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Debtors' Second Amended and Modified Combined Disclosure Statement and*

*Chapter 11 Plan of Liquidation* (the "**Voting Report**"), the Debtors' stakeholders overwhelming support the Plan (well in excess of 90% in both claim amount and votes cast).  As noted in the Voting Report, every single Voting Class has voted to accept the Plan.  Accordingly, the overwhelming support for the Plan evidences the Debtors' stakeholders' support for the Debtor Releases.

14.     <u>Fifth</u>, the Plan provides for meaningful recoveries for all classes affected by the Debtor Releases.  As demonstrated by the liquidation analysis, the number of concessions contained in the Plan by the Prepetition Secured Parties result in a greater recovery for the Holders of Allowed General Unsecured Claims, Allowed Student Claims and Allowed Government Education Claims.  In addition, the consideration being provided by the Prepetition Secured Parties would not be available in a hypothetical chapter 7 liquidation, thereby reducing the potential recoveries to the other Holders of Allowed General Unsecured Claims.  Further, absent the compromises contained in the Plan, the Student Refund Reserve provided for the Beneficiaries of the Student Trust would likely constitute property of the Debtors' Estates subject to Distribution in accordance with the priorities afforded under the Bankruptcy Code.  In turn, that would mean that there would be no funding of any Student Claims Benefit Programs. The Student Claims Benefit Programs may provide an immediate and impactful benefit to all Holders of Allowed Student Claims.  Without the structure of the Plan, and the settlements contained therein, all of the Creditors with Claims of lower priority than Secured Claims would likely receive a diminished recovery on account of their Claims.

15.     Accordingly, the Debtor Releases are justified, are in the best interest of the Debtors' creditors and should be approved under section 1123(b)(3)(A) of the Bankruptcy Code.

C.    **The Holder Releases are Fully Consensual and Permissible Under Applicable Law.**

16.    The Plan provides an appropriately tailored third-party release -- set forth in Section VIII.D.2 of the Plan -- that applies only to consenting parties and, therefore, should be approved.  Numerous courts have recognized that a chapter 11 plan may include a release of nondebtors by nondebtors when such release is consensual.  *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 305 (collecting cases); *Spansion*, 426 B.R. at 144 (stating that "a third party release may be included in a plan if the release is consensual").  With the applicable party's consent, the Holder Releases will be provided to parties who have played an integral role in the Debtors' Chapter 11 Cases.  Specifically, the Plan provides for a discharge and release of claims by Beneficiaries of the Distribution Trust against the Holder Releasees (*i.e.*, the Administrative Agent and Prepetition Lenders, who have actively participated in the Debtors' liquidation and Plan negotiations and whose contributions and concessions have facilitated and made possible the Debtors' proposed Plan), in their respective capacities, in connection with, or related to the Debtors, their Estates, the Chapter 11 Cases, and the Plan.

17.    The Holder Releases are consensual and should be approved.  The Holder Releases were a material inducement for the respective support (financial and otherwise) that the Holder Releasees have provided in connection with the Plan and the Debtors' Chapter 11 Cases, and accordingly, the Holder Releasees have required that the Holder Releases be included in the Plan.  The Holder Releases, like the Debtors Releases, are a necessary and integral element of the Plan.  The Holder Releasees are making substantial contributions to the Chapter 11 Cases and the Plan.  In fact, the Holder Releasees are the same parties as the Debtor Releasees, and thus, the substantial contribution described above supports such relief.  In light of such contributions, a release is appropriate and warranted.

18.    In this case, the Holder Releases are fully consensual with respect to the Beneficiaries of the Distribution Trust since it allows the applicable creditor to affirmatively opt-out of such release as part of its ballot if it does not consent to the Holder Releases.  Courts in this District have held that a chapter 11 plan may provide for a release of claims by third parties against non-debtor third parties where the releasing parties have the opportunity to opt out of the release.  *See In re Washington Mutual Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (observing that consensual third-party releases are permissible); *Zenith*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan); *see also Indianapolis Downs*, 486 B.R. at 304-05 (approving a consensual third-party release that applied to unimpaired holders of claims deemed to accept the plan).  Further, the ballots gave notice to all Beneficiaries of the Distribution Trust of the terms of Holder Releases.  In addition, contrary to the assertions by objectors, courts in this District and others have confirmed that returning a ballot is not essential to demonstrating consent to a release.  *See Indianapolis Downs*, 486 B.R. at 305-06 (confirming plan where abstaining parties were "deemed to consent to the Third Party Release."); *In re DBSD N. Am., inc.*, 419 B.R. 179, 218-19 (S.D.N.Y. 2009) (determining adequate notice of the proposed release was given to impaired creditors, and the ballots set forth the effect of abstaining without opt-in out of the release); *In re Lear Corp.*, No. 09-14326 (ALG) 2009 WL 6677955, at *32 (Bankr. S.D.N.Y. Nov. 5, 2009) (confirming plan where parties were given notice that to vote to accept the plan or abstention from voting constitutes assent to the third-party releases); *see also Spansion*, 246 B.R. at 144 (finding that a release was not overreaching to the extent it bound unimpaired classes deemed to accept the plan since those creditors were being paid in full and had received adequate consideration of the release).

