**<u>Exhibit C</u>**

**(Northern District of Illinois Answer)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Plaintiff, <br><br> v. <br><br> CORINTHIAN COLLEGES, INC. d/b/a Everest College, Everest Institute, Everest University, Everest University Online, Everest College Phoenix, Everest College Online, WyoTech, and Heald College, <br><br> Defendant. | Case Number 1:14-cv-07194 <br><br> Hon. Gary Feinerman |

## ANSWER

Pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure, Defendant Corinthian Colleges ("CCi" or the "Debtors") hereby answers the Bureau's Complaint For Permanent Injunction And Other Relief (the "Complaint") as follows.  CCi denies all allegations in the Complaint except as specifically admitted below.

### PRELIMINARY STATEMENT AND GENERAL DENIAL

As CCi detailed in its September 9, 2015 Status Report, its liquidation plan has been confirmed and it will be liquidating in a matter of days.[1]  As a matter of record, CCi denies the

---

[1] CCi's ability to research and respond to the Bureau's allegations has been hampered by its bankruptcy.  Only a handful of employees were retained to guide it through the bankruptcy process, and at the time of filing fewer than 5 employees—all engaged in essential bankruptcy-related functions—remain. Accordingly, in certain instances CCi has denied allegations based on a lack of information and belief, because of an inability at this time to conduct factual inquiries.

Case: 1:14-cv-07194 Document #: 33 Filed: 08/11/14 Page 2 of 29 PageID #:244

Bureau's allegations in the strongest possible terms, and regrets that it will not have its "day in Court" to present its defenses and its counter-narrative. CCi is confident that a full and fair review of the facts and law would vindicate its denial of the Consumer Financial Protection Bureau's (the "Bureau") allegations in this matter.

The Bureau's Complaint—filed abruptly in September 2014, in the midst of ongoing investigatory dialogue after the Bureau learned of the extent of CCi's financial distress—is neither a neutral nor fair summary of the relevant facts. This is the case for a number of reasons.

- <u>The Bureau's Allegations Are Focused on Anecdotes, Not Evidence of Systemic, Company-Wide Conduct</u>: The Bureau's Case rests in large part on an effort to cite various unrelated and isolated anecdotes—specific incidents and communications from individual schools over the course of a number of years when hundreds of thousands of students attended the campuses—as evidence of a corporate-wide, systemic pattern of behavior. For example, while CCi operated over 100 schools for most of the period identified in the complaint (July 2011 to March 2014, *see* ¶ 1) the Bureau relies largely upon isolated issues at a handful of campuses in 2009-12 that were self-discovered, self-reported, and to which the CCi responded with terminations and remedial action . *See* ¶¶ 61-71, 77-78. None of these incidents suggests any systemic issues, let alone culpability at the corporate level. Indeed, the only evidence the Bureau offers of purported corporate-level malfeasance is an out-of-context quote from CCi's CEO. *See* ¶ 68. However, in context, it is clear (1) that the statement relates to *compliance* with accreditors' placement benchmarks (which require a certain percentage of graduates to be placed to avoid a probationary status)—not falsified placement rates, as the Bureau insinuates—and (2) that CCi's objective *was compliance*, not falsification. The Bureau's allegations relating to alleged collections practices are likewise anecdotal. *See* ¶¶ 126-28, 131-35, 143-44.

2

- CCi Self-Reported and Corrected Placements It Allegedly "Falsified": The Bureau claims that CCi "falsified" its "placement rate."[2]  In support of this claim, it details isolated incidents at individual schools from 2009-12.  *See* ¶¶ 61-65, 77-78.  What the Bureau fails to add is that CCi—not the Bureau—discovered these incidents through its own internal controls, investigated them, fired the employees involved, self-reported these incidents to its accreditors, and corrected its previously-reported placement statistics.  The Bureau has no factual basis to claim that in a systemic fashion *CCi*, as opposed to the individual employees involved in these incidents—who acted in violation of CCi policy and were fired—falsified any reported placement statistic.  And it is disingenuous to present these incidents as evidence of corporate misconduct when company compliance personnel identified, investigated, and corrected CCi's reporting.  This is particularly so given that the vast majority of these incidents occurred prior to the period alleged in the Complaint, and indeed, prior to the July 21, 2011 effective date of the Consumer Financial Protection Act.  Simply put, the Bureau has no factual basis or legal authority to complain of this conduct.

