# EXHIBIT A

**TSA and TSA Amendment**

**Execution Version**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "<u>Agreement</u>") is dated as of February 2, 2015 by and between Zenith Education Group, Inc., a Delaware nonprofit corporation ("<u>Purchaser</u>"), and Corinthian Colleges, Inc., a Delaware corporation (collectively with its consolidated subsidiaries, "<u>Corinthian</u>").

## RECITALS

WHEREAS, Corinthian and Purchaser have entered into an Asset Purchase Agreement (as amended, the "<u>APA</u>") dated as of November 19, 2014, whereby Purchaser is purchasing from Corinthian the assets underlying and related to those postsecondary educational institutions that have been issued an Office of Postsecondary Education Identification Number by the U.S. Department of Education (including any main campus and additional locations) and are set forth on <u>Schedule 1</u> (collectively, the "<u>Schools</u>"), as well as certain of the assets underlying the administrative, central office support and services necessary to operate the Schools;

WHEREAS, for Corinthian to continue to operate its post-secondary educational institutions that are not Schools being purchased by Purchaser (the "<u>Remaining Institutions</u>"), and to provide for future purchasers from Corinthian of those Remaining Institutions who operate the Remaining Institutions as postsecondary educational institutions to be able to do so following any transaction where the Remaining Institutions are sold, Corinthian wishes to obtain and Purchaser wishes to provide certain support services for a limited period of time after the close of the transaction (the "<u>Closing</u>" or "<u>Closing Date</u>") under the APA pursuant to this Agreement; and

WHEREAS, pursuant to the APA, Purchaser has agreed to provide and Corinthian has agreed to be provided (on behalf of itself and its successors in interest that operate one or more of the Remaining Schools) with these services on terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the above premises and the mutual covenants contained herein, it is agreed by and between the parties as follows:

## ARTICLE I
## FEES AND TERM

Section 1.01.    <u>Term and Termination.</u>

(a)    The term of this Agreement (the "<u>Term</u>") shall commence on the Closing Date and shall expire upon the first to occur of (i) the date that is twelve (12) months after the Closing Date, with the option of month-to-month renewals (for up to six months total) with both parties' consent; or (ii) this Agreement is terminated in accordance with <u>Section 1.01(b)</u>. With respect to each Remaining Institution, Purchaser's obligation to provide any particular portion of the Services (as defined in <u>Section 2.01</u> below) shall automatically terminate upon the first to occur of the following events: (i) the Remaining Institution has transitioned such portion of the Services to one or more alternative vendors; or (ii) the Remaining Institution has completed its "teach out" program and ceased delivering services to students. In addition, with respect to each Remaining Institution that is sold by Corinthian to a third party that operates it as a postsecondary educational institution, Purchaser's obligation to provide any particular portion of the Services shall automatically terminate on the first to occur of the following events: (i) the eighteen (18) month anniversary of the Closing Date or (ii) the nine (9) month anniversary of the date of the closing of the acquisition of such Remaining Institution(s) from Corinthian. Notwithstanding anything to the

contrary in this Agreement, including any renewal pursuant to this Section 1.01(a), Purchaser shall not be obligated to provide any Services after its right to do so under existing agreement(s) have expired except as reasonably negotiated between Purchaser, Corinthian and the applicable third party(ies). For example, absent subsequent renegotiations between and among the applicable parties with Campus Management Corp. ("CMC"), Purchaser is not permitted to provide Corinthian or any Remaining Institution access to CampusVue beyond February 2, 2016, and if the purchaser of any Remaining Institution does not enter into a license agreement directly with CMC in connection with the purchase of CampusVue licenses simultaneously with the purchase of the Remaining Institution(s), Purchaser must terminate access to CampusVue for such Remaining Institution(s) no later than three (3) months after the applicable closing date.

(b)    (i) Either Corinthian or Purchaser may terminate this Agreement immediately by written notice to the other if the other materially breaches any of its obligations hereunder and the breach (other than a breach specified in clause 1.01(b)(ii)) remains uncured for thirty (30) days after receipt of written notice of the existence of such breach, and (ii) Purchaser may immediately terminate this Agreement by written notice to Corinthian upon the failure of Corinthian to replenish the Services Advance Account (as defined below) when required to do so pursuant to Section 1.02(g) if such failure reduces the balance of the Services Advance Account below an amount equal to $750,000 or, if less, seventy-five percent (75%) of the amount required to be in the Services Advance Account pursuant to Section 1.02(g) (including as such amount may be reduced pursuant to Section 1.02(g)(iii)) or to replenish the Marketing Services Advance Account (as defined below) to the required level when required to do so pursuant to Section 4.03(b) or if (after five Business Days written notice) Corinthian fails to pay any other amount, if any, when due under this Agreement. Upon any such termination, and in order for such termination notice to be effective, Purchaser shall promptly pay to Corinthian, by wire transfer of immediately available funds, any residual funds in the Services Advance Account net of any amounts owed to Purchaser for services rendered through the date of termination. Notwithstanding any termination of Services by Purchaser pursuant to this Agreement, Purchaser shall continue to make all payments to Corinthian that are payable by it hereunder, and Corinthian shall continue to be responsible to Purchaser for amounts, if any, that may be or become payable by it hereunder.

Section 1.02.    Price and Payment for Services.

(a)    As consideration for the Services (defined in Section 2.01 below) to be provided to Corinthian by Purchaser under the terms of this Agreement, Corinthian shall reimburse Purchaser for all expenses (other than Purchaser's share of the expenses described in Section 1.03 incurred in connection therewith), whether or not described specifically in Exhibit A or Exhibit B, as applicable, in the form of a services fee (the "Services Fee") as specified herein. Purchaser shall invoice Corinthian for the Services at Purchaser's actual cost to provide the Services as set forth in Exhibit A or Exhibit B, as applicable (including internal labor costs, benefits and overhead) plus five percent (5%) for the first six months and ten percent (10%) for the next six months, plus an additional one percent (1%) for each one month renewal pursuant to Section 1.01(a), plus (i) any bona fide increases to Purchaser in the cost of services from its vendors, servicers, or partners that take effect during the Term; and (ii) all reasonable out-of-pocket expenses (other than Purchaser's share of any expenses pursuant to Section 1.03) associated with delivery of the Services (e.g., travel, telecommunications, printing costs). Except as otherwise provided in this Section 1.02, not more frequently than weekly during the Term, Purchaser shall deliver (via electronic mail or post) a written invoice for Services rendered over the prior one (1) week period, which Corinthian shall pay as set forth in Section 1.02(g). With respect to any Services provided hereunder that are not reflected in the 2015 budget or the financial statements delivered by Corinthian to Purchaser in connection with the APA, the parties agree that they will make their relevant subject matter experts available to meet and confer and mutually agree upon a reasonable implementation schedule, fee rates and

any other applicable costs related to such Service, and the parties agree to jointly review and monitor the implementation and costs incurred with respect to such Service as it is provided.

(b)    Intentionally Omitted.

(c)    To the extent that the Services give rise to fees, taxes or any other costs to third parties (including without limitation any hosting fees, but excluding Purchaser's share of any expenses pursuant to Section 1.03), Corinthian shall pay such costs directly, where possible, unless Purchaser's contractual obligations, or concerns, require payment via the Purchaser, except as set forth in Article IV with respect to third party fees, costs and expenses for Exclusive Marketing Services and Cooperative Marketing Services. In no event shall any third party costs in connection with the Services (other than any expenses pursuant to Section 1.03, which shall be paid by Corinthian but for Purchaser's share of them) be at Purchaser's expense, and Purchaser makes no representation or warranty about what any such third party expenses may be during the Term.

(d)    Corinthian and Purchaser shall each pay a late payment charge equal to two percent (2%) per month on all amounts due hereunder by one party to the other but not received on or before the due date.

(e)    During the Term, Corinthian shall continue to deliver to Purchaser, on a weekly basis, updated 13-week cash flow projections.

(f)    During the Term, Corinthian shall, and shall cause its officers, directors, employees, and agents to, provide to Purchaser, upon Purchaser's request, any financial information reasonably related to Purchaser's interest in assuring payment by Corinthian of Services Fees when due and provide to Purchaser copies of any correspondence with any governmental agency that might reasonably be expected to materially adversely affect Corinthian's ability to make payments required hereunder.

(g)    Concurrently with the execution of this Agreement, Corinthian has paid to Purchaser $1.0 million (as adjusted from time to time, the "Services Advance Account").

(i)    Other than with respect to Cooperative Marketing Expenses paid out of the Marketing Services Advance Account, upon Purchaser's issuance to Corinthian of an invoice for payment for Services or any other amounts payable by Corinthian to Purchaser under this Agreement, Purchaser shall debit the Services Advance Account for the amount due under such invoice. Within seven (7) days after that issuance, Corinthian shall pay to Purchaser for inclusion in the Services Advance Account the full amount debited. Any overpayments or underpayments with respect to Services Fees incurred shall be reconciled in the calendar month following the month in which such services were actually provided. Any overpayment shall be credited to the Services Advance Account and any underpayment shall be paid by Corinthian to Purchaser by debiting the Services Advance Account and replenishing it within seven (7) days. Any amounts remaining in the Services Advance Account following a termination of this Agreement and a final reconciliation of Services Fees and other amounts payable to Purchaser with payments actually made will be remitted to Corinthian.

(ii)    Commencing with the fourth full month after the Closing Date, the amount of the Services Advance Account shall be adjusted monthly so as to be the amount that is equal to 75% of the average net monthly aggregate Services Fees payable hereunder for the two preceding months.

(h)    The amount of the Services Fees and the Services Advance Account shall be reduced based on good faith negotiations between Purchaser and Corinthian to reflect any cancellation of services pursuant to Section 2.02. The parties acknowledge that the amounts reflected for particular services in

3

Exhibits A and B are intended as guidelines only and do not take into account fixed costs that may not be reduced in the event of a termination of any particular service. Thus, while the scheduled amounts may be taken into account as guidelines in any negotiation, they shall not be determinative.

(i)     If, in connection with the sale by Corinthian of any Remaining Institution(s), Corinthian enters into (or has entered into) a transition services agreement pursuant to which Purchaser becomes obligated to provide transition services at prices below those required to be paid by Corinthian hereunder, then the positive difference between the amounts paid by the purchaser of such Remaining Institution(s) and the amounts that would have been payable by Corinthian for those same services shall be included as Services Fees payable by Corinthian hereunder.

Section 1.03.    Contract Expenses.

(a)     Promptly following the Closing, Corinthian and Purchaser shall cooperate to obtain:

(i)     to the extent required by the relevant agreement, the consent of each counter-party to each agreement assigned by Corinthian to Purchaser under the APA that grants a license to software that is reasonably necessary for Purchaser to perform the Services hereunder (each such agreement, a "Required Agreement"),

(ii)     any amendments necessary to the Required Agreements to authorize Purchaser to use the relevant software to provide the Services (all costs and expenses that are payable to the applicable third party licensor associated with obtaining the consents and amendments described in this subsection (i) and (ii), "Contract Expenses"), and

(iii)     with respect to the software that is the subject of each Required Agreement, a license to Corinthian for the benefit of the Remaining Institutions, which license provides to Corinthian and the Remaining Institutions rights and benefits equivalent to those enjoyed by Corinthian under such Required Agreement (all costs and expenses that are payable to the applicable third party licensor associated with obtaining such licenses, "Replacement License Expenses").

(iv)     Subject to the limitations of Sections 1.03(b) and 1.03(c), Purchaser and Corinthian shall share equally the Contract Expenses and the Replacement License Expenses. To effect the foregoing, each of Purchaser and Corinthian shall, upon request, promptly reimburse the other for 50% of all Contract Expenses or Replacement License Expenses paid by the other.

(b)     During the Term, Purchaser and Corinthian shall share equally the following amounts to the extent paid to CMC: (i) all new or replacement license fees with respect to any purchasers of the Remaining Institutions, provided that Purchaser's obligation pursuant to this clause (i) shall not exceed $900,000 in the aggregate; (ii) all service bureau fees in connection with Purchaser's operation of CMC's campus management software for the benefit of Corinthian or the Remaining Institutions, provided that Purchaser's obligation pursuant to this clause (ii) shall not exceed $350,000 in the aggregate; and (iii) all support and maintenance fees in connection with Purchaser's operation of CMC's campus management software for the benefit of Corinthian or the Remaining Institutions. To effect the foregoing, each of Purchaser and Corinthian shall, upon request, promptly reimburse the other for the amounts paid by the other pursuant to the preceding sentence.

