**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CORINTHIAN COLLEGES, INC., et al., | Case No. 15-10952 (KJC) |
| Debtors. | Jointly Administered |

## OPPOSTION TO DEBTORS' OBJECTION TO THE CLAIM
## OF THE ILLINOIS OFFICE OF THE ATTORNEY GENERAL

The People of the State of Illinois, by Lisa Madigan, Attorney General of the State of

Illinois ("Illinois Attorney General"), hereby responds to Corinthian Colleges' ("Debtors")

"Debtors Objection to the Claim of the Illinois Office of the Attorney General" ("Objection")

Docket No. 971. The Illinois Attorney General requests that this Court overrule Debtors'

Objection because of – (1) Debtors' failure to prosecute; (2) Debtors' lack standing to object to

the Illinois Attorney General's Claim; (3) Debtors' failure to provide the Illinois Attorney

General with proper notice; (4) Debtors' failure to provide evidence to rebut the Illinois Attorney

General's Claim; and (5) the substantial evidence in support of the Illinois Attorney General's

claim.  The Objection should be dismissed for the forgoing reasons.

## BACKGROUND

On December 14, 2011, the Illinois Attorney General served a Civil Investigative

Demand (CID) on Debtors. The CID requested information from January 1, 2006 through

December 14, 2011. Over the course of the next eighteen months, the Illinois Attorney General

investigated whether Debtors violated Illinois or federal law. The Illinois Attorney General met

with Debtors in July 2013 and presented them with findings that Debtors violated Illinois law

and the evidence supporting those findings. Debtors responded with a letter denying the

allegations in November 2013. The letter did not rebut the evidence gathered by the Illinois

Attorney General.  In June of 2014, Debtors publicly announced their financially precarious position and shortly thereafter the US Department of Education began to wind down Debtors' educational operations.

On July 16, 2015, the Illinois Attorney General filed its proof of claim in this action which is based on the above investigation. Claim No. 2968. On August 28, 2015, the Court entered the Confirmation Order for the Debtors' Liquidating Plan. Docket No. 913. The Plan created two trusts to which all of the Debtors assets and claims against the Debtors were assigned to: the Distribution Trust and the Student Trust. Docket No. 909. Under the Plan, Class 5 claims consisting of Student Claims and Government Education Claims are entitled to any distribution only from the Student Trust. Docket No. 909. On September 16, 2015, the Debtors filed their Objection to the Illinois Attorney General's claim. Docket No. 971.

On September 22, 2015, Notice was filed that all conditions to the Effective Date had occurred or been waived and that the Effective Date of the Plan was September 21, 2015. Docket No. 1014. Pursuant to Paragraph O of the Confirmation Order, on that date, the officers and directors of the Debtors were deemed to have resigned. Docket No. 913.

<u>**ARGUMENT**</u>

## I.    THE OBJECTION SHOULD BE OVERRULED FOR FAILURE TO PROSECUTE.

Debtors cannot prosecute the Objection because they have dissolved and no longer have any employees or agents to act on their behalf. Debtors served the Objection just three business days before the Plan went into effect, knowing that they would not exist to prosecute the Objection. On the Effective Date, which occurred on September 21, 2015, "Debtors' directors and officers and any remaining employees [were] deemed to have resigned . . . ." Docket No. 909 Art.XVII.R. Debtors could not have had a good-faith intention of litigating the Objection.

2

Indeed, Debtors failed to notice the Objection for hearing as required by Federal Rule of Bankruptcy Procedure 3007(a) ("A copy of the objection with notice of the hearing thereon shall be mailed or otherwise be delivered to the claimant, the debtor or debtor- in-possession, and the trustee at least 30 days prior to the hearing."). Debtors' failure to set the Objection for hearing, with no ability to cure this deficiency, alone amounts to a failure to prosecute. *See* Fed. R. Bankr. P. 7041 (failure to comply with court rules is grounds for dismissal of contested matter) (incorporating Fed. R. Civ. P. 41).

Regardless, now that the Effective Date has passed, there is no one left to act on Debtors' behalf because everyone has resigned. *See* Docket No. 909 Art.XVII.R. Thus, Debtors cannot prosecute the Objection. *See, e.g., In re Dole Food Co., Inc. Stockholder Litig.*, 110 A.3d 1257, 1261 (Del. Ch. 2015) ("Because of its lack of a body and mind, a corporation only can act through human agents."); *In re IBIS Corp.*, 272 B.R. 883, 893 (Bankr. E.D. Va. 2001) ("It can be more plausibly argued that the party objecting to the claim has abandoned the objection and that the objection . . . should be dismissed for failure to prosecute in which case the claim would be allowed."). Therefore, Debtors have failed to prosecute their Objection, and it should be dismissed.

