## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| CORINTHIAN COLLEGES, INC., *et al.*[1] | § | |
| | § | Case No. 15-10952 (KJC) |
| | § | |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | **Obj. Deadline:  Sept. 6, 2016 at 4:00 p.m. (ET)** |
| | § | **Hearing Date:  Sept. 20, 2016 at 2:30 p.m. (ET)** |

-----------------------------------------------------------

### DISTRIBUTION TRUSTEE'S MOTION TO REQUIRE ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY TO TURN OVER CERTAIN RECORDS OF CORINTHIAN COLLEGES, INC.'S SELF-FUNDED HEALTH PLAN

Craig R. Jalbert, the distribution trustee ("**Trustee**") for the distribution trust ("**Distribution Trust**") established under the *Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [D.I. 909] (the "**Plan**"), requests entry of an order requiring Anthem Blue Cross Life and Health Insurance Company ("**Anthem**") to turn over certain records relating to the self-funded health plan that Anthem managed on behalf of Debtor Corinthian Colleges, Inc. ("**Corinthian**").

### Introduction

1.      Like many employers, Corinthian offered health care to its employees and their families.  Under a traditional health plan, the employer pays premiums to an insurance

---

[1] The debtors in these cases (the "**Debtors**"), along with the last four digits of each debtor's federal tax identification number, are:  Corinthian Colleges, Inc. (7312), Corinthian Schools, Inc. (0525), Rhodes Colleges, Inc. (7311), Florida Metropolitan University, Inc. (7605), Corinthian Property Group, Inc. (2106), Titan Schools, Inc. (3201), Career Choices, Inc. (1425), Sequoia Education, Inc. (5739), ETON Education, Inc. (3608), Ashmead Education, Inc. (9120), MJB Acquisition Corporation (1912), ECAT Acquisition, Inc. (7789), Pegasus Education, Inc. (2336), Grand Rapids Educational Center, Inc. (2031), Rhodes Business Group, Inc. (6709), Everest College Phoenix, Inc. (6173), CDI Education USA, Inc. (0505), SP PE VII-B Heald Holdings Corp. (0115), SD III-B Heald Holdings Corp. (9707), Heald Capital LLC (6164), Heald Real Estate, LLC (4281), Heald Education, LLC (1465), Heald College, LLC (9639), QuickStart Intelligence Corporation (5665), and Socle Education, Inc. (3477).

company, and the insurance company assumes the risk of paying benefits from its own funds. Corinthian's plan differed in that it was a "self-funded" plan.  In a self-funded plan, the employer cuts out the insurance company and pays benefits directly from company money (and saves on premiums that it would have paid to an insurance company).  Corinthian paid benefits from a pre-funded account that it set up as part of its health plan.

2.      Corinthian hired Anthem as a "third party administrator" to manage the self-funded plan.  Anthem decided which claims to approve and what benefits to pay, based on its assessment of whether a claim satisfied the health plan's terms.  If Anthem approved a claim, then it paid benefits using Corinthian's money.  In exchange for these management services, Corinthian paid Anthem a monthly servicing fee.  As the plan administrator, Anthem holds the plan's books and records, including information about what benefits were paid, how much, and why.

3.      The Distribution Trust believes that it may hold claims against Anthem for improperly accounting for plan funds or paying benefits not in accordance with plan terms, and it has retained advisors to assess these issues.  Because Anthem holds the plan's books and records, the Distribution Trust requested that Anthem turn over certain records about the payments that Anthem approved.  But after months of requests, and despite acknowledging that the information belongs to Corinthian, Anthem turned over only partial information that prevents the Distribution Trust from performing its analysis.  For example, Anthem will not turn over the "allowed amounts" and "ineligible amounts" for the benefits that it approved.  It also "scrambled" other information that the Distribution Trust needs.  As a result, the Distribution Trust's advisors cannot effectively analyze that data.  Until Anthem turns over the complete records requested, the Distribution Trust cannot perform its analysis properly.

2

4.      Corinthian is entitled to know how the company that it hired to manage its self-funded health plan spent that money.  Bankruptcy Code § 542(e) authorizes the turnover of books and records that "relat[e] to the debtor's property or financial affairs."  The records here relate to how Anthem spent Corinthian's funds.  The Distribution Trust therefore requests that the Court order Anthem to provide the information attached hereto as **Exhibit A** under Bankruptcy Code § 542(e).   In the alternative, and only to the extent necessary, the Distribution Trust requests production of the records under Bankruptcy Rule 2004.

