IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| CORINTHIAN COLLEGES, INC., *et al.* | § § § § | Case No. 15-10952 (KJC) |
| | § | Jointly Administered |
| Debtors. | § § § | **Re: D.I. 1225, 1230** |

---

**DISTRIBUTION TRUSTEE'S REPLY IN SUPPORT OF MOTION
TO REQUIRE ANTHEM BLUE CROSS TO TURN OVER CERTAIN
RECORDS OF CORINTHIAN COLLEGES, INC.'S SELF-FUNDED HEALTH PLAN[1]**

Despite its claims of "full cooperation," Anthem had stopped responding to the Trust's inquiries in the weeks leading up to the Motion, leaving the Trust with no choice but to take legal action. The Motion forced Anthem to respond, and having no credible reason for withholding plan records, Anthem has now agreed to turn over most of those records. But Anthem still refuses to turn over an important class of records that the Trust needs: the names, locations, and identification numbers of the health providers who treated Corinthian employees (the "provider information"). This is the only source of information that can reveal certain errors and false positives in Anthem's data. *See Declaration of Jeanne Woodward*, attached hereto as <u>Exhibit A</u> (explaining need for the information and its role in the claims review).

The sole question for the Court is whether Anthem should turn over the "provider information." Under Bankruptcy Code § 542(e), the Trust is entitled to all records relating to Corinthian's financial affairs. Corinthian self-funded its plan, and the Trust needs to know to whom that money was paid, and why. Because the provider information identifies the payees of *Corinthian's* money under its health plan, it relates to Corinthian's financial affairs.

---

[1] Undefined capitalized terms have the same meaning as in the motion [D.I. 1225] (the "<u>Motion</u>").

RLF1 15199876v.4

Anthem resists disclosing provider information on the grounds that it would reveal confidential commercial information or trade secrets. Anthem argues that if this information became public, then Anthem would suffer harm. But the case law requires Anthem to demonstrate harm from disclosing *to the Trust under a confidentiality order*, not harm from public disclosure. In fact, a California court recently rejected the same argument and ordered disclosure of provider rates, because any concerns could be handled through confidentiality. *Children's Hospital Central Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1277 (Cal. Ct. App. 2015). Here, the Trust and Anthem already have entered into a confidentiality agreement that specifically governs provider information. Anthem identifies no real injury that can arise from disclosing under the terms of this agreement that it already signed.

I. **The legal standard governing disclosure of alleged trade secrets**

1.  Federal courts apply a three-part test when an entity resists disclosing an alleged trade secret. First, Anthem must "demonstrate by competent evidence that the information sought is a trade secret and that disclosure of the secret might be harmful." *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 2004 WL 115594, at *2 (D. Del. Jan. 13, 2004). Critically, the "harm" that Anthem must demonstrate is the harm of disclosing this information to the Trust under a protective order, not the harm of disclosure publicly to a third party:

> In determining if disclosure would be harmful, the court must consider 'not the injury that would be caused by public disclosure, but the injury that would result from disclosure under an appropriate protective order.'

*Cash Today of Texas, Inc. v. Greenberg*, 2002 WL 31414138, at *2 (D. Del. Oct. 23, 2002) (citing *Coca-Cola Bottling Co. of Shereveport, Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985)); *see also Medtronic*, 2004 WL 115594, at *2 (same). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning," will not meet this burden; Anthem must articulate the injury of disclosing under a protective order with specificity.

*Medtronic*, 2004 WL 115594, at *2 (citing *Pansy v. Borough of Stroudsbourg*, 23 F.3d 772, 786 (3d Cir. 1994)). Moreover, where (as here) the parties are not business competitors, the possibility of harm diminishes even further. *Id.* ("[I]t is presumed that disclosure to a party who is not in competition with the holder of the trade secret will be less harmful than disclosure to a competitor").

2.  Second, if Anthem can carry this burden, then the Trust must explain why the information "is relevant and necessary to the action." *Coca-Cola Bottling Co. of Shereveport, Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 292 (D. Del. 1985). Information is "relevant" if it satisfies the broad discovery standard of relevance. *Id.*; *see also Cash Today of Texas*, 2002 WL 31414138 at *3 ("Relevance is established, as discussed above, when the sought information is relevant, in broad terms, to the subject matter of the litigation"). Information is "necessary" if it is needed "for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories." *Coca-Cola*, 107 F.R.D. at 293.

