## EXHIBIT A

**Declaration of Jeanne Woodward**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| CORINTHIAN COLLEGES, INC., *et al.* | § | |
| | § | Case No. 15-10952 (KJC) |
| | § | |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | |
| | § | |

-------------------------------------------------------------

## DECLARATION OF JEANNE WOODWARD

I, Jeanne Woodward, declare and state as follows:

1.      I am the Director of Physician Compliance at Medical Recovery Services, Inc. ("MRS"), a vendor that specializes in medical claims review and that is assisting in the claims review of Corinthian's self-funded group health plan. I am one of the persons who will conduct the claims review. A copy of my curriculum vitae is attached hereto. I submit this declaration in support of the *Distribution Trustee's Motion to Require Anthem Blue Cross to Turn Over Certain Records of Corinthian Colleges, Inc.'s Self-Funded Plan* (the "Motion"), and in response to the objection filed by Anthem Blue Cross Life and Health Insurance Company ("Anthem").

2.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my review of relevant data, or my opinion based on my experience, knowledge, and information concerning the Corinthian medical claims review. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.      The "provider information" refers to any entity who is authorized to provide health care services such as hospitals, clinics, physicians, durable medical suppliers, etc. that provided services to Corinthian's employees under its health plan. The provider information also includes a service provider's address submitted on the claim form, tax ID number, and National

Provider Identifier ("NPI"), which is a unique ten digit number that is assigned to every entity providing health services. Most of this information is publicly available and all of this information must be included in any claim form that a service provider submits to the health plan for payment.

4.      Anthem has not turned over any useful provider information. Anthem scrambled the provider tax ID and provider NPI numbers and replaced it with a randomly generated number for each entity that submitted a claim. So for example, if "provider A" submitted a claim, then Anthem assigned a random number to "provider A" throughout the data. Every time "provider A" billed a claim, this number will appear in the data, which tells us that a certain entity has billed multiple times. The scrambled tax ID and NPI numbers do not allow us to determine the credentials that allow a provider to bill for specific services. Even though a rendering provider specialty was furnished in the data, approximately 100,000 claim lines have vague and/or blank rendering provider specialties. Anthem's scrambled number also does not allow us to determine which particular provider within a group/clinic billed the claim or the specific address (for service providers with multiple locations) where the service was provided.

5.      By contrast, the requested provider information will allow us to determine precisely which physician provided a service, what his or her specialties are, where he or she provided the service (address), and how the services provided relate to any services provided by other physicians in the same clinic or group. Every provider has a unique NPI that can be used to research information about the provider and his or her practice and specialty.

6.      These details matter, because the propriety of some claims can be verified only by knowing specifically which provider performed the service, and his or her role in the care of the patient. This is a problem that arises most often with larger service providers that have multiple

2

groups, locations and specialties. The following examples illustrate how certain issues will be impossible to analyze without the provider information.

7.    First, the hospital name and location lets us determine whether a specific hospital is qualified to bill for a service. For example, only a hospital that is certified to provide trauma services and has received "trauma center status" can charge for trauma services. So if the data shows a hospital has billed a "trauma level 2" code, our review would include verifying that the hospital and specific hospital location possessed the proper qualifications to bill for a trauma service. With scrambled provider information and no supplied provider location/address, we have no way to review for these potential errors. The provider information is the only source of information that allows us to do this.

8.    Second, the provider information allows us to determine if our review would identify false positives in the data. Consider this example: a patient visits a multi-specialty clinic on the same day and sees two physicians for separate reasons: a family physician for a cold and a dermatologist for a skin condition. Both physicians bill the same level office visit code, and because the two physicians practice in the same clinic but have different specialties, both claims would be covered. But the data provided by Anthem will show only that the clinic is billing twice on the same day for the same level office visit under the same specialty ("Multi-spcl Clnc or Grp Prac/si") which would appear to be an improper duplicate payment. The requested provider information, such as the rendering provider, would allow us to see that the patient saw two different specialists within one clinic, which would eliminate any false positives.