13

19.    Accordingly,   the   Debtors   submit   that   the   Holder   Releases   are appropriately tailored under the circumstances of these Chapter 11 Cases, are consistent with the practices of this jurisdiction and should be approved.

## II.    Debtors' Responses Specific to the Dept. of ED Objection

### A.    The Dept. of ED Does Not Have Standing to Object on Behalf of Other Claimants.

20.    As an initial matter, the Dept. of ED's objection to the Plan relating to section 507(a)(7) of the Bankruptcy Code should be overruled as (i) the Dept of ED does not hold any priority claims against the Debtors and (ii) the Dept. of ED does not have standing to assert such objection on behalf of former students.  In fact, the Student Committee opposes the relief sought in the Dept. of ED's objection and no claimant holding a potential section 507(a)(7) claim has raised any concern or objection with respect to the treatment of consumer deposit claims under the Plan.

21.    In order to grant a third party standing to oppose a plan of reorganization on behalf of others, such third party must establish that its interests and the interests of those that it claims to represent are closely aligned.  *In re Tascosa Petroleum Corp.*, 196 B.R. 856, 864 (D. Kan. 1996).  Absent this nexus, it cannot challenge portions of the plan that do not affect its direct interests.  *Greer v. Gaston & Snow (In re Gaston & Snow)*, 1996 WL 694421, at *7 (S.D.N.Y. Dec. 4, 1996) (creditor, who did not allege that he would receive more under a chapter 7 liquidation than under the plan cannot argue that the plan violated the "best interest of the creditors" test as to other creditors); *Tascosa Petrol. Corp.*, 196 B.R. at 863 (class 5 creditor could not assert rights of class 4 creditors in objecting to plan); *In re Evans Prods. Co.*, 65 B.R. 870, 874 (S.D. Fla.1986) (affiliated debtors lacked standing "to raise the rights of wrongly classified creditors as a means to attack the overall reorganization plan"); *In re Orlando Inv.,*

*L.P.,* 103 B.R. 593, 596–97 (Bankr. E.D. Pa.1989) (objectors could not challenge plan releases that only affected other interest holders); *In re Johns–Manville Corp.*, 68 B.R. 618, 623 (Bankr.S.D.N.Y.1986) ("[N]o party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation.").

22.    Presently, the Dept. of ED has failed to argue (let alone prove) the required close connection between itself and the student creditors that it purports to represent. Third party standing can be granted but certain extraordinary circumstances need to exist in order for such representation to occur.  *In re Energy Future Holdings Corp.*, 522 B.R. 520, 526 (Bankr. D. Del. 2015) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129, (2004)); see also *Fieger v. Ferry*, 471 F.3d 637, 648 (6th Cir.2006) (prudential limitations on third party standing can be overcome where practical obstacles prevent a party from asserting rights on behalf of itself).  The Dept. of ED has presented no evidence that student creditors do not have the ability to represent themselves or their own interest fully and completely in these bankruptcy proceedings, especially given the existence in these Chapter 11 Cases of the Student Committee.  For this reason, the Dept. of ED's objection to the Plan relating to the alleged impermissible treatment of consumer deposit claims arising under section 507(a)(7) of the Bankruptcy Code should be overruled.

23.    Notwithstanding the foregoing, given the Debtors' belief that there are few, if any, section 507(a)(7) claims relating to Title IV funds due to the Credits and Reversals effectuated prior to the Petition Date, the Debtors have, among other modifications to the Plan, modified the definition of "Student 507(a)(7) Deposit Claims" in the Plan to delete the phrase "(other than from grant monies for which the Student is not personally liable or Title IV, Part C funds)."  *See* Section II.A.143 of third amended and modified Plan.