- The Bureau's Allegations Are Speculative.  Numerous paragraphs in the Complaint insinuate that CCi engaged in wrongdoing without any factual support.  For example, many of the facts that the Bureau cites as evidence that CCi "falsified" placements involve allegations of a lack of documentation *sufficient to verify* placements, and not evidence of any intentional misconduct.  *See* ¶¶ 63, 66, 69, 71.  Similarly, the Bureau pleads no facts to suggest that any of the CCi reported placements in 2012 were not permanently employed, yet it states: "So when Corinthian advertises on its website, www.mycareercounts.org/outcomes, 'In 2012, over 69

---

[2] Individual schools track and report placement rates in specific degree programs to accreditors and students.  The Bureau does not explain what it means by CCi's "placement rate" or where, when, how, or to whom such a placement rate was "falsified."

percent of our 38,721 graduates found careers in their field of study,' this really meant that 69 percent of Corinthian graduates found a job that lasted *as little as one day*" (emphasis added). Likewise, the Bureau suggests that CCi should have lowered tuition when third-party private student loan providers stopped serving students at CCi and other career schools, *see* Compl. ¶¶ 7, 91, knowing that such action would have triggered the violation of another regulation because CCi is required to obtain 10% of its revenue from non-Title IV (i.e. private) funding sources.

- The Bureau Pleads No Evidence Students Actually Were Misled. The Bureau alleges generally that CCi's descriptions of its career services and how it counts placements were misleading. *See* Compl. ¶¶ 49-57, 72-75, 84-88. But it does not allege any facts that suggest any students were misled by these supposed representations. Nor does it allege any facts to suggest that any students learned of, let alone relied upon, the placement reporting issues at particular CCi schools. Compl. ¶¶ 58-71, 76-83. Indeed, it is unclear how students would have learned of the majority of these incidents, since career schools were not required to disclose placement rates to students until July 1, 2011.[3] Likewise, the Bureau makes much of the fact that certain CCi documents did not disclose that CCi was obligated to purchase student loan notes to support the private student loan program financially. Yet, the Bureau acknowledges that the vast majority of CCi students were informed that their loan notes could be sold to CCi—including in the Enrollment Agreements *every* Everest (and WyoTech) student actually signed. *See* Compl. ¶ 114. And, in any event, it does not allege any facts that suggest particular students would not have enrolled or borrowed had CCi disclosed this matter differently.

---

[3] *See* 34 C.F.R. 668.6(b). The Department of Education regulations requiring such a disclosure were promulgated on October 29, 2010 and became effective July 1, 2011. *See* 75 Fed. Reg. 66832, 66948.

- <u>CCi Did Not Promise All Students Would Be Placed</u>. The Bureau also fails to mention that CCi made clear to students that it did not guarantee that students would be placed. In a section entitled "The Student Understands," the Everest, Everest Online, and Wyotech enrollment agreements stated: "The School does not guarantee job placement to graduates upon program/course completion, and does not guarantee a salary or salary range to graduates." Likewise, Heald's enrollment agreement stated: "Heald does not guarantee or imply job placement to graduates upon program/course completion or upon graduation, and does not guarantee or imply a salary or salary range to graduates. No Heald representative has stated or implied to the contrary."

- <u>Size, and Scope of Private Student Loan Program</u>: The Bureau suggests that private student loans offered to CCi students were predatory in nature—unreasonably expensive, *see* Compl. ¶ 117, and a trap for the unwary. *See* Compl. ¶¶ 107-13, 118-49. However, it fails to mention that students were only offered these loans if, after receiving Title IV financial aid, they lacked another means to pay. Nor does it mention that less than 40% of CCi students borrowed under this program, or that CCi supported the program financially and in fact lost money doing so. Nor does it mention that the loans were modest in size (avg. $3,500 - $4,700 over the life of the program), had small in-school payments (avg. $35/month), and had terms competitive with the private student lenders that refused to lend to CCi students.

- <u>Similarity to Federal Student Loans</u>: The Bureau also fails to mention that the private student loan program employed underwriting standards similar to those used by the Federal Government, which (1) limits the amount a student can borrow annually (these limits increase as the student gets closer to graduation), and (2) refuses to lend to students with student loans currently in default. *See* 34 C.F.R. § 668.32(g). Such an approach allows students to obtain

financing for school without regard to their background or credit history—thereby providing equal and open access to an education—as long as they avoid default on existing student loans.[4] The purpose of the private student lending program at issue here was similar, as evidenced by the fact that students were only offered these loans if they lacked another means to pay, and less than 40% of CCi students borrowed under the program.