(c)     Notwithstanding the foregoing, the aggregate amount that Purchaser shall be required to pay in respect of Contract Expenses, Replacement License Expenses, and amounts payable to CMC or otherwise in respect of support and maintenance fees referred to in Sections 1.03(b) and (c) shall not exceed $2,000,000, and Corinthian and the purchasers of the Remaining Institutions shall be wholly

responsible for the timely payment of all other such amounts. At Purchaser's election, such amounts may be invoiced as Services Fees under this Agreement or separately invoiced to Corinthian.

Section 1.04.    Colorado Springs Expenses.

(a)    From and after the Closing and through and including December 31, 2015, Purchaser shall reimburse Corinthian for all amounts owed by Corinthian to the landlord as such amounts become due pursuant to the lease pertaining to the property (the "Garden of the Gods Center") located at 1575 Garden of the Gods Road, Colorado Springs, Colorado 80907 (the "Garden of the Gods Lease"), provided, however, that any amounts due pursuant to this Section 1.04(a) will be reduced by any amounts that Corinthian actually receives from any subtenant of the Garden of the Gods Lease during such period.

(b)    From and after the Closing and through and including February 28, 2015, Purchaser shall reimburse Corinthian for all amounts that Corinthian actually pays with respect to (i) operating expenses at the Garden of the Gods Center, and (ii) the employees at the Garden of the Gods Center, including but not limited to payroll expenses and benefits-related expenses.

(c)    Not more frequently than weekly during the applicable portion of the Term, Corinthian shall deliver (via electronic mail or post) a written invoice for actual amounts due from Purchaser to Corinthian pursuant to this Section 1.04. Payment of such invoice shall be made by offsetting against amounts owing from Corinthian to Purchaser pursuant to this Agreement.

Section 1.05.    Tempe Expenses.

(a)    From and after the Closing and until the first to occur of (i) a subsequent Closing that includes the property located at 8160 South Hardy Drive, Tempe, Arizona 85284 (the "Tempe Location"), (ii) the date on which Purchaser ceases to use the Tempe Location, and (iii) the date on which Corinthian ceases to occupy the Tempe Location and Purchaser assumes Corinthian's obligations under the lease relating to the Tempe Location, Purchaser shall reimburse Corinthian for a portion of the amounts owed by Corinthian to the landlord of the Tempe Location and for other expenses relating to the Tempe Location, in the amount of $89,000 with respect to February 2015 and $72,000 per month thereafter (to be pro rated for partial months as applicable).

(b)    Payment of the amount described in Section 1.05(a) shall be made by offsetting against amounts owing from Corinthian to Purchaser pursuant to this Agreement.

Section 1.06.    HPFS and Similar Expenses.

(a)    In connection with the Closing, each of Purchaser and Corinthian will enter into a new separate lease agreement with Hewlett-Packard Financial Services Company ("HPFS") relating to the lease of certain computer equipment, including laptops, from HPFS. Corinthian's lease agreement will include computer equipment used at or in connection with the Teach Out Schools and the schools relating to Section 1.13(b) of the APA (the "Illinois Schools"), among other schools. From and after the Closing and until the expiration of the applicable Teach Out Sublease or Illinois Sublease, Purchaser shall reimburse Corinthian for the portion of the amounts owed by Corinthian to HPFS for computer equipment used at or in connection with the Teach Out Schools and the Illinois Schools.

(b)    Not more frequently than weekly during the applicable portion of the Term, Corinthian shall deliver (via electronic mail or post) a written invoice for actual amounts due from Purchaser to Corinthian pursuant to this Section 1.06. Payment of such invoice shall be made by offsetting against amounts owing from Corinthian to Purchaser pursuant to this Agreement.

(c)    To the extent there is any other equipment, personal property or other property located at any Teach Out School or Illinois School that is held by Corinthian under a lease, Corinthian and Purchaser shall enter into arrangements substantially identical to those set forth above pursuant to which Purchaser shall reimburse Corinthian for amounts owed by Corinthian to the primary lessor for property used at or in connection with the Teach Out Schools and the Illinois Schools during the time that such Teach Out School or Illinois School is managed by Purchaser.

Section 1.07.    Cooperation. Purchaser and Corinthian shall cooperate and use their respective reasonable best efforts, at Purchaser's expense, to assert any claims that Corinthian may have under the Garden of the Gods Lease or the primary lease with respect to the Tempe Location, if Purchaser reasonably concludes that the assertion of such a claim could appreciably reduce the amounts payable by Purchaser pursuant to Sections 1.04 and 1.05.

ARTICLE II
SERVICES

Section 2.01.    Services. Purchaser agrees to provide the transitional services set forth on Exhibit A and Exhibit B hereto (subject to such modification or adjustment as may be mutually agreed upon in writing by the parties) (the "Services") to Corinthian, or to any successor in interest to Corinthian, in each case with respect to the Remaining Institutions during the Term, or such shorter period of time as set forth on Exhibit A or Exhibit B, as set forth in Section 1.01, as set forth in Article IV or as may be mutually agreed upon in a writing signed by the parties. Notwithstanding anything to the contrary in this Agreement or in Exhibit A or Exhibit B, Purchaser shall not have any obligation to provide any Service that was not being provided to Corinthian as of the Closing Date by personnel, software and equipment (or under third party service agreements) included in the assets purchased by Purchaser under the APA.

Section 2.02.    Cancellation of Services. Except as set forth in Section 4.02 with respect to Marketing Services, Corinthian may elect, by providing prior written notice to Purchaser at least thirty (30) days if possible (but in all cases not fewer than fifteen (15) Business Days notice) prior to the date on which a service is to be terminated, to opt out of receiving all or a portion of the Services, if and to the extent such portion may be terminated or segregated from remaining Services, or from other services that Purchaser is contractually obligated to provide, without undue expense or burden to Purchaser, as determined in the good faith judgment of Purchaser. Corinthian acknowledges and agrees that many of the Services are interconnected to such a degree that it may not be feasible or possible to discontinue certain items of the Services while continuing other items of the Services. Upon receipt of such notice from Corinthian, and to the extent Purchaser shall discontinue the portion(s) of the Services as requested by Corinthian within a commercially reasonable time, Corinthian shall not be charged any Services Fee for the discontinued Services that accrue after their discontinuation by Purchaser. Corinthian shall be responsible for any costs associated with such discontinuation or termination of any Services, including licensing fees, third party termination or buyout fees, or other commercially reasonable discontinuation costs. If requested in writing by Corinthian, Purchaser shall, at Corinthian's expense, preserve data, backup tapes, or any documentation related to discontinued Services or, at Purchaser's election, provide to Corinthian all such data, backup tapes, or any documentation related to discontinued Services.

Section 2.03.    No Exclusivity. Corinthian acknowledges that Purchaser shall be concurrently providing similar services to the schools owned or operated by Purchaser or other third parties during the Term, and Corinthian shall have no exclusive right or covenant not to compete as between Purchaser and Corinthian.

Section 2.04.    Service Coordinators. Each of Corinthian and Purchaser shall nominate a representative to act as the primary contact person with respect to the provision of the Services (other than

6

the Marketing Services) and the Marketing Services (as defined below) (each such person, a "Service Coordinator"). The Service Coordinators shall be managerial-level employees of Corinthian and Purchaser, as applicable. The initial Service Coordinators shall be Ken Ord for Corinthian and Mike Lanouette with respect to Services (other than Marketing Services) and Josh Susser with respect to Marketing Services for Purchaser, and each of their respective phone numbers, facsimile numbers and email addresses is set forth on Schedule 2 attached hereto. Each of Corinthian and Purchaser may, in its sole discretion, change its Service Coordinator from time to time by providing written notice to the other party of such change and the relevant contact information for the new Service Coordinator at least three (3) Business Day prior to such change taking effect. Unless Corinthian and Purchaser otherwise agree in writing, all communications relating to this Agreement or to the Services shall be directed to the Service Coordinators in accordance with Section 6.07 hereof.

Section 2.05.    Subcontractors.  Purchaser may subcontract any of its obligations under this Agreement to the third-party service providers utilized by Corinthian as of the Closing Date or to such other third-party service providers as Corinthian may consent to in writing, such consent not to be unreasonably withheld.

Section 2.06.    IT Security.  During the Term, Corinthian may have access to Purchaser's information technology systems and infrastructure for applications (the "Purchaser IT Systems"), which access shall be provided through secured controlled processes determined by Purchaser in consultation with Corinthian. In connection with any use of and access to the Purchaser IT Systems by Corinthian, Corinthian shall comply at all times with Purchaser's reasonable network security and use policies, as provided by Purchaser. Corinthian shall not, through reverse engineering or any other technique or means, attempt to access Purchaser source code for the Purchaser IT Systems and will use any application software or system provided by Purchaser and related to the Services solely for their intended use. Corinthian shall not access or attempt to access any non-Corinthian data that may be accessible via any Purchaser IT Systems. Corinthian shall, and shall cause its personnel to, comply with the terms and conditions of all third party contracts with respect to software and services provided by third parties to Purchaser to facilitate delivery of the Services.

Section 2.07.    Access Restrictions.  Except as expressly agreed in writing by Purchaser, Corinthian shall only use the Services on behalf of itself and its affiliates, and shall not: (a) provide access to any Purchaser systems to any third parties; (b) utilize the Services in service bureau; or (c) modify, adapt, create derivative works of, reverse engineer, decompile, disassemble or otherwise attempt to discover the source code of software or other materials utilized by Purchaser to deliver the Services.

ARTICLE III
THIRD PARTY SERVICER PROVISIONS

Section 3.01.    Acknowledgment of Department Regulations.  Purchaser and Corinthian acknowledge that certain aspects of the Services related to the administration of any Remaining Institution's participation in the federal student financial assistance programs authorized by Title IV of the Higher Education Act (the "HEA") may be subject to U.S. Department of Education (the "Department") regulations set forth at 34 C.F.R. § 668.25(c), which requirements are applicable to educational institutions and to any "Third-Party Servicer," as defined therein.

Section 3.02.    Third Party Servicer Requirements.  To the extent that certain aspects of the Services may cause Purchaser to be a Third-Party Servicer subject to the requirements of 34 C.F.R. § 668.25, Purchaser agrees, solely with respect to its provision of such Services:

(a)    to comply in all material respects with all statutory provisions of or applicable to Title IV of the HEA, all regulatory provisions prescribed under that statutory authority, and all special arrangements, agreements, limitations, suspensions and terminations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement to use any funds that Purchaser administers under any Title IV, HEA financial assistance program (a "Title IV Program") and any interest or other earnings thereon solely for the purposes specified in and in accordance with that program;

(b)    to refer to the Office of Inspector General of the Department for investigation of any information indicating there is reasonable cause to believe that Corinthian or the Remaining Institutions might have engaged in fraud or other criminal misconduct in connection with the Remaining Institution's administration of any Title IV Program or an applicant for Title IV Program assistance might have engaged in fraud or other criminal misconduct in connection with his or her application, including but not limited to any:

    (i)    false claims by the Remaining Institution for Title IV Program assistance;

    (ii)    false claims of independent student status;

    (iii)    false claims of citizenship;

    (iv)    use of false identities;

    (v)    forgery of signatures or certifications;

    (vi)    false statements of income; and

    (vii)    payment of any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid to any person or entity engaged in any student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds.

(c)    subject to Section 5.02, to be jointly and severally liable with the Remaining Institutions to the Department for any violation by Purchaser, acting as a Third Party Servicer, of any statutory provision of or applicable to Title IV of the HEA, any regulatory provision prescribed under that statutory authority and any applicable special arrangement, agreement or limitation entered into under the authority of statutes applicable to Title IV of the HEA;

(d)    solely to the extent that Purchaser, acting as a Third Party Servicer, disburses funds (including funds received under the Title IV Programs) to a student enrolled at the Remaining Institutions or delivers Federal Stafford Loan (as defined in Title IV of the HEA) proceeds to a student enrolled at the Remaining Institutions, to:

    (i)    confirm the eligibility of the student before making that disbursement or delivering those proceeds, including any applicable information contained in the records required under 34 C.F.R. § 668.24; and

    (ii)    calculate and return any unearned Title IV Program funds to the Title IV Program accounts and the student's lender, as appropriate, in accordance with the provisions of 34 C.F.R. §§ 668.21 and 668.22 and applicable program regulations.

8

(e)    if Corinthian or Purchaser terminates this Agreement, or if Purchaser acting as a Third-Party Servicer for the Remaining Institutions files a petition under the Bankruptcy Code, to return to Corinthian or to the Remaining Institutions all:

(i)    records in the servicer's possession pertaining to the Remaining Institutions' participation in the program or programs for which services are no longer provided; and

(ii)    funds, including Title IV Program funds, received from or on behalf of the Remaining Institutions or the Remaining Institutions' students, for the purposes of the program or programs for which services are no longer provided.