## II.   DEBTORS LACK STANDING TO OBJECT TO THE ILLINOIS ATTORNEY GENERAL'S CLAIM

### A.   *The Filing of Debtors' Objection Was Not In The Interest of Creditors*

Pursuant to 11 U.S.C. § 1107(a), upon the filing of the Debtors' Chapter 11 proceedings, the Debtors became debtors in possession and assumed the duties of a trustee, with limited exceptions. Among the duties of the trustee is "if a purpose would be served . . . object to the allowance of any claim that is improper." 11 U.S.C. § 704(a)(5). In fulfilling such duties, however, it is "paramount" that the "debtor in possession in a bankruptcy case is to act on behalf

of the bankruptcy estate, that is, for the benefit of the creditors." *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000).

This case is a liquidating Chapter 11 proceeding in which the Court confirmed a liquidating plan that ended the existence of the Debtors on the Effective Date of September 21, 2015. Pursuant to the confirmed Plan, all assets, rights and obligations, and claims were assigned to one of two Trusts, the Student Trust and the Distribution Trust. The Illinois Attorney General's claim is being administered by the Student Trust, and the Student Trust is empowered to Object to the Illinois Attorney General's claim. *See* Docket No. 909 Art. X. C, F. Nonetheless, a mere five days before the Effective Date, the Debtors filed an objection to the Illinois Attorney General's proof of claim. In so doing, the Debtors were not acting in the interest of creditors and were not otherwise a party in interest entitled to object to a claim pursuant to 11 U.S.C. § 502(a).

The Student Trustee has not objected to the Illinois Attorney General claim, nor is it likely to do so, as the Student Trust is not expected to make any distributions, but rather is likely to fund and implement Student Claims Benefits Programs. These programs "may include outreach programs and assistance for Students in seeking discharges or releases of their student loan obligations. Accordingly, the Student Claims Benefit Programs could provide an immediate and impactful benefit to all Holders of Student Claims. The immediate establishment of programs dedicated to debt relief for Students has an intangible value far higher than any Distributions that might be made to Holders of Student Claims." Docket No. 909 Art. I. The Student Trustee must make distributions to the Allowed Student 507(a)(7) Deposit Claims and may make distributions to Student Claims Benefits Programs prior to any Allowed Government Education Claim. Docket No. 909 Art. X. C.

Therefore, whether or not the Illinois Attorney General's claim is allowed has no effect on the amount available for distribution from the Student Trust Assets to either the Allowed Student 507(a)(7) Deposit Claims or to the Student Benefits Claim Program. As a result, no creditor of the Debtors would benefit by objecting and prosecuting that objection to the Illinois Attorney General's claim.

### B.  Debtors Do Not Have A Pecuniary Interest

Debtors cannot be acting as a trustee because their actions in objecting to the Illinois Attorney General's claim lack any benefit to creditors. As a result, the Debtors in this liquidating Chapter 11 are more like a debtor in a Chapter 7 proceeding. To have standing to object to a proof of claim, a person must have a pecuniary interest in the outcome. *In re Toms*, 229 B.R. 646, 650 (Bankr. E.D. Pa. 1999) *citing In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir. 1998). An insolvent, liquidating debtor has no "pecuniary interest" in distributions and therefore lacks standing to object. *See, e.g., In re Olsen*, 123 B.R. 312, 313 (Bankr.N.D.Ill.1991) ("[A]n insolvent debtor is not a party in interest within the meaning of § 502(a) because the debtor has no pecuniary interest in the distribution of his/her assets among creditors." (citations omitted)); *In re Stanley*, 114 B.R. 777, 778 (Bankr.M.D.Fla.1990) ("[U]nless the Debtor can demonstrate that disallowing the claim would produce a surplus which would be available to the Debtor, the Debtor lacks standing to object to the claim." (citation omitted)). Debtors here clearly have no pecuniary interest because by the terms of the Confirmed Plan, no assets will revert to the Debtors, and the Debtors will cease to exist. Unable to benefit creditors and lacking a pecuniary interest, the Debtors lack standing to object to the Illinois Attorney General's claim. Therefore, the Court should overrule the objection.