## **Background**

5.      Before its bankruptcy, Corinthian sponsored a group health plan for its eligible employees and their dependents.  Unlike a traditional "fully-insured" plan where a company contracts with an insurance company to cover benefits, Corinthian's plan was "self-funded," meaning that Corinthian paid benefits from its own funds.  Corinthian pre-funded the plan by transferring money into an account to be administered for plan beneficiaries.  From time to time, Corinthian transferred additional funds into the account to replenish its balance.

6.      In 2010, Corinthian retained Anthem to manage the health plan.  Among other things, Anthem had the fiduciary authority to process claims, determine what benefits were due, and pay those amounts to beneficiaries.  If benefits were due and payable, then Anthem would bill Corinthian's pre-funded account.   In return for these services, Corinthian paid Anthem a monthly servicing fee.   Upon information and belief, in the years prior to bankruptcy, Corinthian's plan (under Anthem's management) paid approximately $50 million in benefits per year.

7.      The Debtors filed for bankruptcy in May 2015, and the Court confirmed the Plan in August of that year.  [D.I. 913].  A month later, the Plan went effective and the Debtors set

up the Distribution Trust. The Distribution Trust was established "as a mechanism for liquidating, converting to Cash and distributing the Aggregate Trust Assets for the benefit of the Distribution Trust Beneficiaries…." Corinthian Distribution Trust Agreement § 2.5(a) [D.I. 767]. To carry out this purpose, the Debtors transferred all of their assets to the Distribution Trust (except for certain excluded assets not relevant here), including all claims and causes of action. Plan § IX.B; *see also* Corinthian Distribution Trust Agreement § 2.2.

8.     The Distribution Trust believes that it may hold claims against Anthem relating to its management of the health plan, including for not properly processing claims in accordance with plan terms. To determine the extent of any claims, the Distribution Trust requires the records for Corinthian's plan that are listed in **Exhibit A**.

9.     As Exhibit A demonstrates, the Distribution Trust seeks specific accounting entries for Corinthian's health plan: the patient's name and claim number; the date and place of service; the name of the health provider; the diagnosis codes; the total charge, eligible amount, ineligible amount, and deductible; any co-insurance amounts; the amount paid by the health plan; the check numbers; and similar data. In other words, it is the basic accounting and financial records for Corinthian's health plan.

10.     The Distribution Trust has retained Remnant Capital LLC—a firm experienced in dealing with employee benefit issues in distressed companies—to assist it in reviewing this claims data and assessing the viability of any recoveries against Anthem. This review includes comparing Anthem's benefits decisions to the terms of Corinthian's health plan to determine whether those terms were followed. To carry out this analysis, professionals from Remnant Capital requested the health plan's records from Anthem in January 2016. Anthem's response, to be charitable, was slow. After more prompting by Corinthian, in May 2016 Anthem asked

4

Remnant to sign a confidentiality agreement, which Remnant did. Anthem then released some data, but omitted important information like allowed amounts and denied amounts that Remnant needs to conduct its analysis. Anthem also scrambled other information, such as the names of the health care providers, which renders that information of limited use. Exhibit A identifies which categories of records Anthem withheld. *See* Ex. A (yellow columns denote information not received).

11.    After receiving this partial turnover, the Distribution Trust requested the missing information. Anthem contended that it need not turn over the missing information because in its view, the records it provided were good enough. Of course, Anthem knew full well why the Distribution Trust wanted the information, and so was in the position of the proverbial fox guarding the henhouse—the wrongdoer limiting access to information about the wrongdoing— which is a clear conflict of interest. In an attempt to avoid burdening this Court, the Distribution Trust spent two months responding to Anthem's questions about why it needed the information to complete its analysis. After long spells of silence, Anthem has now stopped responding. The Distribution Trust is left with no choice but to seek the Court's assistance, and asks that the Court order Anthem to produce the missing records for Corinthian's health plan.

## **Relief Requested**

A.    **Because the requested records are "recorded information relating to the debtor's property or financial affairs," Anthem should be required to turn them over under Bankruptcy Code § 542(e)**

12.    Bankruptcy Code § 542(e) authorizes the Court to order the turnover of recorded

information that "relat[es] to the debtor's property or financial affairs":

> Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property

5

or financial affairs, to turn over or disclose such recorded information to the
trustee.