3.  Third, if the information is a trade secret whose disclosure would be harmful, but the information also is relevant and needed, then the Court must balance the need against the harm of disclosure to that party. *Coca-Cola*, 107 F.R.D. at 293. "The balance typically tilts in favor of disclosure." *Medtronic*, 2004 WL 115594, at *2; *see also Coca-Cola*, 107 F.R.D. at 293 (same); *Cash Today of Texas*, 2002 WL 31414138, at *3 (same).

> As the Supreme Court has recognized, orders forbidding any disclosure of trade secrets or confidential commercial information are rare. A survey of the relevant case law reveals that discovery is virtually always ordered once the movant has established that the secret information is relevant and necessary.

*Coca-Cola*, 107 F.R.D. at 293 (quotations and citations omitted).

4.  As an example of how courts have applied this test, the *Coca-Cola* court ordered Coca-Cola Company to disclose the secret formula of Coke, "one of the best kept trade secrets in

3

the world"—which was known only to two people in the company, and the written version kept in a vault that could be opened only by resolution of the board of directors—because the harm of disclosure could be controlled with protective orders. *Id.* at 294, 299. Likewise, *Medtronic* and *Cash Today of Texas* each found that the party resisting disclosure could not articulate any specific harm from disclosing the information confidentially. *Medtronic*, 2004 WL 115594, at *3 (party's claim that disclosure to competitor would place it at disadvantage was insufficient, because disclosure was to lawyers and experts under a protective order); *Cash Today of Texas*, 2002 WL 31414138, at *3 (bank's claim that it would suffer harm by disclosing its agreement with one loan servicer to another loan servicer was "blanket and generalized" assertion unsupported by facts, and in any event court could remedy concern with protective order).[2]

## II. Disclosure causes no harm because the parties already have entered into a confidentiality agreement addressing how to treat provider information

5. To satisfy its burden under the first prong of the test, Anthem must show with specificity that disclosing provider information to the Trust under a protective order would cause injury. *Medtronic*, 2004 WL 115594, at *2; *Cash Today of Texas*, 2002 WL 31414138, at *2; *Coca-Cola*, 107 F.R.D. at 293. The burden of proof lies with Anthem. *Medtronic*, 2004 WL 115594, at *2.

6. Here, disclosure would be governed by the confidentiality agreement that the parties signed in June, a copy of which is attached as <u>Exhibit B</u> (the "<u>Confidentiality Agreement</u>"). *See also* Motion ¶ 10 (setting forth history). The Confidentiality Agreement addresses how to treat provider information: it includes within its scope any "information about the Anthem Company's provider networks, provider negotiated fees, provider discounts and

---

[2] By contrast, Anthem relies on Bankruptcy Code § 107(b), which addresses *public access* to trade secrets. *See In re Altegrity, Inc.*, 2015 WL 10963572, at *3 (Bankr. D. Del. Jul. 6, 2015) (§ 107 concerns right of public access). Anthem also cites *Phillips v. GM*, which likewise dealt with disclosure to the general public. Objection ¶ 16; 307 F.3d 1206, 12111 (9th Cir. 2002).

4

provider contract terms." Confidentiality Agreement ¶ 3. The Confidentiality Agreement also governs the disclosure of any "trade secrets." *Id.* The Confidentiality Agreement obligates the Trust to use confidential information—including any provider information or alleged trade secrets—only for the permitted purposes set out in the agreement. *Id.* ¶ 5. So the Confidentiality Agreement already obligates the Trust to treat provider information strictly confidential and use it only for the agreed-upon purpose of conducting a claims review. *Id.* ¶¶ 3, 5. Anthem does not argue that any deficiency exists in the Confidentiality Agreement's terms (in fact, the agreement was based on Anthem's standard form contract).

7. The Confidentiality Agreement thus adequately addresses Anthem's concerns. A California appellate court recently took a similar approach when deciding whether provider rates were trade secrets immune from disclosure. The court ordered disclosure without needing to address whether they were trade secrets, because a protective order could deal with any concerns:

> Hospital argues that evidence of its contract rates with other health insurance plans is not discoverable because it would disclose proprietary financial information and trade secrets. However, Hospital's concerns can be handled through appropriate protective orders.

*Children's Hospital Central Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1277 (Cal. App. 2015). Here, the Court need not even enter a protective order, because the Confidentiality Agreement already serves that purpose.