9.    Third, the provider information allows us to research and verify a provider's specialty. In prior client reviews, when discrepancies are identified between services provided and provider specialty listed, we then verify the specialty code supplied in the claim data against

3

the provider's actual specialty for accuracy. Furthermore, some of the specialties in Anthem's claim data offer no information whatsoever, such as the following specialty codes:

- 99 - unknown physician specialty
- 88 - unknown supplier/provider specialty
- 87 - all other suppliers
- 84 - preventive medicine
- 70 - multi-spcl clnc or grp prac/si
- 61 - voluntary health or (description incomplete)
- 54 - other medical supply company

When a provider is assigned one of these vague codes, we have no way of knowing the provider's true specialty. This is particularly troublesome for larger practices with multiple groups and specialties, such as multi-specialty clinics. The code "multi-spcl clnc or grp prac/si" [multi-specialty clinic or group practice] (code 70 above) does not actually tell us anything about the specialty of the physician providing the service. The data contains well over ten thousand claim lines with these vague codes and approximately eighty-seven thousand more claim lines where the provider specialty is blank. With the requested provider information, we could use the physician's name or NPI to determine his or her group or specialty.

10.    Knowing whether a patient visited different provider specialties within a single clinic is relevant because it can affect whether a charge is billable and/or reimbursable. Consider this example: A patient visits "Clinic B" and receives abdominal surgery from a surgeon. The typical surgery code includes a certain period of post-operative care by the surgeon (assume 90 days). This means that the surgeon cannot be reimbursed separately if the patient visits the surgeon for post-op care in that period. But now assume that the patient visits another specialist for the same abdominal pain (in this case, assume a gastroenterologist) at same clinic. Because the patient is now seeing a different physician with a different specialty in the same clinic/group, the physician (gastroenterologist) can charge separately for this service. But without the

4

provider information, the data shows only that an unidentified multi-group clinic is billing for a service that appears to be included in the surgeon's payment for post-operative care, and therefore not reimbursable. We would lack the information to determine whether the billing was in fact proper. If we had all the requested provider information as opposed to Anthem's scrambled identifiers, we could determine whether the service was provided by different physicians and therefore reimbursed correctly.

11.     As another example, physicians often bill for a "new patient visit," which have specific billing requirements. A new patient visit can only be reimbursed once in a 3-year period for providers with the same specialty in the same group/clinic. Assume a patient sees "physician A" (rheumatology) who bills for a new patient office visit, and then two days later the patient sees "physician B" (orthopedic surgery) in the same clinic as "physician A," who also bills for a new patient office visit. Even though "physicians A" and "B" are in the same clinic, since they are different specialty providers, the services would be reimbursable. But because "physicians A" and "B" are both billing under the same clinic provider number, Anthem's data would show that both providers have the same specialty. Without the requested provider information, our review would show an unnecessary denial. The requested provider information will allow us to see whether the patient visited two different specialty physicians in the same clinic.

12.     We also review physicians for abusive billing trends if we find discrepancies in their billing, which we cannot do without the requested provider information. For example, assume that a particular physician charges for a "level 5 office visit" (the highest office visit level) but submits a diagnosis code for a condition that does not support the billing of this high level. A physician will be reimbursed at a higher rate for a level 5 visit than for a lower level visit, and so may have an incentive to "upcode." If we find discrepancies like this, we then look

at that physician's billing history to see if he or she has a pattern of "upcoding." We only can perform this analysis by knowing the identity of the physician. If he or she is one physician among several in the clinic, then the incomplete information that Anthem has provided does not allow us to review for abusive billing trends.

13.     The location of the service also matters in situations where a provider performs services in multiple locations. Part of our review consists of looking at whether a service provider charges and is reimbursed the same amount for the same service consistently. For example, if a physician is reimbursed $100 for a particular service consistently, but suddenly is reimbursed $150 for the identical service, this would be flagged as an error. But a service provider with multiple locations could in some situations properly be reimbursed different amounts in different locations based on geographical rate changes, etc. The information that Anthem supplied does not allow us to determine whether a provider has multiple locations, and without knowing that information, we cannot review for these discrepancies.

14.     In the following examples, the provider information permits us to review for "bundling errors." When a service provider submits a claim for payment, they must enter a code for the services they provided. Often, when a service provider performs two or more services in a typical procedure, there is a single "bundled" code that applies in lieu of separate codes for each particular service. To better explain this concept, consider this: if a physician removes a patient's tonsils and adenoids in the same surgery, a single code exists covering both those procedures, even though separate codes also exist for tonsil surgery and adenoids surgery. Usually, submitting the bundled code is reimbursed at a lower rate than the two separate codes billed together. As another example, when a physician draws blood and runs several standard lab tests, there is a single bundled code that covers all those tests, and the provider should bill

6

that code rather than the separate codes for each test, which would lead to a higher reimbursement. Knowing the provider information is relevant as shown in the following example: If a patient visits a clinic and sees two physicians in the same clinic, one of whom draws blood for a laboratory panel code which includes multiple lab tests, the other of whom draws blood for a single lab test which was included in the panel lab test, the clinic will end up submitting a claim for both. Without the provider information, the data will show only that the clinic has billed both a bundled code and a single code for what looks like the same service. The requested provider information allows us to determine if the patient saw two physicians in the same clinic, and therefore whether the charges should be covered.