15

**B.** **The Dept. of ED Has Neither Satisfied Its Burden of Proof Regarding Its Trust Claims Nor Has It Pursued Them in the Appropriate Manner.**

24.      If a debtor holds property impressed with a valid trust, the estate will generally hold that property subject to the interest of the beneficiary.  *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, (1962).  Importantly, however, it is upon the claimant and potential beneficiary to first establish this trust fund interest.  The claimant must still establish (i) the trust relationship, (ii) the identity of the trust funds, and (iii) sufficiently trace the trust funds where they have been commingled with non-trust monies.  *Matter of Felton's Foodway, Inc.*, 49 B.R. 106, 108 (Bankr. M.D. Fla. 1985); *see also In re Columbia Gas Sys., Inc.,* 997 F.2d 1039, 1063 (3d Cir. 1993); *In re Lehigh and New England Railway Co.*, 657 F.2d 570, 579 (3d Cir.1981) (applying tracing principles to secured creditors when the trust funds have been dissipated).  The Dept. ED has failed to meet or even address its burden of proof in this regard.  It simply asserts that certain funds held by the Debtors may be trust funds, claims the Dept. of ED is the beneficiary of that trust interest and alleges that the Plan should not be confirmed, in part, due to this interest.  The Dept. of ED, which has audited time and again the Debtors' operations and use of Title IV funds and knows better than virtually anyone else how the Debtors operated and spent Title IV funds on operational expenses (including by way of the detailed checks and balances incorporated into the Operating Agreement, which was foisted upon the Debtors prepetition by the Dept. of ED (a copy of which is attached hereto as Exhibit C)), should not be permitted to claim ignorance or lack of information regarding how the Debtors' utilized Title IV funds.  Indeed, pursuant to Article III.B of the Operating Agreement, the Monitor (selected by the Dept. of ED under the Operating Agreement) had "full and complete access to Corinthian . . . cash receipts and disbursements (including, without limitation, disbursements of any Title IV student aid funds) . . . ."

**C.**     **Even if the Dept. of ED Had a Trust Fund Interest in Certain of the Debtors' Cash, the Determination of the Amount of Any Remaining Interest Must Be Determined in Accordance with the Lowest Intermediate Balance Test.**

25.     The lowest intermediate balance test ("**LIBT**") has been employed by numerous courts to determine a beneficiary's trust fund balance when such trust funds are commingled with non-trust monies.  The LIBT uses the legal fiction that the funds first withdrawn from the commingled account are non-trust funds.  If the commingled fund has been reduced to zero, "then the trust is considered lost."  *In re Catholic Diocese of Wilmington, Inc.,* 432 B.R. 135, 151 (Bankr. D. Del. 2010).  "[I]f the commingled fund has been reduced below the level of the trust fund amount, but not depleted, the claimant is entitled to the lowest intermediate balance in the account."  *Id.*  Trust funds are not capable of being replenished through deposits made subsequent to the lowest intermediate balance.  *Id.*  While the Third Circuit has never specifically accepted or rejected the LIBT, the reasoning underpinning its ruling in *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, (3d Cir. 1993) is the same as that which is used to support the LIBT.  Additionally, the LIBT has been employed by courts in this District.  *See, e.g., Catholic Diocese of Wilmington, Inc.,* 432 B.R. 135 (Bankr. D. Del. 2010) (court applied LIBT to determine whether defendants met their burden of identifying and tracing funds at issue).

26.     Even assuming that the Dept. of ED did have a trust fund interest in certain Title IV monies paid to the Debtors prior to the Petition Date that were not, for whatever reason, applied to the student ledger on account of a student's institutional charges (which is a virtual impossibility here given the mechanics of the Operating Agreement) or, if a credit balance arose as a result of such application, and such credit balance was not disbursed to the student or to the Dept. of ED or otherwise resolved or extinguished, then the LIBT would

17

determine the remaining amount of that trust fund interest.  As will be established at the confirmation hearing, following application of the LIBT, the Debtors believe there are only approximately $230,000 of remaining trust funds (*i.e.*, funds derived from Title IV disbursements) in any of the Debtors' bank accounts.  These amounts also exclude any funds derived from Title IV disbursements that were deposited prepetition into the Student Refund Reserve, which currently has a balance of approximately $4.3 million.  Pursuant to the Plan, all of the Debtors' right, title and interest in and to the Student Reserve Fund are being transferred to the Student Trust for the benefit of Holders of Class 5 - Student Claims and Government Education Claims, which the Dept. of ED has not objected to.