For these reasons and others detailed below, except as otherwise expressly stated herein, CCi denies each and every claim, theory, and allegation asserted in the Complaint, including, without limitation, any allegations contained in the introduction, headings, or subheadings of the Complaint, and specifically denies any liability under sections 1036(a), 1054(a), and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a), and 5565, and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a *et seq.* Pursuant to Rule 8(b)(6) of the Federal Rules of Civil Procedure, averments in the Complaint to which no responsive pleading is required shall be deemed as denied.

## RESPONSES TO SPECIFIC ALLEGATIONS[5]

Incorporating the foregoing, CCi states as follows in response to the specific allegations in the Complaint.

---

[4] As the Bureau has acknowledged, student loans present underwriting challenges that are not present in other forms of consumer credit, whether secured (like mortgages), or unsecured (like credit cards). *See* Consumer Financial Protection Bureau & U.S. Department of Education, *Private Student Loans*, at 78-79 (Aug. 29, 2012) ("Private student lending presents complexities that are not generally present in other consumer debt products. … a private student loan borrower pursuing postsecondary education full-time often lacks income and credit history. In addition, because loans are generally funded in full and payments are deferred, private student lenders lack the ability to limit or reduce an open line of credit.").

[5] The headings in this section are from the Bureau's Complaint.  We have omitted the subheadings in the Complaint, which are argumentative.  To the extent these subheadings make factual allegations to which a response is required, CCi denies the allegations therein.

## INTRODUCTION

1.      CCi admits that it is a publicly-traded for-profit school that (accurately) presented itself as a provider of quality career training.  CCi denies the remaining allegations in paragraph 1.

2.      CCi denies the allegations in paragraph 2.

3.      CCi denies the allegations in paragraph 3.

4.      CCi admits that prospective students received information from CCi admissions and financial aid staff concerning the value of a CCi education and the options available to them to pay the cost of tuition.  CCi denies the remaining allegations in paragraph 4.

5.      CCi denies the allegations in paragraph 5.  CCi serves non-traditional students with varied demographics. CCi's research has revealed insights about how these students view themselves, and what kinds of models and services the School can provide to help these students succeed in their stated educational goals. In the Complaint, the Bureau selectively quoted from a slide contained in a presentation in an attempt to cast CCi's view of its students in a negative light.  A copy of the complete slide is attached hereto as Exhibit A. For students who *described themselves* as "isolated," CCi saw a need for a "[s]ense of belonging, place where they can succeed." For students who *described themselves* as having "low self esteem," CCi saw a need for a "[c]onfident, capable, real adult, role model for kids." For those who said they have "few people in their lives who care about them," CCi saw a need to provide "[e]ncouragement, someone who believes in them." And for those who said they were "[s]tuck, unable to see and plan well for the future," CCi offered "[s]omeone who can show them how so they can gain independence."

6.      CCi admits that it assisted students in applying for Title IV loans, and that federal
financial aid was not sufficient to cover many students' cost of attendance.  CCi denies the
remaining allegations in paragraph 6.

7.      CCi denies the allegations in paragraph 7.

8.      CCi denies the allegations in paragraph 8.

9.      CCi denies the allegations in paragraph 9.

10.     CCi denies the allegations in paragraph 10.

11.     CCi denies the allegations in paragraph 11.

12.     CCi denies the allegations in paragraph 12.

13.     CCi denies the allegations in paragraph 13.

14.     CCi admits the allegations in paragraph 14.

15.     CCi admits it entered into the Operating Agreement after the Department's Federal
Student Aid office placed CCi on Heightened Cash Monitoring on June 12, 2014.  CCi denies the
remaining allegations in paragraph 15.

16.     CCi admits the allegations in paragraph 16.

17.     CCi admits the allegations in paragraph 17.

18.     CCi admits the allegations in paragraph 18.

19.     CCi admits the Operating Agreement states that Corinthian and the Department "will
work together to establish a reserve fund" of $30 million to be used for student refunds.  CCi
denies the remaining allegations in paragraph 19.

20.     CCi admits the allegations in paragraph 20.

### NATURE OF ACTION

21.     Paragraph 21 states a legal conclusion to which no response is required.

## JURISDICTION AND VENUE

22.     Paragraph 22 states a legal conclusion to which no response is required.

23.     Paragraph 23 states a legal conclusion to which no response is required.

## PLAINTIFF

24.     Paragraph 24 states a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 24.

## DEFENDANT

25.     CCi admits that it previously operated career schools using the names Everest College, Everest Institute, Everest University Online, Everest University, Everest College Phoenix, Heald College, and WyoTech.  CCi denies the remaining allegations in paragraph 25.