Section 3.03.    Further Agreements.  Notwithstanding the provisions of Section 3.02 of this Agreement, Corinthian and Purchaser further agree as follows:

(a)    Only the Department may enforce the provisions of Section 3.02.

(b)    The parties to this Agreement shall not be liable to one another for acts based upon or as the result of actions undertaken that are required in order to comply with the Department regulations applicable to a Third Party Servicer.

(c)    The requirements set forth in Section 3.02 apply to Purchaser solely to the extent that such compliance is (i) required of, and applicable to, Purchaser by applicable law and regulation; and (ii) applicable to Purchaser based upon services actually performed by Purchaser pursuant to this Agreement.

ARTICLE IV
MARKETING SERVICES

Section 4.01.    Marketing Services.

(a)    The Services set forth on Exhibit B hereto (subject to such modification or adjustment as may be mutually agreed upon in writing by the parties) are referred to herein as the "Marketing Services."

(b)    The Marketing Services provided by or payable to third parties, such as vendors, servicers or partners, consist of two categories: (i) those services for which the benefits inure exclusively to Corinthian or the Remaining Institutions and not to Purchaser or the Schools (the "Exclusive Marketing Services"), and (ii) all other marketing services (the "Cooperative Marketing Services").

Section 4.02.    Suspension or Cancellation of Marketing Services.  Corinthian may elect, by providing at least five (5) days prior written notice to Purchaser, to opt out of receiving all or a portion of the Marketing Services that are provided by third parties to the extent such Marketing Services may be suspended or cancelled without undue expense or burden to Purchaser.  Corinthian may elect, by providing at least five (5) days prior written notice to Purchaser, to resume receiving all or a portion of any Marketing Services suspended or cancelled pursuant to the preceding sentence if and to the extent such portion of the Marketing Services may be resumed without undue expense or burden to Purchaser, as determined in the good faith judgment of Purchaser.

Section 4.03.    Price and Payment for Marketing Services.

(a)    With respect to the Exclusive Marketing Services, Purchaser shall direct the applicable vendors to invoice Corinthian directly for such services and Purchaser shall have no obligation to provide

or arrange for any Exclusive Marketing Services if the applicable vendor would require Purchaser to incur any liability in respect of those Services.

(b)    With respect to the third party fees, costs and expenses payable with respect to the Cooperative Marketing Services (the "Cooperative Marketing Expenses"):

(i)    Concurrently with the execution of this Agreement, Corinthian has paid to Purchaser $1.125 million (as adjusted from time to time, the "Marketing Services Advance Account"), which represents 75% of the Cooperative Marketing Services Forecast (as defined below) for the calendar month of February.

(ii)    On or prior to the 15th day of each calendar month, Purchaser shall provide to Corinthian a forecast of Corinthian's portion of the costs related to the Cooperative Marketing Expenses for the following calendar month, which will be based on the estimated CPL (defined in Section 4.03(b)(vi), and the number of leads to be generated for Corinthian for the following calendar month estimated by Purchaser in good faith based on historical lead generation (the "Cooperative Marketing Services Forecast"). The Cooperative Marketing Services Forecast shall be subject to Corinthian's approval, which may not be unreasonably withheld, and Corinthian may suspend or cancel any services reflected on the Cooperative Marketing Services Forecast pursuant to Section 4.02.

(iii)    After deduction for any Cooperative Marketing Services that Corinthian elects to suspend or cancel, Corinthian shall pay to Purchaser on or prior to the first Business Day of each calendar month for inclusion in the Marketing Services Advance Account such amount as may be necessary so that the amount in the Marketing Services Advance Account is equal to at least 75% of the Cooperative Marketing Services Forecast for that calendar month.

(iv)    Not more frequently than weekly during the Term, Purchaser shall deliver (via electronic mail or post) a written invoice for the Cooperative Marketing Expenses for the Cooperative Marketing Services performed during the prior week, reflecting the number of leads and the estimated CPL (defined in Section 4.03(b)(vi) below). Payment for those services, fees, costs and expenses shall be made by debiting the Marketing Services Advance Account upon the issuance of the invoice. Within seven (7) days after that issuance, Corinthian shall pay to Purchaser for inclusion in the Marketing Services Advance Account the full amount debited. For purposes of clarity, for any invoice period that includes days in more than one calendar month, the estimated CPL for one calendar month shall apply to the days in that calendar month, and the estimated CPL for the other calendar month shall apply to the days in that calendar month. If, notwithstanding Section 4.03(a), Purchaser receives a bill for any third party fees, costs or expenses for Exclusive Marketing Services, Purchaser shall direct such third party to remit such bill to Corinthian. If such third party refuses to do so, Purchaser may invoice Corinthian for such amount to the extent Purchaser is required to pay it by such third party.

(v)    Any overpayments or underpayments with respect to Services Fees for Cooperative Marketing Expenses incurred shall be reconciled in the calendar month following the month in which such services were actually provided. The Cooperative Marketing Expenses shall be reconciled to the actual leads and actual CPL as soon as reasonably practicable following the end of the calendar month in which such services were actually provided. Any overpayment shall be credited to the Marketing Services Advance Account and any underpayment shall be paid by Corinthian to Purchaser by debiting the Marketing Services Advance Account and replenishing it within seven (7) days. Any amounts remaining in the Marketing Services Advance Account following a termination of this Agreement and a final reconciliation of fees for Marketing Services and other amounts payable to Purchaser with payments actually made will be remitted to Corinthian.

(vi)    Cost per lead ("CPL") shall be calculated consistent with Corinthian's historical practice and shall be an equal amount for each of Corinthian and Purchaser for comparable leads. If requested by Corinthian, Purchaser shall provide to Corinthian an accounting of CPL calculations for the Marketing Services. In addition, upon reasonable advance notice from Corinthian, Purchaser shall (and shall cause its Affiliates and Representatives (as each term is defined in the APA) to) allow Corinthian and its Representatives, during Purchaser's normal business hours and without unreasonable interference with the operation of Purchaser's business, full access to, and the right to inspect, all Books and Records (as such term is defined in the APA) and such materials and information about the calculation of CPL as Corinthian may reasonably request, and (as applicable) to allow Corinthian and its Representatives to make copies thereof, all of which shall be provided in an organized fashion and so as to facilitate and orderly review; provided, however, that the foregoing shall not unreasonably disrupt the normal operations of Purchaser or its business.

(vii)    Notwithstanding any other provision of this Agreement, Purchaser shall have no obligation to return amounts in the Marketing Services Advance Account or to incur liabilities for payment for Cooperative Marketing Services, if the aggregate payables for those services would exceed the balance of the Marketing Services Advance Account as of the date of incurrence or, as applicable, return.

## ARTICLE V
## LIMITATION OF LIABILITY AND INDEMNIFICATION

Section 5.01.    Limitation of Liability; Disclaimer.

(a)    Exclusion of Damages.  In no event shall Purchaser be liable to Corinthian OR ANY THIRD PARTY for any indirect, incidental, consequential, special, exemplary or punitive damages (including loss of use, lost profits or loss of goodwill) arising out of or in connection with the Agreement, the services or other materials hereunder, whether such liability arises from any claim based upon contract, warranty, tort (including negligence), product liability or otherwise and whether or not PURCHASER has been advised of the possibility of such loss or damage. Some jurisdictions do not allow the exclusion or limitation of warranties or incidental or consequential damages, so that the above limitations or exclusions may not apply. In such jurisdictions, Purchaser's liability will be limited to the greatest extent permitted by applicable law.

(b)    Aggregate Liability.  Under this Agreement, Purchaser's total aggregate liability to Corinthian arising from all causes of action and all theories of liability shall (A) be limited to those actual and direct damages which are reasonably incurred by Corinthian and (B) not exceed the lesser of (i) $3,000,000 and (iii) three times the average historical monthly fees paid by Corinthian to Purchaser pursuant to the Agreement.

(c)    DISCLAIMERS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY STATED HEREIN, PURCHASER DISCLAIMS ALL EXPRESS AND IMPLIED REPRESENTATIONS AND WARRANTIES IN CONNECTION WITH THE SERVICES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. Corinthian acknowledges that in providing the Services, (i) Purchaser will necessarily rely upon information, instructions and assistance it obtains from Corinthian, financial and credit institutions, technology providers and other third parties, and (ii) that the Services will be performed for Purchaser by resources and vendors with which Purchaser had no experience or control over prior to the Closing Date. Accordingly, Purchaser's sole liability and

Corinthian's sole remedy for Service performance issues shall be that Purchaser shall use commercially reasonable efforts to re-perform the applicable Service or, as applicable, to cause the applicable third party vendor to address the issue.

Section 5.02.    Indemnity.

(a)    Corinthian and each of its consolidated subsidiaries shall indemnify, defend and hold Purchaser and each of its officers, directors, employees, agents, representatives, members and affiliates harmless against any and all claims, liabilities, damages, losses, costs, expenses (including, but not limited to, settlements, judgments, court costs and reasonable attorneys' fees) and any loss or damage of any nature whatsoever ("Losses") arising out of or relating to the provision of the Services by Purchaser, which are caused by or arise in connection with: (i) any content and instructions provided by Corinthian for use in connection with marketing and lead generation Services; (ii) any violation of any law or rule of any governmental or accrediting body by Corinthian or any procedure, process or protocol maintained or followed by Corinthian prior to the Closing under the Purchase Agreement and continued by Purchaser, solely in its role as a service provider under this Agreement to Corinthian with respect to the Remaining Institutions or to any purchaser of any Remaining Institutions, following the Closing that results in any such violation during the 120 day period immediately following the date of this Agreement; (iii) any claim made by any third party relating to the regulations referred to in Section 3.02 except for Losses that result from the gross negligence, violations of law, breaches of confidentiality or willful misconduct of Purchaser or its employees, agents or representatives as a direct result of Purchaser's violation of Section 3.02, subject to Section 5.02(b); and (iv) any breach of this Agreement by Corinthian; provided, however, that Corinthian shall not be liable pursuant to this Section 5.02 for Losses that result from the gross negligence, violations of law, breaches of confidentiality or willful misconduct of Purchaser or its employees, agents or representatives.

(b)    Purchaser shall indemnify, defend and hold Corinthian and each of its officers, directors, employees, agents, representatives, members and affiliates harmless against any and all Losses: (i) that result from the gross negligence, violations of law, breaches of confidentiality or willful misconduct of Purchaser or its employees, agents or representatives; (ii) incurred by Corinthian as a direct result of Purchaser's violation of Section 3.02; or (iii) that result from any breach of this Agreement by Purchaser; provided, however, that Purchaser shall have no obligation to indemnify, defend, or hold harmless Corinthian or any other Person against any Losses arising from a procedure, policy, or protocol maintained or followed by Corinthian prior to the Closing and continued by Purchaser during the 120-day period immediately following the date of this Agreement.

(c)    Any claim for indemnity under this Section 5.02 must be made by written notice to the other party within one (1) year after the discovery thereof.

Section 5.03.    Indemnification Procedures.

(a)    If any person seeks indemnification with respect to any claim, the person seeking indemnity (the "Indemnified Person") will notify the party from whom indemnity is sought (the "Indemnifying Person") as promptly as practicable about such claim.

(b)    The Indemnifying Person will have an opportunity to defend third-party claims unless (i) the claim is asserted by a governmental agency, (ii) the claim seeks an injunction or other equitable relief against the Indemnified Person, or (iii) the Indemnifying Person fails to promptly, diligently and in good faith defend the claim as determined in the Indemnified Person's reasonable discretion; provided that if the Indemnifying Person is precluded from defending a third-party claim under this Section 5.03, the Indemnified Person shall defend such third-party claim promptly, diligently and in good faith.

12

(c)      Notwithstanding the Indemnifying Person's right to defend certain third-party claims, the Indemnifying Person will not enter into any settlement with respect to any claim arising hereunder without the prior written consent of the Indemnified Person, not to be unreasonably withheld.

(d)      The Indemnified Person will have the right at its sole cost and expense to employ its own counsel and participate in the defense of any claims (whether or not the Indemnifying Person is defending such claim).

(e)      If the Indemnifying Person does not defend a claim for any reason, or fails to timely (within 30 days after the Indemnified Person gives notice of a claim to the Indemnifying Person) or sufficiently defend a claim in any case for which it is liable under this Agreement, the Indemnifying Person will repay the Indemnified Person for any and all reasonable expenses (including reasonable legal fees) incurred in connection with defending such claim.

(f)      The parties will extend reasonable cooperation to each other in connection with the defense of any claim for which indemnification is sought.

(g)      Each Indemnifying Person's indemnification obligations in this Agreement will survive the termination or expiration of this Agreement with respect to all claims based on events that occurred prior to the termination or expiration of this Agreement, provided, however, that no Indemnifying Person shall have any indemnification obligations with respect to a Remaining Institution for claims based on events occurring after the termination of Services at that Remaining Institution.