### III.    DEBTORS FAILED TO PROVIDE PROPER NOTICE.

Assuming that Debtors do have standing to object to the Illinois Attorney General's Claim, Debtors failed to set the Objection for a hearing as required by Rule 3007. Bankruptcy Rule 3007 requires an objection to be served with a notice of hearing at least 30 days before the hearing. Fed. R. Bankr. P. 3007. The Illinois Attorney General was never served with a notice of hearing, thus the notice is deficient and should be overruled.

## IV. DEBTORS FAILED TO PROVIDE EVIDENCE TO REBUT THE ILLINOIS ATTORNEY GENERAL'S CLAIM.

It is well settled that a filed claim will be allowed unless a party-in-interest objects. 11 U.S.C. § 502(a). Bankruptcy Rule 3001(f) provides that a properly filed proof of claim is *prima facie* evidence of the validity and amount of the claim. In order to overcome the presumptive validity of the Illinois Attorney General's claim, a party-in-interest must produce evidence sufficient to negate the prima facie validity. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 174 (3d Cir. 1992). In objecting, a party-in-interest must produce substantial evidence to overcome the *prima facie* validity of the Illinois Attorney General's claim. *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53, 65 (Bankr. D. Del. 2002).

Contrary to Debtors' assertion in their Objection, the Debtors were aware of specific allegations of wrongdoing by the Illinois Attorney General. The Illinois Attorney General met with Debtors in July 2013 and presented them with the Office's claims and the underlying evidence. In November 2013, Debtors responded to the claims with a letter which the Illinois Attorney General found unpersuasive.

Despite having extensive knowledge of the claims and the underlying evidence, Debtors failed to produce any evidence in support of their Objection. In the Objection, Debtors allude to, but fail to provide, "rebuttal information." Objection at 3. All Debtors provide in support of their Objection is a copy of three answers to complaints filed by other parties. The Illinois Attorney

General is not a party to these cases and the answers do not even address the Illinois Attorney

General's investigation of Debtors. Even if they did, these documents do not constitute evidence;

mere rote denials and assertions of legal defenses are not evidence. No factual assertions to rebut

the Illinois Attorney General's claim were made; rather, Debtors merely broadly deny the

underpinnings of the claim. Thus, the Debtors have not overcome the presumptive validity of the

Illinois Attorney General's claim. As a result, the Court should overrule the Objection.

V.      **THE ATTORNEY GENERAL FOUND THAT DEBTORS ENGAGED IN UNFAIR AND DECEPTIVE ACTS AND PRACTICES AGAINST ILLINOIS STUDENTS IN VIOLATION OF ILLINOIS CONSUMER FRAUD LAW.**

Even if the Debtors' had submitted evidence in support of their Objection to the Illinois

Attorney General's claim, Debtors cannot overcome the evidence of unlawful conduct under the

Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*, that the Illinois Attorney General obtained

over the course of its investigation.[1] The investigation produced substantial, unrebutted evidence

of misrepresentations in Debtors' job placement statistics, misrepresentations concerning its

Medical Assisting Programs, misrepresentations concerning its Dental Assisting Programs, and

misrepresentations and unfairness in its Institutional Loan Program.

a.      **Debtors Misrepresented Job Placement Statistics to Prospective Students.**

The Illinois investigation uncovered substantial evidence that Debtors materially

misrepresented job placement statistics to prospective students. Debtors' job placement statistics

were inflated through a variety of misrepresentations, including 1) counting students as placed in

fields that required state licensure when the students did not pass the licensing exam; 2) counting

students as placed in field when they attended one-day job field trips that Debtors organized; 3)

mischaracterizing jobs as in field; 4) counting jobs that students had prior to attending Debtors'

---

[1] Evidence of Debtors' conduct described herein can be provided to the Court upon notice to the Illinois Attorney General.

schools; and 5) claiming students obtained jobs they did not. In addition to inflating job

placement statistics, Debtors also presented students with outdated job placement data, provided

job placement disclosures only after students enrolled, and orally misrepresented job placement

rates to prospective students.

For at least five years, in written disclosures to students, accreditors, and the State of

Illinois, Debtors grossly inflated the percentage of massage therapy graduates who were placed

in their field by counting students as placed even though the students failed to pass the state

licensure exam. Under Illinois' Massage Licensing Act, 225 ILCS 57/1 *et seq.*, massage

therapists must be licensed by the Illinois Department of Financial and Professional Regulation

(IDFPR) in order to perform massage therapy for compensation. 225 ILCS 57/15(a). Debtors

reported massage therapy job placement rates to prospective students that were materially higher

than its exam passage rates for at least five years, from 2006-2010.