11 U.S.C. § 542(e).

13.     Section 542(e) originally was enacted to address the problem of attorneys and
accountants who demanded payment of their liens before turning over their files to a debtor.
But because § 542(e)'s language reaches beyond this paradigm situation and applies to any
"other person that holds recorded information relating to … the debtor's property or financial
affairs," courts have applied § 542(e) broadly.  *See*, *e.g.*, *Dzikowski v. Tri-O-Clean Sys., Inc.
(In re Tri-O-Clean Sys., Inc.)*, 230 B.R. 192, 199-200 (Bankr. S.D. Fla. 1998) (applying §
542(e) to management services provider that held debtor's records); *In re Terraces
Subdivision, L.L.C.*, 2007 WL 4287742, at *2 (Bankr. D. Alaska Dec. 5, 2007) (applying §
542(e) to land surveying firm that held electronic files relating to debtor's real property); *Sola
Commc'ns, L.L.C. v. Defense Dynamics, L.L.C. (In re Sola Commc'ns, L.L.C.)*, 2005 WL
4806063, at *2 (Bankr. W.D. La. Dec. 21, 2005) (applying § 542(e) to majority equityholder);
*see also* 11 U.S.C. § 101(41) ("person" includes any "individual, partnership or corporation").

14.     The information that Anthem collected as manager of Cortinthian's health plan
belongs to Corinthian.  But even if this was not the case, § 542(e) does not require that the
information belong to the estate.  *See Am. Metromcomm Corp. v. Duane Morris & Heckscher
LLP (In re Am. Metromcomm Corp.)*, 274 B.R. 641, 652 (Bankr. D. Del. 2002) ("Although an
action for turnover under § 542(a) requires that the information requested be property of the
estate, there is no such requirement in § 542(e)"); *Pollner v. Locke Purnell Rain Harrell (In re
Lomas Fin. Corp.)*, 1999 WL 33495524, at *4 (Bankr. D. Del. June 25, 1999) ("LPRH's first
assertion—that the documents are not property of the estate—is irrelevant to a § 542(e)
analysis given that it applies to situations where the documents are not property of the estate.").

6

15.    Likewise, the information need not be in paper format—§ 542(e) applies equally to electronic information.  *See*, *e.g.*, *Terraces Subdivision, L.L.C.*, 2007 WL 4287742, at *2 ("The AutoCAD files which the debtor seeks are electronic files, analogous to Word Perfect or Word files which may be retained by attorneys or Lacerte and Quickbooks electronic files retained by accountants….  I see no basis for treating AutoCad or other electronic files created by land surveyors any differently."); 5 COLLIER ON BANKRUPTCY ¶ 542.07[1], at 542-28 n.2 (16th ed.) ("'Documents' has been broadly interpreted to include electronic files").

16.    The records here relate to Corinthian's "property and financial affairs."  As the sponsor of a self-funded plan, Corinthian bore the risk and responsibility of paying plan benefits.  As the manager of that plan, Anthem determined those benefits on Corinthian's behalf.  It decided what benefits to pay using Corinthian's money.  These decisions affected Corinthian's property and financial affairs because Corinthian was responsible for the payment.  So records about what claims were made and what benefits were paid fall within the ambit of § 542(e).

17.    During the parties' discussions, Anthem's resistance to turning over the records boiled down to two points.  First, Anthem argued that the information is confidential and proprietary.  But Corinthian's advisors have signed multiple confidentiality agreements:  a "business associate agreement" that is standard under HIPAA, and another confidentiality agreement—using Anthem's standard form—that is specific to Corinthian.  So Anthem's concerns about the confidential nature of the information have been addressed.

18.    Second, Anthem has argued that the incomplete information it has provided should be "enough" for Corinthian's advisors to perform their analysis.  It is not.  Put aside for now the fact that Anthem has a conflict of interest in determining what information Corinthian

needs.  Also put aside the fact that § 542(e) does not permit an entity holding records to pick and choose what to turn over.  Even ignoring these two glaring issues, the incomplete information that Anthem provided prevents Corinthian from performing its analysis accurately.  For example, Anthem has omitted the "allowed amounts" and "denied amounts" for the benefits it approved, contending that giving the Distribution Trust only the "total charge amount" and "amount paid" is good enough.  But the Distribution Trust requires the "allowed amounts" and "denied amounts" to determine if coding regulations and reductions were applied correctly.  It cannot do this using only the information that Anthem provided.  Likewise, Anthem has refused to turn over health provider (hospital) names and I.D. numbers.  This matters because whether a provider is an individual or a group affects whether Anthem's coding of a claim is correct.  The Distribution Trust cannot assess this using the scrambled information provided by Anthem.  Finally, Anthem has never explained why it has withheld other information, like employee social security numbers.  *See* **Exhibit A** (listing the full list of data the Distribution Trust needs, and for those categories that Anthem challenged, why it needs it).  Corinthian's advisors typically assess this type of information when performing similar analyses for other companies.