8. It is Anthem's burden to show a particularized harm that would arise from disclosing under the Confidentiality Agreement. The first of Anthem's two attempts to meet this burden is a conclusory statement that disclosure to third parties would be harmful. Anthem suggests that the Trust might inadvertently (or even "intentionally") breach its confidentiality obligations. Objection ¶ 20. What is Anthem's basis for this claim? Simply that "we don't live

in a perfect world," so in theory a breach *could* happen. This is precisely the type of generalized, unsupported conclusion that case law rejects. *See supra* ¶¶ 1, 4. Anthem offers no specific reason why the Trust would breach its confidentiality obligations. And Anthem does not suggest that the Trust is any more likely to breach than a party to any of its other confidentiality agreements. Taking Anthem's argument to its logical conclusion, no confidentiality agreement would ever be sufficient to protect confidential information, because there is always some risk of breach. That is plainly wrong. Any risk of breach is adequately addressed by the remedies that Anthem already holds under the Confidentiality Agreement, including the equitable relief set forth therein. Confidentiality Agreement ¶ 14.

9. Remember that Anthem already turned over some confidential records to the Trust in June. *See* Motion ¶ 10 & Ex. A (rows highlighted in green delineate information that Anthem turned over). Anthem raised no concern then about the Trust's ability to safeguard those confidential records. And Anthem appears to trust other parties to keep the "provider information" confidential through confidentiality agreements, despite its apparent concern that breaches can happen. *See* Declaration of Janet Andrea [D.I. 1231], at Exhibit 1 § 3.1 (attaching a confidentiality provision with a hospital requiring hospital to keep rate information confidential). To say that confidentiality with the Trust is ineffective because "we don't live in a perfect world," while at the same time agreeing to confidentiality of the same information with others, is fallacious. The risk of breach is not a cognizable harm.

10. Second, Anthem argues that confidentiality provisions in its health provider contracts prohibit it from disclosing this information. Objection ¶¶ 18-19. But the contract that Anthem attaches to its Objection actually *allows* disclosure to the Trust. It states that all rate information is *Anthem's* confidential information. *See* Declaration of Janet Andrea [D.I. 1231] at

§ 3.1 ("This Agreement, including but not limited to the Anthem Rates, is Anthem's proprietary information"). It then states that "[n]either party shall disclose any information *proprietary to the other*...." *Id.* (emphasis added). In other words, the other party could not disclose Anthem's rates. But nothing prohibits Anthem from disclosing its own confidential information. Anthem's claim that it is contractually bound from disclosing this information is contradicted by its own document.

11. Further, the confidentiality provision contains two exceptions that apply. First, the provision states that parties may disclose confidential information to the "Plan or its designees." *Id.* Because Anthem did not attach the whole contract, we don't know what the term "Plan" means, but if it refers to health plans, then it includes Corinthian. Second, the provision states that disclosure may be made "as required by law," which would include disclosure upon entry of a court order. *Id.*; *see, e.g., Peskoff v. Faber*, 233 F.R.D. 207 (D.D.C. 2006) (confidentiality provision providing that disclosure was allowed "when required by law" meant that disclosure was allowed when pursuant to legal process). Whether the disclosure here is ordered under Bankruptcy Code § 542(e) or Bankruptcy Rule 2004, it is pursuant to legal process and falls within the "required by law" exception.

12. Finally, to put things in context, recall that the information that Anthem wants to withhold is the same information that Anthem disclosed regularly to every employee submitting a claim, before then using Corinthian's money to pay the claim. Each employee knew (a) where he or she went to receive the service, (b) the total amount charged; (c) the amount allowed; (d) the amount denied; and (e) the amount due from the employee. This is standard information that is included on any explanation of benefits form (the letters you receive in the mail that look like a bill but say "this is not a bill"). With this basic information, any employee could determine

Anthem's discount with the hospital where the employee received the service, by comparing the amount charged by the hospital against the amount allowed/paid to the hospital, and calculating the difference. In fact, some websites now collect and publish this information to bring transparency to health care costs. *See, e.g.*, http://clearhealthcosts.com/faq & http://ww2.kqed.org/stateofhealth/2014/06/23/share-your-bill-make-health-costs-transparent-in-california. To say that Corinthian cannot ever see this same information because it is a secret—when Corinthian *paid* these claims, hired Anthem to process these claims on its behalf, and has agreed to confidential treatment—makes little sense. Indeed, because the precise information the Trust needs has been disclosed to employees, it should not even be considered a trade secret. *See Ruckelhaus v. Monstanto*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished").