15.     These examples are not exhaustive. The identities of the providers who provided services to Corinthian's employees is a source of information that allows us to check for errors or explain discrepancies in Anthem's data as they arise. The provider information is the only information that will allow us to do this properly.

16.     In past medical claims reviews, I have reviewed provider data for the purposes above. After performing a claims review, MRS does not use any confidential information for any other purpose.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed within the United States on October 10, 2016.

By: /s/ *Jeanne Woodward*
    Jeanne Woodward, BSN, RN, CPC, CPMA

RLF1 15374644v.1

# JEANNE WOODWARD, BSN, RN, CPC, CPMA
## CURRICULUM VITAE

## CONTACT INFORMATION

**Address:** 3517 Brandon Avenue SW
2nd Floor
Roanoke, VA 24018
**Phone:** 540-765-1835
**Email:** jeannew@mrsllc.org

## EMPLOYMENT HISTORY

**MEDICAL RECOVERY SERVICES**                                    June 2013 to Present
**Director of Physician Compliance**
- **Teaching/Training** advocates, providers, consumers and businesses with respect to the application of CMS', AMA's and other insurance carriers' guidelines  and  to verify compliance  and correct billing for accurate reimbursement
- **Attorney Services** related to compliance reviews, fair and reasonable pricing analysis, and expert witness services

**NATIONAL GOVERNMENT SERVICES, INC**                    January 2012 to April 2013
**(Medicare Administrative Contractor)**
**Consultant, Provider Outreach and Education**
- **Educate** healthcare providers on Medicare Regulations

**EGGLESTON & EGGLESTON, PC**                              January 2009 to December 2013
**Director, Physician Compliance**
- **Provide In-Depth Training** to multi-specialty physician practices, coders and medical staff related to Medicare Regulations, compliance, medical necessity, documentation, and coding risk issues
- **Comprehensive Coding and Billing Audits** of physician practices related to EHR/EMR documentation, compliance issues, Medicare's policies and billing guidelines, and correct reimbursement of services provided and documented

**ADJUNCT FACULTY MEMBER AT VWCC**                         January 2002 to May 2013
**Instructor, Virginia Western Community College**
- **Taught advanced medical coding classes and ICD-10-CM Diagnosis coding classes** to students to educate on multiple rules and regulations for accurate coding
- **Training** included semester instruction and/or one-day seminars

**MEDICAL CONSULTANT**                                                                 1997 to 2009
### Self-Employed Consultant
- **Provided assistance to Physician Practices** related to Medicare and other insurance carriers' audits
- **Worked** closely with attorneys to obtain favorable outcomes based on policy guidelines and coding publications
- **Specialized** in Evaluation and Management auditing and training
- **Assisted Hospitals with Corporate Integrity Agreements and Compliance Planning** for facilities that were subject to these restrictions
- **Worked with attorneys, U.S. Department of Justice, and other organizations** related to coding, billing, documentation and compliance issues for multiple specialty providers

**TRIGON BLUE CROSS BLUE SHIELD**                                                      1986 to 1996
*(Formerly BlueCross BlueShield of Virginia)*
### Nurse Consultant in Financial Investigations Unit
- **Performed reviews and audits** of medical records in comparison with billed claims
- **Analyzed claim data** to identify aberrant billing patterns
- **Provided training and education** to BCBS staff members related to potential fraudulent claims

### Senior Nurse Reviewer
- **Performed reviews and audits** of medical records and claims for payment
- **Determined medical necessity** and compliance with the contract coverage

## CERTIFICATIONS, LICENSURE,  PROFESSIONAL AFFILIATIONS

- Certified Professional Coder (CPC), American Academy of Professional Coders (AAPC)
- Certified Professional Medical Auditor (CPMA), American Academy of Professional Coders (AAPC)
- Licensed Registered Nurse, Virginia
- Member of American Academy of Professional Coders
- Member of American Nursing Association

## PROFESSIONAL ORGANIZATION PRESENTATIONS

- American Association of Professional Coders
- Medicare Administrative Contractor Conference and Workshops
- Health Care Compliance Association
- Medical Group Management Association
- MD Liaison
- VWCC seminars