**III.**    **Response to Plan Objection Filed by the WARN Claimants**

27.    As unfortunately has become commonplace in corporate bankruptcies, the day after the Debtors commenced their cases a WARN Act complaint was filed.  The complaint sought relief against a single Debtor, CCI, under both the federal and California WARN Acts.  CCI answered the complaint on June 22, 2015, denying the material allegations of the complaint and asserting affirmative defenses.

28.    Thereafter the WARN plaintiffs sought leave to file an amended complaint (the "**Amended Complaint**").   Among other things, the proposed Amended Complaint expanded the number of Debtor defendants from one to seven.  The Debtors did not oppose the motion to amend.  The Amended Complaint was filed on August 20, 2015.

29.    On August 21, the "WARN Claimants" filed an objection to confirmation of the Plan [Docket No. 822] (the "**WARN Objection**").  The WARN Claimants assume that they will succeed on the claims asserted in their Amended Complaint, contend that they are entitled to a $6 - $9 million priority wage claim as a result, and argue that the Plan is not feasible

because it does not reserve for the WARN Claimants' claim. *See generally* WARN Objection. Accordingly, the WARN Claimants request that the Court deny confirmation of the Plan or require a substantial reserve for their claims (which would have the practical effect of dooming the Plan). WARN Objection p. 9. Ironically, were the WARN Claimants to succeed on their objection, the Debtors would likely be forced to convert these cases to chapter 7 (thereby jeopardizing any potential recovery for the WARN Claimants on account of their asserted claims).

30.    The WARN Claimants cite to *In re Harbin*, 486 F.3d 510 (9th Cir. 2007) for the proposition that the impact of ongoing litigation affects whether a plan is feasible. In *Harbin*, the 9th Circuit held that the plan could not be confirmed because a pending appeal of an order setting aside a jury verdict could significantly impede the plan's feasibility in the future. *See id.* at 518. Courts interpreting *Harbin*, however, have not divined a *per se* rule that significant ongoing litigation renders bankruptcy plans infeasible. *See In re RCS Capital Dev., LLC,* 2013 WL 3619172, at *8 (B.A.P. 9th Cir. July 16, 2013) (*Harbin* does not establish a "bright-line" rule that requires a plan to provide for a mechanism for addressing the claims of creditors who may subsequently recover large judgments against the debtors); *In re W.R. Grace & Co.*, 475 B.R. 34, 118 (D. Del. 2012) (distinguishing *Harbin*), *aff'd*, 729 F.3d 332 (3d Cir. 2013); *In re Pawlowski*, 428 B.R. 545, 552-553 (E.D.N.Y. 2009) (same) (citing *In re ELL 11, LLC,* 2008 WL 916695, at *2 (Bankr. M.D. Ga. Apr. 2, 2008)). Rather, *Harbin* instructs bankruptcy courts to evaluate "whether a potential future judgment may affect the debtor's ability to implement its plan" when determining a plan's feasibility. *Harbin*, 486 F.3d at 518; *see also Pawlowski*, 428 B.R. at 553 ("nothing in *Harbin* suggests that ongoing litigation renders a plan inherently unfeasible; it requires merely that the presiding court exercise discretion in

evaluating feasibility in light of such claims"); *see also In re American Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (bankruptcy court should consider impact of debtor's ongoing civil litigation when considering feasibility).

31.     For the reasons set forth below, the Court should deny the WARN Objection because the claims asserted in the Amended Complaint are not likely to succeed. The following summary is intended to respond briefly to the WARN Objection and does not reflect all of the Debtors' defenses to the claims asserted in the Amended Complaint.

### A.     The Debtors Are Not Subject to the California WARN Act.

32.     The WARN Claimants simply assume that the Debtors were "employers" under the California WARN Act and accordingly are subject to its requirements. *See* WARN Objection ¶ 17. However, the Debtors were not "employers" as that term is defined in the California WARN Act, which therefore does not apply to the Debtors.