26.     CCi admits its headquarters were in Santa Ana, California and that it operated five Everest campuses in the Northern District of Illinois—Bedford Park, Burr Ridge, Melrose Park, Merrionette Park, and Skokie.  CCi denies the remaining allegations in paragraph 26.

27.     CCi denies the allegations in paragraph 27.

28.     CCi denies the allegations in paragraph 28.

29.     CCi denies the allegations in paragraph 29.

30.     CCi denies the allegations in paragraph 30.

## FACTUAL BACKGROUND

31.     CCi admits the allegations in paragraph 31.

32.     CCi admits that historically tuition and fees have varied among its schools and programs. CCi denies the remaining allegations in paragraph 32.

33.     CCi admits that many students attending its schools are low-income or the first in their families to seek a high school education.  CCi lacks knowledge or information sufficient to admit

or deny the remaining allegations in paragraph 33.  On that basis, CCi denies the remaining allegations in paragraph 33.

34.    CCi admits that few students pay tuition out of pocket, and that many students rely on Title IV financial aid and private loans.  CCi denies the remaining allegations in paragraph 34.

35.    CCi admits the allegations in paragraph 35.

36.    Paragraph 36 states a legal conclusion to which no response is required.

37.    Paragraph 37 states a legal conclusion to which no response is required.

38.    Paragraph 38 states a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 38.

39.    CCi denies the allegations in paragraph 39.

40.    CCi denies the allegations in paragraph 40.

41.    CCi denies the allegations in paragraph 41.

42.    CCi denies the allegations in paragraph 42.

43.    CCi denies the allegations in paragraph 43.

44.    CCi denies the allegations in paragraph 44.

45.    CCi denies the allegations in paragraph 45.

46.    CCi denies the allegations in paragraph 46.

47.    CCi denies the allegations in paragraph 47.

48.    CCi denies the allegations in paragraph 48.

49.    CCi denies the allegations in paragraph 49.

50.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 50.  On that basis, CCi denies the allegations in paragraph 50.

51.    CCi denies the allegations in paragraph 51.

52.     CCi admits the allegations in paragraph 52.

53.     CCi admits the allegations in paragraph 53.

54.     CCi admits the allegations in paragraph 54.

55.     CCi denies the allegations in paragraph 55.

56.     CCi denies the allegations in paragraph 56.

57.     Paragraph 57 states legal conclusion to which no response is required.  To the extent a response is required, CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 57.  On that basis, CCi denies the allegations in paragraph 57.

58.     CCi denies the allegations in paragraph 58.

59.     CCi denies the allegations in paragraph 59.

60.     CCi admits that in 2006, it what it believes to have been the first in this sector and an indication of its commitment to compliance, it formed a placement verification team to review the accuracy of its job placement statistics.  CCi denies the remaining allegations in paragraph 60.

61.     CCi admits that in 2011 it investigated placements at its Everest Decatur campus, and chose to reverse certain placements it was unable to verify.  CCi terminated the employees responsible for the lack of documentation as well as their supervisors.  CCi also self-reported the matter to its accreditor, and provided it with revised placement statistics.  For one program the revised rate was 37% less than previously reported.  CCi denies the remaining allegations in paragraph 61.

62.     CCi admits that in 2010 it received a report from an employee at its Everest Mid-Cities campus that two employees were improperly verifying placements at two employers. CCi investigated this report, terminated the employees involved, and chose to reverse all but 7 of the

11

251 placements at these two employers.  CCi self-reported this matter to the Texas Workforce

Commission and its accreditor and provided its accreditor with a revised Annual Institutional

Report reflecting the reversed placements.  CCi denies the remaining allegations in paragraph 62.

63.     CCi admits that in 2010 CCi's corporate Placement Verification Team found insufficient

documentation for certain placements at the Everest Institute campus in Hialeah, Florida.  CCi

investigated this and identified a single career services employee as the cause.  This employee

was terminated and CCi self-reported the incident to its accreditor and provided it with a revised

Annual Institutional Report that was 6.6% lower than previously reported.  CCi denies the

remaining allegations in paragraph 63.

64.     CCi admits that in 2011 it conducted an investigation in response to an employee

complaint at the Jonesboro campus, and that this investigation determined that certain former

employees had falsified placement documentation.  CCi reversed the placements, self-reported

the matter to its accreditor, and provided it revised placement reports.  CCi would have fired

these employees if they were still employed by CCi, but they resigned before CCi could take

action.  CCi denies the remaining allegations in paragraph 64.