ARTICLE VI
MISCELLANEOUS

Section 6.01.      Defined Terms.  All defined terms used in this Agreement that are not defined in this Agreement shall be as defined in the APA.

Section 6.02.      Relationship of the Parties.  It is expressly understood and agreed that this Agreement shall not be construed as creating a joint venture, partnership, agency, employment relationship or other association within the meaning of the common law or under the laws of the state in which either party is incorporated, organized, or conducting business.  It is the intent of the parties that with respect to performing the Services hereunder, Purchaser is an independent contractor, and shall provide the Services in accordance with the reasonable instructions provided by authorized representatives of Purchaser, subject to the provisions of this Agreement.  Payments for the Services rendered under this Agreement shall be solely as set forth in Article I, and the parties shall not engage in the sharing of any revenues or profits from the operation of the Remaining Institutions after the Closing Date.  Purchaser does not have the right or authority to enter into any contract, warranty, guarantee or other undertaking in the name or for the account of Corinthian, or to assume or create any obligation or liability of any kind, express or implied, on behalf of Corinthian, or to bind Corinthian in any manner whatsoever, or to hold itself out as having any right, power or authority to create any such obligation or liability on behalf of Corinthian or to bind Corinthian in any manner whatsoever (except as to any actions taken by Purchaser at the express written request and direction of Corinthian).

Section 6.03.      Force Majeure.  Each party shall be excused from its obligations under this Agreement, other than payment obligations, to the extent that any delay or failure in the performance of such obligations is a result of any cause beyond its reasonable control (and without the fault of such party), including, without limitation, acts of God, acts of civil or military authority, embargoes, epidemics, war, terrorism, riots, insurrections, fires, explosions, earthquakes, floods, severe weather conditions or changes in applicable law.

13

Section 6.04.    Entire Agreement; Assignment; Successors.  Except to the extent set forth in Section 6.05, this Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and supersedes all other prior and contemporaneous agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. Purchaser acknowledges and agrees that subsequent purchasers of the Remaining Institutions from Corinthian are intended beneficiaries of this Agreement, and Corinthian may assign any or all of its rights and obligations under this Agreement to any such successor in interest, and no such assignment shall relieve Purchaser of its obligations hereunder.  The parties agree to cooperate to effect mutually agreeable assignment and assumption agreements (or separate agreements entirely between Purchaser and any subsequent purchaser of one or more of the Remaining Institutions from Corinthian) to accomplish the foregoing.  In accordance with the preceding sentences of this Section 6.04, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.  In the event of any conflict or inconsistency between the terms of this Agreement and the terms of any other Transaction Document, the terms of this Agreement shall govern.

Section 6.05.    Set-Off.  By written notice to the other party, either party shall have the right to, and may, set-off against any amounts payable by such party to the other party (whether pursuant to the APA or otherwise) and including, without limitation, amounts otherwise distributable to the Seller Representative or Sellers from the Indemnification Escrow Fund (as defined in the APA).  To the extent necessary, the preceding sentence shall be deemed to have amended, clarified, or modified (as applicable) the APA to provide for the use of the Indemnification Escrow Fund to provide an additional source of payment for Corinthian's obligations hereunder.

Section 6.06.    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect, so long as the economic or legal substance of the transaction contemplated by this Agreement is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible, in a mutually acceptable manner, in order that the Transactions shall be consummated as originally contemplated to the fullest extent possible.

Section 6.07.    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (i) on the date of delivery if delivered personally, (ii) if by facsimile or email, upon electronic confirmation of receipt by facsimile or email, provided, that a copy of such notice or other communication is promptly mailed by registered or certified mail, return receipt requested, postage prepaid, following the transmission of such facsimile or email, (iii) on the first (1st) Business Day following the date of dispatch if delivered utilizing a next-day service by a nationally recognized next-day courier or (iv) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below:

if to Purchaser:

> Zenith Education Group, Inc.
> c/o ECMC Group, Inc.
> 1 Imation Place, Building 2
> Oakdale, MN 55128
> Attention:  Dan Fisher, General Counsel
> Fax:  (651) 325-4086
> Email:  dfisher@ecmc.org

14

with a copy to (which copy shall not constitute notice):

> Drinker Biddle & Reath LLP
> One Logan Square, Suite 2000
> Philadelphia, Pennsylvania 19103
> Attention: H. John Michel, Jr.
> Fax: (215) 988-2757
> Email: John.Michel@dbr.com

if to Corinthian:

> Corinthian Colleges, Inc.
> 6 Hutton Centre Drive, Suite 400
> Santa Ana, California 92707
> Attention:     Chief Executive Officer
>                and General Counsel
> Facsimile No.: (714) 751-3605
> Emails:  jmassimino@cci.edu and smortensen@cci.edu

with a copy to (which copy shall not constitute notice):

> O'Melveny & Myers LLP
> 610 Newport Center Drive, 17th Floor
> Newport Beach, CA 92660
> Attention: Andor Terner, Esq.
> Fax: (949) 823-6994
> Email: aterner@omm.com

or to such other address as the Person to whom notice is given may have previously furnished to the others in writing in the manner set forth above.

Section 6.08.    Governing Law; Venue.

(a)    This Agreement shall be deemed to be made and in all respects shall be interpreted, construed and governed by and in accordance with the Laws of the State of Delaware without regard to the conflicts of laws principles thereof.

(b)    Each of the parties hereto irrevocably consents to the service of any process, pleading, notices or other papers by the mailing of copies thereof by registered, certified or first class mail, postage prepaid, to such party at such party's address set forth herein, or by any other method provided or permitted under the Laws of the State of Delaware.

(c)    To the extent that a party hereto has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, such party hereby irrevocably waives such immunity in respect of its obligations pursuant to this Agreement.

(d)    Each party hereby irrevocably submits to the jurisdiction of any federal or state court located in the county of New Castle of the State of Delaware (and any appellate court therefrom) over any action or proceeding arising out of or relating to this Agreement. Each party hereby irrevocably and

unconditionally waives and agrees not to plead, to the fullest extent provided by law, any objection it may have to venue and the defense of an inconvenient forum to the maintenance of such action or proceeding in such courts.

Section 6.09.    No Third Party Beneficiaries. Except as set forth in Sections 2.01, 3.02, 4.01, 5.02, and 6.04, this Agreement shall be binding upon and inure solely to the benefit of each party hereto and its successors and permitted assigns and nothing in this Agreement is intended to or shall confer upon any other Person any legal or equitable rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 6.10.    Counterparts; Electronic Signature.    This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement may be executed by facsimile or electronic (.pdf) signature and a facsimile or electronic (.pdf) signature shall constitute an original for all purposes.

Section 6.11.    Amendment and Modification. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed by each of the parties.

Section 6.12.    Waivers.    No failure or delay of a party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder. Any agreement on the part of any party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by such party.

Section 6.13.    Time.    Time is of the essence with respect to the obligations of both parties to make payment, and to establish or replenish the Services Advance Account in accordance with this Agreement.

Section 6.14.    No Presumption Against Drafting Party. The parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Applicable Law or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

[SIGNATURE PAGE TO FOLLOW]

16

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**"CORINTHIAN"**

CORINTHIAN COLLEGES, INC.,
a Delaware corporation

By: _____
  Name: Jack D. Massimino
  Title: Chief Executive Officer

**"PURCHASER"**

ZENITH EDUCATION GROUP, INC.,
a Delaware nonprofit corporation

By: _____
  Name: _____
  Title: _____

*(Signature Page to Transition Services Agreement)*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**"CORINTHIAN"**

CORINTHIAN COLLEGES, INC.,
a Delaware corporation

By: _____
   Name: _____
   Title: _____

**"PURCHASER"**

ZENITH EDUCATION GROUP, INC.,
a Delaware nonprofit corporation

By: _____
   Name: _David L. Hawn_____
   Title: _President_____

*(Signature Page to Transition Services Agreement)*

**SCHEDULE 1**

*List of Schools*

<u>Initial Closing</u>

|   | School Name | OPEID | Brand |
|---|---|---|---|
| 1 | Orlando North | 00149900 | Everest |
| 2 | Orlando South | 00149901 | Everest |
| 3 | Melbourne | 00149902 | Everest |
| 4 | Tampa | 00149904 | Everest |
| 5 | Brandon (in Tampa) | 00149905 | Everest |
| 6 | Orange Park | 00149906 | Everest |
| 7 | Pinellas (Largo) | 00149907 | Everest |
| 8 | Lakeland | 00149908 | Everest |
| 9 | Jacksonville | 00149909 | Everest |
| 10 | Pompano Beach | 00149910 | Everest |
| 11 | Merrionette Park | 00149911 | Everest |
| 12 | Kansas City (MO) | 00149912 | Everest |
| 13 | Colorado Springs | 00450300 | Everest |
| 14 | Tyson's Corner (in Vienna) | 00450301 | Everest |
| 15 | Ft. Worth II | 00450303 | Everest |
| 16 | Thornton | 00450700 | Everest |
| 17 | Aurora | 00450701 | Everest |
| 18 | Mid Cities (in Arlington) | 02250603 | Everest |
| 19 | Pittsburgh | 00709100 | Everest |

|    | School Name | OPEID | Brand |
|----|-------------|-------|-------|
| 20 | Chelsea | 00982809 | Everest |
| 21 | Bedford Park | 00982810 | Everest |
| 22 | Portland | 00907900 | Everest |
| 23 | Vancouver | 00907901 | Everest |
| 24 | Dallas | 00907905 | Everest |
| 25 | Silver Spring | 00907906 | Everest |
| 26 | Laramie | 00915700 | WyoTech |
| 27 | Blairsville | 00915705 | WyoTech |
| 28 | Newport News | 00926700 | Everest |
| 29 | Chesapeake | 00926701 | Everest |
| 30 | Southfield | 00982800 | Everest |
| 31 | Dearborn | 00982801 | Everest |
| 32 | Austin | 00982802 | Everest |
| 33 | Detroit | 00982803 | Everest |
| 34 | South Plainfield | 00982804 | Everest |
| 35 | Cross Lanes | 01035600 | Everest |
| 36 | Eagan | 01035602 | Everest |
| 37 | Marietta | 00982807 | Everest |
| 38 | Atlanta Greenbriar | 00982808 | Everest |
| 39 | Norcross | 00982811 | Everest |
| 40 | Skokie | 01185800 | Everest |
| 41 | Burr Ridge | 01185802 | Everest |
| 42 | Melrose Park | 01185803 | Everest |

Schedule 1, page 2

| | School Name | OPEID | Brand |
|---|---|---|---|
| 43 | Grand Rapids | 02100400 | Everest |
| 44 | Kalamazoo | 02100401 | Everest |
| 45 | Merrillville | 02100402 | Everest |
| 46 | Henderson | 02237500 | Everest |
| 47 | Springfield | 02250600 | Everest |
| 48 | San Antonio | 02261300 | Everest |
| 49 | Greenspoint (Houston) | 02261302 | Everest |
| 50 | Houston Hobby | 02261303 | Everest |
| 51 | Salt Lake City (in West Valley City) | 02298500 | Everest |
| 52 | Ft. Worth | 02298501 | Everest |
| 53 | Bremerton | 02300100 | Everest |
| 54 | Everett | 02300103 | Everest |
| 55 | Tacoma | 02300104 | Everest |
| 56 | St. Louis (in Earth City) | 02300105 | Everest |
| 57 | Daytona Beach (in Ormond Beach) | 02346200 | WyoTech |
| 58 | Renton | 02606200 | Everest |
| 59 | Bissonnet (in Houston) | 02606202 | Everest |
| 60 | Seattle | 02617500 | Everest |
| 61 | Tigard (Portland) | 02617506 | Everest |
| 62 | Philadelphia (Bensalem) | 02617507 | Everest |
| 63 | Woodbridge DC | 02617508 | Everest |
| 64 | Columbus (in Gahanna) | 00982805 | Everest |

| | School Name | OPEID | Brand |
|---|---|---|---|
| 65 | Jonesboro | 00982806 | Everest |

**Subsequent Closing (if any)**

| | School Name | OPEID | Brand |
|---|---|---|---|
| 66 | Rochester | 00481100 | Everest |
| 67 | Phoenix | 02295000 | ECP |
| 68 | Mesa | 02295002 | ECP |

**SCHEDULE 2**

*Service Coordinators*

For Corinthian:

Ken Ord
Phone: (714) 825-7432
Fax: (714) 427-3013
Email: kord@cci.edu

For Purchaser:

Services (other than Marketing Services):
Mike Lanouette
Phone: (612) 406-1319
Email: mlanouette@ecmc.org