Under Illinois law, enrollment agreements for private business and vocational schools,

such as those Debtors ran, must be accompanied by job placement data. 105 ILCS 426/40; 105

ILCS 426/37. On their enrollment agreements, Debtors misrepresented to prospective massage

therapy students that as many as 95% of massage therapy graduates got jobs in their field of

study, when exam passage rates ranged from 45% to 0%. This misrepresentation that unlicensed

graduates were "employed in field" regularly led to misleading disclosures for prospective

students at five of Debtors' Illinois campuses, Skokie, Burr Ridge, Chicago, North Aurora, and

Merrionette Park. In addition to misrepresenting the job placement rate, the disclosures on the

enrollment agreement either grossly inflated the exam passage rate or implied that a licensing

exam is not required to work as a massage therapist.  Debtors also inflated massage therapy

placement rates by printing business cards for massage therapy students and then claiming they were self-employed, without any regard to students' income or lack of licensure.

Debtors set up one-day field trips for students and then counted each participant as "placed" for purposes of calculating Debtors' job placement rate.  For example, on July 2, 2008, Debtors sent approximately 60 students on a one-day field trip to Home Away From Home, a home health organization. Each student was paid $36 by Home Away from Home. The students were not scheduled to work any hours beyond July 2, 2008. The students were not to receive any further compensation from Home Away from Home. None of the 60 students were hired by Home Away from Home for ongoing employment beyond July 2, 2008. Nevertheless, the company counted 60 students as placed in the data that it submitted to its accreditor. The effect of these phony placements was to significantly inflate the job placement rate that Debtors reported to their prospective students and accreditor.

Debtors further inflated their placement rate by misclassifying positions as in field when they were not. In Debtors' Medical Assisting programs, graduates who obtained jobs as home health aides were routinely counted as having been placed in their field. Home health aides do not require a certificate and in some cases do not require even a high school diploma. Debtors acknowledged that graduates of their Medical Assisting programs who obtained jobs as home health aides should not have been counted as placed in field. The decision to count home health positions as "placed" led to major inflation in Debtors' job placement rate. In another example, Debtors' counted Medical Administrative Assisting graduates as placed in-field when they worked as cashiers at CVS and Jewel Osco. Debtors' Heald schools were fined nearly $30 million dollars by the United States Department of Education based in part on similar conduct.

In fact, many Illinois graduates of Debtors' programs were cashiers and home health aides before they enrolled or before they graduated. The fact that the students obtained these jobs prior to graduation or even enrollment was not disclosed to prospective students. Debtors' Heald schools were fined nearly $30 million dollars by the United States Department of Education based in part on similar conduct.

Finally, Debtors even went so far as to claim students were placed in jobs where they were not. For example, Tamela Willaims complained to the Illinois Attorney General about a lack of job placement help from Debtors and Debtors responded that she had been placed in a job. Ms. Williams was able to obtain written proof from the alleged employer that she was never employed there.

Illinois law requires that disclosures on job placement rates be attached to enrollment agreements. 105 ILCS 426/40; 105 ILCS 426/37. The disclosures must be for the most recent fiscal year from July 1 to June 30. 105 ILCS 426/37. At all of their Illinois campuses, Debtors provided prospective students with job placement disclosures that were out of date. In many instances, the result of this practice is that prospective students who enrolled, for example, in 2010, were given 2006-2007 job placement figures that were before the economic downturn.

Debtors regularly had students sign enrollment agreements before receiving the disclosures that are required to accompany the agreement. The disclosures are intended to help students make informed decisions regarding their education. By providing them after students sign the enrollment agreements, Debtors denied the student information that is critical when considering whether to enroll in a vocational program. As a result, many students were either misled about job placement because they received old information or they did not receive any information on job placement until after they enrolled, in violation of Illinois law.

Admissions representatives falsely told prospective students that the program in which they are considering enrolling has a placement rate of 90% or more. Admissions representatives also falsely claimed that 80-90% of graduates are hired out of externships. These oral misrepresentations compound the deceptiveness of the written misrepresentations.

The cumulative effect of all these misrepresentations on job placement is to create job placement rates that are untrue and misleading to students.

**b.  Debtors Made Misrepresentations About Their Medical Assisting Programs.**

The Illinois investigation uncovered misrepresentations by Debtors to prospective students about Debtors' medical assisting programs. Debtors misrepresented medical assisting programs as programmatically accredited when the programs were not.