19.    The only reason why Corinthian does not already have this information is because it hired and paid Anthem to manage its health plan as a third party administrator.  Had Corinthian opted to manage its health plan in-house, it would already possess this information, and there could be no dispute that it would be entitled to do so.  Corinthian's decision to retain a third-party administrator does not change this.  Like the third-party manager in *Tri-O-Clean* who was ordered to turn over the books and records of the debtor that it was managing, Anthem likewise should be required to turn over the books and records of Corinthian's self-

8

funded health plan that it managed.  *See In re Tri-O-Clean Sys., Inc.*, 230 B.R. at 199-200

("The Caladera Company was in possession of the books and records of the Debtor as a result

of the Management Agreement entered into in May of 1993…. [T]hese books and records are

to be turned over immediately.").

**B.    Alternatively, to the extent necessary, the Court should order the production of records under Bankruptcy Rule 2004**

20.    Bankruptcy Rule 2004 grants the Court broad authority to order examinations and

the production of documents.  The examination of an entity may permissibly relate to "the acts,

conduct, or property or to the liabilities and financial condition of the debtor, or to any matter

which may affect the administration of the debtor's estate, or to the debtor's right to a

discharge."  Fed. R. Bankr. P. 2004(b).

21.    The scope of Rule 2004 "has been explained as a broad investigation into the

financial affairs of the debtor for the purpose of the discovery of assets of the estate and the

discovery of fraudulent conduct."  *In re Lev*, 2008 WL 207523, *4 (Bankr. D.N.J. Jan. 23,

2008) (citations omitted).   Rule 2004 examinations are "broad, unfettered and in the nature of

fishing expeditions."  *Id.* at *4 (*citing In re Valley Forge Plaza Assoc.*, 109 B.R. 669, 674

(Bankr. E.D. Pa. 1990)).

22.    Here, the requested records fall well within Rule 2004's scope.  The Debtors'

confirmed Plan charges the Distribution Trust with the duty of liquidating and distributing all

trust assets, including claims and causes of action.  The information that the Distribution Trust

seeks directly relates to this duty, because it will help the Distribution Trust assess whether it

holds claims against Anthem for improperly administering Corinthian's health funds.  A trustee

properly may use Rule 2004 as a pre-litigation device to help determine whether claims exist.

9

*See Washington Mutual*, 408 B.R. at 53 ("One of the primary purposes of a Rule 2004 examination is as a pre-litigation device").

23.    Accordingly, to the extent necessary, the Court should compel Anthem to produce the data attached hereto as **Exhibit A** under Bankruptcy Rule 2004.  Ordering this production imposes no cognizable burden on Anthem; **Exhibit A** does not seek any traditional "all documents relating to ____" productions, but rather specific accounting entries for Corinthian's health plan that Anthem managed.

### Certification under Local Rule 2004-1

24.    The undersigned counsel certify that they have met and conferred telephonically three times with Anthem (as well as multiple additional times through email) in an attempt to resolve this issue.

### Conclusion

25.    As the manager of Corinthian's self-funded health plan, Anthem holds its records and should be ordered to turn them over under Bankruptcy Code § 542(e) or, if necessary, to produce them under Bankruptcy Rule 2004.  The Distribution Trust therefore requests that the Court enter the proposed order attached hereto as **Exhibit B** and grant such other relief as it deems just and proper.[2]

---

[2] Under Local Rule 9013-1(f), the Distribution Trust consents to the entry of a final order by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

Dated: August 17, 2016
      Wilmington, Delaware

Respectfully submitted,

/s/ *Cory D. Kandestin*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Cory D. Kandestin (No. 5025)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Facsimile:  302-651-7701
Email: collins@rlf.com
        merchant@rlf.com
        Kandestin@rlf.com

*Counsel for the Distribution Trust*