### III. Even If Anthem can satisfy its burden under the first prong, the records are relevant and Anthem cannot identify any harm outweighing their necessity

#### A. The records are relevant and necessary

13. Under Bankruptcy Code § 542(e), the Trust must demonstrate relevance by showing that the requested records "relat[e] to the debtor's property or financial affairs." This is where the distinction between traditional health plans and self-funded plans takes on importance. In a traditional plan, a company pays premiums to an insurer, and the insurer is responsible for paying any claims from its own money. But in a self-funded plan, the company pays claims directly. Anthem's role as the third party administrator was not to pay claims, but to process them to be paid by Corinthian. Because Corinthian was the payor, the records identifying the payees, and the reasons why the claims were paid, "relate to Corinthian's financial affairs."

14. Anthem argues that its contracts with its health providers have nothing to do with Corinthian and are not health plan records. Objection ¶ 22. But this is a straw man argument, because the Trust is not asking for Anthem's master contracts with its health providers. The Trust is asking only for records of the specific payments that Anthem processed on Corinthian's behalf. These *are* part of the health plan's books and records, because they identify the payees of Corinthian's money under that plan (and the reasons for payment). Anthem's real concern is that this plan information would allow the Trust to discern some of Anthem's provider discounts, but as set forth above, the Confidentiality Agreement already addresses this.

15. Anthem next argues that the provider information is not relevant to the Trust's claims review. Anthem does not support this argument with any details; it simply concludes that the information is "irrelevant" and that the information it has turned over is good enough, without explaining why. Objection ¶ 4. Anthem's relevance argument fails for two reasons. First, because this is a § 542(e) motion, the "relevance" that the Trust must show in this context is that the provider information "relat[es] to the debtor's property or financial affairs." Because records showing to whom Corinthian paid money relates to Corinthian's finances, the standard is satisfied.

16. Second, even assuming that the Trust must show that the information is relevant to its claims review, it easily meets this burden. The broad discovery standard of relevance applies. *Coca-Cola*, 107 F.R.D. at 292. The Federal Rules of Civil Procedure do not define relevance, but the Federal Rules of Evidence do: information is relevant if it is "of consequence in determining the action." Fed. R. Evid. 401(b). So the Trust must show that the provider information is of consequence to its claims review.

17. Attached as <u>Exhibit A</u> is the declaration of Jeanne Woodward, one of the professionals who will perform the claims review. The declaration explains in detail how the provider information affects the claims review. To date, Anthem has scrambled the provider information and instead substituted a randomly generated number for each billing entity. *Id.* at ¶ 4. For example, if "Provider A" billed the plan, the data would show only a random number. Every time Provider A bills a claim, this number will appear in the data, which tells us only that a certain unidentified entity has billed multiple times. *Id.* The random number does not allow the Trust to determine the identity of the provider billing the claim. *Id.* Nor does it allow the Trust to determine which particular provider within a group or clinic billed the claim, what his or her group or specialty was, or the physical location where the service was provided. *Id.*

18. Although the data includes specialty codes for some of the providers, well over 10,000 entries contain vague codes such as "unknown physician specialty" or "unknown supplier/provider specialty," and over 85,000 more entries contain blank specialties. *Id.* ¶ 9. So all in all, approximately 100,000 entries (nearly 25% of the data) lack any specialty codes. Certain large providers also are coded as "multi-specialty" or "multi-group," which again tells us nothing about the specialty of the provider performing the service. *Id.* at ¶ 9. Part of the Trust's review also includes checking any specialty code against the provider's actual specialty to identify discrepancies, which the Trust cannot do without knowing the provider's identity and location. *Id.*

19. Knowing whether a patient visited different specialties or groups within a single clinic is relevant because it can affect whether a charge is billable or reimbursable. *Id.* at ¶ 10. Consider this example: A patient visits "Clinic B" and receives abdominal surgery from a surgeon. The typical surgery code includes a certain period of post-operative care by the surgeon

10

(assume 90 days). *Id.* This means that the surgeon cannot be reimbursed separately if the patient visits the surgeon for post-op care in that period. But now assume that the patient visits another specialist for the same abdominal pain (in this case, assume a gastroenterologist). Because the patient is now seeing a different physician with a different specialty in the same clinic/group, the physician (gastroenterologist) likely could charge separately for this service. *Id.* But without the provider information, the data shows only that an unidentified multi-group clinic is billing for a service that appears to be included in the surgeon's payment for post-operative care, and therefore not reimbursable. *Id.* The Trust would lack the information to determine whether the billing was in fact proper. If the Trust had all the requested provider information as opposed to Anthem's scrambled identifiers, it could determine whether the service was provided by different physicians and therefore reimbursed correctly. *Id.*