33.     The California WARN Act's notice requirement applies to "employers." *See* West's Ann. Cal. Labor Code § 1402(a) (West 2015) ("An *employer* who fails to give notice as required by paragraph (1) of subdivision (a) of Section 1401 before ordering a mass layoff, relocation, or termination is liable to each employee entitled to notice….") (emphasis added). An "employer" is a person "who directly or indirectly owns and operates a covered establishment." Cal. Labor Code § 1400(b). A "covered establishment" is "any industrial or commercial facility or part thereof that employs, or has employed within the preceding 12 months, 75 or more persons." Cal. Labor Code § 1400(a).[3] The California WARN Act claim will fail because the WARN Claimants will not be able to carry their burden of demonstrating that the Debtors were "industrial or commercial facilities" subject to the California WARN Act.

---

[3]     Several of the Debtors either did not employ 75 persons or had facilities located outside of California. Those Debtors would not be subject to the California WARN Act for these additional reasons as well.

34.     As the WARN Claimants admit, "[t]he Debtors were engaged in the business of providing *educational services*." WARN Objection ¶ 2 (emphasis added). Indeed, the Debtors operated educational facilities, not industrial or commercial facilities.

35.     The Debtors are not aware of any decision of a California (or any other) court construing the term "industrial or commerical facility" under the California WARN Act. However, the California legislature clearly understands the difference between commercial/industrial facilities and educational facilities. *See, e.g.,* West. Ann. Cal. Water Code §§ 10608.12(c), (d), (h), (i) (West 2015) (California's Water Code separates "commercial, industrial, and institutional water use" into three categories, and includes both "higher education institutions" and "schools" in the "institutional" category). Notwithstanding this distinction, the California legislature omitted any reference to "institutions" or "educational" facilities from the definition of "covered establishment" (and thus from the definition of "employer") under the California WARN Act.

36.     When a legislature omits language from a statute that is found in other statutes, the omission must be deemed intentional and of significance. *See, e.g.,* *People v. Stevens*, 236 Cal.Rptr. 296, 298 (Cal. App. 1986) ("'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' Moreover, in construing a statute, 'a court cannot insert qualifying provisions not included or rewrite the statute to conform to an assumed intention which does not appear from its language.'") (citations omitted); *Chang Ho Yoo v. Shewry*, 111 Cal.Rptr.3d 322, 333 (Cal. App. 2010) (same); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("'[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute

but omits it in another'") (citation omitted); *DiGiacomo v. Teamsters Pension Trust Fund*, 420 F.3d 220, 227 (3d Cir. 2005) (same).

37.    The California legislature omitted reference to educational institutions or facilities in the California WARN Act.  The Debtors provided "educational services" (WARN Objection ¶ 2) and were educational facilities/institutions, not industrial or commercial facilities. Because the California WARN Act only applies to industrial or commercial facilities, it does not apply to the Debtors.

38.    The WARN Claimants may argue that the Debtors provided educational services *for profit* and accordingly are commercial institutions.  However, any such argument cannot alter the plain (and admitted) fact that "[t]he Debtors were in the business of providing educational services."  WARN Objection ¶ 2.  Moreover, the California Water Code defines as "institutional water users" (rather than commercial or industrial users) both "higher education institutions" and even "hospitals" (Cal. Water Code § 10608.12(i)), even though it is not unusual for such institutions to be run for profit.  Again, the California legislature clearly understands the distinction between industrial/commercial facilities and educational facilities/institutions, even when the latter are run for profit.

39.    In summary, the WARN Claimaints will not be able to carry their burden of demonstrating that the Debtors were "industrial or commercial facilities" subject to the California WARN Act, and accordingly their state law claim will fail.

**B.**    **The Debtors Are Likely to Prevail on the Federal WARN Act Claims.**

40.    The Debtors concede that certain of their facilities may be subject to the federal WARN Act.[4]  The WARN Claimants contend that the Debtors cannot assert any defenses

---

[4]    Some of the Debtors will not qualify as "employers" under the federal WARN Act because they did not have a sufficient number of full time employees.  *See* 29 U.S.C. § 2101(a)(1).

under the WARN Act, such as the "unforeseen business circumstances" defense, because the Debtors supposedly provided no notice to employees. *See* WARN Objection ¶ 22. The WARN Claimants are misinformed.

### i.    *The Debtors Provided Notice that Exceeded the Requirements of the WARN Act.*

41.    The WARN Claimants assume that the Debtors provided no notice at all, much less notice sufficient to satisfy the WARN Act. They are wrong on both counts.