65.     CCi admits that in 2012 it investigated self-employed job placements at its Long Beach

WyoTech campus, and removed a number of job placements on its own initiative.  The

placements removed had *not* been reported to accreditors or students, so there was no need to

revise the school's prior reports.  CCi denies the remaining allegations in paragraph 65.

66.     CCi denies the allegations in paragraph 66.

67.     CCi denies the allegations in paragraph 67.

68.     CCi admits that CEO Jack Massimino circulated a 64-page presentation prior to the

Executive Leadership Team meeting in September 2011.  CCi admits that, in the context of a

series of slides discussing Government funding, the presentation includes one slide titled "Implications," with the following text: "We had a [cohort default rate] problem and fixed it. We had a retention compliance problem and got back into compliance. We have a placement compliance problem now and need to get back into compliance. Do we need to execute against standards higher than just compliance?" The concerns expressed in this slide about placement compliance refer to the fact that CCi had a number of programs on placement reporting status with its accreditors—meaning that in a challenging employment environment amid the worst recession in generations, CCi leadership was concerned about not placing a sufficient number of its graduates. This slide does not, as the Government suggests, mean that the CCi's leadership believed it had issues with the falsification of placements or placement rates reported to accreditors. CCi denies the remaining allegations in paragraph 68.

69.    CCi admits that a 2012 internal audit at the Everest San Francisco campus found that Career Services was missing employment verification forms for eight of fifteen randomly-selected students. The audit report does not include a finding that those students were not in fact placed, only that some hard-copy documentation was missing from the student files. CCi denies the remaining allegations in paragraph 69.

70.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 70. On that basis, CCi denies the allegations in paragraph 70.

71.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 71. On that basis, CCi denies the allegations in paragraph 71.

72.    CCi denies the allegations in paragraph 72.

73.    CCi admits the allegations in paragraph 73.

74.    CCi admits the allegations in paragraph 74.

75.     CCi denies the allegations in paragraph 75.

76.     CCi denies the allegations in paragraph 76.

77.     CCi admits that in 2011 it conducted an investigation in response to an employee complaint at the Brighton Everest Institute campus, and that this investigation revealed that 14 Medical Assistant graduates were incorrectly reported as placed after being hired for a health fair.  CCi fired the two employees responsible, including the campus president, self-reported the matter to its accreditor, and provided it with revised placement rates for the two affected programs.  The rates were 8% and 15% lower than previously reported.  CCi denies the remaining allegations in paragraph 77.

78.     CCi denies the allegations in paragraph 78.

79.     CCi denies the allegations in paragraph 79.

80.     CCi denies the allegations in paragraph 80.

81.     CCi denies the allegations in paragraph 81.

82.     CCi denies the allegations in paragraph 82.

83.     CCi denies the allegations in paragraph 83.

84.     CCi admits stating its schools offered a career-focused education, assistance to students improving their  resumes and interviewing skills, and help finding a job after graduation and throughout their careers.  CCi denies the remaining allegations in paragraph 84.

85.     CCi denies the allegations in paragraph 85.

86.     CCi denies the allegations in paragraph 86.

87.     CCi denies the allegations in paragraph 87.

88.     CCi denies the allegations in paragraph 88.

89.     Paragraph 89 states a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 89.

90.     CCi admits that in or about January 2008, in response to economic conditions, third-party private student loan providers chose to stop serving students attending private career education schools.  CCi denies the remaining allegations in paragraph 90.

91.     CCi admits that in early 2008 it developed a private student loan program for CCi students with a third-party lender in response to the unavailability of financing from other sources, and that this program was generally referred to as the Genesis Loan Program for Corinthian Students.  CCi denies the remaining allegations in paragraph 91.

92.     CCi admits that, when the Genesis Loan Program was launched, agreements related to it obligated CCi to purchase all student loan notes acquired by "Company A," and to pay Company A a discount fee of 50% of the face value of the notes it purchased.  CCi denies the remaining allegations in paragraph 92.

93.     CCi admits that, from approximately March 2008 to June 2011, it purchased student loan notes from Company A, and that the purchase price of the notes was their face value minus any discount fee CCi had already paid to Company A.  CCi further admits that Company A serviced the loans originated under the program.  CCi denies the remaining allegations in paragraph 93.

94.     CCi denies the allegations in paragraph 94.

95.     CCi admits the allegations in paragraph 95.

96.     CCi denies the allegations in paragraph 96.

97.     CCi admits that in June 2011 the private student loan program for CCi students was restructured, and that under the new program "Company B" agreed to purchase the student loan notes originated under the program.  CCi further admits that Company A agreed to continue to

service the loans originated under the program, and that CCi agreed to pay Company B a discount fee. CCi denies the remaining allegations in paragraph 97.