Marketing Services:
Josh Susser
Phone: (651) 325-3571
Email: jsusser@ecmc.org

## EXHIBIT A

## SERVICES

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| Cohort Default Prevention Services | Purchaser will cooperate with Corinthian's efforts to transition these services to Corinthian's preferred vendor, and until such time or the expiration of this Agreement, whichever is sooner, shall assist Corinthian using reasonable efforts, at the direction and with the supervision of Corinthian, with the processing of student financial aid, including the following:<br>• Grace Counseling student outreach efforts<br>• Delinquent Borrower outreach efforts and student counseling services<br>• Forbearance and deferment application support<br>• Default Rate activity and forecast reporting | $116,269 per month |
| Student Account Services | Purchaser will cooperate with Corinthian's efforts to transition these services to Corinthian's preferred vendor, and until such time or the expiration of this Agreement, whichever is sooner, shall assist Corinthian using reasonable efforts, at the direction and with the supervision of Corinthian, with the processing of student accounts, including solely the following services:<br>• Management and posting of all tuition charges and fees in CampusVue for all linear programs; provide reconciliation to enrollment levels<br>• Complete detail student level monthly revenue review in CampusVue;  manage adjustments as needed<br>• Campus support -  routine service requests for student accounts and refunds in active student collections and non-Title 4 cash postings<br>• Close all CampusVue financial transactions into the PeopleSoft general ledger monthly<br>• Reporting on student receivables, revenue and bad debt from CampusVue data<br>• Apply centrally received payments from students and third parties (including those received in ePayment system) to student ledgers<br>• Reconciliation of all cash posted to student ledgers in CampusVue to cash received at bank<br>• Stipend and refund processing, printing and mailing<br>• Stale dated refund and stipend check review including voids, escheatment due diligence<br>• 1098T processing, mailing and customer service<br>• Post-separation student accounts receivable collections<br>• Placement of accounts receivable with collection agencies after internal collection efforts;  reporting on | Included in finance charge |

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | results<br>• 90/10 calculation and monthly reporting<br>• Support year-end external auditor with agreed-upon procedures audit for 90/10 compliance<br>• Student Accounts testing support for all CampusVue upgrades and enhancements | |
| **Financial Aid Services** | Purchaser will cooperate with Corinthian's efforts to transition these services to Corinthian's preferred vendor, and until such time or the expiration of this Agreement, whichever is sooner, shall assist Corinthian using reasonable efforts, at the direction and with the supervision of Corinthian, with the processing of student financial aid, including solely the following services:<br>• Estimated Title IV award packaging<br>• New student file review, including verification, award approvals, originations and certifications<br>• Professional judgment approval requests for Title IV<br>• Continuing student repackaging, adjustment monitoring and processing, including grade level increases<br>• Title IV Pell and SEOG grant and Direct Loan eligibility determination and disbursement release and acceptance posting and processing<br>• Management of all federal system interfaces including exports and imports to CPS and COD for the purpose of ISIR imports and exports, grant and loan award originations, corrections, releases, returns and other adjustments as needed<br>• Non Title IV Private Loan disbursement processing through Common Line system interfaces<br>• Title IV and Non Title IV credit balance resolution processing including the identification, calculation and scheduling of student refunds, third party refunds and returns to Title IV<br>• Exit processing for students who drop or graduate including the identification of students, the calculation of return to Title IV and institutional refund policies and the scheduling and posting of tuition adjustments, student and third party refunds and the creation of required exit documentation<br>• Review and resolution of Pell overpayments<br>• Review, resolution and disbursement of PWD<br>• Monthly enrollment status reporting and exception corrections to NSLDS<br>• Campus Support Services: routine financial aid related service requests and support desk support, including student escalation resolution | $567,027 per month |

Exhibit A, page 2

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | • Campus Support Financial Aid and Student Finance specific Training services as needed and at mutually agreed upon intervals including financial aid process and regulatory updates<br>• Support campus based funds including SEOG and Federal Work Study administration including drawdowns, monitoring to campus allocations and reconciliations of payments<br>• Title IV program budget configurations in Cvue<br>• Title IV disbursement schedule configurations in Cvue<br>• Management of all financial aid configuration in CampusVue for all programs; provide standard financial aid budgets to support enrollment<br>• Required term configurations to support financial aid processes in Cvue<br>• ISIR correction processing including those requiring student interaction in order to obtain additional documents or information required to resolve<br>• Correction of items or documents when possible in order to resolve including ISIR corrections, incomplete documentation, conflicting information and other circumstances identified as Not Packaged, Campus Review Needed and Revision Campus Review Needed packaging statuses<br>• Business process and subject matter expert support for all tools and applications including the maintenance of and access when appropriate to all student and campus facing tools for the purpose of financial aid packaging processes such as Student Portal Document Center, Electronic forms, Document Imaging and the Estimate tools<br>• Provide data required to support Gainful Employment reporting specific to financial aid information required<br>• Provide data required and support in order to update Net Price Calculator and Shopping sheet disclosure information<br>• Provide Business Analyst support in order to modify tools, applications and student facing documents in order to maintain compliance with regulatory changes<br>• Financial aid testing support for all CampusVue upgrades and enhancements<br>• Retain ED system ownership required for financial aid processing including PDPA and SAIG ownership<br>• Support and maintain ED system access for campus users including COD, CPS and NSLDS based on existing security and segregation of duty requirements<br>• Financial aid compliance audit support including weekly | |

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | HCM1 audit support, roster creation, roster submissions<br>• Title IV and Non Title IV Cash flow receipt and refund forecasting and monitoring support<br>• Monthly sales disclosure detailed reporting, including:<br> o Work with IT to assemble images of signed student disclosures from CVue<br> o Perform quality review to ensure correct documentation provided in the image files produced<br> o Compile listing of all student populations with disclosures required<br> o Communicate and monitor exceptions by student and campus<br> o Compile and submit student listing with associated images to the Monitor and ED on a monthly basis<br><br>Purchaser will cooperate with Corinthian's efforts to transition these services to Corinthian's preferred vendor, and until such time or the expiration of this Agreement, whichever is sooner, shall assist Corinthian using reasonable efforts, at the direction and with the supervision of Corinthian, with the processing of student financial aid, including solely the following services:<br><br>• Student outreach efforts by phone, email and text for the purpose of financial aid packaging support including for the purposes of acquiring missing documents required to complete packaging, ensure timely FAFSA completion, and acquire missing documents required to disburse federal funds<br>• Student outreach efforts by phone, email and text in support of active student collection activities<br>• Identification of and contact with students with incomplete packaging (gaps in funding) when comparing the direct program costs and eligible fund sources packaged including resolution e.g. completing an institutional payment plan agreement | |

Exhibit A, page 4

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | • Title IV cash management and accounting support, including ongoing draws from G5 for all federal funds and reconciliations between COD and G5<br>• External ED, VA and Guarantor Program Review support determined on a case by case basis and costs incurred as mutually agreed<br>• Annual SFA filing and support<br>• ECAR recertification, program approvals and maintenance<br>• Provide data required to support IPED reporting specific to financial aid information required<br>• Annual FISAP reporting<br>• Financial aid compliance audit support including weekly HCM1 audit support<br><br>For the avoidance of doubt, the following financial aid services are expressly <u>excluded</u> from the scope of this Agreement:<br>• Identification of students eligible for professional judgment decisions<br>• Identification of students required to satisfy America Reads and Community Service requirements for Federal Work Study requirements<br>• Correction or scheduling of students in modular programs required for packaging completion or disbursement eligibility purposes.<br>• Estimates, approvals or completion of packaging for excluded non-Title IV fund sources including but not limited to such examples as State grants, scholarships and institutional or and private loans.<br>• Completion of status changes to leave of absence, drop or graduate status, evaluation of satisfactory academic progress, posting of grades or attendance or any other academic based activities on which financial aid eligibility is determined. | |
| Information Management Systems | Purchaser will cooperate with Corinthian's efforts to transition these services to Corinthian's preferred vendor, and until such time or the expiration of this Agreement, whichever is sooner, shall assist Corinthian using reasonable efforts, at the direction and with the supervision of Corinthian, with information management systems services, including the following:<br>• Access and usage of CampusVue and lead management for those user counts in effect as of the Closing Date<br>• Access to Socle student facing tools such as Student Portal Document Center, Document Imaging and the Estimate tool (Firetracker) | $267,988 per month, plus one-time fee of $95,500 during February 2015 to cover online platform charge associated with California hybrid students. |

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | o For avoidance of doubt, any portal updates will be scoped out as separate at-cost projects for Corinthian.<br>• Existing WAN circuits, connectivity, management & maintenance<br>• Existing Voice circuits, connectivity, management & maintenance<br>• Phone systems and existing I.T. supported (whether outsourced to Eloyalty or internally) ancillary software to them whether stand-alone or Student 2.0 Cisco infrastructure including the centralized PBX, any in-bound or out-bound phone lines used to deliver services<br>• Campus based Servers and supporting LAN equipment, network authentication and existing network security infrastructure<br>• Desktop, Laptop, and Server configuration, setup, decommissioning, and patching according to existing established processes and procedures<br>• Any systems required for Lead routing and reporting<br>• Existing reporting, data warehouse services for schools and CSC purposes.<br>• Support and maintenance of existing Heald Data Center systems and services along with Canada specific systems and services.<br>• Help Desk support Services for employees and contractors, including CampusVue and account Active Directory administration<br>• Existing Corinthian security related Services pertaining to the systems maintained by Zenith under Transition Services.<br>• Existing systems (applications, hardware, labor) and maintenance processes, as existed prior to the closing, related to the Services<br>• IT related services customarily performed to assist in the shutdown of any "teach out" schools or the Colorado Springs physical location.<br>• Existing Applications in use prior to closing and supported actively by I.T. such as:<br>• Peoplesoft Finance System<br>• Peoplesoft HR System<br>• Existing email based services including Activesync<br>• Those listed on the "Enterprise Environment/Application .pdf dated 11/5/14 and included as part of this Exhibit"<br>• Onsite Network Administrator Support as existed prior to closing. For those locations whereby and employee providing these services is not a Zenith employee post | |

Exhibit A, page 6

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | closing (are attached to a school budget remaining under CCi control), Corinthian agrees to retain and not reduce such campus based personnel while such services are needed under this agreement by Zenith<br>• Student and employee email within existing systems<br>• emote user access capabilities via VPN or Webmail as existed prior to closing.<br>• Vendor management and coordination of those vendors managed by IT prior to closing and required to provide services under this agreement.<br>• Existing Biometric building entry system and administration<br>• For avoidance of doubt, any systems storage data growth, or backup and retention requirements beyond those resources existing prior to closing will be at additional future cost to Corinthian.<br>• Should any products or services currently in use by Corinthian be deemed obsolete or present a material security risk, Corinthian will be required to fund an upgrade to supportable products or eliminate usage of said products, or services, within a mutually agreed upon timeframe but in no event later than that deemed by Zenith to be an acceptable security risk timeframe.<br><br>For the avoidance of doubt, the Enterprise Environment / Application Location matrix as of 11/5/14 is attached hereto as Exhibit C. All enterprise and application information technology set forth on such Exhibit will be supported by Purchaser on behalf of Corinthian under this Agreement during the Term. | |
| Information Management Systems Migration | In preparation for Corinthian's autonomous operations after the Term, Purchaser will use reasonable efforts to assist with the coordination to transition services related to the migration off of the current provided services at the end of the Term. The transition costs will be assumed solely by Corinthian and can include professional services, licensing and other fees, as well as compensation to Purchaser for its migration at Purchaser's rates or as otherwise agreed by the parties. Notwithstanding Purchaser's willingness to use reasonable efforts to assist with the coordination and migration for the end of the Term, Purchaser makes no warranty about, and shall have no liability whatsoever for, such migration or the condition of Corinthian's systems and processes after the Term. It is the responsibility of Corinthian, not Purchaser, to determine and to lead the migration, and to do so in such a manner and at a sufficiently early time so as to permit Corinthian to be able to operate independently after the Term. Purchaser offers any migration-related services, advice and | Actual direct costs to migrate |