The majority of employers who hire medical assistants – physicians, clinics and hospitals – require potential medical assistant employees to have formal training and certification as a Certified Medical Assistant ("CMA"). According to Everest's own website:

> "[w]hile a medical assistant certification is not required by law for those working in the field, a large percentage of professionals choose to become certified. Whatever the reason for becoming a certified medical assistant, it can be a step in the right direction for anyone who is serious about pursuing a career in the industry. A medical assistant certification can help insure patients that a professional is well trained and qualified to assist in their health care issues."

In order to become a CMA an individual must qualify to sit for – and must pass – the "Certified Medical Assistant Exam" administered by the American Association of Medical Assistants ("AAMA"). Everest's own website acknowledged that medical assistant certification is considered to be a professional seal of approval.

While a variety of post-secondary institutions offer Medical Assistant programs, not all of those programs qualify graduates to sit for the Certified Medical Assistant Exam. Only

graduates from Medical Assistant programs with "programmatic accreditation" may sit for the

AAMA's CMA Exam. Two medical assistant accreditation bodies are recognized by the United

States Department of Education:  The Commission on Accreditation of Allied Health Education

Programs ("CAAHEP"), and the Accreditation Bureau of Health Education Schools ("ABHES").

Only graduates of Medical Assistant programs accredited by CAAHEP or ABHES are eligible to

take the AAMA certification exam to become a CMA.

Debtors' Loop campus and Merrionette Park campus were never accredited by CAAHEP

or ABHES. Everest College's Burr Ridge Medical Assistant program was not CAAHEP

accredited prior to September 2007 and was never ABHES accredited. The Skokie Medical

Assistant program was not CAAHEP accredited prior to March 2007 and was never ABHES

accredited. The North Aurora Medical Assistant program was not ABHES accredited prior to

2013 and was never CAAHEP accredited. Everest's Bedford Park Medical Assistant program

was not ABHES accredited until 2013 and was never CAAHEP accredited. Everest's Melrose

Park Medical Assistant program was not ABHES accredited until 2013 and was never CAAHEP

accredited.

Everest's website implied that its campuses would prepare students to sit for the CMA

exam.  Everest had a website with information on Medical Assistant programs. That site

contained a "Certification" section, which included the following information on Certified

Medical Assistants:

> Certified Medical Assistant (CMA)
> A certified medical assistant is a medical assistant **who has passed
> the examination issued by the American Association of Medical
> Assistants.** The medical assistant **certification is considered to be
> a professional seal of approval that** individuals have the
> necessary knowledge and expertise to work as medical assistants.
> (Emphasis added).

12

On the same page, Everest presented a list of FAQs, which contained the following:

>FAQs on Medical Assistant Certification
>
>Am I eligible to take the exam? **You are an eligible candidate to take the exam if you are a graduate from an accredited school offering a medical assistant training program.** (Emphasis added.)

This statement wrongly claimed that graduates of an accredited school are eligible to sit for the CMA exam. In fact, all of Debtors' campuses were accredited but, as discussed earlier, only those campuses with *programmatic* accreditation by CAAHEP or ABHES qualified students to sit for the CMA exam.

Everest's disclosures wrongly implied that campuses that lack programmatic accreditation are, in fact, programmatically accredited. For example, the 2011 program disclosures for Everest Melrose Park  state the following:

>**Programmatic Accreditor - The Medical Assistant program is accredited by the Commission on Accreditation of Allied Health Education Programs** (www.caahep.org) upon the recommendation of the Medical Assistant Education Review Board (MAERB). MAERB uses the following formula to calculate placement for accredited programs: number of graduates employed full or part-time in a related field, as well as those continuing their education or serving in the military, divided by number of graduates. Time Frame: January 1, 2005, through December 31, 2009. (Emphasis added.)

In fact, as of 2011 when the disclosure is dated, Everest Melrose Park was *not* accredited by CAAHEP.

Similarly, the 2012 disclosure for Everest Merrionette Park identified ABHES as the campus's programmatic accreditor. In fact, the Merrionette Park campus's Medical Assisting program was not accredited by either ABHES or CAAHEP in 2012. As of 2014, Debtors removed from their disclosures any reference whatsoever to campuses' programmatic accreditation. Moreover, potential Everest students were told by admissions representatives that

certain Everest Medical Assistant programs would certify those students to take the exam when, in fact, the programs were not CAAHEP accredited.