20. To give another example, many claims are allowable only if the particular service provider is certified to perform the service. *Id.* at ¶ 7. For example, only a provider that has obtained "trauma center status" can properly charge for trauma services. *Id.* So if the data shows that a provider has billed under a "trauma level 2" code, then the claims review would include verifying that the provider possessed the proper qualifications to bill that code. *Id.* Without the provider information, the Trust cannot do this. *Id.*

21. As yet another example, a hospital with multiple locations can have different charges for the same service at different locations. *Id.* at ¶ 13. By scrambling the provider information, Anthem has made it impossible for the Trust to determine if a provider has multiple locations and if so, whether different charges at different locations are proper. *Id.* Rather, the Trust will see only discrepancies in the charges of an unidentified provider without being able to confirm whether those discrepancies are proper. *Id.*

RLF1 15199876v.4

22. The Declaration provides more detailed examples than these. The bottom line is that the provider information allows the Trust to find errors that it would not otherwise find, and to eliminate "false positives"—things that look like errors based on the scrambled information that Anthem provided, but that may have a valid explanation. Rather than repeat the examples in the Declaration verbatim, the Trust hereby incorporates the Declaration by reference. *See* Exhibit A hereto.

23. The Declaration also demonstrates that the provider information is "necessary." To be necessary, the Trust must need the information to support its case. *Coca-Cola*, 107 F.R.D. at 293. Here, the provider information is the *only* source of information that allows the Trust to identify the types of errors and false positives discussed in the Declaration. *Id.* ¶¶ 6-15.

**B.    Anthem identifies no harm outweighing the Trust's need for the records**

24. The fundamental flaw in Anthem's argument is that it identifies no specific harm of disclosing this information under the Confidentiality Agreement. *See supra* ¶¶ 5-12. By contrast, the provider information is the only avenue for the Trust to identify certain errors. *See supra* ¶ 23 & Woodward Declaration ¶¶ 6-15. In balancing the lack of any cognizable harm against the Trust's credible need to know this information about Corinthian's health plan, the balance tips in favor of disclosure. *See Coca-Cola*, 107 F.R.D. at 293 (if information is relevant and necessary, disclosure is "virtually always ordered").

**IV.    <u>Alternatively, disclosure should be ordered under Bankruptcy Rule 2004</u>**

25. In its Motion, the Trust demonstrated that production under Bankruptcy Rule 2004 would be appropriate as an alternative to § 542(e). Motion ¶¶ 20-23. Anthem's only objection is that Rule 2004 incorporates the protections of Federal Rule 45, which permits a Court to protect a party from disclosure of trade secrets. Objection ¶ 27.

26.  But in applying Rule 45, the Court would apply the exact same three-prong standard as discussed above. *See Cash Today of Texas, Inc.*, 2002 WL 31414138, at *2 (conducting the three-part analysis in response to a motion to quash a "subpoena [that] would require the disclosure of confidential information and trade secrets to [party's] competitors"). So if production is ordered under Bankruptcy Rule 2004, then disclosure is appropriate for the same reasons as above.

### Conclusion

27.  The key fact is that Corinthian's plan was self-funded. Who Corinthian paid, how much, and why, is basic plan accounting information. Although Anthem was the entity that managed the payments, it did so *for* Corinthian. Under any other circumstances, Corinthian would know this information. The only difference here is that Anthem was in control of those decisions and holds the records containing the information. At bottom, this dispute falls squarely within Bankruptcy Code § 542(e). The health plan's accounting records identifying payees of Corinthian's money "relate to Corinthian's property and financial affairs." Any concerns about confidential commercial information or trade secrets already are addressed by the Confidentiality Agreement, and Anthem can identify no real harm from disclosing under that agreement. The Trust therefore requests that the Court grant the Motion and enter the proposed order attached thereto.

*[Signature page follows]*

Dated: October 10, 2016
       Wilmington, Delaware

Respectfully submitted,

/s/ 

_____
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Cory D. Kandestin (No. 5025)
Amanda R. Steele (No. 5530)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
Email: collins@rlf.com
       merchant@rlf.com
       kandestin@rlf.com
       steele@rlf.com

*Counsel for the Distribution Trust*