42.    First, the Debtors provided actual notice to all employees. The notice included (a) an April 26, 2015 letter to employees, (b) a detailed list of frequently asked questions and answers thereto, and (c) a series of "town hall" meetings. *See* Exhibit D hereto. The Debtors met their obligations under the circumstances and, more importantly, treated their employees with the respect they deserved.

43.    Second, this notice was more than sufficient to satisfy the WARN Act. Employers need only give as much notice as is practicable and provide a brief statement of the basis for reducing the notice period. 29 U.S.C. § 2102(b)(3); *Czyzewski v. Jevic Trans., Inc. (In re Jevic Hold. Corp.)*, 496 B.R. 151, 158 (D. Del. 2013).

44.    Notice was provided as promptly as practicable under the circumstances. As detailed in the *Declaration of William J. Nolan in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 10] (the "**Nolan Declaration**"), the Debtors already had sold a number of their schools (and thus preserved jobs) and were attempting to sell or teach-out at the remaining campuses (and further preserve jobs). The Debtors had potential buyers scheduled to sign a purchase agreement, but unfortunately the Dept. of ED and the California Attorney General combined to take steps that made a sale impossible (including imposing an unjustified and unsupportable $30 million fine (for which the Debtors have requested a hearing) and

significant operating and financial conditions on a sale).  As a result, the last potential purchaser

withdrew on April 23, 2015.  The Debtors promptly announced the closure of their remaining

schools and provided notice to terminated employees.  *See generally* Nolan Declaration ¶¶ 19-

31.

45.     The notice was quite detailed, and in fact more detailed than the WARN

Act requires.  Among other things, employees were informed:  (a) that as of April 27, 2015, their

employment was being terminated permanently; (b) that efforts to sell the schools and preserve

jobs had been unsuccessful due to recent actions of federal and state regulatory agencies; (c)

where further information could be obtained; and (d) of additional information regarding

benefits, retirement plans, etc.  The Debtors also held "town hall" meetings to explain these

issues to employees and to answer questions.  This notice was more than sufficient under the

WARN Act.  *See*, *e.g.*, *In re Jevic Holding Corp.*, 496 B.R. at 158-59 (describing similar notice

and concluding that "such notice was sufficient to permit the Debtors to invoke the exceptions

laid out in 29 U.S.C. § 2102"); *Varela v. Eclipse Aviation Corp. (In re AE Liquidation, Inc.)*, 522

B.R. 62, 67-68 (Bankr. D. Del. 2014) (same).

## ii.     *The Debtors Are Likely to Prevail on Their Unforeseeable Business Circumstances Defense.*

46.     The notice that the Debtors provided is more than sufficient to support

their affirmative defenses, including the unforeseeable business circumstances defense.  "An

employer may order a plant closing or mass layoff before the conclusion of the 60-day [notice]

period if the closing or mass layoff is caused by business circumstances that were not reasonably

foreseeable as of the time that notice would have been required."  29 U.S.C. § 2102(b)(2)(A).

This defense focuses on the debtor's business judgment, and the question is not whether the

circumstance leading to business closure merely was possible at the time 60 day notice would

24

have been required, but rather whether it was probable. *See*, *e.g.*, *In re Jevic Holding Corp.*, 496 B.R. at 160-62; *In re AE Liquidation, Inc.*, 522 B.R. at 68-69. Indeed, "[t]he WARN Act allows leeway for a company's exercise of reasonable business judgment, and the regulations 'are intended to encourage employers to take all reasonable actions to preserve the company and its jobs.'" *In re Jevic Holding Corp.*, 496 B.R. at 161 (citations omitted).

47. As detailed in the Nolan Declaration, the Debtors made Herculean efforts to sell their schools and preserve jobs. The Debtors already had sold a number of schools and were attempting to sell their remaining schools or provide for teach-out. *See* Nolan Declaration ¶¶ 25-27. In that regard, "the Debtors entered into negotiations with at least three potential buyers for the Heald schools, and held discussions with several other parties regarding the teach-out of the remaining thirteen Everest and WyoTech schools in California." *Id.* ¶ 28. However, irrational and unforeseeable actions by the Dept. of ED and the California Attorney General's office caused these efforts to fail:

> Ultimately, however, no agreement was reached for the sale or teach-out of any of the remaining schools. On April 14, 2015, the DOE imposed a $30 million fine against the Heald schools and prohibited Heald from enrolling new students. Despite multiple efforts by the Debtors and their advisors, as well as potential purchasers of Heald, to negotiate terms with the DOE for the sale of Heald, the DOE sought to impose significant financial and operational conditions on both Corinthian and the potential buyers that were not acceptable to the buyers or capable of performance. These included, among other things, that Heald reduce future tuition by 20 percent, and that Corinthian or a buyer pay to the DOE $30 million (and apart from the payment of the purchase price to the selling entities), $10 to $12 million of which would be paid at closing, and the remaining $18 million to $20 million of which would be paid over time. The California Attorney General also held negotiations with potential buyers over the terms under which it would agree not to continue pursuing the claims it had asserted in a lawsuit against Corinthian against the potential buyer. These negotiations, while protracted, were not successful. As a result of the DOE requirements and conditions and the unsuccessful negotiations with the California Attorney General's office, on April 22, 2014, the last potential buyer withdrew from the Heald sale process. When sale efforts for the remaining schools ceased to be viable, both for the Heald schools and remaining Everest and WyoTech schools in

25

> California, the Debtors pursued teach-out arrangements with third parties in an effort to permit students to complete their education with minimal disruption. Ultimately, however, the DOE continued to insist that unaffiliated teach-out partners assume undefined liabilities of the Debtors in order to conduct teach-outs at the affected campuses on economically viable terms. Without the DOE's cooperation, no teach-out partners were willing to proceed.

*Id.* ¶ 29. Thus, the Debtors unexpectedly were forced to commence wind-down operations, and promptly provided notice to employees. *Id.* ¶ 30-31.

48.     It is difficult to imagine a more appropriate scenario for application of the unforeseeable business circumstance defense, and it would have been commercially unreasonable for the Debtors to provide notice any sooner than they did. *See*, *e.g.*, *In re Jevic Holding Corp.*, 496 B.R. at 162-64 (CIT's refusal to extend forbearance was possible but not probable, thereby justifying application of unforeseeable business circumstance defense; "it was not commercially reasonable to pull the plug on Jevic [60 days earlier] because CIT's refusal to extend forbearance was only a possibility, not a probability."); *In re AE Liquidation, Inc.*, 522 B.R. at 69 ("The Court does not find that it was probable that the sale would fail"). Moreover, prematurely providing WARN notice here would have run counter to the WARN Act's policy of attempting to preserve jobs:

> These events are indicative of a company attempting to stave off layoffs, and attempting to save jobs and the company. The Court does not doubt that CIT refusing to extend forbearance was a possibility. However, it was not necessarily the probable outcome at the time WARN notice was required. It would run counter to the WARN Act's policy of encouraging employers to take all reasonable actions to preserve the company and the jobs to impose liability upon the Debtors for not giving notice sooner than they did. The Court also finds the Third Circuit's elaboration of potential problems with forcing companies to give WARN notice too early particularly illuminating:

> "In addition to circumventing the regulations, plaintiffs' approach would raise several potential problems. Because plaintiffs' view might require an employer to provide frequent WARN notice, it could require an economically viable employer to provide notice of a possible -- but unlikely -- closing. Once the employer's creditors learn of the notice, they may seek to enforce existing debts and become

> unwilling to extend the employer more credit.   In addition, employees may overestimate the risk of closing and prematurely leave their employer, forfeiting (among other things) seniority and unvested benefits.  Such behavior by creditors and employees would increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect."

*In re Jevic Holding Corp.*, 496 B.R. at 163 (citations omitted).  Accordingly, the Debtors believe that the unforeseeable business circumstances defense is likely to succeed in the WARN Action.

49.    For the foregoing reasons (among others), the Debtors respectfully submit that they will have no liability under either the California or federal WARN Acts.  Accordingly, the WARN Objection is no obstacle to confirmation of the Plan.

RLF1 12880731v.1

## CONCLUSION

WHEREFORE, the Debtors respectfully request that any Objections, to the extent not resolved by the third amended and modified Plan or otherwise, be overruled and that the Plan be confirmed.

Dated: August 25, 2015  
       Wilmington, Delaware

      /s/ Mark D. Collins
      Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marisa A. Terranova (No. 5396)
Amanda R. Steele (No. 5530)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Facsimile:  302-651-7701
Email: collins@rlf.com
      merchant@rlf.com
      terranova@rlf.com
      steele@rlf.com

*Attorneys for the Debtors and Debtors in Possession*