98.     CCi admits that in June 2011 it agreed to purchase loans that were more than 90 days past due from Company B. CCi denies the remaining allegations in paragraph 98.

99.     CCi denies the allegations in paragraph 99.

100.    CCi denies the allegations in paragraph 100.

101.    CCi admits that Company B terminated its participation in the private loan program for CCi students in January 2014, and that at that time CCi began purchasing student loan notes in Company B's place. CCi denies the remaining allegations in paragraph 101.

102.    CCi admits that in or about July 2014 financing was no longer made available to CCi students through the private student loan program for CCi students. CCi denies the remaining allegations in paragraph 102.

103.    CCi denies the allegations in paragraph 103.

104.    CCi denies the allegations in paragraph 104.

105.    CCi denies the allegations in paragraph 105.

106.    CCi denies the allegations in paragraph 106.

107.    CCi denies the allegations in paragraph 107.

108.    CCi admits that when a student chose to apply for a private student loan through the private student loan program for CCi students, CCi employees made themselves available to assist that student with the application, and, in many cases, provided assistance to students in applying. CCi denies the remaining allegations in 108.

109.    CCi admits that it provided students with a "Preferred Lender List," including through its website, and that multiple versions of this document contained text similar or identical to that which is quoted.  CCi denies the remaining allegations in paragraph 109.

110.    CCi admits that it provided students with a "Preferred Lender List," including through its website, and that multiple versions of this document contained text similar or identical to that which is quoted.  CCi denies the remaining allegations in paragraph 110.

111.    CCi admits that the Preferred Lender List did not mention that CCi might purchase student loan notes, but other documents provided to students—including their enrollment agreements—did.  CCi denies the remaining allegations in paragraph 111.

112.    CCi denies the allegations in paragraph 112.

113.    CCi denies the allegations in paragraph 113.

114.    CCi admits the allegations in paragraph 114.

115.    CCi denies the allegations in paragraph 115.

116.    CCi admits that the payment plans for loans originated under the private student loan program for CCi students generally required monthly payments while students were in school. CCi denies the remaining allegations in paragraph 116.

117.    CCi admits that in or about July 2011 that loans originated under the private student loan program for CCi students had an interest rate of 14.9% and a 6% origination fee, but this is an outlier.  The interest rates and origination fees for such loans were significantly lower for most of the life of the program, and were identical to the rates and fees for federal unsubsidized loans for almost a year and a half.  CCi denies the remaining allegations in paragraph 118.

118.    CCi denies the allegations in paragraph 118.

119.    CCi admits the allegations in paragraph 119.

17

120.    CCi denies the allegations in paragraph 120.

121.    CCi admits the allegations in paragraph 121.

122.    CCi admits the allegations in paragraph 122.

123.    CCi denies the allegations in paragraph 123.

124.    CCi denies the allegations in paragraph 124.

125.    CCi admits that at some schools, in some instances, if unable to schedule a meeting with a student regarding their in-school loan repayment obligations outside of class time, CCi staff would contact the student during class time to do so.  CCi denies the remaining allegations in paragraph 125.

126.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 126. On that basis, CCi denies the allegations in paragraph 126.

127.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 127. On that basis, CCi denies the allegations in paragraph 127.

128.    CCi denies the allegations in the first sentence of paragraph 128.  CCi lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 128. On that basis, CCi denies the remaining allegations in paragraph 128.

129.    CCi denies the allegations in paragraph 129.

130.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 130. On that basis, CCi denies the allegations in paragraph 130.

131.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 131. On that basis, CCi denies the allegations in paragraph 131.

132.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 132.  On that basis, CCi denies the allegations in paragraph 132.

18

133.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 133.  On that basis, CCi denies the allegations in paragraph 133.

134.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 134.  On that basis, CCi denies the allegations in paragraph 134.

135.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 135.  On that basis, CCi denies the allegations in paragraph 135.

136.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 136.  On that basis, CCi denies the allegations in paragraph 136.

137.    CCi admits that at some schools, in some instances, after other efforts to help students become current on their in-school loan payments failed, CCi staff would remove students' computer access until they developed a plan to do so.  CCi denies the remaining allegations in paragraph 137.

138.    CCi admits that at some schools, in some instances, after other efforts to help students become current on their in-school loan payments failed, CCi staff would limit students' access to the bookstore until they developed a plan to do so.  CCi denies the remaining allegations in paragraph 138.

139.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 139.  On that basis, CCi denies the allegations in paragraph 139.