Exhibit A, page 7

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | assistance on an "as is" basis, with no warranties, and only if and to the extent requested by Corinthian.<br><br>Mutual Obligations: Corinthian and Purchaser acknowledge that both Corinthian and Purchaser will share certain connectivity and responsibilities with respect to the systems accessed and used during the Term.  Accordingly, Corinthian and Purchaser commit that during the Term, Corinthian and Purchaser shall use and protect Purchaser's and Corinthian's systems, Services, and data utilizing no less a standard of care than employed by Purchaser and Corinthian during the 90 days prior to the commencement of the Term.  Corinthian and Purchaser further warrants that they shall fully cooperate with each other's standard practices, and policies, related to the usage of systems and data covered under Purchaser policies and that such party's usage of any such systems and Services will not violate any service provider rules of use, licensing, or law. | |
| Finance | Purchaser will cooperate with Corinthian's efforts to transition these services to Corinthian's preferred vendor, and until such time or the expiration of this Agreement, whichever is sooner, shall assist Corinthian using reasonable efforts, at the direction and with the supervision of Corinthian, with finance functions, including the following:<br>• Processing of trade accounts payable and accounts receivable<br>• Purchasing of items as directed by Corinthian. Expressly excluded from the scope of this Agreement is the negotiation of contracts.<br>• Purchaser shall process and issue payment for Corinthian's payroll checks from Corinthian bank account(s) every two weeks. Purchaser shall not fund any portion of Corinthian's payroll. Payroll includes:<br>   o   Maintaining the PeopleSoft payroll system<br>   o   Inputting the times sheet data<br>   o   Auditing the data for accuracy<br>   o   Year-end W-2 processing<br>• Processing of personal property taxes, sales and use tax returns. Expressly exclude from the scope of this Agreement are all other federal and state registrations, analysis, filings and tax returns.  Purchaser shall not fund any portion of Corinthian's taxes.<br>• Maintain the general ledger<br>• Produce necessary financial reports<br>• Provide audit support<br>• Support SEC reporting and compliance | $47,607 per month |

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | • Management of student accounts on behalf of the US Campuses<br>• Treasury and cash management services include:<br>   ○ Tracking of cash receipts at depository locations as specified by Corinthian<br>   ○ Tracking and posting of all funds flows in specified accounts<br>   ○ Stop payments<br>   ○ Corporate bank deposits<br>   ○ Electronic payment administration<br>• Provide support for working capital calculations and related matters | |
| Human Resources | • Time and labor timekeeping system | $30,716 per month |
| Administrative Services | • Placement and waivers verification<br>• Student services helpline | $33,096 per month |
| Accreditation and Licensing | • Compliance Department – Placement and waivers verification, Integrity Hotline (includes student helpline and employee helpline), regulatory changes/policy changes, document production per the operating agreement.<br>• Transfer Center – ADA accommodations (student), placement/assessment testing, transcript evaluation, transcript services, CARE Student Helpline administration, GED program.<br>• Curriculum – curriculum maintenance to include textbook versioning activities (syllabus updates), curriculum support call in services for faculty.<br>• A&L – site visit preparation (all ACICS campuses will be visited within 6 months), accreditation responses, criteria changes, programmatic visit support, BPPE visit support, licensing as needed.<br>• Provide support for ongoing reporting to the U.S. Department of Education ("ED") and the Monitor regarding:<br>   ○ Any adverse action or potential adverse action, or change in status of existing adverse action, including show cause, probation or similar action "by its accrediting agency or any federal oversight agency"<br>   ○ Any adverse action or potential adverse action, or change in status of adverse action "by state licensure agencies"<br>   ○ All correspondence with accrediting agencies and state licensing agencies<br>   ○ Report that tracks overall student attendance | $21,767 per month |

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | percentages at each campus | |
| | o   Worksheet reflecting all grade and attendance changes made during the month | |
| | o   Student complaints through accrediting agencies or state licensing agencies and info concerning resolution of the complaint | |
| | o   Provide Student Issue Reports (SIRs) dating from July 17, 2014 to present (bi-weekly submissions of SIRs and school complaint binders) | |
| | o   Creation of new teach out agreements or changes to any existing teach out agreements | |
| | o   Status of any teach out plan, including whether the plan has been submitted to an accreditor for approval and the status of each submission, including any significant modifications to the plan | |
| | o   Corinthian's intent to close or sell any locations; and list of locations without teach out agreements in place | |
| | o   Update on signed disclosures for Teach-Out Schools (reenters) | |
| | o   Update on signed disclosures for Sale Schools (as defined in the Operating Agreement with ED) | |
| | o   A current roster of students enrolled at Teach-Out campuses, including the students' start dates | |
| | o   Announcements/changes to student consumer information regarding program placement rates as required by 34 CFR 668.41(d)(5) | |
| | o   Worksheet with placement information for those students included in report submitted to regulatory agency or otherwise published, together with each student's placement/waiver file | |
| | o   Current schedule for, and any document that tracks the status of, productions made to ED, and relevant correspondence including requests for production made by ED | |
| | o   Any further data requested by ED or the Monitor | |
| | o   List of students, by campus, for which Title IV draw is requested | |
| | o   Excel spreadsheet containing the following: (a) List of Corinthian campuses that are eligible to receive Title IV funds, and (b) List of Corinthian campuses that are not eligible to receive Title IV funds, including date on which campus became | |

| TRANSITION SERVICES | DESCRIPTION | COST OR ALLOCATION METHOD FOR APPLICABLE SERVICE (BEFORE 5% OR 10% (PLUS 1%) MARK-UP, AS APPLICABLE) |
|---|---|---|
| | ineligible<br>○ Notification of any changes taken by ED, accreditors or state regulators that might restrict Title IV eligibility<br>○ Title IV auditor submission of results of weekly review of rosters<br>○ The following information for each school: accreditation status; whether allowed to enroll new students; Title IV eligibility<br>○ Transcripts from online marketing chats | |
| Additional Services to be Identified and Added by mutual agreement | Records functions.<br>• At the time of closing CCI will become custodian of all existing backup tapes (made prior to closing). Zenith will manage retrieval of the tapes through the transition period but upon conclusion of the transition period, all tapes will be transferred to CCI for management.  Tapes created post closing will be copied and both entities will receive a copy of the tapes created from closing to the end of the transition services agreement.<br><br>• Physical records will be managed by Zenith throughout the transition. During the transition period records will be separated and CCI will be billed for the storage of their records.  Any records associated to financial or HR records will be considered CCI records.  Financial aid processing records will be considered shared records and joint custodianship for those records will need to be determined during transition services period.  Upon conclusion of the transition period CCI will take ownership of the following records:<br>○ All records associated with the Retained Institutions<br>○ All corporate records such as legal files, HR files, financial files.<br><br>• Zenith will take ownership of files associated with schools owned by Zenith, financial aid processing files, and, in accordance with the APA, shall be custodian for records associated with closed schools. | $6,542 per month |

## EXHIBIT B

### Marketing Services

Purchaser will cooperate with Corinthian's efforts to transition the following services to Corinthian's preferred vendor, and until such transition has occurred or the expiration of this Agreement, whichever is sooner, Purchaser shall assist Corinthian using reasonable efforts, at the direction and with the supervision of Corinthian, including the following:

1. Media buying – Purchaser will act as Corinthian's media buying agent for media placement at vendors of Corinthian's choosing. Purchaser will use reasonable efforts to secure the spend levels, costs and performance as outlined in each month's approved forecast. Purchaser will also act as agent for Corinthian in securing enhancements to the services of vendors as requested by Corinthian.

2. Reporting – Purchaser will provide Corinthian with the reporting that Corinthian produces as of the Agreement Date on the performance of the marketing that is used in the business currently. For the sake of clarity, examples of these reports include: LTR, MTR, TTR, MMR, SPR, Admission's Scorecards, and Core reporting. In addition, Purchaser will forward to Corinthian any reporting produced by vendors that includes media performance, competitive intelligence, or market trends related to the schools operated by Corinthian.

3. Contact Center Services – Purchaser will provide Corinthian with Contact Center support for Inbound calls, Outbound calling, and live chat on Corinthian websites. Purchaser will provide Corinthian with access to regular reporting describing the performance of the various calling campaigns. Corinthian may increase or decrease calling intensity, scripting and disposition of campaigns focused on its campuses upon prior notice.

4. Other Communication Channels – Purchaser will also provide reasonable communication support through email and texting campaigns to existing and prospective students.

5. Website Management – To the extent that Purchaser and Corinthian share the same websites and domains, Purchaser will provide support for changes to the websites and pages related to the Remaining Institutions. For landing pages and websites that are specific to the Remaining Institutions, Purchaser will provide webhosting, support for changes, and lead management support.

6. Lead Management – Purchaser will provide lead management services, including but not limited to: website lead form management, Sparkroom access and support, DNC services, lead scoring, lead scrubbing, monthly lead reconciliation, CRM and CampusView support.

7. Reply Card Processing – Purchaser will process Reply card leads from Direct Mail campaigns using the current workflow.

8. Compliance Review – Purchaser will use its current compliance process, standards, and infrastructure to review communications. In addition, Purchaser will provide online vendor compliance support using the same process and standards as it uses for its own vendors.

9. Creative Support – Purchaser will use reasonable efforts to support changes to Corinthian's written and video collateral using the same workflow and standards used for Purchaser's collateral.

10. Collateral Management – Purchaser will provide inventory management and access to 'One Site' and "Media Builder"

Management of the services and work done by Purchaser employees will be called as "Internal Support." Work done by external agencies will be called "Outsourced Support." If Purchaser proposes to support Corinthian using "Outsourced Support," Corinthian will have the ability to approve work before it is executed by the external agency. If the work can also be accomplished using "Internal Support," Corinthian will have the option to use either method of support, but will be subject to the timelines as specified by Purchaser.

Corinthian may decide not to accept leads from specific lead sources upon prior notice to Purchaser. However, initially Purchaser will provide leads from the following marketing channels with the associated flexibility as described below.

- Local TV campaigns – Corinthian may increase or decrease Local TV spending for Remaining Institutions. Corinthian may pay to re-version the Remaining Institutions' TV spots with different toll free numbers and URLs to allow for calls to go directly to Corinthian facilities.

- Newspaper campaigns – Corinthian may increase or decrease newspaper spending for Remaining Institutions. Corinthian may pay to re-version the Remaining Institutions' ads with different toll free numbers and URLs to allow for calls to go directly to Corinthian facilities.

- Yellow Pages – Corinthian may increase or decrease Yellow Pages spending for Remaining Institutions as new books are published in the Remaining Institutions' Markets.

- Direct Mail & Telemarketing – All campaigns are locked down 60 days in advance.  No significant changes can be made to these campaigns until 60 days after this Agreement is signed. Purchaser can change the new BRE and version the Direct Mail for campus specific addresses and programs.

- Affiliate Marketing – Purchaser can limit the number of leads generated for all campuses by modifying the zip codes in which Purchaser accepts leads.

Media costs and other third party fees, costs and expenses will be passed through to Corinthian at cost based on the process described in Section 4.03 of this Agreement.

The Services listed above will be charged as follows (before 5% or 10% (plus 1%) mark-up, as applicable):

1. $226,342 per month

## EXHIBIT C

**Enterprise Environment / Application Location matrix as of 11/5/14**

[See attached.]

Exhibit C

## FIRST AMENDMENT TO TRANSITION SERVICES AGREEMENT

This FIRST AMENDMENT TO TRANSITION SERVICES AGREEMENT (this "Amendment"), dated as of September 18, 2015 (the "Execution Date"), is entered into by and between Zenith Education Group, Inc., a Delaware nonprofit corporation ("Purchaser") and Corinthian Colleges, Inc., a Delaware corporation ("Corinthian", and together with Purchaser, the "Parties", and each, a "Party"). Capitalized terms used in this Amendment but not defined herein shall have the meanings given to them in the TSA (defined below).

## RECITALS

A.      Reference is made to that certain the Transition Services Agreement dated February 2, 2015 (the "TSA") by and among Purchaser and Corinthian.

B.      On May 4, 2015 (the "Petition Date"), Corinthian and its wholly-owned subsidiaries filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") seeking relief under the provisions of Chapter 11 ("Chapter 11") of the United States Bankruptcy Code. The Chapter 11 proceeding was commenced so that Corinthian could wind up its operations in an orderly manner and to maximize the value for the benefit of Corinthian's stakeholders.

C.      Shortly after the Petition Date, and in recognition of Corinthian's reduced need for transition services, the parties, while negotiating this Amendment, ceased the request and provision of certain services and reduced the scope of other services as reflected in Amended Exhibit A attached hereto (which amended and superseded Exhibit A to the TSA). From May 4, 2015 through the Execution Date, services were provided in accordance with Amended Exhibit A and paid for in accordance with Amended Exhibit D.

D.      On August 28, 2015 the Bankruptcy Court entered an order confirming the *Debtors' Third Amended and Modified Combined Disclosure Statement and Chapter 11 Plan of Liquidation* (the "Plan"). Pursuant to the Plan, a distribution trust (the "Distribution Trust") and a student trust (the "Student Trust") shall be created on the Plan Effective Date (as defined herein) to implement the terms and provisions of the Plan.

E.      Corinthian continues to need transition services during the Chapter 11 proceeding, and, following the effective date of the Plan (the "Plan Effective Date"), the Distribution Trust will need transition services, but both on a much reduced level compared to that required prior to the Petition Date. Accordingly, the Parties have agreed (i) to a reduced scope of services as set forth on Amended Exhibit A, until the Plan Effective Date, and (ii) to certain amendments to the TSA as set forth below.