Everest's disclosures also concealed the fact that graduates of Everest's Medical Assisting program are required to pass an exam in order to obtain certifications as Certified Medical Assistants. Specifically, Debtors' enrollment agreements are required under Illinois law to state the number of students who pass a licensing exam in each program. However, many of Debtors' enrollment agreements said "NA" where they are supposed to disclose the passage rate on medical assisting licensing exams.

In addition, in selling the Medical Assisting program to Illinois consumers, Everest admissions representatives wrongly suggested that Medical Assisting is the first step to obtaining a job as a nurse. Everest's television commercials also said that Everest has a nursing program, when in Illinois, it did not.

### c.   Debtors Made Misrepresentations About Their Dental Assisting Programs.

The Illinois investigation uncovered misrepresentations by Debtors to prospective students about Debtors' dental assisting programs. Debtors misrepresented dental assisting programs as programmatically accredited when the programs were not. They misrepresented that it was required to graduate from a programmatically accredited dental assisting program in order to become a certified dental assistant in Illinois, when in fact no schooling is required.  A consumer needs to either graduate from a certified dental assisting program, or complete 3,500 hours of work experience, in order to become eligible to be a certified dental assistant. Because Debtors' Illinois dental assisting programs were not programmatically accredited, they provided students no assistance in becoming a certified dental assistant.

In Illinois, an individual does not need any work experience or even a high school diploma to become an entry-level dental assistant.  Some employers who hire dental assistants, including dentists, clinics, and hospitals, prefer to hire applicants without any training, and then train those new dental assistants on the job.  Some employers who hire dental assistants, including dentists, clinics and hospitals, require employees to have formal training and certification as a Certified Dental Assistant ("CDA").

The American Dental Association recognizes the Dental Assistant National Board ("DANB") as the national certification board for dental assistants. In order to become a CDA in Illinois, an individual must qualify to sit for – and must pass – the "Certified Dental Assistant Exam" administered by the DANB. An individual who wishes to sit for the CDA Exam administered by the DANB can become eligible via two separate pathways. First, an individual can present to DANB evidence of graduation from a dental assistant program accredited by the Commission on Dental Accreditation of the American Dental Association (CODA). Second, an individual can present to DANB evidence of a high school diploma or GED, plus 3,500 hours of dental assistant experience under the supervision of a licensed dentist.

None of Everest's Illinois' dental assisting programs were programmatically accredited by CODA, although every Everest Illinois campus apart from North Aurora offered a Dental Assistant Program. Therefore, graduates from all of Everest's Illinois Dental Assisting Programs can only become eligible to sit for the DANB exam via the second pathway – by presenting the DANB with evidence of a high school diploma or GED plus 3,500 hours of dental assistant experience under the supervision of a licensed dentist. In short, Everest's Dental Assisting programs did not prepare graduates to sit for the exam that would allow those graduates to become Certified Dental Assistants in Illinois.

Everest College maintained a website, http://dentalassistant.everestcollege.edu, which provides information about Everest's Dental Assistant programs. That site contained a "Certification" section, which included the following information on Certified Dental Assistants:

> A certified dental assistant carries the distinction of having been certified by the Dental Assisting National Board (DANB). The DANB is the American Dental Association's only recognized board. To be eligible to take the Certified Dental Assistant (CDA) exam, an individual must have graduated from an American Dental Assistant (ADA) accredited program, **and** completed 3,500 hours of work experience (full-time or part-time. An additional requirement to take the CDA exam is a General Educational Development (GED) certificate or high school diploma*

Further down the page, after the * symbol, is the following text: "Not all states require the dental assistant certification in the delegation of duties." Everest therefore misrepresented on its website that in order to be eligible to take the DANB CDA exam, an applicant must have graduated from "an American Dental Assistant (ADA) accredited program, and completed 3,500 hours of work experience (full-time or part-time)." This is not, in fact, the case.

As described above, the DANB offers two different pathways to eligibility for the CDA exam. The first pathway requires graduation from a CODA-accredited dental assistant program. If an applicant graduates from a CODA-accredited dental assistant program, that applicant does not have to complete 3,500 hours of work experience as a dental assistant under the supervision of a licensed dentist. None of Everest's Illinois Dental Assistant programs were CODA-accredited. The second pathway requires a high school diploma or GED and completion of 3,500 hours of work experience as a dental assistant under the supervision of a licensed dentist. These "second pathway" applicants do not, contrary to the statement on Everest's website, also have to graduate from an American Dental Assistant (ADA) accredited program. Everest's website

therefore misrepresented the pathways for becoming a Certified Dental Assistant to prospective students.