140.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 140.  On that basis, CCi denies the allegations in paragraph 140.

141.    CCi admits that CCi campuses set goals as to the percentage of private student loans for CCi students that were current (i.e. not delinquent).  CCi denies the remaining allegations in paragraph 141.

142.    CCi admits that the employee bonus plan for certain CCi employees has, among other metrics, incorporated a metric related to the percentage of private student loans for CCi students that were current in the employee's school or division.  CCi denies the remaining allegations in paragraph 142.

143.    CCi admits that an April 5, 2011 email from CCi's Senior Director for Credit Risk Management contains the quoted text.  CCi denies the remaining allegations in paragraph 143.

144.    CCi lacks knowledge or information sufficient to admit or deny the allegations in paragraph 144.  On that basis, CCi denies the allegations in paragraph 144.

145.    Paragraph 145 states a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 145.

146.    CCi denies the allegations in paragraph 146.

147.    CCi denies the allegations in paragraph 147.

148.    CCi denies the allegations in paragraph 148.

149.    CCi denies the allegations in paragraph 149.

## COUNT I

150.    CCi incorporates by reference its responses to the allegations in paragraphs 1-149.

151.    The allegations in paragraph 151 state legal conclusions to which no response is required.

152.    The allegations in paragraph 152 state a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 152.

153.    The allegations in paragraph 153 state a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 153.

154.    The allegations in paragraph 154 state legal conclusions to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 154.

155.    The allegations in paragraph 155 states a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 155.

156.    The allegations in paragraph 156 states a legal conclusion to which no response is required.

157.    The allegations in paragraph 157 state a legal conclusion to which no response is required.

## COUNT II

158.    CCi incorporates by reference its responses to the allegations in paragraphs 1-149.

159.    The allegations in paragraph 159 state legal conclusions to which no response is required.

160.    The allegations in paragraph 160 state legal conclusions to which no response is required. To the extent a response is required, CCi denies the allegations in paragraph 160.

161.    CCi denies the allegations in paragraph 161.

162.    The allegations in paragraph 162 state legal conclusions to which no response is required. To the extent a response is required, CCi denies the allegations in paragraph 162.

163.    The allegations in paragraph 163 state legal conclusions to which no response is required. To the extent a response is required, CCi denies the allegations in paragraph 163.

164.    The allegations in paragraph 164 state a legal conclusion to which no response is required.

165.    The allegations in paragraph 165 state a legal conclusion to which no response is required.

166.    The allegations in paragraph 166 state a legal conclusion to which no response is required.

## COUNT III

167.    CCi incorporates by reference its responses to the allegations in paragraphs 1-149.

168.    The allegations in paragraph 168 state a legal conclusion to which no response is required.

169.    The allegations in 169 state a legal conclusion to which no response is required.

170.    CCi denies the allegations in paragraph 170.

171.    CCi denies the allegations in paragraph 171.

172.    The allegations in paragraph 172 state a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 172.

173.    The allegations in paragraph 173 state a legal conclusion to which no response is required.  To the extent a response is required, CCi denies the allegations in paragraph 173.

174.    The allegations in paragraph 174 state a legal conclusion to which no response is required.

175.    The allegations in paragraph 175 state a legal conclusion to which no response is required.

## COUNT IV

176.    CCi incorporates by reference its responses to the allegations in paragraphs 1-149.

177.    The allegations in paragraph 177 state legal conclusions to which no response is required.

178.    CCi denies the allegations in paragraph 178.

## COUNT V

179.    CCi incorporates by reference its responses to the allegations in paragraphs 1-149.

180.    The allegations in paragraph 180 state legal conclusions to which no response is required.

181.    CCi denies the allegations in paragraph 181.

182.    The allegations in paragraph 182 state a legal conclusion to which no response is required.

**ANSWER TO PRAYER FOR RELIEF**

CCi denies that the Bureau is entitled to any relief against CCi, and CCi requests that the Court dismiss all remaining claims against it with prejudice and order such further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

CCi demands a trial by jury for all issues so triable.

**DEFENSES**

Without assuming any burden of proof, persuasion, or production not otherwise legally assigned to it as to any element of the Bureau's claims, CCi asserts the following affirmative and other defenses:

**FIRST DEFENSE**

The Bureau is an unconstitutional entity; as such, it lacks power to bring this action, and the Court lacks jurisdiction over the matter.

**SECOND DEFENSE**

The CFPA is unconstitutional for vagueness and as applied, and the Bureau's action violates due process because regulated parties lack fair notice of what conduct is prohibited.