F.      As of September 8, 2015, the remaining balance in the Services Advance Account was $97,260.

NOW, THEREFORE, the Parties desire to memorialize their agreements, and in consideration of the premises set forth above and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AMENDMENTS

1.    <u>Section 1.01</u>. Section 1.01 of the TSA is hereby deleted in its entirety and replaced with the following:

Section 1.01.    <u>Term and Termination</u>.

(a)    Subjection to Section 1.01(c) below, this Amendment shall be effective at the close of business on the Execution Date.  The Term shall expire upon the first to occur of (i) March 31, 2016; (ii) or the date this Agreement is terminated in accordance with Section 1.01(b) or Section 1.01(c).  At no time shall Purchaser have any obligation to provide any services from and after the date hereof other than those set forth herein or on <u>Amended Exhibit A</u>. At no time after the Plan Effective Date, shall Purchaser have any obligation to provide any services other than those described in Section 2 of this Amendment. Upon the expiration of the Term, Purchaser shall have no obligation hereunder to provide any further Services.  Notwithstanding anything to the contrary in this Agreement, Purchaser shall not be obligated to provide any Services that are provided to it by third parties after its right to do so under existing agreement(s) with the third parties have expired, except as reasonably negotiated between Purchaser, Corinthian and the applicable third party(ies).

(b)    Either Corinthian or the Distribution Trust, as applicable, or Purchaser may terminate this Agreement immediately by written notice to the other (i) if the other materially breaches any of its obligations hereunder and the breach (other than a breach specified in clause 1.01(b)(ii)) remains uncured for thirty (30) days after receipt of written notice of the existence of such breach, and (ii) Purchaser may terminate this Agreement immediately upon notice if either Corinthian or the Distribution Trust fails to make payment for Services as required hereunder.  Following any termination, (i) Purchaser shall promptly pay to Corinthian or the Distribution Trust, as applicable, by wire transfer of immediately available funds, any residual funds in the Services Advance Account net of any amounts owed to Purchaser under the TSA and (ii) Corinthian or the Distribution Trust, as applicable, shall promptly pay to Purchaser any amounts in excess of the amounts referred to in the preceding clause that it may owe to Purchaser hereunder. Purchaser is not obligated to transfer any information or records to the Student Trust, as any services that the Student Trust requests will be the subject of a separate agreement and payment arrangement between the Purchaser and the Student Trust.  Any costs or expenses that Purchaser incurs in transferring information or records to the Student Trust or responding to related inquiries, shall be the sole responsibility of the Student Trust and Purchaser may not apply any residual funds in the Services Advance Account to pay any costs and expenses relating to the provision of such information and records to the Student Trust.

(c)     This Agreement shall terminate automatically unless: (i) on or before the Plan Effective Date Corinthian files a motion with the Bankruptcy Court seeking the entry of an Order pursuant to section 365 of the Bankruptcy Court approving the assumption and assignment of the TSA, as amended herein, to the Distribution Trust (the "365 Order"); and (ii) the Bankruptcy Court enters the 365 Order within 30 days of the Plan Effective Date (which date may be extended by agreement of the Parties).

2.     Section 1.02.   Section 1.02 of the TSA is hereby deleted in its entirety and replaced with the following:

Section 1.02          Price and Payment for Services.

(a)     Effective as of the Execution Date, other than with respect to the Tax Form Services and the Physical Records Services (which shall be provided in accordance with Sections 2.01(b) and (c) of the TSA (as modified by this Amendment)), services shall only be provided to Corinthian or the Distribution Trust upon request. Such services shall be billed to Corinthian or the Distribution at Purchaser's cost of providing such requested services. The Parties acknowledge that amounts owed for Services provided through the Execution Date have been satisfied in full through the application of funds prepaid by Corinthian into the Services Advance Account and that all requested Services have been provided.

(b)     Intentionally Omitted.

(c)     To the extent that the Services give rise to fees, taxes or any other costs to third parties (including without limitation any hosting fees), Corinthian or the Distribution Trust, as applicable, shall pay such costs directly, where possible, unless Purchaser's contractual obligations, or concerns, require payment via the Purchaser or the Parties otherwise agree.

(d)     Intentionally Omitted.

(e)     Intentionally Omitted.

(f)     Intentionally Omitted.

(g)     As of the Execution Date, Corinthian has on deposit in the Service Advance Account with Purchaser the amount of $97,260.

(i)     Upon Purchaser's issuance to Corinthian or the Distribution Trust of an invoice for payment for Services or any other amounts payable by Corinthian or the Distribution Trust to Purchaser under this Agreement, Purchaser shall debit the Services Advance Account for the amount due under such invoice. Any amounts remaining in the Services Advance Account following a termination of this Agreement and a final reconciliation of Services Fees and other amounts payable to Purchaser with payments actually made will be remitted to the

Distribution Trust and Corinthian or the Distribution Trust, as applicable, shall make any payments that it may owe to Purchaser for Services provided hereunder promptly.

        (ii)    If the amounts in the Services Advance Account are exhausted, Purchaser shall have no further obligation to provide Services to either Corinthian or the Distribution Trust (except for Services that have been prepaid for in full pursuant to Section 2 of this Amendment) unless and until the Services Advance Account is replenished in an amount sufficient to cover the anticipated costs to Purchaser of providing such Services or as otherwise agreed to by the Parties. For the avoidance of doubt, notwithstanding exhaustion of the Services Advance Account or any other termination of the TSA, Purchaser shall be obligated to provide and complete the Tax Form Services and the Physical Records Services, as Purchaser shall be prepaid in full for such Services in accordance with Section 2 of this Amendment.

        (h)    Intentionally Omitted.

    3.    Section 1.04.    Section 1.04 of the TSA is hereby deleted in its entirety and replaced with the following:

Section 1.04    Colorado Lease. Promptly upon the 365 Order becoming a final, non-appealable Order, Purchaser shall pay to the Distribution Trust the amount of $200,000.00 in full and final payment of all amounts due and payable by it to Corinthian in respect of the lease pertaining to the property (the "Garden of the Gods Center") located at 1575 Garden of the Gods Road, Colorado Springs, Colorado 80907.

    4.    Sections 1.03, 1.05, and 1.06.    Sections 1.03 ("Contract Expenses"), 1.05 ("Tempe Expenses"), and 1.06 ("HPFS and Similar Expenses"), are hereby deleted in their entirety.

    5.    Section 2.01.    Section 2.01 of the TSA is hereby deleted in its entirety and replaced with the following:

Section 2.01    Services.

        (a)    Until the Plan Effective Date, Purchaser agrees to provide the transitional services set forth on Amended Exhibit A hereto (subject to such modification or adjustment as may be mutually agreed upon in writing by the parties) upon request of Corinthian.

        (b)    Purchaser agrees to provide Corinthian or the Distribution Trust, as applicable, (i) IRS W-2 forms for all employees of Corinthian and its affiliated entities for the 2015 tax year; (ii) IRS 1098-T forms for any student that paid "qualified education expenses" for the 2015 tax year; and (iii) information to complete closeout filings with applicable state payroll tax agencies (together, the "Tax Form Services"). Purchaser shall provide the Tax Form Services for a fixed

one-time fee of $65,000, which amount shall be debited from the Services Advance Account upon the 365 Order becoming a final, non-appealable Order.

(c)     Purchaser agrees to sort and prepare for pick up by the Distribution Trust all of Corinthian's physical records in Purchaser's possession located at 1010 Riverside Parkway, West Sacramento on or before December 31, 2015 (the "Physical Records Services"). Purchaser shall provide the Physical Records Services for a fixed one-time fee, exclusive of shipping costs, of $27,000, which amount shall be debited from the Services Advance Account upon the 365 Order becoming a final, non-appealable Order.

(d)     On or after the Plan Effective Date, Purchaser shall agree to provide commercially reasonable access to or electronic copies of Corinthian's books and records in Purchaser's possession and control and, if necessary, access to employees during normal business hours, as may be reasonably requested by the Distribution Trust, subject to the payment of Purchaser's actual cost for providing such access and electronic data and on such other terms as may be mutually agreeable. Any services which the Student Trust requests will be the subject of a separate agreement and payment arrangement between the Purchaser and the Student Trust.

(e)     For the avoidance of doubt, Purchaser shall not be required to provide any information relating to its (as contrasted with Corinthian's) business or operations or any information the production of which is prohibited by applicable federal or state law, rules, regulations, or order (including laws and regulations relating to data security and privacy).

(f)     Purchaser makes no warranty as to the accuracy or completeness of any information that may be provided by it hereunder, it being acknowledged that all data in Purchaser's possession that relates to the business and operations of Corinthian was supplied to it by Corinthian.

(g)     Not less than 30 days after the Term, Purchaser shall be free to dispose of any and all of Corinthian's books, records, information and data whether electronically stored or otherwise in its sole discretion; provided that nothing herein is intended to contravene Purchaser's obligations with respect to retaining books, records, information or data under applicable non-bankruptcy law.

6.     Sections 2.02, 2.04, and 2.06. Sections 2.02, 2.04, and 2.06 of the TSA, including Schedule 2 referenced therein, are hereby deleted in their entirety.

7.     Article IV.     ARTICLE IV, MARKETING SERVICES is hereby deleted in its entirety.

8.     Section 5.01(b). Section 5.01(b) of the TSA is hereby deleted in its entirety and replaced with the following:

(b)     Aggregate Liability. Except for errors attributable to Purchaser's gross negligence or willful refusal to perform its obligations hereunder, Purchaser's liability for any failure to perform its obligations hereunder or any breach hereof shall be limited to the amount of fees (excluding any amounts paid in respect of third party costs or disbursements made by Purchaser) actually paid to Purchaser from and after the date hereof.

9.     Section 6.04. The following sentence shall be added to the end of Section 6.04 of the TSA:

Corinthian may assign its rights and obligations under this Agreement (as modified by the Amendment) to the Distribution Trust on the Plan Effective Date. For the avoidance of doubt, any references herein to Corinthian shall apply equally to the Distribution Trust on and after the Plan Effective Date notwithstanding the absence of any specific reference to the Distribution Trust in any particular provision of the Amendment.

10.     Section 6.05. Section 6.05 of the TSA is hereby amended in its entirety to read as follows:

Section 6.05. Set-off. Except with respect to Purchaser's payment obligations under Section 1.04 of this Amendment, by written notice to another Party, any Party shall have the right to and may set-off against any amounts payable by it to such other Party, any amounts payable to it by such other Party.

11.     Amended Schedule 2. Schedule 2 of the TSA is hereby deleted in its entirety.

12.     Amended Exhibit A. Exhibit A of the TSA is hereby deleted in its entirety and replaced with Amended Exhibit A attached hereto for the period from May 4, 2015 through the Plan Effective Date.

13.     Exhibit B. Exhibit B of the TSA is hereby deleted in its entirety.

14.     Exhibit D. Exhibit D of the TSA is hereby deleted in its entirety and replaced with Amended Exhibit D attached hereto for the period from May 4, 2015 through the Plan Effective Date.

15.     Mutual Releases. Upon payment by the Purchaser to the Distribution Trust of $200,000 in cash pursuant to the terms of Section 3 of this Amendment, Corinthian and its successors and assigns, including without limitation the Distribution Trust, on the one hand, and Purchaser, on the other hand, hereby fully, finally, and completely remise, release, acquit and forever discharge each of the others (and each of their respective directors, officers, members, shareholders, employees, agents, and affiliates) from any and all claims, complaints, rights, manner of action or actions, Avoidance, Actions, causes of actions, suits, debts, dues, demands, obligations, charges, costs, expenses (including but not limited to attorneys' fees), sums of money, controversies, damages, accounts and liabilities of every kind and nature whatsoever, whether at law or in equity, from the beginning of time until the Execution Date  that arise from, or are based on, in connection with, alleged in or related in any way to the TSA and this Agreement, , whether liquidated or unliquidated, fixed or contingent, matured or unmatured,

known or unknown, or foreseen or unforeseen.  Nothing in this Section 15 is intended to, nor shall it be construed to, release, waive, relinquish, discharge or otherwise affect Corinthian's, the Distribution Trust's or Purchaser's rights and obligations under this Agreement arising from and after the Execution Date.

16.     Counterparts.  This Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  This Amendment may be executed by facsimile or electronic (.pdf) signature and a facsimile or electronic (.pdf) signature shall constitute an original for all purposes.


[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first written above.

ZENITH EDUCATION GROUP, INC.

By: _____
Name: GREGORY A. VAN GUILDER
Title: TREASURER


CORINTHIAN COLLEGES, INC.