Debtors' admissions representatives also made a variety of affirmative misrepresentations to prospective students regarding Debtors' Dental Assistant programs, including, but not limited to misrepresentations to prospective students regarding graduates' eligibility to sit for the CDA exam, the transferability of the Dental Assistant programs' credits, whether a Dental Assistant diploma is required to enter the field of dental assisting in Illinois, and whether a Dental Assisting diploma is a pre-requisite for a Dental Hygienist program. Debtors also misrepresented to prospective students who were interested in a Dental Hygienist program that Dental Assistants performed the same job as Dental Hygienists.

Several Everest students who enrolled in Everest's Dental Assistant program at Everest's Melrose Park campus were told repeatedly by admissions representatives that the program was certified and students would be certified upon graduation, when in fact that was not the case. Several students were also told by admissions representatives that their credits would easily transfer to another institution, when in fact they would not. Several students found out, three months into the Dental Assistant program, that they would not be certified upon graduation and that their credits would not easily transfer to another institution. A faculty member who shared this information with students was fired soon after. These students wanted to drop the program, but ultimately chose not to because 30 days had elapsed and the students were already liable for the loans they had taken out in order to pay for the 8-month, $17,000-$18,000-program.

### d.  Debtors' Institutional Loan Programs Were Deceptive & Unfair to Students.

Under federal law, Debtors could derive no more than 90% of their revenue from federal sources. These regulations are commonly referred to as the 90/10 rule. The 90/10 rule was

designed to ensure that schools were of sufficient quality to attract private funding. In 2008,

private lenders stopped funding loans to cover the costs of Debtors' programs. Debtors

responded by creating loan programs that they funded and controlled, referred to herein as

Debtors' institutional loan programs. Approximately 50% of Debtors' students took out loans

through these programs. The institutional loan programs were created in order to insure that

Debtors kept 10% of their revenue non-federal, thereby maintaining access to federal student

loans, which accounted for the other 90% of its revenue.

Debtors controlled the institutional loan programs. Under the institutional loan programs,

Debtors were required to repurchase the institutional loans. At times, Debtors did not have to

repurchase the loans until they were 90 days past due, but at any one time, at least 50% of the

institutional loans were more than 90 days past-due. Financial aid officers did not tell students

that Debtors purchased institutional loans.

Debtors provided students with a "Preferred Lender List" that only listed the lender

currently participating in the institutional loan program. Despite Debtors' control over and

funding of the institutional loans, the Preferred Lender List concealed this relationship and

implied that its institutional loans were provided by an independent third-party lender:

> The lender listed below has expressed a willingness to make private education
> loans to Everest students who meets its eligibility and credit criteria. In addition,
> while we do not promote or endorse this lender, we expect this lender to provide
> satisfactory customer service and representatives who can assist borrowers to
> make informed decisions. The lender listed below will work within our processing
> system and disburse funds to the student's account quickly using electronic funds
> transfer.

Debtors used high-pressure tactics to sign students up for Genesis loans on Debtors'

campuses. Financial aid officers were trained to "not let students leave" until they completed

enrollment and financial aid packages. Financial aid officers were trained to keep potential

students on campus until they completed all financial aid and enrollment paperwork.  The officers were discouraged from allowing consumers to take their paperwork home and review it. Financial aid officers were encouraged to sign students up as quickly as possible. One financial aid officer was criticized in an evaluation for allowing a student to wait one week: "Why didn't you ask her to come back this week and not allow her to push it off a week."

In order to maximize revenue, Debtors trained employees to aggressively collect on institutional loans while students remained enrolled in school, a fact that was not disclosed to students when they took out the loans. Debtors pulled students out of class, denied students externships, and denied students diplomas in order to pressure them to make payments. Financial aid officers pressured and harassed students who fell behind on their Genesis loan payments because the payments were "Debtors' money". Debtors paid bonuses to directors and schools with high repayment rates. Financial aid officers were trained to use the following levers to collect payments:

     a. "Secure adequate funding 'up-front'"
     b. "Collect while students are active"
     c. "Review prior to Externship."
     d. "Review prior to taking National Board exam."
     e. "Work, work, work, and then work some more!"
     f. "Contact known dropped students to seek their re-entry into their program of study."
     g. "Contact known graduates to secure payment on their balance—allows for release of official transcript and diploma."
     h. "Secure issued books from cancelled/reversed students to remove or reduce their balance with the school."
     i. "Send students to finance department when requested."

Debtors' institutional loans are consistently characterized by high rates of default and delinquency. More than 60% of students with institutional loans defaulted within three years, a fact that was not disclosed to prospective students. Student loan debt is not dischargeable in bankruptcy.