**THIRD DEFENSE**

The appointment of the Bureau's director is unconstitutional, and the directives and policies promulgated by him are void as a result.

## FOURTH DEFENSE

CCi is not a "covered person" under the CFPA, 12 U.S.C. § 5481(15)(A)(viii), and as such, the Bureau lacks jurisdictional authority to bring this action.

## FIFTH DEFENSE

CCi is a seller of nonfinancial goods and services, and as such is excluded from the Bureau's enforcement authority under the CFPA, 12 U.S.C. § 5517(a)(2)(A)(i).

## SIXTH DEFENSE

The Bureau's Complaint seeks relief that infringes upon CCi's First Amendment right to advertise and inform consumers about the nature, qualities, and value of its products and services.

## SEVENTH DEFENSE

The Complaint and each claim for relief stated therein fail to allege facts sufficient to state a claim upon which relief may be granted.

## EIGHTH DEFENSE

The Complaint is barred, in whole or in part, by the doctrine of laches, waiver, Estoppel, and/or consent.

## NINTH DEFENSE

CCi made full and accurate disclosures of all information required to be disclosed by law.

## TENTH DEFENSE

The Bureau cannot prove consumer reliance on any of the alleged statements by CCi financial aid staff.

## ELEVENTH DEFENSE

Events that constituted superseding or intervening acts caused or contributed to the cause of the losses and damages alleged in the complaint.

## TWELFTH DEFENSE

All damages and losses alleged in the complaint were solely or partially caused by the actions, delays, or inaction of third parties, not by any action, statement, omission, or inaction of CCi.

## THIRTEENTH DEFENSE

None of CCi's conduct was the proximate cause of any foreseeable or actual damages, injuries, or losses.

## FOURTEENTH DEFENSE

Some or all of the alleged statutory violations are barred by the statute of limitations.

## FIFTEENTH DEFENSE

The Bureau's claims fail to the extent they seek injunctive relief against CCi because there is no reasonable likelihood CCi will repeat any alleged violation.

## SIXTEENTH DEFENSE

CCi is not subject to civil money penalties because it has not violated a law, rule, or final order or condition imposed in writing by the Bureau, nor has it committed a reckless or knowing violation of the same, and any excessive civil money penalties would be a violation of the U.S. Constitution.

## SEVENTEENTH DEFENSE

Some or all of the alleged statutory violations occurred prior to the July 21, 2011 effective date of the CFPA, and may not the basis for a penalty because the CFPA is not retroactive.

*        *        *

CCi has not knowingly and intentionally waived any applicable additional defenses and reserves the right to raise additional defenses as they become known to it through discovery in this matter. CCi further reserves the right to amend its Answer and/or Additional Defenses accordingly and/or delete defenses that it determines are not applicable during the course of subsequent discovery.


Dated: September 11th, 2015                    Respectfully submitted,


                                               /s/ Sean M. Berkowitz
                                               Sean M. Berkowitz (# 6209701)
                                               Latham & Watkins LLP
                                               330 North Wabash Ave., Suite 2800
                                               Chicago, IL 60611
                                               (312) 876-7700
                                               Sean.Berkowitz@lw.com

                                               Peter L. Winik (admission pending)
                                               John S. Cooper (#ILND-GB-9885)
                                               Latham & Watkins LLP
                                               555 Eleventh Street, NW
                                               Suite 1000
                                               Washington, DC 20004-1304
                                               (202) 637-2200 (T)
                                               (202) 637-2201 (F)

                                               *Counsel for Corinthian Colleges Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2015, a copy of the foregoing was
filed electronically and served by the Court's CM/ECF System on all counsel of record.


Respectfully submitted,


/s/ Sean M. Berkowitz
Sean M. Berkowitz (# 6209701)
Latham & Watkins LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
(312) 876-7700
Sean.Berkowitz@lw.com

*Counsel for Corinthian Colleges Inc.*

# Exhibit A

Summary of insights about our prospects

| Who they are | What they need |
|---|---|
| • Low self-esteem, few base hits | • Confident, capable, real adult, role model for kids |
| • Stuck, unable to see and plan well for future | • Someone who can show them how so they can gain independence |
| • Few people in their lives who care about them | • Encouragement, someone who believes in them |
| • Isolated | • Sense of belonging, place where they can succeed |
| • Authenticity rules! | • Don't BS me, tell it like it is |
| • Peers are most credible | • Trust is earned, not automatic |
| • Impatient, want quick solutions | • Can't afford to waste time, need quick solutions |

Demand Generation

www.cci.edu

9