By: _____
Name:
Title:

Signature Page

81874501.10

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first written above.

ZENITH EDUCATION GROUP, INC.

By: _____
     Name:
     Title:

CORINTHIAN COLLEGES, INC.

By: _____
     Name:  STAN A. MORTENSEN
     Title:  EVP & GENERAL COUNSEL

81874501.10

## AMENDED EXHIBIT A

## SERVICES

| TRANSITION SERVICES | DESCRIPTION |
|---|---|
| **Student Account Services** | Purchaser shall use reasonable efforts, at the direction and with the supervision of Corinthian, with the processing of student accounts, including solely the following services:<br><br>• Reconciliation of state grant accounts<br>• 1098T processing, mailing and customer service |
| **Financial Aid Services** | Purchaser shall use reasonable efforts, at the direction and with the supervision of Corinthian, with the processing of student financial aid, including solely the following services:<br><br>• Management of federal system interfaces with COD and NSLDS for the purpose of updating student grant and loan amounts associated with the calculation and updates for Return to Title IV<br>• Assist in the voiding of prior student stipends previously issued and any subsequent credit balances that remain, return any Title IV credit balances through COD and provide non-Title IV balances by fund source.<br>• Perform exit calculations for all CCI students for the purpose of calculating Return to Title IV and application of institutional refund policies including the application of tuition adjustments, posting of any payment adjustments and the scheduling and posting of refund transactions including the interface to COD as referenced above.<br>• Perform final enrollment status reporting for CCI students once Return to Title IV calculations are completed.<br>• Support Weworski & associates in completing and submitting the final close out audit.<br>• Maintain read access to student information system for an additional 90 days post filing of the close out audit for the purposes of answering any close out related questions or corrections requested by ED.<br>• Approve continued PDPA access and SAIG mailbox ownership for the purposes of updating final close out procedures outlined above |
| **Information Management Systems** | Purchaser shall use reasonable efforts, at the direction and with the supervision of Corinthian, to provide Corinthian with information management systems services, including the following:<br><br>• Access and usage of CampusVue for purposes of enabling the Financial Aid services above<br>• Existing WAN circuits, connectivity, management & maintenance for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA<br>• Existing Voice circuits, connectivity, management & maintenance for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA<br>• Phone systems and existing I.T. supported (whether outsourced to Eloyalty or internally) ancillary software to them whether stand-alone or Student 2.0 Cisco infrastructure including the centralized PBX, any in-bound or out-bound phone lines used to deliver services for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA |

81874501.10
RLF1 12989588v.2

| TRANSITION SERVICES | DESCRIPTION |
|---|---|
| | <ul><li>Campus based Servers and supporting LAN equipment, network authentication and existing network security infrastructure until May 22, 2015</li><li>Desktop, Laptop, and Server configuration, setup, decommissioning, and patching according to existing established processes and procedures for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA</li><li>Existing reporting, data warehouse services for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA</li><li>Support and maintenance of existing Heald Data Center systems and services along with Canada specific systems and services until May 22</li><li>Help Desk support Services for employees and contractors, including CampusVue and account Active Directory administration for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA</li><li>Existing Corinthian security related Services pertaining to the systems maintained by Zenith for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA</li><li>Existing systems (applications, hardware, labor) and maintenance processes, as existed prior to the closing, related to the Services for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA</li><li>Existing Applications in use prior to closing and supported actively by I.T. such as:<ul><li>Peoplesoft Finance System</li><li>Peoplesoft HR System</li><li>Existing email based services including Activesync for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA</li><li>Those listed on the "Enterprise Environment/Application .pdf dated 11/5/14 and included as part of this Exhibit" for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA</li><li>Employee email within existing systems for schools until May 22, 2015 and for the Campus Support Center until the expiration of the TSA</li><li>emote user access capabilities via VPN or Webmail as existed prior to closing for the Campus Support Center until the expiration of the TSA</li><li>Vendor management and coordination of those vendors managed by IT prior to closing and required to provide services under this agreement for the Campus Support Center until the expiration of the TSA</li><li>Existing Biometric building entry system and administration for the Campus Support Center until the expiration of the TSA</li></ul></li><li>For avoidance of doubt, any systems storage data growth, or backup and retention requirements beyond those resources existing prior to closing will be at additional future cost to Corinthian.</li><li>Should any products or services currently in use by Corinthian be deemed obsolete or present a material security risk, Corinthian will be required to fund an upgrade to supportable products or eliminate usage of said products, or services, within a mutually agreed upon timeframe but in no event later than that deemed by Zenith to be an acceptable security risk timeframe.</li></ul> For the avoidance of doubt, the Enterprise Environment / Application Location matrix as of 11/5/14 is attached hereto as <u>Exhibit C</u>. All enterprise and application information technology set forth on such Exhibit will be supported by Purchaser on behalf of Corinthian under this Agreement during the Term. |
| Information Management | It is the responsibility of Corinthian to determine the identification of data to be backed up and provided to regulatory agencies, and to do so in such a manner and at a sufficiently early time |

| TRANSITION SERVICES | DESCRIPTION |
|---|---|
| Systems Migration | so as to permit Corinthian to fulfill its obligations. To the extent Purchaser provides any migration or data related services, advice and assistance on an "as is" basis, with no warranties, and only if and to the extent requested by Corinthian.<br><br>Mutual Obligations: Corinthian and Purchaser acknowledge that both Corinthian and Purchaser will share certain connectivity and responsibilities with respect to the systems accessed and used during the Term.  Accordingly, Corinthian and Purchaser commit that during the Term, Corinthian and Purchaser shall use and protect Purchaser's and Corinthian's systems, Services, and data utilizing no less a standard of care than employed by Purchaser and Corinthian during the 90 days prior to the commencement of the Term.  Corinthian and Purchaser further warrant to each other that they shall fully cooperate with each other's standard practices, and policies, related to the usage of systems and data covered under Purchaser policies and that such party's usage of any such systems and Services will not violate any service provider rules of use, licensing, or law. |
| Finance | Purchaser shall use reasonable efforts, at the direction and with the supervision of Corinthian, with finance functions, including the following:<br>• Processing of trade accounts payable<br>• Expressly excluded from the scope of this Agreement is the negotiation of contracts<br>• Purchaser shall process and issue payment for Corinthian's payroll checks from Corinthian bank account(s) every two weeks. Purchaser shall not fund any portion of Corinthian's payroll. Payroll includes:<br>   o Maintaining the PeopleSoft payroll system<br>   o Inputting the times sheet data<br>   o Auditing the data for accuracy<br>   o Year-end W-2 processing<br>• Processing of personal property taxes, sales and use tax returns. Expressly exclude from the scope of this Agreement are all other federal and state registrations, analysis, filings and tax returns.  Purchaser shall not fund any portion of Corinthian's taxes.<br>• Maintain the general ledger<br>• Produce necessary financial reports<br>• Management of student accounts<br>• Treasury and cash management services include:<br>   o Tracking of cash receipts at depository locations as specified by Corinthian<br>   o Tracking and posting of all funds flows in specified accounts<br>   o Stop payments<br>   o Corporate bank deposits<br>   o Electronic payment administration<br>• Provide support for working capital calculations and related matters<br>• [[Zenith involvement with CCI post-petition invoices is limited to the upload of payment information from a third party payment processor into the CCI ledger.]] [DISCUSS] |
| Human Resources | • Employee records management, creating separation notices for employees, benefits administration, and payroll processing<br>• Time and labor timekeeping system |

81874501.10
RLF1 12989588v.2

| TRANSITION SERVICES | DESCRIPTION |
|---|---|
| **Additional Services to be Identified and Added by mutual agreement** | Records functions. <br><br> • At the time of closing CCI will become custodian of all existing backup tapes (made prior to closing). Zenith will manage retrieval of the tapes through the transition period but upon conclusion of the transition period, all tapes will be transferred to CCI for management. Tapes created post closing will be copied and both entities will receive a copy of the tapes created from closing to the end of the transition services agreement. <br><br> • Physical records will be managed by Zenith throughout the transition. Upon conclusion of the transition period CCI will take ownership of the following records: <br>     ○ All records associated with the Retained Institutions <br>     ○ All corporate records such as legal files, HR files, financial files. <br><br> • Zenith will take ownership of files associated with schools owned by Zenith, financial aid processing files, and, in accordance with the APA, shall be custodian for records associated with closed schools. |

Amended Exhibit A, Page 4

## EXHIBIT B

**Marketing Services**

**[INTENTIONALLY DELETED]**

81874501.10
RLF1 12989588v.2

## AMENDED EXHIBIT D

### WEEKLY PAYMENT FOR SERVICES
### AND
### MINIMUM SERVICES ADVANCE ACCOUNT

| A | | 4-May | 11-May | 16-May | 25-May | 1-Jun | 8-Jun | 15-Jun | 22-Jun |
|---|---|---|---|---|---|---|---|---|---|
| B | Student Finance | $65,914 | $65,914 | $65,914 | $65,914 | | | | |
| C | SFA A&C | $12,036 | $12,036 | $12,036 | $12,036 | $12,036 | $12,036 | $12,036 | $12,036 |
| D | Student Finance | | | | | | | | |
| E | IT | $2,947 | $2,947 | $2,947 | $2,947 | $2,947 | $2,947 | $2,947 | $2,947 |
| F | HR | $2,846 | $2,846 | $2,846 | $2,846 | | | | |
| G | Records | $1,636 | $1,636 | $1,636 | $1,636 | $1,636 | $1,636 | $1,636 | $1,636 |
| H | Cash receipts journal (CRJ) | | | | $1,840 | | | | |
| I | Payroll | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 |
| J | Accounts Payable | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 |
| K | Accounting / Finance / Treasury | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 |
| | | | | | | | | | |
| L | One time outside costs | $73,750 | $23,750 | $23,750 | $23,750 | $14,690 | $143,664 | $0 | $0 |
| M | Total Weekly | $166,489 | $116,489 | $116,489 | $116,489 | $36,829 | $165,803 | $22,139 | $22,139 |
| N | Amount of Minimum Services Advance Account: | $1,039,078 | $872,589 | $756,101 | $639,612 | $523,123 | $486,295 | $320,492 | $298,353 |

Exhibit D, Page 1

| | | | 29-Jun | 6-Jul | 13-Jul | 20-Jul | 27-Jul | 3-Aug | 10-Aug |
|---|---|---|---|---|---|---|---|---|---|
| A | | | | | | | | | |
| B | Student Finance | | | | | | | | |
| C | SFA A&C | | $12,036 | $12,036 | $12,036 | $12,036 | | | |
| D | Student Finance | | | | | | $10,030 | $10,030 | $10,030 |
| E | IT | | $2,947 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| F | HR | | | | | | | | |
| G | Records | | $1,636 | $1,636 | $1,636 | $1,636 | | | |
| H | Cash receipts journal (CRJ) | | | | | | | | |
| I | Payroll | | $1,840 | | | | | | |
| J | Accounts Payable | | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 |
| K | Accounting / Finance / Treasury | | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 |
| | | | | | | | | | |
| L | One time outside costs | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | |
| M | **Total Weekly** | | **$22,139** | **$19,852** | **$19,852** | **$19,852** | **$16,210** | **$16,210** | **$16,210** |
| N | **Amount of Minimum Services Advance Account:** | | **$276,215** | **$254,076** | **$234,224** | **$214,372** | **$194,520** | **$178,310** | **$162,100** |

Exhibit D, Page 2

81874501.10
RLF1 12989588v.2

| | | 17-Aug | 24-Aug | 31-Aug | 7-Sep | 14-Sep | 21-Sep | 28-Sep | 5-Oct | 12-Oct |
|---|---|---|---|---|---|---|---|---|---|---|
| A | | | | | | | | | | |
| B | Student Finance | | | | | | | | | |
| C | SFA A&C | | | | | | | | | |
| D | Student Finance | $10,030 | $10,030 | $10,030 | $10,030 | $10,030 | $10,030 | $10,030 | $10,030 | $10,030 |
| E | IT | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| F | HR | | | | | | | | | |
| G | Records | | | | | | | | | |
| H | Cash receipts journal (CRJ) | | | | | | | | | |
| I | Payroll | | | | | | | | | |
| J | Accounts Payable | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 |
| K | Accounting / Finance / Treasury | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 | $1,840 |
| | | | | | | | | | | |
| L | One time outside costs | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | |
| M | Total Weekly | $16,210 | $16,210 | $16,210 | $16,210 | $16,210 | $16,210 | $16,210 | $16,210 | $16,210 |
| N | Amount of Minimum Services Advance Account: | $145,890 | $129,680 | $113,470 | $97,260 | $81,050 | $64,840 | $48,630 | $32,420 | $16,210 |

Exhibit D, Page 3