**e.   The Unfair and Deceptive Acts and Practices Described
Above Are Violations of the Illinois Consumer Fraud Act.**

In order to show a violation of Section 2 of the Illinois Consumer Fraud Act ("ICFA"),

the Illinois Attorney General needs to show that a defendant is: (1) engaged in trade or

commerce; and (2) committed unfair or deceptive acts or practices in the conduct of that trade or

commerce. *See People ex rel. Hartigan v. Stianos*, 131 Ill. App. 3d 575, 580 (1985). In addition,

the Illinois Attorney General must also show that the defendant intended the consumer to rely on

his omissions and misrepresentations. *See People ex rel. Madigan v. United Const. of Am., Inc.*,

2012 IL App (1st) 120308, ¶ 9. Circumstantial evidence may be used to establish intent. *See Totz*

*v. Cont'l Du Page Acura,* 236 Ill. App. 3d 891, 903 (1992).

The ICFA is distinct from common law fraud. The Illinois Attorney General need not

show actual reliance under the ICFA. *See Washington Courte Condo. Ass'n-Four v. Washington-*

*Golf Corp.*, 267 Ill. App. 3d 790, 823 (1994).  Likewise, there is no requirement of *scienter*

under the ICFA. *See Duran v. Leslie Oldsmobile, Inc.*, 229 Ill.App.3d 1032, 1039 (1992). The

Illinois Attorney General does not need to demonstrate that a defendant's actions proximately

harmed any consumer in order to prove a violation under Section 2 of the ICFA. *See United*

*Const. of Am., Inc.*, 2012 IL App (1st) 120308 at ¶ 16.

The forgoing evidence uncovered in the Illinois Attorney General's investigation of

Debtors constitutes multiple violations of the ICFA. Debtors were engaged in trade or commerce

in Illinois by enrolling Illinois students into educational programs located in Illinois.

Misrepresenting job placement statistics to prospective students, particularly students interested

in enrolling in a vocational school, was a deceptive act. Misrepresenting that Debtors' medical

assisting programs were programmatically accredited so as to allow students to become certified

medical assistants was a deceptive act. Misrepresenting that Debtors' dental assisting programs

were programmatically accredited so as to allow students to become certified dental assistants was a deceptive act. Misrepresenting that prospective students were required to attend a programmatically accredited dental assisting program in order to become certified dental assistants was a deceptive act. Misrepresenting that students who took out institutional loans did so through an arms-length transaction with a third party, while omitting that over 60% of the loans would default within three years, that Debtors was required to buy back the loans, and that Debtors aggressively pursued collection while students were in school, was an unfair and deceptive act. All of these actions were taken so that prospective students would enroll in Debtors' schools and Debtors could collect the students' federal student loans, showing intent by Debtors that the students rely on the misrepresentations and omissions.

## <u>CONCLUSION</u>

For the reasons set forth, the Court should overrule Debtors' Objection to the Illinois Attorney General's Claim. In the alternative, the Illinois Attorney General reserves the right to seek discovery and to request hearings to prove up their Claims in a contested proceeding.


Dated: December 9, 2015                     Respectfully submitted,
                                            */s/ Joseph M. Sanders*
                                            Joseph M. Sanders
                                            Cecilia Abundis
                                            Assistant Attorney's General
                                            100 W Randolph St., 12th Fl.
                                            Chicago, IL 60601
                                            Telephone: 312-814-6796
                                            Fax: 312-814-2593
                                            E-mail: jsanders@atg.state.il.us
                                            cabundis@atg.state.il.us
                                            *Attorneys for the*
                                            *People of the State of Illinois*

## CERTIFICATE OF SERVICE

I, Joseph Sanders, hereby certify that on the 9th day of December, 2015, I caused a true and correct copy of the foregoing OPPOSTION TO DEBTORS' OBJECTION TO THE CLAIM OF THE ILLINOIS OFFICE OF THE ATTORNEY GENERAL to be served electronically through the Court's ECF system upon those who have entered an appearance in this proceeding, and via overnight mail to the persons listed below.

| | | |
|---|---|---|
| <u>December 9, 2015</u> | <u>Joseph M. Sanders</u> | <u>*/s/ Joseph M. Sanders*</u> |
| *Date* | *Printed Name* | *Signature* |

*Via Overnight Mail:*
The Honorable Kevin J. Carey
824 North Market Street
5th Floor
Wilmington, DE 19801